# EXHIBIT A2

FILED   Received for Filing   Oakland County Clerk   8/23/2023 5:20 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

      Plaintiff,

v.

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

Kay S. Kress (P39339)
**TROUTMAN PEPPER LLP**
4000 Town Center, Ste. 1800
Southfield, MI 48075
T: (248) 359-7365
kay.kress@troutman.com
*Receiver of Defendant MSY*

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendants*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

**BUTZEL LONG PC**
Bernard J. Fuhs (P69621)
*Co-Counsel for Defendants*
150 W Jefferson Avenue, Ste 100
Detroit, MI 48226
(313) 225-7000
fuhs@butzel.com

R.J. Cronkhite (P78374)
**DINSMORE & SHOHL LLP**
900 Wilshire Drive, Ste. 300
Troy, MI 48084
T: (734) 558-5809
rj.cronkhite@dinsmore.com
*Attorneys for Non-Parties*
*Houbeck and Stopczy*

---

**<u>DEFENDANT CHRISTOPHER YATOOMA'S MOTION TO QUASH NON- PARTY
SUBPOENAS AND
FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(c)</u>**

Defendant Christopher Yatooma ("Defendant" or "Chris"), through his undersigned counsel, moves for an Order Quashing Non-Party Subpoenas and for a Protective Order. In support of his motion, Defendant relies on the facts, law and arguments set forth in the accompanying brief.

<div style="text-align: right">

Respectfully submitted,

By:/s/*Jeff Sieving*_____
Jeff Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Rd, Suite 300
Bloomfield Hills, MI 48302
(248) 231-2820
sieving@urbanlegalgroup.com

</div>

Dated: August 23, 2023

## BRIEF IN SUPPORT OF DEFENDANT CHRISTOPHER YATOOMA'S MOTION TO QUASH NON-PARTY SUBPONEAS AND FOR PROTECTIVE ORDER PURSUANT TO M.C.R. 2.302(c)

### BACKGROUND/PROCEDURAL HISTORY

On or about May 10, 2023, Gregory Yatooma ("Greg'" or "Plaintiff") filed the instant action against Christopher Yatooma ("Chris") and MSY Capital Partners, LLC ("MSY" and collectively "Defendants"). Greg and Chris are brothers, and this lawsuit arises out of their former cannabis real estate business relationship. Greg filed a five (5) count complaint alleging breach of contract (Count I), promissory estoppel (Count II), unjust enrichment (Count III), declaratory relief (Count IV), and dissolution of MSY pursuant to MCL 450.4802 (Count V).  The crux of Greg's complaint is that Chris allegedly breached the terms of an so called "Buyout Agreement"; Greg seeks to enforce the terms of the same. Chris denies that the parties agreed upon, or executed, a final separation agreement and denies many of the inaccurate statements that Greg has made to the

Court. For instance, Greg has asserted in his claim for dissolution of MSY that "MSY has no current business other than the distribution of the Litigation Proceeds." (*Complaint*, ¶66). Greg's assertion is false, as MSY has had—and continues to have—active and ongoing investment activity.[1] The account is still open. (*See current MSY bank statement*, attached as **Exhibit 1**). Greg has further misrepresented to this Court that, in attempt to "pull a fast one on his brother", Chris ostensibly closed the MSY bank account with Chase Bank, Chase Bank Account No. ----2627— for which Greg and Chris were joint signatories—and then opened a new bank account in the name of MSY that he solely controls. Again, Greg's assertions to this Court are demonstrably false. It is undisputed that, sometime in December 2022, <u>Greg</u> directed Chase Bank to remove himself from the MSY bank account. (*See* **Exhibit 2**).

As this Court is aware, the Defendants filed a pre-answer motion for summary disposition to compel this matter to arbitration based on an arbitration provision contained in a March 10, 2023, Confidential Settlement Agreement ("CSA"). The CSA involves the distribution of certain settlement proceeds that were required to be distributed to Defendant MSY. The allocation of these settlement proceeds is front and center in the current dispute including, most obviously, Count IV (Declaratory Relief), by which Greg asks this Court to declare his putative rights to the Litigation Proceeds set forth in the CSA; pursuant to the terms of the CSA, any dispute arising out of said agreement is required to go to arbitration. At a minimum, Greg's Count IV claim with respect to the Litigation Proceeds is <u>required</u> to go to Arbitration. Currently, a hearing is set for September 13, 2023.[2] Given the pending motion, Chris has not yet filed an Answer, Counterclaim, or his

---

[1] MSY investment activity is managed by its Senior Vice President of Asset Management, Tony Denome.

[2] The Court also recently appointed attorney Kay S. Kress as the Receiver for MSY to determine its members as well as distribution of the settlement proceeds to the member(s) of MSY.

Initial Disclosures in this case. Moreover, MSY is currently without counsel. Finally, if this matter is moved to arbitration, in whole or in part, discovery as well as third-party subpoenas would be limited and subject to the arbitrator's discretion pursuant to the Michigan Uniform Arbitration Act. *See MCL 691.1697(3)*. Accordingly, Defendant asserts that any discovery in this case is premature until the Court rules on the pending summary disposition motion.

### GREG'S DISCOVERY AND NON-PARTY SUBPOENAS

Even though discovery is premature at this juncture, Greg has decided to ignore the Michigan court rules and engage in voluminous and overly burdensome discovery. Greg's initial discovery has included no less than three (3) sets of discovery requests,[3] as well as three (3) non-party subpoenas.

On August 1, 2023, Greg's counsel served two document and deposition subpoenas: one on Michelle Houbeck and one on Rich Stopczy (the "**Stopczy Subpoena**" and the "**Houbeck Subpoena**," and collectively, the "**Subpoenas**"). The Houbeck Subpoena and the Stopczy Subpoena are respectively attached as ***Exhibit 3*** and ***Exhibit 4***. The Houbeck Subpoena directs Houbeck to appear at Taft Law for deposition on August 21, 2023, 10:00 a.m. The Stopczy Subpoena directs Stopczy to appear at Taft Law for deposition on August 22, 2023, 10:00 a.m. Houbeck is Director of Administration for Chri's companies, including Axon and MSY. Stopczy is IT Manager for Chris' companies, including Axon and MSY.

---

[3] On July 20, 2023, Greg served Request for Admissions, Interrogatories, and Request for Production of Documents. On July 28, 2023, a mere 8 days later, Greg served his Second Discovery Requests. On August 1, 2023, Greg served these Subpoenas. On, August 10, 2023, Greg served his Third Discovery Requests on Defendant and a Third-Party Subpoena on Citizens State Bank seeking more irrelevant information.

The Subpoenas broadly request "all documents" that "concern or relate to" Yatooma@FYBlaw.com and Harbour@FYBlaw.com, "collection" of these two email accounts, or "access" to these two email accounts. By way of background, FYBlaw.com was the former domain name for the Fleming, Yatooma & Borowicz PLC law firm that Greg was previously associated with while providing General Counsel services to Chris's companies, including MSY and Axon Properties LLC ("Axon"). Greg is no longer with FYB Law and, in fact FYB Law *no longer exists under that name*; on April 14, 2023, FBY Law's owner—Attorney Gavin Fleming—renamed the firm to Fleming & Borowicz PLC.

Defendant submits that even a cursory review of the Subpoenas establishes that the information requested by Greg has no bearing or relevance to the Complaint filed in this action. As argued above, Greg asserts claims for breach of contract, promissory estoppel, unjust enrichment, dissolution, and declaratory relief in connection with the termination of the party's former cannabis business relationship. The information sought in Greg's Subpoenas does not pertain to any of these counts. Unsurprisingly, then, Greg's Complaint does not refer to, or even reference, Houbeck or Stopczy. Moreover, the Complaint does not plead any allegations in connection with the FYB email accounts. Accordingly, Chris asserts that the Subpoenas are overly broad, unduly burdensome and have been clearly interposed by Greg for nothing more than harassment purposes.

Since filing his suit, Greg has also engaged in a pattern of harassment and intimidation with Chris's current and former employees. See Cease and Desist letter attached as **Exhibit 5**. One such incident included contacting Stopczy threatening criminal prosecution if he did not immediately transfer and delete certain company emails that were housed on the OCG Company Microsoft tenant cloud account. In so doing, Greg misrepresented his authority to make this

5

demand by telling Stopczy that he owned these accounts, which Greg knew to be false. Remarkably, after serving the above Third-Party Subpoena on Stopczy, Greg again attempted to contact Stopczy by sending an email to his personal email account asking Stopczy to contact him. See **Exhibit 6**. Greg's contact with Stopczy was done knowing full well that Stopczy had retained Counsel with respect to defending the Third-Party Subpoena.

Chris respectfully requests that this Court put an end to Greg's abusive discovery tactics and enter an Order Quashing the Houbeck and Stopczy subpoenas.

## ARGUMENT

**A.    The Subpoenas Are Overly Broad, Unduly Burdensome and Interposed for Purposes Of Harassment.**

Under MCR 2.302(B)(1), a "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case, taking into account all pertinent factors, including . . . the parties' resources and access to relevant information." Relevance "involves two elements, materiality, and probative value. Materially refers to whether the fact was truly at issue." *People v. McGhee*, 268 Mich App 600, 605(2005); MRE 401. Such interpretation of the issues of relevance must be considered under the Michigan Supreme Court's ever-present mandate that the Court Rules "are to be construed to secure the just, speedy, and economical determination of every action . . . ." MCR 1.105. In addition, requested information must be "proportional to the needs of the case." MCR 2.302(B)(1). When a discovery request runs afoul of these standards, MCR 2.302(C) permits the Court to issue an order upon a

showing of good cause that discovery not be had or that it be limited (MCR 2.302(C)(1)-(4)) or that a subpoena be quashed (MCR 2.305(4)). *See also* MCL 600.2206.

MCR 2.305 specifically governs discovery subpoenas and allows a party to issue a subpoena to a non-party for production of documents. Such subpoenas, however, are subject to the provisions of MCR 2.302(C), and the Court may, among other things and on timely motion made by a party before the time specified, "quash or modify the subpoena if it is unreasonable or oppressive" or "enter an order permitted by MCR 2.302(C)." MCR 2.305(A)(4). The non-party's obligation to respond to the subpoena is stayed until such a motion is resolved. *Id*. Protective orders also are available to cut off intrusive, unjustified discovery requests "so as not to subject [a] party to excessive, abusive, or irrelevant discovery requests." *See Estate of Hammond*, 215 Mich App 379, 386 (1996) (affirming issuance of protective order).

Here, all 11 document requests in the Subpoenas seek emails relating to Yatooma@FYBlaw.com and Harbour@FYBlaw.com; Request No. 9 specifically requests "[a]ll documents sent to or received by Yatooma@FYBlaw.com." **Ex. 1; Ex. 2**.

As another example, Request No. 11 requests "[a]ll documents that concern or relate to the January 31, 2023, and February 14, 2023 emails referenced in Footnote 1" of Defendants' July 27 Response to Plaintiff's Motion to Modify And/or Relief From July 3, 2023 Order. *Id*. Footnote 1 brought to the Court's attention the fact that Greg, via email, directed Chris to remove him from MSY Chase Bank Account No. 2627. The Footnote reads as follows:

> Gregory's has made continuous misrepresentations in this litigation, including (1) that MSY has no current business other than the distribution of the Litigation Proceeds - to the contrary, MSY is an active going concern with ongoing business. (2) that Christopher closed MSY's bank account at Chase Bank. Chase Bank Account No. ----2627 is active and open. (3) That Christopher removed Greg from the MSY bank account- when on January 31, 2023, and February 14, 2023, Gregory admitted that he was "selling the companies to Chris", and specifically directed, "Remove me from these accounts, but keep the account active" which specifically mentioned the MSY Chase Bank Account No. 2627

(held under Christopher James & Associates, LLC). 4) Gregory contends that he is a partner in MSY with Christopher, yet he recently told Crain's Detroit Business that he is not business partners with his brothers and haven't been in over 4 years. See Ex D.

Furthermore, the Subpoenas broadly request "all documents" that "concern or relate to" Yatooma@FYBlaw.com and Harbour@FYBlaw.com, "collection" of these two email accounts, or "access" to these two email accounts. **Ex. 3** and **Ex. 4**, Request Nos. 1–8. These requests are overly broad to potentially encompass a large amount of irrelevant information.

Again, it is undisputed that the documents related to the emails are irrelevant to any of the claims that Greg has raised in his lawsuit. Moreover, Greg already has access to Yatooma@FYBlaw.com—including the above-referenced January 31 and February 14 emails—and always has. Similarly, Harbour already has access to Harbour@FYBlaw.com—and always has. Further, upon information and belief, Greg also has full access to Harbour@FYBlaw.com. Upon information and belief, Greg employs Harbour through a competing cannabis business. Given Greg's pre-existing "access" to these emails, there is no need for the third parties to re-produce them. MCR 2.302(B)(1), *supra*.

Simply put, Greg stands to obtain *no* relevant and admissible evidence from these document requests in connection with his breach of contract claim. As such, Chris submits that the Subpoenas have been issued solely to harass, intimidate, and interfere with Chris's employees/businesses in the hopes that he will capitulate to Greg's demands in this action.

**B.      The Third-Party Subpoenas impermissibly seek privileged communications that are non-discoverable under the Investigator-Client and the Attorney Work-Product Privilege.**

Chris further submits that the Subpoenas seek privileged communications that are protected by the investigator-client privilege and the attorney work product privilege in connection with an ongoing security breach investigation.

8

In early 2023, Stopczy discovered suspicious activity on the OCG Companies server involving the sharing of download links containing proprietary and confidential information of Axon Properties, LLC ("Axon").   Houbeck, working with counsel for Axon, initiated an investigation into the security breach. Houbeck[4] and Stopczy along with third-party investigative firm Trident was initially involved in the investigation, with forensic expert and investigative firm Rehmann Corporate Investigative Services also getting involved.

The investigation revealed that after no longer working for Axon, and while working for Greg, Harbour emailed Axon's proprietary information to Morgan Benedict[5] and Greg at Yatooma@FYBlaw.com, allowing Greg and Benedict and other cannabis real estate companies to steal and capitalize on—Axon's strategic leads, research and/or relationships regarding proposed and pending acquisitions and thereby unfairly compete with Axon in the cannabis space.[6] The investigation is still ongoing.

Michigan's discovery rules generally do not allow parties discovery to obtain privileged materials. MCR 2.302(B)(1).

Michigan's investigator-client privilege is codified in Michigan's Professional Investigation Licensure Act, which provides in pertinent part as follows:

(1)     Any person who is or has been an employee of a licensee **shall not divulge** to anyone other than his or her employer or former employer, or as the employer shall direct, except as he or she may be required by law, any information acquired by him or her during his or her employment in respect to any of the work to which he

---

[4] Houbeck is a licensed private investigator and was previously Rehman's Director of Intelligence and Research.

[5] Upon information and belief, Benedict works for Ryno Ventures, LLC, a known competitor.

[6] Axon shares a server with multiple other companies located in the same building, including, at the time, FYB Law- who has also previously served as Defendants' and Axon's general counsel. Also, certain employees of Chris' companies had FYB email addresses, even though they did not work for FYB. Axon's email system, along with FYB Law's email system, were all hosted on the same server-paid for, maintained, and owned by Defendant's companies.

or she shall have been assigned by the employer. Any employee violating the provisions of this section and any employee who willfully makes a false report to his or her employer in respect to any work is guilty of a misdemeanor.

(2)     Any principal, manager, or employee of a licensee who willfully furnishes false information to clients, or who willfully sells, divulges, or otherwise discloses to other than clients, except as may be required by law, any information acquired during employment by the client is guilty of a misdemeanor and is subject to summary suspension of license and revocation of license upon satisfactory proof of the offense to the department. **Any communications, oral or written, furnished by a professional or client to a licensee, or any information secured in connection with an assignment for a client, is considered privileged with the same authority and dignity as are other privileged communications recognized by the courts of this state**.

MCL 338.840(1) and (2).

Here, multiple investigators were involved to investigate Greg and Harbour's misconduct, including Houbeck, Trident, and most recently Rehmann. At all relevant times, Trident and Rehman were licensed private investigation agencies.

Moreover, the information sought would also be protected by the attorney work product privilege as the investigation.

MCR 2.302(B)(3)(a) presently codifies Michigan's work-product doctrine, providing as follows:

Subject to the provisions of subrule (B)(4), a party may obtain discovery of documents and tangible things otherwise discoverable under subrule (B)(1) and prepared in anticipation of litigation or for trial by or for another party or another party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only on a showing that the party seeking discovery has **substantial need** of the materials in the preparation of the case and is **unable without undue hardship** to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

"It is axiomatic that the purpose of the work-product doctrine is to allow an attorney 'to assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare

his legal theories and plan his strategy without undue and needless interference . . . to promote justice and to protect [his] clients' interests.'" *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir. 2006), citing *Hickman*, 329 U.S. at 510. To achieve this goal, the United States Supreme Court observed that "the cause of justice" requires work-product to remain confidential. *Hickman*, 329 U.S. at 511.

The work-product doctrine applies not only to the party and the party's attorney, but also the attorney's employees and agents and any agent or representative of the party, including insurers, experts, and investigators. By including an array of representatives of a party, the Michigan work-product rule acknowledges that much of what is prepared "in anticipation of litigation" is assembled by nonlawyers. In *People v Tronti*, 176 Mich App 544, 550, 440 NW2d 62 (1989), the court liberally quotes from the language of the U.S. Supreme Court in *United States v Nobles*, 422 US 225, 238–239 (1975):

> [T]he [work product] doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

In this vein, MCR 2.302(B)(3)(a), like its federal counterpart, authorizes qualified immunity from discovery for "documents and tangible things … prepared in anticipation of litigation or for trial by or for another party or another party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent)." *Cf. In re Mary Margaret Chartier Revocable Living Trust*, ___NW2d___; 2019 Mich. App. LEXIS 8173, at *28 (Ct App, Dec. 19, 2019) (applying work product protection to party's investigator and his report).

Having been put on notice that Defendant has evidence of Greg's misconduct, Greg now seeks to abuse broadly worded Subpoenas to impermissibly invade the investigator-client privilege

and the attorney work party privilege and get a look at investigative materials that are part of an <u>open and ongoing investigation</u>. Clearly, the information sought pursuant to the Subpoenas are precluded by the plain language of MCL 338.840(2), as well as MCR 2. 302(B)(3)(a).

## CONCLUSION AND REQUESTED RELIEF

Based on the above, Defendant respectfully requests that the Court quash the Subpoenas and issue a protective order that prohibits similar discovery abuses.

Respectfully submitted,

By:/s/*Jeff Sieving*
Jeff Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Rd, Suite 300
Bloomfield Hills, MI 48302
(248) 231-2820
sieving@urbanlegalgroup.com

Dated: August 23, 2023

## CERTIFICATE OF SERVICE

Jeffrey R. Sieving hereby certifies that the foregoing document was filed and served via the Court's electronic case filing and noticing system to all counsel of record.

/s/ *Jeffrey R. Sieving*
Jeffrey R. Sieving

# EXHIBIT 1



**CHASE**

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

July 01, 2023 through July 31, 2023
Account Number: **000000680762627**



| CUSTOMER SERVICE INFORMATION | |
| --- | --- |
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |
| We accept operator relay calls | |

00021192 DRE 021 210 21523 NNNNNNNNNNN  1 000000000 D2 0000

CHRISTOPHER JAMES & ASSOCIATES, LLC
DBA MSY CAPITAL
1615 S TELEGRAPH RD STE 300
BLOOMFIELD HILLS MI 48302-0065

## We're discontinuing Text Banking

Starting on October 15, 2023, we'll no longer offer our Text Banking service. This change doesn't affect any Account Alerts you receive by text. There are other ways you can manage your account from your mobile phone or computer.

Access your accounts with the Chase Mobile® app[1] and on **chase.com**, where you can:
- View your transactions, transfer money and make payments.
- Sign up for Account Alerts — get alerts about your balance, spending and more. Choose the alerts you want in **Profile and Settings**.

If you have questions, please call the number on this statement. We accept operator relay calls.

[1] **Chase Mobile® app** is available for select mobile devices. Message and data rates may apply.

| CHECKING SUMMARY | Chase Platinum Business Checking | |
| --- | --- | --- |
| | INSTANCES | AMOUNT |
| **Beginning Balance** | | **$100.00** |
| Deposits and Additions | 2 | 25,000.00 |
| Checks Paid | 1 | -3,000.00 |
| Electronic Withdrawals | 2 | -5,083.33 |
| Fees | 1 | -95.00 |
| **Ending Balance** | **6** | **$16,921.67** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.



CHASE

July 01, 2023 through July 31, 2023

Account Number: **000000680762627**

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 07/03 | Orig CO Name:Msy Capital Part    Orig ID:810848665  Desc Date:SD1800 CO Entry Descr:Msy Capitasec:CCD   Trace#:091103509924068 Eed:230703  Ind ID: Ind Name:Msy Capital         Transfer To Msy Capital Chase Trn: 1849924068Tc | $12,500.00 |
| 07/28 | Orig CO Name:Msy Capital Part    Orig ID:810848665  Desc Date:SD1800 CO Entry Descr:Msy Capitasec:CCD   Trace#:091103505547366 Eed:230728  Ind ID: Ind Name:Msy Capital         Transfer To Msy Capital Chase Trn: 2095547366Tc | 12,500.00 |
| **Total Deposits and Additions** | | **$25,000.00** |

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|-----------|-------------|-----------|--------|
| 1360  ^ | | 07/13 | $3,000.00 |
| **Total Checks Paid** | | | **$3,000.00** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 07/07 | 07/07 Online Domestic Wire Transfer Via: Central Corp CU/272478075 A/C: Aba/272484056 Portland MI US Ben: Calley Company LLC Portland MI 48875 US Ref: July, 2023 Consulting/Bnf/July, 2023 Consulting Imad: 0707B1Qgc05C002477 Trn: 3067763188Es | $4,583.33 |
| 07/07 | 07/07 Online Domestic Wire Transfer Via: Zeal CU/272477694 A/C: Nicole Fredryk Canton MI 48188 US Ref: June, 2023 Consulting Fee/Bnf/June, 2023 Consulting Fee Imad: 0707B1Qgc08C008035 Trn: 3069913188Es | 500.00 |
| **Total Electronic Withdrawals** | | **$5,083.33** |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 07/06 | Service Charges For The Month of June | $95.00 |
| **Total Fees** | | **$95.00** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 07/03 | $12,600.00 |
| 07/06 | 12,505.00 |
| 07/07 | 7,421.67 |
| 07/13 | 4,421.67 |
| 07/28 | 16,921.67 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $95.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$95.00**  Will be assessed on 8/3/23 |



July 01, 2023 through July 31, 2023
Account Number:   **000000680762627**

## SERVICE CHARGE SUMMARY  *(continued)*

As an added benefit of your Private Client Checking Plus account, you can avoid a monthly service fee on your Chase Platinum Business Checking account in the future by maintaining an average ledger balance of $50,000.00 or more in business deposits and investments.

See your Account Rules and Regulations or stop in to see a banker today to find out more.

## SERVICE CHARGE DETAIL



| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee | 1 | | | $95.00 | $95.00 |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 2 | Unlimited | 0 | $0.40 | $0.00 |
| **Credits** | | | | | |
| Non-Electronic Transactions | 3 | 500 | 0 | $0.40 | $0.00 |
| **Subtotal Other Service Charges (Will be assessed on 8/3/23)** | | | | | **$95.00** |

**ACCOUNT** 000000680762627

| | | | | | |
|---|---|---|---|---|---|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee | 1 | | | | |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 2 | | | | |
| **Credits** | | | | | |
| Non-Electronic Transactions | 3 | | | | |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**

Call us at 1-866-564-2262 or write us at the address on the front of this statement immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

**For personal accounts only:** We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number;
- A description of the error or the transaction you are unsure about, and why you think it is an error or want more information; and
- The amount of the suspected error.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**For business accounts**, see your deposit account agreement or other applicable agreements that govern your account for details.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC FUNDS TRANSFERS:** Contact us immediately if your statement is incorrect or if you need more information about any non-electronic funds transfers on this statement. For more details, see your deposit account agreement or other applicable agreements that govern your account.

**JPMorgan Chase Bank, N.A. Member FDIC**



July 01, 2023 through July 31, 2023
Account Number:    **000000680762627**

This Page Intentionally Left Blank

 **CHASE** ⬡

July 01, 2023 through July 31, 2023
Account Number: **000000680762627**

## STOP PAYMENT RENEWAL NOTICE

**ACCOUNT NUMBER**
000000680762627

**BANK NUMBER**
021

The following Stop Payments will automatically renew for a 1-year period. You can revoke a current stop payment via your online channel (Chase.com or JPM ACCESS) or by calling the number on your statement or contacting your Customer Service Representative.

| REVOKE STOP | SEQUENCE NUMBER | DATE ENTERED | RENEWAL DATE | LOW RANGE OR CHECK NUMBER | HIGH RANGE OR AMOUNT |
|---|---|---|---|---|---|
| ☐ | 0000005-01 | 10/20/20 | 10/20/23 | 1149 | $2,500.00 |

Christopher James & Associates, LLC
Dba Msy Capital
1615 S Telegraph Rd Ste 300
Bloomfield Hills MI 48302-0065

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus OH 43218-2051



July 01, 2023 through July 31, 2023
Account Number:     **000000680762627**

This Page Intentionally Left Blank

# EXHIBIT 2

From:       Gregory Yatooma - FYB
Sent:       Tuesday, December 27, 2022 2:43 PM
To:        Jim Teasdale
Cc:        lauren.c.gentry@chase.com; zachary.r.goldman@jpmorgan.com; Chris Yatooma - MSY; Chris
         Yatooma - OCG; Robert A. Brandt, Jr; CTBARNETT@me.com; Christopher Moceri
Subject:   Re: Removal of Signors from Chase Accounts

Good afternoon all.  Chris and I are finalizing an agreement for Chris to own each of the below companies outright, and that should be done this week.   We, however, can move forward with taking me off the accounts.  Jim Teasdale is working to complete the IRS 8822-B forms as soon as possible to change the EIN responsible party from me to Chris for the applicable entities.  We will send as soon as complete.

Thank you!
-Greg

        On Dec 23, 2022, at 1:43 PM, Jim Teasdale <jteasdale@ocgcompanies.com> wrote:

        Hi Lauren & Zach,

        Merry Christmas to both of you and as per my voicemail today to Lauren and my telephone call to Zach,
        please remove Gregory M. Yatooma from the following bank accounts with J.P. Morgan Chase:

        Axon Properties, LLC / (Account # 381085866)
        Blue Skies Financing, LLC  (Account # 673802523)
        Oakland Business Park, LLC (General Account # 373689295)
        Oakland Business Park, LLC (Building A Account # 629625556)
        Oakland Business Park, LLC (Building C Account # 635783886)

        Also, we would like to close the following accounts that currently have a zero balance:

        Axon Properties, LLC (Arlington Account # 669573997)  Previously Closed but still showing in our Online
        Account Profile
        Axon Properties, LLC (Account # 758884212)
        Michigan Real-Estate Development, LLC ( Account # 931785732)
        Oakland Business Park, LLC (Building B Account # 587979276)
        Oakland Business Park, LLC (Dutton Road Account # 669622919)

        Please let us know what additional information you would require today to have this completed by
        Monday of next week.   Both Chris and Greg are out of town on Tuesday, December 27 and they would
        like to have this finalized by then.  Please let us know if you have any questions or if you need additional
        information and thanks again for your assistance in this matter.

        Jim Teasdale
        Controller
        **JTEASDALE@OCGCOMPANIES.COM**



1

| | |
|---|---|
| From: | Kara Harbour – FYB |
| Sent: | Tuesday, January 31, 2023 11:05 AM |
| To: | Gregory Yatooma – FYB |
| Subject: | RE: Account Clean Up |

Axon Phone Number 248-365-4506

From: Gregory Yatooma – FYB <yatooma@fyblaw.com>
Sent: Tuesday, January 31, 2023 10:54 AM
To: Goldman, Zachary R <zachary.r.goldman@jpmorgan.com>
Cc: Gentry, Lauren C <lauren.c.gentry@chase.com>; Kara Harbour – FYB <harbour@fyblaw.com>
Subject: Account Clean Up
Importance: High

Good morning Zach and Lauren.  In follow up to me selling the companies to Chris, and cleaning up the bank accounts, can you also do the following:

Close this account:
Matthew Consulting IOLTA x 7018
There is also Matthew Consulting business cared that ends in x0002 that shows up as closed (seemingly for years), but it still shows in the profile.  Can you remove that account?

Remove me from these accounts, but keep account active:
PRIORITY ONE LEADS, LLC x8956
AXON PROPERTIES x7000
CHRISTOPHER JAMES & ASSOCIATES, LLC x2627

Login Clean up:
Also, when I log in from a new device, it asks if I want to send a text/call to a number ending in -4506. I don't know what this number is. Can you remove (cuz that's kinda stressful ☺ )? In addition to my cell ending in -8832 which is already included, we can add my email, yatoomag@gmail.com.

Please holler at me with any questions.

Thank you!
-Greg

1

| | |
|---|---|
| From: | Gregory Yatooma – FYB |
| Sent: | Tuesday, February 14, 2023 10:56 AM |
| To: | Lauren Gentry |
| Cc: | Zachary R Goldman; Kara Harbour – FYB |
| Subject: | Re: Account Clean Up |

Good afternoon Lauren. I hope you are well.  Wanted to check in on the below email re the account clean up.

Thank you!

From: Gregory Yatooma - FYB <yatooma@fyblaw.com>
Sent: Tuesday, January 31, 2023 10:54 AM
To: Goldman, Zachary R <zachary.r.goldman@jpmorgan.com>
Cc: Gentry, Lauren C <lauren.c.gentry@chase.com>; Kara Harbour – FYB <harbour@fyblaw.com>
Subject: Account Clean Up
Importance: High

Good morning Zach and Lauren.  In follow up to me selling the companies to Chris, and cleaning up the bank accounts, can you also do the following:

Close this account:

Matthew Consulting IOLTA x 7018

There is also Matthew Consulting business cared that ends in x0002 that shows up as closed (seemingly for years), but it still shows in the profile.  Can you remove that account?

Remove me from these accounts, but keep account active:

PRIORITY ONE LEADS, LLC x8956

AXON PROPERTIES x7000

CHRISTOPHER JAMES & ASSOCIATES, LLC x2627

1

Login Clean up:

Also, when I log in from a new device, it asks if I want to send a text/call to a number ending in -4506. I don't know what this number is. Can you remove (cuz that's kinda stressful ☻ )? In addition to my cell ending in -8832 which is already included, we can add my email, yatoomag@gmail.com.

Please holler at me with any questions.

Thank you!

-Greg

# EXHIBIT 3

# Taft/

27777 Franklin Road, Suite 2500
Southfield, Michigan 48034-8214
Tel: 248.351.3000 | Fax: 248.351.3082

**Emily M. Mayer**
emayer@taftlaw.com

July 28, 2023

Michelle Houbeck
1615 S Telegraph Rd Bloomfield Hills, MI 48302

    *Re:*   *Yatooma v Yatooma, et. al*
         *Oakland County Circuit Court Case No. 2023- 2023-200283-CB*

Dear Ms. Houbeck:

    Enclosed please find a subpoena for production of documents regarding the above-referenced matter and for a deposition. With respect to the document production, no personal appearance is necessary if the documents are timely produced. Please produce the requested documents on or before August 15, 2023, via email to emayer@taftlaw.com or otherwise to the address identified on the subpoena. We will reimburse you for any reasonable copying expenses incurred in connection with producing the documents. However, should your anticipated copying charges exceed $50.00, please advise us by contacting the undersigned in advance, so that we may discuss alternative arrangements for providing copies.

    I have scheduled your deposition for August 21, 2023 beginning at 10:00 a.m. If you are unavailable on the date selected, please contact me as soon as possible. I will do my best to accommodate your schedule. The deposition will be conducted via Zoom and your testimony will be recorded. My office will provide the Zoom instructions prior to the date and time scheduled for the deposition.

    I thank you in advance for your cooperation. Please feel free to contact me if you have any questions.

            Sincerely,

            **Taft Stettinius & Hollister LLP**

            *Emily Mayer*

            Emily M. Mayer

Enclosures
cc: Defendants' Counsel

4887-8917-9982

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT | **SUBPOENA** | CASE NO. and JUDGE |
|---|---|---|
| 6th    JUDICIAL CIRCUIT<br>COUNTY | **Order to Appear and/or Produce** | 2023-200283-CB<br>Hon. Victoria Valentine |

Court address 1200 N Telegraph Rd Pontiac MI 48341     (248) 858-0344    Court telephone no.

Police Report No. (if applicable):

| Plaintiff(s)/Petitioner(s)<br>☐ People of the State of Michigan<br>☑ Gregory Yatooma | | Defendant(s)/Respondent(s)<br>Christopher Yatooma, et al |
|---|---|---|
| | v | |
| ☑ Civil      ☐ Criminal | | Charge |

In the matter of _____

In the Name of the People of the State of Michigan. TO:

Michelle Houbeck

1615 S Telegraph Rd Bloomfield Hills MI 48302

If you require accommodations to use the court because of a disability, or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

## YOU ARE ORDERED TO:

☑ 1. Appear personally at the time and place stated below: You may be required to appear from time to time and day to day until excused.

| ☐ The court address above | ☑ Other: 27777 Franklin Rd Suite 2500 Southfield MI 48034 |
|---|---|
| Day Tuesday \| Monday | Date August 15, 2023 \| August 21, 2023    Time 10:00 a.m. |

☐ 2. Testify at trial / examination / hearing.

☑ 3. ☑ Produce copies* of the following items: (Use additional pages if necessary.) Please produce the documents identified in the enclosed exhibit on or before Tuesday, August 15, 2023 at 10:00 a.m.

*Note: Requesting party must pay reasonable copying costs, which cannot be waived under MCR 2.002.

☐ Permit inspection or copying of the following items: (Use additional pages if necessary.) _____

☐ 4. Testify as to your assets, and bring with you the items listed in line 3 above.

☑ 5. Testify at deposition. Deposition scheduled for August 21, 2023 at 10:00 a.m.

☐ 6. Abide by the attached prohibition against transferring or disposing of property. (MCL 600.6104(2), 600.6116, or 600.6119.)

☐ 7. Other: _____

Approved, SCAO<br>Form MC 11, Rev. 3/23<br>MCL 600.1455, MCL 600.1701, MCL 600.6104, MCL 600.6110, MCL 600.6116,<br>MCL 600.6119, MCR 2.002, MCR 2.105, MCR 2.305, MCR 2.506<br>Page 1 of 2

Distribute form to:<br>Return<br>Witness<br>File

Subpoena, Order to Appear and/or Produce    (3/23)
Page 2 of 2

Case No. 2023-200283-CB

| ☑ 8. | Person requesting subpoena<br>Emily Mayer | Telephone no.<br>248-351-3000 |
|---|---|---|
| | Address<br>27777 Franklin Rd Ste 2500 | |
| | City<br>Southfield MI 48034 | State | Zip |

**NOTE:** If requesting a debtor's examination under MCL 600.6110, or an injunction under item 6, this subpoena must be issued by a judge. For a debtor examination, the affidavit of debtor examination below must also be completed. Debtor's assets can also be discovered through MCR 2.305 without the need for an affidavit of debtor examination or issuance of this subpoena by a judge.

**FAILURE TO OBEY THE COMMANDS OF THE SUBPOENA OR TO APPEAR AT THE STATED TIME AND PLACE MAY SUBJECT YOU TO PENALTY FOR CONTEMPT OF COURT.**

| Court use only |
|---|
| ☐ Served    ☐ Not served |

*Emily Mayer*
Judge/Clerk/Attorney signature and date

---

**AFFIDAVIT FOR JUDGMENT DEBTOR EXAMINATION**

I request that the court issue a subpoena that orders the party named on this form to be examined under oath before a

judge concerning the money or property of _____

for the following reasons: _____

_____
Signature

Subscribed and sworn to before me on _____ .
                                        Date

_____
Deputy clerk/Notary public signature

My commission expires on _____ .
                                        _____
                                        Name (type or print)

Notary public, State of Michigan, County of _____ . ☐ Acting in the County of _____ .
☐ This notarial act was performed using an electronic notarization system or a remote electronic notarization platform.

**Subpoena, Order to Appear and/or Produce** (3/23)

Case No. <u>2023-200283-CB</u>

<div align="center">

**PROOF OF SERVICE**

</div>

**TO PROCESS SERVER:** You must serve the subpoena and file proof of service with the court clerk. If you are unable to complete service, you must return this original and all copies to the court clerk.

<div align="center">

**CERTIFICATE OF SERVICE  / NONSERVICE**

</div>

☐ I served    ☐ personally    ☐ by registered or certified mail, return receipt requested, and delivery restricted to the addressee (copy of return receipt attached)    a copy of the subpoena, together with any required fees and the attachments listed below, on:

☐ I have attempted to serve a copy of the subpoena, together with any required fees and the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |

<div align="center">

**ACKNOWLEDGMENT OF SERVICE**

</div>

I acknowledge that I have received service of a copy of the subpoena, together with any required fees and

_____ on _____ .
Attachments (if any)                                                                          Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

MCR 2.105, MCR 2.107, MCR 2.305(A), MCR 2.506(G)

## EXHIBIT TO SUBPOENA
## INSTRUCTIONS AND DEFINITIONS

A.    For purposes of these Discovery Requests, the term *"document(s)"* shall be deemed to include each original, copy, draft or other version of any kind of any paper, writing, drawing, chart, photograph, record, recording, transcript, data compilation in any format, from which information can be obtained or translated through any means, or other written, recorded or graphic matter, however produced or reproduced, whether sent or received or neither, and all copies thereof (whether or not different in any way from the original by interlineation, receipt stamp, notation, indication of copies sent or received, or otherwise), and includes, by way of illustration only and not by way of limitation, the following: notes, calendar entries, internal and external **communications of any nature**, including correspondence, e-mails, voice memos, telegrams, memoranda, information stored in any computerized format and the necessary software to review the information stored in any computerized format including e-mail, Microsoft Word and Excel documents, Quick book records and work papers, summaries of records of personal conversations, notebooks of any character, diaries, routing slips or memoranda, reports, publications, reports or summaries of investigations, agreements and contracts, including modifications and revisions, drafts of, revisions of and translations of any documents.

B.    Documents stored as hard copy in the ordinary course of business and produced as hard copy shall be produced either: (a) organized and labeled to correspond with the categories in the requests or (b) as they are kept in the usual course of business, including any indicators of the manner in which they kept in the usual course of business (e.g., with labeled file folders).

C.    The word *"identify"*, when used with respect to a document not voluntarily produced, means: (1) to specify the nature of the document (such as, for example, letter, memorandum, etc.); (2) to state the date, if any, appearing on the document or, if none, the date upon which such document was prepared; (3) to describe in general the subject matter of the document; (4) to identify each person who wrote, signed, dictated, or otherwise participated in the preparation of the document; (5) to identify each person, if any, who was an addressee thereof; (6) if it now exists, to identify each person having custody of the document; (7) to identify all documents, oral communications and other information relied upon in drafting such document; and (8) to identify each person having knowledge of such document or the matters discussed or contained in such document.

The word *"identify"*, when used with respect to an individual means state: (1) his/her full name; (2) present or last known business and residence addresses (including county and state); (3) his/her present or last known occupation and position; (4) his/her present or last known employer or business affiliation; and (5) his/her occupation or position at the time in question as specified in the particular interrogatory.

The word *"identify"* when used with respect to an oral communication, means (1) to state the date of such communication; (2) to identify each person participating therein and each person who was present; (3) to state what was said by each participant in the course of such communication, or, if not known or recalled, the substance; (4) to state whether there are any documents which set forth, summarize or refer to any portions of such oral communication; and (5) if such documents exist, to

identify each such document and each person having custody of the document.

   D.   If any document described herein was, but no longer is, within your possession, custody, or control, please state in detail:

      i.   What disposition was made of the document;

      ii.   The date of such disposition;

      iii.   Whether the original document or a copy of the document is within the possession, custody or control of any other person, corporation or entity; and

      iv.   If the answer to subpart (3) is affirmative, the identity of that other person, corporation, or entity.

   E.   *"Person"* and *"representative"* shall include individuals, trusts, corporations, partnerships, and any other form of business entity.

   F.   *"Possession"* or *"control"* shall mean the possession or control of you and your agents, attorneys, or any person from whom you might obtain the requested information or document.

   G.   *"Any"* shall include the collective as well as the singular and shall mean *"each,"* *"all,"* and *"every"* and these terms shall be interchangeable.

   H.   The singular shall be deemed to include the plural and the plural shall be deemed to include the singular. Words of one gender shall be deemed to include words of all genders including the neuter.

   I.   *"Concern"*, *"concerning,"* *"relate,"* *"relating to,"* and *"regarding"* shall be deemed to include directly or indirectly mentioning or describing, pertaining to, that concern or relate to, or being connected with a stated subject matter.

   J.   *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these interrogatories and document requests information which might otherwise be construed to be outside the scope of these interrogatories and document requests.

   K.   Whenever the term *"including"* is used, it shall mean including without limitation.

   L.   Whenever the term *"person"* is used, it shall mean any natural person, governmental body, governmental agency, corporation, general or limited partnership, joint venture, trust, or any other form of organization, association, or entity.

   M.   If you contend that any information sought in these Discovery Requests is exempt from discovery because it falls within the attorney/client privilege, it was prepared in anticipation of litigation or preparation for trial, or is so exempted by any privilege or protection, you are to provide the following information in each such instance in lieu of setting forth the information sought:

      i.   The privilege or protection which you contend applies;

    ii.    The form in which the information is contained (i.e., document, or recollection of one or more persons);

    iii.   If the information is contained in a document, the author, the recipient, and the date of the document;

    iv.   If the information is not contained in a document, the persons involved in the communication and the date of the communication giving rise to the privilege or protection that you claim; and

    v.    The subject matter of the information that you contend is privilege or protected from discovery.

N.    In producing electronically stored information, please eliminate (and "de-dupe") all identical duplicates.

O.    This Subpoena shall be deemed continuing, and supplemental responses are required and must be provided.

P.    Identify by bates number or otherwise, the specific Document Request(s) to which each document produced in response to these Document Requests is responsive.

## DOCUMENT REQUESTS

Please produce the following documents for the time period December 1, 2022 to present:

1.    All documents that concern or relate to Gregory Yatooma's Fleming, Yatooma & Borowicz, PLC ("FYB") email account, Yatooma@FYBLaw.com.

2.    All documents that concern or relate to Kara Harbour's FYB email account, Harbour@FYBLaw.com.

3.    All documents that concern or relate to collection of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

4.    All documents that concern or relate to collection of Kara Harbour's FYB email account, Harbour@FYBLaw.com.

5.    All documents that concern or relate to access to of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

6.    All documents that concern or relate to access to Kara Harbour's FYB email

account, Harbour@FYBLaw.com.

       7.     All documents that concern or relate to the contents of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

       8.     All documents that concern or relate to the contents of Kara Harbour's FYB email account, Harbour@FYBLaw.com.

       9.     All documents sent to or received by Yatooma@FYBLaw.com, including, but not limited to, the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*, enclosed herewith.

       10.    All documents that concern or relate to your acquisition of the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*, enclosed herewith.

       11.    All documents that concern or relate to the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*, enclosed herewith.

FILED   Received for Filing   Oakland County Clerk   7/24/2023 3:17 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF**
**OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB
Hon. Victoria A. Valentine

| | |
|---|---|
| **TAFT STETTINIUS & HOLLISTER LLP**<br>Ethan R. Holtz (P71884)<br>Emily M. Mayer (P78956)<br>T. Andrew Keating (P86261)<br>*Attorneys for Plaintiff*<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000<br>eholtz@taftlaw.com<br>emayer@taftlaw.com<br>akeating@taftlaw.com | **URBAN LEGAL GROUP**<br>Jeffery R. Sieving (P71625)<br>*Co-Counsel for Defendants*<br>1615 S. Telegraph Rd, Ste 300<br>Bloomfield Hills, MI 48032<br>(248) 230-2820<br>sieving@urbanlegalgroup.com<br><br>**BUTZEL LONG, PC**<br>Daniel J. McCarthy(P59457)<br>Bernard J. Fuhs (P69621)<br>*Co-Counsel for Defendant*<br>150 W Jefferson Avenue, Ste 100<br>Detroit, MI 48226<br>(313) 225-7000<br>fuhs@butzel.com |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO MODIFY AND/OR RELIEF FROM JULY 3, 2023, ORDER PURUSANT TO MCR 2.612

      As a preliminary matter, Defendants submit that because of the Court's recent decision to

appoint a Receiver, MSY is currently without Counsel. Defendants therefore respectfully request

that the Court defer ruling on this Motion until the Receiver retains counsel to protect MSY's

interest in this matter.

**INTRODUCTION**

This motion is another example of Plaintiff Gregory Yatooma's ("Gregory") scorched earth litigation tactics. Gregory has filed another specious Motion where his only intent is to mischaracterize his version of the circumstances that have transpired between the parties and in so doing completely wasting this Courts valuable time.[1] It is beyond dispute that (1) Defendants have fully complied with this July 3, 2023, Order regarding the distribution of the Settlement Proceeds; (2) Gregory admits on page 2 of his Motion that the Defendants have complied with the terms of the Order; and (3) there is absolutely no legal basis for Gregory to seek relief from the Order.

**PROCEDURAL HISTORY**

On or about May 10, 2023, Gregory filed the instant action against Christopher Yatooma and MSY Capital Partners, LLC ("Defendants"). On March 17, 2023, Gregory also filed a Motion for an Order Permitting Dykema Gossett, PLLC to Interplead and/or Deposit Disputed Funds with this Court. The "Disputed Funds" involve Settlement Proceeds from litigation previously pending before Judge Warren in the case of *MSY Capital Partners, LLC et al v LIV Wellness Center, LLC et al*, Oakland County Case No. 2019-178037-CB ("MSY/LIV Litigation"). Following an appeal, the parties in the MSY/LIV Litigation agreed to resolve their issues and executed a March 10, 2023, Confidential Settlement Agreement ("CSA"). Pursuant to the CSA, the above parties agreed

---

[1]Gregory's has made continuous misrepresentations in this litigation, including (1) that MSY has no current business other than the distribution of the Litigation Proceeds - to the contrary, MSY is an active going concern with ongoing business. (2) that Christopher closed MSY's bank account at Chase Bank.  Chase Bank Account No. ----2627 is active and open. (3) That Christopher removed Greg from the MSY bank account- when on January 31, 2023, and February 14, 2023, Gregory admitted that he was "selling the companies to Chris", and specifically directed, "Remove me from these accounts, but keep the account active" which specifically mentioned the MSY Chase Bank Account No. 2627 (held under Christopher James & Associates, LLC). 4) Gregory contends that he is a partner in MSY with Christopher, yet he recently told Crain's Detroit Business that he is not business partners with his brothers and haven't been in over 4 years. ***See Ex D***.

that the appeal bond would be returned to Dykema Gossett, PLLC ("Dykema"), to which Dykema would then distribute to each party its designated portion of the bond. As Dykema was prepared to distribute the bond proceeds, Defendant Christopher Yatooma ("Christopher") the designated representative for MSY, instructed Dykema to distribute MSY's portion of the funds. Gregory, on the other hand, provided conflicting different instructions and asked Dykema to wire a portion of MSY's funds to a different non-MSY account. As this Court knows, Dykema refrained from distributing the funds pending either an agreement from Gregory and Christopher or by further order of the court. On June 7, 2023, MSY filed a Motion to Compel Dykema to Distribute the Bond before Judge Warren as provided by the CSA. This Court ordered Gregory's motion stayed pending the hearing in front of Judge Warren. On June 16, 2023, Judge Warren issued an Order closing the MSY/LIV case without ruling on MSY's Motion to Comple Dykema to Distribute the Bond to MSY per the terms of the CSA.

Gregory re-noticed for hearing his Motion to Interplead and/or Deposit Funds with this Court. On June 28, 2023, this Court held a hearing on Gregory's Motion. At the hearing this Court ruled that she would allow the *parties to decide* whether they wanted one- half (1/2) of the funds to go to each party in a trust account or if they wanted the whole amount to go to the Court. If the parties did not reach an agreement, then the parties were instructed to submit an Order that the entire proceeds of the Bond would be deposited with the Court. *See transcript of June 28, 2023, hearing attached hereto as Ex. A.* Thereafter, the parties reached an agreement that one-half (1/2) of the funds be distributed to Gregory Yatooma, on the one hand, and one-half (1/2) the funds to Christopher Yatooma on the other hand, to an account of each party's choosing, where each party shall hold and freeze the Funds until further written agreement of the parties or order of the Court. Accordingly, the parties submitted to this Court a proposed Order Re: Plaintiff's Motion for an

3

Order Permitting Dykema Gossett PLLC To Interplead and/or Deposit Disputed Funds with the Court (the "Order"), *attached hereto as Ex. B.* On July 3, 2023, this Court entered the Order with a single modification that provided that the Settlement Funds were "**To be held in the IOLTA account of the attorney for the respective party**". *The Order is attached hereto as Ex. C.*

In the meantime, Christopher retained Urban Legal Group to act as co-counsel in this action in the place of Legal Consulting, PLLC and a substitution of counsel has since been entered with the Court.

After the Court entered the above Order, the Defendants determined that because the Settlement Proceeds from the MSY/LIV litigation involved cannabis related funds[2], and out of an abundance of caution, it would deposit Christopher's portion of the Settlement Proceeds into the IOLTA account of Urban Legal Group. Urban Legal Group has a IOLTA account with Citizen State Bank, an authorized cannabis banking institution. Urban Legal Group's IOLTA account is fully compliant with the applicable rules of the State Bar of Michigan as all interest from the account goes *directly* to the State Bar. The undersigned is the sole signatory and the only agent authorized to act under the IOLTA account. Finally, it should also be noted that after the resolution of the MSY/LIV Litigation, the Dykema Law Firm held the Settlement Funds at an account with Dart Bank, which is also an authorized cannabis banking institution. Clearly, the Dykema Law firm had the same concerns regarding the treatment of the MSY/LIV Litigation Proceeds.

Contrary to Gregory's specious allegations, there was nothing nefarious surrounding Defendants' decision to deposit its portion of the Settlement Funds with Urban Legal Group.

---

[2] The MSY/LIV Wellness litigation involved a breach of partnership agreement involving the development, ownership and operation of a retail cannabis store located in Ferndale, Michigan.

4

Accordingly, the Defendants have complied with this Court's July 3, 2023, Order. As such this Motion should be denied.

## ARGUMENT

### There Is No Grounds for The Court to Grant Relief from The Order.

Gregory is seeking relief from the Order pursuant to MCR 2.612(C)(1)(a) and (c), alleging that Defendants have attempted to subvert the Court's Order and as such he is the "victim" of mistake, fraud or misconduct. These claims are completely without merit as Defendants have complied with both the letter and "sprit" of this Court's Order.

MCR 2.612(C)(1) provides as follows:

(1) On motion and on just terms, the court may relieve a party or the legal representative of a party from a final judgment, order, or proceeding on the following grounds:

(a) **Mistake, inadvertence, surprise, or excusable neglect.**

(b) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under MCR 2.611(B).

(c) **Fraud (intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.**

d) The judgment is void.

(e) The judgment has been satisfied, released, or discharged; a prior judgment on which it is based has been reversed or otherwise vacated; or it is no longer equitable that the judgment should have prospective application.

(f) Any other reason justifying relief from the operation of the judgment.

Gregory argues that the Court entered the Order on the "belief" that one-half (1/2) of the Settlement proceeds would be transferred into the IOLTA account of one of the Defendants attorneys at the time, either Butzel Long or Legal Consulting. Gregory goes on to allege that it was not contemplated by the Court or by Gregory that the funds would be deposited into the IOLTA account of Urban Legal. Because of this, Gregory wants this Court to modify the Order

5

and require the parties to deposit the entirety of the Settlement Funds into the Circuit Court's

escrow account. Gregory's contention is completely lacking in merit.

At the June 28, 2023, hearing and after extensive argument, the Court made the following

ruling as to the distribution of the Settlement Funds:

> "THE COURT: And with regard to Dykema, again, the Court will take the money
> and have it put into the court fund; if you want to stipulate to something
> differently, you're certainly entitled to do that by stipulation, otherwise the Court
> will take the money as was indicated in the confidential settlement agreement,
> that the money was to be disbursed within two days of the dismissal. That's the
> ruling of the Court."

Per the Court's instruction, the parties jointly negotiated and submitted a proposed Order

whereby each party agreed to each deposit one-half (1/2) of the Settlement Funds to an account

of each party's choosing and further agreed to hold and freeze the funds until further written

agreement of the parties or order of the Court. Thereafter, the Court modified the Order to

instead provide that the Settlement Funds were *"To be held in the IOLTA account of the*

*attorney for the respective party"*. Thereafter, the Defendants deposited their portion of the

Settlement Funds into the Urban Legal Group <u>IOLTA account</u>, which is completely in

compliance with the terms of this Court's Order. Clearly, the Order did not direct the Settlement

Funds to be deposited into an IOLTA account of either the Butzel or Legal Consulting Law

Firms. Instead, the Order specifies that the funds were to be deposited into an IOLTA account for

the attorney for the respective party. As such, the decision by defendants to place the Settlement

Funds into the Urban Legal Group IOLTA account complies with the agreement of the parties

and the terms of the Order.

Gregory further attempts to argue that the Order should be modified pursuant to MCR

2.116(C)(1)(c), alleging fraud and misconduct on the part of the Defendants. Gregory claims that

the Court specifically ruled that the Settlement Funds were not to be deposited into Citizens State Bank. A mere cursory review of the hearing transcript establishes that the Court made no such finding or ruling.[3] Further, the fact that Christopher is the owner of Citizen State Bank is wholly irrelevant to this instant Motion. As set forth above, Christopher's portion of the Settlement Funds have been deposited into an IOLTA account opened and controlled by Urban Legal Group. The Settlement Funds are segregated and frozen until further written agreement of the parties or further order of the Court. Finally, all interest derived from the Settlement Proceeds will go directly to the State Bar of Michigan, not to Christopher. Again, there is no legal or factual basis to support Gregory's claim of fraud or misconduct that would warrant a modification of the Order.

## CONCLUSION

Based on the foregoing, Plaintiff's Motion should be Denied. [4]

Respectfully submitted,

URBAN LEGAL GROUP

By:/s/ *Jeffrey R. Sieving*
Jeffrey R. Sieving
*Co-Counsel for Defendants*
1615 S. Telegraph Rd., Suite 300
Bloomfield Hills, MI 48301
(248) 230-2820
sieving@urbanlegalgroup.com

July 24, 2023

---

[3] The pages of the transcript cited by Gregory refer to the Court's position that the Settlement Funds were to be evenly split into the respective accounts of the parties and not be held solely by Defendant MSY.
[4] Alternatively, if this Court is inclined to modify the Order, the Settlement Funds should be deposited into MSY's account under the strict purview of the Receiver.

7

# EXHIBIT 4

# Taft/

27777 Franklin Road, Suite 2500
Southfield, Michigan 48034-8214
Tel: 248.351.3000 | Fax: 248.351.3082

**Emily M. Mayer**
emayer@taftlaw.com

July 28, 2023

Rich Stopczy
1615 S. Telegraph Rd Bloomfield Hills, MI 48302

      *Re:*   *Yatooma v Yatooma, et. al*
               *Oakland County Circuit Court Case No. 2023- 2023-200283-CB*

Dear Mr. Stopczy:

      Enclosed please find a subpoena for production of documents regarding the above-referenced matter and for a deposition. With respect to the document production, no personal appearance is necessary if the documents are timely produced. Please produce the requested documents on or before August 15, 2023, via email to emayer@taftlaw.com or otherwise to the address identified on the subpoena. We will reimburse you for any reasonable copying expenses incurred in connection with producing the documents. However, should your anticipated copying charges exceed $50.00, please advise us by contacting the undersigned in advance, so that we may discuss alternative arrangements for providing copies.

      I have scheduled your deposition for August 22, 2023 beginning at 10:00 a.m. If you are unavailable on the date selected, please contact me as soon as possible. I will do my best to accommodate your schedule. The deposition will be conducted via Zoom and your testimony will be recorded. My office will provide the Zoom instructions prior to the date and time scheduled for the deposition.

      I thank you in advance for your cooperation. Please feel free to contact me if you have any questions.

               Sincerely,

               **Taft Stettinius & Hollister LLP**

               *Emily Mayer*

               Emily M. Mayer

Enclosures
cc: Defendants' Counsel

Taft Stettinius & Hollister LLP  /  Taftlaw.com  /  The Modern Law Firm

4887-8917-9982

| STATE OF MICHIGAN | | SUBPOENA | CASE NO. and JUDGE |
|---|---|---|---|
| | **JUDICIAL DISTRICT** | **Order to Appear and/or Produce** | 2023-200283-CB |
| 6th | **JUDICIAL CIRCUIT** | | Hon. Victoria Valentine |
| | **COUNTY** | | |

Court address 1200 N Telegraph Rd Pontiac MI 48341     (248) 858-0344    Court telephone no.

Police Report No. (if applicable):

| Plaintiff(s)/Petitioner(s) | | Defendant(s)/Respondent(s) |
|---|---|---|
| ☐ People of the State of Michigan<br>☑ Gregory Yatooma | | Christopher Yatooma, et al |
| | v | |
| ☑ Civil     ☐ Criminal | | Charge |

In the matter of _____

In the Name of the People of the State of Michigan. TO:

Rich Stopczy

1615 S Telegraph Rd Bloomfield Hills, MI 48302

If you require accommodations to use the court because of a disability, or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

## YOU ARE ORDERED TO:

☑ 1. Appear personally at the time and place stated below: You may be required to appear from time to time and day to day until excused.

| ☐ The court address above | ☑ Other: 27777 Franklin Rd Suite 2500 Southfield MI 48034 | |
|---|---|---|
| Day<br>Tuesday \| Tuesday | Date<br>August 15, 2023 \| August 22, 2023 | Time<br>10:00 a.m. |

☐ 2. Testify at trial / examination / hearing.

☑ 3. ☑ Produce copies* of the following items: (Use additional pages if necessary.) Please produce the documents identified in the enclosed exhibit on or before Tuesday, August 15, 2023 at 10:00 a.m.

    *Note: Requesting party must pay reasonable copying costs, which cannot be waived under MCR 2.002.

    ☐ Permit inspection or copying of the following items: (Use additional pages if necessary.) _____

☐ 4. Testify as to your assets, and bring with you the items listed in line 3 above.

☑ 5. Testify at deposition. Deposition scheduled for August 22, 2023 at 10:00 a.m.

☐ 6. Abide by the attached prohibition against transferring or disposing of property. (MCL 600.6104(2), 600.6116, or 600.6119.)

☐ 7. Other: _____

Approved, SCAO
Form MC 11, Rev. 3/23
MCL 600.1455, MCL 600.1701, MCL 600.6104, MCL 600.6110, MCL 600.6116,
MCL 600.6119, MCR 2.002, MCR 2.105, MCR 2.305, MCR 2.506
Page 1 of 2

Distribute form to:
Return
Witness
File

Subpoena, Order to Appear and/or Produce   (3/23)
Page 2 of 2

Case No. _2023-200283-CB_

| ☑ 8. | Person requesting subpoena<br>Emily Mayer | Telephone no.<br>248-351-3000 |
|---|---|---|
| | Address<br>27777 Franklin Rd Ste 2500 | |
| | City                                    State<br>Southfield MI 48034 | Zip |

NOTE: If requesting a debtor's examination under MCL 600.6110, or an injunction under item 6, this subpoena must be issued by a judge. For a debtor examination, the affidavit of debtor examination below must also be completed. Debtor's assets can also be discovered through MCR 2.305 without the need for an affidavit of debtor examination or issuance of this subpoena by a judge.

**FAILURE TO OBEY THE COMMANDS OF THE SUBPOENA OR TO APPEAR AT THE STATED TIME AND PLACE MAY SUBJECT YOU TO PENALTY FOR CONTEMPT OF COURT.**

| Court use only |
|---|
| ☐ Served      ☐ Not served |

*Emily Mayer*
Judge/Clerk/Attorney signature and date

---

**AFFIDAVIT FOR JUDGMENT DEBTOR EXAMINATION**

I request that the court issue a subpoena that orders the party named on this form to be examined under oath before a

judge concerning the money or property of _____

for the following reasons: _____

_____
Signature

Subscribed and sworn to before me on _____ .
                                          Date

_____
Deputy clerk/Notary public signature

My commission expires on _____ .
                                          Name (type or print)

Notary public, State of Michigan, County of _____ . ☐ Acting in the County of _____ .
☐ This notarial act was performed using an electronic notarization system or a remote electronic notarization platform.

**Subpoena, Order to Appear and/or Produce**   (3/23)

Case No. 2023-200283-CB

## PROOF OF SERVICE

**TO PROCESS SERVER:** You must serve the subpoena and file proof of service with the court clerk. If you are unable to complete service, you must return this original and all copies to the court clerk.

## CERTIFICATE OF SERVICE  / NONSERVICE

☐ I served      ☐ personally      ☐ by registered or certified mail, return receipt requested, and delivery restricted to the addressee (copy of return receipt attached)     a copy of the subpoena, together with any required fees and the attachments listed below, on:

☐ I have attempted to serve a copy of the subpoena, together with any required fees and the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of a copy of the subpoena, together with any required fees and

_____ on _____ .
Attachments (if any)          Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

MCR 2.105, MCR 2.107, MCR 2.305(A), MCR 2.506(G)

## EXHIBIT TO SUBPOENA
## INSTRUCTIONS AND DEFINITIONS

A.      For purposes of these Discovery Requests, the term *"document(s)"* shall be deemed to include each original, copy, draft or other version of any kind of any paper, writing, drawing, chart, photograph, record, recording, transcript, data compilation in any format, from which information can be obtained or translated through any means, or other written, recorded or graphic matter, however produced or reproduced, whether sent or received or neither, and all copies thereof (whether or not different in any way from the original by interlineation, receipt stamp, notation, indication of copies sent or received, or otherwise), and includes, by way of illustration only and not by way of limitation, the following: notes, calendar entries, internal and external **communications of any nature**, including correspondence, e-mails, voice memos, telegrams, memoranda, information stored in any computerized format and the necessary software to review the information stored in any computerized format including e-mail, Microsoft Word and Excel documents, Quick book records and work papers, summaries of records of personal conversations, notebooks of any character, diaries, routing slips or memoranda, reports, publications, reports or summaries of investigations, agreements and contracts, including modifications and revisions, drafts of, revisions of and translations of any documents.

B.      Documents stored as hard copy in the ordinary course of business and produced as hard copy shall be produced either: (a) organized and labeled to correspond with the categories in the requests or (b) as they are kept in the usual course of business, including any indicators of the manner in which they kept in the usual course of business (e.g., with labeled file folders).

C.      The word *"identify"*, when used with respect to a document not voluntarily produced, means: (1) to specify the nature of the document (such as, for example, letter, memorandum, etc.); (2) to state the date, if any, appearing on the document or, if none, the date upon which such document was prepared; (3) to describe in general the subject matter of the document; (4) to identify each person who wrote, signed, dictated, or otherwise participated in the preparation of the document; (5) to identify each person, if any, who was an addressee thereof; (6) if it now exists, to identify each person having custody of the document; (7) to identify all documents, oral communications and other information relied upon in drafting such document; and (8) to identify each person having knowledge of such document or the matters discussed or contained in such document.

The word *"identify"*, when used with respect to an individual means state: (1) his/her full name; (2) present or last known business and residence addresses (including county and state); (3) his/her present or last known occupation and position; (4) his/her present or last known employer or business affiliation; and (5) his/her occupation or position at the time in question as specified in the particular interrogatory.

The word *"identify"* when used with respect to an oral communication, means (1) to state the date of such communication; (2) to identify each person participating therein and each person who was present; (3) to state what was said by each participant in the course of such communication, or, if not known or recalled, the substance; (4) to state whether there are any documents which set forth, summarize or refer to any portions of such oral communication; and (5) if such documents exist, to

identify each such document and each person having custody of the document.

     D.     If any document described herein was, but no longer is, within your possession, custody, or control, please state in detail:

        i.     What disposition was made of the document;

        ii.     The date of such disposition;

        iii.     Whether the original document or a copy of the document is within the possession, custody or control of any other person, corporation or entity; and

        iv.     If the answer to subpart (3) is affirmative, the identity of that other person, corporation, or entity.

     E.     *"Person"* and *"representative"* shall include individuals, trusts, corporations, partnerships, and any other form of business entity.

     F.     *"Possession"* or *"control"* shall mean the possession or control of you and your agents, attorneys, or any person from whom you might obtain the requested information or document.

     G.     *"Any"* shall include the collective as well as the singular and shall mean *"each,"* *"all,"* and *"every"* and these terms shall be interchangeable.

     H.     The singular shall be deemed to include the plural and the plural shall be deemed to include the singular. Words of one gender shall be deemed to include words of all genders including the neuter.

     I.     *"Concern"*, *"concerning,"* *"relate,"* *"relating to,"* and *"regarding"* shall be deemed to include directly or indirectly mentioning or describing, pertaining to, that concern or relate to, or being connected with a stated subject matter.

     J.     *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these interrogatories and document requests information which might otherwise be construed to be outside the scope of these interrogatories and document requests.

     K.     Whenever the term *"including"* is used, it shall mean including without limitation.

     L.     Whenever the term *"person"* is used, it shall mean any natural person, governmental body, governmental agency, corporation, general or limited partnership, joint venture, trust, or any other form of organization, association, or entity.

     M.     If you contend that any information sought in these Discovery Requests is exempt from discovery because it falls within the attorney/client privilege, it was prepared in anticipation of litigation or preparation for trial, or is so exempted by any privilege or protection, you are to provide the following information in each such instance in lieu of setting forth the information sought:

        i.     The privilege or protection which you contend applies;

ii.    The form in which the information is contained (i.e., document, or recollection of one or more persons);

iii.   If the information is contained in a document, the author, the recipient, and the date of the document;

iv.    If the information is not contained in a document, the persons involved in the communication and the date of the communication giving rise to the privilege or protection that you claim; and

v.     The subject matter of the information that you contend is privilege or protected from discovery.

N.     In producing electronically stored information, please eliminate (and "de-dupe") all identical duplicates.

O.     This Subpoena shall be deemed continuing, and supplemental responses are required and must be provided.

P.     Identify by bates number or otherwise, the specific Document Request(s) to which each document produced in response to these Document Requests is responsive.

## DOCUMENT REQUESTS

Please produce the following documents for the time period December 1, 2022 to present:

1.     All documents that concern or relate to Gregory Yatooma's Fleming, Yatooma & Borowicz, PLC ("FYB") email account, Yatooma@FYBLaw.com.

2.     All documents that concern or relate to Kara Harbour's FYB email account, Harbour@FYBLaw.com.

3.     All documents that concern or relate to collection of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

4.     All documents that concern or relate to collection of Kara Harbour's FYB email account, Harbour@FYBLaw.com.

5.     All documents that concern or relate to access to of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

6.     All documents that concern or relate to access to Kara Harbour's FYB email

account, Harbour@FYBLaw.com.

      7.     All documents that concern or relate to the contents of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

      8.     All documents that concern or relate to the contents of Kara Harbour's FYB email account, Harbour@FYBLaw.com.

      9.     All documents sent to or received by Yatooma@FYBLaw.com, including, but not limited to, the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*, enclosed herewith.

      10.     All documents that concern or relate to your acquisition of the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*, enclosed herewith.

      11.     All documents that concern or relate to the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*, enclosed herewith.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF**
**OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

                                  Case No. 23- 200283-CB
                                  Hon. Victoria A. Valentine

v.

CHRISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

      Defendants.

| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
|---|---|
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendants* |
| T. Andrew Keating (P86261) | 1615 S. Telegraph Rd, Ste 300 |
| *Attorneys for Plaintiff* | Bloomfield Hills, MI 48032 |
| 27777 Franklin Road, Suite 2500 | (248) 230-2820 |
| Southfield, MI 48034 | sieving@urbanlegalgroup.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BUTZEL LONG, PC** |
| emayer@taftlaw.com | Daniel J. McCarthy(P59457) |
| akeating@taftlaw.com | Bernard J. Fuhs (P69621) |
| | *Co-Counsel for Defendant* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO MODIFY AND/OR RELIEF FROM JULY 3, 2023, ORDER PURUSANT TO MCR 2.612

      As a preliminary matter, Defendants submit that because of the Court's recent decision to appoint a Receiver, MSY is currently without Counsel. Defendants therefore respectfully request that the Court defer ruling on this Motion until the Receiver retains counsel to protect MSY's interest in this matter.

FILED   Received for Filing   Oakland County Clerk   7/24/2023 3:17 PM

**INTRODUCTION**

This motion is another example of Plaintiff Gregory Yatooma's ("Gregory") scorched earth litigation tactics. Gregory has filed another specious Motion where his only intent is to mischaracterize his version of the circumstances that have transpired between the parties and in so doing completely wasting this Courts valuable time.[1]  It is beyond dispute that (1) Defendants have fully complied with this July 3, 2023, Order regarding the distribution of the Settlement Proceeds; (2) Gregory admits on page 2 of his Motion that the Defendants have complied with the terms of the Order; and (3) there is absolutely no legal basis for Gregory to seek relief from the Order.

**PROCEDURAL HISTORY**

On or about May 10, 2023, Gregory filed the instant action against Christopher Yatooma and MSY Capital Partners, LLC ("Defendants"). On March 17, 2023, Gregory also filed a Motion for an Order Permitting Dykema Gossett, PLLC to Interplead and/or Deposit Disputed Funds with this Court. The "Disputed Funds" involve Settlement Proceeds from litigation previously pending before Judge Warren in the case of *MSY Capital Partners, LLC et al v LIV Wellness Center, LLC et al*, Oakland County Case No. 2019-178037-CB ("MSY/LIV Litigation"). Following an appeal, the parties in the MSY/LIV Litigation agreed to resolve their issues and executed a March 10, 2023, Confidential Settlement Agreement ("CSA"). Pursuant to the CSA, the above parties agreed

---

[1] Gregory's has made continuous misrepresentations in this litigation, including (1) that MSY has no current business other than the distribution of the Litigation Proceeds - to the contrary, MSY is an active going concern with ongoing business. (2) that Christopher closed MSY's bank account at Chase Bank.  Chase Bank Account No. ----2627 is active and open. (3) That Christopher removed Greg from the MSY bank account- when on January 31, 2023, and February 14, 2023, Gregory admitted that he was "selling the companies to Chris", and specifically directed, "Remove me from these accounts, but keep the account active" which specifically mentioned the MSY Chase Bank Account No. 2627 (held under Christopher James & Associates, LLC). 4) Gregory contends that he is a partner in MSY with Christopher, yet he recently told Crain's Detroit Business that he is not business partners with his brothers and haven't been in over 4 years. *See Ex D*.

that the appeal bond would be returned to Dykema Gossett, PLLC ("Dykema"), to which Dykema would then distribute to each party its designated portion of the bond.  As Dykema was prepared to distribute the bond proceeds, Defendant Christopher Yatooma ("Christopher") the designated representative for MSY, instructed Dykema to distribute MSY's portion of the funds.  Gregory, on the other hand, provided conflicting different instructions and asked Dykema to wire a portion of MSY's funds to a different non-MSY account.  As this Court knows, Dykema refrained from distributing the funds pending either an agreement from Gregory and Christopher or by further order of the court.  On June 7, 2023, MSY filed a Motion to Compel Dykema to Distribute the Bond before Judge Warren as provided by the CSA. This Court ordered Gregory's motion stayed pending the hearing in front of Judge Warren. On June 16, 2023, Judge Warren issued an Order closing the MSY/LIV case without ruling on MSY's Motion to Comple Dykema to Distribute the Bond to MSY per the terms of the CSA.

Gregory re-noticed for hearing his Motion to Interplead and/or Deposit Funds with this Court. On June 28, 2023, this Court held a hearing on Gregory's Motion. At the hearing this Court ruled that she would allow the *parties to decide* whether they wanted one- half (1/2) of the funds to go to each party in a trust account or if they wanted the whole amount to go to the Court.  If the parties did not reach an agreement, then the parties were instructed to submit an Order that the entire proceeds of the Bond would be deposited with the Court. *See transcript of June 28, 2023, hearing attached hereto as Ex. A.* Thereafter, the parties reached an agreement that one-half (1/2) of the funds be distributed to Gregory Yatooma, on the one hand, and one-half (1/2) the funds to Christopher Yatooma on the other hand, to an account of each party's choosing, where each party shall hold and freeze the Funds until further written agreement of the parties or order of the Court. Accordingly, the parties submitted to this Court a proposed Order Re: Plaintiff's Motion for an

3

Order Permitting Dykema Gossett PLLC To Interplead and/or Deposit Disputed Funds with the Court (the "Order"), *attached hereto as Ex. B*. On July 3, 2023, this Court entered the Order with a single modification that provided that the Settlement Funds were "**To be held in the IOLTA account of the attorney for the respective party**". *The Order is attached hereto as Ex. C.*

In the meantime, Christopher retained Urban Legal Group to act as co-counsel in this action in the place of Legal Consulting, PLLC and a substitution of counsel has since been entered with the Court.

After the Court entered the above Order, the Defendants determined that because the Settlement Proceeds from the MSY/LIV litigation involved cannabis related funds[2], and out of an abundance of caution, it would deposit Christopher's portion of the Settlement Proceeds into the IOLTA account of Urban Legal Group. Urban Legal Group has a IOLTA account with Citizen State Bank, an authorized cannabis banking institution. Urban Legal Group's IOLTA account is fully compliant with the applicable rules of the State Bar of Michigan as all interest from the account goes *directly* to the State Bar. The undersigned is the sole signatory and the only agent authorized to act under the IOLTA account. Finally, it should also be noted that after the resolution of the MSY/LIV Litigation, the Dykema Law Firm held the Settlement Funds at an account with Dart Bank, which is also an authorized cannabis banking institution. Clearly, the Dykema Law firm had the same concerns regarding the treatment of the MSY/LIV Litigation Proceeds.

Contrary to Gregory's specious allegations, there was nothing nefarious surrounding Defendants' decision to deposit its portion of the Settlement Funds with Urban Legal Group.

---

[2] The MSY/LIV Wellness litigation involved a breach of partnership agreement involving the development, ownership and operation of a retail cannabis store located in Ferndale, Michigan.

Accordingly, the Defendants have complied with this Court's July 3, 2023, Order. As such this Motion should be denied.

## ARGUMENT

### There Is No Grounds for The Court to Grant Relief from The Order.

Gregory is seeking relief from the Order pursuant to MCR 2.612(C)(1)(a) and (c), alleging that Defendants have attempted to subvert the Court's Order and as such he is the "victim" of mistake, fraud or misconduct. These claims are completely without merit as Defendants have complied with both the letter and "sprit" of this Court's Order.

MCR 2.612(C)(1) provides as follows:

> (1) On motion and on just terms, the court may relieve a party or the legal representative of a party from a final judgment, order, or proceeding on the following grounds:
>
> (a) **Mistake, inadvertence, surprise, or excusable neglect.**
>
> (b) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under MCR 2.611(B).
>
> (c) **Fraud (intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.**
>
> d) The judgment is void.
>
> (e) The judgment has been satisfied, released, or discharged; a prior judgment on which it is based has been reversed or otherwise vacated; or it is no longer equitable that the judgment should have prospective application.
>
> (f) Any other reason justifying relief from the operation of the judgment.

Gregory argues that the Court entered the Order on the "belief" that one-half (1/2) of the Settlement proceeds would be transferred into the IOLTA account of one of the Defendants attorneys at the time, either Butzel Long or Legal Consulting. Gregory goes on to allege that it was not contemplated by the Court or by Gregory that the funds would be deposited into the IOLTA account of Urban Legal. Because of this, Gregory wants this Court to modify the Order

and require the parties to deposit the entirety of the Settlement Funds into the Circuit Court's

escrow account. Gregory's contention is completely lacking in merit.

At the June 28, 2023, hearing and after extensive argument, the Court made the following

ruling as to the distribution of the Settlement Funds:

> "THE COURT: And with regard to Dykema, again, the Court will take the money
> and have it put into the court fund; if you want to stipulate to something
> differently, you're certainly entitled to do that by stipulation, otherwise the Court
> will take the money as was indicated in the confidential settlement agreement,
> that the money was to be disbursed within two days of the dismissal. That's the
> ruling of the Court."

Per the Court's instruction, the parties jointly negotiated and submitted a proposed Order

whereby each party agreed to each deposit one-half (1/2) of the Settlement Funds to an account

of each party's choosing and further agreed to hold and freeze the funds until further written

agreement of the parties or order of the Court. Thereafter, the Court modified the Order to

instead provide that the Settlement Funds were *__To be held in the IOLTA account of the__

*__attorney for the respective party__*. Thereafter, the Defendants deposited their portion of the

Settlement Funds into the Urban Legal Group <u>IOLTA account</u>, which is completely in

compliance with the terms of this Court's Order. Clearly, the Order did not direct the Settlement

Funds to be deposited into an IOLTA account of either the Butzel or Legal Consulting Law

Firms. Instead, the Order specifies that the funds were to be deposited into an IOLTA account for

the attorney for the respective party. As such, the decision by defendants to place the Settlement

Funds into the Urban Legal Group IOLTA account complies with the agreement of the parties

and the terms of the Order.

Gregory further attempts to argue that the Order should be modified pursuant to MCR

2.116(C)(1)(c), alleging fraud and misconduct on the part of the Defendants. Gregory claims that

the Court specifically ruled that the Settlement Funds were not to be deposited into Citizens State Bank. A mere cursory review of the hearing transcript establishes that the Court made no such finding or ruling.[3] Further, the fact that Christopher is the owner of Citizen State Bank is wholly irrelevant to this instant Motion. As set forth above, Christopher's portion of the Settlement Funds have been deposited into an IOLTA account opened and controlled by Urban Legal Group. The Settlement Funds are segregated and frozen until further written agreement of the parties or further order of the Court. Finally, all interest derived from the Settlement Proceeds will go directly to the State Bar of Michigan, not to Christopher. Again, there is no legal or factual basis to support Gregory's claim of fraud or misconduct that would warrant a modification of the Order.

<div align="center"><b><u>CONCLUSION</u></b></div>

Based on the foregoing, Plaintiff's Motion should be Denied.[4]

Respectfully submitted,

URBAN LEGAL GROUP

By:/s/ *Jeffrey R. Sieving*
Jeffrey R. Sieving
*Co-Counsel for Defendants*
1615 S. Telegraph Rd., Suite 300
Bloomfield Hills, MI 48301
(248) 230-2820
sieving@urbanlegalgroup.com

July 24, 2023

---

[3] The pages of the transcript cited by Gregory refer to the Court's position that the Settlement Funds were to be evenly split into the respective accounts of the parties and not be held solely by Defendant MSY.
[4] Alternatively, if this Court is inclined to modify the Order, the Settlement Funds should be deposited into MSY's account under the strict purview of the Receiver.

# EXHIBIT 5

**J. ADAM BEHRENDT**

JBEHRENDT@BODMANLAW.COM
248-743 6068

August 22, 2023

BODMAN PLC
SUITE 500
201 W. BIG BEAVER ROAD
TROY, MICHIGAN 48084
248-743-6002 FAX
248-743-6000

Ethan R. Holtz, Atty
Emily M. Mayer, Atty
Taft Stettinius & Hollister LLP
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034



Re:  Gregory Yatooma v. Christopher Yatooma and MSY Capital Partners, LLC;
     Oakland County Circuit Court Case No: 23-200283-  CB

Dear Ethan and Emily:

Please be advised that this firm has been retained as co-counsel to Christopher Yatooma ("Chris") regarding the above-referenced lawsuit filed by Gregory Yatooma ("Greg"). I am writing to you as it has come to our attention that Greg has engaged in disturbing and inappropriate conduct in connection with this ongoing matter. Specifically, Greg has reached out to current and former employees who work or have previously worked for Chris with the sole purpose of intimidating, harassing, and threatening these individuals in connection with this litigation. Some examples of his conduct, include:

- Greg has continually attempted to contact James Teasdale ("Teasdale"), who is employed in the accounting department of Chris's companies, including MSY. On one such occasion, Greg attempted to contact Teasdale some 11 times over a holiday weekend. Chris instructed Greg to refrain from contacting Teasdale as it was causing real anxiety to Teasdale. Despite this, Greg continues to reach out, including approaching him at a recent golf outing seeking to discuss this litigation with Teasdale.

- Greg has contacted Rich Stopczy ("Stopczy"), Chris's IT manager for Chris's companies, including MSY. On one such occasion, Greg threatened criminal prosecution if Stopczy did not immediately transfer and delete certain email accounts. The email accounts included employees of Chris's companies and were housed on the OCG Company Microsoft tenant cloud account. In so doing, Greg misrepresented his authority to make this demand by telling the employee that he "owned" these email accounts, which Greg knew to be false. Stopczy was forced to block Greg on his phone but that has not stopped Greg's continuous attempt to contact Stopczy. As recently as July 25, 2023, and August 15, 2023, Greg attempted to contact Stopczy by sending an email to Stopczy's personal email account asking Stopczy to contact him. The most recent contact came after Greg was made

DETROIT  |  TROY  |  ANN ARBOR  |  CHEBOYGAN  |  GRAND RAPIDS

Page 2

aware that Stopczy had retained counsel in this matter to defend him in connection with the recent Third-Party Subpoena served upon him.

- On or about July 24, 2023, Greg contacted Charles Witt ("Witt") a controller for Chris' companies, including MSY. During one call, Greg repeatedly asked Witt to confirm Greg's account of what transpired at the December 13, 2023 meeting attended by the parties. Greg further accused Witt of improperly removing Greg from the MSY bank account. When Witt informed Greg that he did not wish to speak with him, Greg told Witt that he needed to talk with Greg to avoid legal action by Greg. Greg continues to call and text Witt and recently texted Witt stating "Hey bud, I never heard back. Let me know how you want to proceed."

- Greg recently contacted the Executive Director of New Foster Care, a non-profit charity that Chris founded. Greg contacted this employee under false pre-tenses of discussing New Foster Care business when the actual purpose was to discuss her role with Urban Legal, a law firm representing Chris, and relating to an upcoming Motion that Greg was filing in this matter. During the conversation, Greg made disparaging remarks about Chris and others and implied during the conversation that she had committed wrongdoings.

- Greg contacted Chris's former in-house accountant and requested that he access and send Greg certain financial documents relating to Chris's companies. Greg improperly led the former accountant to believe that Greg had authority to make this request.

- Greg has recently contacted two of Chris's employees from the OCG Companies and directed them to do work at Greg's in-law's house in Lake Orion, MI, using Chris's fuel and equipment, without his knowledge and consent.

It has also come to our attention that Greg has divulged to third parties confidential and proprietary information relating to Chris's companies, including but not limited to bank and tax information. Greg has also stolen assets from his companies as well as confidential and proprietary information. Greg has also disseminated this information to third parties as part of a concerted effort to undermine Chris's ongoing business activities. Greg's disclosure of this information is clearly in violation of his ethical obligations pursuant to his former role as legal counsel for Chris. As you are aware, these obligations survive the termination of an attorney-client relationship.

I do not need to explain to you the serious implications of these actions. There is absolutely no basis for Greg, as a party to this action, to be contacting

Page 3

Chris's employees to harass, threaten, and intimidate them for the purpose of advancing his interests in the above litigation. Further, as an attorney, Greg should be aware that some of these individuals/entitites are represented parties. We asked that Greg cease and desist the above egregious actions. We are currently evaluating all options, but if Greg's actions continue, we will have no choice but to seek injunctive relief from the court.

Please instruct your client to govern himself accordingly.

Thank you,

Very truly yours,

J. Adam Behrendt

JAB:jg

# EXHIBIT 6

contact

Greg Yatooma <yatoomag@gmail.com>
Tue 7/25/2023 11:59 AM
To:Richard Stopczy <richs@alluviumllc.com>
Please call me when you have a moment.

Thank you,
-Greg

RE: contact

Greg Yatooma <yatoomag@gmail.com>
Tue 8/15/2023 9:34 AM
To:Richard Stopczy <richs@alluviumllc.com>
Checking in.  do you want to talk?  If you don't want to talk, just let me know.

Thx man.

**From:** Greg Yatooma <yatoomag@gmail.com>
**Sent:** Tuesday, July 25, 2023 12:00 PM
**To:** Rich Stopczy <richs@alluviumllc.com>
**Subject:** contact

Please call me when you have a moment.

Thank you,
-Greg

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS,

      Defendants.

Case No.  2023-200283-CB

Hon. Victoria Valetine

**APPEARANCE**

---

TAFT STETTINIUS & HOLLISTER LLP
By:    Ethan R. Holtz (P71884
        Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
Emayer@taftlaw.com
*Attorneys for Plaintiff*

URBAN LEGAL GROUP
By:    Jeffrey Sieving (P71625)
1615 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Co-Counsel for Defendants*

BODMAN PLC
By:    J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
jbehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

---

4863-6163-3652_2

*Left margin:* FILED    Received for Filing    Oakland County Clerk    8/28/2023 2:10 PM

## APPEARANCE

J. Adam Behrendt, of Bodman PLC, hereby enters his appearance on behalf of Defendant

Christopher Yatooma in the above-captioned case.

Respectfully submitted,

BODMAN PLC

By: /s/ J. Adam Behrendt _____
        J. Adam Behrendt (P58607)
        201 W. Big Beaver Road, Suite 500
        Troy, Michigan 48084
        248-743-6000
August 28, 2023        *Counsel for Defendant Christopher Yatooma*

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2023, I caused the foregoing paper and this Certificate

of Service to be electronically filed by using the MiFILE system which will send notification of

such filing(s) to all counsel of record.

*/s/ J. Adam Behrendt*

2

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

     Plaintiff,

v

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS,

     Defendants.

Case No.  2023-200283-CB

Hon. Victoria Valetine

**APPEARANCE**

---

| | |
|---|---|
| TAFT STETTINIUS & HOLLISTER LLP | URBAN LEGAL GROUP |
| By:   Ethan R. Holtz (P71884 | By:    Jeffrey Sieving (P71625) |
|      Emily Mayer (P78956) | 1615 S. Telegraph Road, Suite 300 |
| 27777 Franklin Road, Suite 2500 | Bloomfield Hills, MI  48302 |
| Southfield, MI | (248) 230-2820 |
| (248) 351-3000 | sieving@urbanlegalgroup.com |
| Eholtz@taftlaw.com | *Co-Counsel for Defendants* |
| Emayer@taftlaw.com | |
| *Attorneys for Plaintiff* | BODMAN PLC |
| | By:    J. Adam Behrendt (P58607) |
| |      Michelle Kolkmeyer (P81355) |
| | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI  48084 |
| | (248) 743-6000 |
| | jbehrendt@bodmanlaw.com |
| | *Counsel for Defendant Christopher Yatooma* |

FILED     Received for Filing     Oakland County Clerk     8/28/2023 2:16 PM

**APPEARANCE**

Michelle Kolkmeyer, of Bodman PLC, hereby enters her appearance on behalf of Defendant Christopher Yatooma in the above-captioned case.

Respectfully submitted,

BODMAN PLC

By: /s/ Michelle Kolkmeyer (P81355)_____
      Michelle Kolkmeyer (P81355)
    201 W. Big Beaver Road, Suite 500
    Troy, Michigan 48084
    248-743-6000

August 28, 2023         *Counsel for Defendant Christopher Yatooma*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2023, I caused the foregoing paper and this Certificate of Service to be electronically filed by using the MiFILE system which will send notification of such filing(s) to all counsel of record.

*/s/ Michelle Kolkmeyer*

2

4863-6163-3652_2

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA,

        Plaintiff,                                   Case No. 23- 200283-CB

v.                                            Hon. Victoria A. Valentine

CHISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

        Defendants.

_____/

| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
|---|---|
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendants* |
| T. Andrew Keating (P86261) | 1615 S. Telegraph Rd, Ste 300 |
| *Attorneys for Plaintiff* | Bloomfield Hills, MI 48032 |
| 27777 Franklin Road, Suite 2500 | (248) 230-2820 |
| (248) 351-3000 | sieving@urbanlegalgroup.com |
| eholtz@taftlaw.com | |
| emayer@taftlaw.com | **BUTZEL LONG, PC** |
| akeating@taftlaw.com | Daniel J. McCarthy (P59457) |
| | Bernard J. Fuhs (P69621) |
| | *Co-Counsel for Defendant* |
| | 150 W. Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

_____

**NOTICE OF HEARING**

      Please take notice that *Non-Party Citizens State bank's Motion to Quash Subpoena* will

be brought for hearing before the Honorable Victoria Valentine, in the Oakland County Circuit

Court, on Wednesday, September 6, 2023, at 9:00 am via Zoom, or as soon thereafter as counsel

may be heard.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1

You are scheduled to join a virtual court room proceeding before the Honorable Victoria A. Valentine in Oakland County 6th Circuit Court. Please visit Zoom Hearing Schedule the Monday before the hearing at:

Please visit Zoom Hearing Schedule the Monday before the hearing at:

https://docs.google.com/spreadsheets/d/1E9FzqhczMJGsJXQjJ1cDZ

k1yglKJ2TkYkZWdNgK3uTc/edit?usp=sharing

for the specific hearing time. The link to this calendar can also be found on the Judge Valentine's Court Protocol.

Zoom Instructions:

To join the Virtual Hearing by computer with video, go to the Zoom Web Site (zoom.us) and click on "Join a Call." When prompted, you will join using Meeting ID 248 858 5282. To join the Virtual Meeting by telephone without video, call 1-646-876-9923 and connect using Meeting ID 248 858 5282.

Respectfully submitted,

PAESANO AKKASHIAN, PC

By: _/s/ Brian M. Akkashian_
Brian M. Akkashian (P55544)
Alec M. Torigian (P81909)
Attorneys for Non-Party Citizens State Bank
7457 Franklin Road, Suite 200
Bloomfield Hills, MI  48301
(248) 792-6686
bakkashian@palawyers.com
atorigian@palawyers.com

Dated:  August 25, 2023

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2023, I electronically filed the foregoing document

with the Clerk of the Court using the MiFile e-File & Serve system which will send notification

of such filing to all registered counsel.

Respectfully submitted,

PAESANO AKKASHIAN, PC

By: _/s/ Brian M. Akkashian_____
Brian M. Akkashian (P55544)
Alec M. Torigian (P81909)
Attorneys for Non-Party Citizens State Bank
7457 Franklin Road, Suite 200
Bloomfield Hills, MI  48301
(248) 792-6886
bakkashian@palawyers.com
atorigian@palawyers.com

Dated:  August 25, 2023

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA,

        Plaintiff,                            Case No. 23- 200283-CB

v.                                       Hon. Victoria A. Valentine

CHISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

        Defendants.

_____/

| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
|---|---|
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendants* |
| T. Andrew Keating (P86261) | 1615 S. Telegraph Rd, Ste 300 |
| *Attorneys for Plaintiff* | Bloomfield Hills, MI 48032 |
| 27777 Franklin Road, Suite 2500 | (248) 230-2820 |
| (248) 351-3000 | sieving@urbanlegalgroup.com |
| eholtz@taftlaw.com | |
| emayer@taftlaw.com | **BUTZEL LONG, PC** |
| akeating@taftlaw.com | Daniel J. McCarthy (P59457) |
| | Bernard J. Fuhs (P69621) |
| | *Co-Counsel for Defendant* |
| | 150 W. Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

_____

### <u>NON-PARTY CITIZENS STATE BANK'S</u><br><u>MOTION TO QUASH SUBPOENA</u>

Non-party Citizens State Bank ("CSB"), by and through its attorneys, Paesano Akkashian,

PC, requests that this Court quash the subpoena issued by Plaintiff Gregory Yatooma ("Plaintiff")

pursuant to MCR 2.302 and 2.305 and award CSB all costs and attorney fees incurred in this

motion pursuant to MCR 2.313(A)(5). If the Court does not quash the subpoena, CSB requests

entry of an appropriate protective order prior to any production by CSB and prepayment by

1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Plaintiff of the reasonable costs of producing documents pursuant to MCR 2.305(A)(4)(c) including, but not limited to, copying costs and costs relating to time spent by CSB employees to compile and produce documents.

      In support of its motion, CSB relies on the attached brief in support.


            Respectfully submitted,

            PAESANO AKKASHIAN, PC

            By: */s/ Brian M. Akkashian*
            Brian M. Akkashian (P55544)
            Alec M. Torigian (P81909)
            Attorneys for Non-Party Citizens State Bank
            7457 Franklin Road, Suite 200
            Bloomfield Hills, MI  48301
            (248) 792-6886
            bakkashian@palawyers.com
            atorigian@palawyers.com


Dated:  August 25, 2023

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA,

        Plaintiff,                          Case No. 23- 200283-CB

v.                                         Hon. Victoria A. Valentine

CHISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

        Defendants.

_____/

<table>
<tr><td><strong>TAFT STETTINIUS & HOLLISTER LLP</strong></td><td><strong>URBAN LEGAL GROUP</strong></td></tr>
<tr><td>Ethan R. Holtz (P71884)</td><td>Jeffery R. Sieving (P71625)</td></tr>
<tr><td>Emily M. Mayer (P78956)</td><td><em>Co-Counsel for Defendants</em></td></tr>
<tr><td>T. Andrew Keating (P86261)</td><td>1615 S. Telegraph Rd, Ste 300</td></tr>
<tr><td><em>Attorneys for Plaintiff</em></td><td>Bloomfield Hills, MI 48032</td></tr>
<tr><td>27777 Franklin Road, Suite 2500</td><td>(248) 230-2820</td></tr>
<tr><td>(248) 351-3000</td><td>sieving@urbanlegalgroup.com</td></tr>
<tr><td>eholtz@taftlaw.com</td><td></td></tr>
<tr><td>emayer@taftlaw.com</td><td><strong>BUTZEL LONG, PC</strong></td></tr>
<tr><td>akeating@taftlaw.com</td><td>Daniel J. McCarthy (P59457)</td></tr>
<tr><td></td><td>Bernard J. Fuhs (P69621)</td></tr>
<tr><td></td><td><em>Co-Counsel for Defendant</em></td></tr>
<tr><td></td><td>150 W. Jefferson Avenue, Ste 100</td></tr>
<tr><td></td><td>Detroit, MI 48226</td></tr>
<tr><td></td><td>(313) 225-7000</td></tr>
<tr><td></td><td>fuhs@butzel.com</td></tr>
</table>

## BRIEF IN SUPPORT OF NON-PARTY CITIZENS STATE BANK'S MOTION TO QUASH SUBPOENA

### I.      INTRODUCTION AND BACKGROUND FACTS

The subpoena at issue in this motion is part of an ongoing and improper effort by Plaintiff

Gregory Yatooma ("Plaintiff"), through discovery, to harass his brother, Defendant Christopher

Yatooma ("Christopher"), as well as to harass and cause undue burden and expense to persons and

3

entities connected with Christopher. The discovery sought is irrelevant to Plaintiff's claims and not proportional to the needs in this case and the subpoena should be quashed.

On May 10, 2023, Plaintiff Greg Yatooma sued Defendants Christopher and MSY Capital Partners, LLC ('MSY") in this matter alleging breach of contract (Count I), promissory estoppel (Count II), unjust enrichment (Count III), declaratory relief (Count VI), and dissolution of MSY pursuant to MCL 450.4802 (Count V). On June 20, 2023, Defendants filed a motion for summary disposition to compel this matter to arbitration based on an arbitration provision contained in a March 10, 2023 Settlement Agreement. The Court has not yet ruled on that motion. If this matter is moved to arbitration, in whole or in part, discovery as well as third-party subpoenas would be limited and subject to the arbitrator's discretion.

The gist of Greg's Complaint is that brothers Chris Yatooma and Greg Yatooma were partners "in many [unspecified] business ventures," that the Yatoomas experienced an unspecified "breakdown in the relationship," that they therefore signed a so-called "Buyout Agreement" on December 14, 2022, to exit Greg from this vague "partnership," and that Chris allegedly broke this purported agreement. *Complaint*, ¶¶ 9, 15, 16, 27.

Plaintiff served a subpoena dated August 10, 2023 (the "Subpoena," **Exhibit A**) on non-party Citizens State Bank ("CSB"), which is owned by Christopher. The Subpoena seeks, *for fifteen (15) different companies* that are customers of CSB, the production of bank statements, canceled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, and documents concerning account access and authorization.[1] For numerous reasons, the Subpoena should be quashed.

---

[1] On the Subpoena SCAO form, the "Testify at deposition" box is checked, but no deponent is named and the cover letter accompanying the Subpoena states that it is for the production of documents. For the avoidance of doubt, CSB seeks to quash the Subpoena in its entirety.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

First, the Subpoena seeks the production by CSB of its customers' bank records. If Plaintiff believes that the requested information is relevant in this action, it should serve subpoenas on the companies named in the Subpoena. CSB should not be required to produce its customers' highly confidential financial information when Plaintiff can seek the information directly from the customers.

Second, Plaintiff's Complaint asserts a breach of contract claim in regard to the enforcement of the alleged December 2022 agreement. It is hard to imagine how the enforcement of the alleged agreement would require discovery into the financial condition or performance of the companies identified in the Subpoena and the highly confidential financial information sought by the Subpoena is irrelevant to Plaintiff's claims. As just one example, of the fifteen (15) companies identified in the subpoena, only three (3) are even mentioned in the December 2022 document.

Third, the Subpoena seeks bank records from Urban Legal Group ("Urban"), which is **Christopher's co- counsel** in this action. There is no rational basis for Plaintiff to request Urban bank records.

The Subpoena should be quashed in its entirety pursuant to MCR 2.302 and 2.305(A)(4)(a) and CSB should be awarded its costs and attorney fees incurred in this motion pursuant to MCR 2.313(A)(5). If the Court does not quash the Subpoena in its entirety, the Court should condition any production on entry of an appropriate protective order pursuant to MCR 2.302(C) and Plaintiff's prepayment of the reasonable costs of producing documents pursuant to MCR 2.305(A)(4)(c) including, but not limited to, copying costs **and** costs relating to time spent by CSB employees to compile and produce the documents.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## II.   <u>LEGAL ARGUMENT</u>

### A.  <u>Legal Standard</u>

Several Michigan Court Rules are implicated in this motion.  MCR 2.302(B)(1) provides:

In General. Parties may obtain discovery regarding any non-privileged matter that is ***relevant to any party's claims or defenses and proportional to the needs of the case***, taking into account all pertinent factors, including whether the burden or expense of the proposed discovery outweighs its likely benefit, the complexity of the case, the importance of the issues at stake in the action, the amount in controversy, and the parties' resources and access to relevant information. Information within the scope of discovery need not be admissible in evidence to be discoverable.  Emphasis added.

MCR 2.305(A)(4) provides, in pertinent part:

A subpoena issued under this rule is subject to the provisions of MCR 2.302(C), and the court in which the action is pending or in which the subpoena is served, on timely motion made by a party or the subpoenaed non-party before the time specified in the subpoena for compliance, may: ***(a) quash or modify the subpoena if it is unreasonable or oppressive; (b) enter an order permitted by MCR 2.302(C); or (c) conditionally deny the motion on prepayment by the party on whose behalf the subpoena is issued of the reasonable cost of producing documents or other tangible things.***  Emphasis added.

MCR 2.302(C) provides, in pertinent part:

(C) Protective Orders. On motion by a party or by the person from whom discovery is sought, and on reasonable notice and for good cause shown, the court in which the action is pending may issue any order that justice requires ***to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense***, including one or more of the following orders: (1) that the discovery not be had…(4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters…The provisions of MCR 2.313(A)(5) apply to the award of expenses incurred in relation to the motion.  Emphasis added.

### B.  <u>The Subpoena Should be Quashed</u>

The Subpoena seeks production by CSB of its customers' bank records.  If Plaintiff believes that the requested information is relevant in this action, it should serve subpoenas on the companies named in the Subpoena.  CSB should not be required to produce its customers' highly confidential financial information when Plaintiff can seek the information directly from the

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

customers.   To the best of CSB's knowledge, no formal notice has been given to the target companies that their bank records have been requested.   Moreover, the information contained in the requested bank records will undoubtedly include information about other persons and entities with whom the target companies do business, such as vendors and customers.

Plaintiff should be required to make a compelling showing of relevance, which he cannot do, before: (1) CSB is required to divert its employees from their daily jobs for a significant amount of time to identify and compile customer bank records, and (2) Plaintiff is permitted to dig around in the bank records of fifteen (15) different companies.  Even then, Plaintiff should not be permitted to do an "end around" of the target companies by seeking to obtain from CSB information that is clearly within the target companies' possession and should be requested from them.

CSB is an entity separate from Christopher and, being a bank, is in a highly regulated industry where confidentiality is paramount.  Plaintiff's Subpoena is not justified by the fact that Christopher owns CSB and has, or had, an ownership interest in some of the companies identified in the Subpoena.

The requested documents are also irrelevant, not proportional to the needs of the case, and the burden or expense of compiling and producing the requested documents outweighs their likely benefit.  The December 2022 document, among other alleged "terms," provides for the payment of specific dollar amounts by Christopher to Plaintiff in connection with separation of the parties' unspecified business relationship.  Importantly, such payment is not conditioned on the financial condition or financial performance of any of the companies identified in the Subpoena, nor is any other term of the December 2022 document.  Thus, the bank records are irrelevant to Plaintiff's claim to enforce the December 2022 document.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Further, of the fifteen (15) companies identified in the Subpoena, only three (3) are even referenced in the December 2022 document and those references are limited to Christopher paying taxes for one of the companies and the termination of Plaintiff's involvement in two others. There is nothing in the December 2022 document that makes the requested bank records relevant.

One of the companies for which bank records are sought is Urban, which is Christopher's co-counsel in this case. CSB is aware that there was a dispute between the parties relating to the deposit of settlement proceeds from litigation between MSY and LIV Wellness Center, LLC ("LIV") in Urban's IOLTA account. It is CSB's understanding that these settlement proceeds have now been deposited with the Court, thereby resolving the Urban IOLTA issue. Urban's bank records are irrelevant.

**C.  If the Court Orders Production of Any Documents, a Protective Order Should be Entered and Plaintiff Should be Required to Pay Copying Costs and All Other Costs Incurred by CSB to Compile and Produce the Documents**

If the Court orders CSB to produce any of its customers' bank records, an appropriate protective order should be entered pursuant to MCR 2.302(C) to ensure that: (1) access to the documents is restricted to those persons necessary for the adjudication of this action, (2) the documents are not filed in the public record, and (3) the documents are not used for any purpose outside this litigation.

In addition, MCR 2.305(A)(4)(c) provides that the Court may require Plaintiff to pay "the reasonable cost of producing documents or other tangible things." The copying costs and number of hours to be spent by CSB employees identifying, compiling and producing documents will depend in large part on the documents (if any) the Court orders produced. If the Court orders production of all documents subject to the Subpoena, CSB will have to review voluminous records for 15+ extremely active accounts. CSB estimates that its employees will have to spend

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

approximately 120 hours identifying and compiling documents.  This is valuable time that CSB's employees should be spending performing their daily jobs.  CSB therefore requests compensation and/or reimbursement for copying costs and for time spent by its employees responding to the Subpoena, as follows:

- Copying costs - $1/page (estimate of 5,000+ pages);
- Labor costs:
  - $75/hour for 60 hours = $4,500
  - $40/hour for 60 hours = $2,400.

See Affidavit of Lara Ward, attached hereto as **Exhibit B**.

### III.     CONCLUSION

For the foregoing reasons, CSB respectfully requests that the Court quash the Subpoena and award CSB all costs and attorney fees incurred in this motion pursuant to MCR 2.313(A)(5). If the Court does not quash the Subpoena, CSB requests entry of an appropriate protective order prior to any production by CSB and compensation and reimbursement for copying costs and for all time spent by CSB employees responding to the Subpoena.

<div align="right">

Respectfully submitted,

PAESANO AKKASHIAN, PC

By: _/s/ Brian M. Akkashian_
Brian M. Akkashian (P55544)
Alec M. Torigian (P81909)
Attorneys for Citizens State Bank
7457 Franklin Road, Suite 200
Bloomfield Hills, MI  48301
(248) 792-6886
bakkashian@palawyers.com
atorigian@palawyers.com

</div>

Dated:  August 25, 2023

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2023, I filed the foregoing document using the MiFile

EFile & Serve system which will send notification of such filing on all registered counsel.

Respectfully submitted,

PAESANO AKKASHIAN, PC

By: _/s/ Brian M. Akkashian_
Brian M. Akkashian (P55544)
Alec M. Torigian (P81909)
Attorneys for Citizens State Bank
7457 Franklin Road, Suite 200
Bloomfield Hills, MI  48301
(248) 792-6886
bakkashian@palawyers.com
atorigian@palawyers.com

Dated:  August 25, 2023

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# EXHIBIT A

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



27777 Franklin Road, Suite 2500
Southfield, Michigan 48034-8214
Tel: 248.351.3000 | Fax: 248.351.3082

**Emily M. Mayer**
emayer@taftlaw.com

August 10, 2023

Citizens State Bank
23500 Woodward Ave Royal Oak MI 48073

> ***Re:***   *Yatooma v Yatooma, et. al*
> *Oakland County Circuit Court Case No. 2023- 2023-200283-CB*

To Whom it May Concern:

Enclosed please find a subpoena for production of documents regarding the above-referenced matter. No personal appearance is necessary if the documents are timely produced. Please produce the requested documents on or before August 28, 2023, via email to emayer@taftlaw.com or otherwise to the address identified on the subpoena. We will reimburse you for any reasonable copying expenses incurred in connection with producing the documents. However, should your anticipated copying charges exceed $50.00, please advise us by contacting the undersigned in advance, so that we may discuss alternative arrangements for providing copies.

I thank you in advance for your cooperation. Please feel free to contact me if you have any questions.

Sincerely,

**Taft Stettinius & Hollister LLP**

*Emily Mayer*

Emily M. Mayer

Enclosures
cc: Defendants' Counsel

4887-8917-9982

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



| STATE OF MICHIGAN | SUBPOENA | CASE NO. and JUDGE |
|---|---|---|
| JUDICIAL DISTRICT | Order to Appear and/or Produce | 2023-200283-CB |
| 6th  JUDICIAL CIRCUIT | | |
| COUNTY | | Hon. Victoria Valentine |

Court address 1200 N Telegraph Rd Pontiac MI 48341     (248) 858-0344    Court telephone no.

Police Report No. (if applicable):

| Plaintiff(s)/Petitioner(s) | | Defendant(s)/Respondent(s) |
|---|---|---|
| ☐ People of the State of Michigan<br>☑ Gregory Yatooma | **v** | Christopher Yatooma, et al |
| ☑ Civil     ☐ Criminal | | Charge |

In the matter of _____

In the Name of the People of the State of Michigan. TO:

Citizens State Bank, 32500 Woodward Ave, Royal Oak, MI 48073

If you require accommodations to use the court because of a disability, or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

## YOU ARE ORDERED TO:

☑ 1. Appear personally at the time and place stated below: You may be required to appear from time to time and day to day until excused.

| ☐ The court address above | ☑ Other: 27777 Franklin Rd Suite 2500 Southfield MI 48034 | |
|---|---|---|
| Day Monday | Date August 28, 2023 | Time 10:00 a.m. |

☐ 2. Testify at trial / examination / hearing.

☑ 3. ☑ Produce copies* of the following items: (Use additional pages if necessary.) Please produce the documents identified in the enclosed exhibit on or before Monday, August 28, 2023 at 10:00 a.m.

*Note:  Requesting party must pay reasonable copying costs, which cannot be waived under MCR 2.002.

☐ Permit inspection or copying of the following items: (Use additional pages if necessary.) _____

_____

☐ 4. Testify as to your assets, and bring with you the items listed in line 3 above.

☑ 5. Testify at deposition.

☐ 6. Abide by the attached prohibition against transferring or disposing of property. (MCL 600.6104(2), 600.6116, or 600.6119.)

☐ 7. Other: _____

_____

Approved, SCAO
Form MC 11, Rev. 3/23
MCL 600.1455, MCL 600.1701, MCL 600.6104, MCL 600.6110, MCL 600.6116,
MCL 600.6119, MCR 2.002, MCR 2.105, MCR 2.305, MCR 2.506
Page 1 of 2

Distribute form to:
Return
Witness
File

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**Subpoena, Order to Appear and/or Produce**   (3/23)
Page 2 of 2

Case No. 2023-200283-CB

| ☑ 8. | Person requesting subpoena | Telephone no. |
| | Emily Mayer | 248-351-3000 |

| Address |
| 27777 Franklin Rd Ste 2500 |

| City | State | Zip |
| Southfield MI 48034 | | |

**NOTE:** If requesting a debtor's examination under MCL 600.6110, or an injunction under item 6, this subpoena must be issued by a judge. For a debtor examination, the affidavit of debtor examination below must also be completed. Debtor's assets can also be discovered through MCR 2.305 without the need for an affidavit of debtor examination or issuance of this subpoena by a judge.

**FAILURE TO OBEY THE COMMANDS OF THE SUBPOENA OR TO APPEAR AT THE STATED TIME AND PLACE MAY SUBJECT YOU TO PENALTY FOR CONTEMPT OF COURT.**

| Court use only |
| ☐ Served   ☐ Not served |

*Emily Mayer*
Judge/Clerk/Attorney signature and date

August 10, 2023

---

**AFFIDAVIT FOR JUDGMENT DEBTOR EXAMINATION**

I request that the court issue a subpoena that orders the party named on this form to be examined under oath before a

judge concerning the money or property of _____

for the following reasons: _____

_____

_____
Signature

Subscribed and sworn to before me on _____ .
Date

_____
Deputy clerk/Notary public signature

My commission expires on _____ .

_____
Name (type or print)

Notary public, State of Michigan, County of _____ . ☐ Acting in the County of _____ .
☐ This notarial act was performed using an electronic notarization system or a remote electronic notarization platform.

Subpoena, Order to Appear and/or Produce    (3/23)

Case No. ___2023-200283-CB___

## PROOF OF SERVICE

**TO PROCESS SERVER:** You must serve the subpoena and file proof of service with the court clerk. If you are unable to complete service, you must return this original and all copies to the court clerk.

## CERTIFICATE OF SERVICE  / NONSERVICE

☐ I served    ☐ personally    ☐ by registered or certified mail, return receipt requested, and delivery restricted to the addressee (copy of return receipt attached)    a copy of the subpoena, together with any required fees and the attachments listed below, on:

☐ I have attempted to serve a copy of the subpoena, together with any required fees and the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | **TOTAL FEE** $ | Name (type or print) |

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of a copy of the subpoena, together with any required fees and

_____ on _____ .
Attachments (if any)                                                        Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

MCR 2.105, MCR 2.107, MCR 2.305(A), MCR 2.506(G)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**EXHIBIT TO SUBPOENA**
**INSTRUCTIONS AND DEFINITIONS**

  A.  For purposes of these Discovery Requests, the term ***"document(s)"*** shall be deemed to include each original, copy, draft or other version of any kind of any paper, writing, drawing, chart, photograph, record, recording, transcript, data compilation in any format, from which information can be obtained or translated through any means, or other written, recorded or graphic matter, however produced or reproduced, whether sent or received or neither, and all copies thereof (whether or not different in any way from the original by interlineation, receipt stamp, notation, indication of copies sent or received, or otherwise), and includes, by way of illustration only and not by way of limitation, the following: notes, calendar entries, internal and external **communications of any nature**, including correspondence, e-mails, voice memos, telegrams, memoranda, information stored in any computerized format and the necessary software to review the information stored in any computerized format including e-mail, Microsoft Word and Excel documents, Quick book records and work papers, summaries of records of personal conversations, notebooks of any character, diaries, routing slips or memoranda, reports, publications, reports or summaries of investigations, agreements and contracts, including modifications and revisions, drafts of, revisions of and translations of any documents.

  B.  Documents stored as hard copy in the ordinary course of business and produced as hard copy shall be produced either: (a) organized and labeled to correspond with the categories in the requests or (b) as they are kept in the usual course of business, including any indicators of the manner in which they kept in the usual course of business (e.g., with labeled file folders).

  C.  The word ***"identify"***, when used with respect to a document not voluntarily produced, means: (1) to specify the nature of the document (such as, for example, letter, memorandum, etc.); (2) to state the date, if any, appearing on the document or, if none, the date upon which such document was prepared; (3) to describe in general the subject matter of the document; (4) to identify each person who wrote, signed, dictated, or otherwise participated in the preparation of the document; (5) to identify each person, if any, who was an addressee thereof; (6) if it now exists, to identify each person having custody of the document; (7) to identify all documents, oral communications and other information relied upon in drafting such document; and (8) to identify each person having knowledge of such document or the matters discussed or contained in such document.

  The word ***"identify"***, when used with respect to an individual means state: (1) his/her full name; (2) present or last known business and residence addresses (including county and state); (3) his/her present or last known occupation and position; (4) his/her present or last known employer or business affiliation; and (5) his/her occupation or position at the time in question as specified in the particular interrogatory.

  The word ***"identify"*** when used with respect to an oral communication, means (1) to state the date of such communication; (2) to identify each person participating therein and each person who was present; (3) to state what was said by each participant in the course of such communication, or, if not known or recalled, the substance; (4) to state whether there are any documents which set forth, summarize or refer to any portions of such oral communication; and (5) if such documents exist, to

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

identify each such document and each person having custody of the document.

D.      If any document described herein was, but no longer is, within your possession, custody, or control, please state in detail:

      i.      What disposition was made of the document;

      ii.     The date of such disposition;

      iii.    Whether the original document or a copy of the document is within the possession, custody or control of any other person, corporation or entity; and

      iv.     If the answer to subpart (3) is affirmative, the identity of that other person, corporation, or entity.

E.      *"Person"* and *"representative"* shall include individuals, trusts, corporations, partnerships, and any other form of business entity.

F.      *"Possession"* or *"control"* shall mean the possession or control of you and your agents, attorneys, or any person from whom you might obtain the requested information or document.

G.      *"Any"* shall include the collective as well as the singular and shall mean *"each,"* *"all,"* and *"every"* and these terms shall be interchangeable.

H.      The singular shall be deemed to include the plural and the plural shall be deemed to include the singular. Words of one gender shall be deemed to include words of all genders including the neuter.

I.      *"Concern"*, *"concerning,"* *"relate,"* *"relating to,"* and *"regarding"* shall be deemed to include directly or indirectly mentioning or describing, pertaining to, that concern or relate to, or being connected with a stated subject matter.

J.      *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these interrogatories and document requests information which might otherwise be construed to be outside the scope of these interrogatories and document requests.

K.      Whenever the term *"including"* is used, it shall mean including without limitation.

L.      Whenever the term *"person"* is used, it shall mean any natural person, governmental body, governmental agency, corporation, general or limited partnership, joint venture, trust, or any other form of organization, association, or entity.

M.      If you contend that any information sought in these Discovery Requests is exempt from discovery because it falls within the attorney/client privilege, it was prepared in anticipation of litigation or preparation for trial, or is so exempted by any privilege or protection, you are to provide the following information in each such instance in lieu of setting forth the information sought:

      i.      The privilege or protection which you contend applies;

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

ii.     The form in which the information is contained (i.e., document, or recollection of one or more persons);

iii.    If the information is contained in a document, the author, the recipient, and the date of the document;

iv.    If the information is not contained in a document, the persons involved in the communication and the date of the communication giving rise to the privilege or protection that you claim; and

v.     The subject matter of the information that you contend is privilege or protected from discovery.

N.     In producing electronically stored information, please eliminate (and "de-dupe") all identical duplicates.

O.     This Subpoena shall be deemed continuing, and supplemental responses are required and must be provided.

P.     Identify by bates number or otherwise, the specific Document Request(s) to which each document produced in response to these Document Requests is responsive.

## <u>DOCUMENT REQUESTS</u>

Please produce the following documents for the time period December 1, 2022 to present:

1.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Axon Properties, LLC.

2.     All documents concerning access to or authorization regarding any account held by Axon Properties, LLC, including but not limited to requests for change in access or authorization.

3.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Oakland Business Park, LLC.

4.     All documents concerning access to or authorization regarding any account held by Oakland Business Park, LLC, including but not limited to requests for change in access or authorization.

5.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Blue Skies Financing, LLC.

6.     All documents concerning access to or authorization regarding any account held by Blue Skies Financing, LLC, including but not limited to requests for change in access or authorization.

7.     Any and all bank statements, cancelled checks, deposit slips, signature cards,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Candid, Inc.

8.      All documents concerning access to or authorization regarding any account held by Candid, Inc., including but not limited to requests for change in access or authorization.

9.      Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by MSY Capital Partners, LLC.

10.     All documents concerning access to or authorization regarding any account held by MSY Capital Partners, LLC, including but not limited to requests for change in access or authorization.

11.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Alchemy Wellness, LLC.

12.     All documents concerning access to or authorization regarding any account held by Alchemy Wellness, LLC, including but not limited to requests for change in access or authorization.

13.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Alchemy Wellness, Inc.

14.     All documents concerning access to or authorization regarding any account held by Alchemy Wellness, Inc., including but not limited to requests for change in access or authorization.

15.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Kurativ, LLC.

16.     All documents concerning access to or authorization regarding any account held by Kurativ, LLC, including but not limited to requests for change in access or authorization.

17.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by JAR Capital, LLC.

18.     All documents concerning access to or authorization regarding any account held by JAR Capital, LLC, including but not limited to requests for change in access or authorization.

19.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Hilger, LLC.

20.     All documents concerning access to or authorization regarding any account held by

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Hilger, LLC, including but not limited to requests for change in access or authorization.

21.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Premier Drive, LLC.

22.     All documents concerning access to or authorization regarding any account held by Premier Drive, LLC, including but not limited to requests for change in access or authorization.

23.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Frequency Wellness, LLC.

24.     All documents concerning access to or authorization regarding any account held by Frequency Wellness, LLC, including but not limited to requests for change in access or authorization.

25.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Urban Legal Group.

26.     All documents concerning access to or authorization regarding any account held by Urban Legal Group, including but not limited to requests for change in access or authorization.

27.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Henry Yandt Construction, LLC.

28.     All documents concerning access to or authorization regarding any account held by Henry Yandt Construction, LLC, including but not limited to requests for change in access or authorization.

29.     Any and all bank statements, cancelled checks, deposit slips, signature cards, designation of beneficiary and/or pay on death designations, whether held jointly or severally, for any and all accounts held by Innovative Financing, LLC.

30.     All documents concerning access to or authorization regarding any account held by Innovative Financing, LLC, including but not limited to requests for change in access or authorization.

31.     Affidavit of the Records Custodian, attesting to the veracity of the documents and information provided.

# EXHIBIT B

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA,

        Plaintiff,

v.

CHISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

        Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendants*
1615 S. Telegraph Rd, Ste 300
Bloomfield Hills, MI 48032
(248) 230-2820
sieving@urbanlegalgroup.com

**BUTZEL LONG, PC**
Daniel J. McCarthy (P59457)
Bernard J. Fuhs (P69621)
*Co-Counsel for Defendant*
150 W. Jefferson Avenue, Ste 100
Detroit, MI 48226
(313) 225-7000
fuhs@butzel.com

## AFFIDAVIT OF LARA WARD

STATE OF MICHIGAN   )
                  )§
COUNTY OF OAKLAND  )

    Lara Ward, being first duly sworn, deposes and states as follows:

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1.    I have personal knowledge regarding the contents of this Affidavit and, if called to testify, my testimony would be consistent herewith.

2.    I am the Executive Vice President, Chief Administrative Officer/Chief Security Officer for Citizens State Bank ("CSB").

3.    I have reviewed the subpoena issued to CSB by Plaintiff Gregory Yatooma (the "Subpoena"), which requests numerous categories of bank records relating to fifteen (15) different companies that are customers of CSB.

4.    There are more than fifteen (15) accounts at issue for these customers, the accounts are very active and it is estimated that full production of all documents requested in the Subpoena will be at least 5,000 pages.

5.    Based on my experience, copying costs of $1.00 per page are customary for the production of bank records.

6.    It is further estimated that, if full production of all documents requested in the Subpoena is required, the identification, compilation, organization and production of the documents will require approximately 120 hours of CSB employee time.

7.    Those CSB employees who would be tasked with compiling and copying documents are compensated at rates of $40 and $75 per hour and it is estimated that approximately 120 hours of employee time will be required if full production of all documents requested in the Subpoena is necessary.

8.    The number of pages and employee hours are estimated based on the comprehensive nature of the request and the volume of documents requested.

9.     These estimates may increase or decrease based on several factors including, but not limited to, the documents ordered produced (if any), and the actual volume of documents identified and compiled.

FURTHER AFFIANT SAYETH NOT.

Lara Ward

Subscribed and sworn to before me this
25 day of August, 2023

, Notary Public

State of Michigan, County of _____
My Commission Expires: _____
Acting in _____ County

C.A. BALLARD
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Apr 14, 2026
ACTING IN COUNTY OF Oakland

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

     Plaintiff,                    Case No. 23- 200283-CB

v.                             Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

     Defendants.

---

| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
|---|---|
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendant* |
| T. Andrew Keating (P86261) | 1615 S. Telegraph Road |
| *Attorneys for Plaintiff* | Bloomfield Hills, MI 48302 |
| 27777 Franklin Road, Suite 2500 | (248) 230-2820 |
| Southfield, MI 48034 | sieving@urbanlegalgroup.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BUTZEL LONG PC** |
| emayer@taftlaw.com | Bernard J. Fuhs (P69621) |
| akeating@taftlaw.com | *Co-Counsel for Defendant* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

---

**<u>STIPULATED ORDER FOR ADJOURNMENT OF CASE MANAGEMENT
CONFERENCE</u>**

At a session of said Court,
held in the County of Oakland,
State of Michigan on _____

PRESENT:  <u>HON. VICTORIA A. VALENTINE</u>
OAKLAND COUNTY CIRCUIT COURT JUDGE

     This matter having come before the Court on the below agreement and stipulation of the

parties. These parties, through their counsel, hereby stipulate to adjourn the Case Management

Conference that is set for August 25, 2023, to a future date to be set by the Court.

Having reviewed the stipulation of the parties, and the Court being otherwise fully advised in the premises:

**IT IS ORDERED** that the case management conference in this matter, which is scheduled for August 25, 2023 at 9:15 AM, is adjourned to September 15, 2023 at 8:30 AM.

This is not a final order and does not close the case.

**IT IS SO ORDERED.**

8/25/2023
Date

/s/ Victoria A. Valentine
August 25, 2023
HON. VICTORIA A. VALENTINE
OAKLAND COUNTY CIRCUIT COURT JUDGE

lm

**STIPULATED AND AGREED TO BY:**

TAFT STETTINIUS & HOLLISTER LLP

*/s/ Ethan R. Holtz*
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*

URBAN LEGAL GROUP

*/s/ Jeffery R. Sieving*
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Chris Yatooma*

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

      Plaintiff,                    Case No. 23- 200283-CB

v.                                   Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

---

| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
|---|---|
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendant Christopher* |
| T. Andrew Keating (P86261) | *Yatooma* |
| *Attorneys for Plaintiff* | 1615 S. Telegraph Road |
| 27777 Franklin Road, Suite 2500 | Bloomfield Hills, MI 48302 |
| Southfield, MI 48034 | (248) 230-2820 |
| (248) 351-3000 | sieving@urbanlegalgroup.com |
| eholtz@taftlaw.com | |
| emayer@taftlaw.com | **BUTZEL LONG PC** |
| akeating@taftlaw.com | Bernard J. Fuhs (P69621) |
| | *Co-Counsel for Defendants* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO NON-PARTY AND DEFENDANT CHRISTOPHER YATOOMA'S MOTIONS TO QUASH SUBPOENAS AND FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(C)

      Plaintiff Gregory Yatooma ("Greg") for his Response in Opposition to Non-Party Michelle

Houbeck's and Rich Stopczy's (together, the "Subpoena Recipients") and Defendant Christopher

Yatooma's ("Chris," and together with the Subpoena Recipients, the "Movants") Motions to

Quash Subpoenas to Houbeck and Stopczy and for Protective Order Pursuant to MCR 2.302(C)

(the "Motions"), states as follows:

1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## <u>INTRODUCTION</u>

There is no question that Chris has illegally downloaded, accessed, and is now using Greg's attorney-client privileged, law firm emails. This Motion and several of its predecessors even attach Greg's emails that could have only been obtained by pilfering Greg's inbox. These Motions filed by Houbeck, Chris's personal assistant, Stopczy, Chris's and Greg's (former) IT manager, and Chris are an attempt to impede Greg's ability to take discovery and stop him from learning the true facts and extent of Chris's illegal conduct.

Movants claim that Greg cannot delve into the theft of his own email because anything these three individuals have done is protected from disclosure by the "investigative privilege" provided by MCL 338.840 since Houbeck is purportedly a "private investigator" who is allegedly investigating Greg. Just so the Court is clear, it is Movants' position that they were entitled to break into Greg's private and privileged email, download it, read it, try to use it against Greg in this lawsuit, use it for their own benefit outside of this lawsuit, and do not have to divulge anything about what they did because Chris's personal assistant is a licensed investigator.

No, that is not how this works - - the police and the FBI could not do what these three have done - - it is just plain illegal.

So of course, there are a multitude of reasons why the purported privilege does not apply and Movants must answer for what they have done. Indeed, MCL 338.840 does not apply to this case factually or legally because:

- The purported privilege does not apply to Houbeck or Stopczy because neither is an employee of a purported investigative. Both are W-2 employees of Axon Properties, LLC ("Axon"), Chris and Greg's (former) company;

- Even if any privilege did apply, it is voided by Movants' crime of illegally accessing Greg's email;

- Again, even if any privilege did apply, it has been waived by disclosure of

2

128709038v4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Greg's stolen emails;

This whole purported "investigation" is a farce, invented to cover Chris's tracks, as the Movant's own pleadings evidence that the "investigation" was launched ***after*** Chris, Stopczy and Houbeck had already accessed and downloaded Greg' entire email box (159,000+ emails). theft of Greg's emails.  Moreover, the supposedly "confidential information" Greg allegedly stole belongs to Greg and relates to a business Greg solely owns pursuant to the Parties' December 14, 2022 Buyout Agreement.

Specifically, pursuant to the December 14, 2022 Buyout Agreement, Greg retained "100% of NJ deal with Jeff." On December 20, 2022 in furtherance of the Buyout Agreement, Stopczy terminated Greg's and his assistant's, Kara Harbour ("Harbour"), access to Greg's and Chris's shared drives. On January 13, 2023, Stopczy collected Greg's entire law firm email account. On January 16, 2023, Harbour emailed what Movants claim was confidential information regarding the NJ deal, allegedly prompting the investigation. Of course, Movants could not have commenced an investigation on January 13 when the action that prompted the investigation did not occur until January 16, three days later.

The Court should see the Motions for what they really are - - Chris's latest attempt to skirt the rules, and the law, to gain a perceived advantage in this case. For the reasons set forth herein, the Motions lack merit and Greg respectfully requests that the Court deny the Motions.

## STATEMENT OF RELEVANT FACTS

On December 20, 2022, six days after Greg and  Chris signed the Buyout Agreement, Rich Stopczy, a W-2 employee of Axon Properties, LLC ("Axon")[1] and the IT manager for all of Greg

---

[1] Axon is one of the principal entities through which Greg and Chris operated their cannabis business and held a significant portion of the assets. In fact, Axon paid all of the expenses of Defendant MSY Capital Partners, LLC lawsuit that produced the funds correctly escrowed with the Clerk of Court.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

and Chris's joint companies, as well as  Fleming Yatooma & Borowicz  PLC (Greg's law firm, "FYB")[2], came to Greg's house and removed Greg and Kara Harbour (Greg's assistant) from the shared servers with Chris.  At that time, Rich Stopczy also confirmed to Greg that no one had access to Greg's FYB email nor could access Greg's computer desktop without Greg's permission.

Rich's confirmation, however, was untrue. On January 13, 2023, Stopczy, at Chris's direction, accessed and downloaded Greg's entire FYB[3] email account, consisting of 159,859 emails, and saved them to Houbeck's[4] computer for her to review and print for Chris's consumption and use. **Exhibit 1, Photos from Stopczy**. Stopczy had no legal right or authority to access FYB's emails on behalf of Chris.

On February 14, 2023, Stopczy again accessed and downloaded Greg's FYB emails from January 13, 2023 to February 14, 2023 to "update" his initial collection, which included an additional 1,254 emails for a total of 161,044 stolen from Greg's FYB email account. This was nearly two months after the signing of the Buyout Agreement, during a period when Greg sent and received hundreds of emails with his attorneys concerning the very issues that eventually became this litigation and also included attorney-client and confidential emails with third parties where

---

[2] FYB was formed in November 2015 and had three partners, Gavin Fleming, Greg, and Greg's cousin, Christina Borowicz. FYB operated out of the same office building as all of Greg's and Chris's other businesses, including Axon.

[3] Greg is an owner of FYB. Because Christina, Gavin and Greg, the three partners in FYB, could no longer assure their clients confidentiality because Chris had accessed their emails, and Chris refused to allow Rich Stopczy to provide Greg, Gavin or Christina with the admin logins so they could remove Rich's access, Christina, Gavin and Greg changed their firm name and created a new email URL so Chris had no ability to access their emails moving forward nor could Chris claim any ownership of the new firm by having the "Yatooma" name in the law firm. The Moving Parties boldly, although having no knowledge of the ownership structure of Greg's law firm states otherwise. Their statements are patently false. Furthermore, Chris, a non-lawyer, is not now and has never been an owner or partner in FYB. *See* no non-lawyers can own firms.

[4] Houbeck has been Chris's personal assistant since July 2018. Houbeck is a W-2 employee paid by Axon.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Greg was acting as an attorney - - including matters that would be of a particular interest to Chris.[5]

FYB's email is hosted by Microsoft; Greg owns the FYB website and domain.[6] Stopczy improperly used his IT admin credentials previously received from Greg to access and download Greg's emails without Greg's knowledge or permission. Importantly all of this activity took place subsequent to the Buyout Agreement and after Greg was told his FYB email had been severed from access by Chris or any others.

Greg first discovered that the foregoing illicit activity had taken place on February 17, 2023, Stopczy contacted Greg and asked him to help "get the domains transferred over for our emails." **Exhibit 2, February 17, 2023 Email**. In that email, Stopczy identified the domains Stopczy believed should be transferred. *Id*. Greg noticed that Stopczy's list included "fyblaw.com" and was confused by its inclusion.

Greg promptly sent Stopczy the following text message: "Hey Stopczy. Got your email. Give me a shout at your convenience." **Exhibit 3, Text Messages Between Greg and Stopczy**.

The two then spoke and Greg asked Stopczy why he included FYB on the list of domains to be transferred because Chris should not have access to FYB. **Exhibit 4, Greg's Declaration**. After an extended silence from Stopczy, Greg asked Stopczy several times if he had accessed Greg's emails. *Id*. Stopczy finally admitted the following to Greg:

- Chris had been pressuring Stopczy to access Greg's emails since the buyout on December 14, 2022;

- Stopczy at first refused several times because he thought it was wrong and

---

[5] Greg is unable to attach his attorney-client emails this response because they are in fact privileged. Greg asks that the Court immediately order a forensic imaging of whatever has been collected/stolen by Stopczy, Chris, and Houbeck for an in camera review.

[6] Movants represent that FYB's email was stored on a server paid for, maintained, and owned by Chris's companies. *See* Subpoena Recipients' Motion, at n6. That simply is not true. FYB's email was cloud-based and paid for and maintained by Greg and his companies until the Buyout. In fact, Greg owns the FYB website and domain to this day and our in his GoDaddy account.

128709038v4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

possibly illegal, but ultimately agreed to do so after Chris assured him that a lawyer said Stopczy was "fully covered";

- Stopczy downloaded Greg's entire FYB email on January 13, 2023 which consisted of 159,859 emails and again on February 14, 2023 which consisted of another 1,254 emails between January 14 and February 14, 2023;

- Stopczy saved Greg's entire FYB email to Houbeck's computer in a PST file.;

- At the direction of Chris, Houbeck, Chris's assistant, was instructed to run searches for certain key words and phrases in Greg's email and print those emails for Chris's review and use.

- Stopczy had not been able to sleep since he downloaded Greg's inbox because he felt so bad and that he was going to do everything he could to make it right;

- He was going to tell Chris that Greg and him talked and that he was going to tell Chris he would no longer be a part of this scheme with Chris and Michelle. [*Id*.]

Greg was, understandably, shocked and upset by this news and asked Stopczy to delete all of the email he downloaded. Stopczy sent Greg videos and photos that Stopczy claimed showed him deleting all of Greg's emails but at the very least proving that this theft as described above had occurred. *Id*.; **Exhibit 3**.[7]

The second video shows Stopczy's computer screen and a list of files, which include "Greg Y" and "Greg Y 1-13-23 to 2-14-23." (Video 2 at 00:00):

---

[7] The videos Stopczy sent to Greg are available at the following links:

Video 1 –
https://drive.google.com/file/d/1G_d741y49NEo5hoV-c731S4ykN8z8GiN/view?usp=sharing

Video 2 –
https://drive.google.com/file/d/1jlCEzSIQ2i0y79Tu6Qcs5WNdhz1JZ2W-/view?usp=sharing

128709038v4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



Stopczy then pans to the right and his screen reflects that the Greg Y files was "last run on 2023-01-13," was "Searched by Rich Stopczy," and contains "159,859 items.") (Video 2 at 00:07).



Stopczy then purports to delete the "Greg Y" file.

Stopczy then moves on to the "Greg Y 1-13-23 to 2-14-23" file and spans to the right and his screen reflects that the file was "last run on 2023-02-14," was "Searched by Rich Stopczy," and contains "1,254 items."). (Video 2 at 00:35).

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



Stopczy then purports to delete the "Greg Y 1-13-23 to 2-14-23" file.

Stopczy then scrolls down to a third file not previously depicted - - "Greg Y as of 2-14-23" (Video 2 at 00:49) which apparently was a re-collection of Greg's entire FYB account. Stopczy spans to the right, and his screen reflects that the file was "last run on 2023-02-14," was "Searched by Rich Stopczy," and contains "161,044 items."). (Video 2 at 00:50)



Stopczy then purports to delete the third file.

To confirm what he was seeing in the video, Greg asked Stopczy to confirm that he deleted

8

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

all copies of Greg's FYB email, and Stopczy so confirms (**Exhibit 3**) :





Greg then conferenced in his assistant Kara Harbour ("Harbour"), because Stopczy was supposed to assign over the admin permissions to Greg's new Microsoft SharePoint account. While Stopczy, Greg, and Kara were on the three-way call commencing the transfer, Houbeck could be heard yelling at Stopczy and demanding that he see Chris immediately. **Exhibit 4**. The line then went dead and Stopczy (presumably at the demand of Chris) blocked Greg's number so Greg could no longer contract him. **Exhibit 4**.

On February 19, 2023, undersigned counsel sent a letter to Steven Pacynski, Esq., Chris's then-counsel, in which he detailed what Stopczy disclosed to Greg, demanded that Chris cease and

128709038v4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

desist from reading Greg's emails, and demanded that Chris delete and return all copies of Greg's email. *See* Subpoena Recipients' Motion, at Exhibit 8. At no point did Chris or his counsel claim they were conducting an "investigation" or that Harbour had committed any "wrongdoing." Greg opted at that time not to assert claims against Chris, Houbeck, or Stopczy for their illegal and unauthorized access and use of Greg's FYB email account because Chris agreed to return Greg's email. To date, he has not.[8]

Despite Stopczy's assurance that he deleted Greg's stolen emails, Chris clearly still has and is now using Greg's emails in this case. On July 24, 2023, Chris filed his *Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612* and, in footnote 1 thereof referenced an email that Greg sent to Chase Bank from Greg's  FYB account and on which Chris was not copied - - Chris could only have gotten that email from Greg's FYB account. **Exhibit 5, Chris's Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612**. Chris and the Subpoena Recipients have since attached that and other emails from Greg's FYB email - - emails to which Movants would not otherwise have access - - to their filings in this case. *See* Subpoena Recipients' Motion, at Exhibit 11; Chris's Motion, at Exhibit 2.

Because Chris had undeniably retained a copy of Greg's FYB emails and is using them to litigate this case and for other self-serving purposes, on July 28, 2023 Greg served subpoenas on Houbeck and Stopczy (the "Subpoenas") and Second Discovery Requests on Chris, all of which seek documents and communications pertaining to the theft of Greg's FYB account and the collection of same. *See* Chris's Motion, at Exhibit 3. Movants, in the filing of this instant motion

---

[8] Ironically, in their Motions, the Movants attempt to attribute some great meaning to Greg's decision not to pursue them criminally or civilly for their theft. That speaks for itself.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

on August 14, 2023, <u>admit</u> to accessing, reviewing and retaining Greg's email, and for the first time, incredibly, claim they were permitted to do so because they were supposedly conducting an "investigation" into Harbour. The timeline and subject matter of this purported "investigation" shows that Movants' position is entirely made up.

The Buyout Agreement, in addition to selling assets to Chris, specifically identifies the assets that Greg retained. **Exhibit 6, at ¶1(6)**. One of the assets Greg retained pursuant to the Buyout Agreement is "100% of NJ deal with Jeff." *Id.* at ¶6. At that time, any right or interest Chris had or may have had in the NJ deal was terminated.

The "NJ deal with Jeff" refers to a consulting project between the parties' brother Jeff, his company Hydra Real Estate Development, LLC ("Hydra") and Axon.[9] The project and terms thereof are memorialized in an April 8, 2022 consulting agreement ("Consulting Agreement"), which states, in relevant part (**Exhibit 7, Consulting Agreement**):

> A. Hydra desires to procure, lease, purchase and acquire cannabis real estate and business licenses located in the State of New Jersey and State of Mississippi ("Asset or Assets").
>
> ***
>
> C. Axon has spent considerable time, effort and resource(s) in procuring and developing certain leads, contacts, knowledge and other proprietary information that assist in the acquisition of Assets ("Confidential Information").
>
> D. Axon has agreed to provide Confidential Information to Hydra subject to the terms and conditions and contained herein.
>
> ***
>
> 1. **Consideration.**
>
>> A. **Confidential Information.** Axon has provided Confidential Information to Hydra, which Confidential Information shall be held in strict confidence and shall not be disclosed to any third party, except as reasonably necessary to consummate the provisions of this Agreement. The parties shall keep this Agreement, the transactions contemplated hereby, and any information exchanged in furtherance hereof strictly confidential.

---

[9] Before execution of the Buyout Agreement, Greg was the 100% owner of Axon. Pursuant to the Buyout Agreement, Greg executed an assignment of his 100% interest in Axon Properties to Chris. **Exhibit 8, Assignment of Membership Interests**.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

On January 16, 2023, pursuant to the Consulting Agreement and consistent with Greg's retention of "100% of NJ deal with Jeff" pursuant to the Buyout Agreement, Harbour, at Greg's direction, emailed the "Confidential Information" to Benedict ("Benedict"), a former employee of Axon who now works for Ryno Holdings. *See* Subpoena Recipients' Motion, at Exhibit 9. Ryno Holdings is a company owned by Ryan Jundt, a friend of Jeff's (and Chris's brother-in-law), that worked with Jeff and Hydra on the NJ Deal. The supposed "Confidential Information" identified in the Consulting Agreement and emailed to Benedict consists of two excel spreadsheets that were saved and maintained on Harbour's computer before she left Axon at the end of December 2022.[10] Ryno Ventures was authorized to receive the "Confidential Information" identified in the Consulting Agreement. *Id.*

But Chris's theft of Greg's 159,859 FYB emails took place on January 13, 2023, three days before the alleged "suspicious activity" by Harbour on January 16, 2023 that allegedly gave rise to the "investigation." However, they are caught - - by their own admission and documentary evidence, they stole nearly 160,000 of Greg's emails (many of which attorney-client privileged) three days before the supposed investigation ever began.

## ARGUMENT

I. **The Investigator-Client Privilege is Inapplicable and does not Excuse the Subpoena Recipients' Compliance with the Subpoenas.**

### A. Neither of the Subpoena Recipients is an employee of a licensee.

MCL 338.840(1) prohibits "Any person who is or has been an employee of a licensee… [from] divulging … any information acquired by him or her during his or her employment in

---

[10] Movants suggest the spreadsheets were stored on a SharePoint that belonged to Chris. Review of the email proves that is wrong. Harbour's email sends the excel files as attachments, not drive links, and states that links within the files to state ordinances were broken (because she was no longer on the server). Stopczy will also have to admit, when under oath, that he removed Greg and Kara from the servers on December 20, 2022.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

respect to any of the work to which he or she shall have been assigned by the employer."

As set forth in the Motions, the "licensee" is "third-party investigative firm Trident Investigative Services LLC." But Trident is not a third-party at all. Given the pre-dispute nature of Greg's and Chris's relationship, Greg has knowledge regarding the organization and operations of Chris's companies, including Trident. Specifically, upon information and belief:[11]

- Trident is not an actual, operating investigatory services firm, but an alter ego of Chris and his entities formed to lead Chris's business associates to believe he works with independent, investigatory services firm on his various business deals; trident

- Trident does not have any clients or business other than tending to Chris's personal and business needs;

- Chris is Houbeck's and Stopczy's boss;

- Houbeck and Stopczy are W-2 employees of and are paid by Axon Properties, not Trident; and

- Chris controls and has authority to hire and fire Houbeck and Stopczy.[12]

These facts establish that neither Houbeck nor Stopczy is an employee of a licensee. In fact, Houbeck and Stopczy do not even assert that they are employees of a licensee. Accordingly, unlike the investigators in *Ravary v Reed* and *People v White* (the authority upon which Movants rely) neither Houbeck nor Stopczy acquired information during his or her employment by a licensee, and neither was assigned work by a licensee. Therefore, the investigator-client privilege does not apply to any activities by Houbeck or Stopczy and the Motions should be denied.

### B. Movants waived any arguably applicable privilege.

---

[11] If the Court prefers, Greg is willing to take, and in fact welcomes, testimony from Chris, Houbeck, and/or Trident on these matters.

[12] This likely sounds familiar to the Court. That is because it is the same system Chris has for Urban Legal Group, an entity formed to mislead people into believing that Chris works with an independent attorney when in fact Urban Legal Group and Mr. Sieving are his personal, on call attorneys and in-house counsel.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

MCL 338.840(2) states that the investigator privilege "…is considered privileged with the same authority and dignity as are other privileged communications recognized by the courts of this state." The privilege is not absolute. On the contrary, "[b]ecause the privilege is statutory, it is to be narrowly construed." Longhofer, § 501.10.1 Investigator's privilege—Rationale of the privilege, 2 Mich. Ct. Rules Prac., Evid. § 501.10.1 (4th ed.).

By analogy to the law applicable to the attorney-client privilege, the investigator-client privilege - - if any existed - - is waived where confidential information has been voluntarily disclosed. *See, e.g.*, *Leibel v Gen Motors Corp*, 250 Mich App 229, 243 (2002) (explaining that attorney-client privilege is waived by the voluntary disclosure of otherwise confidential information); see also *Fed. Deposit Insurance Corp v First Heights Bank, FSB,* 1997 US Dist LEXIS 23321 (E.D. Mich., March 12, 1997) (holding that Michigan accountant-client privilege was waived by earlier disclosure of potentially privileged information). "Once otherwise privileged information is disclosed to a third party by the person who holds the privilege, or if an otherwise confidential communication is necessarily intended to be disclosed to a third party, the privilege disappears." *Oakland Cnty. Prosecutor v Dept of Corr*, 222 Mich App 654, 658 (1997). Like the attorney-client privilege, the work-product protection can be waived. *People v Tronti*, 176 Mich App 544, 550 (1989), quoting *United States v Nobles*, 422 US 225, 239 (1975).

In this case, Movants waived any applicable privilege by disclosing facts concerning the purported "investigation," and attaching the fruits thereof to their court filings. In their respective Motions, Movants explain what prompted the purported investigation (Harbour emailing spreadsheets on January 16, 2023), explain the purported purpose of the investigation (allegedly to determine what Greg was doing on Axon's server (although they claim Kara was on their server, not Greg)), explain the methods of the purported investigation (collection of Greg's FYB email

14

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

account), reveal the alleged findings of the purported investigation (allegedly that Greg directed Harbour to disseminate "confidential and proprietary information"), and even attach documents obtained through their purported investigation.

The moment Movants disclosed this partial information concerning the purported investigation, any confidentiality between Chris and Houbeck/Stopczy was lost, and the waiver applies to all information on the same subject matter. *See, e.g.*, *In re Grand Jury Proceedings Oct 12, 1995*, 78 F3d 251, 255 (CA 6, 1996) (explaining that voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter); 8 *Wigmore on Evidence* (1961), § 2327, p 638 (voluntary waiver of specific communication operates as waiver as to all other communications on same matter, by analogy to the principle of completeness).

### C.  The investigator privilege is inapplicable due to the crime-fraud exception.

"The crime-fraud exception to the attorney-client privilege is predicated on the recognition that where the attorney-client relationship advances the criminal enterprise or fraud, the reasons supporting the privilege fail." *People v Paasche*, 207 Mich App 698, 705 (1994). For the crime-fraud exception to apply, plaintiffs "must show that there is a reasonable basis to (1) suspect the perpetration or attempted perpetration of a crime or fraud and (2) that the communications were in furtherance thereof." *Id*. at 707. "This showing must be made without reference to the allegedly privileged material." *Id.*

In *Marsh v Curran*, 362 F Supp 3d 320, 325 (ED Va, 2019), during a divorce proceeding, the wife intercepted the husband's communications and private financial information in violation of wiretapping laws, and shared the intercepted information with her counsel. Counsel had reason to know that wife obtained the information illegally, but used it in the divorce proceedings anyway. *Id.* at 325–26. Finding that the crime-fraud exception applied, the wife's attorneys had to disclose

15

128709038v4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

information they received from wife, who obtained the information in violation of wiretapping laws, and they attorneys themselves were not immune from liability for violating wiretapping laws. *Id.* at 329.

Movants' Motions are filled with evidence that Movants illegally accessed Greg's FYB emails in violation of at least the following criminal statutes:

| Criminal Statute | Penalty |
|---|---|
| Computer Fraud and Abuse Act, 18 USC 1030, et seq: Accessing a Computer to Defraud and Obtain Value | First conviction: Up to five years |
| Computer Fraud and Abuse Act, 18 USC 1030, et seq: Accessing a Computer and Obtaining Information | First conviction: Up to one year |
| Stored Communications Act, 18 USC 121, et seq | First conviction: Up to one year |
| Electronic Communications Privacy Act, 18 USC 2510, et seq | First conviction: Up to two years |
| Michigan's Computer Crime Statute, MCL 752.791, et seq | First conviction: prison time depending on the severity of the crime |

What's more, Movants admit in their Motion that their "investigation"—and therefore their criminal activities—are ongoing in a likely attempt to have this Court bless their future illegal actions. *See* Subpoena Recipients' Motion, at ¶15 ("The investigation started a few months before this lawsuit and is still ongoing."). Accordingly, like in *Marsh*, the crime-fraud exception overrides any arguably applicable privilege and all documents and information sought in the Subpoenas must be produced and disclosed.

### D. The "Investigation" is a farce that Movants invented to excuse their criminal activity.

The facts and timeline set forth *supra* establish that there is no investigation at all, as their illicit download of Greg's personal and attorney-client privileged inbox predates any alleged "suspicious activity" by at least three (3) days, and they "investigated" the wrong email. Stopczy

16

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

first collected Greg's FYB email on January 13, 2023, three days before Harbour emailed the supposed "Confidential Information" on January 16. It thus defies logic that Stopczy collected Greg's FYB email as part of an investigation when the event that allegedly prompted the investigation had not even occurred, and the investigation was for supposedly for activity by Harbour, not Greg, yet they downloaded 159,000+ emails of Greg.

Furthermore, pursuant to the Buyout Agreement, Greg kept 100% of the NJ Deal with Jeff and could use Axon Properties' information as it pertained to the NJ Deal as he saw fit. Furthermore, pursuant to the Consulting Agreement, Axon Properties / Greg had a contractual obligation to provide the "Confidential Information" to Hydra. Accordingly, there is no question that Greg was within his rights to send or instruct Harbour to send the "Confidential Information" to Hydra or its designee on January 16, 2023.

In fact, Movants have not even identified the alleged "client" for this investigation, who retained or instructed Houbeck to conduct the investigation, any attorney involved in the investigation,[13] or how Stopczy's actions are in any way related to the investigation or protected by any privilege.

But even if Harbour's January 16 email prompted an investigation, that does not give Movants carte blanche to abuse Stopczy's administrative access to Greg's FYB email, steal the entirety of Greg's FYB email, or review Greg's privileged communications with his clients and his lawyers in this lawsuit. Not even law enforcement officers are permitted to commit crimes in

---

[13] Movants cite *In re Mary Margaret Chartier In re Mary Margaret Chartier Revocable Living Tr.*, unpublished opinion of the Court of Appeals, issued December 19, 2019 (Docket No. 344346), 2019 WL 6977836 for the proposition that "applying work product protection to party's investigator and his report." But the decision in *Mary Margaret* stemmed from a report prepared at the request of an attorney. That is not the situation before this Court.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the course of an investigation or to go through someone's email without a court order, and even then, they would have to take special precautions to avoid impeding on the attorney-client privilege emails.

To accept Movants' argument would be akin to allowing Movants to forcibly enter Greg's home, rummage through his bedroom, take whatever they please, and it would all be acceptable and secret because Houbeck retains a supposed "private investigator" license while working full time as Chris's personal assistant. Of course, the law does not permit Movants to smash through Greg's windows anymore than it allows Movants to access and read Greg's email without authorization. A crime is a crime and Movants cannot use the investigator privilege to shield their actions.

## II.     The Subpoenas are appropriately tailored to the needs of this case

Michigan has long supported a policy of far-reaching, open, and effective discovery practice. *Shinkle v Shinkle*, 255 Mich App 221, 225 (2003). The discovery rules must be liberally construed to further the ends of justice. *Id.* In general, the parties may obtain discovery regarding any non-privileged mater that is relevant to any party's claims or defenses. MCR 2.302(B)(1). The purpose of discovery is to simplify and clarify the contested issues, which is necessarily accomplished by the open discovery of all relevant facts and circumstances related to the controversy. MCR 2.302(B)(1); *Reed Dairy Farm v Consumers Power Co*, 227 Mich App 614, 616 (1998). Barring discovery to allow the concealment of facts is the exception and not the rule. *Id.*

Here, the Subpoenas are reasonably calculated to lead to the discovery of admissible evidence. On July 24, 2023 - - months after Stopczy assured Greg he removed all trace of Greg's FYB email from Chris's computer system - - Chris relied upon Greg's FYB emails to form his defense in this case. *See* **Exhibit 5, Chris's Response on Opposition to Plaintiff's Motion to**

18

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612**. Thus, Chris's access to and use of Greg's FYB email is relevant to the parties' claims and defenses and is discoverable. The Subpoena requests are appropriately tailored to discovered this very information - - documents regarding access to and collection of Greg's and Harbour's FYB emails.

### III.     The Subpoenas were timely served.

The Subpoena Recipients also argue that the Subpoenas did not afford them sufficient time to respond because, although the Subpoena Recipients were served on August 1, 2023, they did not retain counsel until August 11, 2023. MCR 2.506(C)(1) states, in relevant part, "…the subpoena must be served at least 2 days before the appearance or 14 days before the appearance when documents are requested appear." The Subpoena Recipients acknowledge that they were served August 1, 2023, 14 days before the August 15, 2023 production date, and more than 21 days before the requested appearances. Thus, the Subpoenas were served in accordance with the Michigan Court Rules, and the date the Subpoena Recipients retained counsel has no bearing on this analysis.

### CONCLUSION

For the reasons set forth above, Greg respectfully requests that the Court deny the Motions and award cost and fees to Greg  and order a forensic imaging of whatever has been collected/stolen by Stopczy, Chris, and Houbeck for an in camera review.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: August 28, 2023                                  By:     /s/ Ethan R. Holtz
                                                        Ethan R. Holtz (P71884)
                                                        Emily M. Mayer (P78956)
                                                        T. Andrew Keating (P86261)
                                                        *Attorneys for Plaintiff*

128709038v4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**Archived:** Monday, August 28, 2023 2:58:23 PM
**From:** Rich Stopczy
**Sent:** Friday, February 17, 2023 11:26:48 AM
**To:** Gregory Yatooma - FYB
**Cc:** Kara Harbour - FYB
**Subject:** Domains that need to be transferred to our GoDaddy
**Importance:** Normal
**Sensitivity:** None

Hi Greg,

I hope you are doing well and staying safe.
We have setup a GoDaddy account, and need to get the domains transferred over for our emails.
It seems really easy to do 🙂
https://www.godaddy.com/help/transfer-my-domain-to-another-godaddy-account-822

Our GoDaddy account email is godaddy@axonprop.com
If you need anything else please let me know.

Here are the domains:



Thank you,
Rich

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 3

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**12/20/2022 2:32 PM**
Mr. Greg iPhone (+12484598832)

U: jaimerowland77@gmail.com
P: JumboShrimp65!

Ignore how lame my password is 😂

**2/17/2023 11:32 AM**
Mr. Greg iPhone (+12484598832)

Hey Rich. Got your email.  Give me a shout at your convenience

**2/17/2023 12:11 PM (Viewed 2/17/2023 12:14 PM)**
Rich Stopczy (5866309417)

File attachment with MIME type: video/quicktime

**2/17/2023 12:14 PM**
Rich Stopczy (5866309417)

File attachment with MIME type: image/png

**2/17/2023 12:28 PM**
Rich Stopczy (5866309417)

File attachment with MIME type: image/png

**2/17/2023 12:37 PM (Viewed 2/17/2023 12:38 PM)**
Rich Stopczy (5866309417)

Chris is in a meeting as soon as he comes out I will talk to him.

**2/17/2023 12:56 PM**
Mr. Greg iPhone (+12484598832)

All the copies of my FYB email are deleted now off of Michelle's computer?

**2/17/2023 12:57 PM**
Rich Stopczy (5866309417)

Yes and the saved searches. There are no copies anywhere.

**2/17/2023 12:57 PM**
Mr. Greg iPhone (+12484598832)

Do you have a copy of the saved searches?

**2/17/2023 12:57 PM**
Rich Stopczy (5866309417)

No

**2/17/2023 12:57 PM (Delivered 2/17/2023 12:58 PM)**
Mr. Greg iPhone (+12484598832)

What kind of searches?

**2/17/2023 12:59 PM**
Rich Stopczy (5866309417)

Content Search is how a pst copy is pulled. I sent you the video of deleting those.

**2/17/2023 1:00 PM**
Rich Stopczy (5866309417)

I already stopped by and texted Chris to poke him to talk

**2/17/2023 1:00 PM**
Mr. Greg iPhone (+12484598832)

Can you show me in the video for hte saved searches?

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**2/17/2023 1:02 PM**

Rich Stopczy (5866309417)



These three.

**2/17/2023 1:03 PM**

Rich Stopczy (5866309417)

Once deleted the results are destroyed.

**2/17/2023 1:03 PM**
Mr. Greg iPhone (+12484598832)

Ok thx. We're there any saved searches where you can see what emails they were accessing?

**2/17/2023 1:05 PM**

Rich Stopczy (5866309417)

In the details it would have shown just your mailbox sorry deleted before opening that :/

**2/17/2023 1:05 PM**
Mr. Greg iPhone (+12484598832)

No worries.  If you are able to recover the searches they did, that woudl be great...but if not, i get it.

**2/17/2023 1:05 PM**
Mr. Greg iPhone (+12484598832)

Thank you for your honesty.  I know this has been difficult on you.

**2/17/2023 1:05 PM (Delivered 2/17/2023 1:46 PM)**
Mr. Greg iPhone (+12484598832)

Im soryr

21

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**2/19/2023 8:05 AM**
Mr. Greg iPhone (+12484598832)

Are you available to talk this morning?

**2/21/2023 9:24 AM**
Mr. Greg iPhone (+12484598832)

Rich, it's my understanding you are transferring the FYB emails today.  Please advise on timing so I can work with Kara on same.

Message sent originally as iMessage and failed. Re-sent later as SMS.

150 total messages and 23 total images.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

      Plaintiff,                           Case No. 23- 200283-CB

v.                                      Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

---

<u>**DECLARATION OF GREGORY YATOOMA**</u>

I, Gregory Yatooma, being first duly sworn, deposes and states as follows:

1.      I write this declaration based upon my personal knowledge and would testify competently as stated if called to do the same.

2.      On December 20, 2022, Rich Stopczy (Stopczy") came to my house and removed my and my assistant's, Kara Harbour ("Harbour"), access to servers previously shared with Christopher Yatooma ("Chris"), in furtherance of the sale of my businesses to Chris on December 14, 2022.

3.      On February 17, 2023, Stopczy sent me an email in which he identified certain accounts for which the domains were to be transferred from my GoDaddy to a GoDaddy held by Chris. My law firm, Fleming Yatooma and Borowicz ("FYB") was among those accounts.

4.      Upon receipt of that email, I sent Stopczy a text message and asked him for a phone call.  Stopczy and I spoke that afternoon.

5.      During the call, I asked Stopczy why he included FYB on the list of domains to be transferred to Chris.

6.      Stopczy said the list was auto generated based on emails to which he had access or

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

DocuSign Envelope ID: 183821FD-7855-4286-A29C-807BEF719541

control.

7.      I once again asked Stopczy why FYB was on that list because Chris should not have access to FYB.

8.      Stopczy admitted to me that he still had access to FYB and could access it through his previous administrative permissions.

9.      After an extended silence from Stopczy, Greg asked Stopczy several times if he had accessed Greg's emails since I was bought out on December 14, 2022.

10.     Stopczy finally admitted the following to me:

- Chris had been pressuring Stopczy to access my FYB emails since the buyout on December 14, 2022;

- Stopczy at first refused several times because he thought it was wrong and possibly illegal, but ultimately agreed to do so after Chris assured him that a lawyer said Stopczy was "fully covered";

- Stopczy downloaded my entire FYB email on January 13, 2023 which consisted of 159,859 emails and again on February 14, 2023 which consisted of another 1,254 emails between January 14 and February 14, 2023;

- Stopczy saved my entire FYB email to Michelle Houbeck's computer in a PST file;

- At the direction of Chris, Houbeck, Chris's assistant, was instructed to run searches in Greg's email for certain key words and phrases and print those emails for Chris's review and use;

- Stopczy said he had not been able to sleep since he downloaded my inbox because he felt so bad and that he was going to do everything he could to make it right; and

- He was going to tell Chris that he and I talked and that he was going to tell Chris he would no longer be a part of this scheme with Chris and Houbeck.

11.     Thereafter, Stopczy sent me several videos that he claimed evidenced that he was deleting my entire FYB email account from Chris's/Houbeck's computer and he confirmed via text message that no other copies existed.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

DocuSign Envelope ID: 183821FD-7855-4286-A29C-807BEE719541

12.     I then added Harbour to our call because Stopczy was going to work with Harbour to assign over the FYB email admin permissions to my new Microsoft SharePoint account..

13.     While Stopczy, Harbour, and I were on the call commencing the transfer, I heard Houbeck yelling at Stopczy and demanding that he see Chris immediately.

14.     The line then went dead and Stopczy (presumably at the demand of Chris) blocked my number so I could no longer contact him.

15.     Chris, through Rich, still has access to my FYB email and refuses to relinquish his admin access to me.

Further declarant sayeth not.

DocuSigned by:

*Greg Yatooma*

213F1E37B94E48C

GREGORY YATOOMA

# Exhibit 5

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF**
**OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER  YATOOMA  and
MSY CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB
Hon. Victoria A. Valentine

---

| | |
|---|---|
| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendants* |
| T. Andrew Keating (P86261) | 1615 S. Telegraph Rd, Ste 300 |
| *Attorneys for Plaintiff* | Bloomfield Hills, MI 48032 |
| 27777 Franklin Road, Suite 2500 | (248) 230-2820 |
| Southfield, MI 48034 | sieving@urbanlegalgroup.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BUTZEL LONG, PC** |
| emayer@taftlaw.com | Daniel J. McCarthy(P59457) |
| akeating@taftlaw.com | Bernard J. Fuhs (P69621) |
| | *Co-Counsel for Defendant* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

---

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO MODIFY AND/OR RELIEF FROM JULY 3, 2023, ORDER PURUSANT TO MCR 2.612

      As a preliminary matter, Defendants submit that because of the Court's recent decision to appoint a Receiver, MSY is currently without Counsel. Defendants therefore respectfully request that the Court defer ruling on this Motion until the Receiver retains counsel to protect MSY's interest in this matter.

FILED     Received for Filing     Oakland County Clerk     7/24/2023 3:17 PM

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**INTRODUCTION**

This motion is another example of Plaintiff Gregory Yatooma's ("Gregory") scorched earth litigation tactics. Gregory has filed another specious Motion where his only intent is to mischaracterize his version of the circumstances that have transpired between the parties and in so doing completely wasting this Courts valuable time.[1]  It is beyond dispute that (1) Defendants have fully complied with this July 3, 2023, Order regarding the distribution of the Settlement Proceeds; (2) Gregory admits on page 2 of his Motion that the Defendants have complied with the terms of the Order; and (3) there is absolutely no legal basis for Gregory to seek relief from the Order.

**PROCEDURAL HISTORY**

On or about May 10, 2023, Gregory filed the instant action against Christopher Yatooma and MSY Capital Partners, LLC ("Defendants"). On March 17, 2023, Gregory also filed a Motion for an Order Permitting Dykema Gossett, PLLC to Interplead and/or Deposit Disputed Funds with this Court. The "Disputed Funds" involve Settlement Proceeds from litigation previously pending before Judge Warren in the case of *MSY Capital Partners, LLC et al v LIV Wellness Center, LLC et al*, Oakland County Case No. 2019-178037-CB ("MSY/LIV Litigation"). Following an appeal, the parties in the MSY/LIV Litigation agreed to resolve their issues and executed a March 10, 2023, Confidential Settlement Agreement ("CSA"). Pursuant to the CSA, the above parties agreed

---

[1]Gregory's has made continuous misrepresentations in this litigation, including (1) that MSY has no current business other than the distribution of the Litigation Proceeds - to the contrary, MSY is an active going concern with ongoing business. (2) that Christopher closed MSY's bank account at Chase Bank.  Chase Bank Account No. ----2627 is active and open. (3) That Christopher removed Greg from the MSY bank account- when on January 31, 2023, and February 14, 2023, Gregory admitted that he was "selling the companies to Chris", and specifically directed, "Remove me from these accounts, but keep the account active" which specifically mentioned the MSY Chase Bank Account No. 2627 (held under Christopher James & Associates, LLC). 4) Gregory contends that he is a partner in MSY with Christopher, yet he recently told Crain's Detroit Business that he is not business partners with his brothers and haven't been in over 4 years. ***See Ex D***.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

that the appeal bond would be returned to Dykema Gossett, PLLC ("Dykema"), to which Dykema would then distribute to each party its designated portion of the bond.  As Dykema was prepared to distribute the bond proceeds, Defendant Christopher Yatooma ("Christopher") the designated representative for MSY, instructed Dykema to distribute MSY's portion of the funds.  Gregory, on the other hand, provided conflicting different instructions and asked Dykema to wire a portion of MSY's funds to a different non-MSY account.  As this Court knows, Dykema refrained from distributing the funds pending either an agreement from Gregory and Christopher or by further order of the court.  On June 7, 2023, MSY filed a Motion to Compel Dykema to Distribute the Bond before Judge Warren as provided by the CSA. This Court ordered Gregory's motion stayed pending the hearing in front of Judge Warren. On June 16, 2023, Judge Warren issued an Order closing the MSY/LIV case without ruling on MSY's Motion to Comple Dykema to Distribute the Bond to MSY per the terms of the CSA.

Gregory re-noticed for hearing his Motion to Interplead and/or Deposit Funds with this Court. On June 28, 2023, this Court held a hearing on Gregory's Motion. At the hearing this Court ruled that she would allow the *parties to decide* whether they wanted one- half (1/2) of the funds to go to each party in a trust account or if they wanted the whole amount to go to the Court.  If the parties did not reach an agreement, then the parties were instructed to submit an Order that the entire proceeds of the Bond would be deposited with the Court. *See transcript of June 28, 2023, hearing attached hereto as Ex. A*. Thereafter, the parties reached an agreement that one-half (1/2) of the funds be distributed to Gregory Yatooma, on the one hand, and one-half (1/2) the funds to Christopher Yatooma on the other hand, to an account of each party's choosing, where each party shall hold and freeze the Funds until further written agreement of the parties or order of the Court. Accordingly, the parties submitted to this Court a proposed Order Re: Plaintiff's Motion for an

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Order Permitting Dykema Gossett PLLC To Interplead and/or Deposit Disputed Funds with the Court (the "Order"), *attached hereto as **Ex. B.*** On July 3, 2023, this Court entered the Order with a single modification that provided that the Settlement Funds were "**To be held in the IOLTA account of the attorney for the respective party**". *The Order is attached hereto as **Ex. C.***

In the meantime, Christopher retained Urban Legal Group to act as co-counsel in this action in the place of Legal Consulting, PLLC and a substitution of counsel has since been entered with the Court.

After the Court entered the above Order, the Defendants determined that because the Settlement Proceeds from the MSY/LIV litigation involved cannabis related funds[2], and out of an abundance of caution, it would deposit Christopher's portion of the Settlement Proceeds into the IOLTA account of Urban Legal Group. Urban Legal Group has a IOLTA account with Citizen State Bank, an authorized cannabis banking institution.  Urban Legal Group's IOLTA account is fully compliant with the applicable rules of the State Bar of Michigan as all interest from the account goes ***directly*** to the State Bar. The undersigned is the sole signatory and the only agent authorized to act under the IOLTA account. Finally, it should also be noted that after the resolution of the MSY/LIV Litigation, the Dykema Law Firm held the Settlement Funds at an account with Dart Bank, which is also an authorized cannabis banking institution. Clearly, the Dykema Law firm had the same concerns regarding the treatment of the MSY/LIV Litigation Proceeds.

Contrary to Gregory's specious allegations, there was nothing nefarious surrounding Defendants' decision to deposit its portion of the Settlement Funds with Urban Legal Group.

---

[2] The MSY/LIV Wellness litigation involved a breach of partnership agreement involving the development, ownership and operation of a retail cannabis store located in Ferndale, Michigan.

4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Accordingly, the Defendants have complied with this Court's July 3, 2023, Order. As such this Motion should be denied.

<div align="center">

**ARGUMENT**

**There Is No Grounds for The Court to Grant Relief from The Order.**

</div>

Gregory is seeking relief from the Order pursuant to MCR 2.612(C)(1)(a) and (c), alleging that Defendants have attempted to subvert the Court's Order and as such he is the "victim" of mistake, fraud or misconduct. These claims are completely without merit as Defendants have complied with both the letter and "sprit" of this Court's Order.

MCR 2.612(C)(1) provides as follows:

> (1) On motion and on just terms, the court may relieve a party or the legal representative of a party from a final judgment, order, or proceeding on the following grounds:
>
> > (a) **Mistake, inadvertence, surprise, or excusable neglect.**
> >
> > (b) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under MCR 2.611(B).
> >
> > (c) **Fraud (intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.**
> >
> > d) The judgment is void.
> >
> > (e) The judgment has been satisfied, released, or discharged; a prior judgment on which it is based has been reversed or otherwise vacated; or it is no longer equitable that the judgment should have prospective application.
> >
> > (f) Any other reason justifying relief from the operation of the judgment.

Gregory argues that the Court entered the Order on the "belief" that one-half (1/2) of the Settlement proceeds would be transferred into the IOLTA account of one of the Defendants attorneys at the time, either Butzel Long or Legal Consulting. Gregory goes on to allege that it was not contemplated by the Court or by Gregory that the funds would be deposited into the IOLTA account of Urban Legal. Because of this, Gregory wants this Court to modify the Order

<div align="center">5</div>

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

and require the parties to deposit the entirety of the Settlement Funds into the Circuit Court's

escrow account. Gregory's contention is completely lacking in merit.

At the June 28, 2023, hearing and after extensive argument, the Court made the following

ruling as to the distribution of the Settlement Funds:

> "THE COURT: And with regard to Dykema, again, the Court will take the money
> and have it put into the court fund; if you want to stipulate to something
> differently, you're certainly entitled to do that by stipulation, otherwise the Court
> will take the money as was indicated in the confidential settlement agreement,
> that the money was to be disbursed within two days of the dismissal. That's the
> ruling of the Court".

Per the Court's instruction, the parties jointly negotiated and submitted a proposed Order

whereby each party agreed to each deposit one-half (1/2) of the Settlement Funds to an account

of each party's choosing and further agreed to hold and freeze the funds until further written

agreement of the parties or order of the Court. Thereafter, the Court modified the Order to

instead provide that the Settlement Funds were "***To be held in the IOLTA account of the***

***attorney for the respective party".***  Thereafter, the Defendants deposited their portion of the

Settlement Funds into the Urban Legal Group <u>IOLTA account</u>, which is completely in

compliance with the terms of this Court's Order. Clearly, the Order did not direct the Settlement

Funds to be deposited into an IOLTA account of either the Butzel or Legal Consulting Law

Firms. Instead, the Order specifies that the funds were to be deposited into an IOLTA account for

the attorney for the respective party. As such, the decision by defendants to place the Settlement

Funds into the Urban Legal Group IOLTA account complies with the agreement of the parties

and the terms of the Order.

Gregory further attempts to argue that the Order should be modified pursuant to MCR

2.116(C)(1)(c), alleging fraud and misconduct on the part of the Defendants. Gregory claims that

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the Court specifically ruled that the Settlement Funds were not to be deposited into Citizens State

Bank. A mere cursory review of the hearing transcript establishes that the Court made no such

finding or ruling.[3] Further, the fact that Christopher is the owner of Citizen State Bank is wholly

irrelevant to this instant Motion. As set forth above, Christopher's portion of the Settlement

Funds have been deposited into an IOLTA account opened and controlled by Urban Legal

Group. The Settlement Funds are segregated and frozen until further written agreement of the

parties or further order of the Court. Finally, all interest derived from the Settlement Proceeds

will go directly to the State Bar of Michigan, not to Christopher. Again, there is no legal or

factual basis to support Gregory's claim of fraud or misconduct that would warrant a

modification of the Order.

## CONCLUSION

Based on the foregoing, Plaintiff's Motion should be Denied. [4]

Respectfully submitted,

URBAN LEGAL GROUP

By:/s/ *Jeffrey R. Sieving*
Jeffrey R. Sieving
*Co-Counsel for Defendants*
1615 S. Telegraph Rd., Suite 300
Bloomfield Hills, MI 48301
(248) 230-2820
sieving@urbanlegalgroup.com

July 24, 2023

---

[3] The pages of the transcript cited by Gregory refer to the Court's position that the Settlement Funds were to be evenly split into the respective accounts of the parties and not be held solely by Defendant MSY.
[4] Alternatively, if this Court is inclined to modify the Order, the Settlement Funds should be deposited into MSY's account under the strict purview of the Receiver.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**<u>CERTIFICATE OF SERVICE</u>**

Jeffrey R. Sieving hereby certifies that the foregoing document was filed and served via the Court's electronic case filing and noticing system to all counsel of record.

<div align="center">

/s/ <u>*Jeffrey R. Sieving*</u>
Jeffrey R. Sieving

</div>

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# EXHIBIT A

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA,

       Plaintiff,            Case No. 2023-200283-CB

vs

CHRISTOPHER YATOOMA and MSY CAPITAL
PARTNERS,

       Defendants.

_____/

MOTION

BEFORE THE HONORABLE VICTORIA A. VALENTINE

Pontiac, Michigan - Wednesday, June 28, 2023

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | ETHAN R. HOLTZ (P71884) |
| | EMILY MAUREEN MAYER (P78956) |
| | Taft Stettinius & Hollister, LLP |
| | 27777 Franklin Road, Suite 2500 |
| | Southfield, Michigan 48034 |
| | (248) 351-3000 |
| | |
| For the Defendants: | DANIEL J. MCCARTHY (P59457) |
| | 201 West Big Beaver Road, Suite 1200 |
| | Troy, Michigan 48084 |
| | (248) 258-1401 |
| | |
| For Christopher Yatooma: | ANTHONY J. BOLOGNA (P72698) |
| | Legal Consulting, PLLC |
| | 26100 American Drive |
| | Suite 500 |
| | Southfield, Michigan 48034 |
| | (248) 227-2278 |

Videotape Transcription Provided By:
Deanna L. Harrison, CER 7464
About Town Court Reporting, Inc.
248-634-3369

1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
ALSO PRESENT:              BRIAN M. MOORE (P58584)
                           Dykema Gossett, PLLC
                           39577 Woodward Avenue, Suite 300
                           Bloomfield Hills, Michigan 48304
                           (248) 203-0772
```

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

TABLE OF CONTENTS

WITNESSES                                              PAGE

None.


EXHIBITS                              Introduced    Admitted

None.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1                    Pontiac, Michigan

2                    Wednesday, June 28, 2023

3                         -     -     -

4           (At 10:17 a.m., proceedings begin)

5           THE CLERK:  Now calling case number 2023-200283-

6      CB, Yatooma v Yatooma.

7           THE COURT:  Good morning.

8           MR. HOLTZ:  Good morning, Your Honor.

9           THE COURT:  Appearances.

10          MR. HOLTZ:  Thank you, Your Honor.  Ethan Holtz

11     for the Plaintiff.

12          MR. MCCARTHY:  Good morning, Your Honor.  Daniel

13     McCarthy appearing for the Defendants.

14          MR. BOLOGNA:  Good morning, Your Honor.  Anthony

15     Bologna appearing for the Defendants as well.

16          THE COURT:  I'm sorry, go ahead, Ms. Mayer.

17          MS. MAYER:  Good morning, Your Honor.  Emily

18     Mayer also on behalf of the Plaintiff.

19          THE COURT:  Okay.  Mr. Holtz, your camera is not

20     on.

21          MR. HOLTZ:  Oh, let me fix that.  Sorry, Your

22     Honor.

23          THE COURT:  Okay.  So you guys had a ruling from

24     Judge Warren.  The case is closed, correct?

25          MR. HOLTZ:  Yes, Your Honor.
```

<div align="center">4</div>

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1          MR. MCCARTHY:  Your Honor, there's one motion

2     hanging in front of Judge Warren we have not received a

3     ruling on.  It's -- it was Plaint -- it was Plaintiff

4     MSY's motion to compel the Dykema firm to distribute the

5     proceeds to MSY consistent with the settlement agreement.

6          I've emailed chambers for Judge Warren, I

7     believe last week; I haven't -- we haven't received a

8     response, which is a little unusual, so we're -- sitting

9     here today, we're unaware what the status is of that

10    pending motion.

11         THE COURT:  Okay.  Well, let me ask you this.

12    With regard to the MSY distribution, what's the

13    distribution supposed to look like?

14         MR. MCCARTHY:  It's sup -- according to the

15    settlement agreement it's supposed to be delivered to MSY.

16         THE COURT:  Right.  And then MSY has

17    shareholders?

18         MR. MCCARTHY:  MSY has a member, correct, Mr.

19    Christopher Yatooma.

20         THE COURT:  Okay.  And then Mr. Yatooma -- Mr.

21    Christopher Yatooma is supposed to give money to his

22    brother?

23         MR. MCCARTHY:  That's the allegation in the case

24    before Your Honor.

25         THE COURT:  Right.  But with regard to -- let's

```
1        see -- I have the settlement agreement, and I think this

2        is confidential, correct?

3               MR. MCCARTHY:  Yes, Your Honor.

4               THE COURT:  Do you want me to take people out of

5        the room?

6               MR. MCCARTHY:  It might be prudent, Your Honor.

7        We -- we submitted to Your Honor under seal.

8               THE COURT:  Yep.

9               MR. MCCARTHY:  Judge Warren did enter an order

10       allowing for the filing under seal of that settlement

11       agreement --

12              THE COURT:  I saw that.

13              MR. MCCARTHY:  Okay.  And I did -- I did email

14       your chambers asking if you wanted your own order sealing

15       that settlement agreement, or whether we can rely on Judge

16       Warren's order?

17              THE COURT:  You should submit your own order

18       under --

19              MR. MCCARTHY:  Okay.

20              THE COURT:  -- 8.119 and this case number.

21              With regard to everyone else who's in the room,

22       can you put them in the waiting room real quick?

23              THE CLERK:  One moment.

24              Sorry about that.  Thank you for your patience.

25              THE COURT:  Okay, we're missing a lot of people.
```

6

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1         We need Mr. --
2              MR. BOLOGNA:  We need Mr. Holtz and Mr.
3    McCarthy.
4              THE COURT:  We need Mr. Holtz and Mr. McCarthy
5    and Mr. --
6              THE CLERK:  Mr. Moore?
7              THE COURT:  And Mr. Bryan Moore.
8              THE CLERK:  Sorry about that.  Thank you.
9              THE COURT:  Okay.  Now do we have everyone we
10   need?
11             MR. BOLOGNA:  I --
12             THE COURT:  Yes?
13             MR. BOLOGNA:  Yes.
14             THE COURT:  Okay.  Mr. Holtz, you're still not
15   on camera.  So --
16             MR. HOLTZ:  Yeah, Judge, something's wrong with
17   my camera.  I'm trying to figure it out.
18             THE COURT:  Okay.  I'm satisfied that you're
19   still Mr. Holtz and recognize your voice.
20             MR. HOLTZ:  Okay.  Thank you, Your Honor.
21             MR. BOLOGNA:  I'll stipulate to his voice, Your
22   Honor.
23             THE COURT:  Okay.
24             MR. HOLTZ:  Yeah, Mr. Bologna knows it well.
25             THE COURT:  Okay.
```

7

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1              So with regard to this matter, Mr. Moore, sir,

2     you want out of the case.  You, under the settlement

3     agreement, had two obligations to pay in the money under

4     section A, and I'm going to be careful with regard to

5     numbers, because this is still recorded.  A and B,

6     correct?

7              MR. MOORE:  That's right.  We agreed to take in

8     the -- in the bond proceeds and to distribute them to each

9     of the parties per section 2, correct.

10             THE COURT:  Okay.  And with regard to this

11    agreement, this is an agreement that was entered into, and

12    I actually reviewed the files, and reviewed Judge Warren's

13    file; no one even saved anything for the Court to have

14    jurisdiction, it goes into arbitration, correct?

15             MR. MCCARTHY:  That's our position, Your Honor.

16             THE COURT:  Yeah.  But under the agreement that

17    I have, the requirement is that Dykema is required to make

18    these distributions within two days of the Court of

19    Appeals entry of the order dismissing, correct?

20             MR. MCCARTHY:  Correct.

21             THE COURT:  Okay, and that's happened?

22             MR. MCCARTHY:  They've distributed to Def -- to

23    the LIV defendants in the Judge Warren case, they have not

24    distributed to MSY.

25             THE COURT:  Right.  So they distributed B, but
```

8

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    not A?

2           MR. MCCARTHY:  Correct.

3           THE COURT:  Okay.  And so -- and under A, you

4    said the member was Christopher, and who was the other

5    member prior to the buyout?

6           MR. MCCARTHY:  Prior to the buyout, I believe it

7    was Gregory Yatooma.

8           THE COURT:  Okay.  And with regard to Mr.

9    Gregory Yatooma, the agreement that's before this Court is

10   that there was a distribution of part A between the two

11   members at the time, correct?

12          MR. MCCARTHY:  I'm trying to understand the

13   Court's question, Your Honor.  I apologize.

14          THE COURT:  Who gets the money?

15          MR. MCCARTHY:  MSY, the entity.

16          THE COURT:  Right.  And then MSY has a

17   requirement to dist -- for distribution to who, 50/50?

18          MR. MCCARTHY:  We haven't answered that

19   allegation yet, Your Honor.  We filed a pre-answer motion

20   for summary disposition.  We're -- we are -- we haven't

21   taken a position on the validity of that alleged

22   agreement.  Right now it's just an allegation in that

23   complaint, and if you look at that document there are --

24   there are defenses that we have yet to assert with respect

25   to that document.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1            So I can't concede today the validity of that

2     document or what its terms purport to be.

3            THE COURT:  Okay.  And with regard to MSY, you

4     represent MSY?

5            MR. MCCARTHY:  Yes, Your Honor.

6            THE COURT:  But there is request for you to --

7     there's a request for you to be disqualified?

8            MR. MCCARTHY:  They filed that motion, Your

9     Honor, before Your Honor, and they also filed that request

10    in front of Judge Warren, which was denied, which we

11    (indiscernible) response.

12           THE COURT:  Right.

13           With regard to holding the money, why don't you

14    hold the money?

15           MR. MCCARTHY:  We are asking for -- we've been

16    asked repeatedly for MSY to hold the money, and as we

17    stated in our initial response to the motion to inter --

18    for request for interpleader, we said that the -- MSY

19    would take the money, and to the ext -- to the -- I think

20    Greg Yatooma claims that he's entitled to 6 1/2 -- well, I

21    don't want to say the amount, but the proportion of the

22    amount that he claims, we'd be willing to freeze is MSY's

23    account.

24           THE COURT:  Okay.  So why don't you guys

25    stipulate --
```

10

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1        MR. MCCARTHY:  The vast portion of that --

2        THE COURT:  -- why don't you stipulate to

3   allowing each attorney to hold the portion one-half?

4        MR. MCCARTHY:  I can make that stipulation, Your

5   Honor, as long as it -- the money gets into MSY's account,

6   and we would -- we would stipulate as an officer of the

7   Court that MSY would freeze the portion of the money that

8   Gregory has claimed entitled to.

9        THE COURT:  No.  What I'm going to tell you is

10  that I'm going to have Mr. Holtz hold half and you hold

11  half.  You're officers of the Court.

12       MR. MCCARTHY:  I understand that, Your Honor.

13  Can I have just two seconds to consult with my client

14  before I make that stipulation on the record?

15       THE COURT:  Sure.

16       MR. MCCARTHY:  Your Honor, I can't -- I

17  apologize, I'm unable to get -- I'm trying to communicate

18  with my client, and I'm trying to get an answer.

19       THE COURT:  Okay.  And you're --

20       MR. MCCARTHY:  Just -- just give me a minute,

21  Your Honor, please.

22       THE COURT:  Oh, it's okay.

23       MR. MCCARTHY:  Okay.  I apologize --

24       THE COURT:  I'm going to --

25       MR. MCCARTHY:  -- it's taking this much time.

11

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1                  THE COURT:  Say it one more time?
2                  MR. MCCARTHY:  I apologize for taking this much
3       time.
4                  THE COURT:  Oh, that's okay.
5                  MR. MCCARTHY:  I just want to point out, Your
6       Honor, I think -- I think, you know, as an officer of the
7       Court, there a professional rule of responsibility I think
8       we all know, MRPC 1.15(c).  Right now Dykema, the law
9       firm, is holding the funds, the funds aren't going
10      anywhere, and under that rule, if there's a dispute among
11      two or more people, they're required to hold those funds
12      regardless, and -- and --
13                 THE COURT:  Well, he's in violation -- they're
14      in violation now of the settlement agreement that they
15      signed on behalf of the company with regard to -- on
16      Dykema.  Look at the signature page.
17                 MR. MCCARTHY:  Right.
18                 THE COURT:  With regard to paragraphs 2 and 14
19      --
20                 MR. MCCARTHY:  Right.
21                 THE COURT:  -- they have L. Lance Boldrey that
22      signed that they were going to execute this agreement and
23      live by the conditions of sections 2 and 14.  So now
24      they're in violation.
25                 MR. MCCARTHY:  I -- I -- I can't disagree with
```

12

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1      that assessment, Your Honor.

2              THE COURT:  Okay.

3              MR. MOORE:  Your Honor, if -- if I may on behalf

4      of Dykema, when we signed the agreement there was no

5      conflict at all between MSY or its members with respect to

6      who were the members and where the money was going to go.

7              After the settlement agreement was signed, then

8      unfortunately, our -- Greg and Chris had a dispute or a

9      conflict, and we received conflicting information on who

10     the members are and where to send the money.

11             THE COURT:  Right.

12             MR. MOORE:  And they put our firm in a position

13     where -- where we had to either decide not to distribute

14     until they resolved this, or until we got a court order,

15     and --

16             THE COURT:  Right.

17             MR. MOORE:  -- and both of them asked me

18     personally not to file a motion to interplead these funds,

19     that they would work this out.

20             So I understand why -- I'm just concerned about

21     the suggestion that we're in violation of -- of an

22     agreement, when we get conflicting wiring instructions on

23     who to send the money to from two different

24     representatives and/or members of MSY, after they signed

25     this agreement, after Dykema signs this agreement, and
```

13

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    puts, unfortunately, Dykema, who agreed to do this, right,

2    out of -- you know, out of a -- out of a request from our

3    client to keep this confidential, you know, they -- you

4    know, no good deed go unpunished category, put our firm in

5    this position.

6          THE COURT:  And, Mr. Moore, at the time that

7    this was executed by the member of your firm indicating

8    the requirement to comply with section 2, what was the

9    understanding of who the members were of MSY?

10         MR. MOORE:  My understanding from Lance Boldrey,

11    and the lawyers that otherwise handled the appeal, right,

12    we didn't handle the underlying case, it was our

13    understanding that it was 50/50.  But we -- but we have --

14    we didn't -- we weren't involved in incorporating this

15    company; that issue was not, you know, at -- an issue in

16    the underlying case.  We -- you know, after this became a

17    dispute, I asked for some information about the company,

18    was there an operating agreement, you know, I received a

19    bunch of information from both sides, and -- and none of

20    it was to me convincing enough to release the funds to one

21    and not the other, and I didn't want to prejudice anyone.

22         MR. BOLOGNA:  Your Honor, may I?

23         THE COURT:  Yes, sir.

24         MR. BOLOGNA:  Anthony Bologna on behalf of Chris

25    Yatooma.

<div align="center">14</div>

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1              I think the one thing that's not in dispute is
2     the settlement agreement, we'll call it, and if you look
3     at the settlement agreement, the signature blocks
4     especially, Chris Yatooma signs as the member, and Greg
5     Yatooma signs as the authorized agent.  And if that
6     settlement agreement isn't in dispute, what's clear is
7     that the funds are to go to MSY, and as Mr. McCarthy said,
8     we're more than willing to freeze the portion that Mr.
9     Yatooma is claiming in this lawsuit that he's entitled in
10    the MSY account.
11             THE COURT:  Right.  And I'm not going to do
12    that, because it's not fair to the other party, and it's
13    not consistent with what's being represented by, I guess,
14    Dykema, as to what's going on here, and it's going to give
15    leverage.
16             I mean you have conflicting information going to
17    the lawyer who is charge of disbursing the funds under a
18    written settlement agreement which they hold liability;
19    it's not right.
20             MR. MCCARTHY:  Your Honor, can I, just for the
21    record, speak to that point, please, on behalf of MSY?
22             You know, in terms of enforcing the agreement,
23    there's no dispute over what the agreement says or how
24    it's supposed to operate.  Whether it creates leverage or
25    not, I believe respectfully is -- is irrelevant that the
```

<div align="center">15</div>

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    -- and which is outlined in our motion to compel Dykema,

2    which was I believe still pending before Judge Warren,

3    that the agreement provides the money goes to MSY.

4    There's no dispute over that.  The agreement designates

5    Christopher Yatooma as the authorized member/agent to

6    provide all notice under the agreement, include -- which

7    notice includes notice to Dykema as to where to send the

8    funds, which again, there's also no dispute that Dykema

9    was instructed by the designated member of MSY and

10   authorized agent of MSY to send the funds to MSY.  End of

11   story.  That's what the contract says --

12          THE COURT:  So are you saying that Mr. Moore, on

13   behalf of Dykema -- or Dykema would not have any liability

14   if he goes and distributes the funds to MSY?

15          MR. MCCARTHY:  That's our position.  That's what

16   they were required to do.  That's what they agreed to do.

17   The Court respects the entities.  Regardless if there's an

18   internal dispute over who the members are, the entity

19   itself is entitled to independent respect, and that's what

20   the contract says.

21          So following the plain terms of the agreement,

22   seems to me would discharge --

23          THE COURT:  What was the underlying lawsuit?

24          MR. MCCARTHY:  The underlying lawsuit was I bel

25   -- I guess Mr. Bologna can testify to that.  I was not

16

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    involved with the underlying lawsuit.  I guess it was a

2    dispute with another -- with LIV, which is a provisioning

3    -- I can't I don't know, Your Honor.  It was -- it was

4    resolved, obviously.

5              THE COURT:  Right.  Okay.

6              MR. MOORE:  If I could just add one -- just so

7    Dykema's position is clear.  We have no objection to any

8    court order, in fact, I welcome some court order,

9    stipulated or otherwise, that puts this money out of our

10   hands.

11             What's been frustrating to me, and I've shared

12   this with all -- I think all the lawyers on this -- at

13   this hearing is I don't understand why there could not be

14   some stipulation that this money go to some bank account

15   and be frozen, subject to further order of the Court, at

16   least at this point.

17             I don't understand why the parties cannot agree

18   to put this money at any financial institution or in their

19   client trust account pursuant to a court order that says

20   the money shall not be moved or touched, absent further

21   order of the Court.

22             MR. BOLOGNA:  Which is what we were proposing,

23   Your Honor, and that's why we were proposing we'll freeze

24   -- we'll -- per court order, that will be frozen, and as

25   we all know, violation of that's going to be subject to

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    severe sanctions by this Court.

2         MR. HOLTZ:  Judge, I've been pretty quiet here,

3    because I'm in the dark, so to speak, but that's not what

4    they're proposing.  That was all well and good until Chris

5    Yatooma went and opened his own MSY bank account, which my

6    client had no access to, at his own bank, that he owns, he

7    wants the money to go into so he can borrow against it and

8    use it, whether he distributes it or not, and Mr.

9    Bologna's suggestion that only half of it be frozen, my

10   client's half, gives Chris Yatooma not just the ability to

11   borrow against my client's half and use it to prop up his

12   bank, but also to utilize his half of the money while this

13   litigation proceeds.

14        This has got nothing to do with the settlement

15   agreement, Judge.  We're beyond the settlement agreement

16   between MSY and LIV.  This is about the dispute between

17   Chris and Greg Yatooma that is in front of you that arises

18   out of their contract --

19        THE COURT:  Okay.  So you can either deposit it

20   with the Court or you guys can stipulate to 50 percent to

21   be held by the Plaintiff, 50 percent to be held by the

22   Defendant.

23        MR. HOLTZ:  Good with me, Judge.  And I assume

24   that would be good with Mr. Moore, because all we were

25   trying to do is get Dykema out --

18

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1            THE COURT:  I think Mr. Moore just doesn't want
2   to be involved, and I don't blame him.
3            MR. HOLTZ:  I don't blame him either, Judge, and
4   they shouldn't be.  And my client feels terrible that
5   Dykema is still involved.
6            THE COURT:  So then Mr. McCarthy, sir, your
7   client will have to decide whether or not he wants the
8   funds -- the half of the funds to go to him that he can
9   have with his attorney in a trust account that isn't
10  touched, or if he wants the whole amount to go to the
11  court.
12           If I don't have a stipulation by tomorrow, then
13  submit an order that indicates that the money will be
14  taken into the court.
15           MR. MCCARTHY:  Your Honor, I just want to place
16  my objections on the record, if I may.
17           I have additional answers in addition to the
18  brief response that we filed and to this request for
19  interpleader.
20           Again, it's our position that if the Court
21  orders Dykema, a non-party, to take MSY's portion of the
22  money and deposit it into court, that that itself is
23  invading the province of the settlement agreement that
24  quite frankly, Judge Warren's order, if he dismissed it
25  and claims that the order -- the settlement was complied
```

19

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    with, by virtue of this Court ordering Dykema --

2              THE COURT:  Well, I don't know that Judge Warren

3    did that, because there is nothing in the settlement

4    agreement that indicates that there's any jurisdiction

5    with Judge Warren once the case was dismissed, which was

6    based upon paragraph two, which paragraph two was that

7    Dykema was going to distribute the funds within two days

8    after the Court of Appeals -- the Court of Appeals appeal

9    being dismissed, which was done, but then Dykema was put

10   in a position where they were given conflicting

11   information, and where Dykema could have liability with

12   regard to the distribution of the funds that they

13   specifically signed the agreement with regard to.

14             MR. MCCARTHY:  Right.  But MSY sitting here

15   today does not have that money.  Dykema is holding that

16   money.  MSY, the designated exclusive recipient of those

17   funds does not have it.

18             THE COURT:  Right.

19             MR. MCCARTHY:  And --

20             THE COURT:  So you can deposit them into the

21   Court in care of MSY, so we don't need -- I don't need

22   your clients to stipulate, if that's where we're going,

23   I'll just have it deposited into the court.

24             MR. MCCARTHY:  I'd like to -- like I said, the

25   Court gave us until tomorrow, so I can communicate with my

20

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
 1        client; I'm just in -- I'd just like to place my other

 2        defenses and objections on the record in case the Court

 3        does ultimately issue that ruling that again, it's our

 4        also position because of the pending summary disposition

 5        motion based on the arbitration provision, that even this

 6        issue would be subject to arbitration, because again, and

 7        I too have sympathy for Dykema's position that it's in,

 8        but Dykema again, regardless of what happened in the past

 9        or communications or who it thought it was communicating

10        with, it was contractually obligated to follow the

11        directions of MSY's agent, according to the strict, plain

12        language of that agreement, and it received those

13        instructions and it chose not to acknowledge those

14        instructions and hold those funds instead, and said we are

15        -- we want further direction, and it's our position they

16        received precisely what is required under that settlement

17        agreement, Christopher Yatooma was a designated agent and

18        member of MSY, he communicated to Dykema where to send

19        those funds, he communicated to Dykema that those funds

20        are to be sent to MSY's account, and that's consistent

21        with what the settlement agreement calls for, and all

22        Dykema had to do --

23               THE COURT:  But it's a new account that was

24        created after the settlement agreement was signed?

25               MR. MCCARTHY:  We dispute that too, Your Honor.
```

<div align="center">21</div>

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1   I believe the original account is still open and active.

2   THE COURT:  Well, then why didn't -- why didn't

3   your client give Dykema instructions to put it into that

4   account?

5   MR. MCCARTHY:  I have to -- I don't know the

6   answer to that question, Your Honor.

7   THE COURT:  Okay.

8   MR. MCCARTHY:  But the point is, is that it

9   makes no difference.  It's MSY that -- the settlement

10   agreement didn't specify or get into that level of detail.

11   As long as Dykema received notice from the agent as -- of

12   MSY to where to send that money, that's it.  Then Dykema

13   would have been out.  And this dispute is nothing more,

14   quite frankly, than a -- just a contract damages action,

15   which again, we believe is still subject to the

16   arbitration provision as outlined in our pending summary

17   disposition motion.

18   So -- and again, Your Honor, our motion in front

19   of Judge Warren, I don't know if he's going to rule on it,

20   so that's another --

21   THE COURT:  Well, he already closed your case,

22   did he not?

23   MR. MCCARTHY:  He issued an order closing the

24   case, but we received follow-up -- it was the -- the

25   orders we received last week or whenever he released those

22

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1  orders, I believe on June 16th, there was an order closing

2  the case, but then about 20 minutes later, we received a

3  subsequent order allowing the settlement agreement to be

4  filed under seal, and our motion for Dykema was pending

5  and briefed and responded to, and I'm just suggesting to

6  this Court, based on my experience litigating with Judge

7  Warren, it was unusual that none of the orders that were

8  released to date didn't reference or acknowledge that

9  motion, and that under the administrative rule, I guess

10  technically he still has 35 days to deal with that motion,

11  and so I don't know if he's issuing an order nunc pro tunc

12  on -- with respect to that motion. And if he granted the

13  motion, which again, in front of Judge Warren, no one

14  contested, Dykema didn't contest that motion, Defendants

15  didn't contest that motion, it would be -- it would be

16  entirely consistent with Judge Warren saying yes, Dykema,

17  you're a signatory to the settlement agreement, you don't

18  object to sending the money to MSY, just do it. Now

19  Dykema has its order, which was what it wants, I guess,

20  the Court's blessing to distribute the funds according to

21  what it agreed to do under the settlement agreement and

22  have the dismissal order entered. That would have been

23  the end of the story.

24  So again, sitting here today, I don't know what

25  Judge Warren is going to do with that, and all due respect

23

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    to this Court, this Court's prior order with respect to

2    interpleading these funds was stayed pending completion of

3    Judge Warren's ruling on that, and I just don't know what

4    the status of that technically pending motion is.

5         THE COURT:  I'm looking at his order of 06/16

6    that closes the case.  His other order that indicates you

7    can file under seal, that might just be for the Court of

8    Appeals.

9         MR. MCCARTHY:  It may be.

10        THE COURT:  There is an order that closes the

11   case.

12        MR. MCCARTHY:  I can't disagree with what the

13   order says, Your Honor, but I've seen before courts have

14   entered subsequent orders nunc pro tunc that would -- even

15   though they be released after the order closing the case,

16   but the order was effective before the closing of the

17   case, and I just don't know.

18        THE COURT:  I mean he has an order there, he's

19   -- I don't -- happy to reconsider my ruling if he reopens

20   the case.

21        MR. MCCARTHY:  I would suggest -- I mean maybe

22   we could put this over a week, which would give everybody

23   enough time to consider the discussions and discourse

24   today, and --

25        THE COURT:  Well, you guys have had time.

24

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1    You've already had time.
2              MR. MCCARTHY:  I understand that, Your Honor,
3    but there have been motions pending and we're still
4    waiting for court rulings, and so again, this waiting for
5    I guess a definitive clar -- you know, definitive clarity
6    from Judge Warren's court on that -- on that mot -- on the
7    Plaintiff's motion with respect to Dykema certainly would
8    have helped things, so it's -- and the parties were
9    waiting on that definitive clarification.
10             THE COURT:  Okay.  Anything else?
11             MR. MCCARTHY:  And again, Your Honor, it's -- I
12   cited MRPC 1.15; if nothing else, Dykema is required to
13   hold those funds regardless if there's a dispute, which
14   would -- which would dictate denial of Plaintiff's motion
15   as presented before the Court.
16             THE COURT:  And with regard to Dykema, again,
17   the Court will take the money and have it put into the
18   court fund; if you want to stipulate to something
19   differently, you're certainly entitled to do that by
20   stipulation, otherwise the Court will take the money as
21   was indicated in the confidential settlement agreement,
22   that that money was to be disbursed within two days of the
23   dismissal.  That's the ruling of the Court, sir.
24             MR. MCCARTHY:  All right, Your Honor.  We'll
25   come back with the court -- with -- with an answer.
```

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
 1              THE COURT:  Thank you.  Anything else?

 2              MR. HOLTZ:  Yeah.  So Judge, we have our motion

 3    to disqualify Butzel and legal advocacy on behalf of MSY,

 4    and I'll be brief.

 5              Greg and Chris Yatooma are the 50 percent

 6    members of MSY.  Chris Yatooma has sworn to that under

 7    oath.  They claim in their opposition that MSY is now a

 8    single member LLC, there's not a single document that

 9    supports that.  The articles of organization provide that

10    MSY is a member-managed LLC, that was what was filed with

11    the State of Michigan.  MSY has no operating agreement,

12    and accordingly, per the LLC act, MSY to operate and to

13    take acts requires the vote of the members to conduct its

14    business.

15              Chris and Greg cannot seemingly agree on

16    anything at this point.  I think that we can all agree on.

17    It's deadlocked, and that's why, among the claims asserted

18    by Greg in this case, Greg is seeking dissolution of MSY,

19    to which MSY is a necessary party, but what's happening

20    here is Chris is basically trying to operate and take

21    control of MSY, and use it for his own purposes, which

22    essentially we've just been arguing about for the last 30

23    minutes.  I'm not going to beat -- belabor that or beat it

24    to death.  And he now has his own personal attorneys in

25    this case doing it on behalf of MSY, appearing on behalf
```

<div align="center">26</div>

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    of MSY, taking legal positions on behalf of MSY, that are

2    Chris's positions.  That is a conflict.  It's a clear

3    conflict.  MSY and Chris are not the same.  It's an

4    entity, it is a 50/50 owned entity, and you can't have the

5    same lawyers representing one and a half sides here.

6            It's a clear conflict, and I don't think there

7    is really any argument that -- about it.  I read the

8    Defend -- I read Chris's attorney's response; they say

9    that the conflict rules are not implicated, because they

10   never represented Greg.  That's totally irrelevant.  Of

11   course they never represented Greg.  I'm not saying they

12   did, and I'm not saying that's why there's a conflict.

13   The conflict exists because they are using the entity to

14   serve Chris's personal interests, and that is a conflict,

15   and it can't continue.

16           They also say that my motion is barred because

17   Judge Warren allegedly determined this in his opinion

18   denying Greg's motion to intervene in the other case.

19   That's not true.  The order is fairly simple, it speaks

20   for itself.  He says I'm not letting you intervene in this

21   case, you didn't follow the procedural requirement of

22   attaching a proposed pleading to your motion, mostly

23   because Greg didn't have any affirmative claims to assert

24   in that case, and so he denied it right there.  He denies

25   the motion to intervene, that ends the discussion; he

27

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    never considered, never ruled upon, never addressed in any

2    way, shape, or form the motion to disqualify MSY, to stop

3    Chris's attorneys from doing what they were trying to do

4    in that case, which this Court has just put a stop to, so

5    that is no legal bar to this motion whatsoever.

6          And so lastly, Judge, I'll just make the point,

7    MSY didn't even -- Chris did not even have legal authority

8    to hire these attorneys on behalf of MSY.  Fifty-fifty

9    members -- member managed LLC, they needed both members'

10   consent to hire these attorneys.  Chris went ahead and did

11   it anyway, and has them asserting his positions.

12         Now they do cite to some testimony of Greg in

13   the other case, in which he said Chris was the manager.

14   Okay.  Greg was wrong.  There's a document filed with the

15   Secretary of State that says it is member managed; that is

16   what's determinative, not what Greg may have testified to

17   on that particular point.  He's allowed to be mistaken

18   about things.  He wasn't even aware that that -- that was

19   what the articles of organization provided.  That's what

20   they provided, it's 50/50; Butzel legal advocacy can

21   represent Chris Yatooma in this case all day long.  I have

22   no issue with that, but they can't represent MSY and use

23   it to do Chris's bidding.

24         MR. MCCARTHY:  Your Honor --

25         THE COURT:  Mr. McCarthy, go ahead.

28

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1              MR. MCCARTHY:  -- with all due respect to the
2     argument you just heard, okay, Mr. Holtz's client is also
3     mistaken and putting the cart before the horse.
4              It's our position we dispute that he's a member
5     of MSY.  According to that document that he's claiming, he
6     can't have -- have it both ways.  The claim is that he
7     sold his interest in all the entities back in December,
8     which is consistent with the three month later settlement
9     agreement where Christopher is signing as the sole member
10    of MSY, and there's no writing or evidence before the
11    Court suggesting that Gregory Yatooma is a current member
12    of MSY, when it's always been our position that as of at
13    least after that December date, it's a single member LLC,
14    and putting the cart before the horse simply because he
15    says he's a current member doesn't mean he's actually a
16    member.  There is no operating agreement.  Even Dykema
17    pointed that out.  Everyone agrees there's no operating
18    agreement.
19             But even with --
20             THE COURT:  So is it a question of fact as to
21    who the members are of MSY Capital Partners, LLC?
22             MR. MCCARTHY:  It sounds to be.  It sounds to
23    be.
24             THE COURT:  Okay.
25             MR. MCCARTHY:  But that's again part of our
```

29

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    pending summary disposition motion, Your Honor.

2              THE COURT:  Well, then wouldn't you be a witness

3    with regard to that issue?

4              MR. MCCARTHY:  Anybody would be -- I don't

5    understand the question, Your Honor.

6              THE COURT:  Wouldn't you, as the attorney of MSY

7    at the time, be a witness to this case, Gregory Yatooma

8    versus Christopher Yatooma and MSY, as to who the actual

9    members are?

10             MR. MCCARTHY:  Not with respect to the records

11   provided, Your Honor.  I mean the records speak for

12   themselves.

13             MR. BOLOGNA:  We weren't attorneys at that time,

14   Your Honor, when all this occurred.

15             THE COURT:  Well, who was the attorney when the

16   alleged membership interest changed?

17             MR. BOLOGNA:  That was prior to us -- and if any

18   -- if anything, it would be Greg Yatooma would be the

19   attorney at the time, but that as prior to us being

20   retained.  We were retained after -- well after all this

21   --

22             MR. HOLTZ:  Your Honor, that's not accurate.

23   Chris Yatooma was being represented by Clark Hill.

24             MR. BOLOGNA:  Thank you, Ethan.  It would be

25   Clark Hill then.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
1            THE COURT:   Okay.   So Christopher Yatooma was

2    represented by Clark Hill at what time?

3            MR. HOLTZ:   In December, when Greg and Chris

4    signed the agreement.   The gentleman's name, I believe, is

5    Steve Pacynski, something like that.

6            MR. BOLOGNA:   But to clarify, that's

7    representing Chris, not MSY, correct?

8            THE COURT:   Right.   So who represented MSY?

9            MR. BOLOGNA:   That's why I said arguably it

10   might be Greg Yatooma, because he acted as the attorney

11   for the company for all those years.

12           MR. MCCARTHY:   It's a very unique situation, as

13   we pointed out in the response, Your Honor.   You got the

14   Plaintiff here, who is an attorney, part of the -- a firm

15   called Fleming Yatooma & I -- mispronounce the last name,

16   Borowitz, I believe, that was counsel of record for MSY.

17           MSY needs counsel, and as far as we -- even --

18   the fact that -- there's no dispute that Chris Yatooma as

19   a member, he could retain counsel to represent the entity,

20   and we cited the court rule, the MRPC rule, that says that

21   even if the law firm represents a principal member of the

22   entity, there's no -- there's no ethical conflict

23   whatsoever.   It's certainly not before the Court at this

24   period in time.

25           THE COURT:   I think the issue is that it's not
```

31

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

1    black and white between the Yatoomas, Mr. Gregory Yatooma

2    and Mr. Christopher Yatooma, so I think that the issue of

3    membership is going to be a question of fact as well.

4           MR. MCCARTHY:  Which --

5           THE COURT:  So --

6           MR. MCCARTHY:  -- would probably go to

7    arbitration, Your Honor.

8           THE COURT:  Right.

9           MR. MCCARTHY:  Which is again --

10          THE COURT:  And so in that case, you know, if it

11    was that there was really -- everyone agreed this is what

12    happened, it would be I think a different scenario than

13    what we have here, where I see with the writing on the

14    wall here that there's always going to be a dispute as to

15    whether or not MSY is actually owned by Gregory Yatooma,

16    Christopher Yatooma, or both Gregory and Christopher

17    Yatooma.

18          MR. MCCARTHY:  Again, Your Honor, I guess that

19    -- all that -- those issues, if there's questions of fact,

20    are to be decided by arbitration.

21          THE COURT:  Okay.  I'm going to hold this motion

22    under advisement.

23          MR. MCCARTHY:  All right, Your Honor.

24          MR. HOLTZ:  Thank you, Judge.

25          THE COURT:  Okay.  Thank you.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

```
 1              Present the order to the Court.  What'd I give
 2      you, 24 hours or 48 hours?
 3              MR. HOLTZ:  24, Judge.
 4              THE COURT:  24 hours.
 5              MR. HOLTZ:  Thank you, Your Honor.
 6              THE COURT:  Thank you.
 7              MR. BOLOGNA:  Thanks, Your Honor.
 8          MR. MCCARTHY:   Thanks.
 9              THE COURT:  The matter's concluded.
10              (At 10:59 a.m., proceedings concluded)
11                          --    --    --
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

33

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

CERTIFICATION

I certify that this transcript, consisting of 34 pages, is a true and accurate transcription, to the best of my ability, of the video proceeding in this case before the Honorable Victoria A. Valentine on Wednesday, June 28, 2023, as recorded by the clerk.

Videotape proceedings were recorded and were provided to this transcriptionist by the Circuit Court and this certified reporter accepts no responsibility for any events that occurred during the above proceedings, for any inaudible and/or indiscernible responses by any person or party involved in the proceedings, or for the content of the videotape provided.

*Deanna H Harrison*

———————————————————
/s/ Deanna L. Harrison, CER 7464
About Town Court Reporting, Inc.
248-634-3369

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# EXHIBIT B

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE
COUNTY OF OAKLAND

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB
Hon. Victoria A. Valentine

| TAFT STETTINIUS & HOLLISTER LLP | LEGAL CONSULTING, PLLC |
|---|---|
| Ethan R. Holtz (P71884) | Anthony J. Bologna (P72698) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendants* |
| T. Andrew Keating (P86261) | 26100 American Drive, Ste 500 |
| *Attorneys for Plaintiff* | Southfield, MI 48038 |
| 27777 Franklin Road, Suite 2500 | (248) 227-2278 |
| Southfield, MI 48034 | ab@consultingpllc.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BUTZEL LONG, PC** |
| emayer@taftlaw.com | Daniel J. McCarthy (P59457) |
| akeating@taftlaw.com | Bernard J. Fuhs (P69621) |
| | *Co-Counsel for Defendants* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

## ORDER RE: PLAINTIFF'S MOTIONS FOR AN ORDER PERMITTING DYKEMA GOSSETT PLLC TO INTERPLEAD AND/OR DEPOSIT DISPUTED FUNDS WITH THE COURT AND TO DISQUALIFY BUTZEL LONG AND LEGAL CONSULTING AS COUNSEL FOR MSY CAPITAL PARTNERS, LLC

At a session of said Court held in the
County of Oakland, State of Michigan
on this _____ day of June 2023.

    PRESENT:   Honorable Victoria Valentine
                    Circuit Court Judge

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

This matter having come before the Court on: (1) "Plaintiff's Motion for Permission for an Order Permitting Dykema Gossett, PLLC to Interplead and/or Deposit Disputed Funds with the Court"; and (2) "Plaintiff's Motion to Disqualify Butzel Long and Legal Consulting as Counsel for MSY", Defendants having filed their responses to Plaintiff's motions and have stated objections to this order, and this matter having been heard via Zoom record on June 28, 2023, the Court orders as follows:

1.      The parties shall communicate with each other through counsel and decide whether the settlement funds currently held by Dykema Gossett, PLLC ("Dykema") (the "Settlement Funds") will be interpleaded with the Court clerk, or split, distributed, and held equally by the parties' respective counsel in their respective client IOLTA accounts, or other means that preserves the funds until further order of the Court.

2.      As ordered by the Court, the parties have communicated and agreed that Dykema shall distribute one half of the Settlement Funds to Gregory Yatooma, on the one hand, and one half of the Settlement Funds to Christopher Yatooma on the other hand (to an account of each party's choosing) (each, the "Funds"), where each party shall hold and freeze the Funds until further written agreement of the parties or order of the Court. Upon request of a party, the parties shall exchange monthly bank account statements for the respective accounts holding the Funds.

3.      Plaintiff's Motion to Disqualify Butzel Long and Legal Consulting as Counsel for MSY is taken under advisement.

_____
Hon. Victoria A. Valentine

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Approved as to form only:

_Emily Mayer_ /
**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

_____ /
**LEGAL CONSULTING, PLLC**
Anthony J. Bologna (P72698) *Co-Counsel for Defendants* 26100
American Drive, Ste 500
Southfield, MI 48038
(248) 227-2278
ab@consultingpllc.com

_____ /
**BUTZEL LONG, PC**
Bernard J. Fuhs (P69621)
Daniel J. McCarthy (P59457)
*Co-Counsel for Defendants*
150 W Jefferson Avenue, Ste 100
Detroit, MI 48226
(313) 225-7000
fuhs@butzel.com
mccarthyd@butzel.com

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# EXHIBIT C

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE**
**COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB
Hon. Victoria A. Valentine

---

| **TAFT STETTINIUS & HOLLISTER LLP** | **LEGAL CONSULTING, PLLC** |
|---|---|
| Ethan R. Holtz (P71884) | Anthony J. Bologna (P72698) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendants* |
| T. Andrew Keating (P86261) | 26100 American Drive, Ste 500 |
| *Attorneys for Plaintiff* | Southfield, MI 48038 |
| 27777 Franklin Road, Suite 2500 | (248) 227-2278 |
| Southfield, MI 48034 | ab@consultingpllc.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BUTZEL LONG, PC** |
| emayer@taftlaw.com | Daniel J. McCarthy (P59457) |
| akeating@taftlaw.com | Bernard J. Fuhs (P69621) |
| | *Co-Counsel for Defendants* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

---

**ORDER RE: PLAINTIFF'S MOTIONS FOR AN ORDER PERMITTING DYKEMA GOSSETT PLLC TO INTERPLEAD AND/OR DEPOSIT DISPUTED FUNDS WITH THE COURT AND TO DISQUALIFY BUTZEL LONG AND LEGAL CONSULTING AS COUNSEL FOR MSY CAPITAL PARTNERS, LLC**

At a session of said Court held in the
County of Oakland, State of Michigan
on this  3    day of July  2023.

PRESENT:    <u>Honorable Victoria Valentine</u>
                    Circuit Court Judge

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

This matter having come before the Court on: (1) "Plaintiff's Motion for Permission for an Order Permitting Dykema Gossett, PLLC to Interplead and/or Deposit Disputed Funds with the Court"; and (2) "Plaintiff's Motion to Disqualify Butzel Long and Legal Consulting as Counsel for MSY", Defendants having filed their responses to Plaintiff's motions and have stated objections to this order, and this matter having been heard via Zoom record on June 28, 2023, the Court orders as follows:

1.      The parties shall communicate with each other through counsel and decide whether the settlement funds currently held by Dykema Gossett, PLLC ("Dykema") (the "Settlement Funds") will be interpleaded with the Court clerk, or split, distributed, and held equally by the parties' respective counsel in their respective client IOLTA accounts, or other means that preserves the funds until further order of the Court.

2.      As ordered by the Court, the parties have communicated and agreed that Dykema shall distribute one half of the Settlement Funds to Gregory Yatooma, on the one hand, and one half of the Settlement Funds to Christopher Yatooma on the other hand (to an account of each ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ shall hold and freeze the Funds until To be held in the IOLTA account of the attorney further written agreement of the parties or order of the Court. Upon request of a party, the parties for the shall exchange monthly bank account statements for the respective accounts holding the Funds. respective party.

3.      Plaintiff's Motion to Disqualify Butzel Long and Legal Consulting as Counsel for MSY is taken under advisement.

/s/ Victoria A. Valentine
July 3, 2023
Hon. Victoria A. Valentine
MT

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Approved as to form only:

_Emily Mayer_ /
**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

Anthony J. Bologna (w/permission)(P69621)
**LEGAL CONSULTING, PLLC**
Anthony J. Bologna (P72698) *Co-Counsel for Defendants* 26100
American Drive, Ste 500
Southfield, MI 48038
(248) 227-2278
ab@consultingpllc.com

Bernard J. Fuhs _____ /
**BUTZEL LONG, PC**
Bernard J. Fuhs (P69621)
Daniel J. McCarthy (P59457)
*Co-Counsel for Defendants*
150 W Jefferson Avenue, Ste 100
Detroit, MI 48226
(313) 225-7000
fuhs@butzel.com
mccarthyd@butzel.com

3

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# EXHIBIT D

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## CRAIN'S DETROIT BUSINESS

You may not reproduce, display on a website, distribute, sell or republish this article or data, or the information contained therein, without prior written consent. This printout and/or PDF is for personal usage only and not for any promotional usage. © Crain Communications Inc.

Cannabis

# Legal seesaw in Auburn Hills marijuana licensing could put 3 of 4 licenses in one man's hands

By Dustin Walsh



Cannabis real estate developer Jeffrey Yatooma could soon have dominance of Auburn Hills' marijuana market.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Yatooma's impending dominance comes after a creative and successful ballot initiative that led to Auburn Hills voters approving weed businesses in the city in November 2022.

But the path for the city has not been straightforward. A month before the vote, City Council effectively blocked marijuana licensing, and Yatooma, with an amendment to zoning rules. And now the council is flipping again. The city's economic development team is expected to recommend a new marijuana ordinance to council next month that would approve licenses for just four properties, three of which are owned by Yatooma.

Auburn Hills Mayor Kevin McDaniel and his economic development team declined to comment on the matter, and more than a dozen emails to members of the Auburn Hills City Council were not returned.

The events in Auburn Hills highlight the fractured world of marijuana licensure where the state allows unlimited licenses, leaving local communities with broad authority to develop their own purported competitive methods to dole them out. Expensive lawsuits against municipalities by motivated operators and their lawyers over those rules are common and, as is the case in Auburn Hills, the players in the marijuana space are more than willing to use all legal means to reduce competition and maximize profits.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## Potential new marijuana licenses

Auburn Hills' economic development team is expected to recommend a new marijuana ordinance to council next month that would approve licenses for just four properties, three of which are owned by Jeffrey Yatooma.



Source: Crain's reporting • Created with Datawrapper

## 'Say Yes' pushes

Yatooma and his associates set their sights on Auburn Hills last year as the state's marijuana industry began to falter under product oversupply and plummeting prices — the grow side of the industry has quickly outpaced the retail side.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

In January 2020, an ounce of marijuana flower retailed at an average of $512.05. Oversupply sank prices to an average of just $121.58 per ounce by July 2022, and marijuana companies were getting desperate, looking to open more retailers as fast as possible to have more outlets for product.

When there are limited locations to sell marijuana in a community, that holds potential to boost the value of real estate and marijuana operating licenses.

The city of Auburn Hills had previously banned medical marijuana businesses within its borders in 2010 and followed suit in 2019 for adult-use recreational sales as cultivation and retail operations prepared to begin operation in December that year.



In July 2022, Yatooma and associates created a ballot drive committee in several municipalities in the hope that voters would force city councils to welcome weed businesses.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Yatooma's "Say Yes" committees cropped up in Sylvan Lake, Brighton, Farmington, Auburn Hills and other communities last summer.

According to reporting by the Livingston Daily, those associated with the ballot drives were Yatooma, under his Canna Zoned MLS real estate business; Joey Kejbou, an attorney who owns dispensaries under the names Consume Cannabis and Mint Cannabis Co. in Michigan, Ohio, Arizona and Illinois and processors in Michigan; Kerri Knipple, a real estate agent employed at Yatooma's Canna Zoned; Benjamin Bayram, a former partner in the law firm of Yatooma's brother, Gregory Yatooma; and John Janiszewski, a senior attorney representing Yatooma and the Say Yes committees.

Ballot proposals had been successful in other Michigan communities that had previously banned marijuana, including a 2020 ballot referendum in the village of Pinckney.



The Say Yes to Auburn Hills Committee gathered the required amount of signatures and moved a ballot initiative to the election in November last year.

"... there was an overwhelmingly positive response to surveys that were sent out prior to the November vote so it's clear the majority of people in the city wanted safe and regulated access to cannabis products," Yatooma told Crain's in an emailed response sent through his lawyers at Dykema. "Auburn Hills has a really strong business community and a large population. Auburn Hills is in the heart of metro Detroit and thousands of

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

commuters come into and pass directly by the city on a daily basis, so this is all conducive to a strong retail business."

But as Yatooma fought to legalize marijuana sales in Auburn Hills, he was also setting up to own a majority of the licenses in town.

## Council in the way?

The ballot language drafted by the Say Yes committee, which was ultimately certified by the city clerk in Auburn Hills, sets boundaries on who can get a marijuana license in the city.

The language reads: "The city shall allow marihuana activities only within a building located on a parcel in which the individual or entity to hold the state license to operate has a recorded interest and CRA pre-qualification status before 30 days after the ballot wording of this ballot question is certified to the county clerk …"

A recorded interest means direct ownership, a titleholder, or a mortgagee on a real property.

Basically, unless a motivated marijuana business or its representatives had control of a property prior to Sept. 9 last year, 30 days after the ballot language was certified, there was no chance of gaining access to a license in Auburn Hills.

Yatooma did not directly answer whether the language was intended to make him one of the only people to have a license under the ordinance.

"I believe this language requires a prequalified entity to have a recorded interest in a property … by a certain date," Yatooma wrote in an email.

But prior to the election, the Auburn Hills City Council preemptively moved to adopt and amend its existing marijuana ordinance to create a new "green zone," where marijuana businesses could be located. On Oct. 17, the council conditionally approved the ordinance if voters approved the Nov. 8 ballot measure — which they did with 4,870 voting to establish the new ordinance and 3,653 voting no.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



The city's new green zone, coincidentally, did not include any of the three properties owned by Yatooma, located at 1801 N. Opdyke Road, 2548 Lapeer Road and 2561 Lapeer Road, according to the latest information available from the Oakland County Register of Deeds.

Yatooma acquired the properties last year under three different LLCs.

A fourth property that qualifies, located at 2705 Lapeer Road, is owned by Green Pastures Land Co. It's unclear whether that entity intends to be involved in the marijuana business in Auburn Hills. It's also unclear whether it's related to a Green Pastures Group LLC that is a co-owner of several Michigan growers and processors.

And that's where the issue has stood for months.

But behind the scenes, Yatooma and his lawyers have pushed hard against the city, according to emails between Janiszewski of Dykema and city attorney Derk Beckerleg obtained by Crain's.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

In an email to Beckerleg on Nov. 14, Janiszewski urged the city council to reconsider its zoning ordinance as it violated the "will of the people."

In that email, Janiszewski alleged the new ordinance violated the Michigan Zoning Enabling Act and potentially open meetings rules by not having a public hearing on the green zone. Janiszewski called into question the legality of the move by city council amending the ordinance.

"... the city council did not follow numerous procedural and substantive requirements for enacting a zoning ordinance ...," Janiszewski wrote in the emailed letter.

The lawyer demanded a meeting with city officials, who agreed to a Nov. 28 meeting at Auburn Hills City Hall. City officials copied on the email from Beckerleg were City Clerk Laura Pierce, City Manager Thomas Tanghe, Assistant City Manager Brandon Skopek and Steve Cohen, director of community development.

According to an email from Janiszewski, he planned to attend the meeting with Yatooma, Bayram and Yatooma's other brother, Gregory Yatooma.

Gregory Yatooma, a Crain's 20 in their 20s honoree in 2007 and self-employed attorney, holds licenses for grow operation Candid Inc. in several communities throughout the state.

When asked about his brothers' operations, Yatooma told Crain's: "I really have no idea what any of my brothers might own. We aren't business partners and haven't been for over four years."

In a phone call with Crain's, Gregory Yatooma said he was at the meeting representing a client, but declined to reveal who that client was.

And the contents of the meeting remain a mystery as Janiszewski sought to have documents Say Yes provided to the city officials at the meeting exempted from the Freedom of Information Act, which allows the public to access documents drafted and used by public employees and officials.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



## Handing over the keys

But in May, Cohen from the city's community development office unveiled a plan to amend the ordinance to give four licenses to the three properties owned by Yatooma and the owned by Green Pastures.

It's unclear whether a threat of a lawsuit was the impetus behind proposed change or why those properties were selected, other than they could have been the only four properties to meet the criteria set under the ordinance passed by voters orchestrated by Yatooma's Say Yes.

When asked why the city is pushing those specific properties, Yatooma said he didn't know.

"I couldn't possibly speak to the city's motivation, but I would like to think that the city is following the initiated ordinance and honoring all of the residents that signed petitions in favor of putting it to a vote and the nearly 5,000 registered voters that showed up and voted to pass it," Yatooma wrote in the email to Crain's.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Kevin Blair, partner and cannabis attorney for Detroit law firm Honigman LLP, said in an email to Crain's that he's confounded by why the city continues to push for near exclusive market access for Yatooma.

"While this certainly isn't the first time that a cannabis company or real estate flipper has tried creative measures to stack the deck in their favor, what's somewhat surprising here is that Auburn Hills so far hasn't done anything to repeal the built-in monopolistic provisions, whereas other municipalities did so immediately," Blair said. (Honigman has represented other cannabis companies, including Lume Cannabis Inc., which has Crain Communications President and CEO KC Crain as an investor, in challenges to municipal licensing decisions.)

If Yatooma receives licenses, it's also unclear whether he would open dispensaries in the locations, become a landlord to another operator or sell the property and licenses — which would likely have an elevated value as he would control three of the only four available licenses in the city.

"If I am fortunate enough to get a license I would certainly explore all feasible options, but I think it's premature to consider any plans at this point," Yatooma told Crain's. "I do think Auburn Hills would be the perfect place to operate a retail store and I would love the opportunity to be a long-term member of the community. I'm an entrepreneur at heart and I'm a supporter of the cannabis industry; I have seen the economic benefits that flow directly to communities, and I also firmly believe in the benefits of cannabis products. I have many friends and family members that use cannabis products for medicinal purposes as well, so providing greater access is important."

## Legal mania

Legal positioning has dominated the local municipal licensure arena since recreational marijuana went legal in late 2019. More than a dozen communities have been wrapped up in expensive lawsuits over their marijuana licensing and zoning rules, including Pontiac, Berkley, Royal Oak and Warren.

Under state law, communities are required to create a competitive process for handing out marijuana licenses if they are limiting the number. Some communities, like Auburn

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Hills, have used zoning rules to either limit the number of available licenses or simply eliminate the possibility of licensure.

"If a city attorney is paying attention at all, they'll understand almost any ordinance they put forward will result in a lawsuit against the city," Lance Boldrey, partner at Dykema, and Janiszewski's colleague, told Crain's for previous story about the rash of previous municipal lawsuits and unrelated to the Auburn Hills issue. "They should also know they pay more for fighting the lawsuit than they could possibly earn in licensing fees or revenue sharing."

Yatooma has been behind several lawsuits against municipalities, including suits against Birch Run Township and Say Yes' lawsuit against Brighton last fall.

A circuit court judge ordered Brighton's City Council to certify the ballot language brought forth by Yatooma's group. Ultimately, the Say Yes ballot drive failed when 57.76 percent of voters in the community rejected the ordinance.

Yatooma also has a history of using creative ways to attempt to gain access to licenses. Beyond the ballot language gambit, Yatooma also reportedly took out a Craigslist ad in Chicago to recruit people negatively impacted by drug laws in Illinois to gain access to an equity license.

The ad, reported on by the Chicago Sun-Times and placed by Yatooma's Canna Zoned, offered $2,000 to anyone that could prove they were eligible under the Illinois social equity license guidelines.

Canna Zoned offered another $20,000 if that person's involvement led to a social equity license. A Chicago resident Edna Patterson, who had been a victim of gun violence, received $2,000 from Yatooma's group to be listed as the majority owner on the application for an equity license. After the Sun-Times reached out to Yatooma and Canna Zoned, Patterson's contract was terminated but she was offered a $400 referral bonus for others that could qualify.

A cannabis real estate firm run by Gregory Yatooma, MSY Capital Partners, gave a $75,000 loan to former Michigan House Speaker Rick Johnson, who had previously chaired the Michigan Marihuana Licensing Board when it voted to prequalify one of his companies for a license, The Detroit News reported in April. The loan in question came after Gov. Gretchen Whitmer had disbanded the licensing board, the News reported.

Johnson pleaded guilty earlier this year to unrelated bribery charges. No criminal charges or accusations of wrongdoing have been levied against Gregory Yatooma or MSY Capital.

*Editor's note: A previous version of this story did not accurately reflect the timing of  MSY's loan to Johnson. And Benjamin Bayram is a former partner in the law firm of Gregory Yatooma. The story previously had him associated with the wrong Yatooma brother.*

By **Dustin Walsh**

Dustin Walsh is a senior reporter for Crain's Detroit Business, covering health care with a focus on industry change and operations, as well as the state's emerging cannabis industry. He is also a regular columnist on all things health, labor, economics and more.

———————

🏷 Cannabis, News, Legal, Commercial Real Estate

———————————————————————————————————————————

**Source URL:** *https://www.crainsdetroit.com/cannabis/jeffrey-yatooma-benefit-auburn-hills-weed-licensing*

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 6

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## Agreement

1. Chris pays Greg $�â–ˆâ–ˆâ–ˆâ–ˆ cash:
    1. $â–ˆâ–ˆâ–ˆâ–ˆ with signed agreement: $â–ˆâ–ˆâ–ˆ by 12/16/22 and $â–ˆâ–ˆ upon final signed agreement no later than 12/22/22.
    2. $â–ˆâ–ˆk/month starting May 1, 2023, with a standard promissory note from Chris personally.
    3. Greg will collect and keep the invoices that are due from Jeff (based on $â–ˆâ–ˆâ–ˆ owed - not a credit against money owed).
    4. Neither Chris nor Greg will pursue the receivables for the â–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆ
    5. Payments are unconditional.
    6. Chris is taking all assets and all liabilities (no excluded liabilities).
2. Ownership transfer of Bloomfield Hills Swim and Tennis – Chris can still have privileges.
3. Lake Orion house for Greg's in-laws.
4. Whatever cash â–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆ
5. 100% of CT deal with Jeff
6. 100% of NJ deal with Jeff
7. Non-interference in any business operations, excluding â–ˆâ–ˆâ–ˆâ–ˆâ–ˆ, and committed transition assistance
8. Chris will pay the taxes for â–ˆâ–ˆâ–ˆâ–ˆ and any other cannabis entities for all years including '21 and '22. If any of those returns are audited and there are additional taxes required, Chris will be responsible. Any income Greg received from â–ˆâ–ˆâ–ˆ (not including the settlement payments) in '21 or '22 are included in the tax liability. Have to be timely filed (excluding '21) and Greg has to sign off on the returns as they are in his name.
9. Move â–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆâ–ˆ out of Greg's name as soon as possible (by the end of the year if possible).
10. $â–ˆâ–ˆ balloon payment towards the payoff amount if/when â–ˆâ–ˆ pays all of their balloon payments in full.
11. Chris pays Greg's health insurance, other benefits, lease payments until year end.
12. Greg assumes â–ˆâ–ˆâ–ˆ payroll effective January 1, 2023.
13. Chris will pay costs of improvements to Lake Orion house that have already been paid.
14. No interest charged on the payout amount.
15. Greg will provide all requested information and any opportunities he is or becomes aware of with the cannabis assets, and participate in a smooth transition until June 1, 2023 and will be supportive and provide assistance during this transition period.
16. Chris is willing to transfer the BHSAT asset at approximately $â–ˆâ–ˆâ–ˆ, as opposed to the value of $â–ˆâ–ˆâ–ˆ that was agreed upon. This result in a significant tax savings for Greg.
17. 50% of Liv Wellness lawsuit proceeds (split expenses – all decisions made together).

12/14/22
12:53
Save RoMaya

Chris Yatooma

12:52 am
12/14/22
Chris Barnett

12/14/22
Greg Yatooma

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 7

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

DocuSign Envelope ID: 31A60ACD-E675-49EC-95BD-F9B4F4848D80

## CONSULTING AGREEMENT

This consulting agreement (the "Agreement") is made and entered into on April 8, 2022 by and between Jeffrey Yatooma, Hydra Real Estate Development, LLC, all of its agents, employees, representatives, and any and all associated or related parties and entities (collectively "Hydra") and Axon Properties, LLC, all of its agents, employees, representatives, and any and all associated or related parties and entities (Collectively "Axon"). This Agreement is made in connection with the acquisition and sale of certain assets, as defined herein. Hydra and Axon are each a "Party" and collectively the "Parties" to this Agreement.

## RECITALS

A. Hydra desires to procure, lease, purchase and acquire cannabis real estate and business licenses located in the State of New Jersey and State of Mississippi ("Asset or Assets").

B. Hydra further desires to improve, develop, operate, market, sell, transfer and/or otherwise convey Assets to prospective buyers or partners ("Revenue Event").

C. Axon has spent considerable time, effort and resource(s) in procuring and developing certain leads, contacts, knowledge and other proprietary information that assist in the acquisition of Assets ("Confidential Information").

D. Axon has agreed to provide Confidential Information to Hydra subject to the terms and conditions and contained herein.

E. In consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. **Consideration**.

   A. **Confidential Information.** Axon has provided Confidential Information to Hydra, which Confidential Information shall be held in strict confidence and shall not be disclosed to any third party, except as reasonably necessary to consummate the provisions of this Agreement. The parties shall keep this Agreement, the transactions contemplated hereby, and any information exchanged in furtherance hereof strictly confidential.

   B. **Consulting Fee.** Axon shall be entitled to twenty-five percent (25%) of the net revenue generated by any Revenue Event for any and all Assets, whether Hydra used the Confidential Information or not to procure such Assets ("Consulting Fee"). The Consulting Fee shall be paid to Axon out of the proceeds of a Revenue Event or within three (3) business days of the closing date of the Revenue Event if the Revenue Event not close through escrow. If the Revenue Event is the operation of the Asset(s), the Consulting Fee shall be paid monthly, and within ten (10) days after the end of the previous month. For the avoidance of doubt, Axon shall not be entitled to a Consulting Fee unless a Revenue Event is consummated.

2. **Indemnification.** The Parties shall indemnify, defend and hold harmless each other, including their agents, representatives, partners, officers, directors, attorneys and associates from and against any and all claims, suits, damages, liens, judgments, penalties, attorneys' fees,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

expenses and/or liabilities arising out of, involving, or in connection with, any of the Confidential Information or the Assets.

3. **Governing Law**.  This Agreement shall be governed by the laws of the State of Michigan and Buyer and its agents, officers, directors and representatives hereby consent to Jurisdiction and venue in Oakland County, Michigan.

4. **Warranty of Authority**.  The Parties represent and warrant that they have obtained all approvals and authorizations as are necessary for the execution, delivery, and performance of this Agreement and that this Agreement has been validly executed and delivered by each Party, and is binding upon and enforceable against each of them in accordance with its terms. Each person executing this Agreement on behalf of a Party represents and warrants that he, she, or it has full legal authority to bind the Party by his, her, or its signature on this Agreement.

5. **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes and cancels all prior negotiations, representations, understandings, and agreements between the Parties concerning this Agreement.

6. **No Drafting Presumption/Headings**.  No presumption shall arise based upon draftsmanship of this Settlement Agreement. Counsel for the Parties have participated in the preparation of this Settlement Agreement or have had ample opportunity to comment upon and/or suggest or require changes in the language prior to its execution. Additionally, the headings in this Settlement Agreement are for convenience of reference only and shall not be considered as part of this Settlement Agreement nor limit or otherwise affect the interpretation thereof.

7. **Obligation to Cooperate**.  The Parties agree to cooperate fully to provide, deliver or supplement any Confidential Information and to take all additional actions which may be reasonably necessary or appropriate to give force and effect to the basic terms and conditions and intent of this Agreement.

8. **Waiver of Defense of Illegality (the Zoma Clause)**.  Each party hereto hereby irrevocably waives any defense based on federal, state or local law or that the transactions contemplated by this agreement are void as against public policy or based on illegality under ANY federal, state or local law, including without limitation any federal cannabis laws. Each party hereto acknowledges that each state having jurisdiction over the Asset has enacted legislation regarding the legal cultivation, sale, and use of cannabis/marijuana, which may be in conflict with federal laws.  Each party expressly waives the right to present any defense related to the illegality of cannabis, the regulation of cannabis, or this agreement, and agrees that such defense(s) shall not be asserted, and will not apply, in any dispute or claim arising out of this Agreement.

*(Signature page to follow)*

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

In Witness Whereof, the undersigned have caused this Purchase Agreement to be executed as of the date first written above.

**Hydra Real Estate Development, LLC**

By: _Jeff Yatooma_
CA30033797CC496...
Name: Jeffrey Yatooma
Its: Member/Authorized Agent

**Axon Properties, LLC**

By: _Greg Yatooma_
213F1E37B04E48C...
Name: Gregory Yatooma
Its: Member/Authorized Agent

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 8

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

**IN**

**AXON PROPERTIES LLC**

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of AXON PROPERTIES LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) of his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest, benefits, and liabilities, of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

DocuSigned by:

*Greg Yatooma*

213F1E37B94E48C...

Gregory Yatooma, an individual

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

DocuSign Envelope ID: 05330E4D-5B93-4D52-B5E4-B41AE0A33928

Approved, SCAO

Original - Court
1st copy - Plaintiff
2nd copy - Defendant

| STATE OF MICHIGAN | SUBSTITUTION OF ATTORNEY | CASE NO. |
|---|---|---|
| 6th JUDICIAL DISTRICT JUDICIAL CIRCUIT COUNTY PROBATE | | 23-200283-CB Hon. Victoria A. Valentine |

| Court address | | Court telephone no. |
|---|---|---|
| 1200 N. Telegraph Road, Pontiac, MI 48341 | | (248) 858-0344 |

| Plaintiff/Petitioner name, address, and telephone no. | | Defendant/Respondent/Minor name, address, and telephone no. |
|---|---|---|
| Gegory Yatooma | v | Christopher Yatooma and MSY Capital Partners, LLC |

☐ Probate    In the matter of _____

**NOTICE**

TO: Clerk of the Court, all attorneys of record, and unrepresented parties: Specify names and addresses

I replace attorney  Daniel J. McCarthy and Bernard Fuhs    on behalf of  Christopher Yatooma

_____  and request copies of all papers filed in this case after this date.

The date of the next scheduled hearing is 8/30/2023 _____ .
                                                    Date

| 8/28/2023 | Bodman PLC |
|---|---|
| Date | Firm |
| *J. Adam Behrendt* (DocuSigned by) | 201 W. Big Beaver Road, Suite 500 |
| Signature | Address |
| J. Adam Behrendt        P58607 | Troy, MI 48084 |
| Name (type or print)    Bar no. | City, state, zip        Telephone no. |

I consent to the substitution of the above attorney in this case.

| 8/29/2023 | *Daniel McCarthy* |
|---|---|
| Date | Withdrawing attorney's signature |
| *Christopher Yatooma* (DocuSigned by) | Daniel J. McCarthy        P59457 |
| Client's signature | Name (type or print)        Bar no. |
| Christopher Yatooma | Butzel Long, P.C. |
| Name (type or print) | Firm |
| | 201 W. Big Beaver Rd, Suite 1200 |
| | Address |
| | Troy, MI  48084        248-258-1616 |
| | City, state, zip        Telephone no. |

**EX PARTE ORDER**

IT IS SO ORDERED.

8/30/2023 _____          /s/ Victoria A. Valentine
Date                                     August 30, 2023
                                         Judge        VICTORIA A VALENTINE        mt
                                                                                   Bar no.

MC 306  (3/15)  **SUBSTITUTION OF ATTORNEY**                          MCR 2.117

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

     Plaintiff,                     Case No. 23- 200283-CB

v.                                  Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

     Defendants.

---

| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
|---|---|
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendant Christopher Yatooma* |
| T. Andrew Keating (P86261) | 1615 S. Telegraph Road |
| *Attorneys for Plaintiff* | Bloomfield Hills, MI 48302 |
| 27777 Franklin Road, Suite 2500 | (248) 230-2820 |
| Southfield, MI 48034 | sieving@urbanlegalgroup.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BUTZEL LONG PC** |
| emayer@taftlaw.com | Bernard J. Fuhs (P69621) |
| akeating@taftlaw.com | *Co-Counsel for Defendants* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO NON-PARTY**
**CITIZENS STATE BANK'S MOTION TO QUASH SUBPOENA**

Plaintiff Gregory Yatooma ("Greg"), for his Response in Opposition to Non-Party Citizens

State Bank's ("CSB") Motion to Quash Subpoena (the "Motion"), states as follows:

**INTRODUCTION**

Defendant Christopher Yatooma ("Chris"), the sole owner of CSB, is attempting to prevent

disclosure of relevant, discoverable documents to which Greg is unquestionably entitled.

On August 10, Greg issued a subpoena to CSB to obtain bank records and related

FILED   Received for Filing   Oakland County Clerk   9/5/2023 9:03 AM

documents regarding the companies that Greg and Chris jointly owned and/or operated. The Subpoena is limited to the time period of December 1, 2022 to present. These documents – and this time period – are highly relevant to the claims and defenses in this case. Specifically, the documents will provide evidence of the companies' operations immediately before Greg and Chris (along with three witnesses) executed the December 14, 2022 agreement pursuant to which Chris bought Greg out of several of their joint business interests (the "Buyout Agreement") and of evidence of the companies' operations since that time.

Greg believes the documents will prove his breach of contract claim and specifically that, after the parties executed the Buyout Agreement and Greg assigned his interests in various companies to Chris in reliance thereon, Chris removed Greg from the companies' bank accounts, began operating the companies' to the exclusion of Greg, sold significant assets owned by the companies, and Chris retained 100% of the proceeds for himself; all of which would support Greg's position that the Buyout Agreement is enforceable.

Alternatively, because Chris has claimed that the Buyout Agreement was not binding (despite that Chris retained all company assets and millions of dollars in cash), Greg's unjust enrichment claim requires disclosure of all financial activity for Greg's companies after the Greg's assignment to Chris. There can be no question that Greg is entitled to take discovery on these matters pursuant to Michigan's liberal and far-reaching discovery. MCR 2.302(B)(1); *In re Estate of Hammond*, 215 Mich App 39, 386 (1996).

Furthermore, CSB's argument that the requested documents should be protected from production because they are highly confidential is unsupported and wrong. On the contrary, courts have consistently held that there is no legitimate expectation of privacy or confidentiality in bank records or similar documents maintained by a bank. *See, e.g., United States v Miller*, 425 US 435,

442 (1976). What's more, until a few short months ago, the companies were either fully owned or jointly owned and operated by Greg as recently as December 13, 2022, so such confidentiality argument is futile. To the extent that CSB or any of the companies have any legitimate concerns regarding dissemination or disclosure of the requested records, those concerns can be addressed by entry of the Oakland County Business Court Model Protective Order, to which Greg will stipulate.

Lastly, CSB's (*i.e.*, Chris's) claim that the Subpoena seeks irrelevant or undiscoverable documents - - and CSB's attempt to compel Greg to pay to obtain the documents - - is nothing more than an attempt by Chris to frustrate Greg's ability to litigate the case by charging an exorbitant fee. Greg assisted Chris in forming CSB and hiring its employees and is a current client of CSB. As such, Greg has firsthand knowledge that nearly all of CSB's records are electronic and that the price it seeks to charge Greg for production is far in excess of CSB's actual cost. In fact, CSB prides itself on being a near paperless entity (with the exception of signature cards and other ancillary regulatory items). CSB boasts on its website, "New technologies have become the core of what we do" and "[w]e offer the technology and product offering of a large bank, the personal relationships of a small-town bank, and the extraordinary customer service of a private bank."

For these reasons, and as set forth more fully below, CSB's Motion should be denied.

## FACTUAL BACKGROUND

### Greg's and Chris's Businesses

As the Court is aware, Greg and Chris are brothers. In 2016, Greg and Chris started working together in many business ventures they owned and/or operated together as partners/members. Those ventures include, but were not limited to: Axon Properties, LLC, Oakland Business Park, LLC, Blue Skies Financing, LLC, Candid, Inc., Alchemy Wellness, LLC, Kurativ, LLC, JAR Capital, LLC, Hilger, LLC, Premier Drive, LLC, Frequency Wellness, LLC, Henry Yandt

Construction, LLC, and Innovative Financing, LLC (the "Companies"). Several of these business ventures that Greg and Chris owned and/or operated jointly, were, solely owned by Greg. The businesses operated by Greg and Chris accumulated significant cannabis assets and were the holders of cannabis accounts receivable in excess of $100,000,000.00, which Greg and Chris owned equally 50/50.

**The Buyout Agreement**

Chris initially complied with the Buyout Agreement, making the required December 16 payment to Greg. Likewise, Greg complied with the Buyout Agreement when he signed documents provided by Chris and/or his attorneys effecting the transfer of Greg's interests in the Companies - - Axon Properties, LLC, Blue Skies Financing, LLC, Michigan Real Estate Development, LLC, and Oakland Business Park, LLC[1] - - to Chris, and Candid, Inc. and Frequency Wellness, LLC to Chris's designee's as Chris was not prequalified to own regulated cannabis assets, in part because he is the sole owner of CSB.. **Exhibit 1, Transfer Documents to Chris and Exhibit 2, Transfer Documents to Chris's Designees**. Greg also. in furtherance of the Buyout Agreement, removed himself from certain bank accounts at CSB. **Exhibit 3, Documents Reflecting Removal of Greg from Bank Accounts**.

It is undisputed that since signing the Buyout Agreement, Chris has sold certain assets previously owned by the Companies and has retained one hundred percent (100%) of the proceeds from such sales. In fact, Lara Ward, the Executive Vice President of CSB, confirmed this in her affidavit, by stating that the "the accounts are very active". Motion, at Exhibit B. That is exactly

---

[1] It is undisputed that since signing the Buyout Agreement, Chris has sold assets owned by the Companies valued at more than $10,000,000.00 and has retained one hundred percent (100%) of the proceeds from those sales.

what Greg is trying to prove in his case to support his breach of contract and unjust enrichment

claims: Chris, the sole shareholder of CSB, has taken full control of over $100M of cannabis assets

of which Greg owned 50% of, and has refused to pay Greg for the purchase of these assets.

**The Subpoena**

On or around August 10, 2023, Greg served CSB with a Subpoena (the "Subpoena"), which

is the subject of this Motion and which relates to the core issues in this litigation. Specifically, the

Subpoena requests that CSB produce documents, from December 1, 2022 through the present,

relating to the Companies and MSY.[2] Importantly, the Subpoena and its cover letter specifically

request electronic copies of any responsive documents.

CSB then filed the instant Motion, claiming that the requested documents are not relevant

to this case. However, these documents are not only relevant, but potentially dispositive as it relates

to the issues of whether Chris has received the benefit of the Buyout Agreement, or if Chris

maintains that the Buyout Agreement is not enforceable against him, whether Chris has been

unjustly enriched by his refusal to pay the monies due Greg. The CSB documents will prove two

things: 1) Chris is running all of these companies to the exclusion of Greg, and Chris, to the

exclusion of Greg, is receiving financial benefit from these companies. Both speak directly to

Greg's claims against Chris. CSB's Motion should be denied.

## ARGUMENT

**I.    The Documents Sought by the Subpoena Are Not Only Relevant to the Issues in This Case, They Are Dispositive.**

Michigan has long supported a policy of far-reaching, open, and effective discovery

practice. *Shinkle v Shinkle*, 255 Mich App 221, 225 (2003). The discovery rules must be liberally

---

[2] The Subpoena also seeks production of documents regarding Urban Legal Group's accounts at CSB. However, given that Urban Legal Group is no longer holding any portion of the MSY Litigation Proceeds in its IOLTA account, Greg withdraws this request.

construed to further the ends of justice. *Id.* The purpose of discovery is to simplify and clarify the contested issues, which is necessarily accomplished by the open discovery of all relevant facts and circumstances related to the controversy. MCR 2.302(B)(1); *Reed Dairy Farm v Consumers Power Co*, 227 Mich App 614, 616 (1998). Barring discovery to allow the concealment of facts is the exception and not the rule. *Id.* MCR 2.305(A)(4)(a) permits the Court to quash or modify a subpoena if it is "unreasonable or oppressive." On the other hand, under MCR 2.302, a party may "obtain discovery regarding any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case…."

Rather than being unreasonable or oppressive, the Subpoena at issue here properly seeks not only relevant, but likely dispositive evidence necessary to prove Greg's claims. Pursuant to the Buyout Agreement, Chris agreed to pay Greg for his interest in the Companies, and in return, Greg agreed to transfer his interest in the Companies to Chris or his designee. Chris made a first payment to Greg, but then refused to make any further payments as required by the Buyout Agreement, resulting in this lawsuit. Chris (and, apparently, CSB) claims that the Buyout Agreement is unenforceable. Either way, Greg is entitled to the documents requested from CSB for several reasons.

First, if the Buyout Agreement is not enforceable, as Chris wrongly contends, Greg is entitled to discovery of the Companies' and MSY's bank records because Greg is still an owner of the Companies. CSB/Chris cannot reasonably argue that Greg, one of two owners of the Companies, is not entitled to the Companies' bank records.

Second, the Companies' bank records are relevant to demonstrating that the Buyout Agreement is enforceable. The bank records will likely reflect that 1) Chris is currently operating the Companies to the exclusion of Greg, 2) Chris has been operating the Companies to the

exclusion of Greg since executing the Buyout Agreement, 3) Chris removed Greg from many of the accounts at some point after executing the Buyout Agreement, and 4) Chris has sold assets belong to the Companies and retained 100% of those proceeds.

Third, the Subpoena is narrowly, temporally tailored to the claims and defenses in this case. Subpoena seeks production of documents from December 1, 2022 through the present. Records in that limited time period are necessary to establish the enforceability of the Buyout Agreement, as stated above, and to reflect changes in account access pre-Buyout Agreement and post-Buyout Agreement.

Fourth, contrary to CSB's argument otherwise, bank statements are not afforded any heightened protection from discovery. In fact, bank records of the Companies' and MSY's financial activities are ordinary bank records in which there is "no legitimate expectation of privacy" because "checks are not confidential communications but negotiable instruments to be used in commercial transactions" and "financial statements and deposit slips . . . contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *United States v Miller*, 425 US 435, 442 (1976); *accord Najjar v US. Dep't of Treasury*, 2003 WL 21254772, at *2 (SD Ind Apr. 11, 2003) ("[g]enerally, there is no legitimate expectation of privacy in the contents of checks, deposit slips or bank statements in a bank's possession").

Finally, even if CSB could articulate a confidentiality concern on behalf of its customers, any such concern can be addressed through entry of a protective order. Greg will stipulate to entry of the Oakland County Business Court Model Protective Order, which provides more than sufficient safeguards for any purported confidentiality interests. *See MedCity Rehab Serv., LLC v State Farm Mut Auto Ins Co*, 2013 WL 1898374, at *3 (ED Mich May 7, 2013) (finding "stipulated

protective order . . . provides for confidential treatment" of financial documents).

Given the limited, 10-month time period, the narrow subject matter of the Subpoena, and the impact the requested documents would have on both the claims and defenses in this case, the Subpoena is proper and CSB's Motion should be denied.

## II.    Greg Should Not Have to Bear CSB's Costs in Responding to the Subpoena.

CSB vaguely claims that Greg should be responsible for at least $12,000 in "reasonable" copying and labor expenses for its production of documents responsive to the Subpoena. This request is anything but reasonable.

Greg was involved with copying contracts for the companies and knows firsthand that black and white copies cost $0.0085 (less than a penny) and color copies cost $0.005, significantly less than the $1 per page CSB is trying to charge Greg. Furthermore, all of CSB's records are maintained electronically and can be generated and sent at the push of a button; it should not take more than an hour to compile the ten months of documents sought in the Subpoena.

CSB makes no substantial argument that the Subpoena is unduly burdensome. CSB merely states that it will have to review the "voluminous" records for the 15 accounts listed in the Subpoena which could take its employees 120 hours. The supporting affidavit is equally vague. However, under Michigan law, a nonparty such as CSB requesting fees for the production of documents "has an obligation to furnish appropriate evidence in support of its charges to the requesting party." *Graham v Thompson*, 167 Mich App 371, 375; 421 NW2d 694 (1988). Appropriate evidence requires that the nonparty itemize all of its costs attributable to the duplication of the requested documents, among other things, *id.*, all of which CSB has failed to do. In fact, the Court of Appeals has stated that, "[a]t a ***minimum***,…[the nonparty] should reveal how many copies are made per year in response to requests occasioned solely by paying requestors, as well as the total number of copies made per year by [the nonparty] for paying, nonpaying, and any

other requestors." *Id.* And even if CSB had provided any of this information, instead of a broad estimate of its copying and labor costs, the requested costs would likely still be unreasonable, as the Court of Appeals has set forth a specific method for calculating "reasonable" costs with that information:

> Once [the itemized] amounts are revealed, they may be compared to the total, itemized labor and machine maintenance costs incurred by [the nonparty]. Those latter costs may be divided in proportion to the number of copies made for paying requestors and the number of copies made for nonpaying and other requestors. A reasonable per-page amount is then easily calculated by dividing the number of copies made for paying requestors into the pro rata amount of expenses incurred attributable to all paying requestors.

*Id.* Here, CSB has only stated, with no supporting evidence or authority, an arbitrary number of hours of labor for the production of the documents and an arbitrary cost for each page copied. CSB has plainly failed to make the required showing that its costs are reasonable.

But even if CSB had provided any justification for its estimated costs, the requested $12,000+ would still be unreasonable. CSB argues that it should be reimbursed for <u>all</u> of the time and effort spend in responding to the Subpoena, but fails to acknowledge that Chris Yatooma, the Defendant in this case, is the sole-owner of CSB and therefore is the ultimate party that would absorb the cost. Additionally, as courts consistently recognize, "it is clear that 'undue burden' for purposes of nonparty discovery does not mean no burden at all" and further, that "recipients of subpoenas should '[b]e prepared to support allegations of undue burden with detailed cost and time calculations, supported by knowledgeable declarations.'" *State Farm Mut Auto Ins Co v Elite Health Centers, Inc*, 364 F Supp 3d 758, 767 (ED Mich, 2018) (internal citations omitted). CSB has failed to do.

In *Graham v Thompson*, *supra*, the leading Michigan case on this point, the appellate court determined that the evidence did not support the trial court's conclusion that a non-party's fee

structure for the duplication of requested records, at $1.00 per page plus a $10.00 processing fee, for a <u>total of $447</u>, represented reasonable expenses incurred by the non-party in complying with the subject discovery request. *Id.* at 375. The court determined that the $447 amount requested was unreasonable and should be reduced. *Id.* Like in Graham, CSB also requests fees of $1.00 per page copied, despite the fact that the Subpoena requests **electronic copies** of the documents, so no copying is required. But, unlike the $447 requested in *Graham*, which the court found to be unreasonable, CSB is requesting, at ***minimum***, **$12,000**. CSB should not be awarded these exorbitant costs, especially given that CSB has failed to explain why it is entitled to that amount or why the Subpoena, which seeks only ten months of records, is unduly burdensome. The Motion should be denied.

<div align="center"><u>**CONCLUSION**</u></div>

For the reasons set forth above, Greg respectfully requests that the Court deny the Motion, require CSB to respond to the Subpoena within seven days, and award cost and fees to Greg, together with any such other relief the Court deems just and appropriate under the circumstances.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: September 5, 2023          By:     /s/ Ethan R. Holtz
                                                   Ethan R. Holtz (P71884)
                                                   Emily M. Mayer (P78956)
                                                   T. Andrew Keating (P86261)
                                                   *Attorneys for Plaintiff*
                                                   27777 Franklin Road, Suite 2500
                                                   Southfield, MI 48034
                                                   (248) 351-3000
                                                   eholtz@taftlaw.com
                                                   emayer@taftlaw.com
                                                   akeating@taftlaw.com

# Exhibit 1

## ASSIGNMENT OF MEMBERSHIP INTERESTS

## IN

## OAKLAND BUSINESS PARK, LLC

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of OAKLAND BUSINESS PARK, LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) of his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest, benefits and liabilities of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

DocuSigned by:

*Greg Yatooma*

213F1E37B94E48C...

Gregory Yatooma, an individual

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

**IN**

**AXON PROPERTIES LLC**

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of AXON PROPERTIES LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) of his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest, benefits, and liabilities, of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

*Greg Yatooma*
213F1E37B94E48C...

Gregory Yatooma, an individual

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

**IN**

**BLUE SKIES FINANCING, LLC**

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of BLUE SKIES FINANCING, LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest benefits and liabilities of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

*Greg Yatooma*
213F1E37B94E48C...

Gregory Yatooma, an individual

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

**IN**

**MICHIGAN REAL ESTATE DEVELOPMENT, LLC**

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of MICHIGAN REAL ESTATE DEVELOPMENT, LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) of his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest, benefits, and liabilities, of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

_____
Greg Yatooma
213E1E37B94E48C...

Gregory Yatooma, an individual

# Exhibit 2

<u>SHAREHOLDER RESOLUTION CONDITIONALLY APPROVING TRANSFER OF SHARES</u>

WHEREAS, pursuant to the By Laws of this corporation (the "Company"), it is deemed desirable and in the best interests of Candid, Inc., a Michigan corporation, that the following actions be taken by the Shareholder (s) of this Company pursuant to this Written Consent:

NOW, THEREFORE, BE IT RESOLVED that the undersigned Shareholder of this Company hereby consents to, approves, and adopts the following:

**CONDITIONAL TRANSFER OF SHARES.**

RESOLVED that this Company sell and issue its Shares to the person(s) set forth below and for the consideration set forth below; that such shares shall be deemed fully paid and nonassessable; and that the Managing Shareholder has determined that the consideration reflects fair value for the shares.

| Name | Percentage of Shares | Consideration |
|------|---------------------|---------------|
| Joseph Gordhamer | 100% | Previously Paid |

FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares.

The undersigned member of this limited liability company consents and agrees to the above on this 27ᵗʰ day of January , 2023

_____
Gregory Yatooma, Shareholder

1-27-23
_____
Date

<u>MEMBER RESOLUTION CONDITIONALLY APPROVING TRANSFER OF SHARES</u>

WHEREAS, pursuant to the Operating Agreement of this limited liability company (the "Company"), it is deemed desirable and in the best interests of Frequency Wellness, LLC, a Michigan limited liability company, that the following actions be taken by the Member(s) of this Company pursuant to this Written Consent:

NOW, THEREFORE, BE IT RESOLVED that the undersigned Member of this Company hereby consents to, approves, and adopts the following:

**CONDITIONAL TRANSFER OF SHARES.**

RESOLVED that this Company sell and issue its Shares to the person(s) set forth below and for the consideration set forth below; that such shares shall be deemed fully paid and nonassessable; and that the Managing Member has determined that the consideration reflects fair value for the shares.

| <u>Name</u> | <u>Number of Shares</u> | <u>Consideration</u> |
|-------------|-------------------------|----------------------|
| Adam Dyson  | 100                     | Previously Paid      |

FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares.

The undersigned member of this limited liability company consents and agrees to the above on this 27ᵗʰ day of January , 2023

_____          1-27-23
Gregory Yatooma, member                          Date

# Exhibit 3



# CHASE 🏦

## BUSINESS ACCOUNT REMOVE SIGNERS FORM

NAME OF BUSINESS  AXON PROPERTIES LLC

TAXPAYER ID NO. ▮▮▮▮▮

BUSINESS ADDRESS  1605 S TELEGRAPH RD BLOOMFIELD HILLS, MI 48302-0044

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**  GREGORY M YATOOMA

**Account Numbers:**

| ▮▮▮▮▮ | | | | |
|---|---|---|---|---|
| | | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**

**Account Numbers:**

| | | | | |
|---|---|---|---|---|
| | | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**

**Account Numbers:**

| | | | | |
|---|---|---|---|---|
| | | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**

**Account Numbers:**

| | | | | |
|---|---|---|---|---|
| | | | | |

## CERTIFICATION

The undersigned hereby certifies that the person(s) removed as authorized signers on the account(s) indicated above have been removed in accordance with resolutions or other documents of the Business regarding signing authority for bank accounts.

| For a Corporation or Unincorporated Association or Organization: | | For Sole Proprietorship: | | For Partnership or Limited Liability Company: | | For Government Entity: | |
|---|---|---|---|---|---|---|---|
| _____ | Date | _____ Owner Sole Proprietor | Date | *Gregory Yatooma* Partner/Member/Manager | 01/30/2023 Date | _____ | Date |
| _____ Printed Name | | _____ Printed Name | | Gregory Yatooma Printed Name | | _____ Printed Name | |

DocuSigned by: Gregory Yatooma  2X3FTE37FD64A5C

This document does not contain TIN certification/Tefra language. This document cannot be used for supporting documentation for TIN certification and IRS processes. JPMorgan Chase Bank, N.A. Member FDIC

# CHASE 🔾

## BUSINESS ACCOUNT REMOVE SIGNERS FORM

NAME OF BUSINESS ___BLUE SKIES FINANCING, LLC___

TAXPAYER ID NO. __854279549__

BUSINESS ADDRESS ___1615 S TELEGRAPH RD BLOOMFIELD HILLS, MI 48302-0065___

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:** ___GREGORY M YATOOMA___

**Account Numbers:**

| | | | |
|---|---|---|---|
| 673802523 | | | |
| | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:** _____

**Account Numbers:**

| | | | |
|---|---|---|---|
| | | | |
| | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:** _____

**Account Numbers:**

| | | | |
|---|---|---|---|
| | | | |
| | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:** _____

**Account Numbers:**

| | | | |
|---|---|---|---|
| | | | |
| | | | |

## CERTIFICATION

The undersigned hereby certifies that the person(s) removed as authorized signers on the account(s) indicated above have been removed in accordance with resolutions or other documents of the Business regarding signing authority for bank accounts.

| For a Corporation or Unincorporated Association or Organization: | Date | For Sole Proprietorship: | Date | For Partnership or Limited Liability Company: | Date | For Government Entity: | Date |
|---|---|---|---|---|---|---|---|
| | | Owner Sole Proprietor | | *Gregory Yatooma* — Partner/Member/Manager | 01/30/2023 | | |
| Printed Name | | Printed Name | | Gregory Yatooma — Printed Name | | Printed Name | |

This document does not contain TIN certification/Tefra language. This document cannot be used for supporting documentation for TIN certification and IRS processes. JPMorgan Chase Bank, N.A. Member FDIC



# CHASE ○

## BUSINESS ACCOUNT REMOVE SIGNERS FORM

NAME OF BUSINESS   OAKLAND BUSINESS PARK, LLC

TAXPAYER ID NO. ███████

BUSINESS ADDRESS   1615 S TELEGRAPH RD BLOOMFIELD HILLS, MI 48302-0065

---

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**   GREGORY M YATOOMA

**Account Numbers:**

| | | | | |
|---|---|---|---|---|
| ████████ | ██████ | ██████ | | |
| | | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**

**Account Numbers:**

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**

**Account Numbers:**

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

Please remove the following signer from the accounts listed below (other authorized signers on record do not change):

**Name of the Signer to Remove:**

**Account Numbers:**

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

## CERTIFICATION

The undersigned hereby certifies that the person(s) removed as authorized signers on the account(s) indicated above have been removed in accordance with resolutions or other documents of the Business regarding signing authority for bank accounts.

| For a Corporation or Unincorporated Association or Organization: | | For Sole Proprietorship: | | For Partnership or Limited Liability Company: | | For Government Entity: | |
|---|---|---|---|---|---|---|---|
| _____ | Date | _____ Owner Sole Proprietor | Date | *Gregory Yatooma* 2X3F1E37F5bE44C Partner/Member/Manager | 01/30/2023 Date | _____ | Date |
| _____ Printed Name | | _____ Printed Name | | Gregory Yatooma _____ Printed Name | | _____ Printed Name | |

This document does not contain TIN certification/Tefra language. This document cannot be used for supporting documentation for TIN certification and IRS processes. JPMorgan Chase Bank, N.A. Member FDIC

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS,

      Defendants.

Case No. 2023-200283-CB

Hon. Victoria Valetine

**NOTICE OF PRESENTMENT UNDER 7
DAY RULE**

| | |
|---|---|
| TAFT STETTINIUS & HOLLISTER LLP | URBAN LEGAL GROUP |
| By:   Ethan R. Holtz (P71884 | By:   Jeffrey Sieving (P71625) |
|        Emily Mayer (P78956) | 1615 S. Telegraph Road, Suite 300 |
| 27777 Franklin Road, Suite 2500 | Bloomfield Hills, MI 48302 |
| Southfield, MI | (248) 230-2820 |
| (248) 351-3000 | sieving@urbanlegalgroup.com |
| Eholtz@taftlaw.com | *Counsel for Defendant Christopher Yatooma* |
| Emayer@taftlaw.com | |
| *Attorneys for Plaintiff* | BODMAN PLC |
| | By:   J. Adam Behrendt (P58607) |
| | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI 48084 |
| | (248) 743-6000 |
| | abehrendt@bodmanlaw.com |
| | *Counsel for Defendant Christopher Yatooma* |

4858-9741-7342.v1

## <u>NOTICE OF PRESENTMENT OF ORDER UNDER 7-DAY RULE</u>

TO: COUNSEL/INTERESTED PARTIES:

The attached **ORDER REGARDING MOTIONS OF DEFENDANT CHRISTOPHER YATOOMA TO QUASH NON-PARTY SUBPOENAS AND FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(C) AND NON-PARTIES' MOTION TO QUASH SUBPEONAS AND FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(C)** is being served on all attorneys and interested parties to this Case.  If you wish to object to the form of o the Order, you must (i) file written objections to entry of this Order with the Court within seven (7) days of service of this Notice, MCR 2.602(B)(3)(a), "state with specificity the inaccuracy or omission" you believe exits, MCR 2.602(B)(3)(c), and notice the objection or hearing with the Court.

If no objections are filed, the Order will be submitted by the Clerk to Hon. Victoria Valentine for entry on September 12, 2023.

Respectfully submitted,

BODMAN PLC


By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Plaintiff*


Dated:  September 5, 2023

2

# PROPOSED ORDER

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA,

    Plaintiff,

v

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS,

    Defendants.

Case No.  2023-200283-CB

Hon. Victoria Valetine

**ORDER REGARDING MOTIONS OF
DEFENDANT CHRISTOPHER
YATOOMA TO QUASH NON-PARTY
SUBPOENAS AND FOR PROTECTIVE
ORDER PURSUANT TO MCR 2.302(C)
AND NON-PARTIES' MOTION TO
QUASH SUBPEONAS AND FOR
PROTECTIVE ORDER PURSUANT TO
MCR 2.302(C)**

---

TAFT STETTINIUS & HOLLISTER LLP
By:   Ethan R. Holtz (P71884)
       Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
Emayer@taftlaw.com
*Attorneys for Plaintiff*

URBAN LEGAL GROUP
By:   Jeffrey Sieving (P71625)
1615 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Counsel for Defendant Christopher Yatooma*

BODMAN PLC
By:   J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

---

PROPOSED

**ORDER REGARDING MOTIONS OF DEFENDANT CHRISTOPHER YATOOMA TO QUASH NON-PARTY SUBPOENAS AND FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(C) AND NON-PARTIES' MOTION TO QUASH SUBPEONAS AND FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(C)**

At a session of said Court, held in the
City of Pontiac, County of Oakland, State of Michigan

on _____

This matter comes before the Court on the motions of defendant Christopher Yatooma and non-parties Michelle Houbeck and Rich Stopczy to quash and for protective order as to two subpoenas issued by plaintiff Gregory Yatooma directed to Ms. Houbeck and Mr. Stopczy. The Court has reviewed the parties' written submissions and held a hearing on August 30, 2023, at which time it heard the arguments of counsel. Having otherwise been advised on the premises;

IT IS HEREBY ORDERED that the above-referenced motions are granted in part and denied in part.

IT IS FURTHER ORDERED that, for the reasons stated on the record, Plaintiff's request for the subpoenaed documents is denied, at this time, without prejudice as to any parties' claims or objections, and pending further determination of the court-appointed receiver as described in the Court's July 28, 2023 Order Granting Disqualification of Butzel Long, PC and Legal Consulting Counsel MSY Capital Partners, LLC and Appointing A Receiver for MSY Capital Partners, LLC.

IT IS FURTHER ORDERED that the non-party subpoena recipients shall preserve the subpoenaed documents that are within their possession, custody, or control, pending further order of the Court.

IT IS FURTHER ORDERED that plaintiff may proceed with the depositions of Ms. Houbeck and Mr. Stopczy on a mutually-convenient date and time with the deponents and all

counsel, but that such depositions shall not include questioning pertaining to the subpoenaed documents as contained in the subpoena, but may go into the topic of access to the e-mail accounts of Yatooma@fyblaw.com and Harbour@fyblaw.com, subject to privilege objections.

IT IS SO ORDERED.

This is not a final order and does not resolve the last pending claim or close the case.

_____PROPOSED_____
Hon. Circuit Court Judge

Dated: _____

4879-2097-2413_4

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS,

      Defendants.

Case No. 2023-200283-CB

Hon. Victoria Valetine

**ORDER REGARDING MOTIONS OF
DEFENDANT CHRISTOPHER
YATOOMA TO QUASH NON-PARTY
SUBPOENAS AND FOR PROTECTIVE
ORDER PURSUANT TO MCR 2.302(C)
AND NON-PARTIES' MOTION TO
QUASH SUBPEONAS AND FOR
PROTECTIVE ORDER PURSUANT TO
MCR 2.302(C)**

---

TAFT STETTINIUS & HOLLISTER LLP
By:   Ethan R. Holtz (P71884)
       Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
Emayer@taftlaw.com
*Attorneys for Plaintiff*

URBAN LEGAL GROUP
By:   Jeffrey Sieving (P71625)
1615 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Counsel for Defendant Christopher Yatooma*

BODMAN PLC
By:   J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

---

**ORDER REGARDING MOTIONS OF DEFENDANT CHRISTOPHER YATOOMA TO QUASH NON-PARTY SUBPOENAS AND FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(C) AND NON-PARTIES' MOTION TO QUASH SUBPEONAS AND FOR PROTECTIVE ORDER PURSUANT TO MCR 2.302(C)**

At a session of said Court, held in the
City of Pontiac, County of Oakland, State of Michigan

on ___9/7/2023___

This matter comes before the Court on the motions of defendant Christopher Yatooma and non-parties Michelle Houbeck and Rich Stopczy to quash and for protective order as to two subpoenas issued by plaintiff Gregory Yatooma directed to Ms. Houbeck and Mr. Stopczy. The Court has reviewed the parties' written submissions and held a hearing on August 30, 2023, at which time it heard the arguments of counsel. Having otherwise been advised on the premises;

IT IS HEREBY ORDERED that the above-referenced motions are granted in part and denied in part.

IT IS FURTHER ORDERED that, for the reasons stated on the record, Plaintiff's request for the subpoenaed documents is denied, at this time, without prejudice as to any parties' claims or objections, and pending further determination of the court-appointed receiver as described in the Court's July 28, 2023 Order Granting Disqualification of Butzel Long, PC and Legal Consulting Counsel MSY Capital Partners, LLC and Appointing A Receiver for MSY Capital Partners, LLC.

IT IS FURTHER ORDERED that the non-party subpoena recipients shall preserve the subpoenaed documents that are within their possession, custody, or control, pending further order of the Court.

IT IS FURTHER ORDERED that plaintiff may proceed with the depositions of Ms. Houbeck and Mr. Stopczy on a mutually-convenient date and time with the deponents and all

4879-2097-2413_5

counsel, but that such depositions shall not include questioning pertaining to the subpoenaed documents as contained in the subpoena, but may go into the topic of access to the e-mail accounts of Yatooma@fyblaw.com and Harbour@fyblaw.com.

IT IS SO ORDERED.

This is not a final order and does not resolve the last pending claim or close the case.

/s/ Victoria A. Valentine
September 7, 2023
Hon. Circuit Court Judge

Dated: __9/7/2023__               VICTORIA A VALENTINE               mt

TAFT STETTINIUS & HOLLISTER LLP

/s/ Ethan R. Holtz (P71884)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
*Attorneys for Plaintiff*

BODMAN PLC

/s/ J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS,

      Defendants.

Case No.  2023-200283-CB

Hon. Victoria Valetine

**DEFENDANT CHRISTOPHER
YATOOMA'S REPLY IN SUPPORT OF
ITS MOTION FOR SUMMARY
DISPOSITION UNDER MCR 2.116(C)(7)
TO COMPEL ARBITRATION**

---

TAFT STETTINIUS & HOLLISTER LLP
By:    Ethan R. Holtz (P71884)
       Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
Emayer@taftlaw.com
*Attorneys for Plaintiff*

URBAN LEGAL GROUP
By:    Jeffrey Sieving (P71625)
1615 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Counsel for Defendant Christopher Yatooma*

BODMAN PLC
By:    J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

---

FILED   Received for Filing   Oakland County Clerk   9/8/2023 12:47 PM

**DEFENDANT CHRISTOPHER YATOOMA'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY DISPOSITION UNDER MCR 2.116(C)(7) TO COMPEL <u>ARBITRATION</u>**

Plaintiff Gregory Yatooma says he is a member of defendant MSY Capital Partners ("MSY"); yet, he is suing MSY for not distributing the funds that he has prevented MSY from receiving under a settlement agreement. Gregory also says he is only an agent of MSY and that he is not trying to benefit from the very settlement agreement that created the existence of the disputed settlement funds. All of the issues raised in his complaint belong in arbitration under the arbitration clause in the settlement agreement.[1] It is in that forum that Gregory's purported rights to any settlement proceeds should be determined. At a minimum, MSY's rights to them should be arbitrated.

It is undisputed that MSY is a party to the March 10, 2023 Settlement Agreement. It also is undisputed that Gregory signed it too, albeit as MSY's agent, so he knows that MSY was due to receive the settlement funds—not him, not Christopher, not any law firm IOLTA account, or the Court. While defendants dispute that Gregory is, or was ever, a member of MSY (which is supported by the lack of an operating agreement, coupled with Gregory's admission in January and February that he had sold his interests to Christopher and that he specifically directed the removal of his name from MSY's Chase bank account), his disputes concerning the settlement funds fall squarely within the settlement agreement's arbitration clause.

---

[1] Gregory's continuous blaring misrepresentations regarding MSY's bank account must be corrected. First, Christopher **never** closed MSY's bank account at Chase Bank. Chase Bank Account No. ----2627 is active and open. *Second, contrary to Gregory's misrepresentation, **he did, in fact, remove himself from MSY's bank account!*** On January 31, 2023 and February 14, 2023, Gregory admitted that he was "selling the companies to Chris", and specifically directed, "Remove me from these accounts, but keep the account active," **which specifically mentioned the MSY Chase Bank Account No. 2627 (held under Christopher James & Associates, LLC)**. *See* **Ex. A**, Gregory Yatooma's 10:54 AM January 31, 2023 email and follow-up 10:56 AM February 14, 2023 email).

1

4872-3719-6414.v2

## I.    The arbitration clause applies to Gregory and his settlement funds claims.

The arbitration clause applies to the "Parties," which include MSY, and states explicitly that it applies to "[a]ny dispute arising out of this Agreement or any breach of this Agreement." Without the Settlement Agreement, there would be no settlement funds. As explained by the Supreme Court in *Altobelli v Hartmann*, 499 Mich 284, 295-96; 884 NW2d 537 (2016):

> "The general policy of this State is favorable to arbitration." *Detroit v A W Kutsche*, 309 Mich 700, 703; 16 NW2d 128 (1944). The burden is on the party seeking to avoid the agreement, not the party seeking to enforce the agreement. *McKinstry v Valley Obstetrics–Gynecology Clinic, PC*, 428 Mich 167, 184; 405 NW2d 88 (1987). In deciding the threshold question of whether a dispute is arbitrable, a reviewing court must avoid analyzing the substantive merits of the dispute. *Kaleva*, 393 Mich at 594–595; 227 NW2d 500. If the dispute is arbitrable, "the merits of the dispute are for the arbitrator. [*Id*. at 295.]

In *Altobelli*, the Court rejected the same argument that Gregory presents here—that he is trying to vindicate his own rights and is not a party to the arbitration provision. But, under *Altobelli*, Gregory is considered an agent of MSY, and he is vested with the responsibility to act in furtherance of MSY's interests. *Id*. ("Because it is axiomatic that the Firm cannot act on its own, [internal citation omitted], and because these particular defendants are clearly endowed with agency authority to administer the Firm's affairs, the individually named defendants must be included within the meaning of "the Firm" in the arbitration clause.")

Both Michigan and United States Supreme Court authority command that Gregory be compelled to arbitrate. Indeed, a non-signatory of a contract "can still be bound by an agreement pursuant to ordinary contract-related legal principles, including incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel." *AFSCME Council 25 v County of Wayne*, 292 Mich App 68, 81; 811 NW2d 4 (2011); *accord Arthur Andersen LLP v Carlisle*, 556 US 624, 631; 129 S Ct 1896, 173 L Ed2d 832 (2009) ("For example, we have recognized that

2

arbitration agreements may be enforced by nonsignatories through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.").

Gregory cannot ignore that his claim to the settlement proceeds only exists by virtue of the Settlement Agreement itself, and he further cannot contest that MSY—and MSY only—is the designated recipient of the funds. Gregory, as an alleged agent of MSY, violated his duties to MSY by breaching the Settlement Agreement through his actions in directing Dykema to disburse the settlement proceeds elsewhere, and he only compounded his breaches through this Court by successfully obtaining the July 3, 2023 Order directing Dykema to split the proceeds and to disburse them to recipients other than MSY.

## II.     The arbitration clause is broad.

To reiterate, the arbitration clause applies to "any dispute arising out of this Agreement" and also to "any breach of this Agreement." As held by *Amtower v William C. Roney & Co*, 232 Mich App 226, 236; 590 NW2d 580 (1998), such language means what it says—any dispute or controversy arising between the parties. *Id*. ("Particularly when considered in light of the federal presumption in favor of arbitrability, we believe that these broadly worded arbitration clauses, covering as they do any controversy arising between the parties, indicate that the arbitrator must decide the timeliness issue.")

Gregory's reliance on *Lichon v Morse*, 507 Mich 424, 439 (2021), is flawed because the arbitration clause in that case was in the context of an employment agreement, which expressly limited its applicability to a dispute "relative to" employment. Here, Gregory tries to avoid the Settlement Agreement's arbitration provision by saying that his complaint does not reference the Settlement Agreement, but it does. Paragraphs 28 through 33 unequivocally speak to the settlement proceeds arising from the Settlement Agreement. Paragraph 28 speaks to "Chris and

3

Greg's attorneys in the MSY litigation" receiving the proceeds. Paragraph 29 alleges—albeit wrongfully—that Chris "attempted to have the entire balance of the Litigation Proceeds released to him directly."[2] And Paragraph 33 is nothing more than a blatant breach of the Settlement Agreement, by alleging that "MSY's attorneys should thus be entitled to interplead and deposit the Litigation Funds with the Court and remove itself from the dispute between Chris and Greg."

Just because Gregory does not specifically mention the March 10, 2023 Settlement Agreement and just because he tries to cleverly disguise the settlement proceeds as "litigation funds" does not change the substantive fact that his complaint raises a dispute concerning the settlement proceeds earmarked for MSY and further constitutes a direct breach of the Settlement Agreement. Gregory attempts to distance himself from *Tobel v AXA Equitable Life Ins Co*, unpublished opinion per curiam of the Court of Appeals, decided February 21, 2012 (Docket No. 298129), but he cannot escape his own allegations where he admitted that he wanted Dykema to distribute the Settlement Funds directly to him. *See* Paragraph 31 of the complaint. Gregory's complaint seeking to benefit directly from the Settlement Agreement containing the existence of the settlement funds is precisely the direct benefit discussed in *Tobel*. *Id*. (". . . a nonsignatory may be bound to an arbitration agreement under an estoppel theory when the nonsignatory seeks a direct benefit from the contract while disavowing the arbitration provision.")

Gregory is a signatory to the Settlement Agreement, he is an agent of MSY, he seeks the settlement funds directly from the Settlement Agreement, and the bulk of his complaint concerns the dispute over the Settlement Funds.[3] The arbitration clause covers this dispute, including his

---

[2]   Again, not true. On April 12, 2023, Christopher, on MSY's behalf, emailed Dykema and provided the wire instructions for MSY's account, not Christopher's, but MSY. *See* **Ex. B**.

[3]   Gregory's conflicting position in his complaint that "[a]t all relevant times, MSY was owned by 50/50 by Greg and Chris . . ." (complaint at Paragraph 14) and that "Greg has completely

4

direct breach of the Settlement Agreement through this proceeding and by virtue of the July 3, 2023 order. Summary disposition under MCR 2.116(C)(7) should be granted, and the Court should dismiss this entire action without prejudice so the parties may proceed in arbitration.

At a minimum, the arbitration provision covers the issue of to whom the settlement proceeds should be paid. Thus, if the Court does not compel the entire matter into arbitration, it should partially compel the matter to arbitration for a determination as to whom/what entity the settlement proceeds should be paid and should stay the remainder of the matter pending that determination.[4]

Respectfully submitted,

BODMAN PLC

By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Plaintiff*

Dated:  September 8, 2023

---

assigned, transferred, and conveyed his interest in the Companies and their respective assets to Chris . . ." (complaint at Paragraph 25) highlight the problems with Greg's position in this case. If he has no interest in MSY, he has no interest in the settlement proceeds to be paid to it.

[4]    Effectively, Gregory's request that the Court hold the funds that the Settlement Agreement says are to be paid directly to MSY is tantamount to pre-judgment garnishment, which the Court Rules do not permit under these circumstances. *See* MCR 3.102.

4872-3719-6414.v2

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2023, I electronically served the attached copy of this Court's Status Conference Scheduling Order for Appeal upon John L. A. Tuttle (MI-80804), attorney for Appellee, using the ECF-filing system which will send notification of such filing and e-serve the document upon all attorneys of record.

/s/ J. Adam Behrendt  (P58607)

4872-3719-6414.v2

# Exhibit A

Privileged & Confidential - Attorney/Investigator Work Product

| | |
|---|---|
| **From:** | Kara Harbour - FYB |
| **Sent:** | Tuesday, January 31, 2023 11:05 AM |
| **To:** | Gregory Yatooma - FYB |
| **Subject:** | RE: Account Clean Up |

Axon Phone Number 248-365-4506

**From:** Gregory Yatooma - FYB <yatooma@fyblaw.com>
**Sent:** Tuesday, January 31, 2023 10:54 AM
**To:** Goldman, Zachary R <zachary.r.goldman@jpmorgan.com>
**Cc:** Gentry, Lauren C <lauren.c.gentry@chase.com>; Kara Harbour - FYB <harbour@fyblaw.com>
**Subject:** Account Clean Up
**Importance:** High

Good morning Zach and Lauren. In follow up to me selling the companies to Chris, and cleaning up the bank accounts, can you also do the following:

Close this account:
Matthew Consulting IOLTA x 7018
There is also Matthew Consulting business cared that ends in x0002 that shows up as closed (seemingly for years), but it still shows in the profile. Can you remove that account?

Remove me from these accounts, but keep account active:
PRIORITY ONE LEADS, LLC x8956
AXON PROPERTIES x7000
CHRISTOPHER JAMES & ASSOCIATES, LLC x2627

Login Clean up:
Also, when I log in from a new device, it asks if I want to send a text/call to a number ending in -4506. I don't know what this number is. Can you remove (cuz that's kinda stressful ☺ )? In addition to my cell ending in -8832 which is already included, we can add my email, yatoomag@gmail.com.

Please holler at me with any questions.

Thank you!
-Greg

1

Privileged & Confidential - Attorney/Investigator Work Product

| | |
|---|---|
| **From:** | Gregory Yatooma - FYB |
| **Sent:** | Tuesday, February 14, 2023 10:56 AM |
| **To:** | Lauren Gentry |
| **Cc:** | Zachary R Goldman; Kara Harbour - FYB |
| **Subject:** | Re: Account Clean Up |

Good afternoon Lauren. I hope you are well.  Wanted to check in on the below email re the account clean up.

Thank you!

**From:** Gregory Yatooma - FYB <yatooma@fyblaw.com>
**Sent:** Tuesday, January 31, 2023 10:54 AM
**To:** Goldman, Zachary R <zachary.r.goldman@jpmorgan.com>
**Cc:** Gentry, Lauren C <lauren.c.gentry@chase.com>; Kara Harbour - FYB <harbour@fyblaw.com>
**Subject:** Account Clean Up
**Importance:** High

Good morning Zach and Lauren.  In follow up to me selling the companies to Chris, and cleaning up the bank accounts, can you also do the following:

Close this account:

Matthew Consulting IOLTA x 7018

There is also Matthew Consulting business cared that ends in x0002 that shows up as closed (seemingly for years), but it still shows in the profile.  Can you remove that account?

Remove me from these accounts, but keep account active:

PRIORITY ONE LEADS, LLC x8956

AXON PROPERTIES x7000

CHRISTOPHER JAMES & ASSOCIATES, LLC x2627

1

Privileged & Confidential - Attorney/Investigator Work Product

Login Clean up:

Also, when I log in from a new device, it asks if I want to send a text/call to a number ending in -4506. I don't know what this number is. Can you remove (cuz that's kinda stressful 😣 )? In addition to my cell ending in -8832 which is already included, we can add my email, yatoomag@gmail.com.

Please holler at me with any questions.

Thank you!

-Greg

2

Exhibit B

| | |
|---|---|
| **From:** | Chris Yatooma - MSY |
| **To:** | Bokhov, R. Lance |
| **Cc:** | Anthony Bologna |
| **Bcc:** | Chris Yatooma - MSY |
| **Subject:** | Re: [External] MSY/Liv - bond proceeds |
| **Date:** | Wednesday, April 12, 2023 9:51:05 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | DYK21006-logo_RGB_FINAL(Custom)_d7656d32-7389-4b1f-8183-04753cc3fce5.png |
| | BY Cash Transfer.png |
| | DYK21006-logo_RGB_FINAL(Custom)_d7656d32-7389-4b1f-8183-04753cc3fce5.png |
| | image002.png |
| | image007.png |
| | image007.png |
| | image001.png |
| | image001.png |
| | image001.png |

Hello Lance, as discussed and previously emailed, as the sole member of MSY only I am authorized to give direction to Dykema on the wire instructions for MSY. Accordingly, please find below the wire instructions for MSY. Please wire the entire $14M to that account as soon as the funds are able to be wired. Please do not share this communication with anyone outside of Dykema as no one else (including previous counsel for MSY) is authorized to communicate for MSY.

Thank you,
Chris Yatooma



Wire Transfer Instructions:

| | |
|---|---|
| Bank Name: | Citizens State Bank |
| Bank Address: | 32500 Woodward Ave., Royal Oak, MI 48073 |
| ABA Transit #: | ███████████ |
| Account Name: | MSY Capital Partners, LLC |
| Account Number: | ████████ |

1615 S. Telegraph Rd
Bloomfield Hills, MI 48302

On Apr 12, 2023, at 2:23 PM, Boldrey, R. Lance <LBoldrey@dykema.com> wrote:

Gentlemen,

Please see below, which I'm sending to both of you because you are each signatories to the Settlement Agreement.  I have account information from Greg, but am still in need of it from Chris, as well as a directive on how to divide the funds.

Thank you!

Best,
Lance

**R. Lance Boldrey** (he/him)
Member

D 517-374-9162 · M 517-282-9697
LBoldrey@dykema.com · dykema.com

BIO   VCARD

201 Townsend Street, Suite 900
Lansing, Michigan 48933

**Dykema**

*** Notice from Dykema Gossett PLLC: This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

**From:** Vidaurri, Gina <GVidaurri@dykema.com>
**Sent:** Wednesday, April 12, 2023 8:19 AM
**To:** Boldrey, R. Lance <LBoldrey@dykema.com>; Gray, Karen <KGray@dykema.com>
**Cc:** Hobson, Kaila <KHobson@dykema.com>; Reynoso, Michelle <MReynoso@dykema.com>; Martinez, Erin M. <EMartinez@dykema.com>; Prather, Diara <DPrather@dykema.com>; Crayton, Tanika <TCrayton@dykema.com>
**Subject:** RE: MSY/Liv - bond proceeds

Good Morning Lance,

The Settlement has arrived.     Per Bank Officials we must hold the funds 48 hrs before releasing any monies.

| Date ⇕ | Check/Ref # ⇕ | Description ⇕ | Debit ⇕ | Credit ⇕ |
|---|---|---|---|---|
| 04/12/2023 | | Memo Credit · OAKLAND COUNTY SUPPLRPMTS ACH Entry Memo Posted Today | | $21,000,000.00 |

Thank you
Gina

**Gina R. Vidaurri**
Accounting Supervisor, Treasury Services

D 210-554-5267
GVidaurri@dykema.com · dykema.com

112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

**Dykema**

**From:** Boldrey, R. Lance <LBoldrey@dykema.com>
**Sent:** Tuesday, April 11, 2023 3:31 PM
**To:** Vidaurri, Gina <GVidaurri@dykema.com>; Gray, Karen <KGray@dykema.com>
**Cc:** Hobson, Kaila <KHobson@dykema.com>; Reynoso, Michelle <MReynoso@dykema.com>; Martinez, Erin M. <EMartinez@dykema.com>; Prather, Diara <DPrather@dykema.com>
**Subject:** RE: MSY/Liv - bond proceeds

Thx!

**R. Lance Boldrey** (he/him)
Member

D 517-374-9162 · M 517-282-9697
LBoldrey@dykema.com · dykema.com

BIO   VCARD

201 Townsend Street, Suite 900
Lansing, Michigan 48933

**Dykema**

**From:** Vidaurri, Gina <GVidaurri@dykema.com>
**Sent:** Tuesday, April 11, 2023 4:31 PM
**To:** Gray, Karen <KGray@dykema.com>; Boldrey, R. Lance <LBoldrey@dykema.com>
**Cc:** Hobson, Kaila <KHobson@dykema.com>; Reynoso, Michelle <MReynoso@dykema.com>; Martinez, Erin M. <EMartinez@dykema.com>; Prather, Diara <DPrather@dykema.com>
**Subject:** RE: MSY/Liv - bond proceeds

Not received as of yet

**Gina R. Vidaurri**
Accounting Supervisor, Treasury Services

D 210-554-5267
GVidaurri@dykema.com · dykema.com

112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

**Dykema**

**From:** Gray, Karen <KGray@dykema.com>
**Sent:** Tuesday, April 11, 2023 3:27 PM
**To:** Boldrey, R. Lance <LBoldrey@dykema.com>; Vidaurri, Gina <GVidaurri@dykema.com>

**Cc:** Hobson, Kaila <KHobson@dykema.com>; Reynoso, Michelle <MReynoso@dykema.com>; Martinez, Erin M. <EMartinez@dykema.com>; Prather, Diara <DPrather@dykema.com>
**Subject:** RE: MSY/Liv - bond proceeds

We are checking with the bank now.  Thanks

**Karen R. Gray**
Financial Controller

D 313-568-5491 · M 313-574-5080
KGray@dykema.com · dykema.com

400 Renaissance Center
Detroit, Michigan 48243

**Dykema**

**From:** Boldrey, R. Lance <LBoldrey@dykema.com>
**Sent:** Tuesday, April 11, 2023 4:09 PM
**To:** Gray, Karen <KGray@dykema.com>; Vidaurri, Gina <GVidaurri@dykema.com>
**Subject:** FW: MSY/Liv - bond proceeds

Funds received from Oakland County on MSY?

**R. Lance Boldrey** (he/him)
Member

D 517-374-9162 · M 517-282-9697
LBoldrey@dykema.com · dykema.com

BIO   VCARD

201 Townsend Street, Suite 900
Lansing, Michigan 48933

**Dykema**

**From:** Riley, Robert M. <RRiley@honigman.com>
**Sent:** Tuesday, April 11, 2023 3:49 PM
**To:** Boldrey, R. Lance <LBoldrey@dykema.com>
**Cc:** Scott Seabolt <sseabolt@hhbjs.com>
**Subject:** MSY/Liv - bond proceeds

*** EXTERNAL***

Hi Lance,

Just touching base to see if Dykema had received the bond distribution from the Court.  I spoke to the Clerk yesterday and she said the money had been sent.

Many thanks.

Robert M. Riley
Partner, Litigation Department

HONIGMAN LLP
O   313.465.7572
rriley@honigman.com

Honigman celebrates 75 years of service
1948 - 2023

This e-mail may contain confidential or privileged information.  If you are not the intended recipient, please delete it and notify the sender of the error.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER YATOOMA and
MSY CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB
Hon. Victoria A. Valentine

**STIPULATED ORDER TO FILE**
**MARCH 10, 2023 SETTLEMENT**
**AGREEMENT UNDER SEAL**

---

**TAFT STETTINIUS & HOLLISTER LLP**
By:  Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com
*Attorneys for Plaintiff*

**URBAN LEGAL GROUP**
By:  Jeffery R. Sieving (P71625)
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Co-Counsel for Defendants*

**BODMAN PLC**
By:   J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher*
*Yatooma*

---

4863-7730-8542_1

## STIPULATED ORDER TO FILE MARCH 10, 2023
## SETTLEMENT AGREEMENT UNDER SEAL

Plaintiff and Defendants having come before this Court on their agreement to File under

Seal their March 10, 2023 Confidential Settlement Agreement, the Court having found good cause

exists to maintain confidentiality within the Agreement and that no less restrictive means exists to

preserve confidentiality,

IT IS ORDERED that the March 10, 2023 Confidential Settlement Agreement can be

filed with this Court under Seal.

IT IS FURTHER ORDERED that any party or person intending to rely on the March

10, 2023 Confidential Settlement Agreement in this matter shall submit the document to this

Court's chambers in a separate sealed envelope designated "sealed."

/s/ Victoria A. Valentine
September 13, 2023
Hon. Victoria Valentine
VICTORIA A VALENTINE            mt

Date:  9/13/2023

Approved as to form only:


**TAFT STETTINIUS & HOLLISTER LLP**

By: **/S/ Emily M. Mayer**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com
*Attorneys for Plaintiff*


**URBAN LEGAL GROUP**

By: **/s/ Jeffrey R. Sieving**
Jeffery R. Sieving (P71625)
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Co-Counsel for Defendants*

**BODMAN PLC**
By: **/s/ J. Adam Behrendt**
J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

2

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

Case No. <u>23-200283-CB</u>
Hon. <u>Victoria Valentine</u>

Gregory Yatooma

    **Plaintiff,**

    **v.**

Christopher Yatooma

    **Defendant.**

_____/

TAFT STETTINIUS HOLLISTER LLP           BODMAN LLP
Ethan R. Holtz (P71884)                         J. Adam Behrendt (P58607)
Emily M. Mayer (P78956)                      Michelle Kolkmeyer (P81355)
eholtz@taftlaw.com                            jbehrendt@bodmanlaw.com

_____/

### STIPULATED PROTECTIVE ORDER

At a session of Court held in the City of Pontiac,
County of Oakland, State of Michigan, on

PRESENT: HONORABLE_____
                              Circuit Judge

Pursuant to MCR 2.302(C), the Court's authority, and on stipulation of the parties,

**IT IS HEREBY ORDERED** that any party or non-party (the "producing party") may designate

information, documents, or things as "Confidential" under the following terms and conditions:

**1.**      Any document, information, or thing may be designated "Confidential" if the producing party

determines in good faith that it (a) contains confidential, competitively sensitive, or proprietary information

that is not readily ascertainable through lawful means by the public, (b) that if disclosed publicly would likely cause oppression, competitive disadvantage, infringement of privacy rights established by statute or regulation, or infringement of confidentiality requirements established by statute or regulation, (c) is or contains information subject to a confidentiality agreement, (d) contains Protected Health Information as defined by 45 CFR § 160.103, or (e) that if used for purposes other than those authorized by this Order could cause oppression or competitive disadvantage.

2.      A producing party may designate any document or other tangible information or thing as "Confidential" by conspicuously stamping or appending the appropriate designation. In the case of a paper document, a producing party may so mark the first page of a multipage document or each applicable page. In the case of an electronic document, a producing party may append to that document the appropriate designation that does not alter the metadata associated with the document or may place the appropriate designation mark "CONFIDENTIAL" on the outside of the medium (whether disc, hard drive, etc.) containing the document.

3.      A copy of this protective order shall be served with any subpoena seeking documents or information from a non-party.

4.      A non-producing party may also designate any document, information, or things produced during the course of this proceeding, not already designated "Confidential" as "Confidential" as if it were a producing party. The non-producing party shall accomplish such designation by notifying all parties in writing of the specific item so designated.

5.      A producing party may designate documents, information, or things disclosed at a deposition as "Confidential" on the record during the deposition or, within 30 days of receiving the deposition transcript, by notifying all parties in writing of the specific item so designated or the lines and pages of the transcript that are "Confidential." All deposition transcripts and exhibits will be deemed Confidential for a period of 30 days after the receipt of the deposition transcript.

   a.      If a producing party designates such materials as "Confidential" on the record, the court reporter shall indicate on the cover page that the transcript includes "Confidential" information and shall list the pages and line numbers and/or exhibits of the transcript where such information is contained and shall

bind the transcript in separate portions containing "Confidential," and non-Confidential material. Further, during the period in which such "Confidential" information is discussed during the deposition, any person present during the deposition who is not authorized to receive such information under Paragraph 10 below, shall be excluded from that portion of the deposition.

> **b.** A non-producing party may designate documents, information, or things disclosed at a deposition as "Confidential" in the same manner as a producing party.

6. If a party producing documents inadvertently fails to mark a document as "Confidential" for which it desires such treatment, it shall so inform the party receiving the documents forthwith, but in no event later than thirty (30) days following the discovery of the inadvertent disclosure. The receiving party thereupon shall return the unmarked documents to the producing party and the producing party shall substitute properly marked documents.

7. The inadvertent or unintentional disclosure by a producing party supplying confidential discovery material, regardless of whether such discovery material was designated as "Confidential," shall not be deemed a waiver in whole or in part of the producing party's claim of confidentiality with respect to the discovery material disclosed, provided that the producing party making such inadvertent or unintentional disclosure notifies the receiving parties forthwith, but in no event later than thirty (30) days after it learns of such inadvertent or unintentional disclosure. If discovery material was disclosed and is subsequently designated as "Confidential," the disclosing party shall make good faith efforts to preserve the "Confidential" nature of such discovery material and to obtain compliance with this Order from any person to whom such discovery material was disclosed.

8. If a producing party, at the time of disclosure, inadvertently fails to identify as "Confidential" any discovery material (including, without limitation, documents, oral, visual, or recorded information) for which it desires such treatment, and another party files the material with the Court prior to receiving notice that such material was inadvertently disclosed without the desired designation, the producing party who made the inadvertent disclosure shall be responsible for seeking appropriate relief from the Court.

9. Should any party object to a designation of any information, documents, or things as "Confidential," the parties or the producing party shall, on an expedited basis, meet and confer in a good faith attempt to

reach an agreement regarding the status of the information, documents, or things. The parties are strongly encouraged to resolve all such objections and, if appropriate, utilize the services of a neutral to assist the parties in the resolution of the dispute. If an objection is not thereby resolved, a party may bring the dispute before the Court on an expedited basis for a determination. The party claiming the "Confidential" designation shall have the burden of proving good cause for the entry of an order maintaining the designation of the information, documents, or testimony under the terms of this Stipulated Protective Order. Until the Court makes such determination, all material designated as "Confidential" shall be treated as such.

10.     All information, documents, or things produced, exchanged, or inspected in the course of this proceeding shall be used solely for the purposes of this proceeding [Alternatively, the parties may strike through the prior sentence if the parties specifically agree that the information may be used in another proceeding including substantially similar parties or substantially similar issues].

11.     All documents, information, or things designated as "Confidential" shall be made available only to the Court's staff and to counsel for the parties (including the paralegal, clerical, and secretarial staff employed by such counsel in connection with this case) and the following persons:

   **a.**      The parties and those agents and employees that are directly involved in the prosecution or defense of this matter;

   **b.**      experts or consultants (together with their clerical staff) retained by the respective parties to assist in this case;

   **c.**      any court reporter employed in this case;

   **d.**      a witness at any deposition or other proceeding in this case;

   **e.**      a potential witness; and

   **f.**      any other person with the written consent of the parties (and any affected non-party producing party) or upon order of the Court.

12.     Materials designated as "Confidential" shall not be made available to persons other than those authorized in paragraphs 11 above – even if attached to or contained within otherwise non-Confidential materials, such as transcripts, memoranda, discovery responses, or affidavits. The "Confidential" information must be removed before the remaining materials may be made available to those other persons.

**13.** Materials designated as "Confidential" shall not be disclosed by opposing counsel to a former employee of Plaintiff or Defendant, respectively, to a witness at any deposition or other proceeding in this case, to a potential witness, or to a testifying or non-testifying expert or consultant, or to any other person who was given consent, unless and until such person has first been supplied with and has read a copy of this Order and has executed a copy of the Confidentiality Agreement attached as <u>Exhibit A</u>**.** Current employees of Plaintiff and Defendant are not required to execute a copy of the Confidentiality Agreement, but must be advised regarding the provisions of this Protective Order.

**14.** Counsel shall maintain files containing materials designated as "Confidential" in a secure location. This provision shall not prevent use of an ESI vendor or host who restricts access to those persons permitted to review Confidential materials as set forth in this Order.

**15.** No documents, information, or things designated as "Confidential," including that contained in pleadings, motions, briefs, declarations, or exhibits (except in sealed envelopes) shall be filed with the Court. Such sealed envelopes shall bear the case caption and shall recite a concise, non-disclosing inventory of their contents for docketing purposes. Additionally, in the case of materials or information designated "Confidential," such sealed envelopes shall prominently bear the notice:

<div align="center">

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO**
**PROTECTIVE ORDER. TO BE OPENED ONLY BY OR AS**
**DIRECTED BY THE COURT.**

</div>

To the extent practical, only those portions of a filing with the Court that contains material designated as "Confidential" shall be filed under seal or provided to the Court for *in-camera* inspection. The Court and its staff shall maintain all filings so designated pending further order or direction from the Court. Provided that no "Confidential" information is disclosed, the parties may generally refer to documents designated as "Confidential" in pleadings, motions, briefs, affidavits, or exhibits filed with the Court, without filing such pleadings, motions, briefs, affidavits, or exhibits under seal.

**16.** Nothing in this Order shall preclude any party or their attorneys from:

**a.** Showing materials designated as "Confidential" to an individual who either prepared or reviewed the document, or is shown by the document, to have received the document.

**b.** Disclosing or using, in any manner or for any purpose, any information, documents, or things from the party's own files that the party itself designated as "Confidential."

**c.** Disclosing or using, in any manner or for any purpose, any information, document, or thing at the trial of this matter. But if a party intends to use or offer into evidence at such trial any materials designated as "Confidential," that party must, unless otherwise ordered by the Court, so inform the producing party in a reasonable time in advance to allow the producing party to take such steps that it deems reasonably necessary to preserve the confidentiality of such information or documents.

**d.** Redacting information from documents produced in accordance with the discovery process, including information that is irrelevant to this action and would provide the opposing party with a business advantage over the producing party if it is produced. Nothing in this subsection limits the opposing party from challenging such redactions before this Court.

**17.** If a party is served with a subpoena or similar process, from any person or entity whatsoever, directing that party to produce any materials designated as "Confidential" by another party, counsel for that party shall immediately give counsel for the designating party written notice of such service so that the designating party may seek a protective order or otherwise act to protect the confidentiality of the designated materials.

**18.** Within sixty (60) days of the conclusion of this action, including any appeals, all originals and reproductions of any materials designated as "Confidential" shall be destroyed at the request of the opposing party; provided, however, counsel for the parties may retain one complete set (including exhibits) of pleadings and motion papers filed with the Court, and one complete copy of deposition testimony given in this action, in addition to materials designated as "Confidential" in a secure location - subject to any applicable Statute of Limitations. Upon request, counsel for the receiving party shall provide written verification to the producing party that all copies of such materials produced to the receiving party have been destroyed, other than as indicated in this paragraph. Materials designated as "Confidential" that are in the custody of the Court are excepted from the terms of this paragraph.

19.     If information or materials are inadvertently produced that are subject to a claim of attorney-client privilege, attorney work product or any other ground on which production of such information or materials should not be made to a party, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege, work product or other ground for withholding production to which the producing party would otherwise be entitled. Any and all facially privileged or work product materials inadvertently produced shall be returned promptly, when discovered. Any other inadvertently produced privileged materials shall be promptly returned upon the request of the producing party.[1]

20.     The terms of this Order shall remain in effect after the action and any related appeals are concluded, except that there shall no longer be any restriction on the use of materials designated as "Confidential" that are used as exhibits at trial (unless such exhibits were used under seal or protective order at trial).

Dated:      9/13/2023

                                                    /s/ Victoria A. Valentine
                                    HON.  September 13, 2023
                                          Circuit Court Judge
                                          VICTORIA A VALENTINE          mt

I stipulate to entry of the above order:

/s/ Emily Mayer                                     /s/ Adam Behrendt

Emily Mayer                                         Adam Behrendt
Attorney for Plaintiff                              Attorney for Defendant

---

[1] This Court continues to enforce ABA Rule of Professional Conduct Formal Opinion 92-368 (1992) which has been withdrawn.

**EXHIBIT A**
**CONFIDENTIALITY AGREEMENT**


I,_____, state that:

1.  My address is _____.

2.  My present employer is _____and the address of my employer is _____

    _____.

3.  My present occupation is _____.

4.  I have received a copy of the Stipulated Protective Order in the case of_____

    ____, Case No._____ Oakland County Circuit Court of Michigan.

5.  I submit to the jurisdiction of the Oakland County Circuit Court for purposes of enforcement of

    the Stipulated Protective Order.

6.  I have carefully read and understand the provisions of the Stipulated Protective Order, and I

    will comply with all of its provisions.

    Pursuant to MCR 1.109(D)(3)(b):

    I declare under the penalties of perjury that this document has been examined by me and that its

    contents are true to the best of my information, knowledge, and belief.


Dated: _____          _____

FILED    Received for Filing    Oakland County Clerk    9/15/2023 3:15 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

     Plaintiff,                          Case No. 23- 200283-CB

v.                                           Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY CAPITAL PARTNERS, LLC,

     Defendants.

---

| **TAFT STETTINIUS & HOLLISTER LLP** | **LEGAL CONSULTING, PLLC** |
|---|---|
| Ethan R. Holtz (P71884) | Anthony J. Bologna (P72698) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendants* |
| T. Andrew Keating (P86261) | 26100 American Drive, Ste 500 |
| *Attorneys for Plaintiff* | Southfield, MI 48038 |
| 27777 Franklin Road, Suite 2500 | (248) 227-2278 |
| Southfield, MI 48034 | ab@consultingpllc.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BUTZEL LONG PC** |
| emayer@taftlaw.com | Bernard J. Fuhs (P69621) *Co-* |
| akeating@taftlaw.com | *Counsel for Defendants* |
| | 150 W Jefferson Avenue, Ste 100 |
| | Detroit, MI 48226 |
| | (313) 225-7000 |
| | fuhs@butzel.com |

---

OPINION AND ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION

At a session of said Court held on the
15th day of September 2023 in the
County of Oakland, State of Michigan

PRESENT: HON. VICTORIA A. VALENTINE

1

This matter is before the Court on Defendants, Christopher Yatooma ("Chris") and MSY Capital Partners LLC's,[1] motion to compel arbitration.[2]

The Court has reviewed the court file, the motion, and the response, and heard oral argument on September 13, 2023.  For the reasons stated on the record and set forth below, Defendants' motion is DENIED.

<center>PERTINENT FACTS</center>

This case arises out of a December 11, 2022, Buyout Agreement ("Agreement") between Plaintiff Greg Yatooma ("Greg") and Defendant Chris Yatooma ("Chris"), which undisputedly does **not** contain an arbitration clause.

The Buyout Agreement between Greg and Chris references, in part, a "Liv Wellness lawsuit," which is an entirely separate lawsuit (Oakland County case no. 2019-178037-CB) to which neither Greg nor Christopher are named as individual parties.  Rather, this Liv Wellness lawsuit is between MSY Capital Partners, LLC and Michigan Real Estate Development, LLC, as named Plaintiffs and Dennis Zoma, Danny Zoma, Duane Karmo, Scott Yaldo as named Defendants.  The Liv Wellness lawsuit resulted in a Settlement Agreement, which was signed by Chris as MSY Capital Partners LLC's member and by Greg, as MSY Capital Partners, LLC's authorized agent and which contains an arbitration clause, which provides:

---

[1] Defendants filed this motion on June 20, 2023. On July 27, 2023, the Court appointed a Receiver over Defendant MSY Capital Partners, LLC for the limited purpose of determining the members of MSY and granted Plaintiff's Motion to disqualify MSY's then retained counsel.  To date, the members of MSY have not yet been determined.
[2] At oral argument on September 13, 2023, Defendant Chris Yatooma's attorney indicated that Defendant Chris Yatooma is proceeding with this motion to compel arbitration.

<center>2</center>

18. **ARBITRATION**.   Any controversy or claim arising out of or relating to this Agreement (including any Exhibit), or the breach thereof, shall be settled in Arbitration, in accordance with the Rules of the American Arbitration Association, and judgment upon the award of the Arbitrator may be entered in any court having jurisdiction thereof. If any Arbitrator is selected other than by the mutual agreement of the parties, the American Arbitration Association shall use its best efforts to select as Arbitrator a person familiar with the industrial linen and laundry business in Michigan. The costs and fees of the American Arbitration Association and the arbitrator shall be shared equally by the parties.

Defendant now brings this Motion to Compel Arbitration based on a Settlement Agreement entered into in a *separate* lawsuit that contains an Arbitration provision to which neither Chris nor Greg are individual parties or signers. To be clear, Defendants are not seeking to compel non-signatories Greg and Chris to arbitrate in that separate lawsuit based on the arbitration provision.  Rather, Defendants are attempting to extract the arbitration provision from the Settlement Agreement in the separate lawsuit and apply it to this instant lawsuit, despite the fact that neither Chris nor Greg were individual parties in the separate lawsuit nor individual signers of the Settlement Agreement.

## STANDARD OF REVIEW

Summary disposition under MCR 2.116(C)(7) may be granted where "[e]ntry of judgment, dismissal of the action, or other relief is appropriate because of . . . an agreement to arbitrate or to litigate in a different forum."  A party is not required to submit any material in support of a motion under MCR 2.116(C)(7); the motion can be evaluated on the pleadings alone. *Maiden v Rozwood*, 461 Mich 109, 119 (1999). "The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Id*. "A party may support a motion

3

under MCR 2.116(C)(7) by affidavits, depositions, admissions, or other documentary evidence."

*Maiden*, 461 Mich at 119.

ANALYSIS

"This threshold question of whether a dispute is subject to arbitration is for a court to determine. As we have said, a party cannot be required to arbitrate an issue which [it] has not agreed to submit to arbitration." *Lichon v Morse,* 507 Mich 424, 437 (2021) (internal citations and quotations omitted).

Recently, the Court of Appeals in its published opinion of *Legacy Home Builders v Rogers*, __Mich App___; 2023 WL 1870446 * 3-4 (rel'd 2/9/2023) reiterated Michigan's law regarding arbitration.

Arbitration is a matter of contract. *Altobelli v Hartmann*, 499 Mich. 284, 294-295, 884 N.W.2d 537 (2016). A valid agreement must exist for arbitration to be binding. *Ferndale v Florence Cement Co*, 269 Mich App 452, 460, 712 N.W.2d 522 (2006). In *Lichon v Morse*, 507 Mich. 424, 437, 968 N.W.2d 461 (2021), our Supreme Court recognized that "[a] party cannot be required to arbitrate an issue which [it] has not agreed to submit to arbitration." (Alterations in original.) "The existence of an arbitration agreement and the enforceability of the terms are judicial questions for the court, not the arbitrators. *Fromm v Meemic Ins Co,* 264 Mich App 302, 305, 690 N.W.2d 528 (2004)

"[W]hen interpreting an arbitration agreement, we apply the same legal principles that govern contract interpretation." *Altobelli*, 499 Mich. at 295, 884 N.W.2d 537 (citation omitted). "Our primary task is to ascertain the intent of the parties at the time they entered into the agreement, which we determine by examining the language of the agreement according to its plain and ordinary meaning." *Id.* (citation omitted).

The general policy of this State is favorable to arbitration. The burden is on the party seeking to avoid the agreement, not the party seeking to enforce the agreement. In deciding the threshold question of whether a dispute is arbitrable, a reviewing court must avoid analyzing the substantive merits of the dispute. If the dispute is arbitrable, the

4

merits of the dispute are for the arbitrator. [*Id.* at 295-296, 884 N.W.2d 537 (quotation marks and citations omitted).]

Ascertaining the arbitrability of an issue requires a court to consider whether the parties' contract contains an arbitration provision, whether the disputed issue *arguably* comes within the arbitration clause, and whether the dispute is expressly exempted from arbitration by the contract. *Fromm*, 264 Mich App at 305-306, 690 N.W.2d (citation omitted). (Emphasis added).

In the instant case, it is undisputed that the Buyout Agreement at issue in this case does **not** contain an arbitration provision.  Rather, Defendants seek to compel Greg to arbitrate this case by relying on an arbitration clause contained in a Settlement Agreement entered into in an entirely separate lawsuit (Oakland County case no. 2019-178037-CB). Neither Greg nor Chris are parties to that lawsuit in their individual capacity.  The "Parties" to the Settlement Agreement in the separate lawsuit are specifically enumerated in its preamble as MSY Capital Partners and Michigan Real Estate Development LLC, as Plaintiffs and LIV Wellness Center LLC, and individuals Dennis Zoma, Danny Zoma, Duane Karmo, Scott Yaldo as Defendants.   Neither Chris nor Greg are enumerated parties.  And while the Settlement Agreement in the separate lawsuit was signed by Chris as MSY's member and Greg as MSY's authorized agent, it was not signed by them individually. Further, the issue in this lawsuit is not whether the settlement agreement was breached or whether MSY was entitled to the settlement distribution. Rather, a core issue here is who are the members of MSY and whether the alleged Buyout Agreement between Chris and Greg was breached.

Based on the above and for the reasons stated on the record, the Court finds that the parties in this lawsuit did **not** include an arbitration clause in their Buyout Agreement, which is the agreement at issue in this lawsuit.  The Court finds that the parties did not agree to submit

to arbitration the disputes in this matter.  Accordingly, Greg cannot be required to arbitrate an

issue he has not agreed to submit to arbitration. See *Lichon v Morse,* 507 Mich at 437.

Based on the above, Defendants' motion to compel arbitration is DENIED.

**IT IS SO ORDERED.**

**This is not a Final Order and does not close the case.**



/s/Victoria A. Valentine

Approved, SCAO

Original - Court
1st copy - Plaintiff
2nd copy - Defendant

| STATE OF MICHIGAN | SUBSTITUTION OF ATTORNEY | CASE NO. |
|---|---|---|
| 6th   JUDICIAL DISTRICT   JUDICIAL CIRCUIT   COUNTY PROBATE | | 2023-200283-CB   Hon. Victoria Valentine |

**Court address**

1200 N. Telegraph Road, Pontiac, MI 48341

**Court telephone no.**

(248) 858-0344

| Plaintiff/Petitioner name, address, and telephone no.   Gregory Yatooma | v | Defendant/Respondent/Minor name, address, and telephone no.   Christopher Yatooma and MSY Capital Partners, LLC |
|---|---|---|

☐ Probate   In the matter of _____

### NOTICE

TO:  Clerk of the Court, all attorneys of record, and unrepresented parties:  Specify names and addresses

I replace attorney  R.J. Cronkhite _____  on behalf of  Non-Parties Michelle Houbeck

and Rich Stopczy _____  and request copies of all papers filed in this case after this date.

The date of the next scheduled hearing is _____  .
                                            Date

9/26/23
Date

Signature
J. Adam Behrendt                    P58607
Name (type or print)                 Bar no.

Bodman PLC
Firm
201 W. Big Beaver, Ste. 500
Address
Troy, MI 48084                      (248) 743-6068
City, state, zip                    Telephone no.

I consent to the substitution of the above attorney in this case.

9/26/23
Date

Client's signature
Michelle Houbeck and Rich Stopczy
Name (type or print)

/s/ R.J. Cronkhite
Withdrawing attorney's signature
R.J. Cronkhite                      P78374
Name (type or print)                 Bar no.
Dinsmore & Shohl LLP
Firm
900 Wilshire Drive, Ste. 300
Address
Troy, MI 48084                      734-558-5809
City, state, zip                    Telephone no.

IT IS SO ORDERED.

9/27/2023
Date

### EX PARTE ORDER

/s/ Victoria A. Valentine
September 27, 2023

Judge
VICTORIA A VALENTINE          mt          Bar no.

**MC 306**  (3/15)  **SUBSTITUTION OF ATTORNEY**          MCR 2.117

FILED   Received for Filing   Oakland County Clerk   10/6/2023 2:42 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23–200283-CB

Hon. Victoria Valentine

**DEFENDANT CHRISTOPHER
YATOOMA'S ANSWER TO
COMPLAINT AND AFFIRMATIVE
DEFENSES**

---

TAFT STETTINIUS & HOLLISTER LLP
By:  Ethan R. Holtz (P71884)
      Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
Emayer@taftlaw.com
*Attorneys for Plaintiff*

URBAN LEGAL GROUP
By:  Jeffrey Sieving (P71625)
1615 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Counsel for Defendant Christopher Yatooma*

BODMAN PLC
By:  J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

---

4857-7641-8944_5

**DEFENDANT CHRISTOPHER YATOOMA'S ANSWER TO COMPLAINT**

Defendant Christopher Yatooma ("Chris") answers the complaint of plaintiff Gregory Yatooma ("Greg") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Greg is an individual who resides in Oakland County, Michigan.

**ANSWER:** Admit.

2.      Chris is an individual who resides in Oakland County, Michigan.

**ANSWER:** Admit.

3.      MSY is a Michigan limited liability company whose principal place of business is in Oakland County, Michigan.

**ANSWER:** Admit.

4.      The Court has jurisdiction over this matter pursuant to MCL 600.601, MCL 600.605, and MCL 600.8315.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris does not contest jurisdiction.

5.      This Complaint involves a business dispute, as defined by MCL 600.8031, and, therefore, meets the statutory requirements for assignment to the Oakland County Business Court.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris does not contest whether this complaint meets the statutory requirements for assignment to the Oakland County Business Court.

4857-7641-8944_5

6.      The amount in controversy, exclusive of interest, costs, and attorneys' fees, exceeds Twenty-Five Thousand Dollars ($25,000.00) and seeks equitable relief.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris denies that Greg is entitled to any relief.

7.      Venue is proper in this Court pursuant to MCL 600.1621, among other provisions.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris does not contest venue.

**STATEMENT OF FACTS**

8.      Greg and Chris are brothers.

**ANSWER:** Admit.

9.      In 2016, Greg and Chris started working together in many business ventures they owned and/or operated together as partners/members.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris admits that Greg and Chris worked together, but denies as untrue that they owned and/or operated business ventures as "partners/members".

3

10.     Several of these business ventures that Greg and Chris owned and/or operated jointly, were, solely owned by Greg.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies the allegations as untrue. However, Chris admits that Greg put certain companies in his own name in an effort to defraud Chris and in violation of the Michigan Rules of Professional Conduct and his fiduciary duties to Chris as his attorney.

11.     The businesses operated by Greg and Chris accumulated significant assets and were the holders of significant accounts receivable, which Greg and Chris owned equally 50/50.

**ANSWER:**  Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies as untrue that all such businesses were owned equally with Greg.

12.     Additionally, Greg and Chris were involved in litigation in which they, through their company MSY, were awarded a significant judgment and the proceeds of the litigation were placed in a law firm IOLTA for distribution ("Litigation Proceeds").

**ANSWER:** Chris admits that MSY was awarded a judgment in certain litigation and the proceeds from that litigation were placed in a law firm IOLTA account for distribution. Chris denies as untrue the remaining allegations.

13.     At all relevant times, MSY was owned 50/50 by Greg and Chris.

**ANSWER:** Chris denies the allegations as untrue.

4857-7641-8944_5

14.     However, in 2022, as will be more fully described below, there was a breakdown in the relationship between Greg and Chris.

**ANSWER:** Chris admits in 2022 there was a breakdown in his relationship with Greg.

15.     Rather than litigating with his brother to terminate the partnership and wind up the affairs and assets of the Companies, with the help of several mediators, Greg and Chris began negotiating a buyout of Greg's ownership and interest in the Companies.

**ANSWER:** Chris denies the allegations as characterized therein as untrue. By way of further answer, Chris submits that Greg created a scheme to extort and steal from Chris in violation of his ethical and fiduciary duties to Chris.

16.     With the help of others over several months and several meetings, on December 14, 2022, Greg and Chris reached a written and binding agreement (the "Buyout Agreement"), signed by both parties and three witnesses, which contained the material terms of the buyout of Greg of all business interests in certain companies owned solely by Greg and other companies operated by Greg and Chris (collectively, the "Companies"). Chris and Greg are both in possession of the Buyout Agreement.

**ANSWER:** Chris denies that the December 14th document was a binding agreement or that it is anything more than a letter of intent that was subject to further negotiation. Chris also denies that it was signed by three witnesses as the document does not identify any witnesses. Furthermore, one of the individuals on the document was not present when his name was signed to it.

<div align="center">5</div>

17.     Each of the three witnesses who executed the Buyout Agreement will testify that the Buyout Agreement was intended to be binding and enforceable and was the culmination of months of negotiations between Greg and Chris.

**ANSWER:** Chris neither admits nor denies the allegations because he lacks knowledge or information to form a belief as to the truth of the allegations.

18.     Chris has never stated to Greg that he believes the Buyout Agreement is anything other than binding and enforceable between the parties.

**ANSWER:** Chris denies as untrue.

19.     The Buyout Agreement expressly memorialized agreements between Greg and Chris concerning the buyout of Greg's interest in the Companies, including but not limited to:

a.     Chris agreed to pay Greg for his interest in the Companies in an amount certain, in excess of $25,000, including a first payment made by December 16, 2022, and a larger payment to be made no later than December 22, 2022 (the "December 22 Payment");

b.     Chris would thereafter begin and be required to make monthly payments to Greg on or about May 1, 2023, and continuing until August 1, 2029;

c.     Greg agreed to transfer his interest in the Companies and the assets, including accounts receivable, owned by the Companies, to Chris or his designee. Greg retained certain other business assets; and

d.     The Litigation Proceeds were to be split equally between Greg and Chris.

6

**ANSWER:** Chris denies these allegations, and their subparts, as untrue. In further answer, the December 14th document speaks for itself and clearly states "$1,700,000 with signed agreement" and "$1.2M upon final signed agreement". However, a signed agreement was never reached and additional payments were contingent on the parties entering into a final agreement, which did not occur. Further, the December 14th document states further payments would be evidenced by "a standard promissory note . . ." A promissory note was never memorialized and, in fact, the parties continued to negotiate, and, during these negotiations, Greg offered to reduce the amount of the promissory note by $2,100,000 and to delay the start of the payments under the future note. Greg agreed the expenses Chris paid for litigation would be reimbursed to Chris off of the top of the Ligation Proceeds. Moreover, there were additional negotiations regarding the Litigation Proceeds where Greg agreed to have other monies owed to Chris paid from the Litigation Proceeds, and then later reneged. Finally, the December 14th document does not say Greg agreed to transfer his interest in any "Companies" (or their assets, including accounts receivable, owned by the "Companies"), to Chris or his designee.

20.    The Buyout Agreement also explicitly provides that all payments from Chris to Greg "are unconditional."

**ANSWER:** Chris denies as untrue. The December 14th document speaks for itself and must be read in its entirety.

21.    Chris initially complied with the Buyout Agreement, making the required December 16 payment to Greg.

7

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

22.     Likewise, Greg complied with the Buyout Agreement when he signed all documents provided by Chris and/or his attorneys effecting [sic] the transfer of Greg's ownership of the Companies, assets, and accounts receivable to Chris and/or his designee.

**ANSWER:** Chris denies as untrue. The December 14th document makes no reference to this obligation by Greg as it was not an agreement. Any documents that Greg signed were for Greg's benefit or to correct the fact that Greg wrongly put assets of his client (and brother) into his own name in violation of the Michigan Rules of Professional Conduct and his fiduciary duty while lying to Chris that this was being done for Chris' benefit.

23.     Greg also removed himself from all company bank accounts, for Chris' benefit.

**ANSWER:** Chris denies as untrue. Greg removed himself as an authorized signer of company bank accounts. He never owned the accounts or contributed any funds to them.

24.     Upon reliance on the Buyout Agreement, Greg was completely removed and separated from all the Companies, the Companies' assets, and their respective bank accounts.

**ANSWER:** Chris denies as untrue.

25.     Other than the Litigation Proceeds, which was specifically reserved in the Buyout Agreement, it is undisputed that Greg has completely assigned, transferred, and conveyed his

8

interest in the Companies and their respective assets to Chris, or Chris' designee, in reliance of the Buyout Agreement.

**ANSWER:** Chris denies as untrue. All Greg purportedly "assigned, transferred, [or] conveyed . . ." were assets that Greg wrongfully put into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris.

26.     It is also undisputed that since the signing of the Buyout Agreement, Chris has sold certain assets previously owned by the Companies and has retained one hundred percent (100%) of the proceeds from such sales.

**ANSWER:** Chris neither admits nor denies the allegations because they are vague and unclear.

27.     Thereafter, once Chris had what he wanted and Greg had signed over his interests in the Companies and removed himself from the bank accounts, Chris reneged on and breached the Buyout Agreement, by, among things, the following:

a.     Refusing to make the December 22 Payment; and

b.     Refusing to split the Litigation Proceeds and attempting to take possession of 100% of same (as described further below); and

c.     Refusing to make the May 1, 2023 payment.

**ANSWER:** Chris denies as untrue.

28.     On April 12, 2023, Chris and Greg's attorneys in the MSY litigation, received the Litigation Proceeds.

4857-7641-8944_5

**ANSWER:** Chris neither admits nor denies the allegations because he lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

29.     Despite that all relevant times Greg was a fifty percent (50%) owner in MSY and the Buyout Agreement clearly states the Litigation Proceeds were to be split equally, Chris surreptitiously contacted MSY's attorneys, claimed Greg had no interest in in the Litigation Proceeds and attempted to have the entire balance of the Litigation Proceeds released to him directly, in an attempt to secure 100% of the Litigation Proceeds for himself.

**ANSWER:** Chris denies as untrue. In further answer, Chris states that Greg was not a member in MSY.

30.     In an April 20, 2023 letter, MSY's attorneys acknowledged that Chris attempted this maneuver and that Chris had claimed to them that Greg had no interest in the Litigation Proceeds.

**ANSWER:** Chris denies as untrue. The April 20, 2023 letter from Dykema speaks for itself.

31.     MSY's attorneys further acknowledged that they had received conflicting wiring instructions from Chris and Greg, and that Greg had requested that the Litigation Proceeds be distributed in accordance with the Buyout Agreement, but that Chris was requiring that the Litigation Proceeds be disbursed solely to him.

**ANSWER:** Chris denies as untrue. The April 20, 2023 letter from Dykema speaks for itself. Furthermore and after Greg directed MSY's attorneys to send the funds to a company

10

unrelated to MSY without Chris' knowledge or consent, Chris directed the Litigation Proceeds to be distributed to MSY as required under the Confidential Settlement Agreement.

32.     Given the conflicting instructions, MSY's attorneys stated that they could not release the funds to either party absent joint instructions and/or a court order.

**ANSWER:** The April 20, 2023 letter from Dykema speaks for itself.

33.     MSY's attorneys should thus be entitled to interplead and deposit the Litigation Proceeds with the Court and remove itself from the dispute between Chris and Greg.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

34.     Chris' various actions are clear and unequivocal breaches of contract, amongst other things.

**ANSWER:** Chris denies as untrue.

## COUNT I: BREACH OF CONTRACT

35.     Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

4857-7641-8944_5

36.     The Buyout Agreement is an enforceable written contract between Greg and Chris, and was executed by three individuals as witnesses that were involved in the negotiations between Greg and Chris.

**ANSWER:** Chris denies that the December 14th document was a binding agreement or that it is anything more than a letter of intent that was subject to further negotiation. Chris also denies that it was signed by three witnesses as the document does not identify any witnesses. Furthermore, one of the individuals on the document was not present when his name was signed to it.

37.     Chris initially performed the Buyout Agreement by making the initial payment due thereunder.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

38.     Greg performed all aspects of the Buyout Agreement by assigning, via written documents, all his rights in each of the Companies, which is undisputed by Chris.

**ANSWER:** Chris denies as untrue. The December 14th document makes no reference to this obligation by Greg as it was not an agreement. Any documents that Greg signed was to correct the fact that Greg wrongfully put assets of his client (and brother) into his own name in violation of the Michigan Rules of Professional Conduct and his fiduciary duty.

39.     Chris then breached the Buyout Agreement, by, among other things:

a.      Refusing to make the December 22 Payment;

4857-7641-8944_5

b.    Refusing to split the Litigation Proceeds 50/50 and attempting (surreptitiously) to take possession of 100% of them; and

c.    Repudiating the remainder of his obligations under the Buyout Agreement when, on April 12, 2023, he sent Greg a text message that he did not intend to honor any portion of the Buyout Agreement moving forward and stating: "I will not be giving you a penny;" and

d.    In line with this April 12 text to Greg, refusing to make the May 1, 2023 payment due under the Buyout Agreement.

**ANSWER:** Chris denies as untrue.

40.    Greg has been damaged by Chris' breaches of the Buyout Agreement in an amount in excess of $25,000.

**ANSWER:** Chris denies the allegations as untrue and further denies that Greg has suffered any damages.

## **COUNT II: PROMISSORY ESTOPPEL, IN THE ALTERNATIVE**

41.    Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

42.    Chris promised Greg the consideration described in the Buyout Agreement in exchange for Greg's promise to assign Greg's ownership interests in the Companies to Chris and/or Chris' designee.

13

**ANSWER:** Chris denies as untrue. The December 14th document makes no reference to this obligation by Greg as it was not an agreement. Any documents that Greg signed were to correct the fact that Greg wrongfully put assets of his client (and brother) into his own name in violation of the Michigan Rules of Professional Conduct and his fiduciary duty.

43.     In reliance on Chris' promises to honor the terms of the Buyout Agreement, Greg assigned his Greg's ownership interests in the Companies to Chris and/or Chris' designee.

**ANSWER** Chris denies as untrue. All Greg purportedly "assigned, transferred, [or] conveyed . . ." were assets that Greg wrongfully put into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris.

44.     Greg reasonably relied on Chris' promises to his detriment, relinquishing ownership and control of significant assets to Chris.

**ANSWER:** Chris denies as untrue.

45.     Chris should be estopped from failing to keep his promise.

**ANSWER:** Chris denies as untrue.

46.     Greg has been damaged in an amount to be determined in trial, but in excess of $25,000.

**ANSWER:** Chris denies as untrue.

## COUNT III: UNJUST ENRICHMENT, IN THE ALTERNATIVE

47.     Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

48.     Chris promised Greg the consideration described in the Buyout Agreement in exchange for Greg's promise to assign Greg's ownership in the Companies to Chris and/or Chris' designee.

**ANSWER:** Chris denies as untrue.

49.     In reliance on Chris' promises to honor the terms of the Buyout Agreement, Greg assigned his Greg's ownership interests in the Companies to Chris and/or Chris' designee thus conferring a benefit onto Chris.

**ANSWER:** Chris denies as untrue.

50.     Chris, after receiving control over Greg's Companies, reneged on his promise to compensate Chris such that his retention of the benefits conferred upon him by Greg is inequitable and unjust.

**ANSWER:** Chris denies as untrue.

51.     Chris has been unjustly enriched by his inequitable conduct and Greg has been damaged as a result in an amount to be determined in trial, but in excess of $25,000.

**ANSWER:** Chris denies as untrue.

15

## COUNT IV: DECLARATORY RELIEF

52.     Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

53.     Greg and Chris are the two members of MSY, each owning fifty percent (50%) of the company.

**ANSWER:** Chris denies as untrue.

54.     In fact, in sworn deposition testimony in the underlying case that resulted in the Litigation Proceeds, Chris affirmed that Greg is the fifty percent (50%) owner of MSY.

**ANSWER:** Chris denies the allegations as untrue. In further answer, Chris states that any statements made by him do not impact whether an individual is a member of a company under Michigan law.

55.     Therefore, Chris is now estopped from claiming anything other than what he swore under oath to this Court as true.

**ANSWER:** Chris denies as untrue. In further answer, Chris states that any statements made by him do not impact whether an individual is a member of a company under Michigan law.

56.     The Buyout Agreement, executed by Chris, further affirms that Greg is the fifty percent (50%) owner of MSY, as it reaffirms that the Litigations Proceeds are to be shared equally by the two of them.

4857-7641-8944_5

**ANSWER:** Chris denies as untrue. By way of further response, the December 14th document makes no mention of MSY.

57.     In addition, in recent correspondence, Chris has acknowledged Greg's rights to fifty percent (50%) of the Litigation Proceeds repeatedly.

**ANSWER:** Chris denies as untrue.

58.     Despite all of this, Chris has claimed to MSY's attorneys that Greg has no ownership interests in MSY or any claim to the Litigation Proceeds and has directed MSY's attorneys to release the Litigation Proceeds solely to his custody.

**ANSWER:** Chris denies as untrue. The April 20, 2023 letter from Dykema speaks for itself. Furthermore and after Greg directed MSY's attorneys to send the funds to a company unrelated to MSY without Chris' knowledge or consent, Chris directed the Litigation Proceeds to be distributed to MSY as required under the Confidential Settlement Agreement.  Further, Greg is not a member of MSY and has no right to the Litigation Proceeds.

59.     With the conflicting instructions received from Greg and Chris as to the Litigation proceeds, the MSY attorneys cannot act without joint instructions and/or a court order.

**ANSWER:** The April 20, 2023 letter from Dykema speaks for itself.

60.     Although there should be none, an actual case and/or controversy thus exists between Greg, Chris and/or MSY as to the recognition of Greg's ownership and the release of the

4857-7641-8944_5

Litigation Proceeds such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

61.     The Court should thus issue a preliminary Order permitting MSY's attorneys to deposit the Litigation Proceeds with the Court.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

62.     The Court should further issue judgment declaring that Greg is fifty percent (50%) owner of MSY with full rights and authority pursuant thereto, including but not limited to the right to receive fifty percent (50%) of the Litigation Proceeds.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies that Greg is entitled to any such relief.

### COUNT V: DISSOLUTION PURSUANT TO MCL 450.4802

63.     Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

4857-7641-8944_5

64.     Greg and Chris are the two members of MSY, each owning fifty percent (50%) of MSY.

**ANSWER:** Chris denies as untrue.


65.     MSY has no current business other than the distribution of the Litigation Proceeds.

**ANSWER:** Chris denies as untrue.


66.     Greg and Chris are in a dispute such that MSY can no longer operate and carry on its business in conformity with its article of incorporation.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion. To the extent an answer is required, Chris denies as untrue.


67.     A judicial decree of dissolution is appropriate pursuant to MCL 450.4802, such that MSY will be dissolved and its affairs wound up, including but not limited to the equal distribution of the Litigation Proceeds to both Greg and Chris.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies that Greg is entitled to any such relief.


WHEREFORE, Chris respectfully requests that the Court enter a no cause of action as to Greg's complaint and award all other relief it deems appropriate.

4857-7641-8944_5

Respectfully submitted,

BODMAN PLC

/s/ J. Adam Behrendt (P58607)
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
Attorneys for Defendant Christopher Yatooma

October 6, 2023

## **AFFIRMATIVE DEFENSES**

Chris submits the following affirmative defenses to Greg's complaint to which he demands a reply under the Michigan Court Rules:

1.      Greg's claims are estopped, released, and/or waived by his own conduct, including but not limited to his own bad faith, unclean hands, and/or fraud.

2.      Greg's claims are barred by the conduct of non-parties, including but not limited to the bad faith, unclean hands, and/or fraud of non-parties.

3.      Greg has failed to mitigate his damages.

4.      Greg has not suffered any damages directly or proximately caused by any actions taken by Chris.

5.      Greg's claims are barred by the requirements of member admission found in the Michigan limited liability company act, MCL 450.4101, *et seq.*

6.      Greg is a licensed Michigan attorney who undisputedly represented Chris and his businesses, including MSY. Greg's claims that he now is/was an owner of any of those companies, including MSY, cannot be enforced because Greg's actions did not adhere to Rule 1.8(a) of the

Michigan Rules of Professional Conduct and the enforcement of any purported agreement between Chris and Greg—or, conversely, the actions of Greg to organize limited liability companies in his own name as member while advising his client that it was being done for his benefit—violate that Rule and cannot be enforced under Michigan law.

7.      Alternatively, any promise made by Chris to Greg of a purported membership interest in MSY and/or any other company was a gift that was not completed under Michigan law and lawfully was revoked.

8.      Greg's claims are barred by Michigan's version of the statute of frauds.

9.      To the extent the Court determines that the December 14th document was anything other than non-binding, it cannot be enforced because it was executed under duress due to Greg's fraudulent conduct and extortion of his brother to ruin Chris' business and personal lives, as evidenced by his actions and communications with Chris, family members, and third parties.

10.     The entities that Greg now claims that he purportedly transferred in reliance upon the December 14th document were fraudulently put into Greg's name based on false statements made by Greg (as his attorney) at the time of their formation that doing so was for Chris' benefit (as his client).

11.     To the extent the Court determines that the December 14th document was anything other than non-binding, it cannot be enforced because it fails by reason of indefiniteness.

12.     Greg's claims for promissory estoppel are barred by his failure to establish a definite and clear promise on the part of Chris.

WHEREFORE, Chris respectfully requests that the Court enter a no cause of action as to Greg's complaint and award all other relief it deems appropriate.

4857-7641-8944_5

Respectfully submitted,

BODMAN PLC

/s/ J. Adam Behrendt (P58607)
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
Attorneys for Defendant Christopher Yatooma

October 6, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I electronically filed the foregoing papers with the Clerk of the Court using the MiFILE TrueFiling E-filing system which will send notification of such filing and e-serve the document upon all attorneys of record.

 /s/J. Adam Behrendt
J. Adam Behrendt

<div style="float:left">FILED   Received for Filing   Oakland County Clerk   10/27/2023 1:03 PM</div>

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA

      Plaintiff,

v.

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER
LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

**Bodman, PLC**
J. Adam Behrendt (P58607)
*Co-Counsel for Defendant*
201 W. Big Beaver Rd, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

---

## NOTICE OF ATTORNEY'S LIEN

Please take notice that Butzel Long, a professional corporation, former

attorney of record for Defendants Christopher Yatooma and MSY Capital Partners,

LLC, claims a lien on either or both of Defendant's recovery of a judgment or

otherwise (including recovery of any amounts from the proceeds of the LIV/MSY

settlement proceeds currently held by this Court) in the amount of $126,372.34 plus interest (which continues to accrue) entered in this action.

The above-claimed attorney's lien represents attorney fees, costs, and expenses (not including interest, which continues to accrue) now due and payable by Defendants to Butzel Long, a professional corporation.

Respectfully submitted,

By:     /s/ *Daniel J. McCarthy*
Daniel J. McCarthy (P59457)
Butzel Long, P.C.
Former Counsel for Defendants
201 W. Big Beaver Rd, Suite 1200
Troy, MI 48084
(248) 258-1616
mccarthyd@butzel.com

Dated: October 27, 2023

2

FILED   Received for Filing   Oakland County Clerk   10/18/2023 11:25 AM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,                      Case No. 23 – 200283-CB

v.                                       Hon. Victoria Valentine

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

---

TAFT STETTINIUS & HOLLISTER LLP
By:   Ethan R. Holtz (P71884)
       Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
Emayer@taftlaw.com
*Attorneys for Plaintiff*

URBAN LEGAL GROUP
By:   Jeffrey Sieving (P71625)
1615 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Counsel for Defendant Christopher Yatooma*

BODMAN PLC
By:   J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

---

**DEFENDANT CHRISTOPHER YATOOMA'S**
**<u>INITIAL DISCLOSURES</u>**

      Defendant Christopher Yatooma ("Chris") submits his Initial Disclosures under MCR

2.302(A) as follows:

4863-0873-6136_1

I.      **The Factual Basis of Defendant's Defenses**

Greg Yatooma ("Greg") and Chris are brothers. Chris owns several businesses, including MSY Capital Partners, LLC. Greg is a licensed attorney in Michigan. In or about 2016, Greg came to work for Chris at one of his companies as his general counsel. In or about 2017, Chris, Greg, and their other brother Jeff began working in the cannabis real estate business. Their relationship was very fluid and informal and no official business relationship was ever formed. Sometime in 2018, Chris and Greg agreed to separate from Jeff, while Chris and Greg continued to work together. Chris contributed all the capital to cover all investment and operating expenses while Greg provided legal services to the business venture. Greg received compensation from Chris for the services he provided to the business venture.

In August of 2022, Greg unceremoniously walked away from the business venture. Instead of working toward an amicable separation and transition of the business, Greg began making demands for millions of dollars in connection with the business venture. Greg made these demands despite never contributing a single dime toward the business venture and having been paid handsomely for his services. Greg further embarked on a campaign to disparage Chris to family/friends and interfere and undermine Chris's business and family relationships and force Chris to capitulate to his outrageous demands. Furthermore, Greg involved others to try to force Chris into meeting these demands.

As a result of Greg's actions, Chris agreed to meet with Greg and others in an attempt to reach an amicable resolution.  The parties met on multiple occasions and exchanged various proposed term sheets. At a meeting that occurred in December of 2022, Chris executed a term sheet to try to reach an amicable resolution with his brother and maintain family peace. The term sheet specifically provided and contemplated for the execution of a final signed agreement.

Accordingly, the parties continued with their negotiations, including exchanging various drafts of a final signed separation agreement. Greg ultimately withdrew from further negotiations and in bad faith filed this action.

**II.    <u>The legal theories on which Defendant's defenses are based.</u>**

Chris asserts the following defenses to Greg's claims:

1.    Greg's claims are estopped, released, and/or waived by his own conduct, including but not limited to his own bad faith, unclean hands, and/or fraud.

2.    Greg's claims are barred by the conduct of non-parties, including but not limited to the bad faith, unclean hands, and/or fraud of non-parties.

3.    Greg has failed to mitigate his damages.

4.    Greg has not suffered any damages directly or proximately caused by any actions taken by Chris.

5.    Greg's claims are barred by the requirements of member admission found in the Michigan limited liability company act, MCL 450.4101, *et seq*.

6.    Greg is a licensed Michigan attorney who undisputedly represented Chris and his businesses, including MSY. Greg's claims now that he is/was an owner of any of those companies, including MSY, cannot be enforced because Greg's actions did not adhere to Rule 1.8(a) of the Michigan Rules of Professional Conduct and the enforcement of any purported agreement between Chris and Greg—or, conversely, the actions of Greg to organize limited liability companies in his own name as member while advising his client that it was being done for his benefit—violate that Rule and cannot be enforced under Michigan law.

3

7.      Alternatively, any promise made by Chris to Greg of a purported membership interest in MSY and/or any other company was a gift that was not completed under Michigan law and lawfully was revoked.

8.      Greg's claims are barred by Michigan's version of the statute of frauds.

9.      To the extent the Court determines that the December 14th document was anything other than non-binding, it cannot be enforced because it was executed under duress due to Greg's fraudulent conduct and extortion of his brother to ruin Chris's business and personal lives as evidence by his actions and communications with Chris, family members, and third parties.

10.     The entities that Greg now claims that he purportedly transferred in reliance upon the December 14th document were fraudulently put into Greg's name based on false statements made by Greg (as his attorney) at the time of their formation that doing so was for Chris's benefit (as his client).

11.     To the extent the Court determines that the December 14th document was anything other than non-binding, it cannot be enforced because Greg committed the first substantial and material breach.

12.     To the extent the Court determines that the December 14th document was anything other than non-binding, it cannot be enforced because it fails by reason of indefiniteness.

13.     Greg's claims for promissory estoppel are barred by his failure to establish a definite and clear promise on the part of Chris.

**III.**      **Identity of Witnesses Likely to Have Discoverable Information**

- Greg Yatooma;

- Chris Yatooma;

- Chandler Yatooma;

4

4863-0873-6136_1

- Charles Locklear;

- Chris Barnett;

- Steve Romaya;

- Jamie Kjos;

- Robert Brandt;

- Martin Manna;

- Jeff Yatooma;

- Ryan Jundt;

- Kara Harbour;

- Ben Bayram;

- Morgan Benedict;

- Chris Moceri;

- Barton Morris;

- Dustin Walsh, Crain's Detroit Business;

- Tom Schuba, Chicago Sun Times;

- David Struett, Chicago Sun Times;

- Robert Snell, The Detroit News;

- Craig Mauger, The Detroit News Representatives, agents and employees of Rehmann Corporate Investigative Services;

- Representatives, agents, employees of Dykema Gossett;

- Representatives, agents, employees of the City of Auburn Hills;

- Representative, agents. and employees of Bloomfield Hills Swim & Tennis Club;

5

4863-0873-6136_1

- Any witnesses listed by Greg;

- All necessary expert witnesses to be named by Chris (not yet determined); and

- Any witnesses that become known through further discovery.

## IV.  Documents Within Defendant's Possession, Custody or Control

- All email and text message communications by and between Greg, Chris and others involving the subject matter of this litigation.

- All proposed separation agreements, documents, emails, and texts exchanged by and between Chris, Greg and/or their respective representatives.

- All documents and communications that evidence Greg's fraud, negligence, breach of fiduciary duties, conversion, tortious interference with Chris's business and contractual relationships, extortion and/or legal malpractice.

- All documents that evidence Greg's tortious interference with the Confidential Settlement Agreement and/or the MSY Settlement Proceeds.

- All documents that evidence all financial contributions made by Chris to the party's business venture.

- All documents that evidence the financial operations and/or condition relating to the party's business venture.

- All documents relating to Axon Properties, LLC's purchase of the property located at 452 Bellevue, Lake Orion, Michigan.

- All relevant trial and deposition testimony relating to the *MSY v. Liv Wellness* litigation matter.

## V.  A Computation of Each Category of Damages Claimed by The Disclosing Party.

Chris anticipates bringing a counter claim and third-party claims seeking to recover all damages relating to Greg's fraud, negligence, breach of fiduciary duties, conversion, tortious interference with business and contractual relationships, extortion, and/or legal malpractice.

## VI.  A Copy of Any Insurance, Indemnity, Or Suretyship Agreement Under Which

6

**Another Person May Be Liable to Satisfy All or Part of a Possible Judgment in the Action or to Indemnify or Reimburse for Payments Made to Satisfy the Judgment.**

Greg may have legal malpractice insurance for some of the claims alleged by Chris. Chris does not have insurance relevant to Greg's claims.

VII. **The Anticipated Subject Areas of Expert Testimony.**

Corporate Fraud and Attorney Ethics expert testimony.

Respectfully submitted,

BODMAN PLC

/s/ J. Adam Behrendt (P58607)
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
Attorneys for Defendant Christopher Yatooma

October 18, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2023, I electronically filed and served the foregoing pleadings using the ECF-filing system which will send notification of such filing and e-serve the document upon all attorneys of record.

/s/ J. Adam Behrendt (P58607)

7

4863-0873-6136_1

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA

      Plaintiff,                       Case No. 23- 200283-CB

v.                                  Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY CAPITAL PARTNERS, LLC,

      Defendants.

---

| | |
|---|---|
| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendant Christopher Yatooma* |
| T. Andrew Keating (P86261) | |
| *Attorneys for Plaintiff* | 1615 S. Telegraph Road |
| 27777 Franklin Road, Suite 2500 | Bloomfield Hills, MI 48302 |
| Southfield, MI 48034 | (248) 230-2820 |
| (248) 351-3000 | sieving@urbanlegalgroup.com |
| eholtz@taftlaw.com | |
| emayer@taftlaw.com | **BODMAN PLC** |
| akeating@taftlaw.com | J. Adam Behrendt (P58607) |
| | Michelle Kolkmeyer (P81355) |
| | *Co-Counsel for Defendant Chris Yatooma* |
| | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI 48084 |
| | (248) 743-6000 |
| | jbehrendt@bodmanlaw.com |

---

## STIPULATED ORDER EXTENDING TIME FOR PLAINTIFF TO FILE AMENDED COMPLAINT AND, IN TURN, FOR DEFENDANT TO FILE AN ANSWER/COUNTERCLAIM THERETO

At a session of said Court, held in the City of Pontiac,
County of Oakland, State of Michigan, on _____

PRESENT: HON. VICTORIA A. VALENTINE
Oakland County Business Court Judge

This matter having come before the Court on the stipulation of the Parties, as evidenced by

the signatures of their counsel below; on October 6, 2023, Defendant Christopher Yatooma

("Chris") filed an Answer to Plaintiff Gregory Yatooma's ("Greg") Complaint; Greg intends to file an Amended Complaint to assert additional claims against Greg and to-be-added defendants; Greg requested and Chris agreed to grant Greg a two-week extension to file an Amended Complaint; and Chris has indicated that he intends to file affirmative claims against Greg thereafter;

     **NOW, THEREFORE, IT IS HEREBY ORDERED** that Greg may file an Amended Complaint on or before November 3, 2023;

     **IT IS FURTHER ORDERED** that Chris may file an Answer, Counterclaim, and/or Third Party Complaint against Greg on or before November 24, 2023, or a time thereafter as agreed by the Parties or ordered by the Court.

     **THIS IS NOT A FINAL ORDER AND DOES NOT RESOLVE THE LAST PENDING CLAIM OR CLOSE THE CASE.**

**IT IS SO ORDERED.**

/s/ Victoria A. Valentine
October 23, 2023
_____
Hon. Victoria Valentine

lm

Approved, SCAO

| STATE OF MICHIGAN | REPORTER/RECORDER CERTIFICATE OF ORDERING TRANSCRIPT ON APPEAL | CASE NO. |
|---|---|---|
| 6th JUDICIAL DISTRICT / JUDICIAL CIRCUIT / COUNTY PROBATE | Appeal to: ☑ Court of Appeals ☐ Circuit | 23-200283-CB |

**Court address**
1200 N Telegraph Rd, Pontiac, MI 48341

**Court telephone no.**
248-858-5282

| Plaintiff's/Petitioner's name(s) and address(es) ☐ Appellant ☑ Appellee | | Defendant's/Respondent's name(s) and address(es) ☑ Appellant ☐ Appellee |
|---|---|---|
| Gregory Yatooma | v | Christopher Yatooma |

| Plaintiff's attorney, bar no., address, and telephone no. | Defendant's attorney, bar no., address, and telephone no. |
|---|---|
| Ethan R. Holtz (P71884) 27777 Franklin Road, Suite 2500 Southfield, MI 48034 (248) 351-3000 | J. Adam Behrendt (P58607) 201 W. Big Beaver, Suite 500 Troy, MI 48084 (248) 743-6000 |

☐ Probate   In the matter of _____

This certificate must be filed by the appellant or the reporter/recorder within 7 days after the transcript is ordered on appeals to the Court of Appeals. This certificate must be filed by the appellant within 7 days after the transcript is ordered on appeals to the circuit court.

I am a certified court reporter/recorder for the court designated above and I certify that:

1. On __10-6-2023__ ☐ a portion of the ☑ the complete transcript of proceedings, taken in this case
   Date

   before Hon. __Victoria A. Valentine__ _____ on __9-15-2023__
   Bar no.   Date(s)

   _____ , was ordered by
   Date(s)

   ☑ a. __Fawzeih H. Daher__ , attorney for __Christopher Yatooma__ .
       Attorney name (type or print)                    Name (type or print)

   ☐ b. the appellant, _____ .
                         Name (type or print)

   ☐ c. the appellee, _____ .
                        Name (type or print)

   ☐ d. the court.

2. Payment has been secured and the transcript will be furnished by me on or about _____ .
                                                                                    Estimated date of completion
   Estimated number of pages is _____ .

☑ 3. The transcript has been filed with the court and furnished as requested. Date filed: __9-20-2023__

☐ 4. There is no record to be transcribed.

| __10-24-23__ | __CSR-015__ |
|---|---|
| Date | Certification designation and number |
| | __104 Oakland Street__ |
| Reporter/Recorder signature | Business address |
| /s/ Naomi D. Leach | Holly, MI 48442    248-634-3369 |
| Name (type or print) | City, state, zip    Telephone no. |

List names, certification designations and numbers, and dates of each proceeding of each reporter or recorder who reported or recorded or transcribed any part of the proceedings:

**MC 501** (6/17)   **REPORTER/RECORDER CERTIFICATE OF ORDERING TRANSCRIPT ON APPEAL**
MCR 7.109(B)(3)(a),
MCR 7.210(B)(3)(a)

FILED    Received for Filing    Oakland County Clerk    10/25/2023 3:25 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

    Plaintiff,

Case No. 23- 200283-CB

v.

Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA, an individual,

    Defendant.

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

## NOTICE OF HEARING

PLEASE TAKE NOTICE that *Plaintiff's Motion for Appointment of Receiver Over Candid, Inc.* will be brought on for hearing before the Honorable Victoria A. Valentine at the Oakland County Circuit Court on **Wednesday, November 1, 2023 at 8:30 a.m.** and will be held via Zoom.

You are scheduled to join a virtual courtroom proceeding before the Honorable Victoria A. Valentine in Oakland County 6th Circuit Court. Please visit the link below on the Monday afternoon prior to the hearing date to see the scheduled time of your proceedings:

https://docs.google.com/spreadsheets/d/1E9FzqhczMJGsJXQjJ1cDZk1yglKJ2TkYkZWdNgK3u Tc/edit?usp=sharing

Zoom Instructions: To join the Virtual Hearing by computer with video, go to the Zoom Web Site (zoom.us) and click on "Join a Call." When prompted, you will join using Meeting ID 248 858 5282. To join the Virtual Meeting by telephone without video, call 1-646-876-9923 and connect using Meeting ID 248 858 5282.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: October 25, 2023          By:     /s/ Ethan R. Holtz
                                         Ethan R. Holtz (P71884)
                                         Emily M. Mayer (P78956)
                                         T. Andrew Keating (P86261)
                                         *Attorneys for Plaintiff*

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

    Plaintiff,

v.

CHRISTOPHER YATOOMA, an individual,

    Defendant.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

## MOTION FOR APPOINTMENT OF RECEIVER OVER CANDID, INC.

Plaintiff Gregory Yatooma ("Greg"), an individual, by his undersigned counsel, for his Motion for Appointment Over Candid, Inc. (the "Motion") states as follows:

1. The parties to this action are Greg and his brother, Defendant Christopher Yatooma ("Chris").

2. Prior to December 2022, Greg and Chris were the 50/50 owners of several successful cannabis entities and other businesses.

3. Among those entities is Candid, Inc., a cannabis grow operation of which Greg is

129653291v1     FEE

the sole record owner, as reported to the CRA, reported to LARA, and reflected in Candid's Bylaws.

4.     Greg is prequalified with the CRA and, as the sole record owner of Candid, Greg, through Candid, holds Candid's five Class C Adult Use licenses and Medical license issued by the CRA.

5.     On December 14, 2022, Greg and Chris signed an agreement memorializing the terms pursuant to which Chris agreed to buy Greg out of several of their joint entities.

6.     Pursuant to that agreement, Greg executed several documents assigning his interests in the entities to Chris or his designees.

7.     Among those documents was an application to the Cannabis Regulatory Authority ("CRA") to transfer ownership of Candid, Inc. from Greg to Josh Smith, one of Chris's employees and his designee.

8.     After Greg assigned the majority of the entities, Chris breached the Buyout Agreement and has now claimed for the first time in his Answer filed on October 6, 2023 that Greg and Chris were never partners in any businesses, despite many of the businesses being in Greg's name, and that Chris only signed the Buyout Agreement because he was under "duress."

9.     Chris has since gone to great lengths to take control of 100% of the entities and their assets, leaving Greg with nothing.

10.    However, at the time Chris filed his Answer, the CRA had not yet approved the Candid transfer.

11.    Accordingly, Greg withdrew the transfer application from the CRA in order to preserve his interest in Candid.

12.    Greg files this Motion for the purpose of preserving Candid during the pendency of

this litigation. Greg requests that the Court appoint Charles D. Bullock, Esq. of Stephenson & Bullock, PLLC, who has extensive experience serving as a receiver for cannabis entities, to serve as receiver of Candid.

13.     There is a serious risk of immediate and irreparable harm to Greg if a receiver is not appointed. It is undisputed that Greg is the sole record owner of Candid and that the only reason he submitted the Candid Application and assigned his interests in other Sold Assets was because Chris agreed to purchase Greg's interests in the Sold Assets as memorialized in the Buyout Agreement.

14.     With the filing of his Answer, Chris has disavowed the Buyout Agreement, disavowed his six year partnership with Greg, refused to pay Greg the consideration due under the Buyout Agreement, and is attempting to take complete control of the Sold Assets, while leaving Greg with nothing.

15.     If the transfer of Candid from Greg to Josh Smith had been effectuated, Greg would have lost ownership of yet another valuable asset, thereby handing Chris even more leverage in this lawsuit. Chris would have had unfettered control over Candid, could have used its considerable revenue for his own purposes, and could even have sold Candid and absconded with the revenue, as he has done with several other assets in which Greg had or has a 50% interest.

16.     Pursuant to the Cannabis Acts, 2016 PA 281, MCL 333.27101, *et seq.*, (MMFLA), and /or the Michigan Regulation and Taxation of Marihuana Act 2018 IL 1, MCL 333.27951, *et seq.*, (MRTMA), and their Joint Administrative Rules Cannabis Acts which govern the Michigan licensed cannabis industry ("Cannabis Laws"), any individual who holds a control or managerial position with a licensed entity must be prequalified. This expressly includes Managers of limited liability companies, and Directors and Officers of Corporations *See* MCL 333.27101, et. seq. *Id.*

at ¶¶ 74-75.

17. Chris is not prequalified with the CRA.

18. Pursuant to Rule 14 of the Joint Administrative Rules Eff March 9, 2022, and their predecessor Rules, licensees are required to not only report material changes to the Cannabis Regulatory Agency, including "(a) Change in owners, officers, members, or managers," but to secure preapproval for any change to ownership or management of the licensed company. *Id.* at ¶ 76.

19. Accordingly, now that there is no pending transfer, other than a Court appointed Receiver, Greg is the only person who can lawfully operate and manage Candid..

20. Candid is a cannabis grow operation with a Fall harvest. Candid's seasonal harvest and corresponding sales are underway and will continue for the next several weeks.

21. Candid is expected to generate $8-12 million in revenue this year.

22. As Candid is a regulated entity and Chris is not prequalified with the CRA, Chris is not authorized by law to operate Candid without Greg.

23. As evidenced by the existence and history of this lawsuit, Greg and Chris are unable to jointly operate Candid.

24. Because it is Greg's position and belief that the Buyout Agreement is binding on the parties, Greg does not desire to operate Candid or retain Candid's proceeds for himself, without a Court order permitting him to do so.

25. However, even with such an order, Greg believes Chris would interfere with Candid's operations.

26. Thus, a receiver is urgently and immediately needed to operate Candid's business, comply with the Medical Marihuana Facilities Licensing Act, prevent transfer of Candid's

ownership, and prevent waste of the very valuable asset.

27. This situation is of exactly the type for which the law mandates a receiver is appropriate. A receiver is necessary and appropriate relief to protect, preserve, and operate the business in a correct and conflict free manner.

WHEREFORE, for the reasons described in the accompanying Brief in Support, Greg respectfully requests that the Court grant his Motion, appoint a receiver to preserve and protect Candid during the pendency of this litigation, enter the order attached hereto as **Exhibit 1**, and grant Greg such other and further relief as the Court deems just and proper.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: October 25, 2023          By:   /s/ Ethan R. Holtz
                                        Ethan R. Holtz (P71884)
                                        Emily M. Mayer (P78956)
                                        *Attorneys for Plaintiff*

## BRIEF IN SUPPORT MOTION FOR APPOINTMENT OF RECEIVER OVER CANDID, INC.

## STATEMENT OF RELEVANT FACTS

### I.      History of the Parties' Business Relationship

Greg and Chris are brothers. In 2016, Greg, Chris, and their brother Jeffrey Yatooma ("Jeff") started working together in many business ventures they owned and/or operated together as partners/members (the "Joint Entities"). At the time of formation of the Joint Entities, it was agreed and understood that Greg, Chris, and Jeff were each 1/3 owners in the Joint Entities. **Exhibit 2, Selections from Chris's Deposition Testimony, 41:19-42:12, 45:8-22.**

At the end of 2018, Jeff separated from Greg, and Chris. After nearly a year of negotiations, on November 13, 2019, Greg, Chris, and Jeff executed a formal agreement pursuant to which Greg and Chris purchased Jeff's 1/3 interests in their Joint Entities. **Exhibit 3, Good Guy Agreement**; **Exhibit 2, Selections from Chris's Deposition Testimony, 49:25-50:5.** After Greg and Chris bought Jeff out of the Joint Entities, Greg and Chris owned the Joint Entities 50/50. *Id.*

On July 10, 2020, Greg and Chris formed Standard Wellness, Inc. **Exhibit 4**. On April 19, 2021, Greg amended Standard Wellness's name to Candid, Inc, which also operates under the name Grip. **Exhibit 5**. Though it was understood at all times that Candid was an asset of Greg's and Chris's partnership, Greg was always the sole record owner of Candid. **Exhibit 6, Candid Bylaws**. As reported to LARA, Greg was the President, Treasurer, Secretary, and Director of Candid. **Exhibit 7**.

Greg is prequalified with the CRA. Greg is the sole record owner of Candid.[1] **Exhibit 8, CRA Licensing Report, at 12-13.** Greg, through Candid, holds Candid's five Class C Adult Use

---

[1] Greg and his wife, Chandler, are the Supplemental Applicants – or owners – with the CRA. The CRA requires an owner of a licensed entity to identify his or her spouse.

licenses and Medical license issued by the CRA. Those licenses were issued in the summer of 2023, and are good for one year. *Id*.

Candid is a cannabis cultivation company that owns and operates an outdoor cannabis farm located at 50680 28th Ave Arlington, Michigan 49013. Candid cultivates 11,500 cannabis plants on its 20 acres and within its 10,000 square foot building.

Candid's harvest and sale of product begin in the Fall. Candid will continue to sell product and collect revenue for the next several months. Candid's revenue is expected to range from $8-$12 million, with net profits expected to be roughly 50% of the revenue, or $4-$6 million, which will depend on the operations and sale of the product.

## II.     Greg and Chris Decide to Part Ways and Agree to the Terms of their Separation

In 2022, there was a significant breakdown in Greg's and Chris's relationship. With the help of several mediators, in Fall 2022, Greg and Chris began negotiating a buyout of Greg's ownership and interest in the Joint Entities. Over several months and several meetings, on December 14, 2022, Greg and Chris reached a written and binding agreement (the "Buyout Agreement"), signed by both parties and three witnesses, which contained the material terms of the buyout. **Exhibit 9, Buyout Agreement**.

Pursuant to the Buyout Agreement, Greg agreed to assign his interests in several of the Joint Entities to Chris in exchange for payment of $18.3 million, on the following schedule: (a) $500,000.00 by December 16, 2022; (b) $1,200,000.00 no later than December 22, 2022; and (c) $220,000.00 per month beginning May 1, 2023. *Id*. All payments were "unconditional." *Id*. Pursuant to the Buyout Agreement, Greg retained the following:

- ☐ Ability to collect on invoices due from brother Jeff;
- ☐ Full ownership of Bloomfield Hills Swim and Tennis;
- ☐ 100% of the Connecticut deal with Jeff;

7

☐   100% of the New Jersey deal with Jeff;[2]

☐   A residence in Lake Orion, Michigan; and

☐   Interest in MSY and 50% of the MSY Litigation Proceeds.[3] *Id*.

The Joint Entities, with the exception of the above-identified assets Greg retained, are hereinafter referred to as the "Sold Assets."

In addition to Greg and Chris, three witnesses signed the Buyout Agreement.[4] Each of the three witnesses will testify that the Buyout Agreement was intended to be binding and enforceable and was the culmination of months of negotiations between Greg and Chris. Steve Romaya, Greg's and Chris's cousin and one of the witnesses, attested: "It was always my understanding, the understanding of everyone else present and everyone who signed/witnessed that Partnership Buyout Agreement that the Partnership Buyout Agreement was a final and binding agreement on both Greg and Chris and contained all the terms upon which Greg agreed to sell his business interests to Chris." **Exhibit 10, Romaya Affidavit, at ¶6.**

The three witnesses will also testify that although the Buyout Agreement numbers were not the initial numbers proposed by either Greg or Chris, the material deal points remained virtually the same throughout the negotiations. **Exhibit 11, October Email from Chris**. Chris initially complied with the Buyout Agreement, making the required $500,000.00 payment to Greg by December 16, 2022. **Exhibit 12, Wire with Memo Line**.

---

[2] The "Connecticut deal" and "NJ deal" refer to agreements between Greg and Chris, on the one hand, and Jeff, on the other hand, pursuant to which Greg and Chris consulted for and provided information to Jeff in return for equity in certain of Jeff's investments. *See, e.g.*, **Exhibit 13, Hydra Agreement**
[3] The Court is well-versed in the facts and history regarding the MSY Litigation Proceeds.
[4] Pastor Jaime Kjos was physically present at the meeting for the first several hours and then was present telephonically for the last 2 hours of the 11-hour meeting. Pastor Jaime asked that his name be signed to the Buyout Agreement as a witness to the agreement between Chris and Greg.

Chris further confirmed the binding nature of the Buyout Agreement when he included reference to the "December 14 Agreement" in the entire agreement provision of a subsequent agreement. **Exhibit 14, License Agreement signed on March 17, 2023, ¶9**.

**III.    Greg Signs Documents Transferring Ownership of the Sold Assets, Including Candid**

Chris and Greg worked with attorneys to transfer ownership of the Sold Assets from Chris to Greg. Chris directed attorney Heather Cude to prepare documents to transfer ownership of certain entities regulated by the CRA, including Candid, in furtherance of the Buyout Agreement. Because Chris was not prequalified with the CRA, Chris directed Cude to prepare the documents to transfer ownership of Candid to Josh Smith, one of Chris's employees who is prequalified with the CRA.

To that end, on or about January 27, 2023, Cude submitted an Amendment Application to the CRA which sought approval of a "Change of Ownership (Adding/Removing/Change of Equity)" for "Gregory Yatooma, sole shareholder of Candid, Inc., is transferring 100% of Candid, Inc.'s stock to Joshua Smith, a prequalified individual" (the "Candid Application"). **Exhibit 15**. As part of the Candid Application, Greg signed and submitted an Amendment Verification & Affidavit of Full Disclosure Attestation pursuant to which he confirmed his understanding that "…this requested amendment is a proposed change and cannot be executed prior to receiving approval from the Agency." *Id*.

On or about February 24, 2023, Greg signed and submitted a "Shareholder Resolution Conditionally Approving Transfer of Shares" of Candid. **Exhibit 16**. The resolution states, in relevant part "FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares." *Id*.

129653291v1

Because Candid was in the process of reviewing its METRC entries with the CRA at the time Candid submitted the Candid Application, the CRA's processing and approval of the Candid Application was delayed.

## IV. Chris Breaches the Buyout Agreement

Greg has fully complied with the Buyout Agreement by signing all requested documents to transfer his interests in the Sold Assets to Chris or Chris's designees, and otherwise. The only remaining obligations pursuant to the Buyout Agreement are Chris's financial obligations to Greg identified in Sections 1.1 (with the exception of the $500,000 payment), 1.2, 1.8, and Chris's refusal to split the MSY Litigation Proceeds identified in Section 17.

As soon as Greg signed the documents to transfer his interests in the Sold Assets and removed himself from the bank accounts, Chris reneged on and breached the Buyout Agreement, by, among other things, refusing to make the $1.2 million payment due December 22, 2022 and attempting to take 100% of MSY Litigation Proceeds for himself. Chris has also refused to make the $220k monthly payments which were to commence on May 1, 2023.

On May 10, 2023, Greg filed this lawsuit in which he asserts claims against Chris for breach of the Buyout Agreement, among other things.

On October 6, 2023, Chris filed an Answer to Greg's Complaint in which he asserts for the first time that Greg was never Chris's partner, Greg merely acted as the Joint Entities' attorney, and that "Greg wrongfully put [the Joint Entities] into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris." Chris further asserts for the first time that he only signed the Buyout Agreement because he was under "duress." **Exhibit 17**. These and other assertions in Chris's Answer are false. **Exhibit 18, Molloy Affidavit**.

Meanwhile, due to the CRA's review of Candid's METRC entries, the CRA has not yet approved Candid's transfer from Greg to Josh Smith. Accordingly, Greg remains the record owner of Candid.

Despite that Greg is the only record owner of Candid, on September 25, 2023, Candid, likely at Chris's behest, commenced a lawsuit against a Candid customer without Greg's knowledge or consent. **Exhibit 19, Candid Lawsuit**.

In light of Chris's position in this lawsuit that Greg was never his partner (despite all evidence to the contrary), Chris only signed the Buyout Agreement because he was under 'duress" (despite all evidence to the contrary), and in light of the fact that Chris has already sold certain assets previously owned by the Joint Entities and has retained one hundred percent (100%) of the proceeds from such sales, on October 19, 2023, Greg submitted a Request to Withdraw the Candid Application from the CRA. **Exhibit 20**. Greg did so in order to stop the transfer of Candid to Chris/Josh Smith and to prevent Chris from effectively stealing every one of the Sold Assets from Greg.

On Monday, October 23, Greg received notification from the CRA that the amendment application to transfer ownership to Smith had been withdrawn. **Exhibit 20.** Now that Candid sits in limbo – owned by Greg, controlled by Chris, and subject to an ownership dispute between Greg and Chris – Greg now seeks immediate appointment of a receiver to operate Candid during the pendency of this lawsuit, which includes selling Candid's product and collecting Candid's revenue. Due to the nature of Candid's complicated business and fragile and perishable products, the receiver must be someone who has experience in cannabis operations, with the CRA, and with METRC (the CRA data tracking software).

## ARGUMENT

### I.     The Court has Statutory and Common Law Authority to Appoint a Receiver

129653291v1

This Court has the statutory authority to appoint a receiver. Pursuant to the Revised Judicature Act, circuit courts are granted the power to appoint receivers:

> Circuit court judges in the exercise of their equitable powers, may appoint receivers in all cases pending where appointment is allowed by law. This authority may be exercised in vacation, in chambers, and during sessions of the court. In all cases in which a receiver is appointed the court shall provide for bond and shall define the receiver's power and duties where they are not otherwise spelled out by law. [MCL 600.2926.]

As the statute expressly states and the Michigan Supreme Court has recognized, there are cases where the trial court may appoint a receiver in the absence of a statute pursuant to its inherent equitable authority. *Petitpren v Taylor School District,* 104 Mich App 283, 293 (1981) (citing *Michigan Minerals, Inc v Williams,* 306 Mich 515, 525-27 (1943)). Moreover, Michigan's Business Corporations Act provides the Court with the power to order "[t]he direction or prohibition of an act of the corporation or of shareholders, directors, officers, or other persons party to the action." MCL 450.1489(1)(d).

In addition, the Michigan Receivership Act, MCL 554.1101 *et seq*, authorizes a court to appoint a receiver "Before judgment, to protect a party that demonstrates an apparent right, title, or interest in property that is the subject of the action" if "The property or its revenue-producing potential is being subjected to or is in danger of waste, loss, dissipation, or impairment" or "on equitable grounds." MCL 554.1016(1)(a), (c). When a receiver is appointed, it stays possession of or exercise control over the receivership property. MCL 554.1024(1)(a).

Indeed, the primary purpose of a receiver is to preserve property. *Band v Livonia Associates,* 176 Mich App 95 (1989); *see also Ypsilanti Fire Marshal v Kircher,* 273 Mich App 496, 528 (2007) ("a court-appointed receiver is a ministerial officer of the court, charged with the task of preserving property and assets during ongoing litigation"). Thus, a receiver may be appointed where necessary to prevent fraud or to protect property against imminent danger of loss.

12

*Weathervane Window, Inc v White Lake Construction Co,* 192 Mich App 316, 322 (1991) (citing 65 Am Jur 2d, Receivers§ 27, p 879). Where there is a risk of "serious, immediate and irreparable harm," the appointment of a receiver is appropriate. *Band, supra,* at 105-06.

Although courts have held that the appointment of a receiver is a harsh remedy, the ability to obtain an order compelling receivership is within the inherent equitable powers of the circuit court, *Livingston v Southern Surety Co,* 262 Mich 438, 441 (1933), and rests squarely within the court's discretion. *Id.* The United States District Court for the Eastern District of Michigan has articulated the following factors to balance when considering appointment of a receiver:

> Factors typically influencing the district court's exercise of discretion include the existence of a valid claim by the moving party; the probability that fraudulent conduct has occurred or will occur to frustrate the claim; imminent danger that property will be lost, concealed, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and the likelihood that appointment of a receiver will do more harm than good.

*Meyer Jeweby Co v Meyer Holdings,* 906 F Supp 426, 432 (ED Mich 1995). Furthermore, the Court can issue an order appointing a receiver without an evidentiary hearing where, as here, the "important facts are uncontroverted." *Band, supra,* at 106. Where there is a risk of "serious, immediate and irreparable harm," the appointment of a receiver is appropriate. *Band, supra,* at 105-06.

Moreover, the appointment of a receiver during pending litigation benefits all of the parties: A receiver is not appointed as the agent of, or for the benefit of, one party or the other; rather he or she is appointed to protect and benefit both parties equally. Thus, as an officer of the court, a receiver should remain unbiased and impartial. *Ypsilanti Fire Marshal, supra,* at 503 (citing *First Nat 'l Bank v E T Barnum Wire & Iron Works,* 60 Mich 487, 499 (1886)).

## II.     Appointment of a Receiver is Necessary to Preserve Candid and its Ability to Operate and Retain its CRA Licenses

The primary purpose of a receiver is to preserve property. *Band, supra,* at 104. Thus, a

receiver may be appointed where necessary to protect property against imminent danger of loss. *Weathervane Window, supra*. Where there is a risk of "serious, immediate and irreparable harm," the appointment of a receiver is appropriate. *Band, supra,* at 105-06.

Here, there is a serious risk of immediate and irreparable harm to Greg and Candid's viability. Specifically, Chris, who is not prequalified with the CRA, is currently operating Candid in violation of the Cannabis Laws and has excluded Greg from Candid's operations.

In addition, it is undisputed that Greg is the sole record owner of Candid and that the only reason Greg submitted the Candid Application and assigned his interests in other Sold Assets was because Chris agreed to purchase Greg's interests in the Sold Assets. Chris has now disavowed the Buyout Agreement, disavowed their six-year partnership, refused to pay Greg the consideration due under the Buyout Agreement, and is attempting to take complete control of the Sold Assets, while leaving Greg with nothing. If the transfer of Candid from Greg to Josh Smith had been effectuated, Greg would have lost ownership of yet another valuable asset, thereby handing Chris even more leverage in this lawsuit.

Furthermore, the proceedings in this lawsuit to date leave no doubt that Greg and Chris are unable to jointly operate Candid and, because Chris is not prequalified with the CRA, Chris cannot legally operate Candid without Greg's involvement and oversight. Historically, Greg has operated Candid with Joe Gordhamer, Chris's employee, and Adam Dyson, who is no longer employed by any Yatooma entity. However, Greg has no desire to operate Candid or to collect its revenue without a Court order permitting him to do so.

Candid will require considerable oversight in the coming weeks. Candid is an outdoor farm whose harvest and sales occur in the Fall. *See, e.g.,* **Exhibit 21, Active Advertisement for Candid Product**. Candid will continue to sell product and collect revenue for the next several

129653291v1

months. Candid's revenue is expected to range from $8-12 million its net profit is expected to be roughly 50% of the revenue, or $4-$6 million. Accordingly, pursuant to the Michigan Receivership Act, and otherwise, the Court should appoint a receiver to operate and control all of Candid's assets in order to protect both Greg's and Chris's interests in Candid and its revenue. Absent a receiver, there is a significant risk that Candid and/or its assets will be lost or dissipated prior to conclusion of this litigation.

## III. The Court Should Appoint Charles D. Bullock, Esq. of Stephenson & Bullock, PLLC as Receiver

Mr. Bullock has extensive experience as a receiver. As reflected in Mr. Bullock's biography, attached hereto as **Exhibit 22**, Mr. Bullock has practiced law for more than 25 years, served as a fiduciary in various capacities, and recently served as court-appointed receiver or neutral in the following cannabis-related matters:

- ☐ **Holistic Health Wayne, Inc.** – Served as court-appointed Receiver over business following a shareholder dispute among its shareholders and silent partners. This was one of the first cannabis-related Receiverships in the State of Michigan. Required specific attention to regulatory, tax, and unique industry contractual terms and conditions. Conducted a court-approved auction of the business (stock sale) resulting in a sale price of $7.5M. Additionally, as Receiver, oversaw operations of the business, including gross receipts of approximately $4M during the receivership. Completed a complex claims reconciliation process. All allowed creditors were paid in full with excess proceeds distributed to equity.

- ☐ **Basrah Custom Design, Inc.** – Serves as court-appointed Receiver over the sale of Green- Zoned real property located in Detroit, Michigan. Conducting a court-approved complex claims reconciliation process for competing claims against sale proceeds from numerous interested parties. Anticipated distributions will be in excess of $1M.

- ☐ **6030 E Mile, LLC, et al. v. AEY Capital, LLC, et al.** – Served as Court-appointed Mediator and Discovery Master in complex litigation brought before the Macomb County Circuit Court across multiple cases. Complex litigation involved alleged shareholder disputes among numerous parties regarding operations of integrated marijuana retail businesses and real estate holdings associated thereto. Determined all discovery disputes among the parties. Litigation successfully resolved via Court-approved mediation process.

☐ **Port Huron Litigation** – Serves and Court-appointed mediator for major litigation involving all of the marijuana licensing in Port Huron, Michigan.

☐ **Veritas Holdings, LLC** – Served as court-appointed mediator and escrow agent relating to grow facility and Green-Zoned real property located in Wayne County, Michigan. Oversaw implementation of complex transaction among parties including sale of real property and transition of operations.

☐ **The Canopy Affairs Group, LLC v. Spartan Partners Services, LLC, et al.** – Served as Court-appointed Mediator and Discovery Master in complex litigation brought before the Wayne County Business Court. Fiduciary obligations included review and analysis of financial data for multiple retail marijuana locations across the State of Michigan with reporting to the Court in the form of recommendations. Also determined all discovery disputes among the parties.

Mr. Bullock is eminently qualified and the Court should appoint Mr. Bullock as receiver for Candid.

## CONCLUSION

WHEREFORE, for the reasons described in the accompanying Brief in Support, Greg respectfully requests that the Court grant his Motion, appoint a Receiver to preserve and protect Candid during the pendency of this litigation at the expense of Candid, enter the order attached hereto as **Exhibit 1**, and grant Greg such other and further relief as the Court deems just and proper.

<div align="center">Respectfully submitted,</div>

<div align="center">**TAFT STETTINIUS & HOLLISTER LLP**</div>

Dated: October 25, 2023          By:    /s/ Ethan R. Holtz
                                        Ethan R. Holtz (P71884)
                                        Emily M. Mayer (P78956)
                                        T. Andrew Keating (P86261)
                                        *Attorneys for Plaintiff*

<div align="center">16</div>

# Exhibit 1

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA, an individual,

      Plaintiff,

v.

CHRISTOPHER YATOOMA, an individual,

      Defendant.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

## ORDER APPOINTING RECEIVER
## AND DEFINING SCOPE OF RECEIVER'S DUTIES

At a session of said Court held in the City of
Pontiac, County of Oakland, State of Michigan

on _____

PRESENT: _____
CIRCUIT COURT JUDGE

    This matter, having come before the Court upon the Plaintiff's Motion for Appointment of

Receiver Over Candid, Inc., the Court having held a hearing and heard argument from Plaintiff's

counsel and Defendants' counsel, and the Court being fully advised of the relief sought;

4859-5239-2266

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      The Court hereby appoints Charles D. Bullock, Esq. as the receiver for Candid, Inc. (the "Receiver").

2.      Effective upon the filing of an acceptance of appointment ("Acceptance"), the Receiver is appointed for and with full and complete powers over all of the real property assets and all of the tangible and intangible personal property assets of the "Companies, including but not limited to, (A) all currently owned or after acquired inventory, equipment, farm products, government payments, investment property, and general intangibles and all accessions additions, replacements, substitutions and proceeds relating thereto (the "Personal Property"); (B) all lease interests in real property; and (C) all cannabis licenses, business licenses, and other licenses and/or permits necessary or incidental to operation of Candid (collectively, the "Receivership Property"): and, the Receiver is hereby ordered and directed to take immediate possession, custody and control of the Receivership Property until further order of this Court. The appointment of the Receiver establishes a receivership (the "Receivership") to operate the business of the Receivership Property and/or Candid for the purposes of protecting the interests of all litigants in the above-captioned action. The Receiver shall have complete and total authority over the Receivership Property. The Receivership shall continue until further order of this Court.

3.      Notwithstanding the broad powers granted to the Receiver over the Receivership Property and Candid in Paragraph 2, the Receiver shall appoint someone of his choosing to commence the day-to-day operations of Candid, who will report directly to the Receiver. The Receiver shall have all appropriate oversight and authority over such person in his operation of Candid, as if the Receiver were Candid's President, including, but not limited to, the ability to hire and fire employees upon determinations made by him as warranted by the circumstances.

4859-5239-2266

4.      Absent prior approval of this Court or as expressly permitted in this Order, no creditor of Candid or other person or entity, shall seek, create or perfect a security interest, lien, claim, right, pledge, option or other encumbrance in, to or against the Receivership Property or levy or execute upon the Receivership Property.

5.      All tenants, bailees or other persons or entities in possession of the Receivership Property or any portion thereof including Plaintiff, Defendant, and all employees of Candid, are hereby:

a.  ordered and directed to attorn to the Receiver; and

b.  ordered and directed to tender the License to the Receiver or its duly authorized agents and representatives,

c.  Cash flow from operations shall be delivered to, or into an account as directed by, the Receiver or its duly authorized agents and representatives.

6.      The Receiver is hereby granted all powers and authority conferred by statutes and case law, to control, operate, sell, encumber, take possession of, Candid and/or Receivership Property for the purpose of satisfaction of the provisions of the Orders of this Court and that the receiver shall comply with all applicable Michigan Court Rules and law, as amended.

7.      The Receiver is hereby granted all powers and authority to engage qualified professional to complete a full and complete accounting of Candid from inception through the duration of the Receivership.

8.      In addition to the other powers of the Receiver provided in this Order and listed below, the Receiver is hereby empowered to take all such actions and exercise all such discretion and authority as may be necessary or desirable in connection with the ongoing operation, maintenance, management, protection and preservation of the Receivership Property and is hereby vested and charged with all of the usual powers and duties of a receiver available under the laws of the State of

3

Michigan, including, but not limited to, those contained in MCLA §§600.2926, including, but not limited to:

a. To take possession, custody and control of the Receivership Property, including, but not limited to all cash proceeds from operations for the purpose of managing, maintaining, preserving, protecting and preventing waste and selling the Receivership Property;

b. Take and maintain possession, custody and control of all documents, books, records, accounts, papers and electronic information relating to the Receivership Property;

c. Operate the business of Candid as a going concern in the ordinary course, including directing the activities of all employees, managers, contractors and other personnel of Candid, including hiring, setting compensation for and discharging such persons (except as limited by paragraphs 3 and 4 above);

d. To employ accountants to conduct a complete accounting of Candid.

e. Collect and receive all earnings, revenues, issues, profits, income and cash proceeds from operations derived from the Receivership Property ("Income"), to use the Income for the ongoing operation of Candid and to endorse checks pertaining to said income either in Candid's name;

f. Make all necessary or proper repairs, renewals, replacements, alterations, additions, betterments and improvements to and on the Receivership Property and comply with any lease agreement for the Receivership Property;

g. Open, maintain and utilize one or more bank accounts in the name of the Receiver or Candid, including, but not limited to, opening and managing such supplemental and/or additional accounts solely in the name of the Receiver as the Receiver finds necessary to effectuate the orderly management of all income of Candid under the Receiver's management and generally for carrying out the Receivership including the continuing operation of Candid;

h. Exclude, as and when appropriate, Candid and its directors, officers, shareholders, employees, agents and representatives from access to the Receivership Property;

i. Sue for any unpaid accounts, receivables, contract payments, rents, profits, payments, income or proceeds in the name of Candid;

j. Institute, prosecute, defend, compromise and/or intervene in or become a party to such actions or proceedings in state or federal courts necessary for the protection, maintenance and preservation of the Receivership Property and to carry out the terms of this Order;

4

k. Enter into and modify, or reject, such contracts, and other arrangements, whether for the Personal Property or the Real Property, including contracts with providers of equipment, supplies and services to Candid and negotiations with creditors and suppliers to Candid with respect to all things relating to Candid's Business, including, without limitation, the terms and conditions of ongoing contractual relationships and the terms and timing of payments to creditors and suppliers, as dictated by the circumstances, all under such terms and conditions as the Receiver, in its discretion, may deem appropriate or desirable;

l. To maintain a separate account with a Bank in the Receiver's own name, as Receiver, from which the Receiver shall disburse all authorized payments as provided in this Order or any other orders entered by this Court;

m. To change any and all locks to the Real Property and, if appropriate, limit access to some or all of the Receivership Property, but in all cases subject to the rights of owners/landlords of the Real Property;

n. To deal with appropriate Federal, state and local governmental authorities on behalf of Candid's Business;

o. To bring the assets of Candid's Business into compliance with all applicable laws and regulations, provided, however, that the payment of governmentally imposed fines, fees and/or taxes shall be the subject of good faith negotiations and will require approval of the Court prior to payment;

p. To pay and enter into agreements for the payment of and/or otherwise with respect to taxes imposed on Candid's Business and/or the Receivership Property as funds are available and as they come due, and to challenge the validity, enforcement and amount of same, including any assessment or claim of taxes due by any Defendant or third party;

q. Take all such further actions and enter into all such other agreements as the Receiver, in its professional discretion, deems appropriate or desirable to maintain, preserve, protect and maximize the value of the Receivership Property.

r. Seek a stay of any action which contravenes any provision in or the spirit of this Order.

The authority granted to the Receiver in this Order is self-executing. The Receiver is authorized to act on behalf of Candid's Business in the Receiver's name and/or in the name of Candid's and/or Candid's Business, as the Receiver deems appropriate, without further order of this Court unless otherwise provided.

4859-5239-2266

9.      The Receiver shall not be responsible to report to any taxing authority any income generated from or by the Receivership Property or to prepare or file any tax returns of or on behalf of Candid or any of its Affiliates from the date of its Acceptance until the date of its withdrawal or the termination of the Receivership.

10.      The Plaintiffs and Defendant and all others that receive notice of this Order shall cooperate with the Receiver in the turnover and transition of the management of the Receivership Property to the Receiver and are hereby enjoined and restrained from impeding or interfering in any manner with the exercise or enforcement by the Receiver of its rights, powers and duties hereunder with regard to the Receivership Property. As part of that cooperation, the Plaintiffs and Defendant and all others that receive notice of this Order, shall immediately deliver to the Receiver and its authorized agents, representatives and/or attorneys full, complete, exclusive and unrestricted physical possession, custody and control of the Receivership Property, at a place and time agreeable to the Receiver in the Receiver's sole discretion, including, without limitation, the following items (and the Plaintiffs and Defendant shall supplement the above-described information promptly to the extent the Plaintiffs or Defendant become aware that information has not been turned over to the Receiver and to the extent that additional information becomes available at any time):

a.   All insurance policies;

b.   A listing of all trade payables and other payables;

c.   Any documents identifying and summarizing any pending litigation (excluding this action) involving the Receivership Property;

d.   All licenses and permits necessary for the operation of the Receivership Property, including the License;

e.   All existing service contracts;

6

f.   All on-site employee payroll records and employee files/applications for insurance and other employee benefits (the release of employee files, records pertaining to workers' compensation claims and payroll records to the Receiver being authorized by this Order);

g.   All documents, books, records and computer files, all passwords need to access any computer or on-line accounts or records which relate to the income, operation and/or management of the Receivership Property;

h.   A list of utilities and utility accounts;

i.   An inventory of all equipment, furniture, vehicles and supplies;

j.   Petty cash fund, if any;

k.   A list outlining the monthly operating expenses for the Receivership Property;

l.   All computers, computer equipment, software, management files, related furniture, supplies, and all passwords needed to access all software and computer files maintained at the on-site and/or any off-site management office(s) in any way relating to the Receivership Property;

m.   A list of all creditors of Candid, including, to the extent known by Candid, the names, addresses, telephone numbers and email addresses of each such creditor, and the amount(s) due each such creditor;

n.   A list of all account debtors of Candid, including, to the extent known by Candid, the names, addresses, telephone numbers and email addresses of each such account debtor, and the amount(s) owing by each such account debtor;

o.   Any other financial documents, not previously listed above, which relate to the Receivership Property as is necessary to manage and/or maintain the Receivership Property;

p.   Such other records and/or personal property pertaining to the Receivership Property as may be requested by the Receiver from time to time.

provided, however, that with respect to Receivership Property, such as books and records, which are under the control of any of the Plaintiffs or Defendant, such parties shall provide and assure reasonable access to the Receiver to such Receivership Property. Delivery of "possession, custody and control" includes but is not limited to turning over to the Receiver and its authorized agents all keys, cards, access codes, passwords and any other information, device or means necessary to have full, complete, exclusive and unrestricted access to all functions of all Receivership Property,

4859-5239-2266

including but not limited to equipment, computers and electronic devices. The Receiver is authorized to change locks and access codes in its sole and absolute discretion

11.     All funds generated by Candid shall be collected and kept in an account opened by the Receiver which neither Plaintiff nor Defendants shall have access to during the Receivership. The Receiver may pay all business and/or other expenses he deems appropriate from such account. The remainder of such funds shall be held in such account pending the outcome of this litigation.

12.     The Receiver is authorized to employ and compensate such agents, independent contractors, employees, and professionals as the Receiver may deem necessary or appropriate to the performance of its duties hereunder.

13.     The Receiver shall use it best efforts to provide such advance notice as is practical under the circumstances to the parties of any matter substantially affecting the Receivership Property.

14.     The Receiver, including personnel hired by the Receiver and agents of the Receiver, is entitled to and shall be paid from the assets of Candid and/or the Receivership Property a reasonable compensation for services rendered ("Receiver Fees") and shall be entitled to reimbursement and shall be reimbursed for its out-of-pocket expenses (including attorneys and other professional fees) incurred while rendering such services ("Receiver Expenses" and, collectively with Receiver Fees, "Receiver Fees & Expenses") under this Order from the date of this Order until the Receiver is removed.

15.     Receiver Fees shall be based on the time expended at hourly rates acceptable not to exceed $350.00 per hour. Application, notice thereof, approval and payment of Receiver Fees & Expenses shall be governed by MCR 2.622(F), the requirements of which are incorporated in this Order.

4859-5239-2266

16.     The Receiver shall keep detailed time entries. The Receiver shall allocate all receipts from, and all expenses incurred for the protection and preservation of, the Receivership Property ("General Expenses") and all Receiver Fees & Expenses as between the Personal Property and the Real Property based on the source of receipts and benefit of expenses to each. If any of the General Expenses or Receiver's Fees & Expenses are mixed as between the Personal Property and Real Property, then the Receiver will allocate them as between the Personal Property and Real Property for that mixed cost or time based on the benefit to such property as determined in the best judgment of the Receiver. The General Expenses and the Receiver Fees & Expenses shall be charged against the appropriate components of the Receivership Property and paid from the income and/or proceeds from that Receivership Property, or paid by the party with the senior security interest or mortgage on said Receivership Property component if the Receiver does not have sufficient funds from the Receivership Property to pay such General Expenses and/or Receiver Fees & Expenses. Any party may challenge the allocation of the General Expenses and/or the Receiver Fees & Expenses by filing an objection to the Receiver's application for payment of Receiver Fees and Expenses and filing at the same time a motion in this proceeding to be heard on the next available court hearing date.

17.     The Receiver may consult with and utilize the services of attorneys of its choice for legal advice and services that directly benefit the Receivership Property and shall be considered part of the Receiver Fees & Expenses.

18.     The Receiver may file an initial application for payment of Receiver's Fees and Expenses seven (7) days after this Order is entered by the Court. The Receiver may file applications for payment of Receiver's Fees and Expenses every seven days at the Receiver's discretion.  In the event that objections to any of the Receiver's applications for Payment of Receiver's Fees and

Expenses are not filed with the Court within the seven (7) day period as provided in MCR 2.622(F)(4), the Receiver is authorized to disburse the Receiver's Fees and Expenses detailed in the application.

19.     The Receiver shall not be liable for any claim, obligation, liability, action, cause of action, cost or expense of Candid or the Receivership Property arising out of or relating to events or circumstances occurring prior to the execution of this Order, including without limitation, any contingent or non-contingent obligations, any liability from the performance of services rendered by third parties, any liability arising from the operation of a medical marijuana caregiver center, and any liability to which Candid is currently or may ultimately be exposed under any applicable laws pertaining to the ownership, use or operation of the Receivership Property and the operation of Candid's Business (collectively, the foregoing is referred to as the "Pre-Receivership Liabilities").  Nothing contained in this Order shall be interpreted to authorize the Receiver to pay or use any of the Receivership Property for payment of Pre-Receivership Liabilities and the Receiver is ordered and directed not to pay any Pre-Receivership Liabilities unless payment is necessary and critical to the ongoing maintenance, management, protection and preservation of the Receivership Property. The Receiver shall not be required to perform under, and may reject, any contract entered into prior to the date on which the Receiver assumes possession of the Receivership Property.

20.     Without limiting any other rights or immunities the Receiver may have at law or in equity, the Receiver and its past, present and future professionals, agents, attorneys, representatives, employees, Affiliates, successors and assigns shall have no liability for acts or omissions in connection with this Order, the Receivership established pursuant to this Order, Candid, Candid's Business or the Receivership Property, so long as such acts and omissions are without gross negligence, gross or willful misconduct, malicious acts and/or the material failure to

10

comply with this Court's orders. The foregoing exculpation shall survive the termination or resignation of the Receiver, and the termination or suspension of the Receivership established hereunder. The Receiver shall be entitled to obtain such insurance coverage as is reasonable to protect itself and its professionals, agents, representatives, employees, Affiliates, successors and assigns against any claims and/or liability which are covered, or not covered, by the foregoing exculpation, and any reasonable premiums or fees for such insurance shall be paid from the Receivership Property and constitute a Receiver Expense.

21.     On or before the 15th day of each month beginning with the first full month following the entry of this Order, the Receiver shall prepare an accounting of all receipts and revenues collected and disbursements made in the previous month (the "Monthly Receiver Report") and shall file with this Court and serve on all other parties who have filed appearances in this case a copy thereof. The Receiver shall file a final report and accounting within forty-five (45) days after the filing of an application for the termination of the Receivership.

22.     The Receiver's appointment shall continue until further order of this Court. The Receiver may resign at the end of any monthly reporting period provided that the Receiver has filed all reports as required in this Order and that the resignation is accepted and approved by the Court. The Receiver may be removed for cause upon the motion of any party. Otherwise, removal of the Receiver shall be within the equitable discretion of the Court. Following removal or resignation, a successor receiver may be appointed upon the motion of any party.

23.     Any action that is due under this Order on a day that is a weekend or a legal holiday shall not be due until the next business day.

24.     This Court shall retain jurisdiction and supervision of all matters concerning the Receiver, the Receivership created hereby and the Receivership Property. Any and all actions

which affect the Receiver or the Receivership Property shall be brought in this Court. The Receiver may seek instructions and additional authority and/or direction from this Court upon written notice to all Parties.

25.     Nothing contained in this Order shall be construed to transfer title to the Receivership Property or ownership in the business operations relating thereto to the Receiver.

26.     The Receiver shall have the right to apply to the Court for further instructions and authorization at any time and from time to time during the pendency of this action.

27.     The obligation of the Receiver to secure a bond is hereby waived. The Receiver hereby agrees that s/he will faithfully and fairly discharge the trust committed to it.

28.     This order does not resolve the last pending claim and does not close the case.

ALL OF THE FOREGOING IS SO ORDERED:


_____
OAKLAND COUNTY CIRCUIT COURT JUDGE

# Exhibit 2

**Christopher Yatooma**
**03/17/2021**

```
 1                    STATE OF MICHIGAN

 2        IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

 3   MSY CAPITAL PARTNERS, LLC, MICHIGAN

 4   REAL ESTATE DEVELOPMENT, LLC,

 5                    Plaintiffs,

 6        -vs-

 7                              Case No. 2019-178037-CB

 8                              Hon. Michael Warren

 9   LIV WELLNESS CENTER, LLC, d/b/a LIV

10   WELLNESS, DENNIS ZOMA, DANNY ZOMA,

11   DUANE KARMO, SCOTT S. YALDO, AND JOHN

12   AND JANE DOES 1-5,

13                    Defendants.

14   _____/

15   PAGE 1 TO 217

16

17        The Deposition of CHRISTOPHER YATOOMA,

18        Taken Via Hanson Remote

19        Commencing at 9:30 p.m.,

20        Wednesday, March 17, 2021

21        Before Laura Steenbergh CSR-3707, RMR, CRR, RDR

22

23    Court reporter, attorneys & witness appearing remotely.

24

25
```



# Christopher Yatooma
## 03/17/2021
**Pages 2..5**

**Page 2**

```
1   APPEARANCES:
2
3   FRANK DELUCA P41604
4   Fleming Yatooma & Borowicz, PLC
5   1615 S. Telegraph Road, Suite 300
6   Bloomfield Hills, MI 48302
7   (248) 230-2820
8
9   SCOTT T. SEABOLT P55890
10  Hickey, Hauck, Bishoff
11  Jeffers & Seabolt, PLLC
12  17199 N. Laurel Park Drive, Suite 215
13  Livonia, Michigan 48152
14  (734) 544-5525
15  sseabolt@jjbjs.com
16      Appearing on behalf of the Plaintiff.
17
18  JASON R. ABEL P70408
19  Honigman, LLP
20  660 Woodward Avenue
21  2290 First National Building
22  Detroit, Michigan 48226-3506
23  jabel@honigman.com
24  (313) 465-7296
25      Appearing on behalf of the Defendants.
```

**Page 3**

```
1   APPEARANCES (Continued):
2
3   ALSO PRESENT:  Greg Yatooma
4                  Dennis Zoma
5                  Alvin Bates
6                  Duane Karmo
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                   TABLE OF CONTENTS
2
3   Witness                                          Page
4   CHRISTOPHER YATOOMA
5   EXAMINATION BY MR. ABEL:                            5
6   EXAMINATION BY MR. SEABOLT:                       213
7   RE-EXAMINATION BY MR. ABEL:                       214
8
9
10                 INDEX TO EXHIBITS
11        (Exhibits attached to transcript)
12
13  Exhibit                                          Page
14  YATOOMA EXHIBIT 37 C. Yatooma Bio                 22
15  YATOOMA EXHIBIT 38 October 2018 Text Stream       26
16  YATOOMA EXHIBIT 39 Binding Agreement and Transfer 129
17  of Permit
18
19
20
21
22
23
24
25
```

Witness — Page
CHRISTOPHER YATOOMA
EXAMINATION BY MR. ABEL: 5
EXAMINATION BY MR. SEABOLT: 213
RE-EXAMINATION BY MR. ABEL: 214

INDEX TO EXHIBITS
(Exhibits attached to transcript)
Exhibit — Page
YATOOMA EXHIBIT 37 C. Yatooma Bio 22
YATOOMA EXHIBIT 38 October 2018 Text Stream 26
YATOOMA EXHIBIT 39 Binding Agreement and Transfer of Permit 129

**Page 5**

```
1   Remote Deposition
2   Wednesday, March 17, 2021
3   About 9:30 a.m.
4       COURT REPORTER:  Good morning.  My name is
5   Laura Steenbergh, notary public and certified shorthand
6   reporter, and this deposition is being held via
7   videoconferencing equipment.  All parties to this
8   deposition are appearing remotely and have agreed to the
9   witness being sworn in remotely.  Due to the nature of
10  remote reporting, please pause briefly before speaking
11  to ensure all parties are heard completely.
12      Do you solemnly swear that the testimony you
13  are about to give will be the truth, the whole truth and
14  nothing but the truth.
15      CHRISTOPHER YATOOMA:  I do.
16      MR. ABEL:  Good morning, Mr. Yatooma.
17      THE WITNESS:  Good morning.
18          CHRISTOPHER YATOOMA,
19  having first been duly sworn, was examined and testified
20      on his oath as follows:
21  EXAMINATION BY MR. ABEL:
22  Q.  Would you mind, please, saying and spelling your last
23      name for the record?
24  A.  Good morning, Jason.
25          My name is Chris Yatooma -- Y-A-T-O-O-M-A.
```

**Christopher Yatooma**
03/17/2021                                                    Pages 38..41

Page 38

1    it might have been occasional magazines somehow that I
2    came across, but it --
3  Q.  Who texts you about the cannabis industry?
4  A.  I mean, just anybody and everybody.  It's a pretty
5    interesting topic for people.
6  Q.  Do you have any understanding of why they text you with
7    that information?
8  A.  Just due to my involvement in the cannabis industry.
9  Q.  What is your involvement in the cannabis industry?
10 A.  Well, obviously, I'm a partner in MSY, as I said,
11   has an interest in this case.  I also own Oakland
12   Business Park, and also I help Greg with his different
13   assets of Axon.
14 Q.  And when you say people text you because of your
15   involvement in the cannabis industry and you said it's
16   because you're a partner in MSY, who have you told
17   you're a partner in MSY to?
18 A.  I mean, it's on my bio, I believe.  So I don't know
19   that -- I think that would be too broad, I don't think I
20   can answer with specificity.
21 Q.  So looking at your bio, though, your bio doesn't mention
22   that MSY is involved in the cannabis industry.  Do you
23   have any understanding of how people would have come to
24   learn that MSY was involved in the cannabis industry?
25 A.  Well, I don't think they would -- I think they would

Page 39

1    just look at me as involved in the cannabis industry.  I
2    don't think there was any concern with what entity I was
3    operating under.
4  Q.  Who have you talked to about your involvement in the
5    cannabis industry other than your brothers?
6  A.  Probably everybody that knows me.  Certainly anybody I
7    talked to about what I did for work would know I'm
8    involved in the cannabis industry.
9  Q.  Approximately how many people have you told that you're
10   involved in the cannabis industry?
11 A.  Over the last couple years I've been involved?  I mean,
12   I'm sure hundreds, maybe thousands.
13 Q.  Do you consider yourself to be a specialist with
14   industry knowledge of the cannabis industry?
15 A.  No.
16       THE WITNESS:  Jason, do you mind if we take a
17   break, bathroom break?
18       MR. ABEL:  Yeah.  Perfect timing.
19       THE WITNESS:  Appreciate it, buddy.  Thank
20   you.
21       MR. SEABOLT:  Hey, Jason, before we go off,
22   Chris has a call that he can't miss that's going to go
23   from about 11:15 to 12:00.  I'm going to suggest that we
24   take an early lunch break at that point and then come
25   back and finish it up.

Page 40

1       MR. ABEL:  That works for me.
2       MR. SEABOLT:  Okay.
3       THE WITNESS:  Appreciate it.  Thanks.
4       MR. ABEL:  Thank you.
5       (A short recess was taken)
6  BY MR. ABEL:
7  Q.  Mr. Yatooma, have you ever submitted an application
8    either as a main applicant or a supplemental applicant
9    to the State of Michigan in conjunction with seeking a
10   marijuana establishment license?
11 A.  No.
12 Q.  Do you understand that you're being deposed here today
13   in connection with a lawsuit filed by MSY Capital
14   Partners and Michigan Real Estate Development, LLC,
15   against LIV Wellness Center, LLC and Dennis Zoma, Duane
16   Karmo and Danny Zoma, is that right?
17 A.  Yes.
18 Q.  And just for ease of the transcript, if I refer to MSY
19   Capital Partners, LLC as just MSY, you'll understand?
20 A.  Absolutely.
21 Q.  And if I refer to Michigan Real Estate Development, LLC,
22   just as M-R-E-D or MRED, you'll understand?
23 A.  Absolutely.
24 Q.  And if I refer to LIV Wellness Center, LLC as LIV or
25   LWC, you'll understand?

Page 41

1  A.  Yep.
2  Q.  Am I correct that you're a member of MSY?
3  A.  Yes.
4  Q.  And how long have you been a member of MSY?
5  A.  Since it was formed.
6  Q.  Do you recall when it was formed?
7  A.  I do not.
8  Q.  Do you recall what the purpose of forming MSY was?
9  A.  Just for the different investment activities I was
10   involved in, to operate under.
11 Q.  And who are the current members of MSY?
12 A.  My brother Greg and I.
13 Q.  And were there any other members of MSY?
14 A.  Did you say were there any other members?
15 Q.  Yes.  At any time.
16 A.  I think we're getting a little bit of cutout, a little
17   delay on the phone.  Can you just repeat the question?
18 Q.  Sure.
19       Were there ever any other members of MSY?
20 A.  Yes.  My brother Jeff.
21 Q.  And when MSY was formed, who were the members?
22 A.  I believe just me.
23 Q.  And when did Jeff become a member of MSY?
24 A.  Around 2017.  It may have been before that, but around.
25 Q.  And do you have an understanding of why Jeff became a



Christopher Yatooma
03/17/2021                                    Pages 42..45

1   member of MSY?
2   A.  Yes.  We were involved in cannabis real estate
3   activities together.
4   Q.  And why did Jeff become involved in MSY in conjunction
5   with those cannabis-related activities?
6   A.  We were utilizing MSY for a period of time for some of
7   those activities we were doing together.
8   Q.  And why utilize MSY instead of one of the other
9   companies that you mentioned that you own?
10  A.  I don't know the specific rationale behind it.
11  Q.  And when did Greg Yatooma become a member of MSY?
12  A.  At the same time Jeff did.
13  Q.  And what cannabis-related activities were you referring
14  to that you said you started utilizing MSY for?
15  A.  Buying and selling cannabis real estate.
16  Q.  What is cannabis real estate?
17  A.  Real estate that can be -- that is zoned properly and
18  can receive a cannabis permit by a municipality to
19  operate, whether it be for grow, PC or any of the other
20  cannabis licenses.
21  Q.  And when did you first become involved in the buying and
22  selling of cannabis real estate?
23  A.  I think we talked about this earlier in the deposition.
24  I would have to look at a document.  I'm not sure.
25  Q.  But you recall the first cannabis real estate that you

1   bought or sold was in Detroit?
2   A.  I don't recall which one.
3   Q.  Is that correct, that the first one you recall was in
4   Detroit?
5   A.  Correct, yes.
6   Q.  And approximately how many cannabis properties have you
7   bought or sold either directly or through one of your
8   businesses?
9   A.  Well, I've had some involvement -- it's a large number,
10  30 or so, give or take.  Maybe more.
11  Q.  When you say maybe more, are you talking 50, 100, 1,000?
12  A.  Less than 1,000.  If you're saying buying and selling as
13  separate activities, it could be -- I think 30 to 60, if
14  you look at them separate.  And then -- yeah, I mean --
15  and then there's deals that maybe didn't come to
16  fruition, you know, so actually you don't count any of
17  those at all, on the buying or the selling end.
18  Q.  And how many cannabis properties has MSY bought or sold
19  since its formation?
20  A.  I don't know.
21  Q.  Who would know?
22  A.  We would have to do an audit to -- I don't know.  Greg
23  would be running point.  I don't know if he would know
24  offhand.  And then we'd have to do an audit of that
25  activity to get a number.  I'm sure he would not know

1   offhand.
2   Q.  Do you know if it's less than 10 or more than 10?
3   A.  The question was what again?  I'm sorry.
4   Q.  Yes.  Approximately how many cannabis properties has MSY
5   bought or sold since its formation?
6   A.  Well, again, it would be done under a special purpose
7   asset, so I don't if MSY closed on them.  I don't know
8   if that's the nature of your question.  But MSY was
9   submitted offers for quite a few.  I don't know how many
10  we were successful on purchasing.
11  Q.  So how many SPEs, single-purpose entities, does MSY own?
12  A.  I don't know.  At -- I don't think it -- I don't know.
13  Q.  Does MSY ever buy and sell cannabis real estate itself
14  or does it always buy and sell through a subsidiary SPE?
15  A.  I don't know.  I'd have to talk to counsel.
16  Q.  Are you aware of a single occasion when MSY bought or
17  sold cannabis real property itself as opposed to having
18  one of its subsidiaries buy and sell it?
19  A.  I'm not sure specifically.  I think there may be some
20  occasions.
21  Q.  And do you recall which properties those might have
22  been?
23  A.  No.
24  Q.  Why would MSY buy and sell cannabis properties itself as
25  opposed to having one of its subsidiaries buy and sell

1   it?
2   A.  I don't know if there would have been a reason.  The
3   market was just a mess.
4   Q.  Does MSY have a manager?
5   A.  I don't believe so.  I think it -- I think member
6   managed would be the term.  I don't know we created a
7   manager.
8   Q.  So when Jeff and Greg became owners of MSY in 2017, what
9   were their percentages of ownership at that time?
10  A.  Any businesses we were in together we were sharing
11  equally.
12  Q.  So was it 33.3 percent each?
13  A.  For any business we were doing together, yes.
14  Q.  How many businesses were you doing together?
15  A.  Of the different cannabis, you know, the different
16  cannabis businesses, the cannabis activity, I would just
17  look at it as one business, candidly, I didn't put a lot
18  of distinction into the different entities that were
19  being used.  I just looked at it my brothers and I were
20  working together in cannabis real estate and we were
21  partners in that.  The entities we were operating under
22  was of no importance to me.
23  BY MR. ABEL:
24  Q.  So why operate under various different entities if it
25  didn't matter to you which entity you were operating



Page 46

1   under?
2 A.   That would have just been a question for counsel.
3 Q.   So you just understood there to be kind of one global
4      Yatooma enterprise that all these businesses were part
5      of, is that fair?
6 A.   As it relates to cannabis, absolutely.
7 Q.   And the businesses in that enterprise were MSY, MRED,
8      Axon, Oakland Business Park and Cannabis Property
9      Brokers of Michigan, is that right?
10 A.  Well, MSY is involved in other activities besides
11     cannabis.  And those other activities my brothers are
12     not partners in.
13 Q.  Sorry, say that again.
14 A.  MSY is involved in other real estate activities,
15     investment activities besides cannabis, and those other
16     activities my brothers are not partners in.
17 Q.  So when you determine -- strike that.
18         What did Jeff Yatooma pay for his membership
19     interest in MSY?
20 A.  I don't -- I mean, it was a pretty fluid situation with
21     my brothers and our partnership.  He certainly
22     contributed to the partnership, but what he paid in I
23     can't speak to.
24 Q.  What did Jeff Yatooma contribute for his membership in
25     MSY?

Page 47

1 A.  I'm sorry, Jason, I don't know if we're getting a bad
2     connection or if the microphone's not picking up.  Say
3     it again, please.
4 Q.  What did Jeff Yatooma contribute to MSY in exchange for
5     his membership?
6 A.  He invested a lot of time and energy and incites,
7     relationships.
8 Q.  What did Greg Yatooma -- now we're getting an echo --
9 A.  You said what did Greg Yatooma?
10 Q.  Yes.  What did Greg Yatooma contribute to MSY in
11     exchange for his membership?
12 A.  You know, Greg was certainly working in the business as
13     well, but Greg also contributed capital in different
14     forms.
15 Q.  What capital did Greg contribute?
16 A.  Both -- I believe both money and other real estate that
17     he owned.
18 Q.  What money did Greg Yatooma contribute to MSY?
19 A.  I don't know the amount.
20 Q.  Can you estimate?
21 A.  Not with any specificity.  I would be guessing.
22 Q.  I don't want you to guess, but was it more than a
23     million dollars or less than a million dollars?
24 A.  I'm really not sure without reviewing some reports.  I'd
25     have to talk to an accountant -- our accountant to get

Page 48

1     some more specifics there.
2 Q.  You don't even know if Greg Yatooma contributed more
3     than a million dollars to MSY?
4         MR. SEABOLT:  Objection, asked and answered.
5 BY MR. ABEL:
6 Q.  You can answer.
7 A.  Do I know?  No.
8 Q.  Do you know whether he contributed more than $100,000 to
9     MSY?
10 A.  Yes.
11 Q.  Do you know if he contributed more than $500,000 to MSY?
12 A.  I think probably, but I'm not sure.
13 Q.  What real estate did Greg Yatooma contribute to MSY?
14 A.  I don't recall.
15 Q.  Do you know how many pieces of real estate Greg Yatooma
16     contributed to MSY?
17 A.  No.
18 Q.  Do you know --
19 A.  Again, pretty fluid between my brother and I -- my
20     brothers and I.
21 Q.  When you say Jeffrey Yatooma contributed his time to
22     MSY, was it your opinion the value of his time was
23     equivalent to the value of the money and real estate
24     that Greg Yatooma contributed?
25 A.  I wouldn't say -- I wouldn't agree or disagree with

Page 49

1     that.  I think, again, a pretty fluid operating between
2     my brothers and I, and I think the feeling was, you
3     know, when there was profits to be shared, if there were
4     profits to be shared that we'd figure it out between us.
5 Q.  Is it fair to say that you moved money in real estate
6     between the various different enterprises constituting
7     what we called before, the Yatooma enterprise?
8 A.  Jason, some of your question got distorted, but also I
9     didn't follow it either.  So I don't know if it was just
10     because of the connection or --
11 Q.  Is it fair to say that the money and property that were
12     contributed to the various different businesses
13     constituting the Yatooma enterprise were fluid; they
14     moved back and forth between those different businesses?
15 A.  I mean, I don't like the term Yatooma enterprise, but if
16     you're saying the cannabis-related businesses my brother
17     Jeff and Greg and I were involved in, when my brother
18     Jeff was involved, then yes.
19 Q.  Were those transfers documented formally in any
20     assignments or agreements?
21 A.  Between the Yatooma enterprises you referred to and the
22     cannabis partnership we were engaged in?
23 Q.  Yes.
24 A.  No.
25 Q.  When did Jeff Yatooma, when was he no longer a member of


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

Christopher Yatooma
03/17/2021                                    Pages 50..53

Page 50

1    MSY?
2  A.  He stopped being involved end of '18, and then formally
3     relinquished all interest to any cannabis-related
4     businesses, as well as other things we were involved in
5     together, end of '19.
6  Q.  And was there a reason that you understand he was no
7     longer involved with the cannabis-related businesses in
8     2018?
9  A.  Yeah.  We just mutually decided it was better for us not
10    to be working together.
11 Q.  Why was that?
12 A.  I'm sorry, what's the question?
13 Q.  Yeah.  Why was that?  Why did you decide it was better
14    not to be working with him?
15 A.  We just decided it was better for us not to work
16    together.
17 Q.  Why?
18 A.  I don't know all the different reasons why.  Different
19    vision for the company.
20 Q.  What different vision did you have for the company that
21    differed from Jeff Yatooma?
22 A.  I mean, these are, you know -- I mean, this would be
23    conversations we were having over the course of all of
24    our work together where it just seemed like we were
25    further and further apart.  It wouldn't be, you know,

Page 51

1     here's my written vision and here's your written vision,
2     Jeff, and see how these things -- it wouldn't be that
3     clean to just try to tell you differences.  But we just
4     had different views on how the business should be
5     operated.
6  Q.  What were your views as to how the business should be
7     operated at the time Jeff Yatooma stopped working with
8     you in 2018?
9  A.  I mean, it would come down to a lot of very specific
10    decisions -- or questions or decisions that needed to be
11    made, you know, where Greg and I felt one way and Jeff
12    felt another.  And after a period of time with that, it
13    just seemed that it was better for us to operate
14    separately.
15 Q.  What decisions did you differ on?
16 A.  I mean, one of them that comes to mind, I mean, this is
17    certainly not an exhaustive list, was the trade show.
18    You know, Jeff felt it was a good use of time and energy
19    and resources to invest in trade shows, you know, Greg
20    and I didn't see the value of that as much.  I mean,
21    that would be one example.  I mean, I'm sure there were
22    many others.  I just don't recall as I sit here.
23 Q.  You don't recall any other examples as to decisions that
24    you differed on with Jeff Yatooma that caused him to go
25    his separate way from you on these cannabis-related

Page 52

1     businesses other than trade show investments?
2  A.  I mean, that was one.  I mean, the amount of properties
3     Jeff wanted to buy, the amount he wanted to sell them
4     for, we were on different pages with that.  I mean, and
5     again, when you break these into specific things, you
6     know, if one partner feels strongly that they want to by
7     an asset and the other partner feels strongly they
8     don't, or they can't agree on the price, it just creates
9     a challenge in working together, right?  Everyone's got
10    to be on the same page.  So, you know, after a period of
11    time of that it just seemed clear to everyone that it
12    was better to operate separately.
13 Q.  Why does it create a challenge?
14 A.  Well, I mean, you've got a make a decision, right?  So
15    if one partner says, well, I want to buy this asset and
16    the other partner says, well, I don't want to, I mean,
17    that's a challenge.  You know, that you need to
18    decide -- a decision needs to be made, right, where both
19    partners are happy ultimately or the partnership doesn't
20    work.  We just had too many of those interactions where
21    neither of us could agree with each other.
22 Q.  And because, among other things, you couldn't agree with
23    Jeff on the amount of properties to buy or the amount to
24    sell those properties for, you decided to go your
25    separate ways and no longer be partners?

Page 53

1  A.  My apologies, Jason, I didn't follow the question.  I
2     heard the last part of it, but what was the first part?
3  Q.  Yeah.  Because you couldn't agree on the amount of
4     properties to buy and sell and the sale prices, those
5     were two factors that led you to essentially dissolve
6     your partnership with Jeff Yatooma?
7  A.  Oh, those were definitely factors, yeah.  Trade shows
8     come to mind, but, you know, that's certainly another
9     factor.  I mean, obviously, we're in the business of
10    buying and selling real estate, so if we can't agree on
11    what real estate to buy, how much to sell it for, real
12    estate to sell or operate, I mean, then that just
13    created ongoing disagreements.
14 Q.  What was the disagreements you had with regard to Jeff
15    Yatooma and the amount of properties to buy?
16 A.  Jeff was bullish, you know, just really wanted to buy
17    anything, any building we could get our hands on, wasn't
18    concerned about price, as I was, or location.  I'm not
19    saying he's wrong, just saying, you know, we had
20    different strategies, different visions.
21 Q.  What was your concern about price?
22 A.  You know, I'm more focused on, you know, if you -- thank
23    you for asking, Jason.  I'd be happy to talk about that.
24       So, you know, everyone says buy low, sell
25    high, but the joke is people forget to buy low.  So I



# Exhibit 3

MSY-004246

**DEFENDANTS
EXHIBIT**

**27**

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release ("Agreement") dated November 13, 2019 ("Effective Date") between Chris Yatooma ("Chris"), Greg Yatooma ("Greg"), Cannabis Property Brokers of Michigan, Inc. ("CPBM"), and Michigan Real Estate Development, Inc. ("MRED"), (collectively, "Good Guys") and Jeff Yatooma ("Jeff" or "Brother") (collectively referred to as the "Parties").

### RECITALS

WHEREAS, in 2017 and 2018 Brother was involved in a cannabis business with the Good Guys, whereby the parties purchased cannabis real estate and with the purpose of improving the property and selling at profit; such real estate included Oakland Business Park ("Business");

WHEREAS, Jeff and Chris previously have jointly owned various investment properties and businesses, including Drakeshire Apartments ("Apartments") and currently both have ownership interest in Bloomfield Hills Swim and Tennis ("Swim Club") and an office building located at 1605/1615 S. Telegraph Rd. Bloomfield Hills, MI 48302 ("Office Building");

WHEREAS, Brother desires to be fully paid for any equity or alleged equity he has in the Business, Swim Club, the Office Building, and any other companies, including Drakeshire ("Jeff Equity");

WHEREAS, it is also the desire of the Parties to separate from each other, and for the Parties to fully release and discharge all claims against each other; and

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and in full and complete settlement of the matters and things recited herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, sets forth herein the agreement between the Parties as follows:

### TERMS OF AGREEMENT

1.      Acknowledgement of Previous Payments.  Jeff acknowledges that Chris has previously paid him an estimated ▮▮▮▮▮▮▮▮▮▮▮ over and above any amounts due for the Apartments which was an approximate additional ▮▮▮▮▮▮ ▮▮▮▮▮▮ ("Previous Draws").

2.      Payment for Jeff Equity.  In addition to the Previous Draws, Good Guys shall make a one-time payment of ▮▮▮▮▮▮▮▮ ("Final Payment") on the Effective Date, totaling ▮▮▮▮▮▮▮▮▮▮▮▮ in payments to Jeff ("Equity Payment").

3.      Discharge of Equity.  Jeff acknowledges that upon payment of the Final Payment, Jeff releases any claim to the Jeff Equity and shall fully release any claim whatsoever in any business previously owned or claimed to be owned with Chris, or any money owed by Greg or Chris to Jeff, including, but not limited to, the Business (and all claims for any of its assets), the Apartments, Swim Club, Office Building, Oakland Business Park and other accompanying properties in Orion Township, the boat in Chris's possession which was previously owned by Jeff, or any other claim or alleged claim for any money owed whatsoever.  For the avoidance of doubt, Jeff shall be waiving any rights, and discharging any claims, he has to being owed anything from Greg or Chris, and this will completely finalize the financial relationship between the Parties.  For the furtherance of the avoidance of doubt, if

1



MSY-004247

Chris and Greg become billionaires off the Business or anything related to what Jeff may have ever claimed to be a part of, even if such windfall happens as early as the day after the Effective Date, Jeff shall have no claim to any of that money whatsoever, and shall simply be very happy for Greg and Chris in their success, and Greg and Chris shall owe Jeff nothing more than love (Romans 13:8).

4.      Website & Email. Jeff shall have no right or privilege to list any Good Guy or Business assets or use Business emails until such time as Good Guys transfer the CPBM website to Jeff, and at such time all Good Guys emails shall be forwarded to their desired email address indefinitely.

5.      Jeff Acknowledgment. The Parties acknowledge that they had previously agreed to make the final payment of          which was to be paid out over six months from the proceeds of the sale of the Parties fifty percent (50%) interest of Liv Wellness in Ferndale, Michigan ("Ferndale"). Jeff acknowledges that he did not want to wait until Ferndale was sold, or have any financing component thereafter, and requested that the Good Guys pay Jeff                                   immediately for full and complete resolution; the Good Guys acquiesced. As Ferndale is going to be in litigation, Jeff further acknowledges that he will be very vested in the litigation and will be as helpful as possible (despite his partnership with Dennis Zoma on other transactions) to help advance the litigation for Greg and Chris, including, but not limited to, providing evidence, testimony, information, source additional information, etc., as may be requested by Greg or Chris. Jeff also agrees to always say the nicest things about Greg and Chris, and shall always be a super-nice guy.  ᒍ˥

6.      General Release. The following general release shall be effective as of the Effective Date of this Agreement:

(a)      Brother, and any of his entities, including its officers, directors, shareholders, agents, successors and assigns, hereby releases and discharges the Good Guys, and all related entities, including each of their members, officers, directors, shareholders, agents, attorneys, employees, parents, subsidiaries, affiliated companies, including any other companies owned or operated, in whole or in part, by Good Guys, successors and assigns, and all persons acting by or through Good Guys, and each of them individually, of and from any and all manner of claims, demands, requirements, agreements, obligations, debts, duties, sums, accounts, covenants, contracts, promises, damages, judgments, controversies, causes of action and claims for payment of attorneys fees or any other costs, or any other fees or expenses paid or incurred, however described, and whether asserted or unasserted, liquidated or unliquidated, and whether sounding in contract, fraud, tort or otherwise, of any kind and of any nature whatsoever, known or unknown, as of the Effective Date hereof.

(b)      Good Guys hereby releases and discharges Brother, including any of its members, officers, directors, shareholders, agents, attorneys, employees, parents, subsidiaries, affiliated of and from any and all manner of claims, demands, requirements, agreements, obligations, debts, duties, sums, accounts, covenants, contracts, promises, damages, judgments, controversies, causes of action and claims for payment of attorneys fees or any other costs, or any other fees or expenses paid or incurred, however described, and whether asserted or unasserted, liquidated or unliquidated, and whether sounding in contract, fraud, tort or otherwise, of any kind and of any nature whatsoever, known or unknown, as of the Effective Date hereof.

7.      General Provisions.

(a)      This Agreement shall be construed under the laws of Michigan.

(b)      This Agreement contains the entire agreement of the Parties and is binding upon them and their respective successors and assigns. This Agreement shall not be altered, amended, or modified by oral representation made before or after the execution of this Agreement. No modification,

2



MSY-004248

amendment, change or discharge of any terms or provisions of this Agreement shall be valid or binding unless the same is in writing and signed by the Party against whom such modification, amendment, change, discharge or waiver is asserted.

     (c)    The failure of any Party at any time to insist upon the strict performance of any of the terms or covenants of this Agreement shall not be deemed a waiver of the right to insist upon strict performance of the same or any other term or covenant of this Agreement at any time.

     (d)    This Agreement may be signed in counterparts.

8.    <u>Representations and Warranties.</u>  The Parties represent and warrant to each other that the following are true, complete and correct as of the Effective Date:

     (a)    Each of the Parties are duly organized, validly existing and qualified and empowered to conduct their business and have full power and authority to enter into and fully perform and comply with the terms of this Agreement.

     (b)    The execution, delivery and performance of this Agreement will not conflict with or result in a breach of any contract, agreement, law, or regulation to which any of the Parties is a party or to which any of the Parties is bound.

     (c)    Each of the Parties have obtained all necessary consents and approvals of their execution and delivery of this Agreement, and this Agreement is valid and enforceable against each of the Parties as in accordance with its terms.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by their signatures below.

Chris Yatooma

_____

Jeff Yatooma

_____

WITNESS:
Mike Abdulnoor

_____

Greg Yatooma

_____

3



# Exhibit 4

Filed by Corporations Division Administrator   Filing Number: 220286679260      Date: 07/10/2020



Form Revision Date 07/2016

# ARTICLES OF INCORPORATION
### For use by DOMESTIC PROFIT CORPORATION

*Pursuant to the provisions of Act 284, Public Acts of 1972, the undersigned executes the following Articles:*

## ARTICLE I

The name of the corporation is:

STANDARD WELLNESS, INC.

## ARTICLE II

Unless the articles of incorporation otherwise provide, all corporations formed pursuant to 1972 PA 284 have the purpose of engaging in any activity within the purposes for which corporations may be formed under the Business Corporation Act. You may provide a more specific purpose:

All Purposes

## ARTICLE III

**1. State the total authorized shares of each class of stock that the corporation is authorized to issue. All corporations must authorize stock.\*** If there is more than one class or series of shares, state the relative rights, preferences and limitations of the shares of each class in Article III(2).

| Class of Stock | Total authorized number of shares |
|---|---|
| COMMON | 10,000 |

## ARTICLE IV

The street address of the registered office of the corporation and the name of the resident agent at the registered office (P.O. Boxes are not acceptable):

1. Agent Name:           BAHOURA LAW
2. Street Address:       77 E LONG LAKE RD
   Apt/Suite/Other:
   City:                 BLOOMFIELD HILLS
   State:                MI                          Zip Code: 48304

3. Registered Office Mailing Address:
   P.O. Box or Street
   Address:
   Apt/Suite/Other:
   City:
   State:                                            Zip Code:

## ARTICLE V

The name(s) and address(es) of the incorporator(s) is (are) as follows:

| Name | Residence or Business Address |
|---|---|

| MIKE BAHOURA | 77 E LONG LAKE RD, BLOOMFIELD HILLS, MI 48304 USA |
|---|---|

## ARTICLE VI

When a compromise or arrangement or plan of reorganization of this corporation is proposed between this corporation and its creditors or any class of them or between this corporation and its shareholders or any class of them, a court of equity jurisdiction within the state, on application of this corporation or of a creditor or shareholder thereof, or an application of a receiver appointed for the corporation, may order a meeting of the creditors or class of creditors or of the shareholders or class of shareholders to be affected by the proposed compromise or arrangement or reorganization, to be summoned in such manner as the court directs. If a majority in number representing 3/4 in value of the creditors or class of creditors, or of the shareholders or class of shareholders to be affected by the proposed compromise or arrangement or a reorganization, agree to a compromise or arrangement or a reorganization of this corporation as a consequence of the compromise or arrangement, the compromise or arrangement of the reorganization, if sanctioned by the court to which the application has been made, shall be binding on all the creditors or class of creditors, or on all the shareholders or class of shareholders and also on this corporation.

## ARTICLE VII

Any action required or permitted under the Act to be taken at an annual or special meeting of shareholders may be taken without a meeting, without prior notice, and without a vote, if consents in writing, setting forth the action so taken, are signed by the holders of outstanding shares that have at least the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote on the action were present and voted. A written consent shall bear the date of signature of the shareholder that signs the consent. Written consents are not effective to take corporate action unless within 60 days after the record date for determining shareholders entitled to express consent to or to dissent from a proposal without a meeting, written consents dated not more than 10 days before the record date and signed by a sufficient number of shareholders to take the action are delivered to the corporation. Delivery shall be to the corporation's registered office, its principal place of business, or an officer or agent of the corporation that has custody of the minutes of the proceedings of its shareholders. Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Prompt notice of taking of the corporate action without a meeting by less than unanimous written consent shall be given to shareholders that would have been entitled to notice of the shareholder meeting if the action had been taken at a meeting and that have not consented to the action in writing. An electronic transmission consenting to an action must comply with Section 407(3).

Signed this 10th Day of July, 2020 by the incorporator(s).

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Mike Bahoura | Incorporator | |
| | | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

○ Decline    ◉ Accept

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the**   ARTICLES OF INCORPORATION

**for**

STANDARD WELLNESS, INC.

**ID Number:**   802478371

**received by electronic transmission on**   July 10, 2020   **, is hereby endorsed.**

**Filed on**   July 10, 2020   **, by the Administrator.**

**The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.**



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 10th day of July, 2020.*

*Linda Clegg*

*Linda Clegg, Interim Director*

*Corporations, Securities & Commercial Licensing Bureau*

# Exhibit 5

Filed by Corporations Division Administrator   Filing Number: 221403966740   Date: 04/19/2021



Form Revision Date 07/2016

## CERTIFICATE OF AMENDMENT TO THE ARTICLES OF INCORPORATION
### For use by DOMESTIC PROFIT CORPORATION

*Pursuant to the provisions of Act 284, Public Acts of 1972, the undersigned corporation executes the following Certificate:*

The identification number assigned by the Bureau is:   802478371

The name of the corporation is:   STANDARD WELLNESS, INC.

The Articles of Incorporation is hereby amended to read as follows:

### Article I
The name of the corporation as amended, is:

CANDID, INC.

The foregoing amendment to the Articles of Incorporation was duly adopted on : 04/19/2021

in accordance with the provisions of the act by the unanimous consent of the incorporator(s) before the first meeting of the Board of Directors or Trustees.

This document must be signed by an authorized officer or agent:

Signed this 19th Day of April, 2021 by:

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Mike Bahoura | Incorporator | |
| | | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.
○ Decline      ◉ Accept

Filed by Corporations Division Administrator   Filing Number: 221403966740      Date: 04/19/2021

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

***This is to Certify that the*** CERTIFICATE OF AMENDMENT TO THE ARTICLES OF
INCORPORATION

***for***

CANDID, INC.

***ID Number:*** 802478371

***received by electronic transmission on*** April 19, 2021 ***, is hereby endorsed.***

***Filed on*** April 19, 2021 ***, by the Administrator.***

***The document is effective on the date filed, unless a subsequent effective date within 90 days after
received date is stated in the document.***



*In testimony whereof, I have hereunto set my
hand and affixed the Seal of the Department,
in the City of Lansing, this 19th day
of April, 2021.*

*Linda Clegg*

Linda Clegg, Director

*Corporations, Securities & Commercial Licensing Bureau*

# Exhibit 6

**DATED 4/19/2021**

**BYLAWS**
**OF**
**CANDID, INC.**
**(A MICHIGAN CORPORATION)**

ARTICLE I
OFFICES AND PURPOSES

SECTION 1.  REGISTERED OFFICE.  The registered agent is Bahoura Law in Bloomfield Hills, Michigan, or such other registered agent as the Board of Directors may designate from time to time in the manner provided for by law.

SECTION 2.  OTHER OFFICES.  The corporation may also have offices at such other places both in and outside the State of Michigan, as the Board of Directors may from time to time determine or the business of the corporation may require.

SECTION 3.  PURPOSE; POWERS.  The purpose of the Company is to engage in any activity for which limited liabilities companies may be formed under the Act.  The Company shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act.  Notwithstanding the foregoing, each of the undersigned members and those members who are later admitted as permitted transferees understand that the Company may be licensed with State of Michigan's Licensing and Regulatory Affairs division and the Marijuana Regulatory Agency ("MRA") as a medical and/or recreational marijuana business pursuant to the Medical Marihuana Facilities Licensing Act ("MMFLA") and/or the Michigan Regulation and Taxation of Marijuana Act ("MRTMA").  Each Member understands that, as of the date of this Operating Agreement, activities under the MMFLA and MRTMA are not permitted under federal law.  Each member voluntarily and knowingly executes this Operating Agreement having had the opportunity to consult with independent counsel and tax professionals to discuss this Operating Agreement and the MMFLA and MRTMA.

ARTICLE II
SHAREHOLDERS

SECTION 1.  PLACE OF MEETING.   All meetings of the shareholders of the corporation shall be held at the registered office or such other place, either within or without the State of Michigan, as may be determined from time to time by the Board of Directors.

SECTION 2.  ANNUAL MEETING OF SHAREHOLDERS.  The annual meeting of shareholders for election of Directors and for such other business as may properly come before the meeting, shall be held on the second Tuesday of January, if not a legal holiday, and if a legal holiday, then on the next business day following, at 10:00 a.m., local time, or at such other date and time as shall be determined from time to time by the Board of Directors, unless such action is taken by written consent as provided in Section 12 of this Article II.  If the annual meeting is not held on the date designated therefor, the Board shall cause the meeting to be held as soon thereafter as convenient.

SECTION 3.  ORDER OF BUSINESS AT ANNUAL MEETING.   The order of business at the annual meeting of the shareholders shall be as follows:

      (a)      Reading of notice and proof of mailing;

      (b)      Reports of Officers;

      (c)      Election of Directors;

      (d)      Transaction of other business mentioned in the notice;

      (e)      Adjournment;

provided that, in the absence of any objection, the presiding officer may vary the order of business at his discretion.

SECTION 4.  NOTICE OF MEETING OF SHAREHOLDERS.  Except as otherwise provided in the applicable State of Michigan law (herein called the "Act"), written notice of the time, place and purposes of a meeting of shareholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, to each shareholder of record entitled to vote at the meeting.  If a meeting is adjourned to another time or place, it is not necessary to give notice of the adjourned meeting if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken and at the adjourned meeting only business is transacted as might have been transacted at the original meeting.  If after the adjournment the Board of Directors fixes a new record date for the adjourned meeting, a notice of the adjourned meeting shall be given to each shareholder of record on the new record date entitled to vote at the meeting.

SECTION 5.  LIST OF SHAREHOLDERS ENTITLED TO VOTE.  Subject to the terms and provisions of these Bylaws, and in compliance with the MMFLA and MRTMA, only those Member(s) owning a membership interest greater than Ten Percent (10%) of the Company or have otherwise received pre-qualification from the MRA shall be entitled to vote on matters concerning the day to day operations and management of the Company.  If a Member owning Ten Percent (10%) or less of the Company seeks to obtain voting rights other than those specifically allowed in this Operating Agreement, that Member must submit an application for "pre-qualification" to the MRA, at that Members sole expense, and upon being issued said "pre-qualification" by the MRA, the Company shall take the necessary steps to amend this Operating Agreement to reflect such changes to that Member's voting rights and subsequently obtain MRA approval of the amended Operating Agreement. The aforementioned applies to those Members owning a membership interest greater than Ten Percent (10%), or have otherwise received pre-qualification from the MRA.  The officer or agent having charge of the stock transfer books for shares of the corporation shall make and certify a complete list of the shareholders entitled to vote at a shareholders' meeting or any adjournment thereof.  The list shall:

      (a)      be arranged alphabetically within each class and series, with the address of, and the number of shares held by, each shareholder.

      (b)      be produced at the time and place of the meeting.

(c)    be subject to inspection by any share holder during the whole time of the meeting.

(d)    be prima facie evidence as to who are the shareholders entitled to examine the list or to vote at the meeting.

SECTION 6.   SPECIAL MEETING OF SHAREHOLDERS.   A special meeting of shareholders may be called at any time by the chief executive officer of the corporation (see Article V, Section 4) or by a majority of the members of the Board of Directors then in office, or by shareholders owning, in the aggregate, not less than a majority of all the shares entitled to vote at such special meeting.   The method by which such meeting may be called is as follows: Upon receipt of a specification in writing setting forth the date and objects of such proposed special meeting, signed by the chief executive officer, or by a majority of the members of the Board of Directors then in office, or by shareholders as above provided, the secretary of the corporation shall prepare, sign and mail the notices requisite to such meeting.

SECTION 7.   QUORUM OF SHAREHOLDERS.   Unless a greater or lesser quorum is provided in the articles of incorporation, in a bylaw adopted by the shareholders or incorporators, or in the Act, shares entitled to cast a majority of the votes at a meeting constitute a quorum at the meeting.   The shareholders present in person or by proxy at the meeting may continue to do business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.   Whether or not a quorum is present, the meeting may be adjourned by a vote of the shares present.

SECTION 8.   VOTE OF SHAREHOLDERS.   Each outstanding share is entitled to one (1) vote on each matter submitted to a vote, unless otherwise provided in the articles of incorporation.   A vote may be cast either orally or in writing.   If an action, other than the election of directors, is to be taken by vote of the shareholders, it shall be authorized by a majority of the votes cast by the holders of shares entitled to vote on the action, unless a greater vote is required by the articles of incorporation or the Act.   Except as otherwise provided in the articles of incorporation, Directors shall be elected by a plurality of the votes cast at an election.

SECTION 9.   RECORD DATE FOR DETERMINATION OF SHAREHOLDERS.   For the purpose of determining shareholders entitled to notice of and to vote at a meeting of shareholders or an adjournment of a meeting, the Board of Directors may fix a record date, which shall not precede the date on which the resolution fixing the record date is adopted by the Board.   The date shall not be more than sixty (60) nor less than ten (10) days before the date of the meeting.   If a record date is not fixed, the record date for determination of shareholders entitled to notice of or to vote at a meeting of shareholders shall be the close of business on the day next preceding the day on which notice is given, or if no notice is given, the day next preceding the day on which the meeting is held.   When a determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders has been made as provided in this Section, the determination applies to any adjournment of the meeting, unless the Board of Directors fixes a new record date under this Section for the adjourned meeting.   For the purpose of determining shareholders entitled to express consent to or to dissent from a proposal without a meeting, the Board of Directors may fix a record date, which shall not precede the date on which the resolution fixing the record date is adopted by the Board and shall not be more than ten (10)

3

days after the Board resolution. If a record date is not fixed and prior action by the Board of Directors is required with respect to the corporate action to be taken without a meeting, the record date shall be the close of business on the day which the resolution of the Board is adopted. If a record date is not fixed and prior action by the Board of Directors is not required, the record date shall be the first date on which a signed written consent is delivered to the corporation as provided in Section 12 of this Article II. For the purpose of determining shareholders entitled to receive payment of a share dividend or distribution, or allotment of a right, or for the purpose of any other action, the Board of Directors may fix a record date, which shall not precede the date on which the resolution fixing the record date is adopted by the Board. The date shall not be more than sixty (60) days before the payment of the share dividend or distribution or allotment of a right or other action. If a record date is not fixed, the record date shall be the close of business on the day on which the resolution of the Board of Directors relating to the corporate action is adopted.

SECTION 10. PROXIES. A shareholder entitled to vote at a meeting of shareholders or to express consent or dissent without a meeting may authorize one or more other persons to act for him by proxy. A proxy shall be signed by the shareholder or his authorized agent or representative. A proxy is not valid after the expiration of three (3) years from its date unless otherwise provided in the proxy.

SECTION 11. INSPECTORS OF ELECTION. The Board of Directors, in advance of a shareholders' meeting, may appoint one (1) or more inspectors of election to act at the meeting or any adjournment thereof. If inspectors are not so appointed, the person presiding at a shareholders' meeting may, and on request of a shareholder entitled to vote thereat shall, appoint one (1) or more inspectors. In case a person appointed fails to appear or act, the vacancy may be filled by appointment made by the Board of Directors in advance of the meeting or at the meeting by the person presiding thereat. The inspectors shall determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine challenges and questions arising in connection with the right to vote, count and tabulate votes, ballots or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all shareholders. On request of the person presiding at the meeting or a shareholder entitled to vote thereat, the inspectors shall make and execute a written report to the person presiding at the meeting of any of the facts found by them and matters determined by them. The report is prima facie evidence of the facts stated and of the vote as certified by the inspectors.

SECTION 12. ACTION BY WRITTEN CONSENT. The articles of incorporation provides that any action required or permitted by the Act to be taken at an annual or special meeting of shareholders may be taken without a meeting, without prior notice and without a vote, if consents in writing, setting forth the action so taken, are signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote on the action were present and voted.

SECTION 13. PARTICIPATION IN MEETING BY TELEPHONE. Unless otherwise restricted by the articles of incorporation, by oral or written permission of a majority of the

4

shareholders, a shareholder may participate in a meeting of shareholders by a conference telephone or by other similar communications equipment through which all persons participating in the meeting may communicate with the other participants.  All participants shall be advised of the communications equipment and the names of the participants in the conference shall be divulged to all participants.  Participation in a meeting pursuant to this Section constitutes presence in person at the meeting.

<div align="center">ARTICLE III<br>DIRECTORS</div>

SECTION 1.  NUMBER AND TERM OF DIRECTORS.  The number of directors which shall constitute the whole Board shall be not less than one (1) nor more than seven (7).  The initial Director shall be Gregory Yatooma.  As of the date of the adoption of the Bylaws, the Board shall consist of one (1) Director.  Thereafter, the number of Directors which shall constitute the Board of Directors for each ensuing year shall be determined at the annual meeting by vote of the shareholders prior to such election; provided, however, that if a motion is not made and carried to increase or decrease the number of Directors, the Board shall consist of the same number of Directors as were elected for the preceding year.  The shareholders may also increase or decrease the number of Directors at any meeting of the shareholders or by a written consent in lieu thereof.  Either the shareholders or the Board of Directors may fill the vacancy caused by an increase in the number of directors.  The first Board of Directors shall hold office until the first annual meeting of shareholders.  At the first annual meeting of shareholders and at each annual meeting thereafter, the shareholders shall elect directors to hold office until the succeeding annual meeting, except in case of the classification of directors as permitted by the Act.  A director shall hold office for the term for which he or she is elected and until his or her successor is elected and qualified, or until his or her resignation or removal.  Directors need not be shareholders.

SECTION 2.  VACANCIES.  Unless otherwise limited by the articles of incorporation or in a written agreement among the shareholders, if a vacancy, including a vacancy resulting from an increase in the number of Directors, occurs in the Board of Directors, the vacancy may be filled as follows:

      (a)     The shareholders may fill the vacancy.

      (b)     The Board may fill the vacancy.

      (c)     If the Directors remaining in office constitute fewer than a quorum of the Board of Directors, they may fill the vacancy by the affirmative vote of a majority of all the Directors remaining in office.

Unless otherwise provided in the articles of incorporation, if the holders of any class or classes of stock or series are entitled to elect one (1) or more Directors to the exclusion of other shareholders, vacancies of that class or classes or series may be filled only by one (1) of the following:

<div align="center">5</div>

(a)     By a majority of the Directors elected by the holders of that class or classes or series then in office, whether or not those Directors constitute a quorum of the Board of Directors.

(b)     By the holders of shares of that class or classes of shares, or series.

In the case of a corporation the Board of Directors of which are divided into classes, any Director chosen to fill a vacancy shall hold office until the next election of the class for which the Director shall have been chosen, and until his or her successor is elected and qualified.  If because of death, resignation, or other cause, a corporation has no Directors in office, an officer, a shareholder, a personal representative, administrator, trustee, or guardian of a shareholder, or other fiduciary entrusted with like responsibility for the person or estate of a shareholder, may call a special meeting of shareholders in accordance with the articles of incorporation or these bylaws.  A vacancy that will occur at a specific date, by reason of a resignation effective at a later date under Section 4 of this Article III or otherwise, may be filled before the vacancy occurs but the newly elected or appointed Director may not take office until the vacancy occurs.

SECTION 3.  REMOVAL.  The shareholders may remove one (1) or more directors with or without cause unless the articles of incorporation provide that Directors may be removed only for cause.  The vote for removal shall be by a majority of shares entitled to vote at an election of Directors, unless the articles of incorporation require a higher vote for removal without cause.

SECTION 4.  RESIGNATION.  A Director may resign by written notice to the corporation.  The resignation is effective upon its receipt by the corporation or a later time as set forth in the notice of resignation.

SECTION 5.  POWERS.  Except as otherwise provided in the Act or in the articles of incorporation, the business and affairs of the corporation may be managed by its Board of Directors, or by the Officers, as the Board of Directors may determine.

SECTION 6.  LOCATION OF MEETINGS.  Regular or special meetings of the Board of Directors may be held either in or outside the State of Michigan.

SECTION 7.  ORGANIZATION MEETING OF BOARD.  The first meeting of each newly elected Board of Directors shall be held at the place of holding the annual meeting of shareholders, and immediately following the same, for the purpose of electing officers and transacting any other business properly brought before it, provided that the organization meeting in any year may be held at a different time and place than that herein provided by a consent of a majority of the Directors of such new board.  No notice of such meeting shall be necessary to the newly elected Directors in order legally to constitute the meeting, provided a quorum shall be present, unless said meeting is not held at the place of holding and immediately following the annual meeting of shareholders.

SECTION 8.  REGULAR MEETING OF BOARD.  Any special meeting of the Board of Directors may be called by the chief executive officer, or by a majority of the persons then comprising the Board of Directors, at any time by means of notice of the time and place thereof

6

to each Director, given not less than twenty-four (24) hours before the time such special meeting is to be held.

SECTION 9.  SPECIAL MEETING OF BOARD.  Any special meeting of the Board of Directors may be called by the chief executive officer, or by a majority of the persons then comprising the Board of Directors, at any time by means of notice of the time and place thereof to each Director, given not less than twenty-four (24) hours before the time such special meeting is to be held.

SECTION 10. QUORUM AND REQUIRED VOTE OF BOARD AND COMMITTEES.  At all meetings of the Board of Directors, a majority of the members of the Board then in office constitutes a quorum for transaction of business, unless the articles of incorporation or these bylaws provide for a larger or smaller number.  The vote of the majority of members present at a meeting at which a quorum is present constitutes the action of the Board of Directors unless the vote of a larger number is required by the Act, the articles of incorporation, or these bylaws. Amendment of these bylaws by the Board of Directors requires the vote of not less than a majority of the members of the Board then in office.  If a quorum shall not be present at any meeting of the Board of Directors, the Directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

SECTION 11. ACTION BY WRITTEN CONSENT.  Action required or permitted to be taken under authorization voted at a meeting of the Board of Directors or a committee of the Board of Directors, may be taken without a meeting if, before or after the action, all members of the Board then in office or of the committee consent to the action in writing.  The written consents shall be filed with the minutes of the proceedings of the Board of Directors or committee.  The consent has the same effect as a vote of the Board of Directors of committee for all purposes.

SECTION 12. COMPENSATION  OF  DIRECTORS.   The Board of Directors, by affirmative vote of a majority of directors in office and irrespective of any personal interest of any of them, may establish reasonable compensation of Directors for services to the corporation as Directors or officers, but approval of the shareholders is required if the articles of incorporation, these bylaws or any provisions of the Act so provide.

ARTICLE IV
NOTICES

SECTION 1.  NOTICE.  Whenever any notice or communication is required to be given by mail to any director or shareholder under any provision of the Act, or of the articles of incorporation or of these bylaws, it shall be given in writing, except as otherwise provided in the Act, to such Director or shareholder at the address designated by him for that purpose or, if none is designated, at his last known address.  The notice or communication is given when deposited, with postage thereon prepaid, in a post office or official depository under the exclusive care and custody of the United States postal service.  The mailing shall be registered, certified or other first class mail except where otherwise provided in the Act.  Written notice may also be given in person or by telegram, telecopy, telex, radiogram, cablegram, or mailgram, and such notice shall

7

be deemed to be given when the recipient receives the notice personally, or when the notice, addressed as provided above, has been delivered to the corporation, or to the equipment transmitting such notice.  Neither the business to be transacted at, nor the purpose of, a regular or special meeting of the board of directors need be specified in the notice of the meeting.

SECTION 2.  WAIVER OF NOTICE.   When, under the Act or the articles of incorporation or these bylaws, or by the terms of an agreement or instrument, a corporation or the Board of Directors or any committee thereof may take action after notice to any person or after lapse of a prescribed period of time, the action may be taken without notice and without lapse of the period of time, if at any time before or after the action is completed the person entitled to notice or to participate in the action to be taken or, in case of a shareholder, offers a waiver of such requirements.  Neither the business to be transacted at, nor the purpose of, a regular or special meeting of the Board of Directors need be specified in the waiver of notice of the meeting.   Attendance of a person at a meeting of shareholders constitutes a waiver of objection to lack of notice or defective notice of the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting and a waiver of objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the shareholder objects to considering the matter when it is presented.  A Director's attendance at or participation in a meeting waives any required notice to him or her of the meeting unless he or she at the beginning of the meeting, or upon his or her arrival, objects to the meeting or the transacting of business at the meeting and does not thereafter vote for or assent to any action taken at the meeting.

ARTICLE V
OFFICERS

SECTION 1.  SELECTION.  The Board of Directors, at its first meeting and at its organization meeting following the annual meeting of shareholders, shall elect or appoint a president, a secretary and a treasurer.  The Board of Directors may also elect or appoint a chairman of the Board, one (1) or more vice presidents and such other officers, employees and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.  Two (2) or more offices may be held by the same person but an officer shall not execute, acknowledge or verify an instrument in more than one (1) capacity.

SECTION 2.  COMPENSATION.  The salaries of all officers, employees and agents of the corporation shall be fixed by the Board of Directors; provided, however, that the Board may delegate to the officers the fixing of compensation of assistant officers, employees and agents.

SECTION 3.  TERM, REMOVAL AND VACANCIES.  Each officer of the corporation shall hold office for the term for which he is elected or appointed and until his successor is elected or appointed and qualified, or until his resignation or removal.  An officer elected or appointed by the Board of Directors may be removed by the Board with or without cause at any time.  An officer may resign by written notice to the corporation.  The resignation is effective

upon its receipt by the corporation or at a subsequent time specified in the notice of resignation. Any vacancy occurring in any office of the corporation shall be filled by the board of directors.

SECTION 4. CHIEF EXECUTIVE OFFICER. If the Board of Directors desires to elect or appoint a chief executive officer, the Board shall designate the chairman of the Board or president as such officer at the first meeting of each newly elected Board of Directors; provided, however, that if a motion is not made and carried to change the designation, the designation shall be the same as the designation for the preceding year; provided, further, that the designation of the chief executive officer may be changed at any special meeting of the Board of Directors. The president shall be the chief executive officer whenever the office of chairman of the Board is vacant. The chief executive officer shall be responsible to the Board of Directors for the general supervision and management of the business and affairs of the corporation and shall see that all orders and resolutions of the Board are carried into effect. The chairman of the Board or president who is not the chief executive officer shall be subject to the authority of the chief executive officer, but shall exercise all of the powers and discharge all of the duties of the chief executive officer during the absence or disability of the chief executive officer.

SECTION 5. CHAIRMAN OF THE BOARD OF DIRECTORS. If the Board of Directors elects or appoints a chairman of the Board, he shall be elected or appointed by, and from among the membership of, the Board of Directors. He shall preside at all meetings of the shareholders, of the Board of Directors and of any executive committee. He shall perform such other duties and functions as shall be assigned to him from time to time by the Board of Directors. He shall be, ex officio, a member of all standing committees. Except where by law the signature of the president of the corporation is required, the chairman of the Board of Directors shall possess the same power and authority to sign all certificates, contracts, instruments, papers and documents of every conceivable kind and character whatsoever in the name of and on behalf of the corporation which may be authorized by the Board of Directors. During the absence or disability of the president, or while that office is vacant, the chairman of the Board of Directors shall exercise all of the powers and discharge all of the duties of the president.

SECTION 6. PRESIDENT. During the absence or disability of the chairman of the Board, or while that office is vacant, the president shall preside over all meetings of the Board of Directors, of the shareholders and of any executive committee, and shall perform all of the duties and functions, and when so acting shall have all powers and authority, of the chairman of the Board. He shall be, ex officio, a member of all standing committees. The president shall, in general, perform all duties incident to the office of president and such other duties as may be prescribed by the Board of Directors.

SECTION 7. VICE PRESIDENTS. The Board of Directors may elect or appoint one or more vice presidents. The Board of Directors may designate one or more vice presidents as executive or senior vice presidents. Unless the Board of Directors shall otherwise provide by resolution duly adopted by it, such of the vice presidents as shall have been designated executive or senior vice presidents and are members of the Board of Directors in the order specified by the Board of Directors (or if no vice president who is a member of the Board of Directors shall have been designated as executive or senior vice president, then such vice presidents as are members of the Board of Directors in the order specified by the Board of Directors) shall perform the

9

duties and exercise the powers of the president during the absence or disability of the president if the office of the chairman of the Board is vacant. The vice presidents shall perform such other duties as may be delegated to them by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 8. SECRETARY. The secretary shall attend all meetings of the shareholders, and of the Board of Directors and of any executive committee, and shall preserve in the books of the corporation true minutes of the proceedings of all such meetings. He shall safely keep in his custody the seal of the corporation, if any, and shall have authority to affix the same to all instruments where it s use is required or permitted. He shall give all notice required by the Act, these bylaws or resolution. He shall perform such other duties as may be delegated to him by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 9. TREASURER. The treasurer shall have custody of all corporate funds and securities and shall keep in books belonging to the corporation full and accurate accounts of all receipts and disbursements; he shall deposit all moneys, securities and other valuable effects in the name of the corporation in such depositories as may be designated for that purpose by the Board of Directors. He shall disburse the funds of the corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the president and the Board of Directors whenever requested an account of all his transactions as treasurer and of the financial condition of the corporation. If required by the Board of Directors, he shall keep in force a bond in form, amount and with a surety or sureties satisfactory to the Board of Directors, conditioned for faithful performance of the duties of his office, and for restoration to the corporation in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and property of whatever kind in his possession or under his control belonging to the corporation. He shall perform such other duties as may be delegated to him by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 10. ASSISTANT SECRETARIES AND ASSISTANCE TREASURERS. The assistant secretary or assistant secretaries, in the absence or disability of the secretary, shall perform the duties and exercise the powers of the secretary. The assistant treasurer or assistant treasurers, in the absence or disability of the treasurer, shall perform the duties and exercise the powers of the treasurer. Any assistant treasurer, if required by the Board of Directors, shall keep in force a bond as provided in Section 9 of this Article V. The assistant secretaries and assistant treasurers, in general, shall perform such duties as shall be assigned to them by the secretary or by the treasurer, respectively, or by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 11. DELEGATION OF AUTHORITY AND DUTIES BY BOARD OF DIRECTORS. All officers, employees and agents shall, in addition to the authority conferred, or duties imposed, on them by these bylaws, have such authority and perform such duties in the management of the corporation as may be determined by resolution of the Board of Directors non-inconsistent with these bylaws.

ARTICLE VI
INDEMNIFICATION

SECTION 1.  LIABILITY INSURANCE.   The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity or arising out of his or her status as such, whether or not the corporation would have power to indemnify him or her against liability under the pertinent provisions of the Act.

ARTICLE VII
STOCKS AND TRANSFERS

SECTION 1.  NOT CERTIFICATED.   The corporation shall issue the initial shares without certificates.

SECTION 2.  SHARE CERTIFICATES: REQUIRED PROVISIONS.   If a certificate representing shares of the corporation is issued, it shall state upon its face all of the following:

(a)     The name of the corporation.

(b)     That the corporation is formed under the laws of the State of Michigan.

(c)     The name of the person to whom issued.

(d)     The number and class of shares, and the designation of the series, if any, which the certificate represents.

(e)     Shall be signed by the Chairman of the Board of Directors, or the President or Vice President, and another officer of the Corporation, such as the Treasurer or the Secretary, certifying the number and class of shares of stock in the Corporation owned by him or her.

A certificate representing shares issued by a corporation which is authorized to issue shares of more than one (1) class shall set forth on its face or back or state on its face or back that the corporation will furnish to a shareholder upon request and without charge a full statement of the designation, relative rights, preferences and limitations of the shares of each class authorized to be issued, and if the corporation is authorized to issue any class of shares in series, the designation, relative rights, preferences and limitations of each series so far as the same have been prescribed and the authority of the Board to designate and prescribe the relative rights, preferences and limitations of other series.

SECTION 3. REPLACEMENT   OF   LOST   OR   DESTROYED   SHARE CERTIFICATES.  The corporation may issue a new certificate for shares or fractional shares in place of a certificate theretofore issued by it, alleged to have been lost or destroyed, and the Board of Directors may require the owner of the lost or destroyed certificate, or his legal

11

representative, to give the corporation a bond sufficient to indemnify the corporation against any claim that may be made against it on account of the alleged lost or destroyed certificate or the issuance of such new certificate.

SECTION 4.   REGISTERED SHAREHOLDERS.  The corporation shall have the right to treat the registered holder of any share as the absolute owner thereof, and shall not be bound to recognize any equitable or other claim to, or interest in, such share on the part of any other person, whether or not the corporation shall have the express or other notice thereof, save as may be otherwise provided by the statutes of Michigan.

SECTION 5.   TRANSFER AGENT AND REGISTRAR.  The Board of Directors may appoint a transfer agent and a registrar in the registration of transfers of its securities.

SECTION 6.   REGULATIONS.  The Board of Directors shall have power and authority to make all such rules and regulations as the Board shall deem expedient regulating the issue, transfer and registration of certificates for shares in this corporation.

ARTICLE VIII
GENERAL PROVISIONS

SECTION 1.   DISTRIBUTIONS IN CASH OR PROPERTY.  The Board of Directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and/or unless otherwise limited by the articles of incorporation, these bylaws or the Act.

SECTION 2.   RESERVES.  The Board of Directors shall have power and authority to set apart such reserve or reserves, for any proper purpose, as the Board in its discretion shall approve, and the Board shall have the power and authority to abolish any reserve created by the Board.

SECTION 3.  VOTING SECURITIES.   Unless otherwise directed by the Board of Directors, the chairman of the Board or president, or in the case of their absence or inability to act, the vice presidents, in order of their seniority, shall have full power and authority on behalf of the corporation to attend and to act and to vote, or to execute in the name or on behalf of the corporation a consent in writing in lieu of a meeting of shareholders or a proxy authorizing an agent or attorney-in-fact for the corporation to attend and vote at any meetings of security holders of corporations in which the corporation may hold securities, and at such meetings he or his duly authorized agent or attorney-in-fact shall possess and may exercise any and all rights and powers incident to the ownership of such securities and which, as the owner thereof, the corporation might have possessed and exercised if present.  The Board of Directors by resolution from time to time may confer like power upon any other person or persons.

SECTION 4.   CHECKS.  All checks, drafts and orders for the payment of money shall be signed in the name of the corporation in such manner and by such officer or officers or such other person or persons as the Board of Directors shall from time to time designate for that purpose.

SECTION 5.   CONTRACTS, CONVEYANCES, ETC.   When the execution of any contract, conveyance or other instrument has been authorized without specification of the executing officers, the chairman of the Board, president or any vice president, and the secretary or assistant secretary, may execute the same in the name and on behalf of this corporation and may affix the corporate seal thereto.  The Board of Directors shall have power to designate the officers and agents who shall have authority to execute any instrument in behalf of this corporation.

SECTION 6.   CORPORATE BOOKS AND RECORDS.   The corporation shall keep books and records of account and minutes of the proceedings of its shareholders, Board of Directors and executive committees, if any.  The books, records and minutes may be kept outside this state.  Any of the books, records or minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

SECTION 7.   FISCAL YEAR.  The fiscal year of the corporation shall end on December 31 of each year.

SECTION 8.   SEAL.  The corporation is not required to have a corporate seal.

ARTICLE IX
AMENDMENTS

SECTION 1.   The shareholders or the Board of Directors may amend or repeal the bylaws or adopt new bylaws unless the articles of incorporation provide that the power to adopt new bylaws is reserved exclusively to the shareholders or that these bylaws or any particular bylaw shall not be altered or repealed by the Board of Directors.  Such action may be taken by written consent or at any meeting of shareholders or the Board of Directors; provided that if notice of any such meeting is required by these bylaws, it shall contain notice of the proposed amendment, repeal or new bylaws, so long as any such amendments to do not violate the Act, rules of the MRA, MMFLA or MRTMA.

Gregory Yatooma

**************************

13

# Exhibit 7

LARA Home    Contact LARA    Online Services    News    MI.gov

## LARA Corporations Online Filing System
### Department of Licensing and Regulatory Affairs

**ID Number: 802478371**          [Request certificate]  [Return to Results]  [New search]

**Summary for: CANDID, INC.**

**The name of the DOMESTIC PROFIT CORPORATION:**   CANDID, INC.

**The name was changed from:** STANDARD WELLNESS, INC. **on** 04-19-2021

**Entity type:**   DOMESTIC PROFIT CORPORATION

**Identification Number:** 802478371

**Date of Incorporation in Michigan:**   07/10/2020

**Purpose:** All Purpose Clause

**Term:**   Perpetual

**Most Recent Annual Report:**  2023          **Most Recent Annual Report with Officers & Directors:**  2021

**The name and address of the Resident Agent:**

| | |
|---|---|
| Resident Agent Name: | BAHOURA LAW |
| Street Address: | 77 E LONG LAKE RD |
| Apt/Suite/Other: | |
| City: | BLOOMFIELD HILLS          State: MI          Zip Code:   48304 |

**Registered Office Mailing address:**

P.O. Box or Street Address:

Apt/Suite/Other:

City:                                    State:                    Zip Code:

**The Officers and Directors of the Corporation:**

| Title | Name | Address |
|---|---|---|
| PRESIDENT | GREG YATOOMA | 77 E LONG LAKE RD BLOOMFIELD HILLS, MI 48304 USA |
| TREASURER | GREG YATOOMA | 77 E LONG LAKE RD BLOOMFIELD HILLS, MI 48304 USA |
| SECRETARY | GREG YATOOMA | 77 E LONG LAKE RD BLOOMFIELD HILLS, MI 48304 USA |
| DIRECTOR | GREG YATOOMA | 77 E LONG LAKE RD BLOOMFIELD HILLS, MI 48304 USA |

**Act Formed Under:**   284-1972 Business Corporation Act

**Acts Subject To:**   284-1972 Business Corporation Act

**Total Authorized Shares:** 10,000

☐ **Written Consent**

[View Assumed Names for this Business Entity]

**View filings for this business entity:**

ALL FILINGS
ANNUAL REPORT/ANNUAL STATEMENTS
ARTICLES OF INCORPORATION
RESTATED ARTICLES OF INCORPORATION
RESTATED ARTICLES OF INCORPORATION
RESTATED ARTICLES OF INCORPORATION

View filings

**Comments or notes associated with this business entity:**

LARA FOIA Process        Transparency        Office of Regulatory Reinvention        State Web Sites

Michigan.gov Home        ADA        Michigan News        Policies

Copyright 2023 State of Michigan

# **Exhibit 8**



GRETCHEN WHITMER
GOVERNOR

STATE OF MICHIGAN
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
LANSING
**CANNABIS REGULATORY AGENCY**
**LICENSING REPORT**
**6/11/2023 – 6/17/2023**

ORLENE HAWKS
DIRECTOR

| PREQUALIFICATIONS | | | | | |
|---|---|---|---|---|---|
| **Name** | **Address** | **Supplemental Applications** | **Date** | **Determination** | **Reason(s) for Denial** |
| FRIENDLY'S LLC<br>AU-ER-003604 | 8201 Parkland<br>Detroit, MI 48239 | Antonella Solomon | 06/12/2023 | CRA approved Prequalification | N/A |
| Steep Industries LLC<br>AU-ER-003834 | 9965 Mirafield Ln<br>McCordsville, IN 46055 | Big Red Org LLC<br>Steep Industries LLC<br>Ryan Hockemeyer<br>Justin Miller<br>Diana Miller<br>Mirantha Wilson Hockemeyer | 06/13/2023 | CRA approved Prequalification | N/A |
| HB Coffeeshop, LLC<br>AU-ER-004127 | 1103 Ravenwood St.<br>Ann Arbor, MI 48103 | Kevin Salerno | 06/13/2023 | CRA approved Prequalification | N/A |
| Fire Leaf, LLC<br>AU-ER-004070 | 40431 Alexandria Dr<br>Sterling Heights, MI 48313 | Marvin Alkasmikha<br>Marie Alkasmikha | 06/14/2023 | CRA approved Prequalification | N/A |
| ML Enterprises MI LLC<br>AU-ER-004130 | 107 W Michigan Ave., 4th Floor<br>Kalamazoo, MI 49007 | Green Logic, LLC<br>Matthew Lacy | 06/14/2023 | CRA approved Prequalification | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| | | | | | |
|---|---|---|---|---|---|
| Biosphere Indoor, LLC<br>AU-ER-004097 | 1301 West Dresser Drive<br>Sturgis, MI 49091 | Milan Gandhi<br>Prakash Gandhi<br>James Deweese<br>Rachel Gandhi<br>Mandakini Gandhi | 06/15/2023 | CRA approved<br>Prequalification | N/A |

| | Licenses Applications | | | | |
|---|---|---|---|---|---|
| **Name** | **Address** | **Supplemental Applications** | **Date** | **Determination** | **Reason(s) for Denial** |
| CLDD, LLC<br>AU-ER-000316<br>Marihuana Retailer<br>Fuel 420<br>AU-R-001005 | 3620 S. Huron RD<br>Bay City, MI 48706 | Monster Holdings Group, Inc.<br>Monster M, LLC<br>Daniel Kidder<br>Christopher Jackson<br>Lori Jackson | 06/13/2023 | CRA Approved<br>Licensure | N/A |
| DNVK Lapeer Inc<br>AU-ER-000333<br>Marihuana Retailer<br>Consume Cannabis of Alma<br>AU-R-001002 | 528 W Warwick DR<br>Alma, MI 48801 | PTS Michigan 2, LLC<br>DNVK 5, LLC<br>Jonathon Sulaka | 06/16/2023 | CRA Approved<br>Licensure | N/A |
| TZee LLC<br>AU-ER-001355<br>Class C Marihuana Grower<br>TZee, LLC<br>AU-G-C-001237 | Suite B<br>4661 W. Dickman RD<br>Battle Creek, MI 49037 | Talal Sheena<br>Zuhair Hanna<br>Lillian Sheena<br>Zina Hanna | 06/15/2023 | CRA Approved<br>Licensure | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| Jelli D Enterprise LLC AU-ER-001411 Class B Marihuana Grower Jelli D Enterprise LLC AU-G-B-000254 | 6806 Sheridan Rd Vassar, MI 48768 | Alba Cili Driton Palaj | 06/16/2023 | CRA Approved Licensure | N/A |
|---|---|---|---|---|---|
| SDRK Group, LLC AU-ER-001720 Class C Marihuana Grower SM Lapeer AU-G-C-001210 | 207 S. Saginaw ST Lapeer, MI 48446 | BR Lapeer, LLC Adnan Shango Raad Kathawa Joseph Dikhow Gary Rexroad Ghaida Shango Najat Dikhow Lisa Rexroad | 06/16/2023 | CRA Approved Licensure | N/A |
| SDRK Group, LLC AU-ER-001720 Class C Marihuana Grower SM Lapeer AU-G-C-001211 | 207 S. Saginaw ST Lapeer, MI 48446 | BR Lapeer, LLC Adnan Shango Raad Kathawa Joseph Dikhow Gary Rexroad Ghaida Shango Najat Dikhow Lisa Rexroad | 06/16/2023 | CRA Approved Licensure | N/A |
| Bloomfield Development Group Grow, LLC AU-ER-002008 Marihuana Retailer Bloomfield Development Group Grow LLC AU-R-001011 | 17812 US Hwy 2 Gould City, MI 49838 | Jeffrey Dotson | 06/12/2023 | CRA Approved Licensure | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| | | | | | |
|---|---|---|---|---|---|
| EGC Enterprises LLC<br>AU-ER-002224<br>Class C Marihuana Grower<br>Evolution Grow Company<br>AU-G-C-001209 | 1060 River Road West<br>Battle Creek, MI 49037 | Green Flake Farms LLC<br>Craig Flocken<br>Melissa Flocken | 06/16/2023 | CRA Approved<br>Licensure | N/A |
| Canapa Valley Farms Grow, LLC<br>AU-ER-003080<br>Excess Marihuana Grower<br>Canapa Valley Farms Grow, LLC<br>AU-G-EX-000362 | Bldg 2<br>700 E Huron AVE<br>Vassar, MI 48768 | Canapa Valley Farms, LLC<br>Vassar Acquisitions Property<br>Management, LLC<br>Vassar Acquisitions, LLC<br>ACC Grow, LLC<br>Frank Denardo Jr.<br>Clifford Miller<br>Garrett Durham<br>Jennifer Miller<br>Caitlyn Durham | 06/15/2023 | CRA Approved<br>Licensure | N/A |
| HTP Telegraph, LLC<br>AU-ER-003869<br>Marihuana Retailer<br>Dreams Canna<br>AU-R-001010 | 28930 South Telegraph RD<br>southfield, MI 48034 | ABCD, LLC<br>PGL Green Enterprises, LLC<br>Tarek Gayar<br>Paul Lutfy<br>Nadia Lutfy | 06/14/2023 | CRA Approved<br>Licensure | N/A |
| Wise Tree Farms LLC<br>AU-ER-003918<br>Class C Marihuana Grower<br>Wise Tree Farms LLC<br>AU-G-C-001241 | 8751 N. Wise RD<br>Clare, MI 48617 | Robert Humphrey<br>Cheryl Humphrey | 06/12/2023 | CRA Approved<br>Licensure | N/A |

| | | | | | |
|---|---|---|---|---|---|
| HGZ Group, LLC<br>AU-ER-003940<br>Class C Marihuana Grower<br>HGZ Group LLC<br>AU-G-C-001233 | 9147 N Chippewa RD<br>Coleman, MI 48618 | Paul Roumaya<br>Mike Bahoura<br>Nanor Roumaya<br>Lydia Bahoura | 06/14/2023 | CRA Approved<br>Licensure | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| Renewals | | | | | |
|---|---|---|---|---|---|
| **Name** | **Address** | **Supplemental Applications** | **Date** | **Determination** | **Reason(s) for Denial** |
| Premier Botanics, LLC<br>AU-ER-000144<br>Marihuana Microbusiness<br>Premier Botanics, LLC<br>AU-MB-000106 | 1450 W Main ST<br>Lowell, MI 49331 | Cheryl Allen<br>John Allen | 06/13/2023 | CRA Approved Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Excess Marihuana Grower<br>One Garden<br>AU-G-EX-000251 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Class C Marihuana Grower<br>One Garden<br>AU-G-C-000188 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/12/2023 | CRA Approved Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Marihuana Retailer<br>Sozo Cannabis<br>AU-R-000688 | 1101 Robert T. Longway BLVD<br>Flint, MI 48503 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved Renewal | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| | | | | | |
|---|---|---|---|---|---|
| Sozo Health Inc.<br>AU-ER-000240<br>Excess Marihuana Grower<br>One Garden<br>AU-G-EX-000249 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Class C Marihuana Grower<br>One Garden<br>AU-G-C-000190 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Marihuana Retailer<br>Sozo Cannabis<br>AU-R-000402 | 580 W Hackley AVE<br>Muskegon, MI 49444 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/14/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Class C Marihuana Grower<br>One Garden<br>AU-G-C-000482 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Marihuana Processor<br>Dabs & Doses<br>AU-P-000190 | 23751 Hoover RD Suite B<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |

| | | | | | |
|---|---|---|---|---|---|
| Sozo Health Inc.<br>AU-ER-000240<br>Class C Marihuana Grower<br>One Garden<br>AU-G-C-000483 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Excess Marihuana Grower<br>One Garden<br>AU-G-EX-000252 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Excess Marihuana Grower<br>One Garden<br>AU-G-EX-000250 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Marihuana Retailer<br>Sozo Cannabis<br>AU-R-000728 | 2617 BAY ST<br>SAGINAW, MI 48602 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Sozo Health Inc.<br>AU-ER-000240<br>Marihuana Retailer<br>Sozo Cannabis<br>AU-R-000795 | 420 E 10 Mile RD Suite A<br>Pleasant Ridge, MI 48069 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |

| | | | | | |
|---|---|---|---|---|---|
| Sozo Health Inc.<br>AU-ER-000240<br>Class C Marihuana Grower<br>One Garden<br>AU-G-C-000189 | 23775 Hoover RD<br>Warren, MI 48089 | Sozo Companies Inc<br>Aaron Rasty<br>Mitchell Ziman<br>Kylie Rasty | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Harbor Farmz North, LLC<br>AU-ER-000282<br>Class C Marihuana Grower<br>Harbor Farmz<br>AU-G-C-000215 | 2839 Full Circle DR<br>Kalamazoo, MI 49001 | MM M.Ward Investments, LLC<br>Michael Ward<br>Kimberly Ward | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Indica LLC<br>AU-ER-000367<br>Marihuana Retailer<br>STICKY YPSI<br>AU-R-000616 | 1070 N Huron River DR<br>Ypsilanti, MI 48197 | Jacob Abraham<br>Ashleigh Abraham | 06/15/2023 | CRA Approved<br>Renewal | N/A |
| Indica LLC<br>AU-ER-000367<br>Marihuana Retailer<br>Sticky River Rouge<br>AU-R-000814 | 10307 W Jefferson AVE<br>River Rouge, MI 48218 | Jacob Abraham<br>Ashleigh Abraham | 06/16/2023 | CRA Approved<br>Renewal | N/A |
| Maivda Investments LLC<br>AU-ER-000428<br>Marihuana Retailer<br>Consume Cannabis Quincy<br>AU-R-000249 | 131 W Chicago ST<br>Quincy, MI 49082 | DNVK 5, LLC<br>PTS Michigan 2, LLC<br>Jonathon Sulaka | 06/12/2023 | CRA Approved<br>Renewal | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| | | | | | |
|---|---|---|---|---|---|
| Liberty Gallery Inc.<br>AU-ER-000468<br>Marihuana Retailer<br>Herbana<br>AU-R-000274 | 702 S Main ST<br>Ann Arbor, MI 48104 | James Daly<br>Brian Doelle | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Michigan GreenWorks, LLC<br>AU-ER-000530<br>Class B Marihuana Grower<br>Michigan GreenWorks, LLC<br>AU-G-B-000200 | 403 Pine ST<br>Kalkaska, MI 49646 | Lyle Russell, Jr. | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Strobel Corporation<br>AU-ER-000576<br>Class C Marihuana Grower<br>Strobel Farms<br>AU-G-C-000673 | 35731 38th AVE<br>Paw Paw, MI 49079 | Chevalier Holdings 3 LLC<br>Adam Schwallier<br>Davide Uccello-Barretta<br>David Rayman<br>Christopher Reames<br>Nicholas Taylor<br>Caitlin Rayman<br>Natalie Taylor | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Strobel Corporation<br>AU-ER-000576<br>Class C Marihuana Grower<br>Strobel Farms<br>AU-G-C-000672 | 35731 38th AVE<br>Paw Paw, MI 49079 | Chevalier Holdings 3 LLC<br>Adam Schwallier<br>Davide Uccello-Barretta<br>David Rayman<br>Christopher Reames<br>Nicholas Taylor<br>Caitlin Rayman<br>Natalie Taylor | 06/12/2023 | CRA Approved<br>Renewal | N/A |

| | | | | | |
|---|---|---|---|---|---|
| Strobel Corporation<br>AU-ER-000576<br>Class C Marihuana Grower<br>Strobel Farms<br>AU-G-C-000442 | 35731 38th AVE<br>Paw Paw, MI 49079 | Chevalier Holdings 3 LLC<br>Adam Schwallier<br>Davide Uccello-Barretta<br>David Rayman<br>Christopher Reames<br>Nicholas Taylor<br>Caitlin Rayman<br>Natalie Taylor | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Strobel Corporation<br>AU-ER-000576<br>Class C Marihuana Grower<br>Strobel Farms<br>AU-G-C-000671 | 35731 38th AVE<br>Paw Paw, MI 49079 | Chevalier Holdings 3 LLC<br>Adam Schwallier<br>Davide Uccello-Barretta<br>David Rayman<br>Christopher Reames<br>Nicholas Taylor<br>Caitlin Rayman<br>Natalie Taylor | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Candid, Inc.<br>AU-ER-000980<br>Class C Marihuana Grower<br>Candid Inc.<br>AU-G-C-000461 | 50680 28th AVE<br>Arlington Twp., MI 49013 | Gregory Yatooma<br>Chandler Yatooma | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Candid, Inc.<br>AU-ER-000980<br>Class C Marihuana Grower<br>Candid, Inc.<br>AU-G-C-000419 | 50680 28th AVE<br>Arlington Twp., MI 49013 | Gregory Yatooma<br>Chandler Yatooma | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Candid, Inc.<br>AU-ER-000980<br>Class C Marihuana Grower<br>Candid, Inc<br>AU-G-C-000463 | 50680 28th AVE<br>Arlington Twp., MI 49013 | Gregory Yatooma<br>Chandler Yatooma | 06/12/2023 | CRA Approved<br>Renewal | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| | | | | | |
|---|---|---|---|---|---|
| Candid, Inc.<br>AU-ER-000980<br>Class C Marihuana Grower<br>Candid, Inc.<br>AU-G-C-000465 | 50680 28th AVE<br>Arlington Twp., MI 49013 | Gregory Yatooma<br>Chandler Yatooma | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Candid, Inc.<br>AU-ER-000980<br>Class C Marihuana Grower<br>Candid, Inc.<br>AU-G-C-000464 | 50680 28th AVE<br>Arlington Twp., MI 49013 | Gregory Yatooma<br>Chandler Yatooma | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Green Planet, LLC<br>AU-ER-001049<br>Class B Marihuana Grower<br>GREEN PLANET LLC<br>AU-G-B-000202 | 3425 S BUTLER RD<br>Dowling, MI 49050 | Mansi Gupta<br>Sukhjinder Singh | 06/16/2023 | CRA Approved<br>Renewal | N/A |
| Green Planet, LLC<br>AU-ER-001049<br>Marihuana Retailer<br>Lumberjack's Provisioning<br>Center<br>AU-R-000709 | 8975 S M37 HWY<br>Dowling, MI 49050 | Mansi Gupta<br>Sukhjinder Singh | 06/16/2023 | CRA Approved<br>Renewal | N/A |
| Makana Fields, LLC<br>AU-ER-001113<br>Class C Marihuana Grower<br>Makana Fields, LLC<br>AU-G-C-000484 | 1141 Eden Way Suite B<br>Chesaning, MI 48616 | Christopher Howard<br>Paul Ingledue<br>Brett Taylor<br>Susan Howard | 06/16/2023 | CRA Approved<br>Renewal | N/A |

| | | | | | |
|---|---|---|---|---|---|
| NU Group, LLC<br>AU-ER-001134<br>Marihuana Retailer<br>Nirvana Center Monroe<br>AU-R-000740 | 14498 Laplaisance RD<br>Monroe, MI 48161 | Nighat Ullah<br>Sheraz Warraich<br>Rustam Bhatti<br>Haider Bhatti<br>Ihsan Ullah | 06/15/2023 | CRA Approved<br>Renewal | N/A |
| NU Group, LLC<br>AU-ER-001134<br>Marihuana Retailer<br>Nirvana Center Michigan<br>AU-R-000816 | 4312 I-75 Business Spur HWY<br>Sault Sainte Marie, MI 49783 | Nighat Ullah<br>Sheraz Warraich<br>Rustam Bhatti<br>Haider Bhatti<br>Ihsan Ullah | 06/15/2023 | CRA Approved<br>Renewal | N/A |
| Transcend DVentures LLC<br>AU-ER-001158<br>Class C Marihuana Grower<br>Space Labs Michigan<br>AU-G-C-000838 | 10310 Harvest PARK<br>Dimondale, MI 48821 | Tarik Lester | 06/15/2023 | CRA Approved<br>Renewal | N/A |
| Transcend DVentures LLC<br>AU-ER-001158<br>Class C Marihuana Grower<br>Space Labs Michigan<br>AU-G-C-000839 | 10310 Harvest PARK<br>Dimondale, MI 48821 | Tarik Lester | 06/15/2023 | CRA Approved<br>Renewal | N/A |
| Riley Partners, LLC<br>AU-ER-001186<br>Marihuana Processor<br>Riley Partners, LLC<br>AU-P-000310 | 4463 S Dort HWY Bldg B<br>Burton, MI 48529 | Louis Meeks II | 06/12/2023 | CRA Approved<br>Renewal | N/A |

| | | | | | |
|---|---|---|---|---|---|
| R&H Investment Holdings LLC<br>AU-ER-001219<br>Class C Marihuana Grower<br>R&H Investment Holdings LLC<br>AU-G-C-000428 | 48888 County Road 374<br>Lawrence, MI 49064 | Joseph Rockwood<br>Julie Rockwood | 06/13/2023 | CRA Approved Renewal | N/A |
| Vassar Tech Farms LLC<br>AU-ER-001473<br>Class C Marihuana Grower<br>Vassar Tech Farms, LLC<br>AU-G-C-000767 | 4855 Oak RD Suite B<br>Vassar, MI 48768 | NRL Holdings LLC<br>Brian Chouinard<br>Anthony Goff<br>Adam Long<br>Julie Chouinard<br>Barbara Goff | 06/14/2023 | CRA Approved Renewal | N/A |
| Vassar Tech Farms LLC<br>AU-ER-001473<br>Class C Marihuana Grower<br>Vassar Tech Farms, LLC<br>AU-G-C-000770 | 4855 Oak RD Suite B<br>Vassar, MI 48768 | NRL Holdings LLC<br>Brian Chouinard<br>Anthony Goff<br>Adam Long<br>Julie Chouinard<br>Barbara Goff | 06/14/2023 | CRA Approved Renewal | N/A |
| Vassar Tech Farms LLC<br>AU-ER-001473<br>Class C Marihuana Grower<br>Vassar Tech Farms, LLC<br>AU-G-C-000771 | 4855 Oak RD Suite B<br>Vassar, MI 48768 | NRL Holdings LLC<br>Brian Chouinard<br>Anthony Goff<br>Adam Long<br>Julie Chouinard<br>Barbara Goff | 06/16/2023 | CRA Approved Renewal | N/A |

| | | | | | |
|---|---|---|---|---|---|
| Hello Farms Licensing MI, LLC AU-ER-001532 Class C Marihuana Grower Hello Farms Licensing MI, LLC AU-G-C-000478 | 580 Shenfield RD Au Gres Township, MI 48703 | Nahidah Meiou Brian Farah Ahmed Ayoub Carl Meiou Wanda Farah | 06/12/2023 | CRA Approved Renewal | N/A |
| 420 Harvey Events, LLC AU-ER-002144 Marihuana Event Organizer 420 Harvey Events, LLC AU-MEO-000159 | , | 420 Harvey Holdings, LLC Edgar Ramon Joanne Ramon Cory Roberts Lynette Roberts | 06/12/2023 | CRA Approved Renewal | N/A |
| 1230 Michigan Inc. AU-ER-002229 Marihuana Retailer The Cake House AU-R-000781 | 1230 E. Michigan  AVE Battle Creek, MI 49014 | Charlena Berry | 06/15/2023 | CRA Approved Renewal | N/A |
| 586 Ventures, LLC AU-ER-002385 Marihuana Retailer Puff Sturgis AU-R-000767 | 651 Wade ST Sturgis, MI 49091 | JCE Management, LLC NICKOLAS HANNAWA Justin Elias SHANNON HANNAWA | 06/15/2023 | CRA Approved Renewal | N/A |
| Libby Holdings, L.L.C. AU-ER-002499 Class C Marihuana Grower Libby420 AU-G-C-000884 | 52570 38TH AVE Bangor, MI 49013 | Ronald Schafer Kimberly Schafer | 06/12/2023 | CRA Approved Renewal | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| | | | | | |
|---|---|---|---|---|---|
| Libby Holdings, L.L.C.<br>AU-ER-002499<br>Class C Marihuana Grower<br>Libby420<br>AU-G-C-000883 | 52570 38TH AVE<br>Bangor, MI 49013 | Ronald Schafer<br>Kimberly Schafer | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Libby Holdings, L.L.C.<br>AU-ER-002499<br>Class C Marihuana Grower<br>Libby420<br>AU-G-C-000882 | 52570 38TH AVE<br>Bangor, MI 49013 | Ronald Schafer<br>Kimberly Schafer | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Libby Holdings, L.L.C.<br>AU-ER-002499<br>Class C Marihuana Grower<br>Libby420<br>AU-G-C-000843 | 52570 38TH AVE<br>Bangor, MI 49013 | Ronald Schafer<br>Kimberly Schafer | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Libby Holdings, L.L.C.<br>AU-ER-002499<br>Class C Marihuana Grower<br>Libby420<br>AU-G-C-000885 | 52570 38TH AVE<br>Bangor, MI 49013 | Ronald Schafer<br>Kimberly Schafer | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| R & A Distributing, LLC<br>AU-ER-002771<br>Class B Marihuana Grower<br>R & A Distributing, LLC<br>AU-G-B-000218 | 3110 Turner ST Suite C<br>Lansing, MI 48906 | Robert Williams | 06/14/2023 | CRA Approved<br>Renewal | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

| | | | | | |
|---|---|---|---|---|---|
| Regency Specialties Inc.<br>AU-ER-002785<br>Marihuana Processor<br>Regency Specialties Inc.<br>AU-P-000295 | 23705 Regency Park<br>Warren, MI 48089 | JAWAN MATTI | 06/12/2023 | CRA Approved<br>Renewal | N/A |
| Prime Tree Farm, LLC<br>AU-ER-002849<br>Marihuana Processor<br>Prime Tree Farm, LLC<br>AU-P-000387 | 55880 72nd  AVE<br>Lawrence, MI 49064 | John Maloy<br>Aaron Isler | 06/14/2023 | CRA Approved<br>Renewal | N/A |
| Prime Tree Farm, LLC<br>AU-ER-002849<br>Class C Marihuana Grower<br>Prime Tree Farm, LLC<br>AU-G-C-000895 | 55880 72nd AVE<br>Lawrence, MI 49064 | John Maloy<br>Aaron Isler | 06/14/2023 | CRA Approved<br>Renewal | N/A |
| Prime Tree Farm, LLC<br>AU-ER-002849<br>Class C Marihuana Grower<br>Prime Tree Farm, LLC<br>AU-G-C-000892 | 55880 72nd AVE<br>Lawrence, MI 49064 | John Maloy<br>Aaron Isler | 06/14/2023 | CRA Approved<br>Renewal | N/A |
| Prime Tree Farm, LLC<br>AU-ER-002849<br>Class C Marihuana Grower<br>Prime Tree Farm, LLC<br>AU-G-C-000893 | 55880 72nd AVE<br>Lawrence, MI 49064 | John Maloy<br>Aaron Isler | 06/14/2023 | CRA Approved<br>Renewal | N/A |

| | | | | | |
|---|---|---|---|---|---|
| Greenstone Wellness, Inc<br>AU-ER-002879<br>Marihuana Retailer<br>Nobody's Home<br>AU-R-000720 | 90 W. Main ST<br>Benton Harbor, MI 49022 | Wilson Chandler | 06/13/2023 | CRA Approved<br>Renewal | N/A |
| Free Reign, LLC<br>AU-ER-002967<br>Class C Marihuana Grower<br>Free Reign, LLC<br>AU-G-C-000855 | 23748 Amber AVE<br>Warren, MI 48089 | Anemone, LLC<br>R & V Consulting, LLC<br>John Petropoulos<br>Raphael Blake<br>Vincent Mazzola<br>Shannan Petropoulos<br>Lauren Bruyninga | 06/16/2023 | CRA Approved<br>Renewal | N/A |
| Penn Township Farms LLC<br>AU-ER-003032<br>Class C Marihuana Grower<br>Penn Township Farms LLC<br>AU-G-C-000863 | 17317 Black ST<br>Vandalia, MI 49095 | Bob Bidawid<br>Tamara Yousif | 06/15/2023 | CRA Approved<br>Renewal | N/A |
| Penn Township Farms LLC<br>AU-ER-003032<br>Class C Marihuana Grower<br>Penn Township Farms LLC<br>AU-G-C-000862 | 17317 Black ST<br>Vandalia, MI 49095 | Bob Bidawid<br>Tamara Yousif | 06/15/2023 | CRA Approved<br>Renewal | N/A |
| SJINK, LLC<br>AU-ER-003288<br>Marihuana Retailer<br>315 North<br>AU-R-000794 | 26831 Michigan AVE<br>Inkster, MI 48141 | Marcine Karmo | 06/15/2023 | CRA Approved<br>Renewal | N/A |

CANNABIS REGULATORY AGENCY
2407 N GRAND RIVER AVE · P.O. BOX. 30205 · LANSING, MI 48909
www.michigan.gov/cra
LARA is an equal opportunity employer/program.

# Exhibit 9

## Agreement

1. Chris pays Greg $18,300,000 cash:
    1. $1,700,000 with signed agreement: $500,000 by 12/16/22 and $1.2M upon final signed agreement no later than 12/22/22.
    2. $220k/month starting May 1, 2023, with a standard promissory note from Chris personally.
    3. Greg will collect and keep the invoices that are due from Jeff (based on $155k owed - not a credit against money owed).
    4. Neither Chris nor Greg will pursue the receivables
    5. Payments are unconditional.
    6. Chris is taking all assets and all liabilities (no excluded liabilities).
2. Ownership transfer of Bloomfield Hills Swim and Tennis – Chris can still have privileges.
3. Lake Orion house for Greg's in-laws.
4. Whatever cash
5. 100% of CT deal with Jeff
6. 100% of NJ deal with Jeff
7. Non-interference in any business operations, excluding            , and committed transition assistance
8. Chris will pay the taxes for Axon, Grip and any other cannabis entities for all years including '21 and '22. If any of those returns are audited and there are additional taxes required, Chris will be responsible. Any income Greg received from Axon (not including the settlement payments) in '21 or '22 are included in the tax liability. Have to be timely filed (excluding '21) and Greg has to sign off on the returns as they are in his name.
9. Move Candid and Frequency Wellness out of Greg's name as soon as possible (by the end of the year if possible).
10. $5M balloon payment towards the payoff amount if/when           pays all of their balloon payments in full.
11. Chris pays Greg's health insurance, other benefits, lease payments until year end.
12. Greg assumes Kara's payroll effective January 1, 2023.
13. Chris will pay costs of improvements to Lake Orion house that have already been paid.
14. No interest charged on the payout amount.
15. Greg will provide all requested information and any opportunities he is or becomes aware of with the cannabis assets, and participate in a smooth transition until June 1, 2023 and will be supportive and provide assistance during this transition period.
16. Chris is willing to transfer the BHSAT asset at approximately $200K, as opposed to the value of $1.5M that was agreed upon. This result in a significant tax savings for Greg.
17. 50% of Liv Wellness lawsuit proceeds (split expenses – all decisions made together).

12/14/22
12:53
Steve RoMaya

Chris Yatooma

12:52 am
12/17/22
Chris Bartlett

Greg Yatooma

# Exhibit 10

## <u>AFFIDAVIT OF STEVE ROMAYA</u>

**I, Steve Romaya, being duly sworn, depose and state as follows:**

1.       I am the cousin of Chris and Greg Yatooma and have personal knowledge of the facts stated herein and if called upon could competently testify as to the truth of the factual representations set forth in this Affidavit.

2.       I was previously a partner with Greg and Chris in a cannabis asset.  Chris and Greg, as the majority partners, jointly bought me out of that asset in early 2022.

3.       In the fall 2022, I was requested by Chris Yatooma to get involved in the partnership break up with his brother Greg, as Chris would often call me for an opinion or to act as a sounding board for him.

4.       At Chris's request, I was present at the meeting on December 14, 2022, which went on for about 9 hours and resulted in the signed agreement for Chris to buy Greg out of their joint business interests and I helped facilitate the final deal.

5.       I was also one of the signors that acted as witness to the agreement for Chris to buy Greg out of their jointly owned business interests on December 14, 2022 ("Partnership Buyout Agreement").

6.       It was always my understanding, the understanding of everyone else present and everyone who signed/witnessed that Partnership Buyout Agreement that the Partnership Buyout Agreement was a final and binding agreement on both Greg and Chris and contained all the terms upon which Greg agreed to sell his business interests to Chris.

1

DocuSign Envelope ID: B5A5B6C9-6D5F-4A90-AD2A-D19ACC3C9848

7.      As part of the Partnership Buyout Agreement, Greg and Chris were splitting the MSY litigation proceeds 50/50 ("MSY Litigation Proceeds").

8.      The splitting of the MSY Litigation Proceeds was never in dispute and was never a point of contention in any discussions I was part of with Chris or Greg prior to the signing of the Partnership Buyout Agreement. At that time, the matter was on appeal.

9.      Chris then contacted me at the end of February 2023 to discuss settling the MSY litigation because Greg wanted to settle, but Chris did not, and since they were 50/50 partners, they both needed to agree.

10.     As confirmed in text communication with Greg, Chris, and their pastor, Chris agreed to settle the MSY litigation if Greg agreed to reduce Chris's payment obligations to Greg under the Partnership Buyout Agreement by a certain amount.

11.     Greg ultimately agreed, and Chris and Greg agreed to settle the MSY litigation at an agreed amount.

12.     At no time prior to the settling of the MSY litigation in March 2023, did Chris claim to me that he owned 100% of MSY or that Greg did not own 50% and/or had not interest or right in the proceeds of the MSY Litigation.

13.     Then, in late March or early April, Chris called me to tell me he was not going to allow the distribution of Greg's share of the  MSY Litigation Proceeds to Greg.

14.     Chris told me, in substance, that since signing the Partnership Buyout Agreement in December, Chris now believed that Greg did not deserve all the money that Chris had agreed to pay because Chris believed that Greg had breached their contract because Greg was working

2

DocuSign Envelope ID: B5A5B6C9-6D5F-4A90-AD2A-D19ACC3C9848

against him; and Chris also now thought the agreement was unfair because Chris was the one who would have to go to work every day and Chris thought that Greg would be able to sit at home and collect money from Chris.

15.     I told Chris that I did not believe Greg was working against him.

16.     We talked for roughly an hour and Chris told me he was going to try to use the MSY Litigation Proceeds to try to renegotiate the entire Partnership Buyout Agreement with Greg.

17.     Chris said to me in substance, that he was going to try to keep Greg from getting his half of the MSY Litigation Proceeds and use that as leverage to get Greg to agree to walk away from the rest of the money Chris had agreed to pay him under the Partnership Buyout Agreement.

18.     I told Chris I thought what he was doing was wrong and I did not agree with it.

19.     I told Chris I thought that Chris should honor the agreement and his word.

20.     Before we hung up, Chris asked me not to tell Greg about this conversation.

21.     But after Greg told me that Chris was trying to keep Greg from getting his half of the MSY Litigation Proceeds, I felt compelled to tell Greg about this conversation with Chris and am providing this Affidavit because I believe what Chris is doing is wrong.


Further affiant sayeth not.


_____                          5/17/2023
                                                          _____
Steve Romaya                                              Date

4861-6097-5716.v1

# Exhibit 11

| | |
|---|---|
| **From:** | Chris Yatooma - MSY |
| **To:** | Gregory Yatooma - FYB |
| **Cc:** | Jamie Kjos; Bob Brandt |
| **Subject:** | Agreement |
| **Date:** | Sunday, October 16, 2022 9:15:03 PM |

Gregory,

Below are the terms I understand we are agreed upon regarding our financial separation. Upon your confirmation, I will communicate the below and forward the draft agreement to tax and legal counsel for review. Based on the initial conversations I have had, there needs to be significant consideration given to how the agreement is structured from a tax perspective.

- $20M to be paid out as stated below:
  - $1.75M now
  - $250k/month starting May 1, 2023
- Ownership transfer of BHSAT (Chris can still offer membership to employees, use for events, and political signage)
- Greg retains ownership of Lake Orion house
- Retains company cash in his possession
- Half of proceeds from Liv Wellness lawsuit (split expenses – all decisions made together)
- Half the proceeds of Axon's share of Jeff's Connecticut license
- 6 month non-compete for Michigan, New Jersey, and New York, and committed transition

Love,
-Your brother, Chris

# Exhibit 12

# CHASE ○ *for* BUSINESS®

Printed from Chase for Business

---

## Matthew Checking (...6573)

### $500,000.00

Incoming wire
transfer

Dec 16, 2022
Posted date

Matthew Checking
(...6573)
Account name

0753290350FF
Transaction ID

1216GMQFMP01023621
SWIFT/FED/CHIP ID

---

### Beneficiary information

| | |
|---|---|
| Account | ....6573 |
| Name | MATTHEW CONSULTING, LLC DBA GREGORY |
| Address | YATO OMA & ASSOCIATES 1605 S TELEGRAPH RD BLOOMFIELD HILLS MI 48302-0044 US |

### Bank information

| | |
|---|---|
| Related references | O/B CITIZENS ST |
| Bank reference number | 0724145010000474 |

### Additional information

| | |
|---|---|
| Additional information | AGREEMENT DATED 12/14/2022 |

---

For transaction details, please refer to the periodic statement for the official record of this transaction.

# Exhibit 13

DocuSign Envelope ID: 31A60ACB-5675-49EC-95BD-F9B4F4848D80

## CONSULTING AGREEMENT

This consulting agreement (the "Agreement") is made and entered into on April 8, 2022 by and between Jeffrey Yatooma, Hydra Real Estate Development, LLC, all of its agents, employees, representatives, and any and all associated or related parties and entities (collectively "Hydra") and Axon Properties, LLC, all of its agents, employees, representatives, and any and all associated or related parties and entities (Collectively "Axon").  This Agreement is made in connection with the acquisition and sale of certain assets, as defined herein.  Hydra and Axon are each a "Party" and collectively the "Parties" to this Agreement.

### RECITALS

A.  Hydra desires to procure, lease, purchase and acquire cannabis real estate and business licenses located in the State of New Jersey and State of Mississippi ("Asset or Assets").

B.  Hydra further desires to improve, develop, operate, market, sell, transfer and/or otherwise convey Assets to prospective buyers or partners ("Revenue Event").

C.  Axon has spent considerable time, effort and resource(s) in procuring and developing certain leads, contacts, knowledge and other proprietary information that assist in the acquisition of Assets ("Confidential Information").

D.  Axon has agreed to provide Confidential Information to Hydra subject to the terms and conditions and contained herein.

E.  In consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### AGREEMENT

1. **Consideration**.

    A. **Confidential Information.**  Axon has provided Confidential Information to Hydra, which Confidential Information shall be held in strict confidence and shall not be disclosed to any third party, except as reasonably necessary to consummate the provisions of this Agreement. The parties shall keep this Agreement, the transactions contemplated hereby, and any information exchanged in furtherance hereof strictly confidential.

    B. **Consulting Fee.**  Axon shall be entitled to twenty-five percent (25%) of the net revenue generated by any Revenue Event for any and all Assets, whether Hydra used the Confidential Information or not to procure such Assets ("Consulting Fee").  The Consulting Fee shall be paid to Axon out of the proceeds of a Revenue Event or within three (3) business days of the closing date of the Revenue Event  if the Revenue Event  not close through escrow.  If the Revenue Event is the operation of the Asset(s), the Consulting Fee shall be paid monthly, and within ten (10) days after the end of the previous month. For the avoidance of doubt, Axon shall not be entitled to a Consulting Fee unless a Revenue Event is consummated.

2. **Indemnification**.   The Parties shall indemnify, defend and hold harmless each other, including their agents, representatives, partners, officers, directors, attorneys and associates from and against any and all claims, suits, damages, liens, judgments, penalties, attorneys' fees,

DocuSign Envelope ID: 31A60ACD-5675-49E6-96BD-F9B4F4849D80

expenses and/or liabilities arising out of, involving, or in connection with, any of the Confidential Information or the Assets.

3. **Governing Law**.  This Agreement shall be governed by the laws of the State of Michigan and Buyer and its agents, officers, directors and representatives hereby consent to Jurisdiction and venue in Oakland County, Michigan.

4. **Warranty of Authority**.  The Parties represent and warrant that they have obtained all approvals and authorizations as are necessary for the execution, delivery, and performance of this Agreement and that this Agreement has been validly executed and delivered by each Party, and is binding upon and enforceable against each of them in accordance with its terms. Each person executing this Agreement on behalf of a Party represents and warrants that he, she, or it has full legal authority to bind the Party by his, her, or its signature on this Agreement.

5. **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes and cancels all prior negotiations, representations, understandings, and agreements between the Parties concerning this Agreement.

6. **No Drafting Presumption/Headings**.  No presumption shall arise based upon draftsmanship of this Settlement Agreement. Counsel for the Parties have participated in the preparation of this Settlement Agreement or have had ample opportunity to comment upon and/or suggest or require changes in the language prior to its execution. Additionally, the headings in this Settlement Agreement are for convenience of reference only and shall not be considered as part of this Settlement Agreement nor limit or otherwise affect the interpretation thereof.

7. **Obligation to Cooperate**.  The Parties agree to cooperate fully to provide, deliver or supplement any Confidential Information and to take all additional actions which may be reasonably necessary or appropriate to give force and effect to the basic terms and conditions and intent of this Agreement.

8. **Waiver of Defense of Illegality (the Zoma Clause)**.  Each party hereto hereby irrevocably waives any defense based on federal, state or local law or that the transactions contemplated by this agreement are void as against public policy or based on illegality under ANY federal, state or local law, including without limitation any federal cannabis laws. Each party hereto acknowledges that each state having jurisdiction over the Asset has enacted legislation regarding the legal cultivation, sale, and use of cannabis/marijuana, which may be in conflict with federal laws. Each party expressly waives the right to present any defense related to the illegality of cannabis, the regulation of cannabis, or this agreement, and agrees that such defense(s) shall not be asserted, and will not apply, in any dispute or claim arising out of this Agreement.

*(Signature page to follow)*

2

In Witness Whereof, the undersigned have caused this Purchase Agreement to be executed as of the date first written above.

**Hydra Real Estate Development, LLC**

By: *Jeff Yatooma* _____
Name: Jeffrey Yatooma
Its: Member/Authorized Agent

**Axon Properties, LLC**

By: *Greg Yatooma* _____
Name: Gregory Yatooma
Its: Member/Authorized Agent

# Exhibit 14

DocuSign Envelope ID: 7FDBB3B1-9ADB-4AF8-A878-0C1A998AAD83

## NEW JERSEY LICENSEE AGREEMENT

THIS NEW JERSEY LICENSEE AGREEMENT (this "Agreement") is made effective on December 31, 2022 (the "Effective Date") by and between Gregory Yatooma, an individual whose address is 127 S. Berkshire Road, Bloomfield Hills, MI 48302 ("Individual"), and Axon Properties LLC, a Michigan limited liability company, whose address is 1615 S. Telegraph Rd., Bloomfield Hills, Michigan 48302 ("Company"). Individual and Company are sometimes individually referred to as "Party" and collectively referred to as the "Parties."

WHEREAS, Company has worked with Individual and Candid Wellness LLC, a New Jersey limited liability company ("Applicant") to apply to the New Jersey Cannabis Regulatory Commission ("CRC") for a license to become a recreational cannabis retailer ("Retailer") in the State of New Jersey.

WHEREAS, Company agrees to hold Individual harmless from any claims and/or liabilities arising out of Company's actions in connection with the Application, as herein defined, to become a Retailer in the State of New Jersey.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, both hereby agree as follows:

## TERMS

1.     Application. The Parties have worked and shall continue to work together to prepare and apply for a license with the CRC for Applicant to become a Retailer in the State of New Jersey (the "Application"). Individual hereby agrees to fully comply with all instructions, lawful requirements, and submittals necessary to complete each process of the Application. Individual hereby understands that in order to be approved to become a Retailer in the State of New Jersey, Applicant must submit and receive approval of two separate applications; approval from the municipality in which Applicant seeks to do business within the State of New Jersey ("Municipal Approval") and an approval from the State of New Jersey ("State Approval").   The Application reflects that Individual holds forty-nine (49%) percent ownership interest in Applicant ("Individual Ownership").

2.     Transfer of Individual Ownership to Company. Within ten (10) business days after Applicant's receipt of the State Approval, and for valuable consideration already received by Individual, Company and Individual shall commence the transfer the Individual Ownership to Company. The obligation to transfer the Individual Ownership shall survive the death or incapacity of Individual. Individual acknowledges and agrees that (a) Company would be irreparably damaged if Individual were to breach its transfer obligations herein for which money damages would be an insufficient remedy, and (b) the covenants set forth in this paragraph were a material inducement to Company entering into and performing its obligations hereunder, and Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Parties if Individual breached the provisions set forth in this paragraph. Accordingly, Company will be entitled to specific performance in the event Individual refuses to or is unable to comply with the transfer obligations contained in this paragraph.

3.     Hold Harmless, Indemnification. Individual is not liable for, and Company shall indemnify, defend, and hold Individual harmless from the payment of taxes, any tax liability, for any violation of any state, local or municipal laws or for any other claim, lawsuits, enforcement actions, losses, demands, lawsuit, causes of action, liability, investigations, fines, sanctions, losses of any kind and nature, damage, injury, expenses, charges, obligations of any kind whatsoever (collectively, "Claims"), whether brought by an individual or other entity, or imposed by a court of law or by administrative action of any federal, state, or local governmental body or agency, arising out of, in any way whatsoever, any acts, omissions,

1

DocuSign Envelope ID: 7FDBB3B1-6A28-4AF8-A878-0C1A998AAD83

negligence, or willful misconduct on the part of Applicant, its officers, owners, personnel, employees, agents, contractors, or volunteers. In no event shall Company be required to defend, indemnify, or hold Individual harmless from any Claims resulting from Individual's willful misconduct. This indemnification applies to and includes, without limitation, the payment of all penalties, fines, judgments, awards, and decrees.

4.    Notice of Any Potential Claim. Company shall immediately notify Individual in writing in the event of potential Claim received by it directly involving Individual in addition to any communications from any state, local or municipal government or agency which arose prior to the Effective Date, or which may affect Individual in anyway. Individual shall immediately notify Company in writing in the event of potential Claim received by him in addition to any communications from any state, local or municipal government or agency which arose prior to the Effective Date, or which may affect Individual in any way.

5.    Tax Liability. Individual is not liable for the payment of taxes or any tax liability whatsoever in connection with Applicant and the Application or business transactions conducted by Applicant subsequent to becoming licensed, and such liability shall be the responsibility of the Company.

6.    Authority to Enter Agreement. Each Party warrants that the individuals who have signed this Agreement have the actual legal power, right, and authority to make this Agreement and bind each respective Party.

7.    Amendment; Modification. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing and signed by both Parties.

8.    Waiver. No waiver of any default shall constitute a waiver of any other default or breach, whether of the same or other covenant or condition. No waiver, benefit, privilege, or service voluntarily given or performed by a Party shall give the other Party any contractual right by custom, estoppel, or otherwise.

9.    Entire Agreement. This Agreement, together with the December 14 Agreement, contains the entire agreement between the Parties related to the Individual Ownership, Individual's obligation to transfer the Individual Ownership to Company, Company's sole liability for payment of taxes, and Company's obligation to indemnify Individual.

10.    Enforceability, Severability, and Blue Pencil. If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited. In the event that any aspect of this Agreement is determined to be unenforceable by a court of competent jurisdiction, then such court is empowered to modify this Agreement to give the broadest possible interpretation permitted under Michigan law.

11.    Assignment. Except as otherwise specifically provided in this Agreement, Individual may not assign all or any portion of its rights under this Agreement without the prior approval of the CRC and Company's written consent, which consent shall not be unreasonably withheld, provided that Company may freely assign all of its rights under this Agreement. Any attempted assignment in violation of this provision shall be void. The provisions hereof shall be binding upon and inure to the benefit of the Parties, their successors and permitted assigns.

12.    Governing Law. This Agreement shall be governed by and construed under the laws of the State of Michigan, without giving effect to conflicts of laws principles. The Parties hereto agree and

New Jersey Licensee Agreement – Gregory Yatooma

acknowledge that no Party makes, will make, or shall be deemed to make or have made any representation or warranty of any kind regarding the compliance of this Agreement with any Federal Cannabis Laws. No Party hereto shall have any right of rescission or amendment arising out of or relating to any non-compliance with Federal Cannabis Laws unless such non-compliance also constitutes a violation of applicable state law as determined in accordance with by the CRC, and no party shall seek to enforce the provisions hereof in federal court unless and until the parties have reasonably determined that the applicable law is fully compliant with Federal Cannabis Laws. As used herein, "Federal Cannabis Laws" means any U.S. federal laws, civil, criminal or otherwise, as such relate, either directly or indirectly, to the cultivation, harvesting, production, distribution, sale and possession of cannabis, marijuana or related substances or products containing or relating to the same, including, without limitation, the prohibition on drug trafficking under 21 U.S.C. § 841(a), et seq., the conspiracy statute under 18 U.S.C. § 846, the bar against aiding and abetting the conduct of an offense under 18 U.S.C. § 2, the bar against misprision of a felony (concealing another's felonious conduct) under 18 U.S.C. § 4, the bar against being an accessory after the fact to criminal conduct under 18 U.S.C. § 3, and federal money laundering statutes under 18 U.S.C. §§ 1956, 1957, and 1960 and the regulations and rules promulgated under any of the foregoing.

[Signatures on following page(s)]

New Jersey Licensee Agreement – Gregory Yatooma

IN WITNESS WHEREOF, the parties have executed and made effective this Agreement as of the Effective Date.

INDIVIDUAL

_Greg Yatooma_ _____
213F1E37B94E48C...
Gregory Yatooma, an individual

COMPANY

Axon Properties LLC

By: _Chris Yatooma_ _____
3B1D0CC3911D4E9...
Christopher Yatooma

Its:     Authorized Agent

**DocuSign®**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 7FDBB3B16AD84AF0A3780C1A998AAD83 | | Status: Completed |
| Subject: Complete with DocuSign: New Jersey Licensee Agreement - Greg Yatooma (3.17.2023).docx | | |
| Source Envelope: | | |
| Document Pages: 4 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Greg Yatooma |
| AutoNav: Enabled | | 1615 S Telegraph Rd |
| EnvelopeId Stamping: Enabled | | nil |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Bloomfield Township, MI  48302 |
| | | Yatooma@FYBLaw.com |
| | | IP Address: 68.34.113.249 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Greg Yatooma | Location: DocuSign |
| 3/17/2023 8:24:29 AM | Yatooma@FYBLaw.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Chris Yatooma<br>cyatooma@msycapital.com<br>President<br>Security Level: Email, Account Authentication (None) | *Chris Yatooma*<br>3B1D0CC3911D4E9... | Sent: 3/17/2023 8:25:52 AM<br>Viewed: 3/17/2023 12:14:50 PM<br>Signed: 3/17/2023 3:04:32 PM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 174.240.117.81 | |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 3/17/2023 12:14:50 PM<br>    ID: aa14a8ca-3709-422a-a146-87ede0feceab | | |
| Greg Yatooma<br>yatooma@fyblaw.com<br>Security Level: Email, Account Authentication (None) | *Greg Yatooma*<br>213F1E37B94E48C... | Sent: 3/17/2023 8:25:51 AM<br>Viewed: 3/17/2023 8:26:05 AM<br>Signed: 3/17/2023 8:26:10 AM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 68.34.113.249 | |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mark James<br>james@fyblaw.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 3/17/2023 8:25:52 AM<br>Viewed: 3/17/2023 11:27:08 AM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/17/2023 8:25:52 AM |
| Certified Delivered | Security Checked | 3/17/2023 8:26:05 AM |
| Signing Complete | Security Checked | 3/17/2023 8:26:10 AM |
| Completed | Security Checked | 3/17/2023 3:04:32 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

# Exhibit 15



License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT APPLICATION

This form is for applicants that have been prequalified or licensed under the Michigan Regulation and Taxation of Marihuana Act (MRTMA) or the Medical Marihuana Facilities Licensing Act (MMFLA) to submit a request for one of the following situations:

- Change of Ownership (Adding/Removing/Change of Equity)
- Change of Entity Name
- Conversion
- Asset Purchase

Applicants/Licensees shall report to the agency any proposed material changes to the marihuana business _before_ making a material change that may require prior authorization by the agency. Please be mindful of any social equity eligibility requirements prior to a change of ownership.

| Supporting Documents Checklists |
|---|
| **If proposing to add members:** |
| ☑ Amendment Application |
| ☑ Proposed Governing Documents |
| ☑ Organizational Structure |
| ☑ Authorizing Resolution |
| *Please note new supplemental applicants who have not already submitted a supplemental application with the CRA will be required to do so. |
| **If proposing to remove members:** |
| ☑ Amendment Application |
| ☑ Proposed Governing Documents |
| ☑ Organizational Structure |
| ☑ Authorizing Resolution or Withdrawal Letter |
| **If proposing change to equity only:** |
| ❑ Amendment Application |
| ❑ Proposed Governing Documents |
| ❑ Organizational Structure |
| ❑ Authorizing Resolution |
| **If proposing a change of entity name:** |
| ❑ Amendment Application |
| ❑ Proposed Governing Documents |
| ❑ Organizational Structure |
| ❑ Certificate of Amendment from LARA Corporations |
| ❑ Articles of Organization |
| ❑ Authorizing Resolution |
| ❑ Certificate of Occupancy (required only if licensed) |
| ❑ Insurance Policy (required only if licensed) |
| ❑ Deed or Lease Agreement (required only if licensed) |
| **If proposing a conversion from one entity type to another:** |
| ❑ Amendment Application |
| ❑ Proposed Governing Documents |
| ❑ Organizational Structure |
| ❑ Certificate of Amendment from LARA Corporations |
| ❑ Articles of Organization |
| ❑ Authorizing Resolution |
| ❑ Certificate of Occupancy (required only if licensed) |
| ❑ Insurance Policy (required only if licensed) |
| ❑ Deed or Lease Agreement (required only if licensed) |
| **If proposing an asset purchase:** |
| ❑ Amendment Application |
| ❑ Proposed Governing Documents – Purchaser |
| ❑ Organizational Structure – Purchaser |
| ❑ Purchase Agreement |
| *Please note a Step 2 license application will be required to be submitted by the purchaser once instructed to do so by the CRA. Please do not file a Step 2 application until you have received the request from the CRA. |

Amendments must be filed on the Accela Citizen Access Portal. For more information about amendments, please view the amendments webpage on the CRA website. Please send all amendment-related communications to CRA-Amendments@Michigan.gov.



# CANNABIS
## REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT APPLICATION

Amendments must be filed on the Accela Citizen Access Portal. For more information about amendments, please view the amendments webpage on the CRA website. Please send all amendment-related communications to CRA-Amendments@Michigan.gov.

### General Information

| Main Applicant/Licensee Legal Name | Main Applicant/Licensee Prequalification Record Number (e.g., ERG-000000, AU-ER-000000) | | |
|---|---|---|---|
| Candid, Inc. | ERG-002700, AU-ER-000980 | | |
| Email | Phone | | |
| yatooma@fyblaw.com | (248) 459-8832 | | |
| Mailing Address (including Suite, Unit, Building #'s) | City | State | Zip Code |
| 1615 S. Telegraph Rd. | Bloomfield Hills | MI | 48302 |

### Amendment Type

- ☒ Change of Ownership (Adding/Removing/Change of Equity)
- ☐ Change of Entity Name
- ☐ Conversion
- ☐ Asset Purchase

### Provide a Detailed Description of the Proposed Amendment (i.e., removing John Doe as 50% owner of Entity A, LLC)

Gregory Yatooma, sole shareholder of Candid, Inc., is transferring 100% of Candid, Inc.'s stock to Joshua Smith, a prequalified individual.

### Person Completing Form

| Name (First, Middle, Last): | Affiliation with Entity: |
|---|---|
| Heather Vanderwalker Cude | Attorney |
| Email Address: | Phone: |
| Cude@fyblaw.com | (248) 496-6979 |



**CANNABIS**
R E G U L A T O R Y   A G E N C Y

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT VERIFICATION & AFFIDAVIT OF FULL DISCLOSURE ATTESTATION
Add additional pages of this form as necessary to account for multiple contact persons.

On behalf of _____Candid, Inc._____, I ___Gregory Yatooma, Shareholder___,
                    *Legal Name of Amendment Applicant*                       *Name & Title of Individual Authorized to Sign on Behalf of Applicant*

confirm the following:

1. I am the individual responsible for submitting this amendment application and have full authority to execute this amendment application.

2. I authorize the Cannabis Regulatory Agency (Agency) to add _____Heather Cude_____ to be a contact person for this amendment. I understand that this person will have access to this amendment record. Further, I understand that this person will retain access and is authorized to communicate with and receive communication from the Agency regarding only this amendment until the licensee submits an official request to remove this person's access and cease communication with this person. The contact information for this person is provided below.

3. The contact information to be used in communications regarding the amendment application named above is as follows:

      Contact E-mail Address: _____cude@fyblaw.com_____

      Contact Phone Number: _____(248) 496-6979_____

      Contact Person's ACA Login User ID (if applicable): ___heathercude___
      (IMPORTANT: ACA Login User ID is required if the contact person needs to have access to online records.
      Please contact the Agency if you need assistance creating an ACA account.)

4. I authorize the person listed as the Person Completing Application within the demographic section of this application to be a contact person for the Agency for this amendment. I understand that this person will have access to records and material submitted to the Agency for the purposes of this amendment application. Further, I understand that this person will retain access and receive communication from the Agency regarding the applicant until the applicant submits an official request to remove this person's access and cease communication with this person.

5. I understand this requested amendment is a proposed change and cannot be executed prior to receiving approval from the Agency. To be compliant with the reporting requirements within the Michigan Regulation and Taxation of Marihuana Act (MRTMA), the Medical Marihuana Facilities Licensing Act (MMFLA), and the administrative rules: Applicants shall report to the agency any proposed material changes to the marihuana business before making a material change that may require prior authorization by the agency.

6. I affirm no conditions exist that would prevent this amendment from taking place once granted approval from the Agency.

7. Further, I affirm, under the penalties of perjury, that the information set forth in this amendment application and all related supporting documentation is true, complete, and accurate, and that no material information has been omitted. Further, I affirm all previously completed Attestations remain true, complete, and accurate, and that no material information has changed that has not been previously reported.

_____         *1-27-23*
Signature of Individual Authorized to Sign on Behalf of Main Applicant    Date

Subscribed and sworn to by *Gregory Yatooma* before me on *January 27, 2023*
              (Authorized Individual Name)                 (Date)

*Kara Harbour*                 *Kara Harbour*
(Notary Public Signature)                 (Notary Public Printed Name)

State of *Michigan*, County of *Oakland*, Acting in the county of *Oakland*, *Michigan*
                                                (county)         (state)

My commission expires: *August 2, 2027*



License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## MAIN ENTITY ORGANIZATIONAL STRUCTURE REQUIREMENTS & EXAMPLE

**Every main entity applicant must submit an organizational structure document that includes the following:**

| | |
|---|---|
| **Limited Liability Company** | All members, the spouses of all members holding a direct or indirect ownership interest of greater than 10% in the main applicant; all managers, and the spouses of all managers. |
| **Publicly Held Corporation** **Privately Held Corporation** | All corporate officers or persons with equivalent titles and their spouses; all directors and their spouses; all shareholders, and the spouses of all shareholders holding a direct or indirect ownership interest of greater than 10% in the main applicant |
| **Trust** | All trustees; all individuals or bodies able to control or direct the affairs of the trust; all beneficiaries, and the spouses of all beneficiaries who receive or have the right to receive more than 10% of the gross or net profit of the trust during any full or partial calendar or fiscal year. |
| **Partnership** **Limited Liability Partnership** | All partners and the spouses of all partners. |
| **Limited Partnership** **Limited Liability Limited Partnership** | All general and limited partners and the spouses of all general and limited partners. |
| **Nonprofit Corporation** | All individuals and entities with membership or shareholder rights and the spouses of all individuals with shareholder rights. |

**Also Include:**

- **All managerial employees,** if applicable
  - An employee is considered a managerial employee if they have the ability to control and direct the affairs of the marijuana business and/or have the ability to make policy concerning the marijuana business.
- **Ownership percentages**
- **Officer titles,** if applicable (e.g., President, Vice President, Treasurer, Secretary; Chief Executive Officer, Chief Financial Officer, etc.)

**Those with less than 2.5% ownership interest in the main applicant and their spouses are not required to be disclosed.**

**Example:**



Ensure all entities and individuals listed on the organizational structure are disclosed on DISCLOSURE OF OWNERSHIP on the next two pages.



CANNABIS
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## DISCLOSURE OF OWNERSHIP

| Candid, Inc. | (248) 459-8832 |
|---|---|
| Entity Name | Phone No. |

### Parties & Spouses

**Disclose all managerial employees and the following for the entity types below.** Add additional pages of this disclosure if necessary.
- **For a limited liability company (LLC):** Disclose all managers, all members that have greater than 10% direct or indirect ownership interest and/or that exercise control over or participate in the management of the LLC, and the spouses of these individuals.
- **For a publicly or privately held corporation:** Disclose all corporate officers or persons with equivalent titles, all directors, all shareholders holding a direct or indirect interest of greater than 10% in the corporation, and the spouses of these individuals.
- **For a trust:** Disclose all trustees, all individuals or bodies able to control or direct the affairs of the trust, all beneficiaries receiving or who have the right to receive greater than 10% of the gross or net profit of the trust during any full or partial calendar or fiscal year, and the spouses of these beneficiaries.
- **For a partnership or limited liability partnership:** Disclose all partners and their spouses.
- **For a limited partnership and limited liability limited partnership:** Disclose all general and limited partners with greater than 10% ownership interest and their spouses.
- **For a nonprofit corporation:** Disclose all entities and individuals with membership or shareholder rights and their spouses.

| Entity or Individual Name | FEIN or SSN | E-mail Address | Date of Birth (if applicable) | Is the Individual Married? |
|---|---|---|---|---|
| Joshua Smith | 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 | smith@axonprop.com | 06/01/1974 | ☒ Yes ☐ No |
| Rebecca Smith (spouse) | 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 | rlsmith299@gmail.com | 04/25/1973 | ☒ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |



License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## DISCLOSURE OF OWNERSHIP, CONTINUED

| Candid, Inc. | (248)459-8832 |
|---|---|
| Entity Name | Phone No. |

### Ten Percent or Less

List all entities and individuals with **10% or less** direct or indirect ownership in the entity for which this application is being completed. Those holding **less than 2.5%** direct or indirect ownership interest in the main entity are not required to be disclosed.

- For a limited liability company (LLC): Disclose all members with 10% or less ownership interest in the main applicant seeking licensure.
- For a publicly and privately held corporation: Disclose all shareholders holding an interest of 10% or less in the main applicant seeking licensure. Shareholders holding an interest of 5% or less in the main applicant seeking licensure are not required to be disclosed.
- For a trust: Disclose all beneficiaries receiving or who have the right to receive 10% or less of the gross or net profit of the trust during any full or partial calendar or fiscal year
- For a limited partnership and limited liability limited partnership: Disclose all general and limited partners with 10% or less ownership interest.

| Entity or Individual Name | Mailing Address | Email Address | Date of Birth (if applicable) |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# Exhibit 16

<u>SHAREHOLDER RESOLUTION CONDITIONALLY APPROVING TRANSFER OF SHARES</u>

WHEREAS, pursuant to the By Laws of this corporation (the "Company"), it is deemed desirable and in the best interests of Candid, Inc., a Michigan corporation, that the following actions be taken by the Shareholder (s) of this Company pursuant to this Written Consent:

NOW, THEREFORE, BE IT RESOLVED that the undersigned Shareholder of this Company hereby consents to, approves, and adopts the following:

**<u>CONDITIONAL TRANSFER OF SHARES</u>.**

RESOLVED that this Company sell and issue its Shares to the person(s) set forth below and for the consideration set forth below; that such shares shall be deemed fully paid and nonassessable; and that the Managing Shareholder has determined that the consideration reflects fair value for the shares.

| Name | Percentage of Shares | Consideration |
|------|---------------------|---------------|
| Joshua Smith | 100% | Previously Paid |

FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares.

The undersigned member of this limited liability company consents and agrees to the above on this 24th day of February 2023

Gregory Yatooma, Shareholder                                        Date

# Exhibit 17

FILED   Received for Filing   Oakland County Clerk   10/6/2023 2:42 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23–200283-CB

Hon. Victoria Valentine

**DEFENDANT CHRISTOPHER
YATOOMA'S ANSWER TO
COMPLAINT AND AFFIRMATIVE
DEFENSES**

---

TAFT STETTINIUS & HOLLISTER LLP
By:   Ethan R. Holtz (P71884)
       Emily Mayer (P78956)
27777 Franklin Road, Suite 2500
Southfield, MI
(248) 351-3000
Eholtz@taftlaw.com
Emayer@taftlaw.com
*Attorneys for Plaintiff*

URBAN LEGAL GROUP
By:   Jeffrey Sieving (P71625)
1615 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 230-2820
sieving@urbanlegalgroup.com
*Counsel for Defendant Christopher Yatooma*

BODMAN PLC
By:   J. Adam Behrendt (P58607)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
abehrendt@bodmanlaw.com
*Counsel for Defendant Christopher Yatooma*

---

4857-7641-8944_5

**DEFENDANT CHRISTOPHER YATOOMA'S ANSWER TO COMPLAINT**

Defendant Christopher Yatooma ("Chris") answers the complaint of plaintiff Gregory Yatooma ("Greg") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.     Greg is an individual who resides in Oakland County, Michigan.

**ANSWER:** Admit.

2.     Chris is an individual who resides in Oakland County, Michigan.

**ANSWER:** Admit.

3.     MSY is a Michigan limited liability company whose principal place of business is in Oakland County, Michigan.

**ANSWER:** Admit.

4.     The Court has jurisdiction over this matter pursuant to MCL 600.601, MCL 600.605, and MCL 600.8315.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris does not contest jurisdiction.

5.     This Complaint involves a business dispute, as defined by MCL 600.8031, and, therefore, meets the statutory requirements for assignment to the Oakland County Business Court.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris does not contest whether this complaint meets the statutory requirements for assignment to the Oakland County Business Court.

4857-7641-8944_5

6.      The amount in controversy, exclusive of interest, costs, and attorneys' fees, exceeds Twenty-Five Thousand Dollars ($25,000.00) and seeks equitable relief.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris denies that Greg is entitled to any relief.

7.      Venue is proper in this Court pursuant to MCL 600.1621, among other provisions.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. In further answer, Chris does not contest venue.

## STATEMENT OF FACTS

8.      Greg and Chris are brothers.

**ANSWER:** Admit.

9.      In 2016, Greg and Chris started working together in many business ventures they owned and/or operated together as partners/members.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris admits that Greg and Chris worked together, but denies as untrue that they owned and/or operated business ventures as "partners/members".

4857-7641-8944_5

10.     Several of these business ventures that Greg and Chris owned and/or operated jointly, were, solely owned by Greg.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies the allegations as untrue. However, Chris admits that Greg put certain companies in his own name in an effort to defraud Chris and in violation of the Michigan Rules of Professional Conduct and his fiduciary duties to Chris as his attorney.

11.     The businesses operated by Greg and Chris accumulated significant assets and were the holders of significant accounts receivable, which Greg and Chris owned equally 50/50.

**ANSWER:**  Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies as untrue that all such businesses were owned equally with Greg.

12.     Additionally, Greg and Chris were involved in litigation in which they, through their company MSY, were awarded a significant judgment and the proceeds of the litigation were placed in a law firm IOLTA for distribution ("Litigation Proceeds").

**ANSWER:** Chris admits that MSY was awarded a judgment in certain litigation and the proceeds from that litigation were placed in a law firm IOLTA account for distribution. Chris denies as untrue the remaining allegations.

13.     At all relevant times, MSY was owned 50/50 by Greg and Chris.

**ANSWER:** Chris denies the allegations as untrue.

14.     However, in 2022, as will be more fully described below, there was a breakdown in the relationship between Greg and Chris.

**ANSWER:** Chris admits in 2022 there was a breakdown in his relationship with Greg.

15.     Rather than litigating with his brother to terminate the partnership and wind up the affairs and assets of the Companies, with the help of several mediators, Greg and Chris began negotiating a buyout of Greg's ownership and interest in the Companies.

**ANSWER:** Chris denies the allegations as characterized therein as untrue. By way of further answer, Chris submits that Greg created a scheme to extort and steal from Chris in violation of his ethical and fiduciary duties to Chris.

16.     With the help of others over several months and several meetings, on December 14, 2022, Greg and Chris reached a written and binding agreement (the "Buyout Agreement"), signed by both parties and three witnesses, which contained the material terms of the buyout of Greg of all business interests in certain companies owned solely by Greg and other companies operated by Greg and Chris (collectively, the "Companies"). Chris and Greg are both in possession of the Buyout Agreement.

**ANSWER:** Chris denies that the December 14th document was a binding agreement or that it is anything more than a letter of intent that was subject to further negotiation. Chris also denies that it was signed by three witnesses as the document does not identify any witnesses. Furthermore, one of the individuals on the document was not present when his name was signed to it.

17.     Each of the three witnesses who executed the Buyout Agreement will testify that the Buyout Agreement was intended to be binding and enforceable and was the culmination of months of negotiations between Greg and Chris.

**ANSWER:** Chris neither admits nor denies the allegations because he lacks knowledge or information to form a belief as to the truth of the allegations.

18.     Chris has never stated to Greg that he believes the Buyout Agreement is anything other than binding and enforceable between the parties.

**ANSWER:** Chris denies as untrue.

19.     The Buyout Agreement expressly memorialized agreements between Greg and Chris concerning the buyout of Greg's interest in the Companies, including but not limited to:

a.      Chris agreed to pay Greg for his interest in the Companies in an amount certain, in excess of $25,000, including a first payment made by December 16, 2022, and a larger payment to be made no later than December 22, 2022 (the "December 22 Payment");

b.      Chris would thereafter begin and be required to make monthly payments to Greg on or about May 1, 2023, and continuing until August 1, 2029;

c.      Greg agreed to transfer his interest in the Companies and the assets, including accounts receivable, owned by the Companies, to Chris or his designee. Greg retained certain other business assets; and

d.      The Litigation Proceeds were to be split equally between Greg and Chris.

4857-7641-8944_5

**ANSWER:** Chris denies these allegations, and their subparts, as untrue. In further answer, the December 14th document speaks for itself and clearly states "$1,700,000 with signed agreement" and "$1.2M upon final signed agreement". However, a signed agreement was never reached and additional payments were contingent on the parties entering into a final agreement, which did not occur. Further, the December 14th document states further payments would be evidenced by "a standard promissory note . . ." A promissory note was never memorialized and, in fact, the parties continued to negotiate, and, during these negotiations, Greg offered to reduce the amount of the promissory note by $2,100,000 and to delay the start of the payments under the future note. Greg agreed the expenses Chris paid for litigation would be reimbursed to Chris off of the top of the Ligation Proceeds. Moreover, there were additional negotiations regarding the Litigation Proceeds where Greg agreed to have other monies owed to Chris paid from the Litigation Proceeds, and then later reneged. Finally, the December 14th document does not say Greg agreed to transfer his interest in any "Companies" (or their assets, including accounts receivable, owned by the "Companies"), to Chris or his designee.

20.    The Buyout Agreement also explicitly provides that all payments from Chris to Greg "are unconditional."

**ANSWER:** Chris denies as untrue. The December 14th document speaks for itself and must be read in its entirety.

21.    Chris initially complied with the Buyout Agreement, making the required December 16 payment to Greg.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

22.     Likewise, Greg complied with the Buyout Agreement when he signed all documents provided by Chris and/or his attorneys effecting [sic] the transfer of Greg's ownership of the Companies, assets, and accounts receivable to Chris and/or his designee.

**ANSWER:** Chris denies as untrue. The December 14th document makes no reference to this obligation by Greg as it was not an agreement. Any documents that Greg signed were for Greg's benefit or to correct the fact that Greg wrongly put assets of his client (and brother) into his own name in violation of the Michigan Rules of Professional Conduct and his fiduciary duty while lying to Chris that this was being done for Chris' benefit.

23.     Greg also removed himself from all company bank accounts, for Chris' benefit.

**ANSWER:** Chris denies as untrue. Greg removed himself as an authorized signer of company bank accounts. He never owned the accounts or contributed any funds to them.

24.     Upon reliance on the Buyout Agreement, Greg was completely removed and separated from all the Companies, the Companies' assets, and their respective bank accounts.

**ANSWER:** Chris denies as untrue.

25.     Other than the Litigation Proceeds, which was specifically reserved in the Buyout Agreement, it is undisputed that Greg has completely assigned, transferred, and conveyed his

interest in the Companies and their respective assets to Chris, or Chris' designee, in reliance of the Buyout Agreement.

**ANSWER:** Chris denies as untrue. All Greg purportedly "assigned, transferred, [or] conveyed . . ." were assets that Greg wrongfully put into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris.

26.      It is also undisputed that since the signing of the Buyout Agreement, Chris has sold certain assets previously owned by the Companies and has retained one hundred percent (100%) of the proceeds from such sales.

**ANSWER:** Chris neither admits nor denies the allegations because they are vague and unclear.

27.      Thereafter, once Chris had what he wanted and Greg had signed over his interests in the Companies and removed himself from the bank accounts, Chris reneged on and breached the Buyout Agreement, by, among things, the following:

a.      Refusing to make the December 22 Payment; and

b.      Refusing to split the Litigation Proceeds and attempting to take possession of 100% of same (as described further below); and

c.      Refusing to make the May 1, 2023 payment.

**ANSWER:** Chris denies as untrue.

28.      On April 12, 2023, Chris and Greg's attorneys in the MSY litigation, received the Litigation Proceeds.

**ANSWER:** Chris neither admits nor denies the allegations because he lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

29.     Despite that all relevant times Greg was a fifty percent (50%) owner in MSY and the Buyout Agreement clearly states the Litigation Proceeds were to be split equally, Chris surreptitiously contacted MSY's attorneys, claimed Greg had no interest in in the Litigation Proceeds and attempted to have the entire balance of the Litigation Proceeds released to him directly, in an attempt to secure 100% of the Litigation Proceeds for himself.

**ANSWER:** Chris denies as untrue. In further answer, Chris states that Greg was not a member in MSY.

30.     In an April 20, 2023 letter, MSY's attorneys acknowledged that Chris attempted this maneuver and that Chris had claimed to them that Greg had no interest in the Litigation Proceeds.

**ANSWER:** Chris denies as untrue. The April 20, 2023 letter from Dykema speaks for itself.

31.     MSY's attorneys further acknowledged that they had received conflicting wiring instructions from Chris and Greg, and that Greg had requested that the Litigation Proceeds be distributed in accordance with the Buyout Agreement, but that Chris was requiring that the Litigation Proceeds be disbursed solely to him.

**ANSWER:** Chris denies as untrue. The April 20, 2023 letter from Dykema speaks for itself. Furthermore and after Greg directed MSY's attorneys to send the funds to a company

10

unrelated to MSY without Chris' knowledge or consent, Chris directed the Litigation Proceeds to be distributed to MSY as required under the Confidential Settlement Agreement.

32.     Given the conflicting instructions, MSY's attorneys stated that they could not release the funds to either party absent joint instructions and/or a court order.

**ANSWER:** The April 20, 2023 letter from Dykema speaks for itself.

33.     MSY's attorneys should thus be entitled to interplead and deposit the Litigation Proceeds with the Court and remove itself from the dispute between Chris and Greg.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

34.     Chris' various actions are clear and unequivocal breaches of contract, amongst other things.

**ANSWER:** Chris denies as untrue.

## COUNT I: BREACH OF CONTRACT

35.     Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

4857-7641-8944_5

36.     The Buyout Agreement is an enforceable written contract between Greg and Chris, and was executed by three individuals as witnesses that were involved in the negotiations between Greg and Chris.

**ANSWER:** Chris denies that the December 14th document was a binding agreement or that it is anything more than a letter of intent that was subject to further negotiation. Chris also denies that it was signed by three witnesses as the document does not identify any witnesses. Furthermore, one of the individuals on the document was not present when his name was signed to it.

37.     Chris initially performed the Buyout Agreement by making the initial payment due thereunder.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

38.     Greg performed all aspects of the Buyout Agreement by assigning, via written documents, all his rights in each of the Companies, which is undisputed by Chris.

**ANSWER:** Chris denies as untrue. The December 14th document makes no reference to this obligation by Greg as it was not an agreement. Any documents that Greg signed was to correct the fact that Greg wrongfully put assets of his client (and brother) into his own name in violation of the Michigan Rules of Professional Conduct and his fiduciary duty.

39.     Chris then breached the Buyout Agreement, by, among other things:

a.      Refusing to make the December 22 Payment;

12

b.      Refusing to split the Litigation Proceeds 50/50 and attempting (surreptitiously) to take possession of 100% of them; and

c.      Repudiating the remainder of his obligations under the Buyout Agreement when, on April 12, 2023, he sent Greg a text message that he did not intend to honor any portion of the Buyout Agreement moving forward and stating: "I will not be giving you a penny;" and

d.      In line with this April 12 text to Greg, refusing to make the May 1, 2023 payment due under the Buyout Agreement.

**ANSWER:** Chris denies as untrue.

40.      Greg has been damaged by Chris' breaches of the Buyout Agreement in an amount in excess of $25,000.

**ANSWER:** Chris denies the allegations as untrue and further denies that Greg has suffered any damages.

### COUNT II: PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

41.      Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

42.      Chris promised Greg the consideration described in the Buyout Agreement in exchange for Greg's promise to assign Greg's ownership interests in the Companies to Chris and/or Chris' designee.

13

**ANSWER:** Chris denies as untrue. The December 14th document makes no reference to this obligation by Greg as it was not an agreement. Any documents that Greg signed were to correct the fact that Greg wrongfully put assets of his client (and brother) into his own name in violation of the Michigan Rules of Professional Conduct and his fiduciary duty.

43.     In reliance on Chris' promises to honor the terms of the Buyout Agreement, Greg assigned his Greg's ownership interests in the Companies to Chris and/or Chris' designee.

**ANSWER** Chris denies as untrue. All Greg purportedly "assigned, transferred, [or] conveyed . . ." were assets that Greg wrongfully put into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris.

44.     Greg reasonably relied on Chris' promises to his detriment, relinquishing ownership and control of significant assets to Chris.

**ANSWER:** Chris denies as untrue.

45.     Chris should be estopped from failing to keep his promise.

**ANSWER:** Chris denies as untrue.

46.     Greg has been damaged in an amount to be determined in trial, but in excess of $25,000.

**ANSWER:** Chris denies as untrue.

## COUNT III: UNJUST ENRICHMENT, IN THE ALTERNATIVE

14

47.     Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

48.     Chris promised Greg the consideration described in the Buyout Agreement in exchange for Greg's promise to assign Greg's ownership in the Companies to Chris and/or Chris' designee.

**ANSWER:** Chris denies as untrue.

49.     In reliance on Chris' promises to honor the terms of the Buyout Agreement, Greg assigned his Greg's ownership interests in the Companies to Chris and/or Chris' designee thus conferring a benefit onto Chris.

**ANSWER:** Chris denies as untrue.

50.     Chris, after receiving control over Greg's Companies, reneged on his promise to compensate Chris such that his retention of the benefits conferred upon him by Greg is inequitable and unjust.

**ANSWER:** Chris denies as untrue.

51.     Chris has been unjustly enriched by his inequitable conduct and Greg has been damaged as a result in an amount to be determined in trial, but in excess of $25,000.

**ANSWER:** Chris denies as untrue.

4857-7641-8944_5

<u>**COUNT IV: DECLARATORY RELIEF**</u>

52.     Greg incorporates the preceding paragraphs as if fully restated herein.

**<u>ANSWER:</u>** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

53.     Greg and Chris are the two members of MSY, each owning fifty percent (50%) of the company.

**<u>ANSWER:</u>** Chris denies as untrue.

54.     In fact, in sworn deposition testimony in the underlying case that resulted in the Litigation Proceeds, Chris affirmed that Greg is the fifty percent (50%) owner of MSY.

**<u>ANSWER:</u>** Chris denies the allegations as untrue. In further answer, Chris states that any statements made by him do not impact whether an individual is a member of a company under Michigan law.

55.     Therefore, Chris is now estopped from claiming anything other than what he swore under oath to this Court as true.

**<u>ANSWER:</u>** Chris denies as untrue. In further answer, Chris states that any statements made by him do not impact whether an individual is a member of a company under Michigan law.

56.     The Buyout Agreement, executed by Chris, further affirms that Greg is the fifty percent (50%) owner of MSY, as it reaffirms that the Litigations Proceeds are to be shared equally by the two of them.

4857-7641-8944_5

**ANSWER:** Chris denies as untrue. By way of further response, the December 14th document makes no mention of MSY.

57.     In addition, in recent correspondence, Chris has acknowledged Greg's rights to fifty percent (50%) of the Litigation Proceeds repeatedly.

**ANSWER:** Chris denies as untrue.

58.     Despite all of this, Chris has claimed to MSY's attorneys that Greg has no ownership interests in MSY or any claim to the Litigation Proceeds and has directed MSY's attorneys to release the Litigation Proceeds solely to his custody.

**ANSWER:** Chris denies as untrue. The April 20, 2023 letter from Dykema speaks for itself. Furthermore and after Greg directed MSY's attorneys to send the funds to a company unrelated to MSY without Chris' knowledge or consent, Chris directed the Litigation Proceeds to be distributed to MSY as required under the Confidential Settlement Agreement.  Further, Greg is not a member of MSY and has no right to the Litigation Proceeds.

59.     With the conflicting instructions received from Greg and Chris as to the Litigation proceeds, the MSY attorneys cannot act without joint instructions and/or a court order.

**ANSWER:** The April 20, 2023 letter from Dykema speaks for itself.

60.     Although there should be none, an actual case and/or controversy thus exists between Greg, Chris and/or MSY as to the recognition of Greg's ownership and the release of the

Litigation Proceeds such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

61.     The Court should thus issue a preliminary Order permitting MSY's attorneys to deposit the Litigation Proceeds with the Court.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required.

62.     The Court should further issue judgment declaring that Greg is fifty percent (50%) owner of MSY with full rights and authority pursuant thereto, including but not limited to the right to receive fifty percent (50%) of the Litigation Proceeds.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies that Greg is entitled to any such relief.

<u>**COUNT V: DISSOLUTION PURSUANT TO MCL 450.4802**</u>

63.     Greg incorporates the preceding paragraphs as if fully restated herein.

**ANSWER:** Chris incorporates his answers to the preceding paragraphs as if fully restated herein.

4857-7641-8944_5

64.     Greg and Chris are the two members of MSY, each owning fifty percent (50%) of MSY.

**ANSWER:** Chris denies as untrue.


65.     MSY has no current business other than the distribution of the Litigation Proceeds.

**ANSWER:** Chris denies as untrue.


66.     Greg and Chris are in a dispute such that MSY can no longer operate and carry on its business in conformity with its article of incorporation.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion. To the extent an answer is required, Chris denies as untrue.


67.     A judicial decree of dissolution is appropriate pursuant to MCL 450.4802, such that MSY will be dissolved and its affairs wound up, including but not limited to the equal distribution of the Litigation Proceeds to both Greg and Chris.

**ANSWER:** Chris neither admits nor denies the allegations because they call for a legal conclusion to which no response is required. To the extent an answer is required, Chris denies that Greg is entitled to any such relief.


WHEREFORE, Chris respectfully requests that the Court enter a no cause of action as to Greg's complaint and award all other relief it deems appropriate.

4857-7641-8944_5

Respectfully submitted,

BODMAN PLC

/s/ <u>J. Adam Behrendt (P58607)</u>
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
Attorneys for Defendant Christopher Yatooma

October 6, 2023

## **<u>AFFIRMATIVE DEFENSES</u>**

Chris submits the following affirmative defenses to Greg's complaint to which he demands a reply under the Michigan Court Rules:

1.     Greg's claims are estopped, released, and/or waived by his own conduct, including but not limited to his own bad faith, unclean hands, and/or fraud.

2.     Greg's claims are barred by the conduct of non-parties, including but not limited to the bad faith, unclean hands, and/or fraud of non-parties.

3.     Greg has failed to mitigate his damages.

4.     Greg has not suffered any damages directly or proximately caused by any actions taken by Chris.

5.     Greg's claims are barred by the requirements of member admission found in the Michigan limited liability company act, MCL 450.4101, *et seq.*

6.     Greg is a licensed Michigan attorney who undisputedly represented Chris and his businesses, including MSY. Greg's claims that he now is/was an owner of any of those companies, including MSY, cannot be enforced because Greg's actions did not adhere to Rule 1.8(a) of the

20

Michigan Rules of Professional Conduct and the enforcement of any purported agreement between Chris and Greg—or, conversely, the actions of Greg to organize limited liability companies in his own name as member while advising his client that it was being done for his benefit—violate that Rule and cannot be enforced under Michigan law.

7.      Alternatively, any promise made by Chris to Greg of a purported membership interest in MSY and/or any other company was a gift that was not completed under Michigan law and lawfully was revoked.

8.      Greg's claims are barred by Michigan's version of the statute of frauds.

9.      To the extent the Court determines that the December 14th document was anything other than non-binding, it cannot be enforced because it was executed under duress due to Greg's fraudulent conduct and extortion of his brother to ruin Chris' business and personal lives, as evidenced by his actions and communications with Chris, family members, and third parties.

10.      The entities that Greg now claims that he purportedly transferred in reliance upon the December 14th document were fraudulently put into Greg's name based on false statements made by Greg (as his attorney) at the time of their formation that doing so was for Chris' benefit (as his client).

11.      To the extent the Court determines that the December 14th document was anything other than non-binding, it cannot be enforced because it fails by reason of indefiniteness.

12.      Greg's claims for promissory estoppel are barred by his failure to establish a definite and clear promise on the part of Chris.

WHEREFORE, Chris respectfully requests that the Court enter a no cause of action as to Greg's complaint and award all other relief it deems appropriate.

4857-7641-8944_5

Respectfully submitted,

BODMAN PLC

/s/ J. Adam Behrendt (P58607)
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI  48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
Attorneys for Defendant Christopher Yatooma

October 6, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2023, I electronically filed the foregoing papers with the

Clerk of the Court using the MiFILE TrueFiling E-filing system which will send notification of

such filing and e-serve the document upon all attorneys of record.

   /s/J. Adam Behrendt
J. Adam Behrendt

22

# Exhibit 18

## <ins>AFFIDAVIT OF BRIAN MOLLOY</ins>

I, Brian Molloy, being duly sworn, depose and state as follows:

1.      I make this affidavit based upon my personal knowledge and could testify competently as stated if called to do the same.

2.      I am previously the Controller for many of the entities and assets jointly owned and/or operated by Gregory Yatooma ("Greg") and Christopher Yatooma ("Chris"), including, but not limited to Axon Properties, LLC, Michigan Real Estate Development, LLC, and MSY Capital Partners, LLC.

3.      I have personal knowledge of the partnership between Greg, Chris, and their brother Jeffrey Yatooma ("Jeff") that began in 2016 ("Brothers Partnership") because I was the Controller for the Brothers Partnership.

4.      From 2016 until November 2019, the Brothers Partnership entities and assets were owned 1/3 by Jeff, 1/3 by Chris, and 1/3 by Greg.

5.      In November 2019, Chris and Greg bought Jeff out of the Brothers Partnership.

6.      I worked with Chris and Greg to help determine the amount of Jeff's buyout.

7.      After buying Jeff out of the Brothers Partnership, the Brothers Partnership entities and assets were owned ½ by Chris and ½ by Greg, and operated as such.

8.      With Greg's permission, Chris was in charge of the books of the Brothers Partnership entities and assets.

9.      With Chris's permission, Greg was in charge of the operations of the Brothers Partnership entities and assets.

10.     Chris and I regularly worked together on the accounting and books for the Brothers Partnership entities, including on dividing assets and liabilities of those entities between Greg's tax return and Chris's tax return.

1

129299250v2

11.     Ultimately, Chris decided whether an asset or liability would be reported by Chris or Greg on their tax returns, and directed me to prepare documents or schedules reflecting those decisions.

12.     For 2019 and 2020, Chris's decisions regarding reporting of assets and liabilities are reflected in Greg's tax returns for those respective years.

13.     I am aware that there is ongoing litigation between Greg and Chris.

14.     I have read the Answer Chris filed to Greg's Complaint on October 6, 2023.

15.     Many of Chris's statements in the Answer are untrue.

16.     Chris never claimed to be the sole owner of any of the Brothers Partnership entities and assets or otherwise claimed that Greg was not an owner of those entities and assets.

17.     In fact, at all times in my conversations with Chris post-November 2019, it was agreed and understood that Chris and Greg were the 50/50 owners of the Brothers Partnership entities and assets.

18.     Chris's and Greg's 50/50 ownership of the Brothers Partnership entities and assets was apparent from my conversations with Chris regarding accounting and reporting and consistent with how Chris directed me to handle the financials for the Brothers Partnership entities and assets.

19.     Chris never said he was, or believed he was, the sole owner of the Brothers Partnership entities, or that Greg was working only for Chris's benefit.

20.     Chris was fully aware of the entities and other assets in Greg's name.

21.     Chris and Greg agreed that Greg would hold certain entities and assets in his name for Chris's and Greg's joint benefit.

2

22.     This included entities regulated by the State of Michigan Cannabis Regulatory Agency ("CRA") because Chris was not prequalified by the CRA and, as the owner of Citizens State Bank, a federally regulated financial institution, Chris did not want cannabis assets in his name.

23.     I left Chris's and Greg's employment in June 2022.

_____
Brian Molloy

Subscribed and sworn to before me this
9th day of October, 2023

_____
Notary Public, Oakland County, State of Michigan
My Commission Expires: August 2, 2027
Acting in the County of Oakland

> KARA HARBOUR
> Notary Public - State of Michigan
> County of Oakland
> My Commission Expires Aug 2, 2027
> Acting in the County of Oakland

3

# Exhibit 19

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF LIVINGSTON

CANDID, INC., a
Michigan Corporation,

        Plaintiff,

Case No.23-*05872*-CB *(N)*

Hon.

**MICHAEL J. NOLAN**

v

REVOLUTION STRAINS, INC,
d/b/a NIRVANA CENTER PROCESING,
a Michigan Corporation

        Defendant.

---

URBAN LEGAL GROUP, PLC
By:Frank M. DeLuca (P41604)
*Attorneys for Plaintiff*
1615 S. Telegraph Rd., Suite 400
Bloomfield Hills, MI  48302
(248) 248-763-8765

FILED
COUNTY CLERK-40th CIRCUIT

OCT -2 2023

LAPEER COUNTY
MICHIGAN

---

**There is no prior resolved or pending action between these
parties arising out of the same transactions and occurrences
alleged in this Complaint.**

/s/ Frank M. DeLuca (P41604)

## COMPLAINT

    **NOW COMES** Plaintiff, Candid, Inc, by and through its undersigned attorneys, and for

its Complaint against Defendant, Revolution Strains, Inc, d/b/a Nirvana Center Processing,

states:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Candid, Inc ("Plaintiff") is a Michigan corporation with offices located in the City of Bloomfield Hills, Oakland County, Michigan.

2.      Defendant Revolution Strains, Inc, d/b/a Nirvana Center Processing ("Defendant") is a Michigan Corporation with offices located in the City of Howell, Livingston County, Michigan.

3.      Defendant has systematically conducted business in Livingston County, Michigan.

4.      This Court has jurisdiction over the Defendant pursuant to MCLA §600.711 and MCLA §600.1621.

5.      The amount in controversy exceeds the sum of $25,000.00, exclusive of interest, costs and attorney fees.

## COUNT I
## BREACH OF CONTRACT/ACCOUNT STATED

6.      Plaintiff repeats and incorporates Paragraphs 1 through 5 as set forth above.

7.      Plaintiff and Defendant were parties to a contract whereunder Defendant ordered and agreed to pay for cannabis products provided by Plaintiff and delivered to Defendant in accordance with set terms and price.

8.      In or about November through December 2022, Defendant purchased cannabis products from Plaintiff.

9.      Pursuant to said contract, Defendant agreed to pay invoices submitted by Plaintiff upon receipt.

10.     Plaintiff has complied with the contract by delivering cannabis products as required and submitted invoices to Defendant as reflected on the account statements attached hereto as *Ex. A*.

*11.*     Defendant has received all credits to which it is entitled and is justly indebted to Plaintiff in the amount of $99,760.00 as shown by the Affidavit of Account Stated attached as *Ex. B.*

12.     Because of Defendant's breach, Plaintiff has suffered damages in the amount of $99,760.00.

13.     By reason of the foregoing, the balance due became an account stated and Defendant thereby became indebted to Plaintiff in the amount of $99,760.00.

**WHEREFORE**, Plaintiff prays that this Honorable Court enter a Judgment against Defendant and in favor of Plaintiff in the amount of $99,760.00, together with accrued statutory interest, costs and attorney fees.

## COUNT II
## UNJUST ENRICHMENT

14.     Plaintiff repeats and incorporates Paragraphs 1 through 13 as set forth above.

15.     Defendant has benefited from the cannabis products provided by Plaintiff.

16.     Defendant understood and agreed that it would pay for the cannabis products ordered by Defendant and delivered by Plaintiff.

17.     The reasonable value of the cannabis products for which Defendant has not paid Plaintiff is $99,760.00, plus interest.

18.     Defendant has been unjustly enriched by its refusal to pay the above sum which is due and owing to Plaintiff.

**WHEREFORE**, Plaintiff prays that this Honorable Court enter a Judgment against Defendant and in favor of Plaintiff in the amount of $99,760.00, together with accrued statutory interest, costs and attorney fees.

<div align="right">

Respectfully submitted,

/s/ Frank M. DeLuca
Frank M. DeLuca (P41604)
Attorneys for Plaintiff
1615 S. Telegraph Rd, Suite 300
Bloomfield Hills, MI 48302
248-230-2820

</div>

Dated:  September 25, 2023.

# EXHIBIT A

# INVOICE
Order # b21760c192



b21760c192

Powered by 



| Order From: | Payable To: | | |
|---|---|---|---|
| **Monroe AU – Nirvana Center** | **GRIP** | Order # | b21760c192 |
| **Billing Address:** | 1615 S Telegraph | Leaf Ref. | 825a15a2 |
| 14498 Laplaisance Rd | Bloomfield, MI 48302 | Created | Nov. 16, 2022 |
| Monroe, MI 48161 | | Shipped | Nov. 17, 2022 |
| **Delivery Address:** | | Classification | Adult Use |
| 14498 Laplaisance Rd | | Created by | Tommy Krauter |
| Monroe, MI 48161 | | | AU-G-C-000461, |
| **Phone Number:** | | | AU-G-C-000465, |
| (734) 264 - 7565 | | | AU-G-C-000464, |
| **Licenses:** | | Seller Licenses | GR-C-001259, |
| AU–R–000740 | | | Au-g-c-000419, |
| | | | GR-C-000775, |
| | | | AU-G-EX-000335 |

| Item Description | Product Detail | Price | Qty | Total |
|---|---|---|---|---|
| **Bermuda Triangle Small Buds 21.48% by GRIP** | **GRIP** | $400.00 | 50.3 (Pound) | $20,120.00 |
| SKU: 1A4050300034D51000000484 – 0335 | Bulk Flower | | | |

| **Disclaimer** | | |
|---|---|---|
| Returns Only Accepted 48Hrs after Delivery | Subtotal (Qty: 50) | $20,120.00 |
| | Shipping Charge** | $0.00 |
| **This seller offers free shipping on orders of $2,000.00 or more. | | |

**Total**                                                        **$20,120.00**

| Default Payment Option: | Check, Net 14 | Total Due |
|---|---|---|
| Payment Due: | Dec. 01, 2022 | **$20,120.00** |
| Payment Status: | Unpaid | |

Other available payment options:
LeafLink Flexible Payment, Net 30 • ACH, COD

**Delivery By:**

**L3 Delivery Coordination Services**
80 Broad Street
New York, NY 10004
None

**Delivery preferences**

Store phone: 734-264-7565

# INVOICE

Order # b21760c192



Powered by ℓℓ leaflink

**All ACH Payments Email AP@GRIPCANNABIS.COM**

**Signatures**

**Sales Rep**

Jim Powrie
powrie@gripcannabis.com
(947) 957 – 6893

Tommy Krauter
krauter@gripcannabis.com

Receiving _____   Date _____

Money Collection _____   Date _____

# INVOICE

Order # b21760c235



b21760c235

 Powered by **leaflink**



| | | |
|---|---|---|
| **Order From:** | **Payable To:** | |
| Monroe AU – Nirvana Center | **GRIP** | |
| **Billing Address:** | 1615 S Telegraph | |
| 14498 Laplaisance Rd | Bloomfield, MI 48302 | |
| Monroe, MI 48161 | | |

**Delivery Address:**
14498 Laplaisance Rd
Monroe, MI 48161

**Phone Number:**
(734) 264 – 7565

**Licenses:**
AU–R–000740

| | |
|---|---|
| Order # | **b21760c235** |
| Leaf Ref. | 163dbcad |
| Created | Nov. 22, 2022 |
| Shipped | Nov. 23, 2022 |
| Classification | Adult Use |
| Created by | Tommy Krauter |
| Seller Licenses | AU-G-C-000461, AU-G-C-000465, AU-G-C-000464, GR-C-001259, Au-g-c-000419, GR-C-000775, AU-G-EX-000335 |

| Item Description | Product Detail | Price | Qty | Total |
|---|---|---|---|---|
| **Animal Mintz Small Buds 24.08% by GRIP**<br>SKU: 1A405030001C843000002449 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 25 (Pound) | $10,000.00 |
| **Animal Mintz Small Buds 25.77% by GRIP**<br>SKU: 1A405030001C843000002451 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Animal Mintz Small Buds 26.68% by GRIP**<br>SKU: 1A405030001C843000002450 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 30 (Pound) | $12,000.00 |
| **Area 51 Buds 18.60% by Garden Theory**<br>SKU: 1A405030001C8A5000000573 – 0465 | **Garden Theory**<br>Bulk Flower | $400.00 | 15.3 (Pound) | $6,120.00 |
| **Shipwreck Small Buds 22.12% by Garden Theory**<br>SKU: 1A405030001C8A5000000709 – 0465 | **Garden Theory**<br>Bulk Flower | $400.00 | 7.3 (Pound) | $2,920.00 |
| **Sunday Funday Buds 18.77% by Garden Theory**<br>SKU: 1A405030001C8A5000000631 – 0789 – 0465 | **Garden Theory**<br>Bulk Flower | $400.00 | 2 (Pound) | $800.00 |
| **Tik Tak OG Large Buds 19.68% by Garden Theory**<br>SKU: 1A405030001C8A5000000912 – 0465 | **Garden Theory**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Tik Tak OG Small Buds 20.80% by Garden Theory**<br>SKU: 1A405030001C8A5000000926 – 0465 | **Garden Theory**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |

# INVOICE

Order # b21760c235



Powered by 

**Disclaimer**

Returns Only Accepted 48Hrs after Delivery

**This seller offers free shipping on orders of $2,000.00 or more.

| | | |
|---|---|---|
| Subtotal (Qty: 231) | | $92,200.00 |
| Shipping Charge** | | $0.00 |
| **Total** | | **$92,200.00** |

| | | |
|---|---|---|
| Default Payment Option: | Check, Net 14 | Total Due |
| Payment Due: | Dec. 07, 2022 | **$50,000.00** |
| Payment Status: | Unpaid | |

Other available payment options:
LeafLink Flexible Payment, Net 30 • ACH, COD

**Delivery preferences**

Store phone: 734-264-7565

## All ACH Payments Email AP@GRIPCANNABIS.COM

**Sales Rep**

Jim Powrie
powrie@gripcannabis.com
(947) 957 – 6893

Tommy Krauter
krauter@gripcannabis.com

**Signatures**

Receiving                           Date
Money Collection                 Date

# INVOICE

Order # b21760c239



b21760c239

Powered by 



| | | |
|---|---|---|
| **Order From:** | **Payable To:** | |
| **Nirvana center Processing** | **GRIP** | |
| Known as "Michigan Supply and Provisions – Ann Arbor AU" on LeafLink | 1615 S Telegraph<br>Bloomfield, MI 48302 | |

**Billing Address:**
24920 Sherwood Ave.
Center Line, MI 48015

**Delivery Address:**
24920 Sherwood Ave.
Center Line, MI 48015

**Licenses:**
AU–P-000286

| | |
|---|---|
| Order # | b21760c239 |
| Leaf Ref. | 36f49210 |
| Created | Nov. 23, 2022 |
| Shipped | Dec. 01, 2022 |
| Classification | Adult Use |
| Created by | Tommy Krauter |
| Seller Licenses | AU–G–C-000461,<br>AU–G–C-000465,<br>AU–G–C-000464,<br>GR–C-001259,<br>Au–g–c-000419,<br>GR–C-000775,<br>AU–G–EX-000335 |

| Item Description | Product Detail | Price | Qty | Total |
|---|---|---|---|---|
| **Bubble Berry Buds 26.56% by Garden Theory**<br>SKU: 1A405030001C843000002173 – 0464 | **Garden Theory**<br>Bulk Flower | $400.00 | 0.6 (Pound) | $240.00 |
| **Peach Rings Small Buds 18.13% by GRIP**<br>SKU: 1A405030001C8A5000000963 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Peach Rings Small Buds 19.09% by GRIP**<br>SKU: 1A405030001C8A5000000962 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Peach Rings Small Buds 19.30% by GRIP**<br>SKU: 1A405030001C8A5000000960 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Peach Rings Small Buds 20.12 by GRIP**<br>SKU: 1A405030001C8A5000000961 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Peaches and Cream Small Buds 19.49% by GRIP**<br>SKU: 1A405030001C843000002465 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Peaches and Cream Small Buds 21.19% by GRIP**<br>SKU: 1A405030001C843000002464 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |
| **Peaches and Cream Small Buds 21.76% by GRIP**<br>SKU: 1A405030001C843000002466 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 50.3 (Pound) | $20,120.00 |

# INVOICE

Order # b21760c239



Powered by **leaflink**

| Item Description | Product Detail | Price | Qty | Total |
|---|---|---|---|---|
| **Pure Michigan #5 Buds 21.70% by GRIP**<br>SKU: 1A405030001C843000002483 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **Sherbet Sunset Buds by GRIP 22.52%**<br>SKU: 1A405030001C8A5000001029 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **Sherbet Sunset Buds by GRIP 22.81%**<br>SKU: 1A405030001C8A5000001028 – 0464 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **Sherbet Sunset Buds by GRIP 24.66%**<br>SKU: 1A405030001C8A5000001036 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 26.1 (Pound) | $10,440.00 |
| **Sin Mintz Buds 21.41% by GRIP**<br>SKU: 1A405030001C8A5000001040 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 7 (Pound) | $2,800.00 |
| **Sin Mintz Buds 22.12% by GRIP**<br>SKU: 1A405030001C8A5000001033 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **Sin Mintz Buds 23.10% by GRIP**<br>SKU: 1A405030001C8A5000001045 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **Sunday Funday Buds 23.24% by GRIP**<br>SKU: 1A405030001C8A5000001031 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **White Runtz Buds 24.17% by GRIP**<br>SKU: 1A405030001C8A5000001046 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **White Runtz Buds 25.21% by GRIP**<br>SKU: 1A405030001C8A5000001047 – 0465 | **GRIP**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |
| **White Runtz Mixed Buds 22.22% by Garden Theory**<br>SKU: 1A405030001C8A5000001071 – 1101 – 0465 | **Garden Theory**<br>Bulk Flower | $400.00 | 49.7 (Pound) | $19,880.00 |

# INVOICE

Order # b21760c239



Powered by 

| | |
|---|---|
| **Notes** | |
| This is just a place holder for next weeks order (for the 28th) | |

**Disclaimer**

Returns Only Accepted 48Hrs after Delivery

**This seller offers free shipping on orders of $2,000.00 or more.

| | |
|---|---|
| Subtotal (Qty: 833) | $333,240.00 |
| Shipping Charge** | $0.00 |
| **Total** | **$333,240.00** |

| | | |
|---|---|---|
| Default Payment Option: | Check, Net 14 | Total Due |
| Payment Due: | Dec. 15, 2022 | **$29,640.00** |
| Payment Status: | Unpaid | |

Other available payment options:
LeafLink Flexible Payment, Net 30 • ACH, COD

**Delivery preferences**

Store Phone: (734) 794-3416

## All ACH Payments Email AP@GRIPCANNABIS.COM

**Sales Rep**

Jim Powrie
powrie@gripcannabis.com
(947) 957 – 6893

Tommy Krauter
krauter@gripcannabis.com

**Signatures**

| | |
|---|---|
| Receiving | Date |
| Money Collection | Date |

*EXHIBIT B*

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF LIVINGSTON**

CANDID, INC., a
Michigan Corporation,

      Plaintiff,

                                 Case No. 23-      -CB
v                                     Hon.

REVOLUTION STRAINS, INC,
d/b/a NIRVANA CENTER PROCESING,
a Michigan Corporation

          Defendant.

---

URBAN LEGAL GROUP, PLC
By:Frank M. DeLuca (P41604)
*Attorneys for Plaintiff*
1615 S. Telegraph Rd., Suite 400
Bloomfield Hills, MI 48302
(248) 248-763-8765

---

## **AFFIDAVIT OF ACCOUNT STATED**

STATE OF MICHIGAN    )
                         ) SS
COUNTY OF OAKLAND )

     I, Josh Smith, being first duly sworn, depose and say that:

     1.     I have personal knowledge of the facts stated herein and am competent to testify

at trial if called to do so.

2.     I am the Chief Financial Officer ("CFO") of Axon Properties, LLC and my responsibilities also include acting as the CFO of Candid, Inc.

3.     I have reviewed the records of this account and testify that Defendant Revolution Strains, Inc, d/b/a Nirvana Center Processing is indebted to Plaintiff in the amount of $99,760.00 over and above any setoffs, defenses, and counterclaims.

Further Affiant sayeth not.


Candid, Inc.


By: _____
      Josh Smith, CFO.


ANGELO JAY BRUNO
NOTARY PUBLIC - MICHIGAN
OAKLAND COUNTY
ACTING IN THE COUNTY OF Oakland
MY COMMISSION EXPIRES JAN. 21, 2026

Subscribed & Sworn to me by
Josh Smith on the 25th day of
September, 2023

# Exhibit 20

## Greg Yatooma

| | |
|---|---|
| **From:** | CRA-Amendments <CRA-Amendments@michigan.gov> |
| **Sent:** | Monday, October 23, 2023 6:32 AM |
| **To:** | Heather Cude |
| **Cc:** | Gregory Manuel |
| **Subject:** | RE: Amendment Application Withdrawal - CA-001658 |

Good Morning,

This amendment has been withdrawn per your request.


Thank you,

*Brook*
License Maintenance Section
Licensing Division
Cannabis Regulatory Agency
Mon-Thurs 6:30am - 5:00pm



---

**From:** Heather Cude <cude@milegalgroup.com>
**Sent:** Friday, October 20, 2023 10:17 AM
**To:** CRA-Amendments <CRA-Amendments@michigan.gov>
**Cc:** Gregory Manuel <yatoomag@gmail.com>
**Subject:** Re: Amendment Application Withdrawal - CA-001658

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**


Good Morning,

I just wanted to confirm that this withdrawal form has been received and is being processed as it is imperative that this application be withdrawn. Please let me know if anything further is needed.

Thank you,

Heather Cude
Michigan Legal Group, PLC
cude@milegalgroup.com
(248) 496-6979

Get Outlook for iOS

---

**From:** Heather Cude <cude@milegalgroup.com>
**Sent:** Thursday, October 19, 2023 8:22 PM
**To:** CRA-Amendments <CRA-Amendments@michigan.gov>
**Cc:** Gregory Manuel <yatoomag@gmail.com>
**Subject:** Amendment Application Withdrawal - CA-001658

Good evening,

Please see the attached request to withdraw Candid, Inc.'s pending amendment application CA-001658.

I would request this withdrawal be effectuated as soon as possible.  Please let me know when it has been processed and the application is withdrawn.


Thank you kindly,

Heather Cude
Michigan Legal Group, PLC
cude@milegalgroup.com
(248) 496-6979

## Greg Yatooma

| | |
|---|---|
| **From:** | CRA-Amendments <CRA-Amendments@michigan.gov> |
| **Sent:** | Monday, October 23, 2023 6:32 AM |
| **To:** | Heather Cude |
| **Cc:** | Gregory Manuel |
| **Subject:** | RE: Amendment Application Withdrawal - CA-001658 |

Good Morning,

This amendment has been withdrawn per your request.

Thank you,

*Brook*
License Maintenance Section
Licensing Division
Cannabis Regulatory Agency
Mon-Thurs 6:30am - 5:00pm



# Exhibit 21



# GRIP 🔵

ADU AU-G-C-000465  ADU AU-G-C-000464  MED GR-C-001259  ADU Au-g-c-000419  MED GR-C-000775  ADU AU-G-EX-000335  ADU AU-G-C-000461  MED GR-C-001132  ADU AU-G-C-000832

Flower

**Hold On Tight**

At Grip, we strive to give you a powerful experience. We cultivate cannabis products that promote **good times, great friends and high spirits.**

Our flower is cultivated with the utmost care so from seed to smoke, we can ensure the highest quality cannabis, every time.

In the winter of 2019, we began growing the most potent and powerful strains of cannabis. We converted an abandoned packing company into a state-of-the-art indoor cultivation facility. As weed enthusiasts and connoisseurs ourselves, our goal is to grow high quality flower that is accessible to all: the every-day user and the social smoker. These products are the fruit of our labor of love, inspired by the music and art around us. We grind every day to...
Read more

🔗 gripcannabis.com      ▣ Message



---

ⓘ Want to learn more about Grip's products? Let them know                                           ✕

---

Search

[ trim                          ✕ ] [ 🔍 ]     [ ☰ Filter ]

Showing 1 - 4 of 4 results                                                          Sort by ▾

| | |
|---|---|
| Selected Subtotal | $0.00 |
| Current cart Subtotal | $0.00 |
| New cart Subtotal | $0.00 |

License

[ Pure X, LLC                                    ADU ]

[ Add to cart ]

⌄  Other Products



GRIP: Bermuda Triangle- TRIM (R&D) V.R% UN-
TESTED TRIM/SUGAR LEAVES  [NEW]

$150.00/pound
$0.33/gram

Quantity            Notes
[ 0 ]               [ – ]

Min: 1   Max: —              •••

**Strain**
Hybrid

# Exhibit 22

# Charles D. Bullock

Stevenson & Bullock, P.L.C.
26100 American Drive, Suite 500
Southfield, Michigan 48034
(248) 354-7906 ext. 2224
(248) 240-4126 (cellular)
cbullock@sbplclaw.com

Charles ("Chuck") Bullock has dedicated his 25+ year career to serving as a fiduciary and representing fiduciaries in countless bankruptcy and state court proceedings. Chuck's practice is grounded in debtors' and creditors' rights, real estate, bankruptcy matters, and business and commercial litigation (including those involving closely held business entities) for debtors and secured and unsecured creditors in complex bankruptcy proceedings, out-of-court negotiations, and transactions involving distressed businesses. Chuck possesses significant experience and understanding of industry-specific challenges across a vast array of business sectors, including those related to or involved in the marijuana industry, including the retail space, grow operations, and real property. The breadth of Chuck's restructuring engagements, from manufacturing to agriculture to health care, including serving in fiduciary capacity, set him apart as uniquely qualified to be an effective fiduciary. Chuck regularly serves as a Receiver or Assignee for the Benefit of Creditors in insolvency proceedings.

Chuck obtained his undergraduate degree from the University of Michigan and his Juris Doctorate from the University of Memphis. He is a founding member (1998) and managing partner of Stevenson & Bullock, P.L.C. As well as being admitted to practice and in good standing in the Sixth Circuit Court of Appeals, U.S. District Court for the Eastern and Western Districts of Michigan and the Western District of Tennessee, Chuck is a member of the state bars of Michigan (1996) and Tennessee (1995). Among his professional memberships, he includes membership in the Federal Bar Association, American Bankruptcy Institute, Detroit Catholic Central Shamrock Bar Association, Detroit Bar Association Foundation (Patron Fellow), and Oakland County Bar Foundation (Charter Fellow).

PROFESSIONAL INVOLVEMENT:

- Clerked for the Hon. Bernice B. Donald, U.S. Bankruptcy Court, Western District, Tennessee (Judge Donald is currently sitting on the Sixth Circuit Court of Appeals);
- Testified before the United States Senate Judiciary Subcommittee on Administrative Oversight and the Courts, "Could Bankruptcy Reform Help Preserve Small Business Jobs?" (March 17, 2010);
- Adjunct Professor (Bankruptcy) at Michigan State University College of Law;
- United States Bankruptcy Court for the Eastern District of Michigan Rules Subcommittee;
- Consistently selected to Super Lawyers (Michigan), DBusiness Magazine Top Lawyers (Michigan), Leading Lawyers (Michigan), and the Best Lawyers in America;
- Merit Selection Panel – Bankruptcy Judgeship – Eighth and Sixth Circuit Pilot Program (2015);
- Merit Selection Panel - Reappointment of United States Magistrate Judge R. Steven Whalen, U.S. District Court for the Eastern District of Michigan (2018);

- Has served as counsel for Chapter 7 panel trustees in over 3,000 bankruptcy cases in the U.S. Bankruptcy Court for the Eastern District of Michigan;
- Serves as Court appointed Assignee, Receiver, or Receiver's Counsel in Lenawee, Macomb, Oakland, and Wayne counties (Michigan) and U.S. District Court for the Eastern District of Michigan;
- Serves as Court appointed Mediator and Facilitator in Macomb, Oakland, and Wayne counties (Michigan) and U.S. District Court for the Eastern District of Michigan; and
- Serves as a Patient Care Ombudsman in the U.S. Bankruptcy Court for the Eastern District of Michigan.
- Serves as Court appointed Discovery Master in Macomb, Oakland, and Wayne counties (Michigan).

COMMUNITY INVOLVEMENT:

The Pewabic Society, Inc. (Pewabic Pottery (Trustee)), Detroit, Michigan; The Children's Foundation f/k/a Children's Hospital of Michigan Foundation (Board Member); Michigan Opera Theatre (Trustee); Historical Society of the United States District Court for the Eastern District of Michigan (Trustee); Oakland County Bar Foundation (Trustee); First Tee of Greater Detroit (Board Member); Life Directions - Detroit (Board Member); Detroit Athletic Club (Detroit, Michigan).

## RECENT NOTABLE EXPERIENCE SERVING AS FIDUCIARY

**Holistic Health Wayne, Inc.** – Served as court-appointed Receiver over business following a shareholder dispute among its shareholders and silent partners. This was one of the first cannabis-related Receiverships in the State of Michigan. Required specific attention to regulatory, tax, and unique industry contractual terms and conditions. Conducted a court-approved auction of the business (stock sale) resulting in a sale price of $7.5M. Additionally, as Receiver, oversaw operations of the business, including gross receipts of approximately $4M during the receivership. Completed a complex claims reconciliation process. All allowed creditors were paid in full with excess proceeds distributed to equity.

**6030 E Mile, LLC, et al. v. AEY Capital, LLC, et al.** – Served as Court-appointed Mediator and Discovery Master in complex litigation brought before the Macomb County Circuit Court across multiple cases. Complex litigation involved alleged shareholder disputes among numerous parties regarding operations of integrated marijuana retail businesses and real estate holdings associated thereto. Determined all discovery disputes among the parties. Litigation successfully resolved via Court-approved mediation process.

**Basrah Custom Design, Inc.** – Serves as court-appointed Receiver over the sale of Green-Zoned real property located in Detroit, Michigan. Conducting a court-approved complex claims reconciliation process for competing claims against sale proceeds from numerous interested parties. Anticipated distributions will be in excess of $1M.

**Port Huron Litigation** – Serves and Court-appointed mediator for major litigation involving all of the marijuana licensing in Port Huron, Michigan.

**Veritas Holdings, LLC** – Served as court-appointed mediator and escrow agent relating to grow facility and Green-Zoned real property located in Wayne County, Michigan. Oversaw

2

implementation of complex transaction among parties including sale of real property and transition of operations.

**The Canopy Affairs Group, LLC v. Spartan Partners Services, LLC, et al.** – Served as Court-appointed Mediator and Discovery Master in complex litigation brought before the Wayne County Business Court.  Fiduciary obligations included review and analysis of financial data for multiple retail marijuana locations across the State of Michigan with reporting to the Court in the form of recommendations.  Also determined all discovery disputes among the parties.

FILED   Received for Filing   Oakland County Clerk   11/3/2023 3:41 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA,

      Plaintiff,

v.

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23 – 200283-CB

Hon. Victoria Valentine

---

| | |
|---|---|
| TAFT STETTINIUS & HOLLISTER LLP | URBAN LEGAL GROUP |
| By:   Ethan R. Holtz (P71884 | By:   Jeffrey Sieving (P71625) |
|       Emily Mayer (P78956) | 1615 S. Telegraph Road, Suite 300 |
| 27777 Franklin Road, Suite 2500 | Bloomfield Hills, MI  48302 |
| Southfield, MI | (248) 230-2820 |
| (248) 351-3000 | sieving@urbanlegalgroup.com |
| Eholtz@taftlaw.com | *Counsel for Defendant Christopher Yatooma* |
| Emayer@taftlaw.com | |
| *Attorneys for Plaintiff* | BODMAN PLC |
| | By:   J. Adam Behrendt (P58607) |
| | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI  48084 |
| | (248) 743-6000 |
| | abehrendt@bodmanlaw.com |
| | *Counsel for Defendant Christopher Yatooma* |

---

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO APPOINT RECEIVER OVER CANDID, INC

### INTRODUCTION

This motion is another example of Plaintiff Gregory Yatooma's ("Greg") continued scorched-earth litigation tactics brought solely to get Defendant Chris Yatooma ("Chris") to capitulate to his many demands in this case.

1

As a preliminary matter, this motion was filed in bad faith directly after defendant's counsel requested to mediate the parties' underlying claims. On Tuesday, October 24, undersigned counsel for Chris reached out to undersigned counsel for Greg to suggest that the parties take this case to mediation. Then on Wednesday, October 25, Greg filed this Motion for Appointment of Receiver of Non-Party Candid, Inc. ("Candid").

Even setting aside Greg's obvious attempt to strong-arm Chris, the motion itself is baseless. It requests that the Court do two improper actions: (1) effectively impose pre-garnishment attachment against Chris and MSY, and (2) enter an order directly affecting the rights of a non-party. Neither of Greg's requests are proper requests for relief from this Court under Michigan statutory law and precedential caselaw.

Greg seeks the appointment of a receiver over a non-party to this action, Candid. But the Court lacks authority in this matter to adjudicate the rights of a person or entity that is a nonparty to an action. Second, Greg has failed to plead or establish any irreparable harm that would remotely justify the extreme remedy of the appointment of a receiver over Candid as it is undisputed that Chris continues to fund and pay the day-to-day operating expenses of Candid. Therefore, any alleged damages Greg believes he has or will suffer can and should be made by way of the claims he has brought in this action. Moreover, Greg voluntarily relinquished his rights to Candid over *nine (9) months* ago when he demanded that the company be transferred out of his name.[1] Notwithstanding the above, Greg recently contacted the CRA and unilaterally revoked the transfer of his membership interest in Candid. Accordingly, Greg has created the very circumstances under which he now seeks the appointment of a receivership over Candid.

---

[1] Greg transferred his interest in Candid to Josh Smith, who is a pre-qualified with the CRA.

The filling of this Motion is nothing more than litigation gamesmanship that should not be rewarded by this Court.

For these reasons, there is no factual or legal basis for the appointment of a receiver over Candid and the Court should deny Greg's motion.

## RELEVANT FACTUAL BACKGROUND

Greg's motion and underlying complaint exclude critical information relevant to the parties' business dealings regarding Candid (again, because Candid is not a party to this lawsuit). Chris provides this counterstatement of facts to fully inform the Court of the circumstances.

On or about May 10, 2023, Gregory filed this action against Chris and MSY Capital Partners, LLC. This dispute arises from the circumstances surrounding the brothers' previous business venture. The business venture involved the acquisition, development, and licensing of certain cannabis properties.  It is undisputed that Chris contributed all the capital to cover all investment and operating expenses, while Greg provided legal and management services to the business venture. Greg received compensation from Chris for the services he provided to the business venture.

In August 2022, Greg withdrew from the business and demanded that he be bought out of his purported "sweat equity." Greg made these demands despite never contributing a single dime toward the business venture and having been paid handsomely for his services. Greg further embarked on a campaign to disparage Chris to Chris's family and friends, interfere with Chris' business and family relationships, and force Chris to capitulate to his outrageous demands.

As a result of Greg's attempts to sabotage Chris's businesses and personal life, Chris agreed to meet with Greg and others to reach an amicable resolution. The parties engaged in months of negotiations culminating in a December 2022 meeting, when the parties negotiated a

3

term sheet that outlined a proposal of a formal separation. The term sheet specifically provided and contemplated for the execution of a final signed agreement. Accordingly, over the next several months the parties continued with their negotiations including exchanging various drafts of a final separation agreement.  Greg ultimately withdrew from further negotiations and filed this action.

In connection with his demand to be bought out, Greg requested that his name be *immediately* removed from certain cannabis businesses because he no longer wanted to be associated with or responsible for operating these businesses.[2] Greg made this demand even though the parties had not yet finalized their separation agreement. One of those businesses that he demanded to be removed from was Candid, for which he now requests receivership over.[3] Beginning in *January 2023 through March of 2023*, and pursuant to Greg's request, the parties executed the necessary documents to effectuate the transfer of ownership, including:

- January 27, 2023, Amendment Application with the CRA to transfer 100% of his shares in Candid. (*See Ex. A*).
- February 24, 2023, Resolution Approving Transfer of Shares. *See Ex. B*)
- February 24, 2023, Executed Resolution. (*See Ex. C*).
- March 30, 2023, Authorization of Additional Contact Person with the CRA. (*See Ex. D*)
- Candid, Inc, Bylaws. (*See, Ex. E*).

---

[2] Greg previously advised Chris that it would be beneficial for Chris that the various operating entities be formed solely in Greg's name, notwithstanding the fact that Chris was providing 100% of the capital contributions. Chris did not object to this structure as he relied on Greg's legal expertise as well as the fact that Greg was his closest confidant and older brother.  It is now apparent that Greg's motive for forming the operating entities solely in his name was done for the sole purpose of creating leverage in favor of Greg if either party decided to exit the business venture.

[3] Candid currently operates a cannabis grow operation in Arlington Township, Michigan.

It is important to note that all the above Candid transfer documents were executed after Chris's purported breach of the December 14, 2022, Buyout Agreement."

To effectuate the transfer of Greg's interest in Candid, the CRA was required to approve the application for the transfer of ownership (Ex. A). The application was submitted in February of this year, but the transfer approval has been delayed because of an outstanding Candid CRA violation. (*See Notice of Deficiency from CRA*, **Ex. F**). Candid's regulatory counsel was negotiating a resolution to the outstanding CRA violation and Greg was extremely anxious to resolve the violation and finalize his transfer of Candid shares. Greg was in regular communication with Candid's representatives and regulatory counsel from *January through his October 23, 2023*, including his email to one of Chris's employees informing him that there were no new updates from the CRA:

> "Good morning, Tyler.  I talked to Jackie on Friday and there is no new news (huh, I don't think I have written those two words next to each other before.. it looks weird..lol).
>
> Thank you,
>
> Greg"

(*See correspondence between Greg and Candid, attached as* **Ex. G**).

Unbeknownst to Chris or the Candid representatives, Greg had contacted the CRA and withdrew the Application to transfer his shares in Candid four (4) days earlier. (*See Greg's Request to Withdraw Transfer Application, attached as* **Ex. H**). Greg immediately contacted Candid's regulatory counsel and terminated her services in a profane and unhinged manner.[4] Greg thereafter revoked Candid's representatives' authorization to contact the CRA on behalf of Candid. At no point in time did Greg advise Candid and Chris of his decision to withdraw the Application with the CRA to transfer his interest in Candid. There was no reasonable basis for

4891-1614-1707_2

Greg to withdraw the Application, other than to create leverage with Chris in his ongoing litigation.[5] In other words, Greg is not happy that Chris has refused to capitulate to his settlement demands and continues to interfere with Chris's ongoing business activities.

Finally, Greg has steadfastly taken the position in this case that the December 14, 2022, term sheet represents a "buyout agreement" of his "sweat equity" in the business venture. As such, Greg had previously sought to enforce the terms of that document. Greg's recent unilateral revocation of the transfer of his ownership interest in Candid represents his acknowledgment that the alleged "buyout agreement" is in fact not enforceable and that the parties had not reached any final accord regarding a separation of the prior business venture. Consequently, if Greg seeks to attempt to revoke his voluntary assignment of Candid, he should further be required to return other assets that he has received to date in connection with the business venture.

In sum: Greg wanted out of Candid. Then he apparently wanted back in, only after this litigation began, so that he could use his Candid shares as leverage. He acted in bad faith by withdrawing the CRA share transfer application without advising Chris. Now, he seeks a receiver over Candid based on a flimsy argument that the fall cannabis harvest is forthcoming and his interest in Candid (which, again, he did not want) could be affected by the management issues that *he alone caused*. The Court should not tolerate Greg's antics.

---

[4] Candid has no legal representation in this pending Motion for Appointment of Receiver.

[5] Neither the Shareholder Resolution Approving the Transfer of Shares nor any other document executed by Greg, provided him with the ability to unilaterally rescind the transfer of his membership interest in Candid. Moreover, Greg acknowledged that he received consideration for the transfer of his membership interest in Candid. ***See Ex. A.***

## ARGUMENT

**I.     The Court Does Not have Jurisdiction in this Lawsuit to Appoint a Receiver Over a Third-Party Entity.**

Plaintiff's motion to appoint a receiver fails at the outset because this court cannot enter an order adjudicating the rights and obligations of a non-party corporation to this proceeding. It is an undisputed fact that Candid is not a party to this action. If Greg wanted to make Candid a party to this proceeding, he would have to move to amend his complaint and add Candid as a party (or initiate a new action). The Michigan Court of Appeals has opined that Michigan courts cannot adjudicate the rights of a third-party, *non-party* corporation in the context of a receivership:

> Appellants first aver on appeal that the circuit court's failure to join Shouneyia Brothers as a party defendant in the underlying divorce action precluded the court from exercising authority over the corporation. Michigan courts have consistently recognized that court may not make '[a]n adjudication affecting' the rights of a person or entity not a party to the case. *Capitol Savings & Loan Co v Standard Savings & Loan Ass'n*, 264 Mich. 550, 553; 250 N.W. 309 (1933); see also *Spurling v Battista*, 76 Mich App 350, 353; 256 NW2d 788 (1977) (concluding that 'the trial court did not have the power to compel [a law firm] to pay witness fees' when the law firm 'was not a party to this action'). Plaintiff theorizes that the appointment of a receiver does not adversely affect any interested nonparty's rights, given that Frank Shouneyia, defendant's coowner in Shouneyia Brothers, consented to the receivership. But plaintiff's argument ignores that the corporation itself amounts to an interested party. **The circuit court thus did not have authority to adjudicate the rights of Shouneyia Brothers without first making it a party to the case**.

*Shouneyia v Shouneyia*, 291 Mich App 318, 323-24; 807 NW2d 48 (2011) (emphasis added) (footnote omitted).

Plaintiff's own motion references the Michigan Business Corporation Act, MCL 450.1489(1)(d) providing courts with the power to order "[t]he direction or prohibition of an act of the

4891-1614-1707_2

corporation or of shareholders, directors, officers or other persons **party to the action**."
(emphasis added).

Even if the Court were inclined to agree with plaintiff that a receivership over Candid is warranted (which it is not), it cannot enter an order appointing a receiver unless and until Candid is a party to the lawsuit under which the receivership is sought. For this reason alone, Greg's motion should be denied.

## II.     The Court Cannot Enter an Order Imposing Pre-Judgment Garnishment in this Circumstance.

Even setting aside the fact that this Court cannot adjudicate the rights of non-party Candid, the relief sought by Greg is inappropriate under the Michigan Court Rules because it essentially requests that the Court impose pre-judgment garnishment, which is inappropriate in this circumstance. MCR 3.102 permits garnishment prior to judgment *only* when a plaintiff has commenced an action based on contract (MCR 3.102(A)(1)), or when a plaintiff is a prejudgment garnishment in an action brought to enforce a foreign judgment (MCR 3.102(3)). Here, Greg has raised no breach of contract claim whatsoever related to Candid. He seeks to impose a receiver over Candid, after having caused the circumstances for which he believes a receiver is necessary, because he seeks to maximize Candid profits that he anticipates will become part of his judgment in this litigation. The Court cannot permit Greg to engage in a bad faith bait-and-switch by unilaterally crippling Candid's ability to sell Greg's shares and remove him from Candid, and then complaining that Candid now needs a receiver because he and Chris cannot work together.

## III.    Even if this Court Could Appoint a Receiver over Candid, Plaintiff Has Failed to Meet the Burden Required to Establish the Appointment of a Receiver.

Lastly, Greg's motion states no sufficient basis to impose the extraordinary remedy of receivership. He alleges no immediate or credible threat of harm to Candid, other than complaining that Candid has no "management" for the fall cannabis harvest season. This ignores

4891-1614-1707_2

that (1) Candid has been without "management" for seven months and there is no immediate danger of loss that is different now than it was seven months ago, (2) **that Greg himself caused the very circumstances he alleges make Candid's management not possible without a receiver**, and (3) fails to address the obvious reality that Chris and his employees have and will continue to manage Candid's day-to-day operations while both Greg's Candid share transfer and this litigation are pending.

The Michigan Receivership Act states that a Court may appoint a receiver "(a) [b]efore judgment, to protect a party that demonstrates an apparent right, title, or interest in real property that is the subject of the action, [where]: (i) [t]he property or its revenue-producing potential is being subjected to or is in danger of waste, loss, dissipation, or impairment." MCL 554.1016(1)(a)(i). The Michigan Revised Judicature Act also provides trial courts with equitable power to appoint a receiver "in all cases pending where appointment is allowed by law." MCL 600.2926.

As plaintiff recognizes in his motion, the imposition of a receivership is a harsh remedy and should only be resorted to in extreme cases. See *Band v Livonia Assoc*, 176 Mich App 95, 105, 439 NW2d 285 (1989). The appointment of a receiver is a remedy of last resort, and should not be used where another, less drastic remedy exists. *Ypsilanti Fire Marshal v Kircher (On Reconsideration)*, 273 Mich App 496, 530; 730 NW2d 481 (2007), *Hofmeister v Randall*, 124 Mich App 443, 446; 335 NW2d 65 (1983). And appointment of a receiver is appropriate to protect property against imminent danger of loss. See, e.g., *Weathervane Window, Inc v White Lake Constr Co*, 192 Mich App 316, 322; 480 NW2d 337 (1991).

It is well settled that a receiver may only be appointed upon a strong showing that the property which is the subject of the litigation is in danger of loss or irreparable injury and is a

9

remedy of last resort. Curiously, Greg's motion is devoid of any evidence to establish that Candid is subject to or in danger of any irreparable injury. It is undisputed that since the party's separation (and beforehand) Chris has capitalized and paid all expenses of Candid to the tune of several millions of dollars. [6] On the other hand, Greg has never contributed a single dime toward Candid.  It is also undisputed that Chris continues to capitalize and fund the operations and as such the status quo has not changed over the past *nine (9) months* with respect to Candid. Greg's demand for appointment of a receiver is predicated on his belief, without any factual basis, that without the appointment of a receiver, Chris will interfere in Candid's operations. There is no evidence or basis to support this conclusory allegation and the overwhelming evidence points to the contrary.  Even so, such a claim would not support the appointment of a receiver over Candid.  Moreover, any alleged damages Greg believes he will suffer relating to Candid can be brought in this action.

Greg's motion identifies no real risk of loss or any exigency necessitating a receiver. Greg has been aware of Candid's management situation for at least seven months (since he himself requested that he be removed from Candid). At best, he claims that the fall harvest season for Candid's cannabis product is at risk of loss—but due to what? He provides no logical connection between the supposedly-critical fall harvest season and imminent danger of loss. He contends that "Candid will require considerable oversight" in the coming weeks but does not address how Candid currently *lacks* oversight or how the current management of Candid, absent a receiver, would result in loss. Beyond his portentous warning that Candid's fall cannabis harvest is forthcoming, Greg has supplied zero basis to impose the extreme remedy of

---

[6] Chris has also paid for the license renewal fees associated with Candid; has engaged counsel and paid for all costs and attorney fees to effectuate the transfer of ownership and resolution of certain CRA violations.

4891-1614-1707_2

receivership. Indeed, this action has been pending for months, and Greg contends that a receiver is now warranted? Greg knows that one is unnecessary and that this motion is nothing more than an attempt to put more pressure on Chris to surrender to Greg's demands.

## CONCLUSION

The Court should deny Greg's motion and sanction him for bringing a motion for appointment of a receiver when the caselaw is clear that such relief is not allowed over a non-party and where the facts and circumstances do not justify the appointment of a receiver.

Respectfully submitted,

BODMAN PLC


By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Plaintiff*

Dated:  November 3, 2023


## PROOF OF SERVICE

I hereby certify that on November 3, 2023, I electronically filed the foregoing papers with the Clerk of the Court using the E-filing system which will send notification of such filing to all attorneys of record.

*/s/ J. Adam Behrendt  (P58607)*

11

4891-1614-1707_2

*EXHIBIT A*



License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT APPLICATION

This form is for applicants that have been prequalified or licensed under the Michigan Regulation and Taxation of Marihuana Act (MRTMA) or the Medical Marihuana Facilities Licensing Act (MMFLA) to submit a request for one of the following situations:

- Change of Ownership (Adding/Removing/Change of Equity)
- Change of Entity Name
- Conversion
- Asset Purchase

Applicants/Licensees shall report to the agency any proposed material changes to the marihuana business _before_ making a material change that may require prior authorization by the agency. Please be mindful of any social equity eligibility requirements prior to a change of ownership.

| Supporting Documents Checklists |
|---|
| **If proposing to add members:** |
| ☑ Amendment Application |
| ☑ Proposed Governing Documents |
| ☑ Organizational Structure |
| ☑ Authorizing Resolution |
| *Please note new supplemental applicants who have not already submitted a supplemental application with the CRA will be required to do so.* |
| **If proposing to remove members:** |
| ☑ Amendment Application |
| ☑ Proposed Governing Documents |
| ☑ Organizational Structure |
| ☑ Authorizing Resolution or Withdrawal Letter |
| **If proposing change to equity only:** |
| ☐ Amendment Application |
| ☐ Proposed Governing Documents |
| ☐ Organizational Structure |
| ☐ Authorizing Resolution |
| **If proposing a change of entity name:** |
| ☐ Amendment Application |
| ☐ Proposed Governing Documents |
| ☐ Organizational Structure |
| ☐ Certificate of Amendment from LARA Corporations |
| ☐ Articles of Organization |
| ☐ Authorizing Resolution |
| ☐ Certificate of Occupancy (required only if licensed) |
| ☐ Insurance Policy (required only if licensed) |
| ☐ Deed or Lease Agreement (required only if licensed) |
| **If proposing a conversion from one entity type to another:** |
| ☐ Amendment Application |
| ☐ Proposed Governing Documents |
| ☐ Organizational Structure |
| ☐ Certificate of Amendment from LARA Corporations |
| ☐ Articles of Organization |
| ☐ Authorizing Resolution |
| ☐ Certificate of Occupancy (required only if licensed) |
| ☐ Insurance Policy (required only if licensed) |
| ☐ Deed or Lease Agreement (required only if licensed) |
| **If proposing an asset purchase:** |
| ☐ Amendment Application |
| ☐ Proposed Governing Documents – Purchaser |
| ☐ Organizational Structure – Purchaser |
| ☐ Purchase Agreement |
| *Please note a Step 2 license application will be required to be submitted by the purchaser once instructed to do so by the CRA. Please do not file a Step 2 application until you have received the request from the CRA.* |

Amendments must be filed on the Accela Citizen Access Portal. For more information about amendments, please view the amendments webpage on the CRA website. Please send all amendment-related communications to CRA-Amendments@Michigan.gov.



# CANNABIS
## REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT APPLICATION

Amendments must be filed on the Accela Citizen Access Portal. For more information about amendments, please view the amendments webpage on the CRA website. Please send all amendment-related communications to CRA-Amendments@Michigan.gov.

### General Information

| Main Applicant/Licensee Legal Name | Main Applicant/Licensee Prequalification Record Number (e.g., ERG-000000, AU-ER-000000) |
|---|---|
| Candid, Inc. | ERG-002700, AU-ER-000980 |
| Email | Phone |
| yatooma@fyblaw.com | (248) 459-8832 |

| Mailing Address (including Suite, Unit, Building #'s) | City | State | Zip Code |
|---|---|---|---|
| 1615 S. Telegraph Rd. | Bloomfield Hills | MI | 48302 |

### Amendment Type

- ☒ Change of Ownership (Adding/Removing/Change of Equity)
- ☐ Change of Entity Name
- ☐ Conversion
- ☐ Asset Purchase

### Provide a Detailed Description of the Proposed Amendment (i.e., removing John Doe as 50% owner of Entity A, LLC)

Gregory Yatooma, sole shareholder of Candid, Inc., is transferring 100% of Candid, Inc.'s stock to Joshua Smith, a prequalified individual.

### Person Completing Form

| Name (First, Middle, Last): | Affiliation with Entity: |
|---|---|
| Heather Vanderwalker Cude | Attorney |
| Email Address: | Phone: |
| Cude@fyblaw.com | (248) 496-6979 |



**CANNABIS**
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT VERIFICATION & AFFIDAVIT OF FULL DISCLOSURE ATTESTATION
Add additional pages of this form as necessary to account for multiple contact persons.

On behalf of _____Candid, Inc._____, I _____Gregory Yatooma, Shareholder_____
    *Legal Name of Amendment Applicant*                    *Name & Title of Individual Authorized to Sign on Behalf of Applicant*
confirm the following:

1. I am the individual responsible for submitting this amendment application and have full authority to execute this amendment application.

2. I authorize the Cannabis Regulatory Agency (Agency) to add _____Heather Cude_____ to be a contact person for this amendment. I understand that this person will have access to this amendment record. Further, I understand that this person will retain access and is authorized to communicate with and receive communication from the Agency regarding only this amendment until the licensee submits an official request to remove this person's access and cease communication with this person. The contact information for this person in provided below.

3. The contact information to be used in communications regarding the amendment application named above is as follows:

    Contact E-mail Address: _____cude@fyblaw.com_____

    Contact Phone Number: _____(248) 496-6979_____

    Contact Person's ACA Login User ID (if applicable): _____heathercude_____
    (IMPORTANT: ACA Login User ID is required if the contact person needs to have access to online records.
    Please contact the Agency if you need assistance creating an ACA account.)

4. I authorize the person listed as the Person Completing Application within the demographic section of this application to be a contact person for the Agency for this amendment. I understand that this person will have access to records and material submitted to the Agency for the purposes of this amendment application. Further, I understand that this person will retain access and receive communication from the Agency regarding the applicant until the applicant submits an official request to remove this person's access and cease communication with this person.

5. I understand this requested amendment is a proposed change and cannot be executed prior to receiving approval from the Agency. To be compliant with the reporting requirements within the Michigan Regulation and Taxation of Marihuana Act (MRTMA), the Medical Marihuana Facilities Licensing Act (MMFLA), and the administrative rules: Applicants shall report to the agency any proposed material changes to the marihuana business before making a material change that may require prior authorization by the agency.

6. I affirm no conditions exist that would prevent this amendment from taking place once granted approval from the Agency.

7. Further, I affirm, under the penalties of perjury, that the information set forth in this amendment application and all related supporting documentation is true, complete, and accurate, and that no material information has been omitted. Further, I affirm all previously completed Attestations remain true, complete, and accurate, and that no material information has changed that has not been previously reported.

_____          _____1-27-23_____
Signature of Individual Authorized to Sign on Behalf of Main Applicant          Date


Subscribed and sworn to by _____Gregory Yatooma_____ before me on _____January 27, 2023_____
                                            *(Authorized Individual Name)*                    *(Date)*

_____Kara Harbour_____          _____Kara Harbour_____
(Notary Public Signature)          (Notary Public Printed Name)

State of _____Michigan_____, County of _____Oakland_____, Acting in the county of _____Oakland_____, _____Michigan_____
                                                                                            *(county)*          *(state)*

My commission expires: _____August 2, 2027_____



CANNABIS
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## MAIN ENTITY ORGANIZATIONAL STRUCTURE REQUIREMENTS & EXAMPLE

Every main entity applicant must submit an organizational structure document that includes the following:

| | |
|---|---|
| Limited Liability Company | All members, the spouses of all members holding a direct or indirect ownership interest of greater than 10% in the main applicant; all managers, and the spouses of all managers. |
| Publicly Held Corporation Privately Held Corporation | All corporate officers or persons with equivalent titles and their spouses; all directors and their spouses; all shareholders, and the spouses of all shareholders holding a direct or indirect ownership interest of greater than 10% in the main applicant. |
| Trust | All trustees; all individuals or bodies able to control or direct the affairs of the trust; all beneficiaries, and the spouses of all beneficiaries who receive or have the right to receive more than 10% of the gross or net profit of the trust during any full or partial calendar or fiscal year. |
| Partnership Limited Liability Partnership | All partners and the spouses of all partners. |
| Limited Partnership Limited Liability Limited Partnership | All general and limited partners and the spouses of all general and limited partners. |
| Nonprofit Corporation | All individuals and entities with membership or shareholder rights and the spouses of all individuals with shareholder rights. |

Also Include:
- **All managerial employees**, if applicable
  - An employee is considered a managerial employee if they have the ability to control and direct the affairs of the marijuana business and/or have the ability to make policy concerning the marijuana business.
- **Ownership percentages**
- **Officer titles**, if applicable (e.g., President, Vice President, Treasurer, Secretary; Chief Executive Officer, Chief Financial Officer, etc.)

**Those with less than 2.5% ownership interest in the main applicant and their spouses are not required to be disclosed.**

Example:



Ensure all entities and individuals listed on the organizational structure are disclosed on DISCLOSURE OF OWNERSHIP on the next two pages.



**CANNABIS**
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## DISCLOSURE OF OWNERSHIP

| Candid, Inc. | (248) 459-8832 |
|---|---|
| Entity Name | Phone No. |

### Parties & Spouses

Disclose all managerial employees and the following for the entity types below. Add additional pages of this disclosure if necessary.
- For a **limited liability company (LLC):** Disclose all managers, all members that have greater than 10% direct or indirect ownership interest and/or that exercise control over or participate in the management of the LLC, and the spouses of these individuals.
- For a **publicly or privately held corporation:** Disclose all corporate officers or persons with equivalent titles, all directors, all shareholders holding a direct or indirect interest of greater than 10% in the corporation, and the spouses of these individuals.
- For a **trust:** Disclose all trustees, all individuals or bodies able to control or direct the affairs of the trust, all beneficiaries receiving or who have the right to receive greater than 10% of the gross or net profit of the trust during any full or partial calendar or fiscal year, and the spouses of these beneficiaries.
- For a **partnership or limited liability partnership:** Disclose all partners and their spouses.
- For a **limited partnership and limited liability limited partnership:** Disclose all general and limited partners with greater than 10% ownership interest and their spouses.
- For a **nonprofit corporation:** Disclose all entities and individuals with membership or shareholder rights and their spouses.

| Entity or Individual Name | FEIN or SSN | E-mail Address | Date of Birth (if applicable) | Is the Individual Married? |
|---|---|---|---|---|
| Joshua Smith | 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 | smith@axonprop.com | 06/01/1974 | ☒ Yes ☐ No |
| Rebecca Smith (spouse) | 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 | rlsmith299@gmail.com | 04/25/1973 | ☒ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |



**CANNABIS**
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## DISCLOSURE OF OWNERSHIP, CONTINUED

| Candid, Inc. | (248)459-8832 |
|---|---|
| Entity Name | Phone No. |

### Ten Percent or Less

List all entities and individuals with <u>10% or less</u> direct or indirect ownership in the entity for which this application is being completed. Those holding <u>less than 2.5%</u> direct or indirect ownership interest in the main entity are not required to be disclosed.

- For a limited liability company (LLC): Disclose all members with 10% or less ownership interest in the main applicant seeking licensure.
- For a publicly and privately held corporation: Disclose all shareholders holding an interest of 10% or less in the main applicant seeking licensure. Shareholders holding an interest of 5% or less in the main applicant seeking licensure are not required to be disclosed.
- For a trust: Disclose all beneficiaries receiving or who have the right to receive 10% or less of the gross or net profit of the trust during any full or partial calendar or fiscal year
- For a limited partnership and limited liability limited partnership: Disclose all general and limited partners with 10% or less ownership interest.

| Entity or Individual Name | Mailing Address | Email Address | Date of Birth (If applicable) |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*EXHIBIT B*

<u>SHAREHOLDER RESOLUTION CONDITIONALLY APPROVING TRANSFER OF SHARES</u>

WHEREAS, pursuant to the By Laws of this corporation (the "Company"), it is deemed desirable and in the best interests of Candid, Inc., a Michigan corporation, that the following actions be taken by the Shareholder (s) of this Company pursuant to this Written Consent:

NOW, THEREFORE, BE IT RESOLVED that the undersigned Shareholder of this Company hereby consents to, approves, and adopts the following:

**<u>CONDITIONAL TRANSFER OF SHARES</u>.**

RESOLVED that this Company sell and issue its Shares to the person(s) set forth below and for the consideration set forth below; that such shares shall be deemed fully paid and nonassessable; and that the Managing Shareholder has determined that the consideration reflects fair value for the shares.

| <u>Name</u> | <u>Percentage of Shares</u> | <u>Consideration</u> |
|---|---|---|
| Joshua Smith | 100% | Previously Paid |

FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares.

The undersigned member of this limited liability company consents and agrees to the above on this 24th day of February 2023

_____                    _2/24/23_____

Gregory Yatooma, Shareholder                             Date

# EXHIBIT C

## RESOLUTION OF CANDID, INC.

The undersigned, being all the Shareholders of Candid, Inc., a Michigan corporation (the Company), take the following actions by and hereby adopt the following resolutions:

**RESOLVED,** that Joshua Smith is hereby authorized by the Company and on behalf of the Company to sign and deliver any necessary documents to the State of Michigan's Cannabis Regulatory Agency for its application(s) to operate Marijuana businesses in accordance with the MMFLA and/or MRTMA.

**FURTHER RESOLVED,** any such actions taken before the date of these resolutions by Joshua Smith are ratified and confirmed.

**COMPANY:**

Candid, Inc.

Dated: 2/24/23                         By: _Josh Smith_____
                                            Joshua Smith, Managing Shareholder

SHAREHOLDER(S):

Dated: 2/24/23                         By: _Josh Smith_____
                                            Joshua Smith

*EXHIBIT D*



CANNABIS
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AUTHORIZATION OF ADDITIONAL CONTACT PERSON
Do not sign until notary is present
**Add additional pages of this form as necessary to account for multiple contact persons.**

**PART A (to be completed by the licensee):**

On behalf of _____Candld, Inc._____ , I ___Gregory Yatooma, Shareholder___ ,

<p style="text-align:center"><small>Legal Name of Licensee                                    Name & Title of Individual Authorized to Sign on Behalf of Licensee</small></p>

confirm the following:

1. I am the individual responsible for submitting this form and have full authority to execute the authorization of an additional contact person for the licensee.

2. I authorize the Cannabis Regulatory Agency (Agency) to add _____Samer Paulus_____
as a contact person for the licensee. I understand that this person will have access to the following licensing records of the licensee: the prequalified record, license record(s), and renewal record(s). Further, I understand that this person will retain record access and is authorized to communicate with and receive communication from the Agency regarding the licensee until the licensee submits an official request to remove this person's access and cease communication with this person. The contact information for this person is provided in Part B below.

3. The contact person named above is to be added to:
   ☐ the licensee's adult-use establishment licensing records only.
   ☐ the licensee's medical facility licensing records only.
   ☒ both the adult-use establishment and the medical facility licensing records of the licensee.

_____          _____3/30/23_____
Authorized Individual Signature                                                   Date

Subscribed and sworn to by _Gregory Yatooma_ before me on _March 30, 2023_
<small>(Authorized Individual Name)                                                                          (Date)</small>

_Kara Harbour_                                    _Kara Harbour_
<small>(Notary Public Signature)                                                          (Notary Public Printed Name)</small>

State of _Michigan_ , County of _Oakland_ . Acting in the county of _Oakland_ , _Michigan_
<small>(county)                        (state)</small>

My commission expires: _August 2, 2027_

**PART B (to be completed by the authorized contact person):**

I _____Samer Paulus_____ , confirm the following:
<p style="text-align:center"><small>Name of Contact Person</small></p>

1. I am the individual named in Part A above.

2. My contact information to be used in communications regarding the licensee named in Part A above is as follows:

   Contact E-mail Address: _____paulus@urbanlegalgroup.com_____

   Contact Phone Number: _____(248) 550-1086_____

   Contact Person's Accela User ID (if applicable): _____paulussam_____
   <small>(IMPORTANT: Accela Login User ID is required if the contact person needs access to online licensing records. Please contact the Agency if you need assistance creating an Accela account.)</small>

_____          _April 4, 2023_
Contact Person Signature                                                         Date

Subscribed and sworn to by _Gregory Yatooma_ before me on _4/4/2023_
<small>(Contact Person Name)                                                                          (Date)</small>

_____          _Angelo Jay Bruno_
<small>(Notary Public Signature)                                                          (Notary Public Printed Name)</small>

State of _Michigan_ , County of _Oakland_ . Acting in the county of _Oakland_ , _MI_
<small>(county)                        (state)</small>

My commission expires: _6/21/2026_

CRA 5326 (Revised Apr-2022)                                                              Page 1 of 1

*EXHIBIT E*

BYLAWS
OF
CANDID, INC.
(A MICHIGAN CORPORATION)

ARTICLE I
OFFICES AND PURPOSES

SECTION 1.  REGISTERED OFFICE.  The registered agent is Bahoura Law in Bloomfield Hills, Michigan, or such other registered agent as the Board of Directors may designate from time to time in the manner provided for by law.

SECTION 2.  OTHER OFFICES.  The corporation may also have offices at such other places both in and outside the State of Michigan, as the Board of Directors may from time to time determine or the business of the corporation may require.

SECTION 3.  PURPOSE; POWERS.  The purpose of the Company is to engage in any activity for which limited liabilities companies may be formed under the Act.  The Company shall have all the powers necessary or convenient to effect any purpose for which it is formed, including all powers granted by the Act.  Notwithstanding the foregoing, each of the undersigned members and those members who are later admitted as permitted transferees understand that the Company may be licensed with State of Michigan's Licensing and Regulatory Affairs division and the Cannabis Regulatory Agency ("CRA") as a medical and/or recreational marijuana business pursuant to the Medical Marihuana Facilities Licensing Act ("MMFLA") and/or the Michigan Regulation and Taxation of Marijuana Act ("MRTMA").  Each Member understands that, as of the date of this Operating Agreement, activities under the MMFLA and MRTMA are not permitted under federal law.  Each member voluntarily and knowingly executes this Operating Agreement having had the opportunity to consult with independent counsel and tax professionals to discuss this Operating Agreement and the MMFLA and MRTMA.

ARTICLE II
SHAREHOLDERS

SECTION 1.  PLACE OF MEETING.   All meetings of the shareholders of the corporation shall be held at the registered office or such other place, either within or without the State of Michigan, as may be determined from time to time by the Board of Directors.

SECTION 2.  ANNUAL MEETING OF SHAREHOLDERS.  The annual meeting of shareholders for election of Directors and for such other business as may properly come before the meeting, shall be held on the second Tuesday of January, if not a legal holiday, and if a legal holiday, then on the next business day following, at 10:00 a.m., local time, or at such other date and time as shall be determined from time to time by the Board of Directors, unless such action is taken by written consent as provided in Section 12 of this Article II.  If the annual meeting is not held on the date designated therefor, the Board shall cause the meeting to be held as soon thereafter as convenient.

SECTION 3.  ORDER OF BUSINESS AT ANNUAL MEETING.   The order of business at the annual meeting of the shareholders shall be as follows:

(a)   Reading of notice and proof of mailing;

(b)   Reports of Officers;

(c)   Election of Directors;

(d)   Transaction of other business mentioned in the notice;

(e)   Adjournment;

provided that, in the absence of any objection, the presiding officer may vary the order of business at his discretion.

SECTION 4.  NOTICE OF MEETING OF SHAREHOLDERS.   Except as otherwise provided in the applicable State of Michigan law (herein called the "Act"), written notice of the time, place and purposes of a meeting of shareholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, to each shareholder of record entitled to vote at the meeting.  If a meeting is adjourned to another time or place, it is not necessary to give notice of the adjourned meeting if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken and at the adjourned meeting only business is transacted as might have been transacted at the original meeting.   If after the adjournment the Board of Directors fixes a new record date for the adjourned meeting, a notice of the adjourned meeting shall be given to each shareholder of record on the new record date entitled to vote at the meeting.

SECTION 5.  LIST OF SHAREHOLDERS ENTITLED TO VOTE.   Subject to the terms and provisions of these Bylaws, and in compliance with the MMFLA and MRTMA, only those Member(s) owning a membership interest greater than Ten Percent (10%) of the Company or have otherwise received pre-qualification from the CRA shall be entitled to vote on matters concerning the day-to-day operations and management of the Company.   If a Member owning Ten Percent (10%) or less of the Company seeks to obtain voting rights other than those specifically allowed in this Operating Agreement, that Member must submit an application for "pre-qualification" to the CRA, at that Members sole expense, and upon being issued said "pre-qualification" by the CRA, the Company shall take the necessary steps to amend this Operating Agreement to reflect such changes to that Member's voting rights and subsequently obtain CRA approval of the amended Operating Agreement. The aforementioned applies to those Members owning a membership interest greater than Ten Percent (10%), or have otherwise received pre-qualification from the CRA.   The officer or agent having charge of the stock transfer books for shares of the corporation shall make and certify a complete list of the shareholders entitled to vote at a shareholders' meeting or any adjournment thereof. The shareholder shall be Joshua Smith.  The list shall:

(a)   be arranged alphabetically within each class and series, with the address of, and the number of shares held by, each shareholder.

2

(b)     be produced at the time and place of the meeting.

(c)     be subject to inspection by any share holder during the whole time of the meeting.

(d)     be prima facie evidence as to who are the shareholders entitled to examine the list or to vote at the meeting.

SECTION 6.  SPECIAL MEETING OF SHAREHOLDERS.  A special meeting of shareholders may be called at any time by the chief executive officer of the corporation (see Article V, Section 4) or by a majority of the members of the Board of Directors then in office, or by shareholders owning, in the aggregate, not less than a majority of all the shares entitled to vote at such special meeting.  The method by which such meeting may be called is as follows: Upon receipt of a specification in writing setting forth the date and objects of such proposed special meeting, signed by the chief executive officer, or by a majority of the members of the Board of Directors then in office, or by shareholders as above provided, the secretary of the corporation shall prepare, sign and mail the notices requisite to such meeting.

SECTION 7.  QUORUM OF SHAREHOLDERS.  Unless a greater or lesser quorum is provided in the articles of incorporation, in a bylaw adopted by the shareholders or incorporators, or in the Act, shares entitled to cast a majority of the votes at a meeting constitute a quorum at the meeting.  The shareholders present in person or by proxy at the meeting may continue to do business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.  Whether or not a quorum is present, the meeting may be adjourned by a vote of the shares present.

SECTION 8.  VOTE OF SHAREHOLDERS.  Each outstanding share is entitled to one (1) vote on each matter submitted to a vote, unless otherwise provided in the articles of incorporation.  A vote may be cast either orally or in writing.  If an action, other than the election of directors, is to be taken by vote of the shareholders, it shall be authorized by a majority of the votes cast by the holders of shares entitled to vote on the action, unless a greater vote is required by the articles of incorporation or the Act.  Except as otherwise provided in the articles of incorporation, Directors shall be elected by a plurality of the votes cast at an election.

SECTION 9.  RECORD DATE FOR DETERMINATION OF SHAREHOLDERS.  For the purpose of determining shareholders entitled to notice of and to vote at a meeting of shareholders or an adjournment of a meeting, the Board of Directors may fix a record date, which shall not precede the date on which the resolution fixing the record date is adopted by the Board.  The date shall not be more than sixty (60) nor less than ten (10) days before the date of the meeting.  If a record date is not fixed, the record date for determination of shareholders entitled to notice of or to vote at a meeting of shareholders shall be the close of business on the day next preceding the day on which notice is given, or if no notice is given, the day next preceding the day on which the meeting is held.  When a determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders has been made as provided in this Section, the determination applies to any adjournment of the meeting, unless the Board of Directors fixes a new record date under this Section for the adjourned meeting.  For the purpose of determining shareholders entitled to express consent to or to dissent from a proposal without a

meeting, the Board of Directors may fix a record date, which shall not precede the date on which the resolution fixing the record date is adopted by the Board and shall not be more than ten (10) days after the Board resolution. If a record date is not fixed and prior action by the Board of Directors is required with respect to the corporate action to be taken without a meeting, the record date shall be the close of business on the day which the resolution of the Board is adopted. If a record date is not fixed and prior action by the Board of Directors is not required, the record date shall be the first date on which a signed written consent is delivered to the corporation as provided in Section 12 of this Article II. For the purpose of determining shareholders entitled to receive payment of a share dividend or distribution, or allotment of a right, or for the purpose of any other action, the Board of Directors may fix a record date, which shall not precede the date on which the resolution fixing the record date is adopted by the Board. The date shall not be more than sixty (60) days before the payment of the share dividend or distribution or allotment of a right or other action. If a record date is not fixed, the record date shall be the close of business on the day on which the resolution of the Board of Directors relating to the corporate action is adopted.

SECTION 10. PROXIES. A shareholder entitled to vote at a meeting of shareholders or to express consent or dissent without a meeting may authorize one or more other persons to act for him by proxy. A proxy shall be signed by the shareholder or his authorized agent or representative. A proxy is not valid after the expiration of three (3) years from its date unless otherwise provided in the proxy.

SECTION 11. INSPECTORS OF ELECTION. The Board of Directors, in advance of a shareholders' meeting, may appoint one (1) or more inspectors of election to act at the meeting or any adjournment thereof. If inspectors are not so appointed, the person presiding at a shareholders' meeting may, and on request of a shareholder entitled to vote thereat shall, appoint one (1) or more inspectors. In case a person appointed fails to appear or act, the vacancy may be filled by appointment made by the Board of Directors in advance of the meeting or at the meeting by the person presiding thereat. The inspectors shall determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine challenges and questions arising in connection with the right to vote, count and tabulate votes, ballots or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all shareholders. On request of the person presiding at the meeting or a shareholder entitled to vote thereat, the inspectors shall make and execute a written report to the person presiding at the meeting of any of the facts found by them and matters determined by them. The report is prima facie evidence of the facts stated and of the vote as certified by the inspectors.

SECTION 12. ACTION BY WRITTEN CONSENT. The articles of incorporation provides that any action required or permitted by the Act to be taken at an annual or special meeting of shareholders may be taken without a meeting, without prior notice and without a vote, if consents in writing, setting forth the action so taken, are signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote on the action were present and voted.

4

SECTION 13. PARTICIPATION IN MEETING BY TELEPHONE.  Unless otherwise restricted by the articles of incorporation, by oral or written permission of a majority of the shareholders, a shareholder may participate in a meeting of shareholders by a conference telephone or by other similar communications equipment through which all persons participating in the meeting may communicate with the other participants.  All participants shall be advised of the communications equipment and the names of the participants in the conference shall be divulged to all participants.  Participation in a meeting pursuant to this Section constitutes presence in person at the meeting.

<div align="center">

ARTICLE III
DIRECTORS

</div>

SECTION 1.  NUMBER AND TERM OF DIRECTORS.  The number of directors which shall constitute the whole Board shall be not less than one (1) nor more than seven (7).  The initial Director shall be Joshua Smith.  As of the date of the adoption of the Bylaws, the Board shall consist of one (1) Director.  Thereafter, the number of Directors which shall constitute the Board of Directors for each ensuing year shall be determined at the annual meeting by vote of the shareholders prior to such election; provided, however, that if a motion is not made and carried to increase or decrease the number of Directors, the Board shall consist of the same number of Directors as were elected for the preceding year.  The shareholders may also increase or decrease the number of Directors at any meeting of the shareholders or by a written consent in lieu thereof.  Either the shareholders or the Board of Directors may fill the vacancy caused by an increase in the number of directors.  The first Board of Directors shall hold office until the first annual meeting of shareholders.  At the first annual meeting of shareholders and at each annual meeting thereafter, the shareholders shall elect directors to hold office until the succeeding annual meeting, except in case of the classification of directors as permitted by the Act.  A director shall hold office for the term for which he or she is elected and until his or her successor is elected and qualified, or until his or her resignation or removal.  Directors need not be shareholders.

SECTION 2.  VACANCIES.  Unless otherwise limited by the articles of incorporation or in a written agreement among the shareholders, if a vacancy, including a vacancy resulting from an increase in the number of Directors, occurs in the Board of Directors, the vacancy may be filled as follows:

      (a)    The shareholders may fill the vacancy.

      (b)    The Board may fill the vacancy.

      (c)    If the Directors remaining in office constitute fewer than a quorum of the Board of Directors, they may fill the vacancy by the affirmative vote of a majority of all the Directors remaining in office.

Unless otherwise provided in the articles of incorporation, if the holders of any class or classes of stock or series are entitled to elect one (1) or more Directors to the exclusion of other shareholders, vacancies of that class or classes or series may be filled only by one (1) of the following:

<div align="center">

5

</div>

(a)     By a majority of the Directors elected by the holders of that class or classes or series then in office, whether or not those Directors constitute a quorum of the Board of Directors.

(b)     By the holders of shares of that class or classes of shares, or series.

In the case of a corporation the Board of Directors of which are divided into classes, any Director chosen to fill a vacancy shall hold office until the next election of the class for which the Director shall have been chosen, and until his or her successor is elected and qualified. If because of death, resignation, or other cause, a corporation has no Directors in office, an officer, a shareholder, a personal representative, administrator, trustee, or guardian of a shareholder, or other fiduciary entrusted with like responsibility for the person or estate of a shareholder, may call a special meeting of shareholders in accordance with the articles of incorporation or these bylaws. A vacancy that will occur at a specific date, by reason of a resignation effective at a later date under Section 4 of this Article III or otherwise, may be filled before the vacancy occurs but the newly elected or appointed Director may not take office until the vacancy occurs.

SECTION 3.   REMOVAL.   The shareholders may remove one (1) or more directors with or without cause unless the articles of incorporation provide that Directors may be removed only for cause.   The vote for removal shall be by a majority of shares entitled to vote at an election of Directors, unless the articles of incorporation require a higher vote for removal without cause.

SECTION 4.   RESIGNATION.   A Director may resign by written notice to the corporation. The resignation is effective upon its receipt by the corporation or a later time as set forth in the notice of resignation.

SECTION 5.   POWERS.   Except as otherwise provided in the Act or in the articles of incorporation, the business and affairs of the corporation may be managed by its Board of Directors, or by the Officers, as the Board of Directors may determine.

SECTION 6.   LOCATION OF MEETINGS.   Regular or special meetings of the Board of Directors may be held either in or outside the State of Michigan.

SECTION 7.   ORGANIZATION MEETING OF BOARD.   The first meeting of each newly elected Board of Directors shall be held at the place of holding the annual meeting of shareholders, and immediately following the same, for the purpose of electing officers and transacting any other business properly brought before it, provided that the organization meeting in any year may be held at a different time and place than that herein provided by a consent of a majority of the Directors of such new board.   No notice of such meeting shall be necessary to the newly elected Directors in order legally to constitute the meeting, provided a quorum shall be present, unless said meeting is not held at the place of holding and immediately following the annual meeting of shareholders.

SECTION 8.   REGULAR MEETING OF BOARD.   Any special meeting of the Board of Directors may be called by the chief executive officer, or by a majority of the persons then comprising the Board of Directors, at any time by means of notice of the time and place thereof

to each Director, given not less than twenty-four (24) hours before the time such special meeting is to be held.

SECTION 9. SPECIAL MEETING OF BOARD. Any special meeting of the Board of Directors may be called by the chief executive officer, or by a majority of the persons then comprising the Board of Directors, at any time by means of notice of the time and place thereof to each Director, given not less than twenty-four (24) hours before the time such special meeting is to be held.

SECTION 10. QUORUM AND REQUIRED VOTE OF BOARD AND COMMITTEES. At all meetings of the Board of Directors, a majority of the members of the Board then in office constitutes a quorum for transaction of business, unless the articles of incorporation or these bylaws provide for a larger or smaller number. The vote of the majority of members present at a meeting at which a quorum is present constitutes the action of the Board of Directors unless the vote of a larger number is required by the Act, the articles of incorporation, or these bylaws. Amendment of these bylaws by the Board of Directors requires the vote of not less than a majority of the members of the Board then in office. If a quorum shall not be present at any meeting of the Board of Directors, the Directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

SECTION 11. ACTION BY WRITTEN CONSENT. Action required or permitted to be taken under authorization voted at a meeting of the Board of Directors or a committee of the Board of Directors, may be taken without a meeting if, before or after the action, all members of the Board then in office or of the committee consent to the action in writing. The written consents shall be filed with the minutes of the proceedings of the Board of Directors or committee. The consent has the same effect as a vote of the Board of Directors of committee for all purposes.

SECTION 12. COMPENSATION OF DIRECTORS. The Board of Directors, by affirmative vote of a majority of directors in office and irrespective of any personal interest of any of them, may establish reasonable compensation of Directors for services to the corporation as Directors or officers, but approval of the shareholders is required if the articles of incorporation, these bylaws or any provisions of the Act so provide.

ARTICLE IV
NOTICES

SECTION 1. NOTICE. Whenever any notice or communication is required to be given by mail to any director or shareholder under any provision of the Act, or of the articles of incorporation or of these bylaws, it shall be given in writing, except as otherwise provided in the Act, to such Director or shareholder at the address designated by him for that purpose or, if none is designated, at his last known address. The notice or communication is given when deposited, with postage thereon prepaid, in a post office or official depository under the exclusive care and custody of the United States postal service. The mailing shall be registered, certified or other first class mail except where otherwise provided in the Act. Written notice may also be given in person or by telegram, telecopy, telex, radiogram, cablegram, or mailgram, and such notice shall

be deemed to be given when the recipient receives the notice personally, or when the notice, addressed as provided above, has been delivered to the corporation, or to the equipment transmitting such notice. Neither the business to be transacted at, nor the purpose of, a regular or special meeting of the board of directors need be specified in the notice of the meeting.

SECTION 2. WAIVER OF NOTICE. When, under the Act or the articles of incorporation or these bylaws, or by the terms of an agreement or instrument, a corporation or the Board of Directors or any committee thereof may take action after notice to any person or after lapse of a prescribed period of time, the action may be taken without notice and without lapse of the period of time, if at any time before or after the action is completed the person entitled to notice or to participate in the action to be taken or, in case of a shareholder, offers a waiver of such requirements. Neither the business to be transacted at, nor the purpose of, a regular or special meeting of the Board of Directors need be specified in the waiver of notice of the meeting. Attendance of a person at a meeting of shareholders constitutes a waiver of objection to lack of notice or defective notice of the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting and a waiver of objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the shareholder objects to considering the matter when it is presented. A Director's attendance at or participation in a meeting waives any required notice to him or her of the meeting unless he or she at the beginning of the meeting, or upon his or her arrival, objects to the meeting or the transacting of business at the meeting and does not thereafter vote for or assent to any action taken at the meeting.


ARTICLE V
OFFICERS

SECTION 1. SELECTION. The Board of Directors, at its first meeting and at its organization meeting following the annual meeting of shareholders, shall elect or appoint a president, a secretary and a treasurer. The Board of Directors may also elect or appoint a chairman of the Board, one (1) or more vice presidents and such other officers, employees and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board. Two (2) or more offices may be held by the same person but an officer shall not execute, acknowledge or verify an instrument in more than one (1) capacity.

SECTION 2. COMPENSATION. The salaries of all officers, employees and agents of the corporation shall be fixed by the Board of Directors; provided, however, that the Board may delegate to the officers the fixing of compensation of assistant officers, employees and agents.

SECTION 3. TERM, REMOVAL AND VACANCIES. Each officer of the corporation shall hold office for the term for which he is elected or appointed and until his successor is elected or appointed and qualified, or until his resignation or removal. An officer elected or appointed by the Board of Directors may be removed by the Board with or without cause at any time. An officer may resign by written notice to the corporation. The resignation is effective

upon its receipt by the corporation or at a subsequent time specified in the notice of resignation. Any vacancy occurring in any office of the corporation shall be filled by the board of directors.

SECTION 4.  CHIEF EXECUTIVE OFFICER.  If the Board of Directors desires to elect or appoint a chief executive officer, the Board shall designate the chairman of the Board or president as such officer at the first meeting of each newly elected Board of Directors; provided, however, that if a motion is not made and carried to change the designation, the designation shall be the same as the designation for the preceding year; provided, further, that the designation of the chief executive officer may be changed at any special meeting of the Board of Directors.  The president shall be the chief executive officer whenever the office of chairman of the Board is vacant.  The chief executive officer shall be responsible to the Board of Directors for the general supervision and management of the business and affairs of the corporation and shall see that all orders and resolutions of the Board are carried into effect.  The chairman of the Board or president who is not the chief executive officer shall be subject to the authority of the chief executive officer, but shall exercise all of the powers and discharge all of the duties of the chief executive officer during the absence or disability of the chief executive officer.

SECTION 5.  CHAIRMAN OF THE BOARD OF DIRECTORS.  If the Board of Directors elects or appoints a chairman of the Board, he shall be elected or appointed by, and from among the membership of, the Board of Directors.  He shall preside at all meetings of the shareholders, of the Board of Directors and of any executive committee.  He shall perform such other duties and functions as shall be assigned to him from time to time by the Board of Directors.  He shall be, ex officio, a member of all standing committees.  Except where by law the signature of the president of the corporation is required, the chairman of the Board of Directors shall possess the same power and authority to sign all certificates, contracts, instruments, papers and documents of every conceivable kind and character whatsoever in the name of and on behalf of the corporation which may be authorized by the Board of Directors. During the absence or disability of the president, or while that office is vacant, the chairman of the Board of Directors shall exercise all of the powers and discharge all of the duties of the president.

SECTION 6.  PRESIDENT.  During the absence or disability of the chairman of the Board, or while that office is vacant, the president shall preside over all meetings of the Board of Directors, of the shareholders and of any executive committee, and shall perform all of the duties and functions, and when so acting shall have all powers and authority, of the chairman of the Board.  He shall be, ex officio, a member of all standing committees.  The president shall, in general, perform all duties incident to the office of president and such other duties as may be prescribed by the Board of Directors.

SECTION 7.  VICE PRESIDENTS.  The Board of Directors may elect or appoint one or more vice presidents.  The Board of Directors may designate one or more vice presidents as executive or senior vice presidents.  Unless the Board of Directors shall otherwise provide by resolution duly adopted by it, such of the vice presidents as shall have been designated executive or senior vice presidents and are members of the Board of Directors in the order specified by the Board of Directors (or if no vice president who is a member of the Board of Directors shall have been designated as executive or senior vice president, then such vice presidents as are members of the Board of Directors in the order specified by the Board of Directors) shall perform the

duties and exercise the powers of the president during the absence or disability of the president if the office of the chairman of the Board is vacant.  The vice presidents shall perform such other duties as may be delegated to them by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 8.  SECRETARY.   The secretary shall attend all meetings of the shareholders, and of the Board of Directors and of any executive committee, and shall preserve in the books of the corporation true minutes of the proceedings of all such meetings.  He shall safely keep in his custody the seal of the corporation, if any, and shall have authority to affix the same to all instruments where it s use is required or permitted.  He shall give all notice required by the Act, these bylaws or resolution.  He shall perform such other duties as may be delegated to him by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 9.  TREASURER.  The treasurer shall have custody of all corporate funds and securities and shall keep in books belonging to the corporation full and accurate accounts of all receipts and disbursements; he shall deposit all moneys, securities and other valuable effects in the name of the corporation in such depositories as may be designated for that purpose by the Board of Directors.  He shall disburse the funds of the corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the president and the Board of Directors whenever requested an account of all his transactions as treasurer and of the financial condition of the corporation.  If required by the Board of Directors, he shall keep in force a bond in form, amount and with a surety or sureties satisfactory to the Board of Directors, conditioned for faithful performance of the duties of his office, and for restoration to the corporation in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and property of whatever kind in his possession or under his control belonging to the corporation.  He shall perform such other duties as may be delegated to him by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 10. ASSISTANT SECRETARIES AND ASSISTANCE TREASURERS.  The assistant secretary or assistant secretaries, in the absence or disability of the secretary, shall perform the duties and exercise the powers of the secretary.  The assistant treasurer or assistant treasurers, in the absence or disability of the treasurer, shall perform the duties and exercise the powers of the treasurer.  Any assistant treasurer, if required by the Board of Directors, shall keep in force a bond as provided in Section 9 of this Article V.  The assistant secretaries and assistant treasurers, in general, shall perform such duties as shall be assigned to them by the secretary or by the treasurer, respectively, or by the Board of Directors, any executive committee, the chairman of the Board or the president.

SECTION 11. DELEGATION OF AUTHORITY AND DUTIES BY BOARD OF DIRECTORS.  All officers, employees and agents shall, in addition to the authority conferred, or duties imposed, on them by these bylaws, have such authority and perform such duties in the management of the corporation as may be determined by resolution of the Board of Directors non-inconsistent with these bylaws.

10

ARTICLE VI
INDEMNIFICATION

SECTION 1.  LIABILITY INSURANCE.  The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity or arising out of his or her status as such, whether or not the corporation would have power to indemnify him or her against liability under the pertinent provisions of the Act.

ARTICLE VII
STOCKS AND TRANSFERS

SECTION 1.  NOT CERTIFICATED.  The corporation shall issue the initial shares without certificates.

SECTION 2.  SHARE CERTIFICATES: REQUIRED PROVISIONS.  If a certificate representing shares of the corporation is issued, it shall state upon its face all of the following:

      (a)      The name of the corporation.

      (b)      That the corporation is formed under the laws of the State of Michigan.

      (c)      The name of the person to whom issued.

      (d)      The number and class of shares, and the designation of the series, if any, which the certificate represents.

      (e)      Shall be signed by the Chairman of the Board of Directors, or the President or Vice President, and another officer of the Corporation, such as the Treasurer or the Secretary, certifying the number and class of shares of stock in the Corporation owned by him or her.

A certificate representing shares issued by a corporation which is authorized to issue shares of more than one (1) class shall set forth on its face or back or state on its face or back that the corporation will furnish to a shareholder upon request and without charge a full statement of the designation, relative rights, preferences and limitations of the shares of each class authorized to be issued, and if the corporation is authorized to issue any class of shares in series, the designation, relative rights, preferences and limitations of each series so far as the same have been prescribed and the authority of the Board to designate and prescribe the relative rights, preferences and limitations of other series.

SECTION 3.  REPLACEMENT  OF  LOST  OR  DESTROYED  SHARE CERTIFICATES.  The corporation may issue a new certificate for shares or fractional shares in place of a certificate theretofore issued by it, alleged to have been lost or destroyed, and the Board of Directors may require the owner of the lost or destroyed certificate, or his legal

representative, to give the corporation a bond sufficient to indemnify the corporation against any claim that may be made against it on account of the alleged lost or destroyed certificate or the issuance of such new certificate.

SECTION 4.   REGISTERED SHAREHOLDERS.  The corporation shall have the right to treat the registered holder of any share as the absolute owner thereof, and shall not be bound to recognize any equitable or other claim to, or interest in, such share on the part of any other person, whether or not the corporation shall have the express or other notice thereof, save as may be otherwise provided by the statutes of Michigan.

SECTION 5.   TRANSFER AGENT AND REGISTRAR.  The Board of Directors may appoint a transfer agent and a registrar in the registration of transfers of its securities.

SECTION 6.   REGULATIONS.  The Board of Directors shall have power and authority to make all such rules and regulations as the Board shall deem expedient regulating the issue, transfer and registration of certificates for shares in this corporation.

ARTICLE VIII
GENERAL PROVISIONS

SECTION 1.   DISTRIBUTIONS IN CASH OR PROPERTY.  The Board of Directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and/or unless otherwise limited by the articles of incorporation, these bylaws or the Act.

SECTION 2.   RESERVES.  The Board of Directors shall have power and authority to set apart such reserve or reserves, for any proper purpose, as the Board in its discretion shall approve, and the Board shall have the power and authority to abolish any reserve created by the Board.

SECTION 3.   VOTING SECURITIES.   Unless otherwise directed by the Board of Directors, the chairman of the Board or president, or in the case of their absence or inability to act, the vice presidents, in order of their seniority, shall have full power and authority on behalf of the corporation to attend and to act and to vote, or to execute in the name or on behalf of the corporation a consent in writing in lieu of a meeting of shareholders or a proxy authorizing an agent or attorney-in-fact for the corporation to attend and vote at any meetings of security holders of corporations in which the corporation may hold securities, and at such meetings he or his duly authorized agent or attorney-in-fact shall possess and may exercise any and all rights and powers incident to the ownership of such securities and which, as the owner thereof, the corporation might have possessed and exercised if present.  The Board of Directors by resolution from time to time may confer like power upon any other person or persons.

SECTION 4.   CHECKS.  All checks, drafts and orders for the payment of money shall be signed in the name of the corporation in such manner and by such officer or officers or such other person or persons as the Board of Directors shall from time to time designate for that purpose.

SECTION 5.  CONTRACTS, CONVEYANCES, ETC.   When the execution of any contract, conveyance or other instrument has been authorized without specification of the executing officers, the chairman of the Board, president or any vice president, and the secretary or assistant secretary, may execute the same in the name and on behalf of this corporation and may affix the corporate seal thereto.  The Board of Directors shall have power to designate the officers and agents who shall have authority to execute any instrument in behalf of this corporation.

SECTION 6.  CORPORATE BOOKS AND RECORDS.  The corporation shall keep books and records of account and minutes of the proceedings of its shareholders, Board of Directors and executive committees, if any.  The books, records and minutes may be kept outside this state.  Any of the books, records or minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

SECTION 7.  FISCAL YEAR.  The fiscal year of the corporation shall end on December 31 of each year.

SECTION 8.  SEAL.  The corporation is not required to have a corporate seal.

<div align="center">

ARTICLE IX
AMENDMENTS
</div>

SECTION 1.  The shareholders or the Board of Directors may amend or repeal the bylaws or adopt new bylaws unless the articles of incorporation provide that the power to adopt new bylaws is reserved exclusively to the shareholders or that these bylaws or any particular bylaw shall not be altered or repealed by the Board of Directors.  Such action may be taken by written consent or at any meeting of shareholders or the Board of Directors; provided that if notice of any such meeting is required by these bylaws, it shall contain notice of the proposed amendment, repeal or new bylaws, so long as any such amendments to do not violate the Act, rules of the CRA, MMFLA or MRTMA.

Joshua Smith

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<div align="center">13</div>

*EXHIBIT F*

| | |
|---|---|
| **From:** | CRA-Amendments <CRA-Amendments@michigan.gov> |
| **Sent:** | Tuesday, March 7, 2023 8:47 AM |
| **To:** | Heather Cude |
| **Subject:** | RE: [External] Notice of Deficiency - CA-001658 - Candid, Inc. |

Good Morning Heather,

I wanted to provide you with an update. I received the following information from our legal department "Currently, there is pending discipline that must be resolved prior to the amendment being approved."

Once I receive confirmation this has been completed, I will be able to finalize the amendment.


Thank you,

*Brook*
License Maintenance Section
Licensing Division
Cannabis Regulatory Agency
Tues-Fri 7:00am - 5:30pm



**From:** Heather Cude <cude@fyblaw.com>
**Sent:** Thursday, March 2, 2023 10:43 AM
**To:** CRA-Amendments <CRA-Amendments@michigan.gov>
**Subject:** RE: [External] Notice of Deficiency - CA-001658 - Candid, Inc.

---

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

---

Good Morning,

Please see attached for the response narrative and updated organizational structure, responding to Notice of Deficiency dated February 28, 2023.

This should satisfy all outstanding inquiries.  Please let me know if there is anything more needed in support of this amendment application.

Thanks,

*Heather Cude*
Attorney

1



1615 S. TELEGRAPH RD., SUITE 300
BLOOMFIELD HILLS, MICHIGAN 48302
DIRECT: 248.496.6979
FAX: 248.382.0000
Cude@FYBLaw.com
www.FYBLaw.com

**From:** CRA-Amendments@michigan.gov <CRA-Amendments@michigan.gov>
**Sent:** Tuesday, February 28, 2023 10:04 AM
**To:** Heather Cude <cude@fyblaw.com>
**Subject:** [External] Notice of Deficiency - CA-001658 - Candid, Inc.

The License Maintenance Section of the Cannabis Regulatory Agency is in receipt of your application for an amendment. Your application has been found to be deficient as it relates to the items in the attached notice of deficiency. Please include the question with your response.

Please note, the failure of an applicant to correct a deficiency within 5 days of notification by the Cannabis Regulatory Agency may result in the denial of the application. If you need additional time, please let your analyst know.

Thank you,

Brook

Licensing Maintenance Section

Licensing Division

Cannabis Regulatory Agency

# EXHIBIT G

**Subject:** RE: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

**Date:** Monday, October 23, 2023 at 9:53:16 AM Eastern Daylight Time

**From:** Greg Yatooma

**To:** Tyler Ruby Axon, 'Jackie Langwith'

**CC:** Sam Paulus

Good morning Tyler.  I talked to Jackie on Friday and there is no new news (huh, I don't think I have written those two words next to each other before.. it looks weird..lol).

Thank you,
-Greg

**From:** Tyler Ruby Axon <ruby@axonprop.com>
**Sent:** Monday, October 23, 2023 9:03 AM
**To:** Jackie Langwith <jackie@pollicella.net>
**Cc:** Greg Yatooma <yatoomag@gmail.com>; Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Good morning Jackie. I hope you had a nice weekend. Do we have news from Friday??

Thanks,

Tyler
947-259-2609

**From:** Tyler Ruby Axon <ruby@axonprop.com>
**Date:** Friday, October 20, 2023 at 9:44 AM
**To:** Jackie Langwith <jackie@pollicella.net>
**Cc:** Greg Yatooma <yatoomag@gmail.com>, Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Happy Friday Jackie. Today is good news Friday, right??!

Thanks,

Tyler
947-259-2609

**From:** Tyler Ruby - Axon <ruby@axonprop.com>
**Date:** Wednesday, October 18, 2023 at 12:50 PM
**To:** Jackie Langwith <jackie@pollicella.net>
**Cc:** Greg Yatooma <yatoomag@gmail.com>, Sam Paulus
<paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Thanks for the update Jackie. Keep pushing for a response by Friday. It will be nice to wrap this up.

Thanks,

Tyler
947-259-2609

**From:** Jackie Langwith <jackie@pollicella.net>
**Date:** Wednesday, October 18, 2023 at 12:37 PM
**To:** Tyler Ruby - Axon <ruby@axonprop.com>
**Cc:** Greg Yatooma <yatoomag@gmail.com>, Sam Paulus
<paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Tyler/Greg/Sam:
I just got off the phone with Katie. She said she will have a response for us she is hoping by Friday. She said she has been actively pursuing this and actively discussing it with management and that they are still discussing. She said the CRA Legal Hearings workload and said discussions are both partially why she can't respond today but will be responding by Friday. She is aware of the time sensitive nature and as mentioned, she is actively pursuing this with management and has moved it up in the queue toward that end.

I have called Alyssa and not received a response re: allowing the approval of the management agreement while the complaint is still pending.
I will keep following up.
Jackie

Image removed by sender.


Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

**Main Office:**
4312 East Grand River Ave
Howell, Michigan 48843
(517) 546-1181

**Troy Office:**
340 East Big Beaver Ave, Suite 145
Penta Center Building C
Troy, Michigan 48083
(248) 729-7077

Image removed by sender.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Tue, Oct 17, 2023 at 10:18AM Tyler Ruby - Axon <ruby@axonprop.com> wrote:

Hi Jackie,

Hope you're having a great week. What did Katie and Alyssa say? Can you keep the pressure on them so they can prioritize this and get things wrapped up?

Thanks,

Tyler
947-259-2609

**From:** Tyler Ruby - Axon <ruby@axonprop.com>
**Date:** Thursday, October 12, 2023 at 5:01 PM
**To:** Jackie Langwith <jackie@pollicella.net>
**Cc:** Greg Yatooma <yatoomag@gmail.com>, Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Thank you Jackie. Keep pushing and being the squeaky wheel! Have a great weekend.

Thanks,

Tyler
947-259-2609

**From:** Jackie Langwith <jackie@pollicella.net>
**Date:** Thursday, October 12, 2023 at 4:39 PM
**To:** Tyler Ruby - Axon <ruby@axonprop.com>
**Cc:** Greg Yatooma <yatoomag@gmail.com>, Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Hi Tyler,
This is not atypical for the CRA.

As we discussed I will call Katie and call Alyssa next week.
Jackie
**Error! Filename not specified.**

Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Thu, Oct 12, 2023 at 4:24PM Tyler Ruby - Axon <ruby@axonprop.com> wrote:

Hi Jackie,

Thank you for the update. Does Katie have an explanation for the delays?
Also, what Alyssa's response in regards to ownership transfer?

Thanks,

Tyler
947-259-2609

**From:** Jackie Langwith <jackie@pollicella.net>
**Date:** Thursday, October 12, 2023 at 4:15 PM
**To:** Greg Yatooma <yatoomag@gmail.com>
**Cc:** Tyler Ruby - Axon <ruby@axonprop.com>, Sam Paulus
<paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Received from Katie:

I have spoken to management and another meeting is set up next week to discuss the file. I
will be in touch after that meeting.

Let me know if you have any questions.

Have a great weekend!
**Error! Filename not specified.**

Jacqueline Langwith, Partner

POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member


On Wed, Oct 11, 2023 at 8:39AM Greg Yatooma <yatoomag@gmail.com> wrote:

Good morning.  Please send us the update when received.

Thank you,
-Greg

**From:** Tyler Ruby - Axon <ruby@axonprop.com>
**Sent:** Friday, October 6, 2023 3:59 PM
**To:** Jackie Langwith <jackie@pollicella.net>
**Cc:** Greg Yatooma <yatoomag@gmail.com>; Sam Paulus
<paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Thanks Jackie. Let's hope we can wrap this up next Wednesday. Keep us posted! Have a great
weekend.


Thanks,

Tyler
947-259-2609


**From:** Jackie Langwith <jackie@pollicella.net>
**Date:** Friday, October 6, 2023 at 3:50 PM
**To:** Tyler Ruby - Axon <ruby@axonprop.com>
**Cc:** Greg Yatooma <yatoomag@gmail.com>, Sam Paulus
<paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Katie's email that I just received, re Candid counteroffer:
A meeting with management has been set for next Wednesday. I will provide a response
once we've discussed the file.
Error! Filename not specified.

Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Fri, Oct 6, 2023 at 12:44PM Tyler Ruby - Axon <ruby@axonprop.com> wrote:

Thank you Jackie.


Thanks,

Tyler
947-259-2609



**From:** Jackie Langwith <jackie@pollicella.net>
**Date:** Friday, October 6, 2023 at 12:30 PM
**To:** Tyler Ruby - Axon <ruby@axonprop.com>
**Cc:** Greg Yatooma <yatoomag@gmail.com>, Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Katie, indicated she would get back to me before the end of the day with a response to our counter offer.
Per the email that I sent to legal, regarding allowing the ownership change to occur while we negotiate, I will escalate that to Alyssa Grissom.

Error! Filename not specified.

Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Fri, Oct 6, 2023 at 12:27PM Tyler Ruby - Axon <ruby@axonprop.com> wrote:

Jackie,
Can you call them today if we don't have an answer. We really need to get this wrapped up asap. Thank you for your help!

Thanks,

Tyler
947-259-2609

**From:** Greg Yatooma <yatoomag@gmail.com>
**Date:** Friday, October 6, 2023 at 10:46 AM
**To:** 'Jackie Langwith' <jackie@pollicella.net>
**Cc:** Tyler Ruby - Axon <ruby@axonprop.com>, Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** RE: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Please advise on an update.

Thank you,
-Greg

**From:** Jackie Langwith <jackie@pollicella.net>
**Sent:** Tuesday, October 3, 2023 5:39 PM
**To:** Greg Yatooma <yatoomag@gmail.com>
**Cc:** Tyler Ruby - Axon <ruby@axonprop.com>; Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

No update.
**Error! Filename not specified.**

Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Tue, Oct 3, 2023 at 10:08AM Greg Yatooma <yatoomag@gmail.com> wrote:

> Good morning. Any update on this matter?
>
> Thank you,
> -Greg
>
>
> **From:** Jackie Langwith <jackie@pollicella.net>
> **Sent:** Friday, September 29, 2023 2:46 PM
> **To:** Greg Yatooma <yatoomag@gmail.com>
> **Cc:** Tyler Ruby - Axon <ruby@axonprop.com>; Sam Paulus <paulus@urbanlegalgroup.com>
> **Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055
>
> Katie (handling the complaint) indicates that we should receive the CRA's response to our counter offer next week.
> **Error! Filename not specified.**
>
> Jacqueline Langwith, Partner
> POLLICELLA, PLLC
> jackie@pollicella.net
> 888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Fri, Sep 29, 2023 at 1:03PM Greg Yatooma <yatoomag@gmail.com> wrote:

> Good afternoon. Checkin in.
>
> Thank you,
> -Greg
>
>
> **From:** Jackie Langwith <jackie@pollicella.net>
> **Sent:** Tuesday, September 26, 2023 1:27 PM
> **To:** Greg Yatooma <yatoomag@gmail.com>
> **Cc:** Tyler Ruby - Axon <ruby@axonprop.com>; Sam Paulus <paulus@urbanlegalgroup.com>

**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

No response yet from the CRA regarding our counter offer, which was sent on Thursday. I also have sent an email to the Legal Division on Friday trying to get the amendment approved while we negotiate on the compliance matters.. If I don't have a response by the end of the week, I will follow up with both of them.

**Error! Filename not specified.**

Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Tue, Sep 26, 2023 at 1:17PM Greg Yatooma <yatoomag@gmail.com> wrote:

Good afternoon. Checking in for an update.

Thank you,
-Greg

**From:** Jackie Langwith <jackie@pollicella.net>
**Sent:** Thursday, September 21, 2023 1:42 PM
**To:** Greg Yatooma <yatoomag@gmail.com>
**Cc:** Tyler Ruby - Axon <ruby@axonprop.com>; Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Not as far as I know. I apologize. You will be on all going forward.
**Error! Filename not specified.**

Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Thu, Sep 21, 2023 at 1:41PM Greg Yatooma <yatoomag@gmail.com> wrote:

> Thank you. Is there a reason why I am taking off the additional emails between this group?
>
> Thank you,
> -Greg
>
> **From:** Jackie Langwith <jackie@pollicella.net>
> **Sent:** Thursday, September 21, 2023 1:41 PM
> **To:** Greg Yatooma <yatoomag@gmail.com>
> **Cc:** Tyler Ruby - Axon <ruby@axonprop.com>; Sam Paulus <paulus@urbanlegalgroup.com>
> **Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055
>
> They offered $40,000 and $20,000 and we countered with $10,000 and $5,000.
>
> **Error! Filename not specified.**
>
> Jacqueline Langwith, Partner
> POLLICELLA, PLLC
> jackie@pollicella.net
> 888-413-1669 M (517) 410-5400
>
> Main Office:                          Troy Office:
> 4312 East Grand River Ave        340 East Big Beaver Ave, Suite 145
> Howell, Michigan 48843                Penta Center Building C
> (517) 546-1181                        Troy, Michigan 48083
>                                       (248) 729-7077
>
> Error! Filename not specified.
>
> State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member
>
> On Thu, Sep 21, 2023 at 1:38PM Greg Yatooma <yatoomag@gmail.com> wrote:
>
>> What was our revised offer?  As long as this is in my name, I do need to be kept in the loop.   Jackie, please give me a call when you get a moment.
>>
>> Thank you,
>> -Greg

**From:** Jackie Langwith <jackie@pollicella.net>
**Sent:** Thursday, September 21, 2023 1:36 PM
**To:** Tyler Ruby - Axon <ruby@axonprop.com>
**Cc:** Gregory Manuel <yatoomag@gmail.com>; Sam Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

I am also pushing to get the amendment approved without having the complaint wrapped up.
I have been communicating with Devin who is in charge of amendments. She said that it is a new policy about a year ago that they wait until any complaints are resolved  "to ensure the discipline is being taken on the party that was responsible for the cause of the disciplinary action and not the incoming party." I suggested that we might provide something that indicates the incoming party is fully aware of the compliance action. I am waiting to hear back.

**Error! Filename not specified.**

Jacqueline Langwith, Partner
POLLICELLA, PLLC
jackie@pollicella.net
888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave | 340 East Big Beaver Ave, Suite 145 |
| Howell, Michigan 48843 | Penta Center Building C |
| (517) 546-1181 | Troy, Michigan 48083 |
| | (248) 729-7077 |

Error! Filename not specified.

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

On Thu, Sep 21, 2023 at 1:32PM Tyler Ruby - Axon <ruby@axonprop.com> wrote:

> Hi Greg,
>
> Yes, you're right. The counter offer response was sent this morning. If that comes back reasonable, then we can get it paid, settled, and closed out asap.
>
> Thanks,
>
> Tyler
> 947-259-2609

**From:** Gregory Manuel <yatoomag@gmail.com>
**Date:** Thursday, September 21, 2023 at 8:18 AM
**To:** Tyler Ruby - Axon <ruby@axonprop.com>
**Cc:** Jackie Langwith <jackie@pollicella.net>, Sam Paulus
<paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc. ENFs-23-
00054 & 23-00055

Tyler, Have we not countered yet? It's been 10 days. Our response is due
today. I don't think I'm following why this is taking so long to respond to
them.

-Greg

> On Sep 21, 2023, at 7:16AM, Tyler Ruby - Axon
> <ruby@axonprop.com> wrote:
>
> Yes. Certainly! The CRA offered 60k. We are in the process
> of countering.
>
> Thanks,
>
> Tyler

**From:** Gregory Manuel <yatoomag@gmail.com>
**Sent:** Tuesday, September 19, 2023 3:06:49 PM
**To:** Tyler Ruby - Axon <ruby@axonprop.com>
**Cc:** Jackie Langwith <jackie@pollicella.net>; Sam
Paulus <paulus@urbanlegalgroup.com>
**Subject:** Re: [External] Proposed Offer: Candid, Inc.
ENFs-23-00054 & 23-00055

Can you please keep me in the loop with these
communications. What was our last offer? Thank you.

> On Sep 19, 2023, at 3:06 PM, Tyler Ruby -
> Axon <ruby@axonprop.com> wrote:
>
> Hi Greg,

Yes, we received the CRA offer to settle the issue. The amount was pretty high. We are negotiating with them to reduce the amount. That process should go fairly quickly. We hope to settle this asap as well.

Thanks,

Tyler

947-259-2609

---

**From:** Greg Yatooma <yatoomag@gmail.com>
**Date:** Tuesday, September 19, 2023 at 8:21 AM
**To:** 'Jackie Langwith' <jackie@pollicella.net>, Sam Paulus <paulus@urbanlegalgroup.com>, Tyler Ruby - Axon <ruby@axonprop.com>
**Subject:** RE: [External] Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Good morning all. Sam, Tyler, do we have an update on the offer from last week? I believe we really need to get this all wrapped up.

Thank you,

-Greg

**From:** Jackie Langwith

<jackie@pollicella.net>
**Sent:** Wednesday, September 13, 2023 12:37 PM
**To:** Sam Paulus
<paulus@urbanlegalgroup.com>; Tyler Ruby - Axon <ruby@axonprop.com>; Greg Yatooma <yatoomag@gmail.com>
**Subject:** Fwd: Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055

Please see the CRA's offer in regard to resolving Candid Labs compliance violations.

Please advise.

Jacqueline Langwith, Partner

POLLICELLA, PLLC

jackie@pollicella.net

888-413-1669 M (517) 410-5400

| Main Office: | Troy Office: |
|---|---|
| 4312 East Grand River Ave 145 Howell, Michigan 48843 (517) 546-1181 | 340 East Big Beaver Ave, Suite Penta Center Building C Troy, Michigan 48083 |
| | (248) 729-7077 |

State Bar of Michigan Marijuana Law Section and Probate & Estate Planning Member

---------- Forwarded message ---------
From: **Filimon, Katherine (LARA)**
<FilimonK1@michigan.gov>
Date: Wed, Sep 13, 2023 at 12:35PM
Subject: Proposed Offer: Candid, Inc. ENFs-23-00054 & 23-00055
To: Jackie Langwith <jackie@pollicella.net>

Good afternoon, Jackie.

After consideration of the information and mitigation provided, in conjunction with a review of the file with management, the CRA is offering the following terms of settlement:

ENF# 23-00054: Respondent must pay a fine of $20,000.00 within 30 days of the effective date of the consent order.

ENF# 23-00055: Respondent must pay a fine of $40,000.00 within 30 days of the effective date of the consent order.

Please confirm via response to this email by September 21, 2023, if your client is agreeable to the offered settlement. If I do not hear back from you by the due date, I will assume that you no longer wish to engage in a settlement and the matter will be set for hearing.

If you have any questions or wish to discuss the matter, please contact me at your earliest convenience before the due date. Thank you.

Thank you,

Katie

# Katherine M. Filimon

Departmental Analyst

Legal Section

Cannabis Regulatory Agency

Work: (517)281-8030

FilimonK1@michigan.gov

www.michigan.gov/CRA

# EXHIBIT H

Get Outlook for iOS

**From:** Heather Cude <cude@milegalgroup.com>
**Sent:** Thursday, October 19, 2023 8:22 PM
**To:** CRA-Amendments <CRA-Amendments@michigan.gov>
**Cc:** Gregory Manuel <yatoomag@gmail.com>
**Subject:** Amendment Application Withdrawal - CA-001658

Good evening,

Please see the attached request to withdraw Candid, Inc.'s pending amendment application CA-001658.

I would request this withdrawal be effectuated as soon as possible.  Please let me know when it has been processed and the application is withdrawn.

Thank you kindly,

Heather Cude
Michigan Legal Group, PLC
cude@milegalgroup.com
(248) 496-6979

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**Greg Yatooma**

| | |
|---|---|
| **From:** | CRA-Amendments <CRA-Amendments@michigan.gov> |
| **Sent:** | Monday, October 23, 2023 6:32 AM |
| **To:** | Heather Cude |
| **Cc:** | Gregory Manuel |
| **Subject:** | RE: Amendment Application Withdrawal - CA-001658 |

Good Morning,

This amendment has been withdrawn per your request.

Thank you,

*Brooke*

License Maintenance Section
Licensing Division
Cannabis Regulatory Agency
Mon-Thurs 6:30am - 5:00pm

CANNABIS
REGULATORY AGENCY

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

      Plaintiff,

v.

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Co-Counsel for Defendant Chris Yatooma*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

---

## SECOND STIPULATED ORDER EXTENDING TIME FOR PLAINTIFF TO FILE AMENDED COMPLAINT AND, IN TURN, FOR DEFENDANT TO FILE AN ANSWER/COUNTERCLAIM THERETO

At a session of said Court, held in the City of Pontiac,
County of Oakland, State of Michigan, on _____

PRESENT: HON. VICTORIA A. VALENTINE
Oakland County Business Court Judge

This matter having come before the Court on the stipulation of the Parties, as evidenced by

the signatures of their counsel below; on October 6, 2023, Defendant Christopher Yatooma

("Chris") filed an Answer to Plaintiff Gregory Yatooma's ("Greg") Complaint; Greg intends to file an Amended Complaint to assert additional claims against Chris and to-be-added defendants; Greg requested and Chris agreed to grant Greg a further two-week extension to file an Amended Complaint; and Chris has indicated that he intends to file affirmative claims against Greg thereafter;

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Greg may file an Amended Complaint on or before November 17, 2023;

**IT IS FURTHER ORDERED** that Chris may file an Answer, Counterclaim, and/or Third Party Complaint against Greg on or before December 8, 2023, or a time thereafter as agreed by the Parties or ordered by the Court.

**THIS IS NOT A FINAL ORDER AND DOES NOT RESOLVE THE LAST PENDING CLAIM OR CLOSE THE CASE.**

**IT IS SO ORDERED.**

/s/ Victoria A. Valentine
November 7, 2023
_____
Hon. Victoria Valentine

lm

Stipulated as to form:

/s/ Ethan R. Holtz
_____
Ethan R. Holtz (P71884)
*Attorneys for Plaintiffs*

/s/ J. Adam Behrendt
_____
J. Adam Behrendt (P58607)
*Attorneys for Defendant Christopher Yatooma*

This case has been designated as an eFiling case, for more information please visit
www.oakgov.com/efiling.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

      Plaintiffs,

v.

CHRISTOPHER YATOOMA, an individual,
MSY CAPITAL PARTNERS, LLC, a
Michigan limited liability company, RICH
STOPCZY, an individual, MICHELLE
HOUBECK, an individual,

      Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant Chris Yatooma,*
*Defendant Rich Stopczy, and Defendant*
*Michelle Houbeck*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher*
*Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

**<u>VERIFIED AMENDED COMPLAINT</u>**

Plaintiffs Gregory Yatooma ("Greg"), by his undersigned counsel, for his Verified

Amended Complaint against Defendants Christopher Yatooma ("Chris"), MSY Capital, LLC

("MSY"), Rich Stopczy ("Rich"), and Michelle Houbeck ("Houbeck") allege as follows:

1

11/7/2023 9:24 PM    Oakland County Clerk    Received for Filing    FILED

## PARTIES, JURISDICTION AND VENUE

1.      Greg is an individual who resides and conducts business in Oakland County, Michigan.

2.      Chris is an individual who resides and conducts business in Oakland County, Michigan.

3.      MSY is a Michigan limited liability company whose principal place of business is in Oakland County, Michigan.

4.      Stopczy is an individual who conducts business in Oakland County, Michigan.

5.      Houbeck is an individual who conducts business in Oakland County, Michigan.

6.      The Court has jurisdiction over this matter pursuant to MCL 600.601, MCL 600.605, and MCL 600.8315.

7.      This Complaint involves a business dispute, as defined by MCL 600.8031, and, therefore, meets the statutory requirements for assignment to the Oakland County Business Court.

8.      The amount in controversy, exclusive of interest, costs, and attorneys' fees, exceeds Twenty-Five Thousand Dollars ($25,000.00) and seeks equitable relief.

9.      Venue is proper in this Court pursuant to MCL 600.1621, among other provisions.

## STATEMENT OF FACTS

**History of Greg's and Chris's Business Dealings**

10.     Greg and Chris are brothers.

11.     In 2016, Greg's and Chris's brother Jeffrey Yatooma ("Jeff") approached Greg and Chris and proposed that the three brothers start a venture in Michigan's emerging cannabis industry, including principally, among other things, obtaining municipal cannabis licenses for various types of licensed business and selling those entities at a profit to operators.

DocuSign Envelope ID: AD16E09A-8A1A-4A98-A7C5-22CB65B65833

12.     Greg and Chris agreed and, over the next several years, Greg, Chris, and Jeff worked together in many business ventures they owned and/or operated together as partners/members, including but not limited to, MSY, Michigan Real Estate Development, LLC ("MRED"), and other entities formed for the use of their cannabis business partnership ("Partnership Entities").

13.     Since the three were brothers, Greg, Chris, and Jeff were not concerned with documenting their ownership interests in each of the Partnership Entities they formed to carry out their business, which were usually single-purpose limited liability companies that usually lacked operating agreements and/or other formal documentation of the brothers' ownership interests.

14.     But it was always agreed and understood between Greg, Chris, and Jeff that the Partnership Entities were each owned 1/3 by each brother respectively. **Exhibit 1, Selections from Chris's Deposition Testimony, 41:19-42:12, 45:8-22.**

15.     From 2016-2018, Greg and Jeff primarily worked to grow the Partnership Entities in the cannabis industry while Chris largely provided some but not all of the financing and back office support.

16.     One of the assets procured by Greg and Jeff for the Partnership Entities was an agreement between Partnership Entities MSY, on the one hand, and LIV Wellness, LLC ("Liv") (and its owners) to jointly own and operate a medical marijuana retail provisioning center business in Ferndale, Michigan.

17.     Pursuant to the Liv Agreement, MSY owned, 50% of the Ferndale provisioning center.

18.     During their time together, Greg, Chris, and Jeff formed/operated the following Partnership Entities, among others. MSY, MRED, and Oakland Business Park, LLC ("OBP").

3

19. At the end of 2018, Jeff separated from Greg, Chris, and his interests in the various the Partnership Entities that existed at the time.

20. After nearly a year of negotiations, on November 13, 2019, Greg, Chris, and Jeff executed a formal agreement pursuant to which Greg and Chris purchased Jeff's 1/3 interests in the Partnership Entities (the "Good Guy Agreement"). **Exhibit 2, Good Guy Agreement**; **Exhibit 1, 49:25-50:5** .

21. The Good Guy Agreement states, in relevant part, that (a) Jeff, Greg, and Chris were involved in a cannabis business; and (b) Greg and Chris shall pay Jeff for his interests in the Partnership Entities. **Exhibit 2, at Recitals, ¶2**.

22. Greg and Chris purchased Jeff's interests in the Partnership Entities in accordance with the Good Guy Agreement.

23. Upon such purchase, Greg and Chris owned the Joint Entities 50/50. **Exhibit 1, 41:19-42:12, 45:8-22.**

24. Thereafter, Greg and Chris continued to work together, jointly owning and/or operating the Partnership Entities and continued to expand their holdings and joint operations, forming new partnership entities, along with various single purpose entities that owned property, and other assets (collectively, the "Joint Entities").

25. Several of the Joint Entities were owned by Greg as the sole record owner.

26. Because Greg and Chris were brothers, they continued their practice of not documenting their respective ownership of the Joint Entities.

27. However, at all times Greg and Chris agreed and understood that both Greg and Chris were the 50/50 members/shareholders/owners of the Joint Entities through their larger partnership. **Exhibit 3, Affidavit of Brian Molloy**.

28.     Ryan Jundt ("Jundt") was also a minority partner of Greg and Chris in certain of the Joint Entities.

29.     The Joint Entities developed after Greg and Chris purchased Jeff's interests include, but are not limited to, the following: Candid, Inc. (f/k/a Standard Wellness), Focus Group Enterprises ("FGE"), Innovative Financing, LLC, Axon Properties, LLC ("Axon"), Frequency Wellness, LLC, and Alchemy Wellness, LLC.

30.     Over the course of the brothers' business relationship, Greg was primarily responsible for the operations of the Joint Entities and Chris was primarily responsible for the finances and internal accounting of the Joint Entities.

31.     Brian Molloy, the former controller for many of the Joint Entities, worked with Chris to prepare and provide the necessary information for Chris and Greg to file their respective tax returns.

32.     For several years, Chris directed Molloy to put certain assets and liabilities of the Joint Entities on Chris's tax return and other assets and liabilities of the Joint Entities on Greg's tax return.

33.     At all times, and at Chris's direction, the main operational companies for the Joint Entities, Axon and MRED, were on Greg's tax return only.

34.     The Joint Entities accumulated significant assets, including real property and cannabis licenses, accounts receivable of more than $55 million, and other real estate and operating assets worth more than $100 million, which Greg and Chris owned equally 50/50.

**The MSY/Liv Litigation**

35.     On November 18, 2019, after Liv breached its partnership agreements with MSY, MSY filed a lawsuit against Liv and other defendants after Liv disavowed its partnership

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

agreement with MSY and MRED. *See MSY Capital Partners, LLC v Liv Wellness Center, LLC d/b/a Liv Wellness*, Oakland County Circuit Court Case No. 2019-178037-CB (Hon. Michael Warren) (the "MSY Litigation").

36.     The court held a jury trial and the jury returned a verdict in favor of MSY and against Liv in the amount of $19 million.

37.     On October 28, 2021, the jury verdict was reduced to a judgment.

38.     On December 20, 2021, Liv filed a claim of appeal.

39.     On January 14, 2022, Liv paid a $21 million appeal bond to the Clerk of the Oakland County Circuit Court.

40.     MSY engaged Dykema Gossett PLLC as its appellate counsel.

41.     Greg, a 50% member of MSY, signed Dykema's engagement letter on behalf of MSY. **Exhibit 4, Dykema Engagement Letter.**

42.     While Liv's appeal was pending, MSY and Liv reached a settlement and pursuant to a March 10, 2023 Confidential Settlement Agreement the parties agreed, in relevant part, that the Bond would be paid to Dykema who, in turn would distribute an agreed upon portion of the Bond to each of Liv and MSY. MSY's portion of the Bond is hereinafter referred to as the "MSY Litigation Proceeds."

43.     Both Greg and Chris signed the Confidential Settlement Agreement on behalf of MSY.

**Greg and Chris Separate Their Business Dealings**

44.     In 2022, there was a significant breakdown in Greg's and Chris's relationship.

45.     With the help of several mediators, in Fall 2022, Greg and Chris began negotiating a buyout of Greg's ownership and interest in the Joint Entities.

46.     Over several months and several meetings, on December 14, 2022, Greg and Chris reached a written and binding agreement (the "Buyout Agreement"), signed by both parties and three witnesses,[1] which contained the material terms of the buyout. **Exhibit 5, Buyout Agreement**.

47.     Pursuant to the Buyout Agreement, Greg agreed to assign his interests in several of the Joint Entities to Chris in exchange for payment of $18.3 million, on the following schedule: (a) $500,000.00 by December 16, 2022; (b) $1,200,000.00 no later than December 22, 2022; and (c) $220,000.00 per month beginning May 1, 2024. *Id*. All payments were "unconditional." *Id*.

48.     Pursuant to the Agreement, Greg retained the following:

> Ability to collect on invoices due from Jeff;
>
> Full ownership of Bloomfield Hills Swim and Tennis;
>
> 100% of the Connecticut deal with Jeff;
>
> 100% of the New Jersey deal with Jeff;[2]
>
> A residence in Lake Orion, Michigan,
>
> Interest in MSY and 50% of the MSY Litigation Proceeds. *Id*.

49.     The Joint Entities, with the exception of the above-identified assets Greg retained, are hereinafter referred to as the "Sold Assets."

50.     Each of the three witnesses will testify that the Buyout Agreement was intended to be binding and enforceable and was the culmination of months of negotiations between Greg and Chris.

---

[1] Jaime Kjos was physically present at the meeting for the first several hours and then was present telephonically for the last 2 hours of the 11-hour meeting. Pastor Kjos asked that his name be signed to the Buyout Agreement as a witness to the agreement between Greg and Chris.

[2] The "Connecticut deal" and "NJ deal" refer to agreements between Greg and Chris, on the one hand, and Jeff, on the other hand, pursuant to which Greg and Chris consulted for and provided information to Jeff in return for equity in certain of Jeff's investments. *See, e.g.*, **Exhibit 6, Consulting Agreement**

DocuSign Envelope ID: AD16E09A-8A1A-4A98-A3C5-22CB65B65883

51.     They will also testify that although the Buyout Agreement numbers were not the initial numbers proposed by either Greg or Chris, the material deal points remained the same throughout the negotiations. **Exhibit 7, October Email from Chris**.

52.     Steve Romaya, Greg's and Chris's cousin and one of the witnesses, attested: "It was always my understanding, the understanding of everyone else present and everyone who signed/witnessed that Partnership Buyout Agreement that the Partnership Buyout Agreement was a final and binding agreement on both Greg and Chris and contained all the terms upon which Greg agreed to sell his business interests to Chris." **Exhibit 8, Romaya Affidavit, at ¶6.**

53.     Immediately after signing the Agreement on December 14, 2023, Chris emailed attorney Gavin Fleming, informed him that "Greg and I resolved our issues yesterday," and instructed Fleming to release $100,000.00 he was holding in escrow pending agreement between Greg and Chris regarding terms of the buyout. **Exhibit 9, Email to Fleming**.

54.     Prior to this litigation, Chris never stated to Greg that he believed the Buyout Agreement to be anything other than a binding and enforceable agreement between them.

**Events Subsequent to Execution of the Buyout Agreement**

55.     Chris initially complied with the Buyout Agreement, making the required $500,000.00 payment to Greg by December 16, 2022. **Exhibit 10, Wire with Memo Line**.

56.     Chris and Greg worked with Mark James, a former FYB attorney, to transfer ownership of the Sold Assets from Chris to Greg.

57.     Chris directed James to prepare ownership transfer documents of certain entities and assets and to send those documents to Greg for signature in furtherance of the Buyout Agreement.

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

58.     At Chris's direction, James prepared and sent Greg membership interest assignments for Axon, Blue Skies Financing, LLC, OBP, and MRED.

59.     Pursuant to the Buyout Agreement, Greg executed all assignments and agreements that Mark James prepared. All of the assignments had an effective date of December 14, 2022, the date of the Buyout Agreement. **Exhibit 11, Assignments.**

60.     Chris also directed James to prepare a deed to transfer ownership of a residence owned by Greg and his aunt to an entity owned solely by Chris in furtherance of the Buyout Agreement.

61.     James prepared the deed and Greg signed the deed, thereby relinquishing his ownership of the residence. **Exhibit 12, 299 N. Berkshire Deed**.

62.     Chris also directed James to prepare a document for Greg to transfer ownership of a New Jersey recreational cannabis license in furtherance of the Buyout Agreement.

63.     Due to regulations, the license was not yet transferable so James drafted a longer form agreement pursuant to which Greg agreed to transfer Candid's license to Chris via Axon in the future when it could be transferred ("License Agreement.").

64.     The draft License Agreement contained a merger clause that read: "This Agreement, contains the entire agreement between the Parties related to the Individual Ownership, Individual's obligation to transfer the Individual Ownership to Company, Company's sole liability for payment of taxes, and Company's obligation to indemnify Individual."

65.     Because the License Agreement arose from and was subject to the Buyout Agreement, Greg requested and Chris agreed to revise the entire agreement clause to read "This Agreement together with the December 14 Agreement."

66.     The merger clause of the final, executed License Agreement states: "This Agreement, **together with the December 14 Agreement**, contains the entire agreement between the Parties related to the Individual Ownership, Individual's obligation to transfer the Individual Ownership to Company, Company's sole liability for payment of taxes, and Company's obligation to indemnify Individual." **Exhibit 13, License Agreement**.

67.     On March 17, 2023, Chris signed the License Agreement as "Authorized Agent" of Axon.

68.     In addition, and pursuant to the Buyout Agreement, Chris removed himself as a member and officer of Bloomfield Hills Swim and Tennis, LLC, and from the Bloomfield Hills Swim and Tennis, LLC bank account with Citizens State Bank (the bank owned and operated by Chris. **Exhibit 14, Email to Rana.**

69.     Chris also directed Mark James to remove Chris as an officer and director of a second entity, Bloomfield Hills Swim & Tennis, Inc. in furtherance of the same.

70.     In addition, Chris directed Heather Cude, another former FYB attorney, to prepare documents to transfer ownership of certain entities regulated by the CRA, including Frequency, Candid and Alchemy (the "Cannabis Entities") in furtherance of the Buyout Agreement.

71.     Because Chris was not prequalified with the CRA, Chris directed Cude to prepare the documents to transfer ownership of the Cannabis Entities from Greg and Ryan Jundt ("Jundt"), Chris's brother-in-law, to Chris's employees who were prequalified with the CRA.

72.     All parties knew and understood that Greg was transferring the Cannabis Entities in furtherance of the Buyout Agreement.

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65833

73.     In addition, all parties knew and understood that Chris – who was not prequalified with the CRA – was transferring the Cannabis Entities to certain employees because they were prequalified, but that Chris would remain the beneficial owner of the Cannabis Entities.

74.     Initially, Chris directed Cude to work with Greg to have the Cannabis Entities transferred to Chris's employee Adam Dyson ("Dyson").

75.     Cude prepared documents to effectuate the transfer of Frequency and Candid with the CRA and sent them to Greg for signature.

76.     Cude also prepared documents to effectuate the transfer of Alchemy, which was held by Jundt, from Jundt to Adam Dyson ("Dyson").

77.     However, shortly after filing for the transfer from Greg and Jundt to Dyson, Dyson had second thoughts about taking on this responsibility and role for Chris, and demanded that he be removed from the Cannabis Entities.

78.     Dyson resigned his position with Chris, hired an attorney, and Cude worked with Dyson and Dyson's attorney to have the Cannabis Entities taken out of Dyson's name.

79.     Because the Frequency assignment had already been submitted to the CRA, Cude worked with Dyson and his attorney to transfer Frequency to Josh Smith ("Smith"), Chris's Chief Financial Officer.

80.     Because the Alchemy assignment had already been submitted to the CRA, Cude worked with Dyson's attorney to transfer Alchemy to Joseph Gordhamer ("Gordhamer", the President of OCG Companies, LLC, one of Chris's companies.

81.     Because the Candid assignment had not yet been submitted to the CRA, Cude worked with Greg to have him re-execute the document to effectuate transfer of Candid to Smith instead of Dyson.

11

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

82.     On or about January 27, 2023, Cude submitted an Amendment Application to the CRA which sought approval of a "Change of Ownership (Adding/Removing/Change of Equity)" for "Gregory Yatooma, sole shareholder of Candid, Inc., is transferring 100% of Candid, Inc.'s stock to Joshua Smith, a prequalified individual" (the "Candid Application"). **Exhibit 15, Candid Application**.

83.     As part of the Candid Application, Greg signed and submitted an Amendment Verification & Affidavit of Full Disclosure Attestation pursuant to which he confirmed his understanding that "...this requested amendment is a proposed change and cannot be executed prior to receiving approval from the Agency." *Id*.

84.     On or about February 24, 2023, Greg signed and submitted a "Shareholder Resolution Conditionally Approving Transfer of Shares" of Candid. **Exhibit 16, Candid Resolution**. The resolution states, in relevant part "FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares." *Id*.

85.     The CRA was in the process of reviewing Candid's METRC entries with the CRA at the time Candid submitted the Candid Application, so the CRA's processing and approval of the Candid Application was delayed.

86.     Neither Dyson nor Smith nor Gordhamer paid, or gave any other form of consideration, for the transfer of Frequency, Candid or Alchemy, which are worth millions of dollars.

87.     Frequency has since been transferred from Smith to Gordhamer (both of whom are Chris's employees).

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65833

88.    Pursuant to the Buyout Agreement, Greg also removed himself from all of the Sold Assets' bank accounts, for Chris's benefit.

89.    It is undisputed that Greg fully complied with the Buyout Agreement.

90.    The only remaining obligations pursuant to the Buyout Agreement were Chris's financial obligations to Greg identified in Sections 1.1 (with the exception of the $500,000 payment), 1.2, 1.8.

91.    It is undisputed that since signing the Buyout Agreement, Chris sold certain assets previously owned by the Joint Entities and has retained one hundred percent (100%) of the proceeds from such sales.

92.    Chris is using assets, funds, and other infrastructure of the Joint Entities for Chris's own personal benefit at the expense of Greg and the Joint Entities.

**Chris Attempts to Steal 100% of the MSY Litigation Proceeds**

93.    On March 13, 2023, Chris agreed that Greg and Chris should direct Dykema to wire the MSY Litigation Proceeds less legal expenses 50% directly to Greg and 50% directly to Chris:



94.    On April 12, 2023, Dykema received the MSY Litigation Proceeds.

95.    Despite that all relevant times Greg was a fifty percent (50%) owner in MSY and the Buyout Agreement clearly states the Litigation Proceeds were to be split equally, sometime on

or about April 12, 2023, Chris surreptitiously contacted MSY's attorneys, claimed Greg had no interest in in the MSY Litigation Proceeds and attempted to have the entire balance of the MSY Litigation Proceeds released to Chris directly.

96.   Prior to contacting Dykema on or about April, 12, 2023, Chris had never alleged that Greg was not a 50/50 owner in MSY or claimed that Greg was not entitled to 50% of the Litigation Proceeds.

97.   In an April 20, 2023 letter, Dykema acknowledged that Chris attempted this maneuver and that Chris had claimed to them that Greg had no interest in the MSY Litigation Proceeds. **Exhibit 17, Letter from Brian Moore.**

98.   Dykema further acknowledged that they had received conflicting wiring instructions from Chris and Greg, and that Greg had requested that the Litigation Proceeds be split 50/50 between Chris and Greg in accordance with Section 17 the Buyout Agreement, but that Chris was requiring that the Litigation Proceeds be disbursed solely to him.

99.   Given the conflicting instructions, MSY's attorneys stated that they could not release the funds to either party absent join instructions and/or a court order.

100.   On July 28, 2023, at Greg's request, the Court entered an order instructing the parties to deposit the Litigation Proceeds with the Clerk of the Oakland County Circuit Court.

101.   Chris's various actions are clear and unequivocal breaches of contract, amongst other things.

**The Candid Transfer**

102.   As soon as Greg signed over his interests in the Sold Assets and removed himself from the bank accounts, Chris reneged on and breached the Buyout Agreement, by, among other

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

things, refusing to make the $1.2 million payment due December 22, 2022 and attempting to take 100% of MSY Litigation Proceeds for himself.

103.    Chris also refused to make the $220,000 monthly payments that were to commence on May 1, 2023, completely repudiating his remaining obligations pursuant to the Buyout Agreement.

104.    Greg accordingly commenced suit against Chris for his clear breach of the Buyout Agreement.

105.    In his Answer filed October 6, 2023, Chris claimed that Greg was never Chris's partner, Greg merely acted as the Joint Entities' attorney, and that "Greg wrongfully put [the Joint Entities] into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris."

106.    These and other assertions in Chris's Answer are false, as confirmed by multiple former employees and partners, and Chris's own testimony in the MSY Litigation.  **Exhibit 3, Molloy Affidavit.**

107.    Chris further claims in his Answer that Chris only signed the Buyout Agreement because he was under "duress" (despite all evidence to the contrary) thus and again completely repudiating the Buyout Agreement and his obligations pursuant thereto.

108.    Greg is thus relieved, as a matter of law, from any further obligation to perform pursuant to the Buyout Agreement and on October 19, 2023, Greg submitted a Request to Withdraw the Candid Application from the CRA. **Exhibit 18, Candid Withdrawal Request**.

109.    On Monday, October 23, Greg received notification from the CRA that the Candid Application to transfer ownership to Smith had been withdrawn.

110.    Despite that Greg is the President, Secretary, Treasurer, and named licensee on Candid's CRA licenses, Chris has excluded Greg from Candid's operations and retained 100% of Candid's revenue.

111.    Candid is a cannabis grow operation with a Fall harvest. Candid's seasonal harvest and corresponding sales are underway and will continue for the next several weeks. Candid is expected to generate millions of dollars in revenue this year. As Candid is a regulated entity and Chris is not prequalified with the CRA, Chris is not authorized by law to operate Candid without Greg.

**Chris, Houbeck, and Stopczy Hack Greg's FYB Email**

112.    On December 20, 2022, six days after Greg and Chris signed the Buyout Agreement, Rich Stopczy, a W-2 employee of Axon and the IT manager for all of the Joint Entities, as well as FYB[3], came to Greg's house and removed Greg and Kara Harbour ("Harbour") (Greg's assistant) from the shared servers with Chris.

113.    At that time, Stopczy also confirmed to Greg that no one had access to Greg's FYB email nor could access Greg's computer desktop without Greg's permission.

114.    Stopczy's confirmation, however, was untrue.

115.    On January 13, 2023, Stopczy, at Chris's direction, accessed and downloaded Greg's entire FYB email account, consisting of 159,859 emails, and saved them to Michelle Houbeck's[4] computer for her to review and print for Chris's consumption and use. **Exhibit 19, Photos from Stopczy**.

---

[3] FYB operated out of the same office building as all of Greg's and Chris's other businesses, including Axon. Greg and Chris jointly owned the office building after Jeff's buyout.

[4] Houbeck has been Chris's executive assistant since July 2018. Houbeck is a W-2 employee paid by Axon.

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A3C5-22CB65B65833

116.    On February 14, 2023, Stopczy again accessed and downloaded Greg's FYB emails from January 13, 2023 to February 14, 2023 to "update" his initial collection, which included an additional 1,254 emails for a total of 161,044 stolen from Greg's FYB email account.

117.    This was nearly two months after Greg and Chris signed the Buyout Agreement, during a period when Greg sent and received hundreds of emails with his attorneys concerning the very issues that eventually became this litigation, and also included attorney-client and confidential emails with third parties where Greg was acting as an attorney - - including matters that would be of a particular interest to Chris.

118.    FYB's email is hosted by Microsoft's cloud-based Office 365 servers. FYB's email is not stored on a physical server. Greg owns the FYB website and domain.

119.    Because he was FYB's former IT director, Stopczy retained administrative privileges to the FYB accounts without Greg's knowledge or permission.

120.    Stopczy did not have any legal right or authority to access or download FYB's emails on behalf of Chris or Houbeck and Stopczy exceeded his authority with respect to the FYB email accounts.

121.    Stopczy improperly used his IT admin credentials to access and download Greg's emails without Greg's knowledge or permission.

122.    Importantly all of this activity took place subsequent to the Buyout Agreement and after Greg was told his FYB email had been severed from access by Chris or any others.

123.    On December 20, 2023, Greg spoke with Stopczy to discuss transfer of the Sold Assets' and MSY's domains from Greg's GoDaddy account to a GoDaddy account held by Chris. Because Chris had not yet set up his GoDaddy account, Stopczy asked to transfer the domains at a later date.

DocuSign Envelope ID: AD16E09A-8A1A-4A98-A3C5-22CB65B65883

124.     On February 17, 2023, Stopczy contacted Greg and asked him to help "get the domains transferred over for our emails." **Exhibit 20, February 17, 2023 Email**.

125.     In that email, Stopczy identified the domains Stopczy believed should be transferred. *Id*. Greg noticed that Stopczy's list included "fyblaw.com" and was confused by its inclusion.

126.     Greg promptly sent Stopczy the following text message: "Hey Stopczy. Got your email. Give me a shout at your convenience." **Exhibit 21, Text Messages Between Greg and Stopczy**.

127.     The two then spoke on the phone and Greg asked Stopczy why he included FYB on the list of domains to be transferred because Chris should not have access to FYB. **Exhibit 22, Greg's Declaration**.

128.     After an extended silence from Stopczy, Greg asked Stopczy several times if he had accessed Greg's emails. *Id*. Stopczy finally admitted the following to Greg:

> Chris had been pressuring Stopczy to access Greg's emails since the buyout on December 14, 2022;

> Stopczy at first refused several times because he thought it was wrong and possibly illegal, but ultimately agreed to do so after Chris assured him that a lawyer said Stopczy was "fully covered";

> Stopczy downloaded Greg's entire FYB email on January 13, 2023 which consisted of 159,859 emails  and again on February 14, 2023 which consisted of another 1,254 emails between January 14 and February 14, 2023;

> Stopczy saved Greg's entire FYB email to Houbeck's computer in a PST file.;

> At the direction of Chris, Houbeck, Chris's assistant, was instructed to run searches for certain key words and phrases in Greg's email and print those emails for Chris's review and use.

> Stopczy had not been able to sleep since he downloaded Greg's inbox because he felt so bad and that he was going to do everything he could to

make it right;

He was going to tell Chris that Greg and him talked and that he was going to tell Chris he would no longer be a part of this scheme with Chris and Michelle. [*Id.*]

129. Stopczy sent Greg videos and photos that Stopczy claimed showed him deleting all of Greg's emails but at the very least proving that this theft as described above had occurred. *Id.*[5]

130. The second video shows Stopczy's computer screen and a list of files, which include "Greg Y" and "Greg Y 1-13-23 to 2-14-23." (Video 2 at 00:00):



131. Stopczy then pans to the right and his screen reflects that the Greg Y files was "last run on 2023-01-13," was "Searched by Rich Stopczy," and contains "159,859 items.") (Video 2 at 00:07).

---

[5] The videos Stopczy sent to Greg are available at the following links: Video 1 – https://drive.google.com/file/d/1G_d741y49NEo5hoV-c731S4ykN8z8GiN/view?usp=sharing
Video 2 – https://drive.google.com/file/d/1jlCEzSIQ2i0y79Tu6Qcs5WNdhz1JZ2W-/view?usp=sharing



132.    Stopczy then purports to delete the "Greg Y" file.

133.    Stopczy then moves on to the "Greg Y 1-13-23 to 2-14-23" file and spans to the right and his screen reflects that the file was "last run on 2023-02-14," was "Searched by Rich Stopczy," and contains "1,254 items."). (Video 2 at 00:35).



134.    Stopczy then purports to delete the "Greg Y 1-13-23 to 2-14-23" file.

135.    Stopczy then scrolls down to a third file not previously depicted - - "Greg Y as of 2-14-23" (Video 2 at 00:49) which apparently was a re-collection of Greg's entire FYB account.

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A3C5-22CB65B65833

Stopczy spans to the right, and his screen reflects that the file was "last run on 2023-02-14," was "Searched by Rich Stopczy," and contains "161,044 items."). (Video 2 at 00:50)



136.    Stopczy then purports to delete the third file.

137.    Greg asked Stopczy to confirm that he deleted all copies of Greg's FYB email, and Stopczy so confirmed:



DocuSign Envelope ID: AD16E09A-8A1A-4A88-A3C5-22CB65B65883



138.    Greg then conferenced in his assistant, Harbour, because Stopczy was supposed to assign over the admin permissions to Greg's new Microsoft SharePoint account.

139.    While Stopczy, Greg, and Harbour were on the three-way call commencing the transfer, Houbeck could be heard yelling at Stopczy and demanding that he see Chris immediately. **Exhibit 22**.

140.    The line then went dead and Stopczy (presumably at Chris's demand) blocked Greg's number so Greg could no longer contract him. *Id.*

141.    Chris, Stopczy, and Houbeck have refused to destroy their copies of Greg's FYB email.

142.    In fact, this litigation has revealed that Chris, Stopczy, and/or Houbeck are actively reviewing Greg's FYB email and using the contents thereof to litigate this case.

143.    Chris has even gone so far as to read emails between Greg and his counsel in this matter. Greg did not know that Chris was reading his attorney client privileged emails until after Greg sent and received hundreds of emails with his counsel regarding his dispute with Chris.

144.    In addition, Kevin Oberle, a former Axon employee, attested that Chris has been

using Greg's FYB email as a source to develop leads and strategy in the cannabis industry. **Exhibit 23, Oberle Affidavit**.

145.    Chris even gave certain of his new hires FYB email addresses, even though they did not work for Greg or FYB.

146.    Due to Chris's unwillingness to return Greg's FYB email, his continued use of Greg's FYB email, and Chris's continued unauthorized access to Greg's FYB email, Greg was forced to cease operating as FYB.

147.    FYB and its website URL are no longer in use today as Greg could no longer assure clients that his emails were not being read by Chris or his staff.

148.    As of the filing of this Amended Complaint, Chris persists in his refusal to allow Rich, and Rich has refused to tender, the administrative logins to Greg's FYB email.

149.    Consequently, Rich, Chris and Michelle still have full access to Greg's attorney client privileged emails.

<u>COUNT I: BREACH OF PARTNERSHIP</u>
<u>AGAINST CHRIS</u>

150.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

151.    Greg and Chris agreed to form a partnership to engage in a business wherein each would furnish capital, management and/or effort(s) to such business.

152.    Greg and Chris intended to share equally in the profits and losses of the partnership.

153.    The partnership agreement was mutual, enforceable, and supported by consideration.

154.    Chris has refused to perform his obligations pursuant to the partnership by, among other things:

Denying the existence of a partnership;

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

Denying Greg's interest in the Joint Entities;

Excluding Greg from the operation of the partnership and the Joint Entities;

Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the partnership; and

Failing to distribute Greg's share of partnership revenue to him.

155.    As a direct and proximate result of Chris's breaches of the partnership, Greg has been and will continue to be damaged.

WHEREFORE, Greg requests a judgment in his favor and against Chris, in an amount equal to the value of Greg's 50% interest in the partnership that will be determined at trial in excess of $25,000, including actual and exemplary damages for willful wanton, and reckless conduct, plus attorneys' fees, expert, and other professional fees, costs, pre-judgment interest, post-judgment interest, and such further relief as the Court deems just and proper.

## COUNT II: BREACH OF PARTNERSHIP FIDUCIARY DUTIES AGAINST CHRIS

156.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

157.    "[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another." Vicencio v Ramirez, 211 Mich App 501, 508; 536 NW2d 280 (1995).

158.    As set forth above, Greg and Chris formed a partnership to jointly own and operate the Joint Entities.

159.    In forming the partnership, jointly operating, and agreeing to jointly own the Joint Entities, Greg and Chris reposed faith, confidence, and trust in each other and relied upon the judgment and advice of one another in all aspects of the partnership, thereby establishing fiduciary relationship between them.

160.    Such fiduciary duties required Chris to act in good faith, with the care of an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonable believed to be in the best interests of the parties' Joint Entities.

161.    Conversely, such fiduciary duties prohibits Chris from dealing dishonestly with and in an underhanded fashion with Greg, and in ways that deprive Greg of the value of his partnership interests, engaging in conduct that greatly diminishes the return or economic benefit that Greg should receive as an equal partner in the partnership, and engaging in self-dealing to the detriment of Greg.

162.    In breach of his fiduciary duties to Greg, Chris engaged in the following actions and inactions, including, but not limited to:

>    Denying the existence of a partnership;

>    Denying Greg's interest in the Joint Entities;

>    Excluding Greg from the operation of the partnership and the Joint Entities;

>    Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the partnership; and

>    Failing to distribute Greg's share of partnership revenue to him.

163.    As a direct and proximate result of Chris's breaches of fiduciary duties, Greg has been and will continue to be damaged.

WHEREFORE, Greg requests a judgment in his favor and against Chris, in an amount that will be determined at trial in excess of $25,000, including actual and exemplary damages for willful wanton, and reckless conduct, plus attorneys' fees, expert, and other professional fees, costs, pre-judgment interest, post-judgment interest, and such further relief as the Court deems just and proper.

## COUNT III: BREACH OF JOINT VENTURE, IN THE ALTERNATIVE AGAINST CHRIS

25

DocuSign Envelope ID: AD16E09A-8A1A-4A98-A7C5-22CB65B65833

164.     Plaintiff incorporates the preceding paragraphs as if fully restated herein.

165.     Greg and Chris agreed to form a joint venture to engage in a business wherein each would furnish capital, management and/or effort(s) to such business.

166.     Greg and Chris intended to share equally in the profits and losses of the joint venture.

167.     The joint venture was mutual, enforceable, and supported by consideration.

168.     Pursuant to that agreement, Greg and Chris jointly owned and operated the Joint Entities, with equal interest therein and control thereof, for several years.

169.     Chris has refused to perform his obligations pursuant to the joint venture by, among other things:

> Denying the existence of a joint venture;
>
> Denying Greg's interest in the Joint Entities;
>
> Excluding Greg from the operation of the joint venture and the Joint Entities;
>
> Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the joint venture; and
>
> Failing to distribute Greg's share of joint venture revenue to him.

170.     As a direct and proximate result of Chris's breaches of the joint venture, Greg has been and will continue to be damaged.

WHEREFORE, Greg requests a judgment in his favor and against Chris, in an amount equal to the value of Greg's 50% interest in the joint venture that will be determined at trial in excess of $25,000, including actual and exemplary damages for willful wanton, and reckless conduct, plus attorneys' fees, expert, and other professional fees, costs, pre-judgment interest, post-judgment interest, and such further relief as the Court deems just and proper.

**COUNT IV: BREACH OF JOINT VENTURE FIDUCIARY DUTIES, IN THE**

DocuSign Envelope ID: AD16E09A-8A1A-4A98-A3C5-22CB65B65883

## ALTERNATIVE
## AGAINST CHRIS

171.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

172.    As a joint venturer with Greg, Chris had an affirmative duty to discharge his duties in the utmost good faith and honesty in all matters relating to the joint venture and in a manner he reasonably believed to be in the best interest of the joint venture.

173.    In breach of his fiduciary duties to Greg, Chris engaged in the following actions and inactions, including, but not limited to:

> Denying the existence of a joint venture;
>
> Denying Greg's interest in the Joint Entities;
>
> Excluding Greg from the operation of the joint venture and the Joint Entities;
>
> Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the joint venture; and
>
> Failing to distribute Greg's share of joint venture revenue to him.

174.    As a direct and proximate result of Chris's breaches of fiduciary duties, Greg has been and will continue to be damaged.

WHEREFORE, Greg requests a judgment in his favor and against Chris, in an amount that will be determined at trial in excess of $25,000, including actual and exemplary damages for willful wanton, and reckless conduct, plus attorneys' fees, expert, and other professional fees, costs, pre-judgment interest, post-judgment interest, and such further relief as the Court deems just and proper.

## COUNT V: DECLARATORY RELIEF AS TO OWNERSHIP OF THE JOINT ENTITIES

175.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65833

176. Greg and Chris are the two members of the Joint Entities, each owning fifty percent (50%) of the Joint Entities.

177. In fact, in sworn deposition testimony Chris testified and affirmed that Greg is a fifty percent (50%) owner of the Joint Entities.

178. Therefore, Chris is now estopped from claiming anything other than what he swore under oath to this Court as true.

179. Chris now claims that Greg has no ownership interests in the Joint Entities.

180. Although there should be none, an actual case and/or controversy thus exists between Greg, Chris and/or the Joint Entities as to the recognition of Greg's ownership such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

181. The Court should issue judgment declaring that Greg is fifty percent (50%) owner of the Joint Entities with full rights and authority pursuant thereto.

WHEREFORE, Greg respectfully requests that the Court enter a Judgment declaring and adjudging that Greg is fifty percent (50%) owner of the Joint Entities' outstanding membership interests or shares, including, but not limited to, MSY, Candid, Inc., Innovative Financing, MRED, Axon Properties, LLC, Oakland Business Park, LLC, Premier Drive LLC, Blue Skies Financing, LLC, Bloomfield Hills Swim & Tennis, LLC, CSB Investments, LLC, Frequency Wellness, LLC, Henry Yandt Construction, LLC, Alchemy Wellness, LLC, with full rights and authority pursuant thereto, together with such and further relief the Court deems just and proper.

## COUNT VI: BREACH OF CONTRACT
## AGAINST CHRIS

182. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

28

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A3C5-22CB65B65833

183.     The Buyout Agreement is an enforceable written contract between Greg and, Chris, and was executed by three individuals as witnesses who were involved in the negotiations between Greg and Chris.

184.     Chris initially complied with the Buyout Agreement, making the required $500,000.00 payment to Greg by December 16, 2022.

185.     Greg performed all aspects of the Buyout Agreement by, including, but not limited to, assigning, via written documents, all his rights in the Sold Assets, which is undisputed by Chris.

186.     Chris breached the Buyout Agreement, by, among other things:

Refusing to make the $1.2 million December 22 Payment;

Refusing to split the MSY Litigation Proceeds 50/50 and attempting (surreptitiously) to take possession of 100% of them; and

Repudiating the remainder of his obligations under the Buyout Agreement when, on April 12, 2023, he sent Greg a text message that he did not intend to honor any portion of the Buyout Agreement moving forward and stating: "I will not be giving you a penny."

187.     By his statements and conduct, Chris has anticipatorily repudiated the Buyout Agreement and, therefore, Greg is entitled to recover the full $18.3 million due thereunder and all other benefits of the Buyout Agreement, including the payment of taxes due under Section 8 of the Buyout Agreement.

188.     Greg has been damaged by Chris's breaches of the Buyout Agreement in an amount in excess of $25,000.

WHEREFORE, Greg requests a judgment in his favor and against Chris in an amount that will be determined at trial in excess of $25,000, exclusive of interest and costs, plus attorneys' fees, expert, and other professional fees, costs, pre-judgment interest, post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT VII: PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

## AGAINST CHRIS

189.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

190.    Chris promised to pay Greg $18.3 million, among other benefits, in exchange for Greg's promise to assign Greg's ownership interests in the Sold Assets to Chris and/or Chris's designee(s).

191.    In reliance on Chris's promises to honor the terms of the Buyout Agreement, Greg assigned his ownership interests in the Sold Assets to Chris and/or Chris's designees, Dyson, Gordhamer, and Smith.

192.    Greg reasonably relied upon Chris's promises to his detriment, relinquishing ownership and control of significant assets to Chris.

193.    Chris should be estopped from failing to keep his promise.

194.    Greg has been damaged in an amount to be determined in trial, but in excess of $25,000.

WHEREFORE, Greg requests a judgment in his favor and against Chris in an amount that will be determined at trial in excess of $25,000, exclusive of interest and costs, plus attorneys' fees, expert, and other professional fees, costs, pre-judgment interest, post-judgment interest, and further relief as the Court deems just and proper.

## COUNT VIII: UNJUST ENRICHMENT, IN THE ALTERNATIVE, AND DECLARATORY RELIEF AS TO OWNERSHIP OF FREQUENCY AND CANDID AGAINST CHRIS

195.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

196.    Chris promised Greg the consideration described in the Buyout Agreement in exchange for Greg's promise to assign Greg's ownership in the Sold Assets to Chris and/or Chris's designees, Dyson, Gordhamer and Smith.

197.    In reliance on Chris's promises to honor the terms of the Buyout Agreement, Greg assigned his ownership interests in the Sold Assets to Chris, and/or Chris's designees, Dyson, Gordhamer and Smith thus conferring a benefit onto Chris and/or Chris's designees, Dyson, Gordhamer and Smith.

198.    Greg executed an assignment for his 100% ownership interest in Candid to Smith.

199.    Smith did not pay or give Greg any form of consideration for the Candid assignment. Chris did not pay or give Greg any form of consideration for the Candid assignment.

200.    Greg assigned his 100% ownership interest in Frequency to Dyson.

201.    Dyson did not pay or give Greg any form of consideration for the Frequency assignment. Chris did not pay or give Greg any form of consideration for the Frequency assignment.

202.    Dyson, without receiving consideration, transferred Frequency to Smith.

203.    Smith, without receiving consideration, transferred Frequency to Gordhamer.

204.    Gordhamer did not pay or give Greg any form of consideration for the Frequency assignment. Chris did not pay or give Greg any form of consideration for the Frequency assignment.

205.    With Greg's permission, Jundt assigned his 100% ownership interest in Alchemy to Gordhamer, thus conferring a benefit onto Gordhamer.

206.    After Chris received control over the Sold Assets, directly or through his designees, Chris reneged on his promise to compensate Chris such that his retention of the benefits conferred upon him, Gordhamer, and Smith by Greg is inequitable and unjust.

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

207.     An actual case and/or controversy thus exists between Greg, on the one hand, and Chris, on the other hand, as to the ownership of Frequency, Candid, and Alchemy, such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

208.     The Court should issue judgment declaring that Chris, Gordhamer, and/or Smith are not entitled to ownership of Frequency, Candid, or Alchemy, and in absence of an agreement by Chris to buy Greg out, Greg is the rightful owner of Frequency and/or Candid.

209.     Chris has been unjustly enriched by his inequitable conduct and Greg has been damaged as a result in an amount to be determined in trial, but in excess of $25,000.

WHEREFORE, Greg requests a judgment in his favor and against Chris in an amount that will be determined at trial in excess of $25,000, exclusive of interest and costs, a judgment of specific performance requiring Chris to return the Sold Assets to Greg, plus attorneys' fees, expert, and other professional fees, costs, pre-judgment interest, post-judgment interest, and such other and further relief as the Court deems just and proper.

## COUNT IX: DECLARATORY RELIEF AS TO OWNERSHIP OF MSY AND ENTITLEMENT TO THE MSY LITIGATION PROCEEDS

210.     Plaintiff incorporates the preceding paragraphs as if fully restated herein.

211.     Greg and Chris are the two members of MSY, each owning fifty percent (50%) of the company.

212.     In fact, in sworn deposition testimony in the underlying case that resulted in the MSY Litigation Proceeds, Chris testified and affirmed that Greg is a fifty percent (50%) owner of MSY.

213.     Therefore, Chris is now estopped from claiming anything other than what he swore under oath to this Court as true.

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A3C5-22CB65B65833

214. Paragraph 17 of the Buyout Agreement, executed by Chris, further affirms that Greg is the fifty percent (50%) owner of MSY, as it reaffirms that the Litigations Proceeds are to be shared equally by the two of them.

215. In addition, in recent correspondence, Chris has repeatedly acknowledged Greg's rights to fifty percent (50%) of the MSY Litigation Proceeds.

216. Despite all of this, Chris now claims that Greg has no ownership interests in MSY or any claim to the MSY Litigation Proceeds.

217. Although there should be none, an actual case and/or controversy thus exists between Greg, Chris and/or MSY as to the recognition of Greg's ownership and the release of the Litigation Proceeds such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

218. The Court should thus issue a preliminary Order permitting MSY's attorneys to deposit the Litigation Proceeds with the Court.

219. The Court should further issue judgment declaring that Greg is fifty percent (50%) owner of MSY with full rights and authority pursuant thereto, including but not limited to the right to receive fifty percent (50%) of the Litigation Proceeds or that Greg has the right to receive right to receive fifty percent (50%) of the Litigation Proceeds.

WHEREFORE, Greg respectfully requests that the Court enter a preliminary Order permitting MSY's attorneys to deposit the Litigation Proceeds with the Court and Judgment declaring and adjudging that Greg is fifty percent (50%) owner of MSY's outstanding membership interests with full rights and authority pursuant thereto, including but not limited to the right to receive fifty percent (50%) of the Litigation Proceeds, or a Judgment declaring and adjudging that

33

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65833

Greg is entitled to receive fifty percent (50%) of the Litigation Proceeds, together with such and further relief the Court deems just and proper.

## COUNT X: DISSOLUTION OF MSY PURSUANT TO MCL 450.4802

220.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

221.    Greg and Chris are the two members of MSY, each owning fifty percent (50%) of MSY.

222.    MSY has investments, but no ongoing business other than the distribution of the Litigation Proceeds.

223.    Greg and Chris are in a dispute such that MSY can no longer operate and carry on its business in conformity with its article of organization.

224.    A judicial decree of dissolution is appropriate pursuant to MCL 450.4802, such that MSY will be dissolved and its affairs wound up, including but not limited to the equal distribution of the MSY Litigation Proceeds and MSY's investments to both Greg and Chris.

WHEREFORE, Greg requests Judgment in his favor entering a judicial decree of dissolution of MSY pursuant to MCL 450.4802 and the winding up of MSY's affairs pursuant to MCL 450.4805, including but not limited to the distribution of the Litigation Proceeds, 50/50 between Greg and Chris, together with such other and further relief the Court deems just and proper.

## COUNT XI: FRAUDULENT INDUCEMENT
## AGAINST CHRIS

225.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

226.     As set forth above, Chris made material representations to Greg regarding the terms of Greg's and Chris's separation and specifically separation of the Joint Entities, as reflected in the Buyout Agreement.

227.     Those representations were false at the time they were made as Chris had no intention of honoring his material representations to Greg regarding the terms of Greg's and Chris's separation and specifically separation of the Joint Entities.

228.     Chris's statements to non-parties, including Romaya, make clear that Chris had no intention of performing pursuant to the Buyout Agreement or paying Greg for his interests in the Joint Entities.

229.     Chris made these representations knowing they were false or with reckless disregard of their truth.

230.     Chris made these representations with the intent of inducing Greg to enter into the Buyout Agreement, assign his interests in the Joint Entities to Chris or his designees, and take other actions that would give Chris ownership and/or control over the Joint Entities.

231.     Greg relied on Chris's representations by entering into the Buyout Agreement and assigning his interests in the Joint Entities, as reflected above.

232.     Greg has been damaged as a direct and proximate result of Chris's fraudulent inducement.

233.     Accordingly, Chris is liable to Greg for damages as a result of Chris's fraudulent misrepresentations.

WHEREFORE, Greg requests a judgment in his favor and against Chris, in an amount that will be determined at trial in excess of $25,000, including actual and exemplary damages for willful wanton, and reckless conduct, plus attorneys' fees, expert, and other professional fees,

costs, pre-judgment interest, post-judgment interest, and such further relief as the Court deems just and proper.

## **COUNT XII: DISSOLUTION OF GREG'S AND CHRIS'S PARTNERSHIP**

234.     Plaintiffs incorporate the preceding paragraphs as if fully restated herein.

235.     Michigan's Uniform Partnership Act permits dissolution of a partnership in certain situations, including "...by the express will of any partner when no definite term or particular undertaking is specified." MCL 449.31(1)(b).

236.     Based on Chris's actions as described above, including his breaches of duty, Greg seeks to have his partnership with Chris dissolved.

237.     Pursuant to MCL 449.31 and 449.32, Greg is entitled to judicial decree dissolving his partnership with Chris and:

    a.    An order pursuant to MCL 449.21 and 22 causing Chris to account;

    b.    An order pursuant to MCL 449.37 appointing Greg with full authority to wind up the partnership;

    c.    An order pursuant to MCL 449.38 entitling Greg to all partnership property, less any cash due to Chris in a net amount, plus the value of his partnership, and entitling Greg to continue on in the partnership's business to his sole benefit.

WHEREFORE, Greg requests a judgment in his favor and against Chris: (1) decreeing the dissolution of any partnership between Greg and Chris; (2) appointing Greg to wind the business of the partnership; (3) causing Chris to account to the partnership; (4) awarding all partnership property to Greg, including but not limited to the membership interests in each of the Joint Entities, less any cash due to Chris and the value of Chris's partnership interest; (5) and such other and further relief as the Court deems appropriate.

## COUNT XIII: DECLARATORY RELIEF AS TO ACCESS AND ADMINISTRATIVE RIGHTS TO GREG'S FYB EMAIL

238. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

239. FYB's email is hosted by Microsoft's cloud-based Office 365 servers. FYB's email is not stored on a physical server. Greg owns the FYB website and domain.

240. Because he was FYB's IT director, Stopczy retained administrative privileges to the FYB accounts.

241. However, Stopczy did not have any legal right or authority to access or download FYB's emails on behalf of Chris or Houbeck. Stopczy exceeded his authority with respect to the FYB email accounts.

242. At Chris's direction, Stopczy improperly used his IT admin credentials to access and download Greg's emails without Greg's knowledge or permission.

243. At Chris's direction, Houbeck reviewed Greg's email for the purpose of obtaining a perceived advantage in this lawsuit and business leads.

244. Despite several demands that Chris, Stopczy, and Houbeck relinquish administrative access and rights to Greg's FYB email, Chris persists in his refusal to allow Rich, and Rich has refused to tender, the administrative logins to Greg's FYB email.

245. Consequently, Rich, Chris and Michelle still have full access to Greg's attorney client privileged emails.

246. An actual case and/or controversy exists between Greg, Chris, Stopczy, and Houbeck as to the administrative rights and access to Greg's FYB email.

247. The Court should further issue judgment declaring that Greg is the rightful owner to Greg's FYB email and the administrative rights thereto, that Chris's, Stopczy's, and Houbeck's

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

access to Greg's FYB email was improper, and that Chris, Stopczy, and Houbeck must relinquish administrative control of Greg's FYB email and return it to Greg.

WHEREFORE, Greg respectfully requests that the Court enter a judgment declaring that Greg is the rightful owner to Greg's FYB email and the administrative rights thereto, that Chris's, Stopczy's, and Houbeck's access to Greg's FYB email was improper, and that Chris, Stopczy, and Houbeck must relinquish administrative control of Greg's FYB email and return it to Greg together with such and further relief the Court deems just and proper.

## COUNT XIV: VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030 *ET SEQ.* AGAINST CHRIS, STOPCZY, AND HOUBECK

248. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

249. In addition to its criminal penalties, the CFAA gives a private cause of action for the damage and losses caused by the intentional, unauthorized, access of a protected computer.

250. During the relevant period, Chris, Stopczy, and Houbeck were not authorized to access Greg's FYB email, the Microsoft server FYB's email was hosted on, and/or exceeded their authorization, and were not authorized to access Greg's emails.

251. Chris, Stopczy, and Houbeck intentionally and without consent, permission, or authorization gained access to confidential and sensitive information through Greg's FYB email.

252. Greg's FYB email account was hosted on a protected computer which at all relevant times operated and affected interstate commerce.

253. Without consent, permission or authorization, Chris, Stopczy, and Houbeck obtained Greg's confidential, proprietary, and sensitive business records and e-mails through their unauthorized access of Greg's FYB and/or access that exceeded existing permission or authorization.

DocuSign Envelope ID: AD16E09A-8A1A-4A98-A7C5-22CB65B65833

254.     Defendants' intentional access of the protected computers and FYB email account caused loss and damages to Greg, including, but not limited to, costs in excess of $5,000.00 incurred to investigate how Chris, Stopczy, and Houbeck obtained unauthorized access to Greg's FYB email and the extent of the unauthorized access, and such costs continue to accrue as the investigation continues.

255.     Chris, Stopczy, and Houbeck took all such actions knowingly and intentionally, with the intent to defraud, and without Greg's consent or permission and in violation of the Computer Fraud and Abuse Act.

256.     Chris, Stopczy, and Houbeck committed these tortious actions during the exercise of a nongovernmental or proprietary function.

257.     Chris, Stopczy, and Houbeck did not act and could not have reasonably believed that he was acting within the scope of his authority at the time these tortious actions took place.

258.     As a direct and proximate result of Chris's, Stopczy's, and Houbeck's unlawful and improper actions, Greg has suffered losses in an amount to be proven at trial.

259.     Punitive and exemplary damages are appropriate because Chris's, Stopczy's, and Houbeck's actions were willful and intentional.

260.     As a direct and proximate result of Chris's unlawful and improper actions, Greg has suffered losses in an amount to be proven at trial, but in excess of $25,000.00.

261.     Greg has suffered irreparable harm through the exploitation of its confidential information.

262.     Greg is entitled to compensatory damages and injunctive relief for Chris's violation of 18 U.S.C. §1030 *et seq.*, including 18 U.S.C. §1030(g).

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A7C5-22CB65B65883

WHEREFORE, Greg respectfully requests that this Court enter a judgment in his favor and against Chris, Stopczy, and Houbeck awarding Greg preliminary and permanent injunctive relief barring Chris, Stopczy, and/or Houbeck from using Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to turn over each of the electronic devices and servers they have utilized since January 1, 2023 for forensic examination, requiring Chris, Stopczy, and Houbeck to return any of Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to destroy any of Greg's confidential information and FYB email in their possession, damages in an amount in excess of $25,000.00, plus his costs and attorneys' fees, and any such other and further relief as the Court deems just and proper.

## COUNT XV: VIOLATION OF FEDERAL WIRETAP ACT, 18 U.S.C. §2510 *ET SEQ* AGAINST CHRIS, STOPCZY, AND HOUBECK

263.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

264.    The Federal Wiretap Act ("FWA") criminalizes and creates civil liability for the intentional interception of electronic communications without a judicial warrant.

265.    The FWA provides a civil remedy for the interception of an electronic communication and the disclosure and use of an intercepted electronic communication.

266.    Pursuant to the FWA, the interception of an electronic communication is the acquisition of the contents of the communication through the use of any electronic devices, which include computer programs.

267.    Chris, Stopczy, and Houbeck are not authorized users of Greg's FYB email and/or exceeded their authorization.

268.    Without authorization, Chris, Stopczy, and Houbeck used a computer program to contemporaneously intercept Greg's electronic communications and used those communications to benefit themselves.

40

DocuSign Envelope ID: AD16E09A-8A1A-4A88-A3C5-22CB65B65883

269. Chris, Stopczy, and Houbeck took all such actions knowingly and intentionally and in violation of the FWA.

270. Punitive and exemplary damages are appropriate because Chris's, Stopczy's, and Houbeck's actions were willful and intentional.

271. This Court should award Greg his attorneys' fees under 18 U.S.C. § 2520(b)(3).

WHEREFORE, Greg respectfully requests that this Court enter a judgment in his favor and against Chris, Stopczy, and Houbeck awarding Greg preliminary and permanent injunctive relief barring Chris, Stopczy, and/or Houbeck from using Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to turn over each of the electronic devices and servers they have utilized since January 1, 2023 for forensic examination, requiring Chris, Stopczy, and Houbeck to return any of Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to destroy any of Greg's confidential information and FYB email in their possession, damages in an amount in excess of $25,000.00, plus his costs and attorneys' fees, and any such other and further relief as the Court deems just and proper.

## COUNT XVI: VIOLATION OF THE STORED COMMUNICATIONS ACT AGAINST CHRIS, STOPCZY, AND HOUBECK

272. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

273. The Stored Communications Act ("SCA") prohibits the intentional access of a facility through which an electronic communication service is provided without authorization, or intentionally exceeding authorization to access that facility, and the obtaining, altering, or prevention of authorized access to an electronic communication while it is in electronic storage in such system.

274. In addition to its criminal penalties, the SCA provides a civil cause of action for any person aggrieved by any violation of the SCA.

DocuSign Envelope ID: AD16E09A-8A1A-4A98-A7C5-22CB65B65883

275.    Chris, Stopczy, and Houbeck intentionally and without authorization gained access to confidential and sensitive information stored on a facility through which an electronic communications service is provided by accessing Greg's FYB email that was stored on Microsoft's cloud-based Office 365 servers.

276.    Pursuant to the SCA, Microsoft's cloud-based Office 365 servers are a facility through which an electronic communication service is provided.

277.    Without authorization, Chris, Stopczy, and Houbeck obtained confidential, proprietary, and sensitive business records and electronic communications of Greg while they were stored on Microsoft's cloud-based Office 365 serves.

278.    Chris's, Stopczy's, and Houbeck's unauthorized access or access in excess of authorization caused actual harm to Greg, including but not limited to, investigation costs, attorneys' fees, and the improper disclosure of confidential and sensitive information.

279.    Chris, Stopczy, and Houbeck took all such actions knowingly and intentionally and in violation of the SCA.

280.    Punitive and exemplary damages are appropriate because Chris's, Stopczy's, and Houbeck's actions were willful and intentional.

281.    This Court should award Greg his attorneys' fees under 18 U.S.C. § 2707(c).

WHEREFORE, Greg respectfully requests that this Court enter a judgment in his favor and against Chris, Stopczy, and Houbeck awarding Greg preliminary and permanent injunctive relief barring Chris, Stopczy, and/or Houbeck from using Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to turn over each of the electronic devices and servers they have utilized since January 1, 2023 for forensic examination, requiring Chris, Stopczy, and Houbeck to return any of Greg's confidential information and FYB email, requiring Chris,

Stopczy, and Houbeck to destroy any of Greg's confidential information and FYB email in their possession, damages in an amount in excess of $25,000.00, plus his costs and attorneys' fees, and any such other and further relief as the Court deems just and proper.

### COUNT XVII: INVASION OF PRIVACY (INTRUSION UPON SECLUSION) AGAINST CHRIS, STOPCZY, AND HOUBECK

282.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

283.    Greg's FYB emails, particularly those sent to his attorney, are of a secret and private nature.

284.    Greg's privileged emails related to proprietary, secret, and private subject matters.

285.    Greg indisputably had a right to keep the subject matter of his *privileged* communications private.

286.    Chris, Stopczy, and Houbeck obtained Greg's emails and the information contained therein by surreptitiously accessing and downloading emails to which Chris, Stopczy, and Houbeck were not parties and had no legitimate reason to ever view or access.

287.    Chris, Stopczy, and Houbeck obtained Greg's emails and private, confidential information through criminal activity (see, e.g., MCL § 750.540) and violations of the SCA, CFAA, and FWA, all of which have criminal components.

288.    The manner in which Chris, Stopczy, and Houbeck obtained Greg's emails constitute criminal acts and is objectionable to a reasonable man.

289.    Any invasion of the attorney-client privilege is *per se* objectionable to all persons, unreasonable or otherwise.

290.    Greg has been damaged as a direct and proximate result of these Chris's, Stopczy's, and Houbeck's intrusions.

291. The full extent of Greg's damages is not yet known because Chris, Stopczy, and Houbeck remain in possession and control of copies of Plaintiffs' emails and privileged information and are using said information to interfere with Greg's interests and potentially other aspects of Greg's private life.

WHEREFORE, Greg respectfully requests that this Court enter a judgment in his favor and against Chris, Stopczy, and Houbeck awarding Greg preliminary and permanent injunctive relief barring Chris, Stopczy, and/or Houbeck from using Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to turn over each of the electronic devices and servers they have utilized since January 1, 2023 for forensic examination, requiring Chris, Stopczy, and Houbeck to return any of Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to destroy any of Greg's confidential information and FYB email in their possession, damages in an amount in excess of $25,000.00, plus his costs and attorneys' fees, and any such other and further relief as the Court deems just and proper.

## COUNT XVIII: CONVERSION PURSUANT TO COMMON LAW AND MCL 600.2919(A) AGAINST CHRIS, STOPCZY, AND HOUBECK

292. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

293. At all relevant times, Greg owned and had a right to exclusive possession and control of his FYB email.

294. Chris, Stopczy, and Houbeck intentionally and wrongfully exercised distinct acts of dominion over Greg's FYB email.

295. The distinct acts of dominion by Chris, Stopczy, and Houbeck over Greg's FYB email were inconsistent with Greg's rights to exclusive ownership, possession, and control over Greg's FYB email.

296. The acts described above constitute unlawful conversion of Greg's FYB email.

297.    As a result, Greg has been damaged in an amount in excess of $25,000.00, exclusive of interest, costs, and attorneys' fees.

298.    Pursuant to MCL 600.2919a, Greg may recover three (3) times the amount of actual damages sustained, plus costs and reasonable attorneys' fees.

WHEREFORE, Greg respectfully requests that this Court enter a judgment in his favor and against Chris, Stopczy, and Houbeck awarding Greg preliminary and permanent injunctive relief barring Chris, Stopczy, and/or Houbeck from using Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to turn over each of the electronic devices and servers they have utilized since January 1, 2023 for forensic examination, requiring Chris, Stopczy, and Houbeck to return any of Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to destroy any of Greg's confidential information and FYB email in their possession, damages in an amount in excess of $25,000.00, treble damages, plus his costs and attorneys' fees, and any such other and further relief as the Court deems just and proper.

## COUNT XIX: CIVIL CONSPIRACY
## AGAINST CHRIS, STOPCZY, AND HOUBECK

299.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

300.    Chris, Stopczy, and Houbeck maliciously and wrongfully conspired with one another for the illegal purpose of unlawfully accessing Greg's FYB email in violating of the Computer Fraud and Abuse Act and Stored Communications Act, converting Greg's FYB email, and improperly using Greg's FYB email.

301.    Chris, Stopczy, and Houbeck maliciously and wrongfully conspired with one another to personally benefit from such underlying misconduct.

302. The conspiracy resulted in the unlawful and tortious activity of violating the Computer Fraud and Abuse Act, violating the Stored Communications Act, and common law and statutory conversion.

303. As a proximate result of this conspiracy, Chris, Stopczy, and Houbeck are jointly and severally liable to Greg for all injuries and damages sustained.

WHEREFORE, Greg respectfully requests that this Court enter a judgment in his favor and against Chris, Stopczy, and Houbeck awarding Greg preliminary and permanent injunctive relief barring Chris, Stopczy, and/or Houbeck from using Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to turn over each of the electronic devices and servers they have utilized since January 1, 2023 for forensic examination, requiring Chris, Stopczy, and Houbeck to return any of Greg's confidential information and FYB email, requiring Chris, Stopczy, and Houbeck to destroy any of Greg's confidential information and FYB email in their possession, damages in an amount in excess of $25,000.00, treble damages, plus his costs and attorneys' fees, and any such other and further relief as the Court deems just and proper.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: November 7, 2023     By:     /s/ Ethan R. Holtz
                                     Ethan R. Holtz (P71884)
                                     Emily M. Mayer (P78956)
                                     *Attorneys for Plaintiff*

## **VERIFICATION**

I declare that the allegations in the Verified First Amended Complaint set forth above and

attached are true and accurate to the best of my knowledge, information and belief.

*Greg Yatooma*

Gregory Yatooma

Dated:  November 7, 2023

# Exhibit 1

**Christopher Yatooma**
**03/17/2021**

1          STATE OF MICHIGAN

2      IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

3   MSY CAPITAL PARTNERS, LLC, MICHIGAN

4   REAL ESTATE DEVELOPMENT, LLC,

5                    Plaintiffs,

6      -vs-

7                                Case No. 2019-178037-CB

8                                Hon. Michael Warren

9   LIV WELLNESS CENTER, LLC, d/b/a LIV

10   WELLNESS, DENNIS ZOMA, DANNY ZOMA,

11   DUANE KARMO, SCOTT S. YALDO, AND JOHN

12   AND JANE DOES 1-5,

13                    Defendants.

14   _____/

15   PAGE 1 TO 217

16

17      The Deposition of CHRISTOPHER YATOOMA,

18      Taken Via Hanson Remote

19      Commencing at 9:30 p.m.,

20      Wednesday, March 17, 2021

21      Before Laura Steenbergh CSR-3707, RMR, CRR, RDR

22

23    Court reporter, attorneys & witness appearing remotely.

24

25



# Christopher Yatooma
## 03/17/2021
Pages 2..5

**Page 2**

```
1   APPEARANCES:
2
3   FRANK DELUCA P41604
4   Fleming Yatooma & Borowicz, PLC
5   1615 S. Telegraph Road, Suite 300
6   Bloomfield Hills, MI 48302
7   (248) 230-2820
8
9   SCOTT T. SEABOLT P55890
10  Hickey, Hauck, Bishoff
11  Jeffers & Seabolt, PLLC
12  17199 N. Laurel Park Drive, Suite 215
13  Livonia, Michigan 48152
14  (734) 544-5525
15  sseabolt@jjbjs.com
16      Appearing on behalf of the Plaintiff.
17
18  JASON R. ABEL P70408
19  Honigman, LLP
20  660 Woodward Avenue
21  2290 First National Building
22  Detroit, Michigan 48226-3506
23  jabel@honigman.com
24  (313) 465-7296
25      Appearing on behalf of the Defendants.
```

**Page 4**

```
1               TABLE OF CONTENTS
2
3   Witness                                    Page
4   CHRISTOPHER YATOOMA
5   EXAMINATION BY MR. ABEL:                       5
6   EXAMINATION BY MR. SEABOLT:                  213
7   RE-EXAMINATION BY MR. ABEL:                  214
8
9
10              INDEX TO EXHIBITS
11         (Exhibits attached to transcript)
12
13  Exhibit                                    Page
14  YATOOMA EXHIBIT 37 C. Yatooma Bio            22
15  YATOOMA EXHIBIT 38 October 2018 Text Stream  26
16  YATOOMA EXHIBIT 39 Binding Agreement and Transfer  129
17  of Permit
18
19
20
21
22
23
24
25
```

**Page 3**

```
1   APPEARANCES (Continued):
2
3   ALSO PRESENT:  Greg Yatooma
4                  Dennis Zoma
5                  Alvin Bates
6                  Duane Karmo
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1   Remote Deposition
2   Wednesday, March 17, 2021
3   About 9:30 a.m.
4        COURT REPORTER:  Good morning.  My name is
5   Laura Steenbergh, notary public and certified shorthand
6   reporter, and this deposition is being held via
7   videoconferencing equipment.  All parties to this
8   deposition are appearing remotely and have agreed to the
9   witness being sworn in remotely.  Due to the nature of
10  remote reporting, please pause briefly before speaking
11  to ensure all parties are heard completely.
12       Do you solemnly swear that the testimony you
13  are about to give will be the truth, the whole truth and
14  nothing but the truth.
15       CHRISTOPHER YATOOMA:  I do.
16       MR. ABEL:  Good morning, Mr. Yatooma.
17       THE WITNESS:  Good morning.
18            CHRISTOPHER YATOOMA,
19  having first been duly sworn, was examined and testified
20  on his oath as follows:
21  EXAMINATION BY MR. ABEL:
22  Q.  Would you mind, please, saying and spelling your last
23      name for the record?
24  A.  Good morning, Jason.
25       My name is Chris Yatooma -- Y-A-T-O-O-M-A.
```

Christopher Yatooma
03/17/2021                                              Pages 38..41

Page 38

1   it might have been occasional magazines somehow that I
2   came across, but it --
3 Q.  Who texts you about the cannabis industry?
4 A.  I mean, just anybody and everybody.  It's a pretty
5   interesting topic for people.
6 Q.  Do you have any understanding of why they text you with
7   that information?
8 A.  Just due to my involvement in the cannabis industry.
9 Q.  What is your involvement in the cannabis industry?
10 A.  Well, obviously, I'm a partner in MSY.  MSY, as I said,
11   has an interest in this case.  I also own Oakland
12   Business Park, and also I help Greg with his different
13   assets of Axon.
14 Q.  And when you say people text you because of your
15   involvement in the cannabis industry and you said it's
16   because you're a partner in MSY, who have you told
17   you're a partner in MSY to?
18 A.  I mean, it's on my bio, I believe.  So I don't know
19   that -- I think that would be too broad, I don't think I
20   can answer with specificity.
21 Q.  So looking at your bio, though, your bio doesn't mention
22   that MSY is involved in the cannabis industry.  Do you
23   have any understanding of how people would have come to
24   learn that MSY was involved in the cannabis industry?
25 A.  Well, I don't think they would -- I think they would

Page 39

1   just look at me as involved in the cannabis industry.  I
2   don't think there was any concern with what entity I was
3   operating under.
4 Q.  Who have you talked to about your involvement in the
5   cannabis industry other than your brothers?
6 A.  Probably everybody that knows me.  Certainly anybody I
7   talked to about what I did for work would know I'm
8   involved in the cannabis industry.
9 Q.  Approximately how many people have you told that you're
10   involved in the cannabis industry?
11 A.  Over the last couple years I've been involved?  I mean,
12   I'm sure hundreds, maybe thousands.
13 Q.  Do you consider yourself to be a specialist with
14   industry knowledge of the cannabis industry?
15 A.  No.
16       THE WITNESS:  Jason, do you mind if we take a
17   break, bathroom break?
18       MR. ABEL:  Yeah.  Perfect timing.
19       THE WITNESS:  Appreciate it, buddy.  Thank
20   you.
21       MR. SEABOLT:  Hey, Jason, before we go off,
22   Chris has a call that he can't miss that's going to go
23   from about 11:15 to 12:00.  I'm going to suggest that we
24   take an early lunch break at that point and then come
25   back and finish it up.

Page 40

1       MR. ABEL:  That works for me.
2       MR. SEABOLT:  Okay.
3       THE WITNESS:  Appreciate it.  Thanks.
4       MR. ABEL:  Thank you.
5       (A short recess was taken)
6 BY MR. ABEL:
7 Q.  Mr. Yatooma, have you ever submitted an application
8   either as a main applicant or a supplemental applicant
9   to the State of Michigan in conjunction with seeking a
10   marijuana establishment license?
11 A.  No.
12 Q.  Do you understand that you're being deposed here today
13   in connection with a lawsuit filed by MSY Capital
14   Partners and Michigan Real Estate Development, LLC,
15   against LIV Wellness Center, LLC and Dennis Zoma, Duane
16   Karmo and Danny Zoma, is that right?
17 A.  Yes.
18 Q.  And just for ease of the transcript, if I refer to MSY
19   Capital Partners, LLC as just MSY, you'll understand?
20 A.  Absolutely.
21 Q.  And if I refer to Michigan Real Estate Development, LLC,
22   just as M-R-E-D or MRED, you'll understand?
23 A.  Absolutely.
24 Q.  And if I refer to LIV Wellness Center, LLC as LIV or
25   LWC, you'll understand?

Page 41

1 A.  Yep.
2 Q.  Am I correct that you're a member of MSY?
3 A.  Yes.
4 Q.  And how long have you been a member of MSY?
5 A.  Since it was formed.
6 Q.  Do you recall when it was formed?
7 A.  I do not.
8 Q.  Do you recall what the purpose of forming MSY was?
9 A.  Just for the different investment activities I was
10   involved in, to operate under.
11 Q.  And who are the current members of MSY?
12 A.  My brother Greg and I.
13 Q.  And were there any other members of MSY?
14 A.  Did you say were there any other members?
15 Q.  Yes.  At any time.
16 A.  I think we're getting a little bit of cutout, a little
17   delay on the phone.  Can you just repeat the question?
18 Q.  Sure.
19       Were there ever any other members of MSY?
20 A.  Yes.  My brother Jeff.
21 Q.  And when MSY was formed, who were the members?
22 A.  I believe just me.
23 Q.  And when did Jeff become a member of MSY?
24 A.  Around 2017.  It may have been before that, but around.
25 Q.  And do you have an understanding of why Jeff became a



Christopher Yatooma
03/17/2021                                    Pages 42..45

1   member of MSY?
2   A.  Yes.  We were involved in cannabis real estate
3       activities together.
4   Q.  And why did Jeff become involved in MSY in conjunction
5       with those cannabis-related activities?
6   A.  We were utilizing MSY for a period of time for some of
7       those activities we were doing together.
8   Q.  And why utilize MSY instead of one of the other
9       companies that you mentioned that you own?
10  A.  I don't know the specific rationale behind it.
11  Q.  And when did Greg Yatooma become a member of MSY?
12  A.  At the same time Jeff did.
13  Q.  And what cannabis-related activities were you referring
14      to that you said you started utilizing MSY for?
15  A.  Buying and selling cannabis real estate.
16  Q.  What is cannabis real estate?
17  A.  Real estate that can be -- that is zoned properly and
18      can receive a cannabis permit by a municipality to
19      operate, whether it be for grow, PC or any of the other
20      cannabis licenses.
21  Q.  And when did you first become involved in the buying and
22      selling of cannabis real estate?
23  A.  I think we talked about this earlier in the deposition.
24      I would have to look at a document.  I'm not sure.
25  Q.  But you recall the first cannabis real estate that you

1       bought or sold was in Detroit?
2   A.  I don't recall which one.
3   Q.  Is that correct, that the first one you recall was in
4       Detroit?
5   A.  Correct, yes.
6   Q.  And approximately how many cannabis properties have you
7       bought or sold either directly or through one of your
8       businesses?
9   A.  Well, I've had some involvement -- it's a large number,
10      30 or so, give or take.  Maybe more.
11  Q.  When you say maybe more, are you talking 50, 100, 1,000?
12  A.  Less than 1,000.  If you're saying buying and selling as
13      separate activities, it could be -- I think 30 to 60, if
14      you look at them separate.  And then -- yeah, I mean --
15      and then there's deals that maybe didn't come to
16      fruition, you know, so actually you don't count any of
17      those at all, on the buying or the selling end.
18  Q.  And how many cannabis properties has MSY bought or sold
19      since its formation?
20  A.  I don't know.
21  Q.  Who would know?
22  A.  We would have to do an audit to -- I don't know.  Greg
23      would be running point.  I don't know if he would know
24      offhand.  And then we'd have to do an audit of that
25      activity to get a number.  I'm sure he would not know

1       offhand.
2   Q.  Do you know if it's less than 10 or more than 10?
3   A.  The question was what again?  I'm sorry.
4   Q.  Yes.  Approximately how many cannabis properties has MSY
5       bought or sold since its formation?
6   A.  Well, again, it would be done under a special purpose
7       asset, so I don't if MSY closed on them.  I don't know
8       if that's the nature of your question.  But MSY was
9       submitted offers for quite a few.  I don't know how many
10      we were successful on purchasing.
11  Q.  So how many SPEs, single-purpose entities, does MSY own?
12  A.  I don't know.  At -- I don't think it -- I don't know.
13  Q.  Does MSY ever buy and sell cannabis real estate itself
14      or does it always buy and sell through a subsidiary SPE?
15  A.  I don't know.  I'd have to talk to counsel.
16  Q.  Are you aware of a single occasion when MSY bought or
17      sold cannabis real property itself as opposed to having
18      one of its subsidiaries buy and sell it?
19  A.  I'm not sure specifically.  I think there may be some
20      occasions.
21  Q.  And do you recall which properties those might have
22      been?
23  A.  No.
24  Q.  Why would MSY buy and sell cannabis properties itself as
25      opposed to having one of its subsidiaries buy and sell

1       it?
2   A.  I don't know if there would have been a reason.  The
3       market was just a mess.
4   Q.  Does MSY have a manager?
5   A.  I don't believe so.  I think it -- I think member
6       managed would be the term.  I don't know we created a
7       manager.
8   Q.  So when Jeff and Greg became owners of MSY in 2017, what
9       were their percentages of ownership at that time?
10  A.  Any businesses we were in together we were sharing
11      equally.
12  Q.  So was it 33.3 percent each?
13  A.  For any business we were doing together, yes.
14  Q.  How many businesses were you doing together?
15  A.  Of the different cannabis, you know, the different
16      cannabis businesses, the cannabis activity, I would just
17      look at it as one business, candidly, I didn't put a lot
18      of distinction into the different entities that were
19      being used.  I just looked at it my brothers and I were
20      working together in cannabis real estate and we were
21      partners in that.  The entities we were operating under
22      was of no importance to me.
23  BY MR. ABEL:
24  Q.  So why operate under various different entities if it
25      didn't matter to you which entity you were operating



Page 46
1   under?
2  A.  That would have just been a question for counsel.
3  Q.  So you just understood there to be kind of one global
4      Yatooma enterprise that all these businesses were part
5      of, is that fair?
6  A.  As it relates to cannabis, absolutely.
7  Q.  And the businesses in that enterprise were MSY, MRED,
8      Axon, Oakland Business Park and Cannabis Property
9      Brokers of Michigan, is that right?
10  A.  Well, MSY is involved in other activities besides
11      cannabis.  And those other activities my brothers are
12      not partners in.
13  Q.  Sorry, say that again.
14  A.  MSY is involved in other real estate activities,
15      investment activities besides cannabis, and those other
16      activities my brothers are not partners in.
17  Q.  So when you determine -- strike that.
18          What did Jeff Yatooma pay for his membership
19      interest in MSY?
20  A.  I don't -- I mean, it was a pretty fluid situation with
21      my brothers and our partnership.  He certainly
22      contributed to the partnership, but what he paid in I
23      can't speak to.
24  Q.  What did Jeff Yatooma contribute for his membership in
25      MSY?

Page 47
1  A.  I'm sorry, Jason, I don't know if we're getting a bad
2      connection or if the microphone's not picking up.  Say
3      it again, please.
4  Q.  What did Jeff Yatooma contribute to MSY in exchange for
5      his membership?
6  A.  He invested a lot of time and energy and incites,
7      relationships.
8  Q.  What did Greg Yatooma -- now we're getting an echo --
9  A.  You said what did Greg Yatooma?
10  Q.  Yes.  What did Greg Yatooma contribute to MSY in
11      exchange for his membership?
12  A.  You know, Greg was certainly working in the business as
13      well, but Greg also contributed capital in different
14      forms.
15  Q.  What capital did Greg contribute?
16  A.  Both -- I believe both money and other real estate that
17      he owned.
18  Q.  What money did Greg Yatooma contribute to MSY?
19  A.  I don't know the amount.
20  Q.  Can you estimate?
21  A.  Not with any specificity.  I would be guessing.
22  Q.  I don't want you to guess, but was it more than a
23      million dollars or less than a million dollars?
24  A.  I'm really not sure without reviewing some reports.  I'd
25      have to talk to an accountant -- our accountant to get

Page 48
1      some more specifics there.
2  Q.  You don't even know if Greg Yatooma contributed more
3      than a million dollars to MSY?
4          MR. SEABOLT:  Objection, asked and answered.
5  BY MR. ABEL:
6  Q.  You can answer.
7  A.  Do I know?  No.
8  Q.  Do you know whether he contributed more than $100,000 to
9      MSY?
10  A.  Yes.
11  Q.  Do you know if he contributed more than $500,000 to MSY?
12  A.  I think probably, but I'm not sure.
13  Q.  What real estate did Greg Yatooma contribute to MSY?
14  A.  I don't recall.
15  Q.  Do you know how many pieces of real estate Greg Yatooma
16      contributed to MSY?
17  A.  No.
18  Q.  Do you know --
19  A.  Again, pretty fluid between my brother and I -- my
20      brothers and I.
21  Q.  When you say Jeffrey Yatooma contributed his time to
22      MSY, was it your opinion the value of his time was
23      equivalent to the value of the money and real estate
24      that Greg Yatooma contributed?
25  A.  I wouldn't say -- I wouldn't agree or disagree with

Page 49
1      that.  I think, again, a pretty fluid operating between
2      my brothers and I, and I think the feeling was, you
3      know, when there was profits to be shared, if there were
4      profits to be shared that we'd figure it out between us.
5  Q.  Is it fair to say that you moved money in real estate
6      between the various different enterprises constituting
7      what we called before, the Yatooma enterprise?
8  A.  Jason, some of your question got distorted, but also I
9      didn't follow it either.  So I don't know if it was just
10      because of the connection or --
11  Q.  Is it fair to say that the money and property that were
12      contributed to the various different businesses
13      constituting the Yatooma enterprise were fluid; they
14      moved back and forth between those different businesses?
15  A.  I mean, I don't like the term Yatooma enterprise, but if
16      you're saying the cannabis-related businesses my brother
17      Jeff and Greg and I were involved in, when my brother
18      Jeff was involved, then yes.
19  Q.  Were those transfers documented formally in any
20      assignments or agreements?
21  A.  Between the Yatooma enterprises you referred to and the
22      cannabis partnership we were engaged in?
23  Q.  Yes.
24  A.  No.
25  Q.  When did Jeff Yatooma, when was he no longer a member of



Christopher Yatooma
03/17/2021                                      Pages 50..53

Page 50

1    MSY?
2 A.  He stopped being involved end of '18, and then formally
3    relinquished all interest to any cannabis-related
4    businesses, as well as other things we were involved in
5    together, end of '19.
6 Q.  And was there a reason that you understand he was no
7    longer involved with the cannabis-related businesses in
8    2018?
9 A.  Yeah.  We just mutually decided it was better for us not
10   to be working together.
11 Q.  Why was that?
12 A.  I'm sorry, what's the question?
13 Q.  Yeah.  Why was that?  Why did you decide it was better
14   not to be working with him?
15 A.  We just decided it was better for us not to work
16   together.
17 Q.  Why?
18 A.  I don't know all the different reasons why.  Different
19   vision for the company.
20 Q.  What different vision did you have for the company that
21   differed from Jeff Yatooma?
22 A.  I mean, these are, you know -- I mean, this would be
23   conversations we were having over the course of all of
24   our work together where it just seemed like we were
25   further and further apart.  It wouldn't be, you know,

Page 51

1    here's my written vision and here's your written vision,
2    Jeff, and see how these things -- it wouldn't be that
3    clean to just try to tell you differences.  But we just
4    had different views on how the business should be
5    operated.
6 Q.  What were your views as to how the business should be
7    operated at the time Jeff Yatooma stopped working with
8    you in 2018?
9 A.  I mean, it would come down to a lot of very specific
10   decisions -- or questions or decisions that needed to be
11   made, you know, where Greg and I felt one way and Jeff
12   felt another.  And after a period of time with that, it
13   just seemed that it was better for us to operate
14   separately.
15 Q.  What decisions did you differ on?
16 A.  I mean, one of them that comes to mind, I mean, this is
17   certainly not an exhaustive list, was the trade show.
18   You know, Jeff felt it was a good use of time and energy
19   and resources to invest in trade shows, you know, Greg
20   and I didn't see the value of that as much.  I mean,
21   that would be one example.  I mean, I'm sure there were
22   many others.  I just don't recall as I sit here.
23 Q.  You don't recall any other examples as to decisions that
24   you differed on with Jeff Yatooma that caused him to go
25   his separate way from you on these cannabis-related

Page 52

1    businesses other than trade show investments?
2 A.  I mean, that was one.  I mean, the amount of properties
3    Jeff wanted to buy, the amount he wanted to sell them
4    for, we were on different pages with that.  I mean, and
5    again, when you break these into specific things, you
6    know, if one partner feels strongly that they want to by
7    an asset and the other partner feels strongly they
8    don't, or they can't agree on the price, it just creates
9    a challenge in working together, right?  Everyone's got
10   to be on the same page.  So, you know, after a period of
11   time of that it just seemed clear to everyone that it
12   was better to operate separately.
13 Q.  Why does it create a challenge?
14 A.  Well, I mean, you've got a made a decision, right?  So
15   if one partner says, well, I want to buy this asset and
16   the other partner says, well, I don't want to, I mean,
17   that's a challenge.  You know, that you need to
18   decide -- a decision needs to be made, right, where both
19   partners are happy ultimately or the partnership doesn't
20   work.  We just had too many of those interactions where
21   neither of us could agree with each other.
22 Q.  And because, among other things, you couldn't agree with
23   Jeff on the amount of properties to buy or the amount to
24   sell those properties for, you decided to go your
25   separate ways and no longer be partners?

Page 53

1 A.  My apologies, Jason, I didn't follow the question.  I
2    heard the last part of it, but what was the first part?
3 Q.  Yeah.  Because you couldn't agree on the amount of
4    properties to buy and sell and the sale prices, those
5    were two factors that led you to essentially dissolve
6    your partnership with Jeff Yatooma?
7 A.  Oh, those were definitely factors, yeah.  Trade shows
8    come to mind, but, you know, that's certainly another
9    factor.  I mean, obviously, we're in the business of
10   buying and selling real estate, so if we can't agree on
11   what real estate to buy, how much to sell it for, real
12   estate to sell or operate, I mean, then that just
13   created ongoing disagreements.
14 Q.  What was the disagreements you had with regard to Jeff
15   Yatooma and the amount of properties to buy?
16 A.  Jeff was bullish, you know, just really wanted to buy
17   anything, any building we could get our hands on, wasn't
18   concerned about price, as I was, or location.  I'm not
19   saying he's wrong, just saying, you know, we had
20   different strategies, different visions.
21 Q.  What was your concern about price?
22 A.  You know, I'm more focused on, you know, if you -- thank
23   you for asking, Jason.  I'd be happy to talk about that.
24        So, you know, everyone says buy low, sell
25   high, but the joke is people forget to buy low.  So I



# Exhibit 2

MSY-004246

DEFENDANTS
EXHIBIT

27

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release ("Agreement") dated November 13, 2019 ("Effective Date") between Chris Yatooma ("Chris"), Greg Yatooma ("Greg"), Cannabis Property Brokers of Michigan, Inc. ("CPBM"), and Michigan Real Estate Development, Inc. ("MRED"), (collectively, "Good Guys") and Jeff Yatooma ("Jeff" or "Brother") (collectively referred to as the "Parties").

### RECITALS

WHEREAS, in 2017 and 2018 Brother was involved in a cannabis business with the Good Guys, whereby the parties purchased cannabis real estate and with the purpose of improving the property and selling at profit; such real estate included Oakland Business Park ("Business");

WHEREAS, Jeff and Chris previously have jointly owned various investment properties and businesses, including Drakeshire Apartments ("Apartments") and currently both have ownership interest in Bloomfield Hills Swim and Tennis ("Swim Club") and an office building located at 1605/1615 S. Telegraph Rd. Bloomfield Hills, MI 48302 ("Office Building");

WHEREAS, Brother desires to be fully paid for any equity or alleged equity he has in the Business, Swim Club, the Office Building, and any other companies, including Drakeshire ("Jeff Equity");

WHEREAS, it is also the desire of the Parties to separate from each other, and for the Parties to fully release and discharge all claims against each other; and

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and in full and complete settlement of the matters and things recited herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, sets forth herein the agreement between the Parties as follows:

### TERMS OF AGREEMENT

1.     Acknowledgement of Previous Payments.  Jeff acknowledges that Chris has previously paid him an estimated ▮▮▮▮▮▮▮▮ over and above any amounts due for the Apartments which was an approximate additional ▮▮▮▮▮▮ ▮▮▮▮▮ ("Previous Draws").

2.     Payment for Jeff Equity.  In addition to the Previous Draws, Good Guys shall make a one-time payment of ▮▮▮▮▮ ("Final Payment") on the Effective Date, totaling ▮▮▮▮▮▮▮▮▮▮ in payments to Jeff ("Equity Payment").

3.     Discharge of Equity.  Jeff acknowledges that upon payment of the Final Payment, Jeff releases any claim to the Jeff Equity and shall fully release any claim whatsoever in any business previously owned or claimed to be owned with Chris, or any money owed by Greg or Chris to Jeff, including, but not limited to, the Business (and all claims for any of its assets), the Apartments, Swim Club, Office Building, Oakland Business Park and other accompanying properties in Orion Township, the boat in Chris's possession which was previously owned by Jeff, or any other claim or alleged claim for any money owed whatsoever.  For the avoidance of doubt, Jeff shall be waiving any rights, and discharging any claims, he has to being owed anything from Greg or Chris, and this will completely finalize the financial relationship between the Parties.  For the furtherance of the avoidance of doubt, if

1



MSY-004247

Chris and Greg become billionaires off the Business or anything related to what Jeff may have ever claimed to be a part of, even if such windfall happens as early as the day after the Effective Date, Jeff shall have no claim to any of that money whatsoever, and shall simply be very happy for Greg and Chris in their success, and Greg and Chris shall owe Jeff nothing more than love (Romans 13:8).

4.    Website & Email.  Jeff shall have no right or privilege to list any Good Guy or Business assets or use Business emails until such time as Good Guys transfer the CPBM website to Jeff, and at such time all Good Guys emails shall be forwarded to their desired email address indefinitely.

5.    Jeff Acknowledgment.    The Parties acknowledge that they had previously agreed to make the final payment of              which was to be paid out over six months from the proceeds of the sale of the Parties fifty percent (50%) interest of Liv Wellness in Ferndale, Michigan ("Ferndale"). Jeff acknowledges that he did not want to wait until Ferndale was sold, or have any financing component thereafter, and requested that the Good Guys pay Jeff                                    immediately for full and complete resolution; the Good Guys acquiesced.  As Ferndale is going to be in litigation, Jeff further acknowledges that he will be very vested in the litigation and will be as helpful as possible (despite his partnership with Dennis Zoma on other transactions) to help advance the litigation for Greg and Chris, including, but not limited to, providing evidence, testimony, information, source additional information, etc., as may be requested by Greg or Chris. Jeff also agrees to always say the nicest things about Greg and Chris, and shall always be a super nice guy.   𝒥𝒴

6.    General Release.  The following general release shall be effective as of the Effective Date of this Agreement:

(a)    Brother, and any of his entities, including its officers, directors, shareholders, agents, successors and assigns, hereby releases and discharges the Good Guys, and all related entities, including each of their members, officers, directors, shareholders, agents, attorneys, employees, parents, subsidiaries, affiliated companies, including any other companies owned or operated, in whole or in part, by Good Guys, successors and assigns, and all persons acting by or through Good Guys, and each of them individually, of and from any and all manner of claims, demands, requirements, agreements, obligations, debts, duties, sums, accounts, covenants, contracts, promises, damages, judgments, controversies, causes of action and claims for payment of attorneys fees or any other costs, or any other fees or expenses paid or incurred, however described, and whether asserted or unasserted, liquidated or unliquidated, and whether sounding in contract, fraud, tort or otherwise, of any kind and of any nature whatsoever, known or unknown, as of the Effective Date hereof.

(b)    Good Guys hereby releases and discharges Brother, including any of its members, officers, directors, shareholders, agents, attorneys, employees, parents, subsidiaries, affiliated of and from any and all manner of claims, demands, requirements, agreements, obligations, debts, duties, sums, accounts, covenants, contracts, promises, damages, judgments, controversies, causes of action and claims for payment of attorneys fees or any other costs, or any other fees or expenses paid or incurred, however described, and whether asserted or unasserted, liquidated or unliquidated, and whether sounding in contract, fraud, tort or otherwise, of any kind and of any nature whatsoever, known or unknown, as of the Effective Date hereof.

7.    General Provisions.

(a)    This Agreement shall be construed under the laws of Michigan.

(b)    This Agreement contains the entire agreement of the Parties and is binding upon them and their respective successors and assigns. This Agreement shall not be altered, amended, or modified by oral representation made before or after the execution of this Agreement. No modification,

2



MSY-004248

amendment, change or discharge of any terms or provisions of this Agreement shall be valid or binding unless the same is in writing and signed by the Party against whom such modification, amendment, change, discharge or waiver is asserted.

        (c)    The failure of any Party at any time to insist upon the strict performance of any of the terms or covenants of this Agreement shall not be deemed a waiver of the right to insist upon strict performance of the same or any other term or covenant of this Agreement at any time.

        (d)    This Agreement may be signed in counterparts.

8.    <u>Representations and Warranties.</u>  The Parties represent and warrant to each other that the following are true, complete and correct as of the Effective Date:

        (a)    Each of the Parties are duly organized, validly existing and qualified and empowered to conduct their business and have full power and authority to enter into and fully perform and comply with the terms of this Agreement.

        (b)    The execution, delivery and performance of this Agreement will not conflict with or result in a breach of any contract, agreement, law, or regulation to which any of the Parties is a party or to which any of the Parties is bound.

        (c)    Each of the Parties have obtained all necessary consents and approvals of their execution and delivery of this Agreement, and this Agreement is valid and enforceable against each of the Parties as in accordance with its terms.

    IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by their signatures below.

Chris Yatooma

_____

Greg Yatooma

_____

Jeff Yatooma

_____

WITNESS:
Mike Abdulnoor

_____



# Exhibit 3

## <u>AFFIDAVIT OF BRIAN MOLLOY</u>

I, Brian Molloy, being duly sworn, depose and state as follows:

1.      I make this affidavit based upon my personal knowledge and could testify competently as stated if called to do the same.

2.      I am previously the Controller for many of the entities and assets jointly owned and/or operated by Gregory Yatooma ("Greg") and Christopher Yatooma ("Chris"), including, but not limited to Axon Properties, LLC, Michigan Real Estate Development, LLC, and MSY Capital Partners, LLC.

3.      I have personal knowledge of the partnership between Greg, Chris, and their brother Jeffrey Yatooma ("Jeff") that began in 2016 ("Brothers Partnership") because I was the Controller for the Brothers Partnership.

4.      From 2016 until November 2019, the Brothers Partnership entities and assets were owned 1/3 by Jeff, 1/3 by Chris, and 1/3 by Greg.

5.      In November 2019, Chris and Greg bought Jeff out of the Brothers Partnership.

6.      I worked with Chris and Greg to help determine the amount of Jeff's buyout.

7.      After buying Jeff out of the Brothers Partnership, the Brothers Partnership entities and assets were owned ½ by Chris and ½ by Greg, and operated as such.

8.      With Greg's permission, Chris was in charge of the books of the Brothers Partnership entities and assets.

9.      With Chris's permission, Greg was in charge of the operations of the Brothers Partnership entities and assets.

10.     Chris and I regularly worked together on the accounting and books for the Brothers Partnership entities, including on dividing assets and liabilities of those entities between Greg's tax return and Chris's tax return.

1

129299250v2

11.     Ultimately, Chris decided whether an asset or liability would be reported by Chris or Greg on their tax returns, and directed me to prepare documents or schedules reflecting those decisions.

12.     For 2019 and 2020, Chris's decisions regarding reporting of assets and liabilities are reflected in Greg's tax returns for those respective years.

13.     I am aware that there is ongoing litigation between Greg and Chris.

14.     I have read the Answer Chris filed to Greg's Complaint on October 6, 2023.

15.     Many of Chris's statements in the Answer are untrue.

16.     Chris never claimed to be the sole owner of any of the Brothers Partnership entities and assets or otherwise claimed that Greg was not an owner of those entities and assets.

17.     In fact, at all times in my conversations with Chris post-November 2019, it was agreed and understood that Chris and Greg were the 50/50 owners of the Brothers Partnership entities and assets.

18.     Chris's and Greg's 50/50 ownership of the Brothers Partnership entities and assets was apparent from my conversations with Chris regarding accounting and reporting and consistent with how Chris directed me to handle the financials for the Brothers Partnership entities and assets.

19.     Chris never said he was, or believed he was, the sole owner of the Brothers Partnership entities, or that Greg was working only for Chris's benefit.

20.     Chris was fully aware of the entities and other assets in Greg's name.

21.     Chris and Greg agreed that Greg would hold certain entities and assets in his name for Chris's and Greg's joint benefit.

22.     This included entities regulated by the State of Michigan Cannabis Regulatory Agency ("CRA") because Chris was not prequalified by the CRA and, as the owner of Citizens State Bank, a federally regulated financial institution, Chris did not want cannabis assets in his name.

23.     I left Chris's and Greg's employment in June 2022.

_____
Brian Molloy

Subscribed and sworn to before me this
9th day of October, 2023

_____
Notary Public, Oakland County, State of Michigan
My Commission Expires:  August 2, 2027
Acting in the County of Oakland

KARA HARBOUR
Notary Public - State of Michigan
County of Oakland
My Commission Expires Aug 2, 2027
Acting in the County of Oakland

3

# Exhibit 4



**Dykema Gossett PLLC**
Capitol View
201 Townsend Street, Suite 900
Lansing, MI 48933
WWW.DYKEMA.COM
Tel: (517) 374-9100
Fax: (517) 374-9191

**Scott A. Hughes**
Direct Dial: (517) 374-9172
Direct Fax: (855) 242-8122
Email: SHughes@dykema.com

January 22, 2020                                         **Via Email**

MSY Capital Partners, LLC
c/o Gregory Yatooma
1615 S. Telegraph Road
Bloomfield Hills, MI 48302

      Re:    Dykema Engagement Letter

Dear Greg:

We are pleased to confirm the retention of Dykema Gossett PLLC ("we" or the "Firm") as legal counsel to MSY Capital Partners, LLC (the "Client") in connection with filing an administrative complaint with the Marijuana Regulatory Agency (the "Matter"). This letter and the enclosed Standard Terms of Representation describe the basis on which our Firm will provide legal services to the Client. You will be our principal Client contact for this Matter. If you have questions concerning any of the information provided in this letter, I welcome your call.

**Client**. For purposes of this engagement, and for present and future conflicts of interest purposes, our client is MSY Capital Partners, LLC and not any of its parents, subsidiaries, affiliates, partners, or individual owners, officers, directors, managers, employees, or agents, unless we otherwise agree in writing and/or in a separate engagement letter. Accordingly, representation of the Client in this Matter will not give rise to any conflict of interest in the event other clients of the Firm are adverse to any of such other entities or persons affiliated with the Client.

**Scope of Engagement**. We have agreed that our engagement is limited to performing services related to the Matter only, unless we agree in writing that it shall also apply for other existing or future matters. Our engagement does not include any advice or other legal services relating to federal or state tax laws, federal or state securities laws, bankruptcy laws, or the filing of UCC financing statements, unless we otherwise agree in writing.

**Fees; Costs; Payment**. I will have primary responsibility for this matter, together with the assistance of other lawyers or paralegals from time to time as the need arises. We have agreed that fees for our services will be based on a 5% discount from our normal hourly rates, subject to

DYKEMA

MSY Capital Partners, LLC
January 22, 2020
Page 2

final approval of the Firm prior to the commencement of any work on the Matter.  My current hourly rate is $395 (after discount $375.25).  A monthly invoice will be furnished to you, which will include an itemization of legal services and reimbursable disbursement costs.  Payment is due upon receipt.  Unless special arrangements are otherwise made, invoices from third parties may be forwarded to the Client for direct payment.  The financial terms of our representation are further described in the enclosed Standard Terms of Representation.

As we discussed, we require a retainer of $500 in connection with this Matter.  This retainer will be held by us in a non-interest bearing client trust account, and will be applied to the Firm's last statement, unless we opt to apply it to earlier billings not paid on time.  We reserve the right to request the replenishment of or an increase in the amount of the retainer.

**Standard Terms of Representation.**  Additional information regarding fees and other important matters appear in the enclosed Standard Terms of Representation, which are incorporated as part of this letter and which the Client should review carefully before agreeing to our engagement.

You are encouraged to consult with other counsel on any of the terms of this letter and the attachments, including the waiver provisions thereof.

Please indicate the Client's acceptance of the terms of this letter and the Standard Terms of Representation by signing and returning a copy of this letter to me with the retainer.  If you do not sign and return this letter, but use our services, such use shall be considered your acceptance of this engagement letter and the enclosed Standard Terms of Representation.

We are delighted that you have chosen to refer this Matter to us, and we look forward to working with you.

Very truly yours,

**DYKEMA GOSSETT, PLLC**

Agreed to and Accepted:

MSY Capital Partners, LLC

By: GREGORY YATOOMA                    Date:  1/22/2020

# Exhibit 5

## Agreement

1. Chris pays Greg $18,300,000 cash:
    1. $1,700,000 with signed agreement: $500,000 by 12/16/22 and $1.2M upon final signed agreement no later than 12/22/22.
    2. $220k/month starting May 1, 2023, with a standard promissory note from Chris personally.
    3. Greg will collect and keep the invoices that are due from Jeff (based on $155k owed - not a credit against money owed).
    4. Neither Chris nor Greg will pursue the receivables ███████████████████
    5. Payments are unconditional.
    6. Chris is taking all assets and all liabilities (no excluded liabilities).
2. Ownership transfer of Bloomfield Hills Swim and Tennis – Chris can still have privileges.
3. Lake Orion house for Greg's in-laws.
4. Whatever cash ████████████████████
5. 100% of CT deal with Jeff
6. 100% of NJ deal with Jeff
7. Non-interference in any business operations, excluding ███████, and committed transition assistance
8. Chris will pay the taxes for Axon, Grip and any other cannabis entities for all years including '21 and '22. If any of those returns are audited and there are additional taxes required, Chris will be responsible. Any income Greg received from Axon (not including the settlement payments) in '21 or '22 are included in the tax liability. Have to be timely filed (excluding '21) and Greg has to sign off on the returns as they are in his name.
9. Move Candid and Frequency Wellness out of Greg's name as soon as possible (by the end of the year if possible).
10. $5M balloon payment towards the payoff amount if/when ███ pays all of their balloon payments in full.
11. Chris pays Greg's health insurance, other benefits, lease payments until year end.
12. Greg assumes Kara's payroll effective January 1, 2023.
13. Chris will pay costs of improvements to Lake Orion house that have already been paid.
14. No interest charged on the payout amount.
15. Greg will provide all requested information and any opportunities he is or becomes aware of with the cannabis assets, and participate in a smooth transition until June 1, 2023 and will be supportive and provide assistance during this transition period.
16. Chris is willing to transfer the BHSAT asset at approximately $200K, as opposed to the value of $1.5M that was agreed upon. This result in a significant tax savings for Greg.
17. 50% of Liv Wellness lawsuit proceeds (split expenses – all decisions made together).

12/14/22
12:53
Steve RoMaya

Chris Yatooma

12:52 am
12/14/22
Chris Bassett

Greg Yatooma

# Exhibit 6

## CONSULTING AGREEMENT

This consulting agreement (the "Agreement") is made and entered into on April 8, 2022 by and between Jeffrey Yatooma, Hydra Real Estate Development, LLC, all of its agents, employees, representatives, and any and all associated or related parties and entities (collectively "Hydra") and Axon Properties, LLC, all of its agents, employees, representatives, and any and all associated or related parties and entities (Collectively "Axon"). This Agreement is made in connection with the acquisition and sale of certain assets, as defined herein. Hydra and Axon are each a "Party" and collectively the "Parties" to this Agreement.

### RECITALS

A. Hydra desires to procure, lease, purchase and acquire cannabis real estate and business licenses located in the State of New Jersey and State of Mississippi ("Asset or Assets").

B. Hydra further desires to improve, develop, operate, market, sell, transfer and/or otherwise convey Assets to prospective buyers or partners ("Revenue Event").

C. Axon has spent considerable time, effort and resource(s) in procuring and developing certain leads, contacts, knowledge and other proprietary information that assist in the acquisition of Assets ("Confidential Information").

D. Axon has agreed to provide Confidential Information to Hydra subject to the terms and conditions and contained herein.

E. In consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### AGREEMENT

1. **Consideration**.

   A. **Confidential Information.** Axon has provided Confidential Information to Hydra, which Confidential Information shall be held in strict confidence and shall not be disclosed to any third party, except as reasonably necessary to consummate the provisions of this Agreement. The parties shall keep this Agreement, the transactions contemplated hereby, and any information exchanged in furtherance hereof strictly confidential.

   B. **Consulting Fee.** Axon shall be entitled to twenty-five percent (25%) of the net revenue generated by any Revenue Event for any and all Assets, whether Hydra used the Confidential Information or not to procure such Assets ("Consulting Fee"). The Consulting Fee shall be paid to Axon out of the proceeds of a Revenue Event or within three (3) business days of the closing date of the Revenue Event if the Revenue Event not close through escrow. If the Revenue Event is the operation of the Asset(s), the Consulting Fee shall be paid monthly, and within ten (10) days after the end of the previous month. For the avoidance of doubt, Axon shall not be entitled to a Consulting Fee unless a Revenue Event is consummated.

2. **Indemnification**. The Parties shall indemnify, defend and hold harmless each other, including their agents, representatives, partners, officers, directors, attorneys and associates from and against any and all claims, suits, damages, liens, judgments, penalties, attorneys' fees,

DocuSign Envelope ID: 31A60ACD-E675-40EC-95BD-F9B4F4848D80

expenses and/or liabilities arising out of, involving, or in connection with, any of the Confidential Information or the Assets.

3. **Governing Law**.  This Agreement shall be governed by the laws of the State of Michigan and Buyer and its agents, officers, directors and representatives hereby consent to Jurisdiction and venue in Oakland County, Michigan.

4. **Warranty of Authority**.  The Parties represent and warrant that they have obtained all approvals and authorizations as are necessary for the execution, delivery, and performance of this Agreement and that this Agreement has been validly executed and delivered by each Party, and is binding upon and enforceable against each of them in accordance with its terms. Each person executing this Agreement on behalf of a Party represents and warrants that he, she, or it has full legal authority to bind the Party by his, her, or its signature on this Agreement.

5. **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes and cancels all prior negotiations, representations, understandings, and agreements between the Parties concerning this Agreement.

6. **No Drafting Presumption/Headings**.  No presumption shall arise based upon draftsmanship of this Settlement Agreement. Counsel for the Parties have participated in the preparation of this Settlement Agreement or have had ample opportunity to comment upon and/or suggest or require changes in the language prior to its execution. Additionally, the headings in this Settlement Agreement are for convenience of reference only and shall not be considered as part of this Settlement Agreement nor limit or otherwise affect the interpretation thereof.

7. **Obligation to Cooperate**.  The Parties agree to cooperate fully to provide, deliver or supplement any Confidential Information and to take all additional actions which may be reasonably necessary or appropriate to give force and effect to the basic terms and conditions and intent of this Agreement.

8. **Waiver of Defense of Illegality (the Zoma Clause)**.  Each party hereto hereby irrevocably waives any defense based on federal, state or local law or that the transactions contemplated by this agreement are void as against public policy or based on illegality under ANY federal, state or local law, including without limitation any federal cannabis laws. Each party hereto acknowledges that each state having jurisdiction over the Asset has enacted legislation regarding the legal cultivation, sale, and use of cannabis/marijuana, which may be in conflict with federal laws.  Each party expressly waives the right to present any defense related to the illegality of cannabis, the regulation of cannabis, or this agreement, and agrees that such defense(s) shall not be asserted, and will not apply, in any dispute or claim arising out of this Agreement.

*(Signature page to follow)*

2

In Witness Whereof, the undersigned have caused this Purchase Agreement to be executed as of the date first written above.


**Hydra Real Estate Development, LLC**

By: *Jeff Yatooma*
Name: Jeffrey Yatooma
Its: Member/Authorized Agent


**Axon Properties, LLC**

By: *Greg Yatooma*
Name: Gregory Yatooma
Its: Member/Authorized Agent

# Exhibit 7

| | |
|---|---|
| **From:** | <u>Chris Yatooma - MSY</u> |
| **To:** | <u>Gregory Yatooma - FYB</u> |
| **Cc:** | <u>Jamie Kjos</u>; <u>Bob Brandt</u> |
| **Subject:** | Agreement |
| **Date:** | Sunday, October 16, 2022 9:15:03 PM |

Gregory,

Below are the terms I understand we are agreed upon regarding our financial separation. Upon your confirmation, I will communicate the below and forward the draft agreement to tax and legal counsel for review. Based on the initial conversations I have had, there needs to be significant consideration given to how the agreement is structured from a tax perspective.

- $20M to be paid out as stated below:
  - $1.75M now
  - $250k/month starting May 1, 2023
- Ownership transfer of BHSAT (Chris can still offer membership to employees, use for events, and political signage)
- Greg retains ownership of Lake Orion house
- Retains company cash in his possession
- Half of proceeds from Liv Wellness lawsuit (split expenses – all decisions made together)
- Half the proceeds of Axon's share of Jeff's Connecticut license
- 6 month non-compete for Michigan, New Jersey, and New York, and committed transition

Love,
-Your brother, Chris

# Exhibit 8

DocuSign Envelope ID: B6A5B6C9-6D5F-4A90-AD2A-D19ACC3C9848

## AFFIDAVIT OF STEVE ROMAYA

**I, Steve Romaya, being duly sworn, depose and state as follows:**

1.      I am the cousin of Chris and Greg Yatooma and have personal knowledge of the facts stated herein and if called upon could competently testify as to the truth of the factual representations set forth in this Affidavit.

2.      I was previously a partner with Greg and Chris in a cannabis asset.  Chris and Greg, as the majority partners, jointly bought me out of that asset in early 2022.

3.      In the fall 2022, I was requested by Chris Yatooma to get involved in the partnership break up with his brother Greg, as Chris would often call me for an opinion or to act as a sounding board for him.

4.      At Chris's request, I was present at the meeting on December 14, 2022, which went on for about 9 hours and resulted in the signed agreement for Chris to buy Greg out of their joint business interests and I helped facilitate the final deal.

5.      I was also one of the signors that acted as witness to the agreement for Chris to buy Greg out of their jointly owned business interests on December 14, 2022 ("Partnership Buyout Agreement").

6.      It was always my understanding, the understanding of everyone else present and everyone who signed/witnessed that Partnership Buyout Agreement that the Partnership Buyout Agreement was a final and binding agreement on both Greg and Chris and contained all the terms upon which Greg agreed to sell his business interests to Chris.

4861-6097-5716.v1

7.      As part of the Partnership Buyout Agreement, Greg and Chris were splitting the MSY litigation proceeds 50/50 ("MSY Litigation Proceeds").

8.      The splitting of the MSY Litigation Proceeds was never in dispute and was never a point of contention in any discussions I was part of with Chris or Greg prior to the signing of the Partnership Buyout Agreement. At that time, the matter was on appeal.

9.      Chris then contacted me at the end of February 2023 to discuss settling the MSY litigation because Greg wanted to settle, but Chris did not, and since they were 50/50 partners, they both needed to agree.

10.     As confirmed in text communication with Greg, Chris, and their pastor, Chris agreed to settle the MSY litigation if Greg agreed to reduce Chris's payment obligations to Greg under the Partnership Buyout Agreement by a certain amount.

11.     Greg ultimately agreed, and Chris and Greg agreed to settle the MSY litigation at an agreed amount.

12.     At no time prior to the settling of the MSY litigation in March 2023, did Chris claim to me that he owned 100% of MSY or that Greg did not own 50% and/or had not interest or right in the proceeds of the MSY Litigation.

13.     Then, in late March or early April, Chris called me to tell me he was not going to allow the distribution of Greg's share of the  MSY Litigation Proceeds to Greg.

14.     Chris told me, in substance, that since signing the Partnership Buyout Agreement in December, Chris now believed that Greg did not deserve all the money that Chris had agreed to pay because Chris believed that Greg had breached their contract because Greg was working

2

DocuSign Envelope ID: B5A5B6C9-6D5F-4A90-AD2A-D19ACC3C8848

against him; and Chris also now thought the agreement was unfair because Chris was the one who would have to go to work every day and Chris thought that Greg would be able to sit at home and collect money from Chris.

15. I told Chris that I did not believe Greg was working against him.

16. We talked for roughly an hour and Chris told me he was going to try to use the MSY Litigation Proceeds to try to renegotiate the entire Partnership Buyout Agreement with Greg.

17. Chris said to me in substance, that he was going to try to keep Greg from getting his half of the MSY Litigation Proceeds and use that as leverage to get Greg to agree to walk away from the rest of the money Chris had agreed to pay him under the Partnership Buyout Agreement.

18. I told Chris I thought what he was doing was wrong and I did not agree with it.

19. I told Chris I thought that Chris should honor the agreement and his word.

20. Before we hung up, Chris asked me not to tell Greg about this conversation.

21. But after Greg told me that Chris was trying to keep Greg from getting his half of the MSY Litigation Proceeds, I felt compelled to tell Greg about this conversation with Chris and am providing this Affidavit because I believe what Chris is doing is wrong.

Further affiant sayeth not.

_____          5/17/2023
_____
Steve Romaya                                      Date

3

4861-6097-5716.v1

# Exhibit 9

| | |
|---|---|
| **From:** | Chris Yatooma - MSY |
| **To:** | Gavin Fleming |
| **Cc:** | Gregory Yatooma - FYB; Jim Teasdale |
| **Subject:** | Re: Funds Axon Properties, LLC Placed in FYB IOLTA During MRED/MSY v. Liv Case |
| **Date:** | Wednesday, December 14, 2022 4:11:39 PM |
| **Attachments:** | image001.jpg |
| | image001.jpg |

Thank you, Gavin, I appreciate you!

On Dec 14, 2022, at 4:05 PM, Gavin Fleming <fleming@fyblaw.com> wrote:

Hi Chris, praise Jesus, answered prayers!!! So happy for you guys.  Chris, I will be in the office tomorrow probably and Friday morning definitely, so I will get with Jim and sign a check.

Gavin

Gavin J. Fleming

Fleming Yatooma & Borowicz PLC
1615 S. Telegraph, Suite 300
248 231 9594
fleming@fyblaw.com

**From:** Chris Yatooma - MSY <cyatooma@msycapital.com>
**Sent:** Wednesday, December 14, 2022 4:03:44 PM
**To:** Gavin Fleming <fleming@fyblaw.com>
**Cc:** Gregory Yatooma - FYB <yatooma@fyblaw.com>; Jim Teasdale <jteasdale@ocgcompanies.com>
**Subject:** Re: Funds Axon Properties, LLC Placed in FYB IOLTA During MRED/MSY v. Liv Case

Hello Gavin, Greg and I resolved our issues yesterday. I would appreciate if we can transfer these escrowed funds back to Axon ASAP. Thanks.

On Nov 28, 2022, at 10:19 AM, Gavin Fleming <fleming@fyblaw.com> wrote:

Thanks for the input.

Gavin J. Fleming

Fleming Yatooma & Borowicz PLC
1615 S. Telegraph, Suite 300
248 231 9594
fleming@fyblaw.com

# Exhibit 10

# CHASE ○ *for* BUSINESS®

Printed from Chase for Business

## Matthew Checking (...6573)

### $500,000.00

Incoming wire
transfer

Dec 16, 2022
Posted date

Matthew Checking
(...6573)
Account name

▮▮▮▮▮▮▮▮▮▮▮
Transaction ID

▮▮▮▮▮▮▮▮▮▮▮
SWIFT/FED/CHIP ID

---

### Beneficiary information

| | |
|---|---|
| Account | ....6573 |
| Name | MATTHEW CONSULTING, LLC DBA GREGORY |
| Address | YATO OMA & ASSOCIATES 1605 S TELEGRAPH RD BLOOMFIELD HILLS MI 48302-0044 US |

### Bank information

| | |
|---|---|
| Related references | O/B CITIZENS ST |
| Bank reference number | ▮▮▮▮▮▮▮▮▮ |

### Additional information

| | |
|---|---|
| Additional information | AGREEMENT DATED 12/14/2022 |

---

For transaction details, please refer to the periodic statement for the official record of this transaction.

# Exhibit 11

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

**IN**

**AXON PROPERTIES LLC**

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of AXON PROPERTIES LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) of his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest, benefits, and liabilities, of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

*Greg Yatooma*
—213F1E37B94E48C...
_____
Gregory Yatooma, an individual

DocuSign Envelope ID: B59F58BB-AA1D-47F2-BC53-0F123FDE5570

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

**IN**

**MICHIGAN REAL ESTATE DEVELOPMENT, LLC**

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of MICHIGAN REAL ESTATE DEVELOPMENT, LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) of his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest, benefits, and liabilities, of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

_____
*Greg Yatooma*
213F1E37B94E48C...
Gregory Yatooma, an individual

## ASSIGNMENT OF MEMBERSHIP INTERESTS

### IN

### OAKLAND BUSINESS PARK, LLC

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of OAKLAND BUSINESS PARK, LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) of his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest, benefits and liabilities of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

*DocuSigned by:*

*Greg Yatooma*

—213F1E37B94E48C...

Gregory Yatooma, an individual

## ASSIGNMENT OF MEMBERSHIP INTERESTS

## IN

## BLUE SKIES FINANCING, LLC

Effective as of December 14, 2022, GREGORY YATOOMA, an individual ("Assignor"), sole member of BLUE SKIES FINANCING, LLC, a Michigan limited liability company (the "Company"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby assign, transfer and convey to Chris Yatooma ("Assignee") one hundred percent (100%) his membership interests in the Company (the "Assigned Interests"), together with all right, title, interest benefits and liabilities of any kind to which Assignor is entitled or subject to with respect to such Assigned Interests.

ASSIGNOR:

*Greg Yatooma*
213F1E37B94E48C...

Gregory Yatooma, an individual

# Exhibit 12

# QUIT CLAIM DEED

The Grantors
Gregory M. Yatooma as to 99% and Marlana Geha as to 1%, Tenants in Common, whose address at 1615 S. Telegraph Rd., Bloomfield Hills, MI 48302

Quit Claims to
299 N Berkshire, LLC, a Michigan limited liability company as to 99% and Marlana Geha as to 1%, Tenants in Common, whose address at 1615 S. Telegraph Rd., Bloomfield Hills, MI 48302

the following described premises situated in the Township of Bloomfield, County of Oakland, and State of Michigan, to wit:

Lot 28, Bloomfield Highlands Subdivision, according to the plat thereof as recorded in Liber 7 of Plats, Page 37, Oakland County Records.

Tax Parcel No.:      C-19-04-327-002
Commonly known as:   299 N. Berkshire Road, Bloomfield Hills, Michigan 48302

together with all tenements, hereditaments, and appurtenances thereto belonging or in any way appertaining for the sum of $1.00, subject to easements and restrictions of record. Exempt from transfer tax pursuant to MCL 207.526(a) (State) and MCL 207.505(a) (County).

Grantor grants to the Grantee the right to make zero (0) division(s) under Section 108 of the Land Division Act, Act No. 288 of the Public Acts of 1967.

This Property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

(Signatures on following pages)

1

GRANTORS:

Dated: January 27, 2023

_____
Gregory M. Yatooma, an individual


Dated: January ___ , 2023

_____
Marlana Geha, an individual


STATE OF MICHIGAN      )
                       ) SS
COUNTY OF OAKLAND      )

    The foregoing instrument was acknowledged before me this 27th day of January, 2023, by Gregory M. Yatooma, an individual, as his free act and will.

KARA HARBOUR
Notary Public - State of Michigan
County of Oakland
My Commission Expires Aug 2, 2027
Acting in the County of Oakland

_____
Notary Public, Oakland County, Michigan
My commission expires: August 2, 2027
Acting in Oakland County, Michigan


STATE OF MICHIGAN      )
                       ) SS
COUNTY OF OAKLAND      )

    The foregoing instrument was acknowledged before me this ____ day of January, 2023, by Marlana Geha, an individual, as her free act and will.

_____
Notary Public, _____ County, Michigan
My commission expires: _____
Acting in _____ County, Michigan


*Drafted by and when recorded return to:*
Mark R. James
Fleming Yatooma & Borowicz, PLC
1615 S. Telegraph Rd.
Bloomfield Hills, MI 48302

Tax Parcel: C-19-04-327-002

2

# Exhibit 13

## NEW JERSEY LICENSEE AGREEMENT

THIS NEW JERSEY LICENSEE AGREEMENT (this "Agreement") is made effective on December 31, 2022 (the "Effective Date") by and between Gregory Yatooma, an individual whose address is 127 S. Berkshire Road, Bloomfield Hills, MI 48302 ("Individual"), and Axon Properties LLC, a Michigan limited liability company, whose address is 1615 S. Telegraph Rd., Bloomfield Hills, Michigan 48302 ("Company"). Individual and Company are sometimes individually referred to as "Party" and collectively referred to as the "Parties."

WHEREAS, Company has worked with Individual and Candid Wellness LLC, a New Jersey limited liability company ("Applicant") to apply to the New Jersey Cannabis Regulatory Commission ("CRC") for a license to become a recreational cannabis retailer ("Retailer") in the State of New Jersey.

WHEREAS, Company agrees to hold Individual harmless from any claims and/or liabilities arising out of Company's actions in connection with the Application, as herein defined, to become a Retailer in the State of New Jersey.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, both hereby agree as follows:

### TERMS

1.    Application. The Parties have worked and shall continue to work together to prepare and apply for a license with the CRC for Applicant to become a Retailer in the State of New Jersey (the "Application"). Individual hereby agrees to fully comply with all instructions, lawful requirements, and submittals necessary to complete each process of the Application. Individual hereby understands that in order to be approved to become a Retailer in the State of New Jersey, Applicant must submit and receive approval of two separate applications; approval from the municipality in which Applicant seeks to do business within the State of New Jersey ("Municipal Approval") and an approval from the State of New Jersey ("State Approval"). The Application reflects that Individual holds forty-nine (49%) percent ownership interest in Applicant ("Individual Ownership").

2.    Transfer of Individual Ownership to Company. Within ten (10) business days after Applicant's receipt of the State Approval, and for valuable consideration already received by Individual, Company and Individual shall commence the transfer the Individual Ownership to Company. The obligation to transfer the Individual Ownership shall survive the death or incapacity of Individual. Individual acknowledges and agrees that (a) Company would be irreparably damaged if Individual were to breach its transfer obligations herein for which money damages would be an insufficient remedy, and (b) the covenants set forth in this paragraph were a material inducement to Company entering into and performing its obligations hereunder, and Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Parties if Individual breached the provisions set forth in this paragraph. Accordingly, Company will be entitled to specific performance in the event Individual refuses to or is unable to comply with the transfer obligations contained in this paragraph.

3.    Hold Harmless, Indemnification. Individual is not liable for, and Company shall indemnify, defend, and hold Individual harmless from the payment of taxes, any tax liability, for any violation of any state, local or municipal laws or for any other claim, lawsuits, enforcement actions, losses, demands, lawsuit, causes of action, liability, investigations, fines, sanctions, losses of any kind and nature, damage, injury, expenses, charges, obligations of any kind whatsoever (collectively, "Claims"), whether brought by an individual or other entity, or imposed by a court of law or by administrative action of any federal, state, or local governmental body or agency, arising out of, in any way whatsoever, any acts, omissions,

1

negligence, or willful misconduct on the part of Applicant, its officers, owners, personnel, employees, agents, contractors, or volunteers. In no event shall Company be required to defend, indemnify, or hold Individual harmless from any Claims resulting from Individual's willful misconduct. This indemnification applies to and includes, without limitation, the payment of all penalties, fines, judgments, awards, and decrees.

4.     <u>Notice of Any Potential Claim</u>. Company shall immediately notify Individual in writing in the event of potential Claim received by it directly involving Individual in addition to any communications from any state, local or municipal government or agency which arose prior to the Effective Date, or which may affect Individual in anyway. Individual shall immediately notify Company in writing in the event of potential Claim received by him in addition to any communications from any state, local or municipal government or agency which arose prior to the Effective Date, or which may affect Individual in any way.

5.     <u>Tax Liability</u>. Individual is not liable for the payment of taxes or any tax liability whatsoever in connection with Applicant and the Application or business transactions conducted by Applicant subsequent to becoming licensed, and such liability shall be the responsibility of the Company.

6.     <u>Authority to Enter Agreement</u>. Each Party warrants that the individuals who have signed this Agreement have the actual legal power, right, and authority to make this Agreement and bind each respective Party.

7.     <u>Amendment; Modification</u>. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing and signed by both Parties.

8.     <u>Waiver</u>. No waiver of any default shall constitute a waiver of any other default or breach, whether of the same or other covenant or condition. No waiver, benefit, privilege, or service voluntarily given or performed by a Party shall give the other Party any contractual right by custom, estoppel, or otherwise.

9.     <u>Entire Agreement</u>. This Agreement, together with the December 14 Agreement, contains the entire agreement between the Parties related to the Individual Ownership, Individual's obligation to transfer the Individual Ownership to Company, Company's sole liability for payment of taxes, and Company's obligation to indemnify Individual.

10.    <u>Enforceability, Severability, and Blue Pencil</u>. If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited. In the event that any aspect of this Agreement is determined to be unenforceable by a court of competent jurisdiction, then such court is empowered to modify this Agreement to give the broadest possible interpretation permitted under Michigan law.

11.    <u>Assignment</u>. Except as otherwise specifically provided in this Agreement, Individual may not assign all or any portion of its rights under this Agreement without the prior approval of the CRC and Company's written consent, which consent shall not be unreasonably withheld, provided that Company may freely assign all of its rights under this Agreement. Any attempted assignment in violation of this provision shall be void. The provisions hereof shall be binding upon and inure to the benefit of the Parties, their successors and permitted assigns.

12.    <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of Michigan, without giving effect to conflicts of laws principles. The Parties hereto agree and

acknowledge that no Party makes, will make, or shall be deemed to make or have made any representation or warranty of any kind regarding the compliance of this Agreement with any Federal Cannabis Laws. No Party hereto shall have any right of rescission or amendment arising out of or relating to any non-compliance with Federal Cannabis Laws unless such non-compliance also constitutes a violation of applicable state law as determined in accordance with by the CRC, and no party shall seek to enforce the provisions hereof in federal court unless and until the parties have reasonably determined that the applicable law is fully compliant with Federal Cannabis Laws. As used herein, "Federal Cannabis Laws" means any U.S. federal laws, civil, criminal or otherwise, as such relate, either directly or indirectly, to the cultivation, harvesting, production, distribution, sale and possession of cannabis, marijuana or related substances or products containing or relating to the same, including, without limitation, the prohibition on drug trafficking under 21 U.S.C. § 841(a), et seq., the conspiracy statute under 18 U.S.C. § 846, the bar against aiding and abetting the conduct of an offense under 18 U.S.C. § 2, the bar against misprision of a felony (concealing another's felonious conduct) under 18 U.S.C. § 4, the bar against being an accessory after the fact to criminal conduct under 18 U.S.C. § 3, and federal money laundering statutes under 18 U.S.C. §§ 1956, 1957, and 1960 and the regulations and rules promulgated under any of the foregoing.

[Signatures on following page(s)]

New Jersey Licensee Agreement – Gregory Yatooma

IN WITNESS WHEREOF, the parties have executed and made effective this Agreement as of the Effective Date.

INDIVIDUAL

*Greg Yatooma*

Gregory Yatooma, an individual

COMPANY

Axon Properties LLC

By:   *Chris Yatooma*

Christopher Yatooma

Its:   Authorized Agent

New Jersey Licensee Agreement – Gregory Yatooma

**DocuSign**

## Certificate Of Completion

Envelope Id: 7FDBB3B16AD84AF0A3780C1A998AAD83
Subject: Complete with DocuSign: New Jersey Licensee Agreement - Greg Yatooma (3.17.2023).docx
Source Envelope:
Document Pages: 4
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 2
Initials: 0

Status: Completed

Envelope Originator:
Greg Yatooma
1615 S Telegraph Rd
nil
Bloomfield Township, MI  48302
Yatooma@FYBLaw.com
IP Address: 68.34.113.249

## Record Tracking

Status: Original
        3/17/2023 8:24:29 AM

Holder: Greg Yatooma
        Yatooma@FYBLaw.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Chris Yatooma | *Chris Yatooma* | Sent: 3/17/2023 8:25:52 AM |
| cyatooma@msycapital.com | 3B1D0CC3911D4E9... | Viewed: 3/17/2023 12:14:50 PM |
| President | | Signed: 3/17/2023 3:04:32 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 174.240.117.81 | |

Electronic Record and Signature Disclosure:
      Accepted: 3/17/2023 12:14:50 PM
      ID: aa14a8ca-3709-422a-a146-87ede0feceab

| | | |
|---|---|---|
| Greg Yatooma | *Greg Yatooma* | Sent: 3/17/2023 8:25:51 AM |
| yatooma@fyblaw.com | 213F1E37B94E48C... | Viewed: 3/17/2023 8:26:05 AM |
| Security Level: Email, Account Authentication (None) | | Signed: 3/17/2023 8:26:10 AM |
| | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 68.34.113.249 | |

Electronic Record and Signature Disclosure:
      Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mark James | COPIED | Sent: 3/17/2023 8:25:52 AM |
| james@fyblaw.com | | Viewed: 3/17/2023 11:27:08 AM |
| Security Level: Email, Account Authentication (None) | | |

Electronic Record and Signature Disclosure:
      Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/17/2023 8:25:52 AM |
| Certified Delivered | Security Checked | 3/17/2023 8:26:05 AM |
| Signing Complete | Security Checked | 3/17/2023 8:26:10 AM |
| Completed | Security Checked | 3/17/2023 3:04:32 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

# Exhibit 14

| | |
|---|---|
| **From:** | Rana Adou |
| **To:** | Chris Yatooma - OCG; Tony Denome; Gregory Yatooma - FYB |
| **Cc:** | Michelle Houbeck - MSY |
| **Subject:** | RE: [External] Bloomfield Hills Swim and Tennis LLC |
| **Date:** | Friday, March 17, 2023 2:40:49 PM |
| **Attachments:** | image001.png |

Thank you Chris!

Rana Adou
SVP- Business Development Team Leader
radou@micsb.com



NMLS #753800

32500 Woodward Ave.
Royal Oak, MI 48073
Work: 248.833.6720
Cell: 248.602.8169

**From:** Chris Yatooma - OCG <cyatooma@ocgcompanies.com>
**Sent:** Friday, March 17, 2023 2:35 PM
**To:** Rana Adou <radou@micsb.com>; Tony Denome <tdenome@msycapital.com>; Gregory Yatooma - FYB <yatooma@fyblaw.com>
**Cc:** Michelle Houbeck - MSY <mhoubeck@msycapital.com>
**Subject:** RE: Bloomfield Hills Swim and Tennis LLC

> **CAUTION: This email originated from outside the organization.**
> Do not click links or open attachments unless you recognize the sender and know the content is safe.

Approved.

Thanks, Rana.

**From:** Rana Adou <radou@micsb.com>
**Sent:** Friday, March 17, 2023 1:33 PM
**To:** Tony Denome <tdenome@msycapital.com>; Chris Yatooma - OCG <cyatooma@ocgcompanies.com>; Gregory Yatooma - FYB <yatooma@fyblaw.com>
**Cc:** Michelle Houbeck - MSY <mhoubeck@msycapital.com>
**Subject:** [External] Bloomfield Hills Swim and Tennis LLC
**Importance:** High

Hello

Chris and Tony, I am removing you from the above account. and adding Greg a sole owner.

Chris and Tony if you could reply back approving the request. I can get started on preparing the documents today.

Thank you,



Rana Adou
SVP- Business Development Team Leader
radou@micsb.com



NMLS #753800
32500 Woodward Ave.
Royal Oak, MI 48073
Work: 248.833.6720
Cell: 248.602.8169

# Exhibit 15



License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT APPLICATION

This form is for applicants that have been prequalified or licensed under the Michigan Regulation and Taxation of Marihuana Act (MRTMA) or the Medical Marihuana Facilities Licensing Act (MMFLA) to submit a request for one of the following situations:

- Change of Ownership (Adding/Removing/Change of Equity)
- Change of Entity Name
- Conversion
- Asset Purchase

Applicants/Licensees shall report to the agency any proposed material changes to the marihuana business _before_ making a material change that may require prior authorization by the agency. Please be mindful of any social equity eligibility requirements prior to a change of ownership.

### Supporting Documents Checklists

**If proposing to add members:**
- ☑ Amendment Application
- ☑ Proposed Governing Documents
- ☑ Organizational Structure
- ☑ Authorizing Resolution

*Please note new supplemental applicants who have not already submitted a supplemental application with the CRA will be required to do so.

**If proposing to remove members:**
- ☑ Amendment Application
- ☑ Proposed Governing Documents
- ☑ Organizational Structure
- ☑ Authorizing Resolution or Withdrawal Letter

**If proposing change to equity only:**
- ☐ Amendment Application
- ☐ Proposed Governing Documents
- ☐ Organizational Structure
- ☐ Authorizing Resolution

**If proposing a change of entity name:**
- ☐ Amendment Application
- ☐ Proposed Governing Documents
- ☐ Organizational Structure
- ☐ Certificate of Amendment from LARA Corporations
- ☐ Articles of Organization
- ☐ Authorizing Resolution
- ☐ Certificate of Occupancy (required only if licensed)
- ☐ Insurance Policy (required only if licensed)
- ☐ Deed or Lease Agreement (required only if licensed)

**If proposing a conversion from one entity type to another:**
- ☐ Amendment Application
- ☐ Proposed Governing Documents
- ☐ Organizational Structure
- ☐ Certificate of Amendment from LARA Corporations
- ☐ Articles of Organization
- ☐ Authorizing Resolution
- ☐ Certificate of Occupancy (required only if licensed)
- ☐ Insurance Policy (required only if licensed)
- ☐ Deed or Lease Agreement (required only if licensed)

**If proposing an asset purchase:**
- ☐ Amendment Application
- ☐ Proposed Governing Documents – Purchaser
- ☐ Organizational Structure – Purchaser
- ☐ Purchase Agreement

*Please note a Step 2 license application will be required to be submitted by the purchaser once instructed to do so by the CRA. Please do not file a Step 2 application until you have received the request from the CRA.

Amendments must be filed on the Accela Citizen Access Portal. For more information about amendments, please view the amendments webpage on the CRA website. Please send all amendment-related communications to CRA-Amendments@Michigan.gov.

 CANNABIS
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT APPLICATION

Amendments must be filed on the Accela Citizen Access Portal. For more information about amendments, please view the amendments webpage on the CRA website. Please send all amendment-related communications to CRA-Amendments@Michigan.gov.

### General Information

| Main Applicant/Licensee Legal Name | Main Applicant/Licensee Prequalification Record Number (e.g., ERG-000000, AU-ER-000000) | | |
|---|---|---|---|
| Candid, Inc. | ERG-002700, AU-ER-000980 | | |
| **Email** | **Phone** | | |
| yatooma@fyblaw.com | (248) 459-8832 | | |
| **Mailing Address (including Suite, Unit, Building #'s)** | **City** | **State** | **Zip Code** |
| 1615 S. Telegraph Rd. | Bloomfield Hills | MI | 48302 |

### Amendment Type

- ☒ Change of Ownership (Adding/Removing/Change of Equity)
- ☐ Change of Entity Name
- ☐ Conversion
- ☐ Asset Purchase

### Provide a Detailed Description of the Proposed Amendment (i.e., removing John Doe as 50% owner of Entity A, LLC)

Gregory Yatooma, sole shareholder of Candid, Inc., is transferring 100% of Candid, Inc.'s stock to Joshua Smith, a prequalified individual.

### Person Completing Form

| Name (First, Middle, Last): | Affiliation with Entity: |
|---|---|
| Heather Vanderwalker Cude | Attorney |
| **Email Address:** | **Phone:** |
| Cude@fyblaw.com | (248) 496-6979 |

CRA 5398 (Revised Sept-2022)



**CANNABIS**
REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## AMENDMENT VERIFICATION & AFFIDAVIT OF FULL DISCLOSURE ATTESTATION
### Add additional pages of this form as necessary to account for multiple contact persons.

On behalf of _____Candid, Inc._____, I _____Gregory Yatooma, Shareholder_____,
           Legal Name of Amendment Applicant                     Name & Title of Individual Authorized to Sign on Behalf of Applicant

confirm the following:

1. I am the individual responsible for submitting this amendment application and have full authority to execute this amendment application.

2. I authorize the Cannabis Regulatory Agency (Agency) to add _____Heather Cude_____ to be a contact person for this amendment. I understand that this person will have access to this amendment record. Further, I understand that this person will retain access and is authorized to communicate with and receive communication from the Agency regarding only this amendment until the licensee submits an official request to remove this person's access and cease communication with this person. The contact information for this person is provided below.

3. The contact information to be used in communications regarding the amendment application named above is as follows:

    Contact E-mail Address: _____cude@fyblaw.com_____

    Contact Phone Number: _____(248) 496-6979_____

    Contact Person's ACA Login User ID (if applicable): _____heathercude_____
    (IMPORTANT: ACA Login User ID is required if the contact person needs to have access to online records.
    Please contact the Agency if you need assistance creating an ACA account.)

4. I authorize the person listed as the Person Completing Application within the demographic section of this application to be a contact person for the Agency for this amendment. I understand that this person will have access to records and material submitted to the Agency for the purposes of this amendment application. Further, I understand that this person will retain access and receive communication from the Agency regarding the applicant until the applicant submits an official request to remove this person's access and cease communication with this person.

5. I understand this requested amendment is a proposed change and cannot be executed prior to receiving approval from the Agency. To be compliant with the reporting requirements within the Michigan Regulation and Taxation of Marihuana Act (MRTMA), the Medical Marihuana Facilities Licensing Act (MMFLA), and the administrative rules: Applicants shall report to the agency any proposed material changes to the marihuana business before making a material change that may require prior authorization by the agency.

6. I affirm no conditions exist that would prevent this amendment from taking place once granted approval from the Agency.

7. Further, I affirm, under the penalties of perjury, that the information set forth in this amendment application and all related supporting documentation is true, complete, and accurate, and that no material information has been omitted. Further, I affirm all previously completed Attestations remain true, complete, and accurate, and that no material information has changed that has not been previously reported.

_____         _1-27-23_
Signature of Individual Authorized to Sign on Behalf of Main Applicant      Date

Subscribed and sworn to by _Gregory Yatooma_ before me on _January 27, 2023_
                (Authorized Individual Name)                    (Date)

_Kara Harbour_               _Kara Harbour_
(Notary Public Signature)                  (Notary Public Printed Name)

State of _Michigan_, County of _Oakland_, Acting in the county of _Oakland_, _Michigan_
                                              (county)            (state)

My commission expires: _August 2, 2027_



License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## MAIN ENTITY ORGANIZATIONAL STRUCTURE REQUIREMENTS & EXAMPLE

**Every main entity applicant must submit an organizational structure document that includes the following:**

| | |
|---|---|
| **Limited Liability Company** | All members, the spouses of all members holding a direct or indirect ownership interest of greater than 10% in the main applicant; all managers, and the spouses of all managers. |
| **Publicly Held Corporation** **Privately Held Corporation** | All corporate officers or persons with equivalent titles and their spouses; all directors and their spouses; all shareholders, and the spouses of all shareholders holding a direct or indirect ownership interest of greater than 10% in the main applicant. |
| **Trust** | All trustees; all individuals or bodies able to control or direct the affairs of the trust; all beneficiaries, and the spouses of all beneficiaries who receive or have the right to receive more than 10% of the gross or net profit of the trust during any full or partial calendar or fiscal year. |
| **Partnership** **Limited Liability Partnership** | All partners and the spouses of all partners. |
| **Limited Partnership** **Limited Liability Limited Partnership** | All general and limited partners and the spouses of all general and limited partners. |
| **Nonprofit Corporation** | All individuals and entities with membership or shareholder rights and the spouses of all individuals with shareholder rights. |

**Also Include:**

- **All managerial employees**, if applicable
  - An employee is considered a managerial employee if they have the ability to control and direct the affairs of the marijuana business and/or have the ability to make policy concerning the marijuana business.
- **Ownership percentages**
- **Officer titles**, if applicable (e.g., President, Vice President, Treasurer, Secretary; Chief Executive Officer, Chief Financial Officer, etc.)

**Those with less than 2.5% ownership interest in the main applicant and their spouses are not required to be disclosed.**

**Example:**



Ensure all entities and individuals listed on the organizational structure are disclosed on DISCLOSURE OF OWNERSHIP on the next two pages.



# CANNABIS
## REGULATORY AGENCY

License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## DISCLOSURE OF OWNERSHIP

| Candid, Inc. | (248) 459-8832 |
|---|---|
| Entity Name | Phone No. |

## Parties & Spouses

**Disclose all managerial employees and the following for the entity types below.** Add additional pages of this disclosure if necessary.

- **For a limited liability company (LLC):** Disclose all managers, all members that have greater than 10% direct or indirect ownership interest and/or that exercise control over or participate in the management of the LLC, and the spouses of these individuals.
- **For a publicly or privately held corporation:** Disclose all corporate officers or persons with equivalent titles, all directors, all shareholders holding a direct or indirect interest of greater than 10% in the corporation, and the spouses of these individuals.
- **For a trust:** Disclose all trustees, all individuals or bodies able to control or direct the affairs of the trust, all beneficiaries receiving or who have the right to receive greater than 10% of the gross or net profit of the trust during any full or partial calendar or fiscal year, and the spouses of these beneficiaries.
- **For a partnership or limited liability partnership:** Disclose all partners and their spouses.
- **For a limited partnership and limited liability limited partnership:** Disclose all general and limited partners with greater than 10% ownership interest and their spouses.
- **For a nonprofit corporation:** Disclose all entities and individuals with membership or shareholder rights and their spouses.

| Entity or Individual Name | FEIN or SSN | E-mail Address | Date of Birth (if applicable) | Is the Individual Married? |
|---|---|---|---|---|
| Joshua Smith | 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 | smith@axonprop.com | 06/01/1974 | ☒ Yes ☐ No |
| Rebecca Smith (spouse) | 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 | rlsmith299@gmail.com | 04/25/1973 | ☒ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No |



License Maintenance Section | Licensing Division
P.O. Box 30205, Lansing, MI 48909
Telephone: 517-284-8599
CRA-Amendments@Michigan.gov

## DISCLOSURE OF OWNERSHIP, CONTINUED

| Candid, Inc. | (248)459-8832 |
|---|---|
| Entity Name | Phone No. |

### Ten Percent or Less

List all entities and individuals with **10% or less** direct or indirect ownership in the entity for which this application is being completed. Those holding **less than 2.5%** direct or indirect ownership interest in the main entity are not required to be disclosed.

- For a **limited liability company (LLC):** Disclose all members with 10% or less ownership interest in the main applicant seeking licensure.
- For a **publicly and privately held corporation:** Disclose all shareholders holding an interest of 10% or less in the main applicant seeking licensure. Shareholders holding an interest of 5% or less in the main applicant seeking licensure are not required to be disclosed.
- For a **trust:** Disclose all beneficiaries receiving or who have the right to receive 10% or less of the gross or net profit of the trust during any full or partial calendar or fiscal year
- For a **limited partnership and limited liability limited partnership:** Disclose all general and limited partners with 10% or less ownership interest.

| Entity or Individual Name | Mailing Address | Email Address | Date of Birth (if applicable) |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# Exhibit 16

SHAREHOLDER RESOLUTION CONDITIONALLY APPROVING TRANSFER OF SHARES

WHEREAS, pursuant to the By Laws of this corporation (the "Company"), it is deemed desirable and in the best interests of Candid, Inc., a Michigan corporation, that the following actions be taken by the Shareholder (s) of this Company pursuant to this Written Consent:

NOW, THEREFORE, BE IT RESOLVED that the undersigned Shareholder of this Company hereby consents to, approves, and adopts the following:

**CONDITIONAL TRANSFER OF SHARES**.

RESOLVED that this Company sell and issue its Shares to the person(s) set forth below and for the consideration set forth below; that such shares shall be deemed fully paid and nonassessable; and that the Managing Shareholder has determined that the consideration reflects fair value for the shares.

| Name | Percentage of Shares | Consideration |
|------|---------------------|---------------|
| Joshua Smith | 100% | Previously Paid |

FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares.

The undersigned member of this limited liability company consents and agrees to the above on this 24th day of February 2023

_____          _____
Gregory Yatooma, Shareholder                         Date
                                                          2/24/23

# Exhibit 17



**Dykema Gossett PLLC**
39577 Woodward Avenue
Suite 300
Bloomfield Hills, MI 48304
WWW.DYKEMA.COM
Tel:  (248) 203-0700
Fax: (248) 203-0763

**Brian M. Moore**
Direct Dial: (248) 203-0772
Direct Fax: (855) 236-1295
Email: BMoore@dykema.com

April 20, 2023                                                            *Via Email Only*

Ethan Holtz, Esq.
eholtz@taftlaw.com

Anthony  Bologna, Esq.
ab@consultingpllc.com

        Re:      **MSY/LWC – Distribution of Bond Proceeds**

Dear Ethan & Anthony:

        Pursuant to the Confidential Settlement Agreement effective March 10, 2023 ("Settlement Agreement"), and in connection with the $21,000,000 bond which was being held by the circuit court to secure the outstanding judgment pending appeal ("Bond"), Dykema agreed that the circuit court could distribute the Bond to Dykema's IOLTA account and Dykema would then distribute $14,000,000 of the Bond to MSY Capital Partners, LLC  ("MSY") and $7,000,000 of the Bond to Liv Wellness Center, LLC ("LWC").  Dykema agreed to do this with the understanding that the Bond would be held by Dykema for a very short period of time after the effective date of the Settlement Agreement and, importantly, there was no dispute concerning the distribution of the Bond.  It was also Dykema's understanding during this engagement that Chris Yatooma and Greg Yatooma each held a 50% membership interest in MSY.

        After the circuit court distributed the Bond to Dykema, Dykema received conflicting wiring instructions from Chris and Greg with respect to the distribution of the Bond to MSY.  Dykema disbursed $7,000,000 to LWC and advised Chris and Greg that it would not distribute the $14,000,000 to MSY until it received joint wiring instructions from Chris and Greg.  Since that time, Dykema has received conflicting information and documents from Chris and Greg as to who are the members of MSY and who has authority to act on behalf of MSY.  Chris maintains he has been and remains the sole member of MSY, while Greg maintains that Chris and Greg each hold a 50% interest in MSY.  Both Chris and Greg maintain that they have the authority to act on behalf of MSY to direct the disposition of the funds.  Dykema understands there is not a written operating agreement.

        As we have discussed, it is very unfortunate and disappointing that Chris and Greg have put Dykema in this position.  I have encouraged each of you to exchange the information and documents provided to Dykema and to endeavor to resolve this matter.  Based on our separate calls on April 17, 2023, I understood that Chris and Greg agreed to put the funds in escrow to be held by another holder.  At this time, Dykema will not distribute the $14,000,000 bond proceeds to MSY until it receives either (i) joint wiring instructions from Chris and Greg with respect to some

**Dykema**

Ethan Holtz, Esq.
Anthony Bologna, Esq.
April 20, 2023
Page 2

or all of these bond proceeds, (ii) an escrow agreement executed by Chris and Greg to move the funds to another holder, or (ii) a court order directing the distribution of these bond proceeds. Please know that Dykema will not hold these proceeds indefinitely.  In the event Dykema does not receive joint wiring instructions, an escrow agreement or a court order by April 28, 2023, Dykema reserves the right to interplead the funds with the Court.

Please let me know if you have any questions.

Sincerely,

**Dykema Gossett PLLC**

Brian M. Moore

cc:      Lance Boldrey, Esq.

# Exhibit 18

**Greg Yatooma**

| | |
|---|---|
| **From:** | CRA-Amendments <CRA-Amendments@michigan.gov> |
| **Sent:** | Monday, October 23, 2023 6:32 AM |
| **To:** | Heather Cude |
| **Cc:** | Gregory Manuel |
| **Subject:** | RE: Amendment Application Withdrawal - CA-001658 |

Good Morning,

This amendment has been withdrawn per your request.

Thank you,

*Brook*
License Maintenance Section
Licensing Division
Cannabis Regulatory Agency
Mon-Thurs 6:30am - 5:00pm



---

**From:** Heather Cude <cude@milegalgroup.com>
**Sent:** Friday, October 20, 2023 10:17 AM
**To:** CRA-Amendments <CRA-Amendments@michigan.gov>
**Cc:** Gregory Manuel <yatoomag@gmail.com>
**Subject:** Re: Amendment Application Withdrawal - CA-001658

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Good Morning,

I just wanted to confirm that this withdrawal form has been received and is being processed as it is imperative that this application be withdrawn. Please let me know if anything further is needed.

Thank you,

Heather Cude
Michigan Legal Group, PLC
cude@milegalgroup.com
(248) 496-6979

1

Get Outlook for iOS

_____

**From:** Heather Cude <cude@milegalgroup.com>
**Sent:** Thursday, October 19, 2023 8:22 PM
**To:** CRA-Amendments <CRA-Amendments@michigan.gov>
**Cc:** Gregory Manuel <yatoomag@gmail.com>
**Subject:** Amendment Application Withdrawal - CA-001658

Good evening,

Please see the attached request to withdraw Candid, Inc.'s pending amendment application CA-001658.

I would request this withdrawal be effectuated as soon as possible.  Please let me know when it has been processed and the application is withdrawn.


Thank you kindly,

Heather Cude
Michigan Legal Group, PLC
cude@milegalgroup.com
(248) 496-6979

# **Exhibit 19**



# **Exhibit 20**

**Archived:** Monday, August 28, 2023 2:58:23 PM
**From:** Rich Stopczy
**Sent:** Friday, February 17, 2023 11:26:48 AM
**To:** Gregory Yatooma - FYB
**Cc:** Kara Harbour - FYB
**Subject:** Domains that need to be transferred to our GoDaddy
**Importance:** Normal
**Sensitivity:** None

---

Hi Greg,

I hope you are doing well and staying safe.
We have setup a GoDaddy account, and need to get the domains transferred over for our emails.
It seems really easy to do 
https://www.godaddy.com/help/transfer-my-domain-to-another-godaddy-account-822

Our GoDaddy account email is godaddy@axonprop.com
If you need anything else please let me know.

Here are the domains:

## Domains

+ Add domain    ✉ Buy domain    ↻ Refresh

| | Domain name ↑ | | Status |
|---|---|---|---|
| ☐ | ocgcompanies.com (Default) | ⋮ | ⚠ Possible service issues |
| ☐ | altitudegrp.com | ⋮ | ⚠ Possible service issues |
| ☐ | axonprop.com | ⋮ | ⚠ Possible service issues |
| ☐ | blueskiesfinancing.com | ⋮ | ⚠ Possible service issues |
| ☐ | cannabisinvoices.com | ⋮ | ⚠ Possible service issues |
| ☐ | fyblaw.com | ⋮ | ⚠ Possible service issues |
| ☐ | gripcannabis.com | ⋮ | ⚠ Possible service issues |
| ☐ | henryyandt.com | ⋮ | ⚠ Possible service issues |
| ☐ | msycapital.com | ⋮ | ⚠ Possible service issues |
| ☐ | oaklandbusinesspark.com | ⋮ | ⚠ Possible service issues |
| ☐ | ocgcompanies.onmicrosoft.com | ⋮ | ✔ Healthy |
| ☐ | outdoorcreationsgroup.com | ⋮ | ⚠ Possible service issues |
| ☐ | walton-co.com | ⋮ | ⚠ Possible service issues |

Thank you,
Rich

# Exhibit 21

**12/20/2022 2:32 PM**
Mr. Greg iPhone (+12484598832)

U: jaimerowland77@gmail.com
P: JumboShrimp65!

Ignore how lame my password is 😂

**2/17/2023 11:32 AM**
Mr. Greg iPhone (+12484598832)

Hey Rich. Got your email.  Give me a shout at your convenience

**2/17/2023 12:11 PM (Viewed 2/17/2023 12:14 PM)**
Rich Stopczy (5866309417)

File attachment with MIME type: video/quicktime

**2/17/2023 12:14 PM**
Rich Stopczy (5866309417)

File attachment with MIME type: image/png

**2/17/2023 12:28 PM**
Rich Stopczy (5866309417)

File attachment with MIME type: image/png

**2/17/2023 12:37 PM (Viewed 2/17/2023 12:38 PM)**
Rich Stopczy (5866309417)

Chris is in a meeting as soon as he comes out I will talk to him.

**2/17/2023 12:56 PM**
Mr. Greg iPhone (+12484598832)

All the copies of my FYB email are deleted now off of Michelle's computer?

**2/17/2023 12:57 PM**
Rich Stopczy (5866309417)

Yes and the saved searches. There are no copies anywhere.

**2/17/2023 12:57 PM**
Mr. Greg iPhone (+12484598832)

Do you have a copy of the saved searches?

**2/17/2023 12:57 PM**
Rich Stopczy (5866309417)

No

**2/17/2023 12:57 PM (Delivered 2/17/2023 12:58 PM)**
Mr. Greg iPhone (+12484598832)

What kind of searches?

**2/17/2023 12:59 PM**
Rich Stopczy (5866309417)

Content Search is how a pst copy is pulled. I sent you the video of deleting those.

**2/17/2023 1:00 PM**
Rich Stopczy (5866309417)

I already stopped by and texted Chris to poke him to talk

**2/17/2023 1:00 PM**
Mr. Greg iPhone (+12484598832)

Can you show me in the video for hte saved searches?

20

**2/17/2023 1:02 PM**

Rich Stopczy (5866309417)



🔲These three.

**2/17/2023 1:03 PM**

Rich Stopczy (5866309417)

Once deleted the results are destroyed.

**2/17/2023 1:03 PM**
Mr. Greg iPhone (+12484598832)

Ok thx. We're there any saved searches where you can see what emails they were accessing?

**2/17/2023 1:05 PM**

Rich Stopczy (5866309417)

In the details it would have shown just your mailbox sorry deleted before opening that :/

**2/17/2023 1:05 PM**
Mr. Greg iPhone (+12484598832)

No worries.  If you are able to recover the searches they did, that woudl be great...but if not, i get it.

**2/17/2023 1:05 PM**
Mr. Greg iPhone (+12484598832)

Thank you for your honesty.  I know this has been difficult on you.

**2/17/2023 1:05 PM (Delivered 2/17/2023 1:46 PM)**
Mr. Greg iPhone (+12484598832)

Im soryr

21

**2/19/2023 8:05 AM**
Mr. Greg iPhone (+12484598832)

Are you available to talk this morning?

**2/21/2023 9:24 AM**
Mr. Greg iPhone (+12484598832)

Rich, it's my understanding you are transferring the FYB emails today.  Please advise on timing
so I can work with Kara on same.

Message sent originally as iMessage and failed. Re-sent later as SMS.

150 total messages and 23 total images.

# Exhibit 22

DocuSign Envelope ID: 187821FD-7855-A286-A29C-897BEE719541

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA

      Plaintiff,                      Case No. 23- 200283-CB

v.                                       Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY CAPITAL PARTNERS, LLC,

      Defendants.

---

### DECLARATION OF GREGORY YATOOMA

I, Gregory Yatooma, being first duly sworn, deposes and states as follows:

1.      I write this declaration based upon my personal knowledge and would testify competently as stated if called to do the same.

2.      On December 20, 2022, Rich Stopczy (Stopczy") came to my house and removed my and my assistant's, Kara Harbour ("Harbour"), access to servers previously shared with Christopher Yatooma ("Chris"), in furtherance of the sale of my businesses to Chris on December 14, 2022.

3.      On February 17, 2023, Stopczy sent me an email in which he identified certain accounts for which the domains were to be transferred from my GoDaddy to a GoDaddy held by Chris. My law firm, Fleming Yatooma and Borowicz ("FYB") was among those accounts.

4.      Upon receipt of that email, I sent Stopczy a text message and asked him for a phone call. Stopczy and I spoke that afternoon.

5.      During the call, I asked Stopczy why he included FYB on the list of domains to be transferred to Chris.

6.      Stopczy said the list was auto generated based on emails to which he had access or

DocuSign Envelope ID: 187821FD-7855-4286-A29C-807BEF7105A1

control.

7.     I once again asked Stopczy why FYB was on that list because Chris should not have access to FYB.

8.     Stopczy admitted to me that he still had access to FYB and could access it through his previous administrative permissions.

9.     After an extended silence from Stopczy, Greg asked Stopczy several times if he had accessed Greg's emails since I was bought out on December 14, 2022.

10.    Stopczy finally admitted the following to me:

- Chris had been pressuring Stopczy to access my FYB emails since the buyout on December 14, 2022;

- Stopczy at first refused several times because he thought it was wrong and possibly illegal, but ultimately agreed to do so after Chris assured him that a lawyer said Stopczy was "fully covered";

- Stopczy downloaded my entire FYB email on January 13, 2023 which consisted of 159,859 emails and again on February 14, 2023 which consisted of another 1,254 emails between January 14 and February 14, 2023;

- Stopczy saved my entire FYB email to Michelle Houbeck's computer in a PST file;

- At the direction of Chris, Houbeck, Chris's assistant, was instructed to run searches in Greg's email for certain key words and phrases and print those emails for Chris's review and use;

- Stopczy said he had not been able to sleep since he downloaded my inbox because he felt so bad and that he was going to do everything he could to make it right; and

- He was going to tell Chris that he and I talked and that he was going to tell Chris he would no longer be a part of this scheme with Chris and Houbeck.

11.    Thereafter, Stopczy sent me several videos that he claimed evidenced that he was deleting my entire FYB email account from Chris's/Houbeck's computer and he confirmed via text message that no other copies existed.

DocuSign Envelope ID: 183821FD-7855-4286-A29C-807BEF719541

12.     I then added Harbour to our call because Stopczy was going to work with Harbour to assign over the FYB email admin permissions to my new Microsoft SharePoint account..

13.     While Stopczy, Harbour, and I were on the call commencing the transfer, I heard Houbeck yelling at Stopczy and demanding that he see Chris immediately.

14.     The line then went dead and Stopczy (presumably at the demand of Chris) blocked my number so I could no longer contact him.

15.     Chris, through Rich, still has access to my FYB email and refuses to relinquish his admin access to me.

Further declarant sayeth not.

DocuSigned by:

*Greg Yatooma*

213F1E37B94E48C...

GREGORY YATOOMA

# Exhibit 23

## AFFIDAVIT OF KEVIN OBERLE

**I, Kevin Oberle, being duly sworn, depose and state as follows:**

1 • I write this affidavit based upon my personal knowledge and would testify competently as stated if called to do the same.

2 • In August 2022, Gregory Yatooma ("Greg") hired me as the Director of Business Operations at Axon Properties, LLC ("Axon").

3 • As Axon's Director of Business Operations, I reported to Greg and was responsible for Axon's property acquisitions and other business development aspects of the business.

4 • In or around December 2022, I was informed that Christopher Yatooma ("Chris") bought Greg out of Axon.

5 • Due to the buyout, I reported to Chris and Chris instructed me not to talk to Greg.

6 • In January 2023, Chris informed me and other Axon employees that he had "new information" regarding business in a certain municipality and instructed me to pursue certain business opportunities based on the "new information."

7 • Chris's instructions were contrary to all information available to me and other Axon employees.

8 • Accordingly, an Axon employee asked Chris how he obtained the "new information."

9 • Chris responded vaguely that he had a "source" and we were to simply follow

his instructions.

10 • Prior to my termination, it came to light that Chris was accessing Greg's email at the same time that Chris stated that he had a "source".

11 • It is my understanding and firm belief that Chris was using information in Greg's email as his "source" of information.

12 • In addition, Chris asked me to apply for prequalification with the Cannabis Regulatory Authority ("CRA") so he could put his cannabis assets in my name.

13 • It was my understanding that Chris could not have his name associated with any cannabis business because he wanted to conceal his cannabis involvement from certain of his other business interests.

14 • Consequently, Chris asked his employees to be prequalified with the CRA, accept assignment of the CRA regulated entities, then sign an agreement indicating that Chris was the ultimate owner of the CRA regulated entity.

15 • Although I would have the company prequalified in my name, Chris would remain the sole "owner" of the CRA regulated entities at all times, and would retain all decision making authority and profit.

16 • I agreed to apply for prequalification on behalf of myself and my wife because I saw it as an opportunity to be a team player.

17 • Chris directed me to work with other Axon employees to submit an application for prequalification to the CRA on my behalf in the name of Flaming Dragon, LLC ("Flaming Dragon").

18 • Axon paid all expenses incurred in connection with the application.

19 • The CRA approved my prequalification for Flaming Dragon.

20 • After Chris bought Greg out of their businesses, Chris asked me to put Candid, Inc., one of Greg's operating CRA regulated entities, in my name.

21 • Chris pressured me to agree and encouraged me to "be a team player."

22 • Because Candid, Inc. was an operating entity, I had no knowledge of its operations, assets, or liabilities beyond that it had significant assets, and I did not have a clear understanding of the risk involved, I did not want to put Candid, Inc. in my name.

23 • At the same time, another Axon employee, Josh Smith, became prequalified with the CRA.

24 • Josh Smith agreed to put Candid, Inc. in his name.

25 • Shortly thereafter, I was terminated from Axon without cause (which Axon confirmed in writing on April 26, 2023) and told to transfer Flaming Dragon to another Axon employee.

26 • Prior to transferring Flaming Dragon, I requested indemnification for Flaming Dragon.

27 • Axon agreed and on June 8, 2023, I received an indemnification agreement signed by Tyler Ruby, President of Axon (**Exhibit A**).

28 • On July 26, 2023, at Chris's instruction, I transferred Flaming Dragon to Joe Gordhamer (**Exhibit B**).

29 • I was not compensated for having Flaming Dragon in my name for Chris's

3

benefit or for transferring Flaming Dragon to Joe Gordhamer.

Further affiant sayeth not.

KEVIN OBERLE

Subscribed and sworn to before me this
_15_ day of _September_, 2023

Notary Public, State of Michigan, County, _wayne_
My Commission Expires: _10/10/2025_
Acting in the County of _wayne_

DAVID AVERY
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
MY COMMISSION EXPIRES OCT 10, 2025
ACTING IN THE COUNTY OF _wayne_

4

**EXHIBIT A**



### INDEMNIFICATION AGREEMENT

In consideration of the transfer of his membership interest in Flaming Dragon, LLC, a Michigan limited liability company (FD) to Joe Gordhamer (Transferee), Axon Properties, LLC, a Michigan limited liability company (Axon), shall indemnify, hold harmless, and defend Kevin Oberle, personally (Indemnitee), against any losses, claims, damages, or liabilities to any such person in connection with any matter involving the operation of Flaming Dragon, LLC, except to the extent that any such loss, claim, damages, or liability have resulted from the gross negligence, bad faith, willful misfeasance, or reckless disregard by Indemnitee of its obligations or duties.

Acknowledged and agreed to on _June 8, 2023._

AXON PROPERTIES, LLC

By: Tyler Ruby
Its: President

---

## AFFIDAVIT OF TYLER RUBY
## IN REGARD TO FLAMING DRAGON, LLC

I, TYLER RUBY, being duly sworn, depose and state as follows:

1. I am over twenty-one years of age and have personal knowledge of the facts stated herein and if called upon could competently testify as to the truth of the factual representations set forth in this Affidavit.

2. I am familiar with the entity Flaming Dragon, LLC, a Michigan limited liability company endorsed by the Michigan Department of Licensing and Regulatory Affairs on November 15, 2022 and otherwise established by its organizer, Kevin Oberle.

3. As of the date of this Affidavit, I am the President of Axon Properties, LLC, a Michigan limited liability company.

4. Kevin Oberle is personally known to me and was a former employee of Axon Properties, LLC.

5. I have no personal knowledge of any transactions entered on behalf of Flaming Dragon, LLC.

6. I have no personal knowledge of any agreements entered by anyone as an authorized agent of Flaming Dragon, LLC.

7. I have never instructed any person to enter into any agreements as an authorized agent of Flaming Dragon, LLC.

Further affiant sayeth not.

_____
Tyler Ruby

Subscribed and sworn to before me
this ___8th___ day of June ___, 2023

_____
Pamela Hust

# EXHIBIT B

### RESOLUTION OF FLAMING DRAGON, LLC

The undersigned, being all the Members of Flaming Dragon, LLC, a Michigan Limited Liability Company, take the following actions by and hereby adopt the following resolutions:

**RESOLVED**, that Kevin Oberle is transferring 100% of his ownership interest in Flaming Dragon, LLC to Joseph Gordhamer.

**FURTHER RESOLVED**, any such actions taken before the date of these resolutions by Kevin Oberle are ratified and confirmed.

**COMPANY:**

Flaming Dragon, LLC

Dated: 7-2C-2)

By:_____

Kevin Oberle

**MEMBER(S):**

Dated: 7-2C-23

By:_____

Kevin Oberle

STATE OF MICHIGAN
THE CIRCUIT COURT
FOR THE COUNTY OF OAKLAND
1200 N. TELEGRAPH ROAD, PONTIAC MI 48341

CASE NO. 2023-200283-CB   YATOOMA,GREGORY,,                VS YATOOMA,CHRISTOPHER,,

THE ABOVE CASE HAS BEEN ASSIGNED FOR SETTL CONF 0830AM JUDGE VALENTINE    ON 10-11-24

YOU WILL RECEIVE NO FURTHER NOTICE. NO CONTINUANCES WILL BE GRANTED EXCEPT FOR GOOD CAUSE
AND WITH THE APPROVAL OF THE ASSIGNED JUDGE.


**HEARING/TRIAL NOTICE**

J. ADAM BEHRENDT          P58607
201 W BIG BEAVER RD STE 500
TROY              MI  48084-4160


**YOU ARE SCHEDULED FOR A VIRTUAL HEARING**                    11-09-23
VISIT HTTPS://WWW.OAKGOV.COM/COURTS/ZOOM    FOR MORE INFO    CASE MANAGEMENT OFFICE
ZOOM MEETING ID: 2488585282                                    248-858-0350

STATE OF MICHIGAN
THE CIRCUIT COURT
FOR THE COUNTY OF OAKLAND
1200 N. TELEGRAPH ROAD, PONTIAC MI 48341

CASE NO. 2023-200283-CB  YATOOMA,GREGORY,,  VS YATOOMA,CHRISTOPHER,,

THE ABOVE CASE HAS BEEN ASSIGNED FOR SETTL CONF 0830AM JUDGE VALENTINE   ON 09-13-24

YOU WILL RECEIVE NO FURTHER NOTICE. NO CONTINUANCES WILL BE GRANTED EXCEPT FOR GOOD CAUSE
AND WITH THE APPROVAL OF THE ASSIGNED JUDGE.


**HEARING/TRIAL NOTICE**

    J. ADAM BEHRENDT         P58607
    201 W BIG BEAVER RD STE 500
    TROY              MI  48084-4160


**YOU ARE SCHEDULED FOR A VIRTUAL HEARING**                    11-09-23
VISIT HTTPS://WWW.OAKGOV.COM/COURTS/ZOOM    FOR MORE INFO    CASE MANAGEMENT OFFICE
ZOOM MEETING ID: 2488585282                                  248-858-0350

STATE OF MICHIGAN
THE CIRCUIT COURT
FOR THE COUNTY OF OAKLAND
1200 N. TELEGRAPH ROAD, PONTIAC MI 48341

CASE NO. 2023-200283-CB  YATOOMA,GREGORY,,          VS YATOOMA,CHRISTOPHER,,

THE ABOVE CASE HAS BEEN ASSIGNED FOR TRIAL     0830AM JUDGE VALENTINE     ON 10-28-24

YOU WILL RECEIVE NO FURTHER NOTICE. NO CONTINUANCES WILL BE GRANTED EXCEPT FOR GOOD CAUSE
AND WITH THE APPROVAL OF THE ASSIGNED JUDGE.


**HEARING/TRIAL NOTICE**

J. ADAM BEHRENDT          P58607
201 W BIG BEAVER RD STE 500
TROY               MI  48084-4160


**YOU ARE REQUIRED TO APPEAR IN PERSON **          11-09-23
VISIT HTTPS://WWW.OAKGOV.COM/COURTS/CIRCUIT  FOR MORE INFO    CASE MANAGEMENT OFFICE
248-858-0350

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

     Plaintiff,

v.

CHRISTOPHER YATOOMA, an individual,
MSY CAPITAL PARTNERS, LLC, a
Michigan limited liability company,

     Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant Chris Yatooma*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

## STIPULATED SCHEDULING ORDER

At a session of said Court held in the City of Pontiac,
County of Oakland, State of Michigan on   11/9/2023
PRESENT: Honorable Victoria Valentine
Business Court Judge

    This matter having come before the Court upon the stipulation of the parties, and the Court

being fully advised in the premises, the Court hereby enters the following Scheduling Order:

| Close of Discovery | August 1, 2024 |
|---|---|
| Expert Disclosure Deadline | April 1, 2024 |
| Expert Report Deadline | June 24, 2024 |
| Fact Witness List | February 15, 2024 |
| Mediation Deadline | April 1, 2024 |
| Settlement Conference | October 11 , 2024 |
| Dispositive Motions Filed and Heard by | August 30, 2024 |
| Pre-Trial Conference | September 13 , 2024 |
| Motions in Limine Filed and Heard by | October 14, 2024 |
| Jury Trial | October 28, 2024 |

This order is not a final order and does not resolve the last pending claim in this case.

**IT IS SO ORDERED.**

/s/ Victoria A. Valentine
November 9, 2023

_____
Hon. Victoria Valentine
MT

Stipulated as to form:

/s/ Ethan R. Holtz
_____
Ethan R. Holtz (P71884)
*Attorneys for Plaintiffs*

/s/ J. Adam Behrendt
_____
J. Adam Behrendt (P58607)
*Attorneys for Defendant Christopher Yatooma*

129687647v1

DocuSign Envelope ID: 262769FA-5B6B-46B1-9E80-B8C26261A46E

**Summons** (3/23)

Case No. __23-200283-CB__

FILED    Received for Filing    Oakland County Clerk    11/13/2023 9:24 AM

## PROOF OF SERVICE

**TO PROCESS SERVER**: You must serve the summons and complaint and file proof of service with the court clerk before the expiration date on the summons. If you are unable to complete service, you must return this original and all copies to the court clerk.

## CERTIFICATE OF SERVICE / NONSERVICE

☐ I served ☐ personally ☐ by registered or certified mail, return receipt requested, and delivery restricted to the the addressee (copy of return receipt attached)    a copy of the summons and the complaint, together with the attachments listed below, on:

☐ I have attempted to serve a copy of the summons and complaint, together with the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

☐ I am a sheriff, deputy sheriff, bailiff, appointed court officer or attorney for a party.

☐ I am a legally competent adult who is not a party or an officer of a corporate party. I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Fee | | Signature |
|---|---|---|---|---|
| $ | | $ | | |
| Incorrect address fee | Miles traveled | Fee | TOTAL FEE | Name (type or print) |
| $ | | $ | $ | |

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of a copy of the summons and complaint, together with

None

_____ on _11/10/2023_____ .

Attachments (if any)                                            Date and time

*J. Adam Behrendt*
0F37273B7B4E43C...

Signature   J. Adam Behrendt          on behalf of   Michelle Houbeck

Name (type or print)

MCL 600.1910, MCR 2.104, MCR 2.105

| Approved, SCAO | | | Original - Court | 2nd copy - Plaintiff |
| | | | 1st copy - Defendant | 3rd copy - Return |

| **STATE OF MICHIGAN** | **SUMMONS** | **CASE NO.** |
| 6th JUDICIAL DISTRICT / JUDICIAL CIRCUIT / COUNTY | | 23-200283-CB |

| Court address | Court telephone no. |
| 1200 N Telegraph Rd, Pontiac, MI 48341 | (248) 858-0582 |

| Plaintiff's name, address, and telephone no. | | Defendant's name, address, and telephone no. |
| GREGORY YATOOMA | v | MICHELLE HOUBECK |
| | | This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling. |

| Plaintiff's attorney, bar no., address, and telephone no. |
| Ethan R. Holtz (P71884) |
| Taft Stettinius & Hollister LLP |
| 27777 Franklin Road, Suite 2500 |
| Southfield, MI 48034 |
| (248) 351-3000 |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk. **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date | Court clerk |
| 11/8/2023 | 02/07/2024 | Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

| MC 01 (3/23) | **SUMMONS** | MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105 |

FILED    Received for Filing    Oakland County Clerk    11/8/2023 8:12 AM

DocuSign Envelope ID: 262769FA-5B6B-46B1-9E80-B8C26261A46E

**Summons** (3/23)                                                                  Case No. $\underline{\text{23-200283-CB}}$

**Received for Filing    Oakland County Clerk    11/13/2023 9:24 AM**

**FILED**

## PROOF OF SERVICE

**TO PROCESS SERVER**: You must serve the summons and complaint and file proof of service with the court clerk before the expiration date on the summons. If you are unable to complete service, you must return this original and all copies to the court clerk.

## CERTIFICATE OF SERVICE / NONSERVICE

☐ I served   ☐ personally   ☐ by registered or certified mail, return receipt requested, and delivery restricted to the the addressee (copy of return receipt attached)   a copy of the summons and the complaint, together with the attachments listed below, on:

☐ I have attempted to serve a copy of the summons and complaint, together with the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|------|--------------------------|
| Place or address of service | |
| Attachments (if any) | |

☐ I am a sheriff, deputy sheriff, bailiff, appointed court officer or attorney for a party.

☐ I am a legally competent adult who is not a party or an officer of a corporate party. I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---------------|----------------|-------|--|-----------|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of a copy of the summons and complaint, together with

Attachments (if any)   None                                            on   11/10/2023   .
                                                                               Date and time

Signature   *J. Adam Behrendt*                                         on behalf of   Rich Stopczy
            └─ DocuSigned by: ─┘
            0F37273B7B4E43C...

Name (type or print)   J. Adam Behrendt

MCL 600.1910, MCR 2.104, MCR 2.105

DocuSign Envelope ID: 262769FA-5B6B-46B1-9E80-B3C26261A46E

Approved, SCAO

| | | Original - Court | 2nd copy - Plaintiff |
|---|---|---|---|
| | | 1st copy - Defendant | 3rd copy - Return |

| **STATE OF MICHIGAN** | **SUMMONS** | **CASE NO.** |
|---|---|---|
| 6th   **JUDICIAL DISTRICT**<br>**JUDICIAL CIRCUIT**<br>**COUNTY** | | 23-200283-CB |

| Court address | Court telephone no. |
|---|---|
| 1200 N Telegraph Rd, Pontiac, MI 48341 | (248) 858-0582 |

| Plaintiff's name, address, and telephone no. | | Defendant's name, address, and telephone no. |
|---|---|---|
| GREGORY YATOOMA | v | RICH STOPCZY |
| Plaintiff's attorney, bar no., address, and telephone no.<br>Ethan R. Holtz (P71884)<br>Taft Stettinius & Hollister LLP<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000 | | This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling. |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.      **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 11/8/2023 | 02/07/2024 | Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (3/23)   **SUMMONS**                                    MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

FILED    Received for Filing    Oakland County Clerk    11/8/2023 8:12 AM

lm

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

      Plaintiffs,

v.

CHRISTOPHER YATOOMA, an individual, MSY
CAPITAL PARTNERS, LLC, a Michigan limited
liability company, RICH STOPCZY, an individual,
MICHELLE HOUBECK, an individual,

      Defendants.

Case No. 23-200283-CB

Hon. Victoria A. Valentine

**NOTICE OF PRESENTMENT
OF ORDER UNDER 7 DAY
RULE**

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
*Counsel for Defendant Chris Yatooma*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher
Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI  48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

11/14/2023 10:09 AM   Oakland County Clerk

FILED   Received for Filing

4862-3964-3536_1

## NOTICE OF PRESENTMENT OF ORDER UNDER 7-DAY RULE

TO: COUNSEL/INTERESTED PARTIES:

The attached **ORDER DENYING PLAINTIFF'S MOTION TO APPOINT RECEIVER OVER CANDID, INC** is being served on all attorneys and interested parties to this Case.  If you wish to object to the form of o the Order, you must (i) file written objections to entry of this Order with the Court within seven (7) days of service of this Notice, MCR 2.602(B)(3)(a), "state with specificity the inaccuracy or omission" you believe exits, MCR 2.602(B)(3)(c), and notice the objection or hearing with the Court.

If no objections are filed, the Order will be submitted by the Clerk to Hon. Victoria Valentine for entry on November 21, 2023.

Respectfully submitted,

BODMAN PLC


By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
Michelle Kolkmeyer (P81355)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Plaintiffs/Counter-Defendants*


Dated:  November 14, 2023

4862-3964-3536_1

# **PROPOSED ORDER**

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA, an individual,

    Plaintiffs,

v.

CHRISTOPHER YATOOMA, an individual, MSY
CAPITAL PARTNERS, LLC, a Michigan limited
liability company, RICH STOPCZY, an individual,
MICHELLE HOUBECK, an individual,

    Defendants.

Case No. 23-200283-CB

Hon. Victoria A. Valentine

**ORDER DENYING PLAINTIFF'S
MOTION  TO APPOINT
RECEIVER OVER CANDID, INC.**

PROPOSED

---

| | |
|---|---|
| **TAFT STETTINIUS & HOLLISTER LLP** | **BODMAN PLC** |
| Ethan R. Holtz (P71884) | J. Adam Behrendt (P58607) |
| Emily M. Mayer (P78956) | Melissa Benton Moore (P73018) |
| *Attorneys for Plaintiff* | *Counsel for Defendant Chris Yatooma* |
| 27777 Franklin Road, Suite 2500 | 201 W. Big Beaver Road, Suite 500 |
| Southfield, MI 48034 | Troy, MI 48084 |
| (248) 351-3000 | (248) 743-6000 |
| eholtz@taftlaw.com | jbehrendt@bodmanlaw.com |
| emayer@taftlaw.com | mmoore@bodmanlaw.com |
| | |
| | **URBAN LEGAL GROUP** |
| | Jeffery R. Sieving (P71625) |
| | *Co-Counsel for Defendant Christopher Yatooma* |
| | 1615 S. Telegraph Road |
| | Bloomfield Hills, MI  48302 |
| | (248) 230-2820 |
| | sieving@urbanlegalgroup.com |

---

4862-3964-3536_1

**ORDER DENYING PLAINTIFF'S MOTION**
**TO APPOINT RECEIVER OVER CANDID, INC.**

At a session of said Court held in
City of Pontiac, Oakland County, State of Michigan,

on _____

PRESENT: _____
Hon. Victoria A. Valentine

This matter comes before the Court on plaintiff's October 25, 2023 motion for appointment of receiver over Candid, Inc. The Court has reviewed the parties' written submissions and held a hearing on November 8, 2023 at which time it heard argument of counsel. Now, therefore, and having otherwise been fully advised on the premises;

IT IS HEREBY ORDERED that plaintiff's motion is denied for the reasons state on the record.

IT IS SO ORDERED.

_____PROPOSED_____
CIRCUIT COURT JUDGE

4862-3964-3536_1

RECEIVED: 11/14
OBJECTIONS:NO
SIGNED:MT

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA, an individual,

    Plaintiffs,

v.

CHRISTOPHER YATOOMA, an individual, MSY
CAPITAL PARTNERS, LLC, a Michigan limited
liability company, RICH STOPCZY, an individual,
MICHELLE HOUBECK, an individual,

    Defendants.

Case No. 23-200283-CB

Hon. Victoria A. Valentine

**ORDER DENYING PLAINTIFF'S
MOTION TO APPOINT
RECEIVER OVER CANDID, INC.**

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
*Counsel for Defendant Chris Yatooma*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com
mmoore@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher
Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

4862-3964-3536_1

**ORDER DENYING PLAINTIFF'S MOTION**
**TO APPOINT RECEIVER OVER CANDID, INC.**

At a session of said Court held in
City of Pontiac, Oakland County, State of Michigan,

on _____11/22/2023_____

PRESENT:   __VICTORIA A VALENTINE__
Hon. Victoria A. Valentine

This matter comes before the Court on plaintiff's October 25, 2023 motion for appointment

of receiver over Candid, Inc. The Court has reviewed the parties' written submissions and held a

hearing on November 8, 2023 at which time it heard argument of counsel. Now, therefore, and

having otherwise been fully advised on the premises;

IT IS HEREBY ORDERED that plaintiff's motion is denied for the reasons state on the

record.

IT IS SO ORDERED.

/s/ Victoria A. Valentine
November 22, 2023
_____
CIRCUIT COURT JUDGE
VICTORIA A VALENTINE
MT

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

     Plaintiff,

v.

CHRISTOPHER YATOOMA, an individual, MSY CAPITAL PARTNERS, LLC, a Michigan limited liability company, RICH STOPCZY, an individual, MICHELLE HOUBECK,

     Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant Chris Yatooma,*
*Defendant Rich Stopczy, and Defendant*
*Michelle Houbeck*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher*
*Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

**NOTICE OF HEARING**

*Document Submitted for Filing to MI Oakland County 6th Circuit Court.*

PLEASE TAKE NOTICE that *Plaintiff's Motion to Compel Defendant Chris Yatooma to Respond to Discovery Requests.* will be brought on for hearing before the Honorable Victoria A. Valentine at the Oakland County Circuit Court on **Wednesday, December 6, 2023 at 8:30 a.m.** and will be held via Zoom.

You are scheduled to join a virtual courtroom proceeding before the Honorable Victoria A. Valentine in Oakland County 6th Circuit Court. Please visit the link below on the Monday afternoon prior to the hearing date to see the scheduled time of your proceedings:

https://docs.google.com/spreadsheets/d/1E9FzqhczMJGsJXQjJ1cDZk1yglKJ2TkYkZWdNgK3u Tc/edit?usp=sharing

Zoom Instructions: To join the Virtual Hearing by computer with video, go to the Zoom Web Site (zoom.us) and click on "Join a Call." When prompted, you will join using Meeting ID 248 858 5282. To join the Virtual Meeting by telephone without video, call 1-646-876-9923 and connect using Meeting ID 248 858 5282.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: November 29, 2023          By:     /s/ Ethan R. Holtz
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

2

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

      Plaintiff,

v.

CHRISTOPHER YATOOMA, an individual, MSY CAPITAL PARTNERS, LLC, a Michigan limited liability company, RICH STOPCZY, an individual, MICHELLE HOUBECK,

      Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant Chris Yatooma,*
*Defendant Rich Stopczy, and Defendant*
*Michelle Houbeck*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher*
*Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

## PLAINTIFF'S MOTION TO COMPEL DEFENDANT CHRIS YATOOMA TO RESPOND TO DISCOVERY REQUESTS

Plaintiff Gregory Yatooma ("Greg"), an individual, by his undersigned counsel, submits this Motion to Compel Defendant Christopher Yatooma ("Chris") to fully and completely respond to Greg's Discovery Requests (the "Motion"), and states as follows:

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## **RELEVANT FACTS**

1.      Greg and Chris are brothers.

2.      In 2016, Greg's and Chris's brother Jeffrey Yatooma ("Jeff") approached Greg and Chris and proposed that the three brothers start a venture in Michigan's emerging cannabis industry, including principally, among other things, obtaining municipal cannabis licenses for various types of licensed business and selling those entities at a profit to operators.

3.      Greg and Chris agreed and, over the next several years, Greg, Chris, and Jeff worked together in many business ventures they owned and/or operated together as partners/members, including but not limited to, MSY, Michigan Real Estate Development, LLC ("MRED"), and other entities formed for the use of their cannabis business partnership ("Partnership Entities").

4.      Since the three were brothers, Greg, Chris, and Jeff were not concerned with documenting their ownership interests in each of the Partnership Entities they formed to carry out their business, which were usually single-purpose limited liability companies that usually lacked operating agreements and/or other formal documentation of the brothers' ownership interests.

5.      But it was always agreed and understood between Greg, Chris, and Jeff that the Partnership Entities were each owned 1/3 by each brother respectively.

6.      From 2016-2018, Greg and Jeff primarily worked to grow the Partnership Entities in the cannabis industry while Chris largely provided some but not all of the financing and back office support.

7.      At the end of 2018, Jeff separated from Greg, Chris, and his interests in the various the Partnership Entities that existed at the time.

8.      After nearly a year of negotiations, on November 13, 2019, Greg, Chris, and Jeff executed a formal agreement pursuant to which Greg and Chris purchased Jeff's 1/3 interests in

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the Partnership Entities (the "Good Guy Agreement").

9.      The Good Guy Agreement states, in relevant part, that (a) Jeff, Greg, and Chris were involved in a cannabis business; and (b) Greg and Chris shall pay Jeff for his interests in the Partnership Entities.

10.     Greg and Chris purchased Jeff's interests in the Partnership Entities in accordance with the Good Guy Agreement.

11.     Upon such purchase, Greg and Chris owned the Joint Entities 50/50.

12.     Thereafter, Greg and Chris continued to work together, jointly owning and/or operating the Partnership Entities and continued to expand their holdings and joint operations, forming new partnership entities, along with various single purpose entities that owned property, and other assets (collectively, the "Joint Entities").

13.     Several of the Joint Entities were owned by Greg as the sole record owner.

14.     Because Greg and Chris were brothers, they continued their practice of not documenting their respective ownership of the Joint Entities.

15.     However, at all times Greg and Chris agreed and understood that both Greg and Chris were the 50/50 members/shareholders/owners of the Joint Entities through their larger partnership.

16.     Over the course of the brothers' business relationship, Greg was primarily responsible for the operations of the Joint Entities and Chris was primarily responsible for the finances and internal accounting of the Joint Entities.

17.     The Joint Entities accumulated significant assets, including real property and cannabis licenses, accounts receivable of more than $55 million, and other real estate and operating assets worth more than $100 million, which Greg and Chris owned equally 50/50.

129980964v1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

18.     In 2022, there was a significant breakdown in Greg's and Chris's relationship.

19.     In Fall 2022, Greg and Chris began negotiating a buyout of Greg's ownership and interest in the Joint Entities.

20.     After several months and several meetings, on December 14, 2022, Greg and Chris reached a written and binding agreement (the "Buyout Agreement"), signed by both parties and three witnesses, which contained the material terms of the buyout. **Exhibit 1, Buyout Agreement**.

21.     Pursuant to the Buyout Agreement, Greg agreed to assign his interests in several of the Joint Entities to Chris in exchange for payment of $18.3 million, on the following schedule: (a) $500,000.00 by December 16, 2022; (b) $1,200,000.00 no later than December 22, 2022; and (c) $220,000.00 per month beginning May 1, 2024. *Id*. All payments were "unconditional." *Id*.

22.     Pursuant to the Agreement, Greg retained the following: Ability to collect on invoices due from Jeff; Full ownership of Bloomfield Hills Swim and Tennis; 100% of the Connecticut deal with Jeff; 100% of the New Jersey deal with Jeff; A residence in Lake Orion, Michigan; and Interest in MSY and 50% of the MSY Litigation Proceeds. *Id*.

23.     The Joint Entities, with the exception of the above-identified assets Greg retained, are hereinafter referred to as the "Sold Assets."

24.     Each of the three witnesses will testify that the Buyout Agreement was intended to be binding and enforceable and was the culmination of months of negotiations between Greg and Chris.

25.     Steve Romaya, Greg's and Chris's cousin and one of the witnesses, attested: "It was always my understanding, the understanding of everyone else present and everyone who signed/witnessed that Partnership Buyout Agreement that the Partnership Buyout Agreement was a final and binding agreement on both Greg and Chris and contained all the terms upon which

129980964v1

Greg agreed to sell his business interests to Chris." **Exhibit 2, Romaya Affidavit, at ¶6.**

26.     Immediately after signing the Agreement on December 14, 2023, Chris emailed attorney Gavin Fleming, informed him that "Greg and I resolved our issues yesterday," and instructed Fleming to release $100,000.00 he was holding in escrow pending agreement between Greg and Chris regarding terms of the buyout. **Exhibit 3, Email to Fleming**.

27.     Prior to this litigation, Chris never stated to Greg that he believed the Buyout Agreement to be anything other than a binding and enforceable agreement between them.

28.     Chris initially complied with the Buyout Agreement, making the required $500,000.00 payment to Greg by December 16, 2022. **Exhibit 4, Wire with Memo Line**.

29.     Chris and Greg worked with Mark James, an attorney, to transfer ownership of the Sold Assets from Greg to Chris.

30.     Chris directed James to prepare ownership transfer documents of certain entities and assets and to send those documents to Greg for signature in furtherance of the Buyout Agreement.

31.     Pursuant to the Buyout Agreement, Greg executed all assignments and agreements that Mark James prepared. All of the assignments had an effective date of December 14, 2022, the date of the Buyout Agreement.

32.     In addition, Chris directed Heather Cude, another attorney, to prepare documents to transfer ownership of certain entities regulated by the CRA, including Frequency, Candid and Alchemy (the "Cannabis Entities") in furtherance of the Buyout Agreement.

33.     Because Chris was not prequalified with the CRA, Chris directed Cude to prepare the documents to transfer ownership of the Cannabis Entities from Greg and Ryan Jundt ("Jundt"), Chris's brother-in-law, to Chris's employees who were prequalified with the CRA.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

34.    All parties knew and understood that Greg was transferring the Cannabis Entities in furtherance of the Buyout Agreement.

35.    In addition, all parties knew and understood that Chris – who was not prequalified with the CRA – was transferring the Cannabis Entities to certain employees because they were prequalified, but that Chris would remain the beneficial owner of the Cannabis Entities.

36.    Pursuant to the Buyout Agreement, Greg also removed himself from all of the Sold Assets' bank accounts, for Chris's benefit.

37.    It is undisputed that Greg fully complied with the Buyout Agreement.

38.    The only remaining obligations pursuant to the Buyout Agreement were Chris's financial obligations to Greg identified in Sections 1.1 (with the exception of the $500,000 payment), 1.2, 1.8.

39.    It is undisputed that since signing the Buyout Agreement, Chris sold certain assets previously owned by the Joint Entities and has retained one hundred percent (100%) of the proceeds from such sales.

40.    Chris is using assets, funds, and other infrastructure of the Joint Entities for Chris's own personal benefit at the expense of Greg and the Joint Entities.

41.    As soon as Greg signed over his interests in the Sold Assets and removed himself from the bank accounts, Chris reneged on and breached the Buyout Agreement, by, among other things, refusing to make the $1.2 million payment due December 22, 2022 and attempting to take 100% of MSY Litigation Proceeds for himself.

42.    Chris also refused to make the $220,000 monthly payments that were to commence on May 1, 2023, completely repudiating his remaining obligations pursuant to the Buyout Agreement.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

43.     Greg accordingly commenced suit against Chris for his clear breach of the Buyout Agreement.

44.     In his Answer filed October 6, 2023, Chris claimed that Greg was never Chris's partner, Greg merely acted as the Joint Entities' attorney, and that "Greg wrongfully put [the Joint Entities] into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris."

45.     These and other assertions in Chris's Answer are false, as confirmed by multiple former employees and partners, and Chris's own testimony in the MSY Litigation.

46.     Chris further claims in his Answer that Chris only signed the Buyout Agreement because he was under "duress" (despite all evidence to the contrary) thus and again completely repudiating the Buyout Agreement and his obligations pursuant thereto.

47.     On these and other facts, Greg has asserted claims for breach of partnership, breach of fiduciary duties, breach of joint venture, breach of contract, promissory estoppel, unjust enrichment, fraudulent inducement, *inter alia*, against Chris.

## DISCOVERY REQUESTS & RESPONSES

48.     On July 20, 2023, Greg served Discovery Requests on Chris (the "First Discovery Requests"). **Exhibit 4, Chris's Objections & Responses to First Discovery Requests**. On September 1, 2023, Chris served written responses to the First Discovery Requests. *Id*.

49.     The First Discovery Requests seek production of the following categories of documents that are relevant to Greg's claims and Chris's defenses:

| Category | Chris's Objections |
|---|---|
| Documents and communications between Chris and specifically identified individuals "that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout | • Objects to the defined term "Buyout Agreement" because denies that the parties entered into a final and binding agreement<br>• Objects to the term "concern or relate to" as vague, overbroad, and unduly burdensome |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| | |
|---|---|
| Agreement and any term thereof, and/or this lawsuit" (RFP Nos. 3-30) | |
| Documents and communications between Chris and entities with which the Joint Entities have ongoing business (RFP Nos. 31-35) | • Objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome<br>• Objects that requests are not reasonably calculated to lead to the discovery of admissible evidence |
| Documents that Chris asked Greg to sign from December 13, 2022 to the present that Greg declined or refused to sign (RFP No. 39) | • Objects to the defined term "Buyout Agreement" because denies that the parties entered into a final and binding agreement<br>• Objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome |
| Corporate and financial documents of the Joint Entities (RFP Nos. 40-107) | • Objects to the term "concern or relate to" as vague, overbroad, and unduly burdensome |
| Recordings of conversations with or regarding Greg or the Buyout Agreement (RFP Nos. 108-109) | • Objects to the extent that Plaintiff was copied on, has access to, or otherwise is in possession, custody, or control of any such recordings. |

50.    On July 28, 2023, Greg served Second Discovery Requests on Chris (the "Second Discovery Requests"). **Exhibit 5, Chris's Objections & Responses to Second Discovery Requests**. On September 8, 2023, Chris served written responses to the Second Discovery Requests. *Id*.

51.    The Second Discovery Requests seek production of the following categories of documents that are relevant to Greg's claims and Chris's defenses:

| Category | Chris's Objections |
|---|---|
| Documents that concern or relate to any one or more purchase, sale, lease, conveyance, agreement, financing transaction, payment received, payment made, or distribution of funds made for or in connection with a specifically-identified real properties owned by the Joint Entities (RFP Nos. 12-18) | • Objects that requests seek information that is irrelevant to the claims or defenses in this action<br>• Objects that requests are is not reasonably calculated to lead to the discovery of admissible evidence |
| Documents that concern or relate to any permit, license or other asset or entity that permits, license, and/or allows the use, manufacturing, and/or sale of cannabis associated with specifically-identified real properties owned by the Joint Entities (RFP Nos. 13-17) | • Objects that requests seek information that is irrelevant to the claims or defenses in this action<br>• Objects that requests are is not reasonably calculated to lead to the discovery of admissible evidence |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

52.     On August 10, 2023, Greg served Third Discovery Requests on Chris (the "Third Discovery Requests"). **Exhibit 6, Chris's Objections & Responses to Third Discovery Requests**. On September 8, 2023, Chris served written responses to the Third Discovery Requests. *Id*.

53.     The Third Discovery Requests seek production of documents that support, concern, or relate to Chris's July 26, 2023 testimony before this Court that "… my brother, Greg, … was my attorney…"; "… my brother, Greg, … was …my general counsel…"; "… Greg's strategy, and he's -- he's said this to me in text and in communication is to continue to interfere with things."; Greg has "…interfered with the business."; Greg has "…interfered with other monies that was due to the company, coming to the company in a way to extort the best payment for himself."; "…I've paid 100 percent of the costs. Greg doesn't dispute that, so I've paid over a million dollars in costs."; "…I've advanced a million dollars in fees."; Greg has "…been very clear about to me that he's going to frustrate my business."; and Greg is "…doing that to extort the largest payment he can get or in this case, the largest settlement he can get.." *Id*. at RFP Nos. 1-9.

54.     Chris objected to all of those requests on the basis that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. *Id*.

55.     On September 29, 2023, Chris produced 1,429 pages of documents. Those documents fall into six categories: (a) documents that Chris believes pertain to ownership of MSY and, upon information and belief, Chris provided to the receiver; (b) Chase bank account statements for an account in the name of Christopher James & Associates, LLC d/b/a MSY Capital; (c) a November 16, 2022 email from Chris to Greg regarding their separation and attachments

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

thereto; (d) emails with Dykema Gossett regarding distribution of the MSY Litigation Proceeds; (e) deposition and trial transcripts from the MSY Litigation; and (f) text messages between Greg and Chris.

56.     As set forth more fully below, Chris has failed to produce documents responsive to the majority of Greg's discovery requests and should be compelled to do so.

## CHRIS SHOULD BE COMPELLED TO FULLY & COMPLETELY RESPOND TO THE FIRST, SECOND, AND THIRD DISCOVERY REQUESTS

57.     Pursuant to MCR 2.302(B)(1), "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case, taking into account all pertinent factors . . . [i]nformation within the scope of discovery need not be admissible in evidence to be discoverable."

58.     "Michigan law is strongly committed to open and far-reaching discovery, and generally provides for discovery of any relevant, nonprivileged matter." *Ostoin v. Waterford Twp Police Dept*, 189 Mich App 334 (1991). The rules are so liberal that a request need only "appear reasonably calculated to lead to the discovery of admissible evidence." *Bauroth v Hammoud*, 465 Mich 375, 378 (2001).

59.     The purpose of discovery is to simplify and clarify the contested issues, which is necessarily accomplished by the open discovery of all relevant facts and circumstances related to the controversy. *Reed Dairy Farms v Consumers Power Co*, 227 Mich App 614, 616 (1998). Discovery should be used to "promote the discovery of the facts and circumstances of a controversy, rather than aid in their concealment." *Id.*

60.     Consistent with these principles, Greg served the First, Second, and Third Discovery Requests on Chris, all of which are tailored to the issues in this case:

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| Category | Propriety of Requests |
|---|---|
| Documents and communications between Chris and specifically identified individuals "that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit" (First Requests 3-30) | These requests seek production of Chris's communications with individuals with whom Chris is likely to have communicated regarding topics that are directly related to the parties' claims and defenses in this case. Chris has not produced a single document responsive to these requests. |
| Documents and communications between Chris and entities with which the Joint Entities have ongoing business (First Requests 31-35) | These requests seek production of Chris's communications with entities with which the Joint Entities have ongoing business and are likely to aid in Greg's valuation of the Joint Entities, which is necessary to prove his damages, and will demonstrate that Chris is operating the Joint Entities to Greg's exclusion. Chris has not produced a single document responsive to these requests. |
| Documents that Chris asked Greg to sign from December 13, 2022 to the present that Greg declined or refused to sign (First Requests 39) | Documents responsive to this request will demonstrate that Greg fully and completely complied with his obligations pursuant to the Buyout Agreement and executed all documents that Chris asked him to execute. This is relevant to Greg's claims and Chris's defenses thereto. |
| Corporate and financial documents of the Joint Entities (First Requests 40-107) | Documents responsive to these requests will aid in Greg's valuation of the Joint Entities, which is necessary to prove his damages, and will demonstrate that Chris is operating the Joint Entities to Greg's exclusion. With the exception of certain MSY documents, Chris has not produced a single document responsive to these requests. |
| Recordings of conversations with or regarding Greg or the Buyout Agreement (First Requests 108-109) | These requests are limited to topics that are directly related to the parties' claims and defenses in this case. Chris has not produced a single document responsive to these requests. |
| Documents that concern or relate to any one or more purchase, sale, lease, conveyance, agreement, financing transaction, payment received, payment made, or distribution of funds made for or in connection with a specifically-identified real properties owned by the Joint Entities (Second Requests 12, 18) | Documents responsive to these requests will aid in Greg's valuation of the Joint Entities, which is necessary to prove his damages, and will demonstrate that Chris is operating the Joint Entities to Greg's exclusion. Chris has not produced a single document responsive to these requests. |
| Documents that concern or relate to any permit, license or other asset or entity that permits, license, and/or allows the use, | Documents responsive to these requests will aid in Greg's valuation of the Joint Entities, which is necessary to prove his damages, and will |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| | |
|---|---|
| manufacturing, and/or sale of cannabis associated with specifically-identified real properties owned by the Joint Entities (Second Requests 13-17) | demonstrate that Chris is operating the Joint Entities to Greg's exclusion. Chris has not produced a single document responsive to these requests. |
| Documents that support, concern, or relate to Chris's July 26, 2023 testimony before this Court (Third Requests 1-9) | These requests pertain to statements made to Chris before this Court concerning Greg and the parties' operation of the Joint Entities. Chris has not produced a single document responsive to these requests. |

61.     MCR 2.313(A) allows a party to bring a motion seeking an order compelling discovery if a party fails to produce or permit inspection of requested documents and/or fails to answer interrogatories.

62.     When a motion to compel is granted, MCR 2.313(A)(5) provides that the Court, after a hearing, may require the party whose conduct necessitated the motion or the attorney advising such conduct, or both, to pay to the moving party the reasonable expenses incurred in obtaining the order.

63.     As set forth in detail above, Greg's First, Second, and Third Discovery Requests seek documents from Chris that are relevant, proportional to the needs of the case, and are not otherwise protected by attorney-client or other privilege. Chris's boilerplate objections to the requests are unavailing and fall to meaningfully dispute the necessity of any of Greg's requests.

64.     Greg's Motion to Compel should be granted and Chris should be ordered to produce, within fourteen (14) days of the hearing on this motion to compel, all documents responsive to the following requests: First Discovery Requests RFP Nos. 3-35, 39-109; Second Discovery Requests RFP Nos. 12-18; Third Discovery Requests RFP Nos. 1-9.

WHEREFORE Greg, respectfully requests that the Court grant his Motion, compel Chris to fully and completely respond to the above-identified discovery requests within 14 days, and grant Greg such other and further relief as this Court deems just and proper.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: November 29, 2023

By:   <u>/s/ Ethan R. Holtz</u>
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA, an individual,

      Plaintiff,

v.

CHRISTOPHER YATOOMA, an individual, MSY CAPITAL PARTNERS, LLC, a Michigan limited liability company, RICH STOPCZY, an individual, MICHELLE HOUBECK,

      Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Counsel for Defendant Chris Yatooma,*
*Defendant Rich Stopczy, and Defendant*
*Michelle Houbeck*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher*
*Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEFENDANT CHRIS YATOOMA TO RESPOND TO DISCOVERY REQUESTS**

      For his Brief, Greg relies on and incorporates the authority and arguments in the accompanying motion.

129980964v1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

Dated: November 29, 2023

By:    /s/ Ethan R. Holtz
          Ethan R. Holtz (P71884)
          Emily M. Mayer (P78956)
          *Attorneys for Plaintiff*

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## Agreement

1. Chris pays Greg $18,300,000 cash:
   1. $1,700,000 with signed agreement: $500,000 by 12/16/22 and $1.2M upon final signed agreement no later than 12/22/22.
   2. $220k/month starting May 1, 2023, with a standard promissory note from Chris personally.
   3. Greg will collect and keep the invoices that are due from Jeff (based on $155k owed - not a credit against money owed).
   4. Neither Chris nor Greg will pursue the receivables for the manicure product (Ryan).
   5. Payments are unconditional.
   6. Chris is taking all assets and all liabilities (no excluded liabilities).
2. Ownership transfer of Bloomfield Hills Swim and Tennis – Chris can still have privileges.
3. Lake Orion house for Greg's in-laws.
4. Whatever cash Greg has in a safe in his house is Greg's.
5. 100% of CT deal with Jeff
6. 100% of NJ deal with Jeff
7. Non-interference in any business operations, excluding Auburn Hills, and committed transition assistance
8. Chris will pay the taxes for Axon, Grip and any other cannabis entities for all years including '21 and '22. If any of those returns are audited and there are additional taxes required, Chris will be responsible. Any income Greg received from Axon (not including the settlement payments) in '21 or '22 are included in the tax liability. Have to be timely filed (excluding '21) and Greg has to sign off on the returns as they are in his name.
9. Move Candid and Frequency Wellness out of Greg's name as soon as possible (by the end of the year if possible).
10. $5M balloon payment towards the payoff amount if/when Shryne pays all of their balloon payments in full.
11. Chris pays Greg's health insurance, other benefits, lease payments until year end.
12. Greg assumes Kara's payroll effective January 1, 2023.
13. Chris will pay costs of improvements to Lake Orion house that have already been paid.
14. No interest charged on the payout amount.
15. Greg will provide all requested information and any opportunities he is or becomes aware of with the cannabis assets, and participate in a smooth transition until June 1, 2023 and will be supportive and provide assistance during this transition period.
16. Chris is willing to transfer the BHSAT asset at approximately $200K, as opposed to the value of $1.5M that was agreed upon. This result in a significant tax savings for Greg.
17. 50% of Liv Wellness lawsuit proceeds (split expenses – all decisions made together).

12/14/22
12:53
Steve RoMaya

Chris Yatooma

12:52 am
12/14/22
Chris Barnett

12/14/22
Greg Yatooma

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

DocuSign Envelope ID: B5A5B6C9-6D5F-4A90-AD2A-D19ACC3C8848

## AFFIDAVIT OF STEVE ROMAYA

**I, Steve Romaya, being duly sworn, depose and state as follows:**

1.      I am the cousin of Chris and Greg Yatooma and have personal knowledge of the facts stated herein and if called upon could competently testify as to the truth of the factual representations set forth in this Affidavit.

2.      I was previously a partner with Greg and Chris in a cannabis asset.  Chris and Greg, as the majority partners, jointly bought me out of that asset in early 2022.

3.      In the fall 2022, I was requested by Chris Yatooma to get involved in the partnership break up with his brother Greg, as Chris would often call me for an opinion or to act as a sounding board for him.

4.      At Chris's request, I was present at the meeting on December 14, 2022, which went on for about 9 hours and resulted in the signed agreement for Chris to buy Greg out of their joint business interests and I helped facilitate the final deal.

5.      I was also one of the signors that acted as witness to the agreement for Chris to buy Greg out of their jointly owned business interests on December 14, 2022 ("Partnership Buyout Agreement").

6.      It was always my understanding, the understanding of everyone else present and everyone who signed/witnessed that Partnership Buyout Agreement that the Partnership Buyout Agreement was a final and binding agreement on both Greg and Chris and contained all the terms upon which Greg agreed to sell his business interests to Chris.

1

4861-6097-5716.v1

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

7.      As part of the Partnership Buyout Agreement, Greg and Chris were splitting the MSY litigation proceeds 50/50 ("MSY Litigation Proceeds").

8.      The splitting of the MSY Litigation Proceeds was never in dispute and was never a point of contention in any discussions I was part of with Chris or Greg prior to the signing of the Partnership Buyout Agreement. At that time, the matter was on appeal.

9.      Chris then contacted me at the end of February 2023 to discuss settling the MSY litigation because Greg wanted to settle, but Chris did not, and since they were 50/50 partners, they both needed to agree.

10.     As confirmed in text communication with Greg, Chris, and their pastor, Chris agreed to settle the MSY litigation if Greg agreed to reduce Chris's payment obligations to Greg under the Partnership Buyout Agreement by a certain amount.

11.     Greg ultimately agreed, and Chris and Greg agreed to settle the MSY litigation at an agreed amount.

12.     At no time prior to the settling of the MSY litigation in March 2023, did Chris claim to me that he owned 100% of MSY or that Greg did not own 50% and/or had not interest or right in the proceeds of the MSY Litigation.

13.     Then, in late March or early April, Chris called me to tell me he was not going to allow the distribution of Greg's share of the  MSY Litigation Proceeds to Greg.

14.     Chris told me, in substance, that since signing the Partnership Buyout Agreement in December, Chris now believed that Greg did not deserve all the money that Chris had agreed to pay because Chris believed that Greg had breached their contract because Greg was working

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

against him; and Chris also now thought the agreement was unfair because Chris was the one who would have to go to work every day and Chris thought that Greg would be able to sit at home and collect money from Chris.

15.     I told Chris that I did not believe Greg was working against him.

16.     We talked for roughly an hour and Chris told me he was going to try to use the MSY Litigation Proceeds to try to renegotiate the entire Partnership Buyout Agreement with Greg.

17.     Chris said to me in substance, that he was going to try to keep Greg from getting his half of the MSY Litigation Proceeds and use that as leverage to get Greg to agree to walk away from the rest of the money Chris had agreed to pay him under the Partnership Buyout Agreement.

18.     I told Chris I thought what he was doing was wrong and I did not agree with it.

19.     I told Chris I thought that Chris should honor the agreement and his word.

20.     Before we hung up, Chris asked me not to tell Greg about this conversation.

21.     But after Greg told me that Chris was trying to keep Greg from getting his half of the MSY Litigation Proceeds, I felt compelled to tell Greg about this conversation with Chris and am providing this Affidavit because I believe what Chris is doing is wrong.

Further affiant sayeth not.



Steve Romaya                                                  5/17/2023
Steve Romaya                                                  Date

DEBORAH STETZEL
Notary Public - State of Michigan
County of Oakland
My Commission Expires Oct. 2, 2023

4861-6097-5716.v1

3

# Exhibit 3

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| | |
|---|---|
| **From:** | Chris Yatooma - MSY |
| **To:** | Gavin Fleming |
| **Cc:** | Gregory Yatooma - FYB; Jim Teasdale |
| **Subject:** | Re: Funds Axon Properties, LLC Placed in FYB IOLTA During MRED/MSY v. Liv Case |
| **Date:** | Wednesday, December 14, 2022 4:11:39 PM |
| **Attachments:** | image001.jpg |
| | image001.jpg |

Thank you, Gavin, I appreciate you!

On Dec 14, 2022, at 4:05 PM, Gavin Fleming <fleming@fyblaw.com> wrote:

Hi Chris, praise Jesus, answered prayers!!! So happy for you guys.  Chris, I will be in the office tomorrow probably and Friday morning definitely, so I will get with Jim and sign a check.

Gavin

Gavin J. Fleming

Fleming Yatooma & Borowicz PLC
1615 S. Telegraph, Suite 300
248 231 9594
fleming@fyblaw.com

---

**From:** Chris Yatooma - MSY <cyatooma@msycapital.com>
**Sent:** Wednesday, December 14, 2022 4:03:44 PM
**To:** Gavin Fleming <fleming@fyblaw.com>
**Cc:** Gregory Yatooma - FYB <yatooma@fyblaw.com>; Jim Teasdale <jteasdale@ocgcompanies.com>
**Subject:** Re: Funds Axon Properties, LLC Placed in FYB IOLTA During MRED/MSY v. Liv Case

Hello Gavin, Greg and I resolved our issues yesterday. I would appreciate if we can transfer these escrowed funds back to Axon ASAP. Thanks.

On Nov 28, 2022, at 10:19 AM, Gavin Fleming <fleming@fyblaw.com> wrote:

Thanks for the input.

Gavin J. Fleming

Fleming Yatooma & Borowicz PLC
1615 S. Telegraph, Suite 300
248 231 9594
fleming@fyblaw.com

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA

     Plaintiff,

                             Case No. 23- 200283-CB

v.

                             Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

     Defendants.

---

| | |
|---|---|
| **TAFT STETTINIUS & HOLLISTER LLP** | **URBAN LEGAL GROUP** |
| Ethan R. Holtz (P71884) | Jeffery R. Sieving (P71625) |
| Emily M. Mayer (P78956) | *Co-Counsel for Defendant Chris Yatooma* |
| T. Andrew Keating (P86261) | 1615 S. Telegraph Road |
| *Attorneys for Plaintiff* | Bloomfield Hills, MI 48302 |
| 27777 Franklin Road, Suite 2500 | (248) 230-2820 |
| Southfield, MI 48034 | sieving@urbanlegalgroup.com |
| (248) 351-3000 | |
| eholtz@taftlaw.com | **BODMAN PLC** |
| emayer@taftlaw.com | J. Adam Behrendt (P58607) |
| akeating@taftlaw.com | Michelle Kolkmeyer (P81355) |
| | *Co-Counsel for Defendant Chris Yatooma* |
| | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI 48084 |
| | (248) 743-6000 |
| | jbehrendt@bodmanlaw.com |

---

### DEFENDANT CHRISTOPHER YATOOMA'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

     Defendant Christopher Yatooma ("Chris" or "Defendant"), by and through his attorneys, and for his responses and objections to Plaintiff's First Set of Interrogatories and Request for Production of Documents, ("Discovery Requests"), state as follows:

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## GENERAL OBJECTIONS

1.      Defendant's responses are based on information available to Defendant at this time and are made on the basis of Defendant's current knowledge and belief, after reasonable inquiry. Defendant has not yet filed an answer in this action and has not yet begun its investigation of the facts related to this action. There may be additional facts and/or documents affecting Defendant's response of which Defendant is currently unaware, despite reasonable investigation and inquiry. Defendant reserves the right to modify the responses with such relevant information as Defendant may subsequently discover. Defendant's responses are made without prejudice to using or relying upon subsequently discovered information during trial.

2.      Defendant objects to these Discovery Requests to the extent they seek information protected from disclosure by the attorney-client privilege, work product doctrine, investigator-client privilege or any other applicable privilege or doctrine.

3.      Defendant objects to these Discovery Requests to the extent they seek responses or information beyond that which is authorized or permitted under the Michigan Court Rules.

4.      Defendant objects to these Discovery Requests to the extent they seek responses or information outside the time period relevant to the issues in this case.

5.      Defendant objects to these Discovery Requests to the extent they seek to impose upon Defendant an obligation to investigate or discover information or materials from others or third parties, including but not limited to, the Defendant herein.  Defendant will not undertake a search or be responsible for producing information and/or documents in the custody or control of any other persons or parties.

6.      In providing responses to the discovery below, Defendant does not waive, but

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

rather specifically preserve:

(a)     All objections as to competency, relevancy, materiality, and admissibility of the discovery requests and responses thereto and their subject matter;

(b)     All rights to object on any ground whatsoever to the use of any of the discovery requests or their subject matter in any proceeding or hearing, including the trial in this action;

(c)     All rights to object on any ground to any further discovery requests involving or relating to the subject matter of these discovery requests; and

(d)     Any and all privileges and/or rights under any statute or common law.

7.     Defendant's answers or responses herein are not a waiver of his right to seek a Protective Order.

8.     Defendant also objects to the request that they produce emails, text messages or other documents that Plaintiff is copied on, has access to, or otherwise are in their possession, custody or control. Defendant is under no obligation to produce documents that Plaintiff already has in his possession, custody, or control.

9.     Defendant objects to the Request to the extent they seek information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

10.     Defendant objects to providing any discovery, including responding to Plaintiffs' unauthorized issuance of discovery requests given that Defendants have filed a pre-answer motion for summary disposition which remains unadjudicated.  Under the court rules, namely, MCR 2.302(A)(5)(b), Plaintiff was required to abide by the express time provision and serve its *initial* disclosures only within 14 days *after* Defendants had filed their responsive pleading.  Given the pending pre-answer summary disposition motion, which is based upon the broad agreement to arbitrate, discovery in this case is grossly premature and, assuming that Defendants' summary disposition motion is granted, discovery, if any, is required to be

3

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

conducted under the auspices of arbitration.

## **INTERROGATORIES**

1.      For any Request for Admission to which your answer is not an unqualified admission, please state with particularity the reason(s) you did not admit the request, all facts that support the reason(s), all persons with knowledge of these facts, and all documents that support these facts.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections, Defendant directs Plaintiff to Defendant's answers to Plaintiff's Request for Admissions.

2.      Identify each individual who assisted in responding to these Discovery Requests, including their name, title, contact information, and each request with which he or she assisted.

**RESPONSE:**

Defendant states that the answers to these Discovery Requests are the answers of the Defendant prepared with the assistance of Defendant and Defendant's attorneys.

3.      Identify all facts that support each of your affirmative defenses, all persons with knowledge of those facts, and all documents that support those facts.

**RESPONSE:**

In addition to the General Objections, Defendant objects to this Request as it is premature and seeking information that is impossible to ascertain at this early stage of the litigation, especially since Defendant has filed a pre-answer Motion for Summary Disposition seeking to compel arbitration of this matter and has not yet filed its Answer and Affirmative Defenses.

4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## <u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>

Produce the following documents for the time period October 1, 2022, to the present, unless otherwise indicated:

1.     Produce all documents reviewed or relied upon in responding to the above interrogatories.

**RESPONSE:** Not applicable.

2.     Produce all documents referred to in your responses to the above interrogatories.

**RESPONSE**: Not applicable.

3.     Produce all documents between you, on the one hand, and Chris Barnett, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE**:  In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to this Request as to the term "concern or relate to" as the same is vague, overly broad, and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

4.     Produce all documents between you, on the one hand, and Robert Brandy, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:**  In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to this Request as to the term "concern or relate to" as the same is vague, overly broad, and unduly burdensome. Without waiving said objections, Defendant

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

5.     Produce all documents between you, on the one hand, and Martin Manna, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to this Request as to the term "concern or relate to" as the same is vague, overly broad, and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

6.     Produce all documents between you, on the one hand, and Ryan Jundt, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to this Request as to the term "concern or relate to" as the same is vague, overly broad, and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

7.     Produce all documents between you, on the one hand, and Steve Romaya, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to this Request as to the term "concern or relate to" as the same is vague, overly broad, and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

8.      Produce all documents between you, on the one hand, and Jeffrey Yatooma, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to this Request as to the term "concern or relate to" as the same is vague, overly broad, and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

9.      Produce all documents between you, on the one hand, and Adam Dyson, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

7

to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

10.     Produce all documents between you, on the one hand, and Joe Gordhammer, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

11.     Produce all documents between you, on the one hand, and Tony Denome, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

12.     Produce all documents between you, on the one hand, and Josh Smith, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

13.    Produce all documents between you, on the one hand, and Charles Whitt, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

14.    Produce all documents between you, on the one hand, and Jim Teasdale, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome.  Without waiving said objections, Defendant is continuing

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

15.     Produce all documents between you, on the one hand, and Jill Moldenhauer, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile any responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

16.     Produce all documents between you, on the one hand, and Brian Molloy, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

17.     Produce all documents between you, on the one hand, and any one or more representative of Dykema Gossett, on the other hand, that concern or relate to Greg, the MSY

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce any documents upon entry of an acceptable protective order and within a reasonable time.

18.     Produce all documents between you, on the one hand, and Michelle Houbeck, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce any documents upon entry of an acceptable protective order and within a reasonable time.

19.     Produce all documents between you, on the one hand, and Rich Stopczy, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

20. Produce all documents between you, on the one hand, and Rich Stopczy, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** See Answer to Request for Production 19.

21. Produce all documents between you, on the one hand, and Scott Seabolt, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

22. Produce all documents between you, on the one hand, and Jeffrey Yatooma, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

23. Produce all documents between you, on the one hand, and Shannon Urbon, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

24. Produce all non-privileged documents between you, on the one hand, and Jeffrey Sieving, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant objects to this as it seeks information protected by the attorney-client privilege and work product doctrine. Defendant further objects to the Request on the basis of the attorney-client privilege and work product doctrine.

25. Produce all documents between you, on the one hand, and Sam Paulus, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

13

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

26.    Produce all documents between you, on the one hand, and Rana Adou, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

27.    Produce all documents between you, on the one hand, and Dan Fischer, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

28.     Produce all documents between you, on the one hand, and Mark James, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant also objects to this as it seeks information protected by the attorney-client privilege and work product doctrine. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

29.     Produce all documents between you, on the one hand, and any one or more employee or representative of Citizens State Bank, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving this objection, Defendant further submits that Plaintiff has issued a Subpoena to Citizens State Bank for documents relating to this litigation which is currently subject to a Motion to Quash field by Citizens State Bank.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

30.     Produce all documents between you, on the one hand, and any one or more employee or representative of Dutton East, on the other hand, that concern or relate to Greg, the MSY Litigation, the MSY Litigation Proceeds, the Buyout Agreement and any term thereof, and/or this lawsuit.

**RESPONSE:** In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

31.     Produce all documents between you, on the one hand, and any one or more employees or representative of Heller, on the other hand.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

32.     Produce all documents between you, on the one hand, and any one or more employee or representative of Eugene, on the other hand.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

33.     Produce all documents between you, on the one hand, and any one or more employee or representative of Care Arbor LLC, on the other hand.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

34.     Produce all documents between you, on the one hand, and any one or more employee or representative of Ka Ulua Ana, on the other hand.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

35.     Produce all documents between you, on the one hand, and any one or more employee or representative of Shryne, on the other hand.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

36.     Produce Jeffrey Sieving's employment agreement(s).

**RESPONSE:** In addition to the above General Objections, Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence, is interposed for the purposes of harassment and is therefore improper.

17

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

37.     Produce your engagement letter with Urban Legal Group for the above-captioned case.

**RESPONSE:** In addition to the above General Objections, Defendant also objects to this as it seeks information protected by the attorney client-privilege or the attorney work product doctrine. Further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence, is interposed for the purposes of harassment and is therefore improper.

38.     Produce your engagement letter with Jeffrey Sieving for the above-captioned case.

**RESPONSE:**  In addition to the above General Objections, Defendant also objects to this as it seeks information protected by the attorney client-privilege or the attorney work product doctrine. Further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence, is interposed for the purposes of harrasment and is therefore improper.

39.     Produce all documents that you asked Greg to sign at any time from December 13, 2022, to the present that Greg declined or refused to sign.

**RESPONSE:**  In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Defendant further objects to the phrase "all documents" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

40.     Produce the following documents for Blue Skies Financing, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

41.     Produce the following documents for Innovative Financing, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

42.    Produce the following documents for Axon Properties, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements, proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

43.     Produce the following documents for Oakland Business Park, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements, proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

44.     Produce the following documents for Premier Drive LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual

21

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

45.    Produce the following documents for MSY: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

46.     Produce the following documents for 31- Ray, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

47.     Produce the following documents for Resident Agent Company, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

48. Produce the following documents for CSB Investments, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

49.     Produce the following documents for To Infinity & Beyond!, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

50.     Produce the following documents for Frequency Wellness, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

51.     Produce the following documents for Henry Yandt Construction, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

(e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

52.     Produce the following documents for Alchemy Wellness, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

53.     Produce the following documents for Candid, Inc.: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements, proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

54.     Produce the following documents for 24 Leonard Wood Drive, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly

28

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

55.    Produce the following documents for Better Provisioning, Inc.: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

56.    Produce the following documents for JAR Capital, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

57.    Produce the following documents for 21319 Kelsey, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements, proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

58.     Produce the following documents for 17853 Donnell, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements, proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

59.     Produce the following documents for Kurativ, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

60.     Produce the following documents for Hillger, LLC: documents that concern or

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

61.    Produce the following documents for 280 N. Washington, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements,

33

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

62.     Produce the following documents for 1225 S Lapeer Road, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

63.     Produce the following documents for 244 S Court Street, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**REPONSE**:  In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

64.     Produce the following documents for CSB Investments, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements, proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

65.     Produce the following documents for 1639 S Huron, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements, proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

66.    Produce the following documents for 135 W Monroe, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

67.    Produce the following documents for 190 N Washington Constantine, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

members, or management,    general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

68.    Produce the following documents for Crucial Wellness, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

69.    Produce the following documents for Honesty Wellness, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

70.    Produce the following documents for Satisfaction Wellness, LLC: documents that

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

71.    Produce the following documents for Mount Holly Provisioning, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

72.     Produce the following documents for 11 Bellor, LLC: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management,   general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

73.     Produce the following documents for True Cannabis, Inc.: documents that concern or relate to ownership, organizational structure, grant of any interest or stock, meetings of any board or other governing body, meetings of any group of owners or members, or management, general ledgers with full detail (including, without limitation, all journal entries and adjusting journal entries), monthly and annual internally prepared financial statements, monthly and annual CPA prepared financial statements, income statements, cash flow statements, cash flow projections, income tax returns (with all exhibits) and any supporting documentation/schedules (e.g. accountant workpapers, schedule K-1's, etc.) used to prepare each return, bank statements, credit card statements,  proposed budgets, final budgets, balance sheets, check registers, canceled checks, loan applications, loan documents, accounts receivable, accounts payable, profit and loss statements, and any other audited or unaudited financial statement or record, including all drafts or proposals of any one or more of the aforementioned documents.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to the phrase "concerns or relate to" as the same is vague, overly broad and unduly burdensome. Defendant further objects as the request seek information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

74.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Blue Skies Financing, LLC.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE:** In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

75.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Innovative Financing, LLC.

**RESPONSE:** In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

76.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Axon Properties, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

77.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Oakland Business Park.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

78.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

detail) held by Premier Drive LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

79.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by MSY.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential proprietary information that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

80.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 31- Ray, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

81.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Resident Agent Company, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

82.     Complete copies of bank statements including supporting documentation for all

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by CSB Investments, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

83.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by To Infinity & Beyond! LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

84.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Frequency Wellness, LLC.

**RESPONSE:**  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

85.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Henry Yandt Construction, LLC.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

86.    Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Alchemy Wellness, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

87.    Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Candid, Inc.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

88.    Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 24 Leonard Wood Drive, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

89.    Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Better Provisioning, Inc.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

lead to the discovery of admissible evidence and is therefore improper.

90.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by JAR Capital, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

91.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 21319 Kelsey, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

92.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 17853 Donnell, LLC.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

93.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Kurativ, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

94.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Hillger, LLC.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

95.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 280 N. Washington, LLC.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

96.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 1225 S Lapeer Road, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information of a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

97.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 244 S Court Street, LLC.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

98. Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by CSB Investments, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

99. Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 1639 S Huron, LLC.

**RESPONSE:** In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

100. Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 135 W Monroe, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

101. Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

detail) held by 190 N Washington Constantine, LLC.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

102.    Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Crucial Wellness, LLC.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

103.    Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Honesty Wellness, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

104.    Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Satisfaction Wellness, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

105.    Complete copies of bank statements including supporting documentation for all

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by Mount Holly Provisioning, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

106.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by 11 Bellor, LLC.

**RESPONSE**: In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

107.     Complete copies of bank statements including supporting documentation for all receipts and disbursements (e.g., bank wire detail, cleared check copies, withdrawal slips, deposit detail) held by True Cannabis, Inc.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects as the request seeks confidential financial information from a non-party that is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper.

108.     All recordings of any conversation with and/or regarding Greg.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to the extent that Plaintiff was copied on, has access to, or otherwise is in possession, custody, or control of any such recordings. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

109.    All recordings of any conversation with and/or regarding the Buyout Agreement.

**RESPONSE**: In addition to the above General Objections, Defendant objects to the term "Buyout Agreement" as Defendant denies that the parties entered into a final and binding agreement. Without waiving said objections, Defendant is continuing to compile responsive, non-privileged information and will produce documents upon entry of an acceptable protective order and within a reasonable time.

110.    Produce all documents and communications relating to any expert testimony or opinions that will or may be offered on your behalf at any hearing or trial in this action, including, without limitation, all non-privileged documents provided to any expert or consultant in connection with this matter and any report or statement created by any expert or consultant.

**RESPONSE**: In addition to the General Objections, Defendant objects to this Request as it is premature and seeking information that is impossible to ascertain at this early stage of the litigation, especially since Defendant has filed a pre-answer Motion for Summary Disposition seeking to compel arbitration of this matter.

111.    Produce the most current curriculum vitae for each expert witness you intend to call at trial.

**RESPONSE**: See answer to Request for Production 109.

Produce all sworn statements, affidavits, or declarations that you have made or obtained from any person with regard to the subject matter of any pleading filed in this matter.

**RESPONSE**: None.

112.    Produce all documents that you have received in response to any subpoena issued in this matter.

**RESPONSE**: None.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

113.    Produce all documents you intend to introduce or may introduce as an exhibit at any hearing, deposition, trial, or other proceeding in this action.

**RESPONSE**: In addition to the General Objections, Defendant objects to this Request as it is premature and seeking information that is impossible to ascertain at this early stage of the litigation, especially since Defendant has filed a pre-answer Motion for Summary Disposition seeking to compel arbitration of this matter.

114.    To the extent not previously produced, produce all writings, records, documents and/or tangible evidence that relates in any way, whether directly or indirectly, to any issue, claim, or defense presented in this case, whether or not you have made a decision as to whether it will be introduced as an exhibit, or used in any other way, in the trial of this case.

**RESPONSE:** In addition to the General Objections, Defendant objects to this Request as it is premature and seeking information that is impossible to ascertain at this early stage of the litigation, especially since Defendant has filed a pre-answer Motion for Summary Disposition seeking to compel arbitration of this matter.

Respectfully submitted,

By:      /s/*Jeff Sieving*
         Jeff Sieving (P71625)
         *Co-Counsel for Defendant*
         1615 S. Telegraph Rd, Suite 300
         Bloomfield Hills, MI 48302
         (248) 231-2820
         sieving@urbanlegalgroup.com

Dated: August 31, 2023

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

I affirm that the foregoing answers are true and correct to the best of my knowledge, information and belief.

/s/Christopher Yatooma

## **CERTIFICATE OF SERVICE**

Jeffrey R. Sieving hereby certifies that the foregoing document was served via the Court's

electronic case filing and noticing system to all counsel of record.

/s/ *Jeffrey R. Sieving*
Jeffrey R. Sieving

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| **STATE OF MICHIGAN**<br>MI Oakland County 6th Circuit Court | **PROOF OF ELECTRONIC SERVICE** | **CASE NO.** 2023-200283-CB |
| --- | --- | --- |

Case title

YATOOMA,GREGORY,, vs. YATOOMA,CHRISTOPHER,,

1. MiFILE served the following documents on the following persons in accordance with MCR 1.109(G)(6).

| Type of document | Title of document |
| --- | --- |
| MISCELLANEOUS | Answers to First Interrogatories and RFP-TBF_083123 |

| Person served | E-mail address of service | Date and time of service |
| --- | --- | --- |
| Ethan R. Holtz | eholtz@taftlaw.com | 08/31/2023  4:50:48 PM |
| Emily M. Mayer | emayer@taftlaw.com | 08/31/2023  4:50:48 PM |
| T. Andrew Keating | akeating@taftlaw.com | 08/31/2023  4:50:48 PM |
| Fuhs J. Bernard | fuhs@butzel.com | 08/31/2023  4:50:48 PM |
| Kay Kress | kay.kress@troutman.com | 08/31/2023  4:50:48 PM |
| J. Adam Behrendt | jbehrendt@bodmanlaw.com | 08/31/2023  4:50:48 PM |
| Michelle Kolkmeyer | mkolkmeyer@bodmanlaw.com | 08/31/2023  4:50:48 PM |

2. I, Jeffery Sieving, initiated the above MiFILE service transmission.

This proof of electronic service was automatically created, submitted, and signed on my behalf by MiFILE. I declare under the penalties of perjury that this proof of electronic service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

08/31/2023
_____
Date

/s/Jeffery Sieving
_____
Signature

Urban Legal Group
_____
Firm (if applicable)

# Exhibit 5

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

GREGORY YATOOMA

      Plaintiff,

v.

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

      Defendants.

Case No. 23- 200283-CB

Hon. Victoria A. Valentine

---

| | |
|---|---|
| **TAFT STETTINIUS & HOLLISTER LLP**<br>Ethan R. Holtz (P78884)<br>Emily M. Mayer (P78956)<br>T. Andrew Keating (P86261)<br>*Attorneys for Plaintiff*<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000<br>eholtz@taftlaw.com<br>emayer@taftlaw.com<br>akeating@taftlaw.com | **URBAN LEGAL GROUP**<br>Jeffery R. Sieving (P71625)<br>*Co-Counsel for Defendant Chris Yatooma*<br>1615 S. Telegraph Road<br>Bloomfield Hills, MI 48302<br>(248) 230-2820<br>sieving@urbanlegalgroup.com<br><br>**BODMAN PLC**<br>J. Adam Behrendt (P58607)<br>Michelle Kolkmeyer (P81355)<br>*Co-Counsel for Defendant Chris Yatooma*<br>201 W. Big Beaver Road, Suite 500<br>Troy, MI 48084<br>(248) 743-6000<br>jbehrendt@bodmanlaw.com |

---

**DEFENDANT CHRISTOPHER YATOOMA'S OBJECTIONS AND ANSWERS TO
PLAINTIFF'S SECOND DISCOVERY REQUESTS**

Defendant Christopher Yatooma ("Chris" or "Defendant"), by and through his attorneys,

and for his responses and objections to Plaintiff's Second Discovery Requests, ("Discovery

Requests"), state as follows:

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## **GENERAL OBJECTIONS**

1.      Defendant's responses are based on information available to Defendant at this time and are made on the basis of Defendant's current knowledge and belief, after reasonable inquiry. Defendant has not yet filed an answer in this action and has not yet begun its investigation of the facts related to this action. There may be additional facts and/or documents affecting Defendant's response of which Defendant is currently unaware, despite reasonable investigation and inquiry. Defendant reserves the right to modify the responses with such relevant information as Defendant may subsequently discover. Defendant's responses are made without prejudice to using or relying upon subsequently discovered information during trial.

2.      Defendant objects to these Discovery Requests to the extent they seek information protected from disclosure by the attorney-client privilege, work product doctrine, investigator-client privilege or any other applicable privilege or doctrine.

3.      Defendant objects to these Discovery Requests to the extent they seek responses or information beyond that which is authorized or permitted under the Michigan Court Rules.

4.      Defendant objects to these Discovery Requests to the extent they seek responses or information outside the time period relevant to the issues in this case.

5.      Defendant objects to these Discovery Requests to the extent they seek to impose upon Defendant an obligation to investigate or discover information or materials from others or third parties, including but not limited to, the Defendant herein.  Defendant will not undertake a search or be responsible for producing information and/or documents in the custody or control of any other persons or parties.

6.      In providing responses to the discovery below, Defendant does not waive, but

2

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

rather specifically preserve:

    (a)    All objections as to competency, relevancy, materiality, and admissibility of the discovery requests and responses thereto and their subject matter;

    (b)    All rights to object on any ground whatsoever to the use of any of the discovery requests or their subject matter in any proceeding or hearing, including the trial in this action;

    (c)    All rights to object on any ground to any further discovery requests involving or relating to the subject matter of these discovery requests; and

    (d)    Any and all privileges and/or rights under any statute or common law.

7.    Defendant's answers or responses herein are not a waiver of his right to seek a Protective Order.

8.    Defendant also objects to the request that they produce emails, text messages or other documents that Plaintiff is copied on, has access to, or otherwise are in their possession, custody or control. Defendant is under no obligation to produce documents that Plaintiff already has in his possession, custody, or control.

9.    Defendant objects to the Request to the extent they seek information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

10.    Defendant objects to providing any discovery, including responding to Plaintiffs' unauthorized issuance of discovery requests given that Defendants have filed a pre-answer motion for summary disposition which remains unadjudicated. Under the court rules, namely, MCR 2.302(A)(5)(b), Plaintiff was required to abide by the express time provision and serve its *initial* disclosures only within 14 days *after* Defendants had filed their responsive pleading. Given the pending pre-answer summary disposition motion, which is based upon the broad agreement to arbitrate, discovery in this case is grossly premature and, assuming that Defendants' summary disposition motion is granted, discovery, if any, is required to be

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

conducted under the auspices of arbitration.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

Produce the following documents for the time period October 1, 2022 to the present, unless otherwise indicated:

1.      All documents that concern or relate to Gregory Yatooma's Fleming, Yatooma & Borowicz, PLC ("FYB") email account, Yatooma@FYBLaw.com.

**RESPONSE**:  Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

2.      All documents that concern or relate to Kara Harbour's FYB email account, Harbour@FYBLaw.com.

**RESPONSE**: Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

3.      All documents that concern or relate to collection of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

**RESPONSE**:  Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

4.      All documents that concern or relate to collection of Kara Harbour's FYB email account, Harbour@FYBLaw.com.

**RESPONSE**:  Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

5.      All documents that concern or relate to access to of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

**RESPONSE:**  Pursuant to the September 7, 2023, Protective Order entered in this matter,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

defendant is not required to produce these documents.

6.    All documents that concern or relate to access to Kara Harbour's FYB email account, Harbour@FYBLaw.com.

**RESPONSE**:  Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

7.    All documents that concern or relate to the contents of Gregory Yatooma's FYB email account, Yatooma@FYBLaw.com.

**RESPONSE**:  Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

8.    All documents that concern or relate to the contents of Kara Harbour's FYB email account, Harbour@FYBLaw.com.

**RESPONSE**:  Pursuant to the September 7, 2023 Protective Order entered in this matter, defendant is not required to produce these documents.

9.    All documents sent to or received by Yatooma@FYBLaw.com, including, but not limited to, the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*.

**RESPONSE**:  Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

10.   All documents that concern or relate to your acquisition of the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*.

**RESPONSE**:  Pursuant to the September 7, 2023, Protective Order entered in this matter,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

defendant is not required to produce these documents.

      11.    All documents that concern or relate to the January 31, 2023 and February 14, 2023 emails referenced in Footnote 1 of *Defendants' Response in Opposition to Plaintiff's Motion to Modify and/or Relief from July 3, 2023, Order Pursuant to MCR 2.612*.

      **RESPONSE**: Pursuant to the September 7, 2023, Protective Order entered in this matter, defendant is not required to produce these documents.

      12.    All documents that concern or relate to any one or more purchase, sale, lease, conveyance, agreement, financing transaction, payment received, payment made, or distribution of funds made for or in connection with the real property commonly known as 525 S Court St, Lapeer, MI 48446.

      **RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

      13.    All documents that concern or relate to any permit, license or other asset or entity that permits, license, and/or allows the use, manufacturing, and/or sale of cannabis associated with the real property commonly known as 525 S Court St, Lapeer, MI 48446.

      **RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order,

6

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

14.     All documents that concern or relate to any one or more purchase, sale, lease, conveyance, agreement, financing transaction, payment received, payment made, or distribution of funds made for or in connection with the real property commonly known as 4898 Bald Mountain Rd, Lake Orion, MI 48326.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

15.     All documents that concern or relate to any permit, license or other asset or entity that permits, license, and/or allows the use, manufacturing, and/or sale of cannabis associated with the real property commonly known as 4898 Bald Mountain Rd, Lake Orion, MI 48326.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

16.     All documents that concern or relate to any one or more purchase, sale, lease, conveyance, agreement, financing transaction, payment received, payment made, or distribution

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

of funds made for or in connection with the real property commonly known as 14930 Laplaisance Rd Suite 121, Monroe, MI 48161.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

17.    All documents that concern or relate to any permit, license or other asset or entity that permits, license, and/or allows the use, manufacturing, and/or sale of cannabis associated with the real property commonly known as 14930 Laplaisance Rd Suite 121, Monroe, MI 48161.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

18.    All documents that concern or relate to any one or more purchase, sale, lease, conveyance, agreement, financing transaction, payment received, payment made, or distribution of funds made for or in connection with the real property commonly known as 24 Leonard Wood Rd Battle Creek, MI 49037.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

19.     All documents that concern or relate to any permit, license or other asset or entity that permits, license, and/or allows the use, manufacturing, and/or sale of cannabis associated with the real property commonly known as 24 Leonard Wood Rd Battle Creek, MI 49037.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action and (b) is not reasonably calculated to lead to the discovery of admissible evidence and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant non-privileged information responsive to this request within a mutually agreeable time period.

Respectfully submitted,

By:/s/*Jeff Sieving*
Jeff Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Rd, Suite 300
Bloomfield Hills, MI 48302
(248) 231-2820
September 8, 2023.          sieving@urbanlegalgroup.com

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## CERTIFICATE OF SERVICE

Jeffrey R. Sieving hereby certifies that the foregoing document was served via the Court's

electronic case filing and noticing system to all counsel of record.

/s/ *Jeffrey R. Sieving*
Jeffrey R. Sieving

10

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| **STATE OF MICHIGAN**<br>MI Oakland County 6th Circuit Court | **PROOF OF ELECTRONIC SERVICE** | **CASE NO.** 2023-200283-CB |
|---|---|---|

| Case title |
|---|
| YATOOMA,GREGORY,, vs. YATOOMA,CHRISTOPHER,, |

1. MiFILE served the following documents on the following persons in accordance with MCR 1.109(G)(6).

| Type of document | Title of document |
|---|---|
| MISCELLANEOUS | Defendant's Answers to Second Discovery Request-TBF_090823 |
| MISCELLANEOUS | Defendant's Answers to Third Set of Discovery_TBF-090823 |

| Person served | E-mail address of service | Date and time of service |
|---|---|---|
| Ethan R. Holtz | eholtz@taftlaw.com | 09/08/2023  3:14:02 PM |
| Emily M. Mayer | emayer@taftlaw.com | 09/08/2023  3:14:02 PM |
| T. Andrew Keating | akeating@taftlaw.com | 09/08/2023  3:14:02 PM |
| Fuhs J. Bernard | fuhs@butzel.com | 09/08/2023  3:14:02 PM |
| Kay Kress | kay.kress@troutman.com | 09/08/2023  3:14:02 PM |
| J. Adam Behrendt | jbehrendt@bodmanlaw.com | 09/08/2023  3:14:02 PM |
| Michelle Kolkmeyer | mkolkmeyer@bodmanlaw.com | 09/08/2023  3:14:02 PM |

2. I, Jeffery Sieving, initiated the above MiFILE service transmission.

This proof of electronic service was automatically created, submitted, and signed on my behalf by MiFILE. I declare under the penalties of perjury that this proof of electronic service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

09/08/2023
_____
Date

/s/Jeffery Sieving
_____
Signature

Urban Legal Group
_____
Firm (if applicable)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit 6

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA

     Plaintiff,

Case No. 23- 200283-CB

v.

Hon. Victoria A. Valentine

CHRISTOPHER YATOOMA and MSY
CAPITAL PARTNERS, LLC,

     Defendants.

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
T. Andrew Keating (P86261)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com
akeating@taftlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Chris Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Michelle Kolkmeyer (P81355)
*Co-Counsel for Defendant Chris Yatooma*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

---

## DEFENDANT CHRISTOPHER YATOOMA'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S THIRD DISCOVERY REQUESTS

Defendant Christopher Yatooma ("Chris" or "Defendant"), by and through his attorneys, and for his responses and objections to Plaintiff's Third Discovery Requests, ("Discovery Requests"), state as follows:

## **GENERAL OBJECTIONS**

1.      Defendant's responses are based on information available to Defendant at this time and are made on the basis of Defendant's current knowledge and belief, after reasonable inquiry. Defendant has not yet filed an answer in this action and has not yet begun its investigation of the facts related to this action. There may be additional facts and/or documents affecting Defendant's response of which Defendant is currently unaware, despite reasonable investigation and inquiry. Defendant reserves the right to modify the responses with such relevant information as Defendant may subsequently discover. Defendant's responses are made without prejudice to using or relying upon subsequently discovered information during trial.

2.      Defendant objects to these Discovery Requests to the extent they seek information protected from disclosure by the attorney-client privilege, work product doctrine, investigator-client privilege or any other applicable privilege or doctrine.

3.      Defendant objects to these Discovery Requests to the extent they seek responses or information beyond that which is authorized or permitted under the Michigan Court Rules.

4.      Defendant objects to these Discovery Requests to the extent they seek responses or information outside the time period relevant to the issues in this case.

5.      Defendant objects to these Discovery Requests to the extent they seek to impose upon Defendant an obligation to investigate or discover information or materials from others or third parties, including but not limited to, the Defendant herein.  Defendant will not undertake a search or be responsible for producing information and/or documents in the custody or control of any other persons or parties.

6.      In providing responses to the discovery below, Defendant does not waive, but

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

rather specifically preserve:

    (a)    All objections as to competency, relevancy, materiality, and admissibility of the discovery requests and responses thereto and their subject matter;

    (b)    All rights to object on any ground whatsoever to the use of any of the discovery requests or their subject matter in any proceeding or hearing, including the trial in this action;

    (c)    All rights to object on any ground to any further discovery requests involving or relating to the subject matter of these discovery requests; and

    (d)    Any and all privileges and/or rights under any statute or common law.

7.    Defendant's answers or responses herein are not a waiver of his right to seek a Protective Order.

8.    Defendant also objects to the request that they produce emails, text messages or other documents that Plaintiff is copied on, has access to, or otherwise are in their possession, custody or control. Defendant is under no obligation to produce documents that Plaintiff already has in his possession, custody, or control.

9.    Defendant objects to the Request to the extent they seek information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

10.    Defendant objects to providing any discovery, including responding to Plaintiffs' unauthorized issuance of discovery requests given that Defendants have filed a pre-answer motion for summary disposition which remains unadjudicated.  Under the court rules, namely, MCR 2.302(A)(5)(b), Plaintiff was required to abide by the express time provision and serve its *initial* disclosures only within 14 days *after* Defendants had filed their responsive pleading.  Given the pending pre-answer summary disposition motion, which is based upon the broad agreement to arbitrate, discovery in this case is grossly premature and, assuming that Defendants' summary disposition motion is granted, discovery, if any, is required to be

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

conducted under the auspices of arbitration.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

Produce the following documents for the time period October 1, 2022, to the present, unless otherwise indicated:

1.      All documents that support, concern, or relate to your July 26, 2023 testimony that "… my brother, Greg, … was my attorney…" *See* enclosed July 26, 2023 Transcript, 14:11-12.

**RESPONSE:** In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

2.      All documents that support, concern, or relate to your July 26, 2023 testimony that "… my brother, Greg, … was …my general counsel…" *See* enclosed July 26, 2023 Transcript, 14:11-12.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

3.      All documents that support, concert, or relate to your July 26, 2023 testimony that "… Greg's strategy, and he's -- he's said this to me in text and in communication is to continue to interfere with things." *See* enclosed July 26, 2023 Transcript, 16:11-13.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

4.      All documents that support, concern, or relate to your July 26, 2023 testimony that Greg has "…interfered with the business." *See* enclosed July 26, 2023 Transcript, 16:15.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

5.      All documents that support, concern, or relate to your July 26, 2023 testimony that Greg has "…interfered with other monies that was due to the company, coming to the company in a way to extort the best payment for himself." *See* enclosed July 26, 2023 Transcript, 16:15-17.

**RESPONSE**:  In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and

(c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

6.    All documents that support, concern, or relate to your July 26, 2023 testimony that "…I've paid 100 percent of the costs. Greg doesn't dispute that, so I've paid over a million dollars in costs." *See* enclosed July 26, 2023 Transcript, 16:24-25.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

7.    All documents that support, concern, or relate to your July 26, 2023 testimony that "…I've advanced a million dollars in fees." *See* enclosed July 26, 2023 Transcript, 17:22-23.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

8.    All documents that support, concern, or relate to your July 26, 2023 testimony that Greg has "…been very clear about to me that he's going to frustrate my business." *See* enclosed July 26, 2023 Transcript, 18:22-24.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

9.      All documents that support, concern, or relate to your July 26, 2023 testimony that Greg is "…doing that to extort the largest payment he can get or in this case, the largest settlement he can get.." *See* enclosed July 26, 2023 Transcript, 19:1-3.

**RESPONSE**: In addition to the above General Objections, Defendant further objects to this Request on the grounds that (a) it seeks information that is irrelevant to the claims or defenses in this action, (b) is not reasonably calculated to lead to the discovery of admissible evidence and (c) is premature at this early stage of the litigation and is therefore improper. Without waiving these objections and upon entry of a protective order, Defendant will produce relevant and non-privileged information responsive to this request within a mutually agreeable time period.

Respectfully submitted,

By:/s/*Jeff Sieving*_____
Jeff Sieving (P71625)
*Co-Counsel for Defendant*
1615 S. Telegraph Rd, Suite 300
Bloomfield Hills, MI 48302
(248) 231-2820
sieving@urbanlegalgroup.com

Dated: September 8, 2023.

## CERTIFICATE OF SERVICE

Jeffrey R. Sieving hereby certifies that the foregoing document was served via the Court's

electronic case filing and noticing system to all counsel of record.

/s/ *Jeffrey R. Sieving*
Jeffrey R. Sieving

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| **STATE OF MICHIGAN**<br>MI Oakland County 6th Circuit Court | **PROOF OF ELECTRONIC SERVICE** | **CASE NO.** 2023-200283-CB |
|---|---|---|

| Case title |
|---|
| YATOOMA,GREGORY,, vs. YATOOMA,CHRISTOPHER,, |

1. MiFILE served the following documents on the following persons in accordance with MCR 1.109(G)(6).

| Type of document | Title of document |
|---|---|
| MISCELLANEOUS | Defendant's Answers to Second Discovery Request-TBF_090823 |
| MISCELLANEOUS | Defendant's Answers to Third Set of Discovery_TBF-090823 |

| Person served | E-mail address of service | Date and time of service |
|---|---|---|
| Ethan R. Holtz | eholtz@taftlaw.com | 09/08/2023  3:14:02 PM |
| Emily M. Mayer | emayer@taftlaw.com | 09/08/2023  3:14:02 PM |
| T. Andrew Keating | akeating@taftlaw.com | 09/08/2023  3:14:02 PM |
| Fuhs J. Bernard | fuhs@butzel.com | 09/08/2023  3:14:02 PM |
| Kay Kress | kay.kress@troutman.com | 09/08/2023  3:14:02 PM |
| J. Adam Behrendt | jbehrendt@bodmanlaw.com | 09/08/2023  3:14:02 PM |
| Michelle Kolkmeyer | mkolkmeyer@bodmanlaw.com | 09/08/2023  3:14:02 PM |

2. I, Jeffery Sieving, initiated the above MiFILE service transmission.

This proof of electronic service was automatically created, submitted, and signed on my behalf by MiFILE. I declare under the penalties of perjury that this proof of electronic service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

09/08/2023
_____
Date

/s/Jeffery Sieving
_____
Signature

Urban Legal Group
_____
Firm (if applicable)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

<div style="text-align:left">

11/30/2023 10:07 AM    Oakland County Clerk    Received for Filing    FILED

</div>

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

GREGORY YATOOMA, an individual,

      Plaintiffs,

v.

CHRISTOPHER YATOOMA, an individual, MSY
CAPITAL PARTNERS, LLC, a Michigan limited
liability company, RICH STOPCZY, an individual,
MICHELLE HOUBECK, an individual,

      Defendants.

Case No. 23-200283-CB

Hon. Victoria A. Valentine

**DEFENDANTS RICH STOPCZY
AND MICHELLE HOUBECK'S
ANSWER TO VERIFIED
AMENDED COMPLAINT AND
AFFIRMATIVE DEFENSES**

---

**TAFT STETTINIUS & HOLLISTER LLP**
Ethan R. Holtz (P71884)
Emily M. Mayer (P78956)
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
eholtz@taftlaw.com
emayer@taftlaw.com

**BODMAN PLC**
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
*Counsel for Defendants*
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
jbehrendt@bodmanlaw.com

**URBAN LEGAL GROUP**
Jeffery R. Sieving (P71625)
*Co-Counsel for Defendant Christopher
Yatooma*
1615 S. Telegraph Road
Bloomfield Hills, MI 48302
(248) 230-2820
sieving@urbanlegalgroup.com

---

**DEFENDANTS RICH STOPCZY AND MICHELLE HOUBECK'S ANSWER TO
VERIFIED AMENDED COMPLAINT**

Defendants Rich Stopczy and Michelle Houbeck answer plaintiff Gregory Yatooma's verified amended complaint as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Greg is an individual who resides and conducts business in Oakland County, Michigan.

**ANSWER: Upon information and belief, admitted.**

2.      Chris is an individual who resides and conducts business in Oakland County, Michigan.

**ANSWER: Admitted.**

3.      MSY is a Michigan limited liability company whose principal place of business is in Oakland County, Michigan.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information as to the corporate form of MSY to form a belief as to the truth of the allegations.**

4.      Stopczy is an individual who conducts business in Oakland County, Michigan.

**ANSWER: Admitted.**

5.      Houbeck is an individual who conducts business in Oakland County, Michigan.

**ANSWER: Admitted.**

6.      The Court has jurisdiction over this matter pursuant to MCL 600.601, MCL 600.605, and MCL 600.8315.

**ANSWER: Defendants Stopczy and Houbeck neither admit nor deny the allegations because they call for a legal conclusion to which no response is required.**

2

7.      This Complaint involves a business dispute, as defined by MCL 600.8031, and, therefore, meets the statutory requirements for assignment to the Oakland County Business Court.

**ANSWER: Defendants Stopczy and Houbeck neither admit nor deny the allegations because they call for a legal conclusion to which no response is required.**

8.      The amount in controversy, exclusive of interest, costs, and attorneys' fees, exceeds Twenty-Five Thousand Dollars ($25,000.00) and seeks equitable relief.

**ANSWER: Defendants Stopczy and Houbeck neither admit nor deny the allegations because they call for a legal conclusion to which no response is required. By way of further response, defendants Stopczy and Houbeck deny that plaintiff is entitled to any relief.**

9.      Venue is proper in this Court pursuant to MCL 600.1621, among other provisions.

**ANSWER: Defendants neither admit nor deny the allegations because they call for a legal conclusion to which no response is required.**

## STATEMENT OF FACTS
### History of Greg's and Chris's Business Dealings

10.      Greg and Chris are brothers.

**ANSWER: Admitted.**

11.      In 2016, Greg's and Chris's brother Jeffrey Yatooma ("Jeff") approached Greg and Chris and proposed that the three brothers start a venture in Michigan's emerging cannabis industry, including principally, among other things, obtaining municipal cannabis licenses for various types of licensed business and selling those entities at a profit to operators.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

12.      Greg and Chris agreed and, over the next several years, Greg, Chris, and Jeff worked together in many business ventures they owned and/or operated together as

3

partners/members, including but not limited to, MSY, Michigan Real Estate Development, LLC ("MRED"), and other entities formed for the use of their cannabis business partnership ("Partnership Entities").

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

13.     Since the three were brothers, Greg, Chris, and Jeff were not concerned with documenting their ownership interests in each of the Partnership Entities they formed to carry out their business, which were usually single-purpose limited liability companies that usually lacked operating agreements and/or other formal documentation of the brothers' ownership interests.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

14.     But it was always agreed and understood between Greg, Chris, and Jeff that the Partnership Entities were each owned 1/3 by each brother respectively. **Exhibit 1, Selections from Chris's Deposition Testimony, 41:19-42:12, 45:8-22.**

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

15.     From 2016-2018, Greg and Jeff primarily worked to grow the Partnership Entities in the cannabis industry while Chris largely provided some but not all of the financing and back office support.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

16.     One of the assets procured by Greg and Jeff for the Partnership Entities was an agreement between Partnership Entities MSY, on the one hand, and LIV Wellness, LLC ("Liv")

(and its owners) to jointly own and operate a medical marijuana retail provisioning center business in Ferndale, Michigan.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

17.     Pursuant to the Liv Agreement, MSY owned, 50% of the Ferndale provisioning center.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

18.     During their time together, Greg, Chris, and Jeff formed/operated the following Partnership Entities, among others. MSY, MRED, and Oakland Business Park, LLC ("OBP").

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

19.     At the end of 2018, Jeff separated from Greg, Chris, and his interests in the various the Partnership Entities that existed at the time.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

20.     After nearly a year of negotiations, on November 13, 2019, Greg, Chris, and Jeff executed a formal agreement pursuant to which Greg and Chris purchased Jeff's 1/3 interests in the Partnership Entities (the "Good Guy Agreement"). **Exhibit 2, Good Guy Agreement; Exhibit 1, 49:25-50:5.**

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

21.     The Good Guy Agreement states, in relevant part, that (a) Jeff, Greg, and Chris were involved in a cannabis business; and (b) Greg and Chris shall pay Jeff for his interests in the Partnership Entities. **Exhibit 2, at Recitals, ¶2**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

22.     Greg and Chris purchased Jeff's interests in the Partnership Entities in accordance with the Good Guy Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

23.     Upon such purchase, Greg and Chris owned the Joint Entities 50/50. **Exhibit 1, 41:19-42:12, 45:8-22.**

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

24.     Thereafter, Greg and Chris continued to work together, jointly owning and/or operating the Partnership Entities and continued to expand their holdings and joint operations, forming new partnership entities, along with various single purpose entities that owned property, and other assets (collectively, the "Joint Entities").

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

25.     Several of the Joint Entities were owned by Greg as the sole record owner.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

26.     Because Greg and Chris were brothers, they continued their practice of not documenting their respective ownership of the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

27.     However, at all times Greg and Chris agreed and understood that both Greg and Chris were the 50/50 members/shareholders/owners of the Joint Entities through their larger partnership. **Exhibit 3, Affidavit of Brian Molloy**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

28.     Ryan Jundt ("Jundt") was also a minority partner of Greg and Chris in certain of the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

29.     The Joint Entities developed after Greg and Chris purchased Jeff's interests include, but are not limited to, the following: Candid, Inc. (f/k/a Standard Wellness), Focus Group Enterprises ("FGE"), Innovative Financing, LLC, Axon Properties, LLC ("Axon"), Frequency Wellness, LLC, and Alchemy Wellness, LLC.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

30.     Over the course of the brothers' business relationship, Greg was primarily responsible for the operations of the Joint Entities and Chris was primarily responsible for the finances and internal accounting of the Joint Entities.

7

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

31.     Brian Molloy, the former controller for many of the Joint Entities, worked with Chris to prepare and provide the necessary information for Chris and Greg to file their respective tax returns.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

32.     For several years, Chris directed Molloy to put certain assets and liabilities of the Joint Entities on Chris's tax return and other assets and liabilities of the Joint Entities on Greg's tax return.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

33.     At all times, and at Chris's direction, the main operational companies for the Joint Entities, Axon and MRED, were on Greg's tax return only.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

34.     The Joint Entities accumulated significant assets, including real property and cannabis licenses, accounts receivable of more than $55 million, and other real estate and operating assets worth more than $100 million, which Greg and Chris owned equally 50/50.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

**The MSY/Liv Litigation**

8

35.     On November 18, 2019, after Liv breached its partnership agreements with MSY, MSY filed a lawsuit against Liv and other defendants after Liv disavowed its partnership agreement with MSY and MRED. See *MSY Capital Partners, LLC v Liv Wellness Center, LLC d/b/a Liv Wellness*, Oakland County Circuit Court Case No. 2019-178037-CB (Hon. Michael Warren) (the "MSY Litigation").

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

36.     The court held a jury trial and the jury returned a verdict in favor of MSY and against Liv in the amount of $19 million.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

37.     On October 28, 2021, the jury verdict was reduced to a judgment.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

38.     On December 20, 2021, Liv filed a claim of appeal.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

39.     On January 14, 2022, Liv paid a $21 million appeal bond to the Clerk of the Oakland County Circuit Court.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

40.     MSY engaged Dykema Gossett PLLC as its appellate counsel.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

41.     Greg, a 50% member of MSY, signed Dykema's engagement letter on behalf of MSY. **Exhibit 4, Dykema Engagement Letter**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

42.     While Liv's appeal was pending, MSY and Liv reached a settlement and pursuant to a March 10, 2023 Confidential Settlement Agreement the parties agreed, in relevant part, that the Bond would be paid to Dykema who, in turn would distribute an agreed upon portion of the Bond to each of Liv and MSY. MSY's portion of the Bond is hereinafter referred to as the "MSY Litigation Proceeds."

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

43.     Both Greg and Chris signed the Confidential Settlement Agreement on behalf of MSY.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

<u>Greg and Chris Separate Their Business Dealings</u>

44.     In 2022, there was a significant breakdown in Greg's and Chris's relationship.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

45.     With the help of several mediators, in Fall 2022, Greg and Chris began negotiating a buyout of Greg's ownership and interest in the Joint Entities.

10

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

46.     Over several months and several meetings, on December 14, 2022, Greg and Chris reached a written and binding agreement (the "Buyout Agreement"), signed by both parties and three witnesses,[1] which contained the material terms of the buyout. **Exhibit 5, Buyout Agreement**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations, including the footnote.**

47.     Pursuant to the Buyout Agreement, Greg agreed to assign his interests in several of the Joint Entities to Chris in exchange for payment of $18.3 million, on the following schedule: (a) $500,000.00 by December 16, 2022; (b) $1,200,000.00 no later than December 22, 2022; and (c) $220,000.00 per month beginning May 1, 2024. Id. All payments were "unconditional." Id.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

48.     Pursuant to the Agreement, Greg retained the following:

> Ability to collect on invoices due from Jeff;
> Full ownership of Bloomfield Hills Swim and Tennis;
> 100% of the Connecticut deal with Jeff;
> 100% of the New Jersey deal with Jeff;[2]

---

[1] Jaime Kjos was physically present at the meeting for the first several hours and then was present telephonically for the last 2 hours of the 11-hour meeting. Pastor Kjos asked that his name be signed to the Buyout Agreement as a witness to the agreement between Greg and Chris.

[2] The "Connecticut deal" and "NJ deal" refer to agreements between Greg and Chris, on the one hand, and Jeff, on the other hand, pursuant to which Greg and Chris consulted for and

11

4870-9978-3058_6

A residence in Lake Orion, Michigan,
Interest in MSY and 50% of the MSY Litigation Proceeds. *Id*.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

49.    The Joint Entities, with the exception of the above-identified assets Greg retained, are hereinafter referred to as the "Sold Assets."

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

50.    Each of the three witnesses will testify that the Buyout Agreement was intended to be binding and enforceable and was the culmination of months of negotiations between Greg and Chris.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

51.    They will also testify that although the Buyout Agreement numbers were not the initial numbers proposed by either Greg or Chris, the material deal points remained the same throughout the negotiations. **Exhibit 7, October Email from Chris**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

52.    Steve Romaya, Greg's and Chris's cousin and one of the witnesses, attested: "It was always my understanding, the understanding of everyone else present and everyone who signed/witnessed that Partnership Buyout Agreement that the Partnership Buyout Agreement was

---

provided information to Jeff in return for equity in certain of Jeff's investments. *See, e.g.*, **Exhibit 6, Consulting Agreement**

a final and binding agreement on both Greg and Chris and contained all the terms upon which Greg agreed to sell his business interests to Chris." **Exhibit 8, Romaya Affidavit, at 116**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

53.    Immediately after signing the Agreement on December 14, 2023, Chris emailed attorney Gavin Fleming, informed him that "Greg and I resolved our issues yesterday," and instructed Fleming to release $100,000.00 he was holding in escrow pending agreement between Greg and Chris regarding terms of the buyout. **Exhibit 9, Email to Fleming**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

54.    Prior to this litigation, Chris never stated to Greg that he believed the Buyout Agreement to be anything other than a binding and enforceable agreement between them.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

**Events Subsequent to Execution of the Buyout Agreement**

55.    Chris initially complied with the Buyout Agreement, making the required $500,000.00 payment to Greg by December 16, 2022. **Exhibit 10, Wire with Memo Line**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

56.    Chris and Greg worked with Mark James, a former FYB attorney, to transfer ownership of the Sold Assets from Chris to Greg.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

13

57.     Chris directed James to prepare ownership transfer documents of certain entities and assets and to send those documents to Greg for signature in furtherance of the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

58.     At Chris's direction, James prepared and sent Greg membership interest assignments for Axon, Blue Skies Financing, LLC, OBP, and MRED.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

59.     Pursuant to the Buyout Agreement, Greg executed all assignments and agreements that Mark James prepared. All of the assignments had an effective date of December 14, 2022, the date of the Buyout Agreement. **Exhibit 11, Assignments**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

60.     Chris also directed James to prepare a deed to transfer ownership of a residence owned by Greg and his aunt to an entity owned solely by Chris in furtherance of the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

61.     James prepared the deed and Greg signed the deed, thereby relinquishing his ownership of the residence. **Exhibit 12, 299 N. Berkshire Deed**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

62.     Chris also directed James to prepare a document for Greg to transfer ownership of a New Jersey recreational cannabis license in furtherance of the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

63.     Due to regulations, the license was not yet transferable so James drafted a longer form agreement pursuant to which Greg agreed to transfer Candid's license to Chris via Axon in the future when it could be transferred ("License Agreement.").

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

64.     The draft License Agreement contained a merger clause that read: "This Agreement, contains the entire agreement between the Parties related to the Individual Ownership, Individual's obligation to transfer the Individual Ownership to Company, Company's sole liability for payment of taxes, and Company's obligation to indemnify Individual."

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

65.     Because the License Agreement arose from and was subject to the Buyout Agreement, Greg requested and Chris agreed to revise the entire agreement clause to read "This Agreement together with the December 14 Agreement."

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

66.     The merger clause of the final, executed License Agreement states: "This Agreement, together with the December 14 Agreement, contains the entire agreement between the Parties related to the Individual Ownership, Individual's obligation to transfer the Individual

15

Ownership to Company, Company's sole liability for payment of taxes, and Company's obligation to indemnify Individual." **Exhibit 13, License Agreement**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

67.     On March 17, 2023, Chris signed the License Agreement as "Authorized Agent" of Axon.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

68.     In addition, and pursuant to the Buyout Agreement, Chris removed himself as a member and officer of Bloomfield Hills Swim and Tennis, LLC, and from the Bloomfield Hills Swim and Tennis, LLC bank account with Citizens State Bank (the bank owned and operated by Chris. **Exhibit 14, Email to Rana**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

69.     Chris also directed Mark James to remove Chris as an officer and director of a second entity, Bloomfield Hills Swim & Tennis, Inc. in furtherance of the same.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

70.     In addition, Chris directed Heather Cude, another former FYB attorney, to prepare documents to transfer ownership of certain entities regulated by the CRA, including Frequency, Candid and Alchemy (the "Cannabis Entities") in furtherance of the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

16

71. Because Chris was not prequalified with the CRA, Chris directed Cude to prepare the documents to transfer ownership of the Cannabis Entities from Greg and Ryan Jundt ("Jundt"), Chris's brother-in-law, to Chris's employees who were prequalified with the CRA.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

72. All parties knew and understood that Greg was transferring the Cannabis Entities in furtherance of the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

73. In addition, all parties knew and understood that Chris — who was not prequalified with the CRA — was transferring the Cannabis Entities to certain employees because they were prequalified, but that Chris would remain the beneficial owner of the Cannabis Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

74. Initially, Chris directed Cude to work with Greg to have the Cannabis Entities transferred to Chris's employee Adam Dyson ("Dyson").

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

75. Cude prepared documents to effectuate the transfer of Frequency and Candid with the CRA and sent them to Greg for signature.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

76.    Cude also prepared documents to effectuate the transfer of Alchemy, which was held by Jundt, from Jundt to Adam Dyson ("Dyson").

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

77.    However, shortly after filing for the transfer from Greg and Jundt to Dyson, Dyson had second thoughts about taking on this responsibility and role for Chris, and demanded that he be removed from the Cannabis Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

78.    Dyson resigned his position with Chris, hired an attorney, and Cude worked with Dyson and Dyson's attorney to have the Cannabis Entities taken out of Dyson's name.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

79.    Because the Frequency assignment had already been submitted to the CRA, Cude worked with Dyson and his attorney to transfer Frequency to Josh Smith ("Smith"), Chris's Chief Financial Officer.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

80.    Because the Alchemy assignment had already been submitted to the CRA, Cude worked with Dyson's attorney to transfer Alchemy to Joseph Gordhamer ("Gordhamer", the President of OCG Companies, LLC, one of Chris's companies.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

81.    Because the Candid assignment had not yet been submitted to the CRA, Cude worked with Greg to have him re-execute the document to effectuate transfer of Candid to Smith instead of Dyson.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

82.    On or about January 27, 2023, Cude submitted an Amendment Application to the CRA which sought approval of a "Change of Ownership (Adding/Removing/Change of Equity)" for "Gregory Yatooma, sole shareholder of Candid, Inc., is transferring 100% of Candid, Inc.'s stock to Joshua Smith, a prequalified individual" (the "Candid Application"). **Exhibit 15, Candid Application.**

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

83.    As part of the Candid Application, Greg signed and submitted an Amendment Verification & Affidavit of Full Disclosure Attestation pursuant to which he confirmed his understanding that "...this requested amendment is a proposed change and cannot be executed prior to receiving approval from the Agency." *Id*.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

84.    On or about February 24, 2023, Greg signed and submitted a "Shareholder Resolution Conditionally Approving Transfer of Shares" of Candid. **Exhibit 16, Candid Resolution**. The resolution states, in relevant part "FURTHER RESOLVED that this transfer of shares is conditioned upon the Cannabis Regulatory Agency's ("CRA") approval of this Company's Amendment Application proposing this transfer of shares." *Id*.

19

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

85.     The CRA was in the process of reviewing Candid's METRC entries with the CRA at the time Candid submitted the Candid Application, so the CRA's processing and approval of the Candid Application was delayed.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

86.     Neither Dyson nor Smith nor Gordhamer paid, or gave any other form of consideration, for the transfer of Frequency, Candid or Alchemy, which are worth millions of dollars.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

87.     Frequency has since been transferred from Smith to Gordhamer (both of whom are Chris's employees).

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

88.     Pursuant to the Buyout Agreement, Greg also removed himself from all of the Sold Assets' bank accounts, for Chris's benefit.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

89.     It is undisputed that Greg fully complied with the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

90.     The only remaining obligations pursuant to the Buyout Agreement were Chris's financial obligations to Greg identified in Sections 1.1 (with the exception of the $500,000 payment), 1.2, 1.8.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

91.     It is undisputed that since signing the Buyout Agreement, Chris sold certain assets previously owned by the Joint Entities and has retained one hundred percent (100%) of the proceeds from such sales.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

92.     Chris is using assets, funds, and other infrastructure of the Joint Entities for Chris's own personal benefit at the expense of Greg and the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

**<u>Chris Attempts to Steal 100% of the MSY Litigation Proceeds</u>**

93.     On March 13, 2023, Chris agreed that Greg and Chris should direct Dykema to wire the MSY Litigation Proceeds less legal expenses 50% directly to Greg and 50% directly to Chris:



4870-9978-3058_6

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

94.     On April 12, 2023, Dykema received the MSY Litigation Proceeds.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

95.     Despite that all relevant times Greg was a fifty percent (50%) owner in MSY and the Buyout Agreement clearly states the Litigation Proceeds were to be split equally, sometime on or about April 12, 2023, Chris surreptitiously contacted MSY's attorneys, claimed Greg had no interest in in the MSY Litigation Proceeds and attempted to have the entire balance of the MSY Litigation Proceeds released to Chris directly.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

96.     Prior to contacting Dykema on or about April, 12, 2023, Chris had never alleged that Greg was not a 50/50 owner in MSY or claimed that Greg was not entitled to 50% of the Litigation Proceeds.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

97.     In an April 20, 2023 letter, Dykema acknowledged that Chris attempted this maneuver and that Chris had claimed to them that Greg had no interest in the MSY Litigation Proceeds. **Exhibit 17, Letter from Brian Moore**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

4870-9978-3058_6

98.     Dykema further acknowledged that they had received conflicting wiring instructions from Chris and Greg, and that Greg had requested that the Litigation Proceeds be split 50/50 between Chris and Greg in accordance with Section 17 the Buyout Agreement, but that Chris was requiring that the Litigation Proceeds be disbursed solely to him.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

99.     Given the conflicting instructions, MSY's attorneys stated that they could not release the funds to either party absent join instructions and/or a court order.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

100.    On July 28, 2023, at Greg's request, the Court entered an order instructing the parties to deposit the Litigation Proceeds with the Clerk of the Oakland County Circuit Court.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

101.    Chris's various actions are clear and unequivocal breaches of contract, amongst other things.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

**The Candid Transfer**

102.    As soon as Greg signed over his interests in the Sold Assets and removed himself from the bank accounts, Chris reneged on and breached the Buyout Agreement, by, among other things, refusing to make the $1.2 million payment due December 22, 2022 and attempting to take 100% of MSY Litigation Proceeds for himself.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

103.    Chris also refused to make the $220,000 monthly payments that were to commence on May 1, 2023, completely repudiating his remaining obligations pursuant to the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

104.    Greg accordingly commenced suit against Chris for his clear breach of the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

105.    In his Answer filed October 6, 2023, Chris claimed that Greg was never Chris's partner, Greg merely acted as the Joint Entities' attorney, and that "Greg wrongfully put [the Joint Entities] into his own name in a scheme to defraud Chris and in violation of his ethical and fiduciary duties to Chris."

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

106.    These and other assertions in Chris's Answer are false, as confirmed by multiple former employees and partners, and Chris's own testimony in the MSY Litigation. **Exhibit 3, Molloy Affidavit.**

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

4870-9978-3058_6

107.    Chris further claims in his Answer that Chris only signed the Buyout Agreement because he was under "duress" (despite all evidence to the contrary) thus and again completely repudiating the Buyout Agreement and his obligations pursuant thereto.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

108.    Greg is thus relieved, as a matter of law, from any further obligation to perform pursuant to the Buyout Agreement and on October 19, 2023, Greg submitted a Request to Withdraw the Candid Application from the CRA. **Exhibit 18, Candid Withdrawal Request**.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

109.    On Monday, October 23, Greg received notification from the CRA that the Candid Application to transfer ownership to Smith had been withdrawn.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

110.    Despite that Greg is the President, Secretary, Treasurer, and named licensee on Candid's CRA licenses, Chris has excluded Greg from Candid's operations and retained 100% of Candid's revenue.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

111.    Candid is a cannabis grow operation with a Fall harvest. Candid's seasonal harvest and corresponding sales are underway and will continue for the next several weeks. Candid is expected to generate millions of dollars in revenue this year. As Candid is a regulated entity and

Chris is not prequalified with the CRA, Chris is not authorized by law to operate Candid without Greg.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

**Chris, Houbeck, and Stopczy Hack Greg's FYB Email**

112. On December 20, 2022, six days after Greg and Chris signed the Buyout Agreement, Rich Stopczy, a W-2 employee of Axon and the IT manager for all of the Joint Entities, as well as FYB[3], came to Greg's house and removed Greg and Kara Harbour ("Harbour") (Greg's assistant) from the shared servers with Chris.

**ANSWER: Admitted that Stopczy came to Greg's home on or about December 20, 2022. Denied as to the remaining allegations.**

113. At that time, Stopczy also confirmed to Greg that no one had access to Greg's FYB email nor could access Greg's computer desktop without Greg's permission.

**ANSWER: Denied.**

114. Stopczy's confirmation, however, was untrue.

**ANSWER: Denied; but, by way of clarification, Stopczy made no such confirmation as alleged in paragraph 113.**

115. On January 13, 2023, Stopczy, at Chris's direction, accessed and downloaded Greg's entire FYB email account, consisting of 159,859 emails, and saved them to Michelle

---

[3] FYB operated out of the same office building as all of Greg's and Chris's other businesses, including Axon. Greg and Chris jointly owned the office building after Jeff's buyout.

26

Houbeck's[4] computer for her to review and print for Chris's consumption and use. **Exhibit 19, Photos from Stopczy.**

**ANSWER: Admitted that Stopczy downloaded the e-mails. Denied as to the remaining allegations.**

116. On February 14, 2023, Stopczy again accessed and downloaded Greg's FYB emails from January 13, 2023 to February 14, 2023 to "update" his initial collection, which included an additional 1,254 emails for a total of 161,044 stolen from Greg's FYB email account.

**ANSWER: Admitted that Stopczy downloaded and saved the range of e-mails identified. Denied as to the remaining allegations.**

117. This was nearly two months after Greg and Chris signed the Buyout Agreement, during a period when Greg sent and received hundreds of emails with his attorneys concerning the very issues that eventually became this litigation, and also included attorney-client and confidential emails with third parties where Greg was acting as an attorney - - including matters that would be of a particular interest to Chris.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

118. FYB's email is hosted by Microsoft's cloud-based Office 365 servers. FYB's email is not stored on a physical server. Greg owns the FYB website and domain.

**ANSWER: Admitted that emails for FYB are hosted on a cloud-based server that is paid for, and controlled by, an entity owned by Chris Yatooma and that there are no physical servers**

---

[4] Houbeck has been Chris's executive assistant since July 2018. Houbeck is a W-2 employee paid by Axon.

27

that host email. **Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the remaining allegations.**

119.    Because he was FYB's former IT director, Stopczy retained administrative privileges to the FYB accounts without Greg's knowledge or permission.

**ANSWER: Admitted that Stopczy had certain administrative privileges, but denied as to the remaining allegations, including whether Greg's knowledge or permission was not necessary for a computer system owned/controlled by a third party.**

120.    Stopczy did not have any legal right or authority to access or download FYB's emails on behalf of Chris or Houbeck and Stopczy exceeded his authority with respect to the FYB email accounts.

**ANSWER: Denied. In further answer, defendants Stopczy and Houbeck state that Greg's knowledge or permission was not necessary for a computer system owned/controlled by a third party.**

121.    Stopczy improperly used his IT admin credentials to access and download Greg's emails without Greg's knowledge or permission.

**ANSWER: Denied.**

122.    Importantly all of this activity took place subsequent to the Buyout Agreement and after Greg was told his FYB email had been severed from access by Chris or any others.

**ANSWER: Denied.**

123.    On December 20, 2023, Greg spoke with Stopczy to discuss transfer of the Sold Assets' and MSY's domains from Greg's GoDaddy account to a GoDaddy account held by Chris. Because Chris had not yet set up his GoDaddy account, Stopczy asked to transfer the domains at a later date.

4870-9978-3058_6

**ANSWER: Stopczy admits only that a discussion occurred on that date. Denied as to the remaining allegations.**

124.    On February 17, 2023, Stopczy contacted Greg and asked him to help "get the domains transferred over for our emails." **Exhibit 20, February 17, 2023 Email**.

**ANSWER: Admitted only that the quoted text appears in Exhibit 20.  By way of further response, the cited correspondence speaks for itself.**

125.    In that email, Stopczy identified the domains Stopczy believed should be transferred. *Id.* Greg noticed that Stopczy's list included "fyblaw.com" and was confused by its inclusion.

**ANSWER: Stopczy admits sending an email about domains. Other than what is said in the e-mail, Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the remaining allegations.**

126.    Greg promptly sent Stopczy the following text message: "Hey Stopczy. Got your email. Give me a shout at your convenience." **Exhibit 21, Text Messages Between Greg and Stopczy.**

**ANSWER: Admitted only that the quoted text appears in Exhibit 21.  By way of further response, the cited messages speak for themselves.**

127.    The two then spoke on the phone and Greg asked Stopczy why he included FYB on the list of domains to be transferred because Chris should not have access to FYB. **Exhibit 22, Greg's Declaration.**

**ANSWER: Admitted only that Greg and Stopczy spoke on the phone. Denied as to the remaining allegations.**

128. After an extended silence from Stopczy, Greg asked Stopczy several times if he had accessed Greg's emails. *Id*. Stopczy finally admitted the following to Greg:

> Chris had been pressuring Stopczy to access Greg's emails since the buyout on December 14, 2022;
> Stopczy at first refused several times because he thought it was wrong and possibly illegal, but ultimately agreed to do so after Chris assured him that a lawyer said Stopczy was "fully covered";
> Stopczy downloaded Greg's entire FYB email on January 13, 2023 which consisted of 159,859 emails and again on February 14, 2023 which consisted of another 1,254 emails between January 14 and February 14, 2023;
> Stopczy saved Greg's entire FYB email to Houbeck's computer in a PST file.;
> At the direction of Chris, Houbeck, Chris's assistant, was instructed to run searches for certain key words and phrases in Greg's email and print those emails for Chris's review and use.
> Stopczy had not been able to sleep since he downloaded Greg's inbox because he felt so bad and that he was going to do everything he could to make it right;
> He was going to tell Chris that Greg and him talked and that he was going to tell Chris he would no longer be a part of this scheme with Chris and Michelle. [*Id*.]

**ANSWER: Neither admitted nor denied as to defendants Stopczy and Houbeck because they lack knowledge or information to form a belief as to the truth of the allegations.**

129. Stopczy sent Greg videos and photos that Stopczy claimed showed him deleting all of Greg's emails but at the very least proving that this theft as described above had occurred. *Id*.[5]

**ANSWER: Admitted that Stopczy sent Greg videos and photos. Denied as to the remaining allegations. By way of further response, the linked videos are inaccessible.**

130. The second video shows Stopczy's computer screen and a list of files, which include "Greg Y" and "Greg Y 1-13-23 to 2-14-23." (Video 2 at 00:00):

---

[5] The videos Stopczy sent to Greg are available at the following links: Video 1 — https://drive.google.com/file/d/1G_d741v49NEo5hoV-c73154ykN8z8GiN/view?usp=sharing
Video 2 —
https://drive.google.cornifile/d/liICEzSIQ2i0v79Tu6Qcs5WNdhz1JZ2W-/view?usp=sharinR

30



**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**

131.    Stopczy then pans to the right and his screen reflects that the Greg Y files was "last run on 2023-01-13," was "Searched by Rich Stopczy," and contains "159,859 items.") (Video 2 at 00:07).



**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**

132.    Stopczy then purports to delete the "Greg Y" file.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**

133.    Stopczy then moves on to the "Greg Y 1-13-23 to 2-14-23" file and spans to the right and his screen reflects that the file was "last run on 2023-02-14," was "Searched by Rich Stopczy," and contains "1,254 items."). (Video 2 at 00:35).

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**



**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**

134.    Stopczy then purports to delete the "Greg Y 1-13-23 to 2-14-23" file.

32

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**

135. Stopczy then scrolls down to a third file not previously depicted - - "Greg Y as of 2-14-23" (Video 2 at 00:49) which apparently was a re-collection of Greg's entire FYB account. Stopczy spans to the right, and his screen reflects that the file was "last run on 2023-02-14," was "Searched by Rich Stopczy," and contains "161,044 items."). (Video 2 at 00:50)



**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**

136. Stopczy then purports to delete the third file.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. By way of further response, the linked videos are inaccessible.**

137. Greg asked Stopczy to confirm that he deleted all copies of Greg's FYB email, and Stopczy so confirmed:

33



Once deleted the resLots are I:tem.:eyed.

Rw g        :•>2.6f1K94 17,

in the detaill it wokild have stwern stst vote rradbox SDITV deleted before opening that •./

2/17/2*23 IiOS PM

**ANSWER: Denied. By way of further response, the quoted text messages speak for themselves.**

138.   Greg then conferenced in his assistant, Harbour, because Stopczy was supposed to assign over the admin permissions to Greg's new Microsoft SharePoint account.

**ANSWER: Stopczy denies that he was supposed to assign over the admin permissions to Greg's new Microsoft SharePoint account and further states it is not possible to transfer administrative access to a single email account or a single domain on a multi-domain tenant. Defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the remaining allegations.**

139.   While Stopczy, Greg, and Harbour were on the three-way call commencing the transfer, Houbeck could be heard yelling at Stopczy and demanding that he see Chris immediately. **Exhibit 22.**

**ANSWER: Denied.**

34

140.    The line then went dead and Stopczy (presumably at Chris's demand) blocked Greg's number so Greg could no longer contract him. *Id*.

**ANSWER: Denied. In further answer, Stopczy blocked Greg's number because of Greg's harassment and threats. Greg's behavior continued which necessitated a Cease and Desist letter to be sent to Greg on August 22, 2023.**

141.    Chris, Stopczy, and Houbeck have refused to destroy their copies of Greg's FYB email.

**ANSWER: Admitted. Pursuant to the Court's order dated September 7, 2023, defendants are required to preserve these documents, which also are the subject of an ongoing investigation involving the theft of company assets.**

142.    In fact, this litigation has revealed that Chris, Stopczy, and/or Houbeck are actively reviewing Greg's FYB email and using the contents thereof to litigate this case.

**ANSWER: Defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the remaining allegations. In further answer, Stopczy and Houbeck state that these documents are the subject of an ongoing investigation involving the theft of company assets.**

143.    Chris has even gone so far as to read emails between Greg and his counsel in this matter. Greg did not know that Chris was reading his attorney client privileged emails until after Greg sent and received hundreds of emails with his counsel regarding his dispute with Chris.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

144.    In addition, Kevin Oberle, a former Axon employee, attested that Chris has been using Greg's FYB email as a source to develop leads and strategy in the cannabis industry. **Exhibit 23, Oberle Affidavit.**

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

145.    Chris even gave certain of his new hires FYB email addresses, even though they did not work for Greg or FYB.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

146.    Due to Chris's unwillingness to return Greg's FYB email, his continued use of Greg's FYB email, and Chris's continued unauthorized access to Greg's FYB email, Greg was forced to cease operating as FYB.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. In further answer, Stopczy and Houbeck state that, upon information and belief, Greg was removed from what is now Fleming & Borowicz PLC by its sole member, Gavin Fleming, due to his alleged connection to Rick Johnson, who recently was sentenced on federal bribery charges, as reported by the Detroit News on February 26, 2023 and on April 6, 2023.**

147.    FYB and its website URL are no longer in use today as Greg could no longer assure clients that his emails were not being read by Chris or his staff.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. In further answer, Stopczy and Houbeck state that, upon information and belief, FYB and its URL are no longer**

36

used today because Greg was removed from what is now Fleming & Borowicz PLC by its sole member, Gavin Fleming, due to his alleged connection to Rick Johnson, who recently was sentenced on federal bribery charges, as reported by the Detroit News on February 26, 2023 and on April 6, 2023.

148.     As of the filing of this Amended Complaint, Chris persists in his refusal to allow Rich, and Rich has refused to tender, the administrative logins to Greg's FYB email.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. In further answer, Stopczy and Houbeck state that it is not possible to transfer administrative access to a single email account or a single domain on a multi-domain tenant.**

149.     Consequently, Rich, Chris and Michelle still have full access to Greg's attorney client privileged emails.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

### COUNT I: BREACH OF PARTNERSHIP AGAINST CHRIS

150.     Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

151.     Greg and Chris agreed to form a partnership to engage in a business wherein each would furnish capital, management and/or effort(s) to such business.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

152.     Greg and Chris intended to share equally in the profits and losses of the partnership.

37

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

153.    The partnership agreement was mutual, enforceable, and supported by consideration.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

154.    Chris has refused to perform his obligations pursuant to the partnership by, among other things:

> Denying the existence of a partnership;
> Denying Greg's interest in the Joint Entities;
> Excluding Greg from the operation of the partnership and the Joint Entities;
> Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the partnership; and
> Failing to distribute Greg's share of partnership revenue to him.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

155.    As a direct and proximate result of Chris's breaches of the partnership, Greg has been and will continue to be damaged.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

<u>**COUNT II: BREACH OF PARTNERSHIP FIDUCIARY DUTIES**</u>
<u>**AGAINST CHRIS**</u>

156.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

38

157.    "[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another." Vicencio v Ramirez, 211 Mich App 501, 508; 536 NW2d 280 (1995).

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

158.    As set forth above, Greg and Chris formed a partnership to jointly own and operate the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

159.    In forming the partnership, jointly operating, and agreeing to jointly own the Joint Entities, Greg and Chris reposed faith, confidence, and trust in each other and relied upon the judgment and advice of one another in all aspects of the partnership, thereby establishing fiduciary relationship between them.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

160.    Such fiduciary duties required Chris to act in good faith, with the care of an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that they reasonable believed to be in the best interests of the parties' Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

161.    Conversely, such fiduciary duties prohibits Chris from dealing dishonestly with and in an underhanded fashion with Greg, and in ways that deprive Greg of the value of his partnership interests, engaging in conduct that greatly diminishes the return or economic benefit that Greg

should receive as an equal partner in the partnership, and engaging in self-dealing to the detriment of Greg.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

162.    In breach of his fiduciary duties to Greg, Chris engaged in the following actions and inactions, including, but not limited to:

> Denying the existence of a partnership;
> Denying Greg's interest in the Joint Entities;
> Excluding Greg from the operation of the partnership and the Joint Entities;
> Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the partnership; and
> Failing to distribute Greg's share of partnership revenue to him.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

163.    As a direct and proximate result of Chris's breaches of fiduciary duties, Greg has been and will continue to be damaged.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

<u>**COUNT III: BREACH OF JOINT VENTURE, IN THE ALTERNATIVE \\ AGAINST CHRIS**</u>

164.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

165.    Greg and Chris agreed to form a joint venture to engage in a business wherein each would furnish capital, management and/or effort(s) to such business.

4870-9978-3058_6

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

166.    Greg and Chris intended to share equally in the profits and losses of the joint venture.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

167.    The joint venture was mutual, enforceable, and supported by consideration.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

168.    Pursuant to that agreement, Greg and Chris jointly owned and operated the Joint Entities, with equal interest therein and control thereof, for several years.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

169.    Chris has refused to perform his obligations pursuant to the joint venture by, among other things:

>    Denying the existence of a joint venture;
>    Denying Greg's interest in the Joint Entities;
>    Excluding Greg from the operation of the joint venture and the Joint Entities;
>    Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the joint venture; and
>    Failing to distribute Greg's share of joint venture revenue to him.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

170.    As a direct and proximate result of Chris's breaches of the joint venture, Greg has been and will continue to be damaged.

41

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

## COUNT IV: BREACH OF JOINT VENTURE FIDUCIARY DUTIES, IN THE ALTERNATIVE AGAINST CHRIS

171.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

172.    As a joint venturer with Greg, Chris had an affirmative duty to discharge his duties in the utmost good faith and honesty in all matters relating to the joint venture and in a manner he reasonably believed to be in the best interest of the joint venture.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

173.    In breach of his fiduciary duties to Greg, Chris engaged in the following actions and inactions, including, but not limited to:

> Denying the existence of a joint venture;
> Denying Greg's interest in the Joint Entities;
> Excluding Greg from the operation of the joint venture and the Joint Entities;
> Failing to ensure that Greg received his rightful share of proceeds from sales of assets owned by the joint venture; and
> Failing to distribute Greg's share of joint venture revenue to him.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

174.    As a direct and proximate result of Chris's breaches of fiduciary duties, Greg has been and will continue to be damaged.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

## COUNT V: DECLARATORY RELIEF AS TO OWNERSHIP OF THE JOINT ENTITIES

175.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

176.    Greg and Chris are the two members of the Joint Entities, each owning fifty percent (50%) of the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

177.    In fact, in sworn deposition testimony Chris testified and affirmed that Greg is a fifty percent (50%) owner of the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

178.    Therefore, Chris is now estopped from claiming anything other than what he swore under oath to this Court as true.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

179.    Chris now claims that Greg has no ownership interests in the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

180.    Although there should be none, an actual case and/or controversy thus exists between Greg, Chris and/or the Joint Entities as to the recognition of Greg's ownership such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

4870-9978-3058_6

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

181.    The Court should issue judgment declaring that Greg is fifty percent (50%) owner of the Joint Entities with full rights and authority pursuant thereto.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

<u>**COUNT VI: BREACH OF CONTRACT AGAINST CHRIS**</u>

182.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

183.    The Buyout Agreement is an enforceable written contract between Greg and, Chris, and was executed by three individuals as witnesses who were involved in the negotiations between Greg and Chris.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

184.    Chris initially complied with the Buyout Agreement, making the required $500,000.00 payment to Greg by December 16, 2022.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

185.    Greg performed all aspects of the Buyout Agreement by, including, but not limited to, assigning, via written documents, all his rights in the Sold Assets, which is undisputed by Chris.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

44

186.     Chris breached the Buyout Agreement, by, among other things: Refusing to make the $1.2 million December 22 Payment;

> Refusing to split the MSY Litigation Proceeds 50/50 and attempting (surreptitiously) to take possession of 100% of them; and
> Repudiating the remainder of his obligations under the Buyout Agreement when, on April 12, 2023, he sent Greg a text message that he did not intend to honor any portion of the Buyout Agreement moving forward and stating: "I will not be giving you a penny."

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

187.     By his statements and conduct, Chris has anticipatorily repudiated the Buyout Agreement and, therefore, Greg is entitled to recover the full $18.3 million due thereunder and all other benefits of the Buyout Agreement, including the payment of taxes due under Section 8 of the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

188.     Greg has been damaged by Chris's breaches of the Buyout Agreement in an amount in excess of $25,000.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

### COUNT VII: PROMISSORY ESTOPPEL, IN THE ALTERNATIVE AGAINST CHRIS

189.     Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

190.    Chris promised to pay Greg $18.3 million, among other benefits, in exchange for Greg's promise to assign Greg's ownership interests in the Sold Assets to Chris and/or Chris's designee(s).

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

191.    In reliance on Chris's promises to honor the terms of the Buyout Agreement, Greg assigned his ownership interests in the Sold Assets to Chris and/or Chris's designees, Dyson, Gordhamer, and Smith.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

192.    Greg reasonably relied upon Chris's promises to his detriment, relinquishing ownership and control of significant assets to Chris.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

193.    Chris should be estopped from failing to keep his promise.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

194.    Greg has been damaged in an amount to be determined in trial, but in excess of $25,000.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

## COUNT VIII: UNJUST ENRICHMENT, IN THE ALTERNATIVE, AND DECLARATORY RELIEF AS TO OWNERSHIP OF FREQUENCY AND CANDID AGAINST CHRIS

195.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

196.    Chris promised Greg the consideration described in the Buyout Agreement in exchange for Greg's promise to assign Greg's ownership in the Sold Assets to Chris and/or Chris's designees, Dyson, Gordhamer and Smith.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

197.    In reliance on Chris's promises to honor the terms of the Buyout Agreement, Greg assigned his ownership interests in the Sold Assets to Chris, and/or Chris's designees, Dyson, Gordhamer and Smith thus conferring a benefit onto Chris and/or Chris's designees, Dyson, Gordhamer and Smith.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

198.    Greg executed an assignment for his 100% ownership interest in Candid to Smith.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

199.    Smith did not pay or give Greg any form of consideration for the Candid assignment. Chris did not pay or give Greg any form of consideration for the Candid assignment.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

200.    Greg assigned his 100% ownership interest in Frequency to Dyson.

47

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

201.    Dyson did not pay or give Greg any form of consideration for the Frequency assignment. Chris did not pay or give Greg any form of consideration for the Frequency assignment.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

202.    Dyson, without receiving consideration, transferred Frequency to Smith.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

203.    Smith, without receiving consideration, transferred Frequency to Gordhamer.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

204.    Gordhamer did not pay or give Greg any form of consideration for the Frequency assignment. Chris did not pay or give Greg any form of consideration for the Frequency assignment.

**ANSWER Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

205.    With Greg's permission, Jundt assigned his 100% ownership interest in Alchemy to Gordhamer, thus conferring a benefit onto Gordhamer.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

4870-9978-3058_6

206. After Chris received control over the Sold Assets, directly or through his designees, Chris reneged on his promise to compensate Chris such that his retention of the benefits conferred upon him, Gordhamer, and Smith by Greg is inequitable and unjust.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

207. An actual case and/or controversy thus exists between Greg, on the one hand, and Chris, on the other hand, as to the ownership of Frequency, Candid, and Alchemy, such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

208. The Court should issue judgment declaring that Chris, Gordhamer, and/or Smith are not entitled to ownership of Frequency, Candid, or Alchemy, and in absence of an agreement by Chris to buy Greg out, Greg is the rightful owner of Frequency and/or Candid.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

209. Chris has been unjustly enriched by his inequitable conduct and Greg has been damaged as a result in an amount to be determined in trial, but in excess of $25,000.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

### COUNT IX: DECLARATORY RELIEF AS TO OWNERSHIP OF MSY AND ENTITLEMENT TO THE MSY LITIGATION PROCEEDS

210. Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

211.    Greg and Chris are the two members of MSY, each owning fifty percent (50%) of the company.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

212.    In fact, in sworn deposition testimony in the underlying case that resulted in the MSY Litigation Proceeds, Chris testified and affirmed that Greg is a fifty percent (50%) owner of MSY.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

213.    Therefore, Chris is now estopped from claiming anything other than what he swore under oath to this Court as true.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

214.    Paragraph 17 of the Buyout Agreement, executed by Chris, further affirms that Greg is the fifty percent (50%) owner of MSY, as it reaffirms that the Litigations Proceeds are to be shared equally by the two of them.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

215.    In addition, in recent correspondence, Chris has repeatedly acknowledged Greg's rights to fifty percent (50%) of the MSY Litigation Proceeds.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

216.     Despite all of this, Chris now claims that Greg has no ownership interests in MSY or any claim to the MSY Litigation Proceeds.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

217.     Although there should be none, an actual case and/or controversy thus exists between Greg, Chris and/or MSY as to the recognition of Greg's ownership and the release of the Litigation Proceeds such that a declaratory judgment is necessary so that the parties' may govern their future conduct accordingly.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

218.     The Court should thus issue a preliminary Order permitting MSY's attorneys to deposit the Litigation Proceeds with the Court.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

219.     The Court should further issue judgment declaring that Greg is fifty percent (50%) owner of MSY with full rights and authority pursuant thereto, including but not limited to the right to receive fifty percent (50%) of the Litigation Proceeds or that Greg has the right to receive right to receive fifty percent (50%) of the Litigation Proceeds.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

## <u>COUNT X: DISSOLUTION OF MSY PURSUANT TO MCL 450.4802</u>

220.     Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

221.    Greg and Chris are the two members of MSY, each owning fifty percent (50%) of MSY.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

222.    MSY has investments, but no ongoing business other than the distribution of the Litigation Proceeds.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

223.    Greg and Chris are in a dispute such that MSY can no longer operate and carry on its business in conformity with its article of organization.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

224.    A judicial decree of dissolution is appropriate pursuant to MCL 450.4802, such that MSY will be dissolved and its affairs wound up, including but not limited to the equal distribution of the MSY Litigation Proceeds and MSY's investments to both Greg and Chris.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

<u>**COUNT XI: FRAUDULENT INDUCEMENT AGAINST CHRIS**</u>

225.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

4870-9978-3058_6

226.    As set forth above, Chris made material representations to Greg regarding the terms of Greg's and Chris's separation and specifically separation of the Joint Entities, as reflected in the Buyout Agreement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

227.    Those representations were false at the time they were made as Chris had no intention of honoring his material representations to Greg regarding the terms of Greg's and Chris's separation and specifically separation of the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

228.    Chris's statements to non-parties, including Romaya, make clear that Chris had no intention of performing pursuant to the Buyout Agreement or paying Greg for his interests in the Joint Entities.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

229.    Chris made these representations knowing they were false or with reckless disregard of their truth.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

230.    Chris made these representations with the intent of inducing Greg to enter into the Buyout Agreement, assign his interests in the Joint Entities to Chris or his designees, and take other actions that would give Chris ownership and/or control over the Joint Entities.

4870-9978-3058_6

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

231.    Greg relied on Chris's representations by entering into the Buyout Agreement and assigning his interests in the Joint Entities, as reflected above.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

232.    Greg has been damaged as a direct and proximate result of Chris's fraudulent inducement.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

233.    Accordingly, Chris is liable to Greg for damages as a result of Chris's fraudulent misrepresentations.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

### COUNT XII: DISSOLUTION OF GREG'S AND CHRIS'S PARTNERSHIP

234.    Plaintiffs incorporate the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

235.    Michigan's Uniform Partnership Act permits dissolution of a partnership in certain situations, including "...by the express will of any partner when no definite term or particular undertaking is specified." MCL 449.31(1)(b).

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

54

236.    Based on Chris's actions as described above, including his breaches of duty, Greg seeks to have his partnership with Chris dissolved.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

237.    Pursuant to MCL 449.31 and 449.32, Greg is entitled to judicial decree dissolving his partnership with Chris and:

    a.    An order pursuant to MCL 449.21 and 22 causing Chris to account;

    b.    An order pursuant to MCL 449.37 appointing Greg with full authority to wind up the partnership;

    c.    An order pursuant to MCL 449.38 entitling Greg to all partnership property, less any cash due to Chris in a net amount, plus the value of his partnership, and entitling Greg to continue on in the partnership's business to his sole benefit. WHEREFORE, Greg requests a judgment in his favor and against Chris: (1) decreeing the dissolution of any partnership between Greg and Chris; (2) appointing Greg to wind the business of the partnership; (3) causing Chris to account to the partnership; (4) awarding all partnership property to Greg, including but not limited to the membership interests in each of the Joint Entities, less any cash due to Chris and the value of Chris's partnership interest; (5) and such other and further relief as the Court deems appropriate.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

## COUNT XIII: DECLARATORY RELIEF AS TO ACCESS AND ADMINISTRATIVE RIGHTS TO GREG'S FYB EMAIL

238.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

239.    FYB's email is hosted by Microsoft's cloud-based Office 365 servers. FYB's email is not stored on a physical server. Greg owns the FYB website and domain.

**ANSWER: Admitted that emails for FYB are hosted on a cloud-based server that is paid for, and controlled by. an entity owned by Chris Yatooma and that there are no physical servers**

that host email. **Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the remaining allegations.**

240.    Because he was FYB's IT director, Stopczy retained administrative privileges to the FYB accounts.

**ANSWER: Admitted that Stopczy had certain administrative privileges.**

241.    However, Stopczy did not have any legal right or authority to access or download FYB's emails on behalf of Chris or Houbeck. Stopczy exceeded his authority with respect to the FYB email accounts.

**ANSWER: Denied. In further answer, defendants Stopczy and Houbeck state that Greg's knowledge or permission was not necessary for a computer system owned/controlled by a third party.**

242.    At Chris's direction, Stopczy improperly used his IT admin credentials to access and download Greg's emails without Greg's knowledge or permission.

**ANSWER: Denied.**

243.    At Chris's direction, Houbeck reviewed Greg's email for the purpose of obtaining a perceived advantage in this lawsuit and business leads.

**ANSWER: Denied. In further answer, defendants Stopczy and Houbeck state that these documents are the subject of an ongoing investigation involving the theft of company assets.**

244.    Despite several demands that Chris, Stopczy, and Houbeck relinquish administrative access and rights to Greg's FYB email, Chris persists in his refusal to allow Rich, and Rich has refused to tender, the administrative logins to Greg's FYB email.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations. In further answer,**

56

**defendants Stopczy and Houbeck state that it is not possible to transfer administrative access to a single email account or a single domain on a multi-domain tenant.**

245.    Consequently, Rich, Chris and Michelle still have full access to Greg's attorney client privileged emails.

**ANSWER: Neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

246.    An actual case and/or controversy exists between Greg, Chris, Stopczy, and Houbeck as to the administrative rights and access to Greg's FYB email.

**ANSWER: Denied.**

247.    The Court should further issue judgment declaring that Greg is the rightful owner to Greg's FYB email and the administrative rights thereto, that Chris's, Stopczy's, and Houbeck's access to Greg's FYB email was improper, and that Chris, Stopczy, and Houbeck must relinquish administrative control of Greg's FYB email and return it to Greg.

**ANSWER: Denied.**

## COUNT XIV: VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. 1030 *ET SEQ.* AGAINST CHRIS, STOPCZY, AND HOUBECK

248.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

249.    In addition to its criminal penalties, the CFAA gives a private cause of action for the damage and losses caused by the intentional, unauthorized, access of a protected computer.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary.**

57

250.    During the relevant period, Chris, Stopczy, and Houbeck were not authorized to access Greg's FYB email, the Microsoft server FYB's email was hosted on, and/or exceeded their authorization, and were not authorized to access Greg's emails.

**ANSWER: Denied.**

251.    Chris, Stopczy, and Houbeck intentionally and without consent, permission, or authorization gained access to confidential and sensitive information through Greg's FYB email.

**ANSWER: Denied.**

252.    Greg's FYB email account was hosted on a protected computer which at all relevant times operated and affected interstate commerce.

**ANSWER: Denied.**

253.    Without consent, permission or authorization, Chris, Stopczy, and Houbeck obtained Greg's confidential, proprietary, and sensitive business records and e-mails through their unauthorized access of Greg's FYB and/or access that exceeded existing permission or authorization.

**ANSWER: Denied.**

254.    Defendants' intentional access of the protected computers and FYB email account caused loss and damages to Greg, including, but not limited to, costs in excess of $5,000.00 incurred to investigate how Chris, Stopczy, and Houbeck obtained unauthorized access to Greg's FYB email and the extent of the unauthorized access, and such costs continue to accrue as the investigation continues.

**ANSWER: Denied.**

255.    Chris, Stopczy, and Houbeck took all such actions knowingly and intentionally, with the intent to defraud, and without Greg's consent or permission and in violation of the Computer Fraud and Abuse Act.

**ANSWER: Denied.**

256.    Chris, Stopczy, and Houbeck committed these tortious actions during the exercise of a nongovernmental or proprietary function.

**ANSWER: Denied.**

257.    Chris, Stopczy, and Houbeck did not act and could not have reasonably believed that he was acting within the scope of his authority at the time these tortious actions took place.

**ANSWER: Denied.**

258.    As a direct and proximate result of Chris's, Stopczy's, and Houbeck's unlawful and improper actions, Greg has suffered losses in an amount to be proven at trial.

**ANSWER: Denied.**

259.    Punitive and exemplary damages are appropriate because Chris's, Stopczy's, and Houbeck's actions were willful and intentional.

**ANSWER: Denied.**

260.    As a direct and proximate result of Chris's unlawful and improper actions, Greg has suffered losses in an amount to be proven at trial, but in excess of $25,000.00.

**ANSWER: Denied.**

261.    Greg has suffered irreparable harm through the exploitation of its confidential information.

**ANSWER: Denied.**

262.     Greg is entitled to compensatory damages and injunctive relief for Chris's violation of 18 U.S.C. §1030 et seq., including 18 U.S.C. §1030(g).

**ANSWER: Denied.**

## COUNT XV: VIOLATION OF FEDERAL WIRETAP ACT, 18 U.S.C. §2510 *ET SEQ* AGAINST CHRIS, STOPCZY, AND HOUBECK

263.     Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

264.     The Federal Wiretap Act ("FWA") criminalizes and creates civil liability for the intentional interception of electronic communications without a judicial warrant.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary.**

265.     The FWA provides a civil remedy for the interception of an electronic communication and the disclosure and use of an intercepted electronic communication.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary.**

266.     Pursuant to the FWA, the interception of an electronic communication is the acquisition of the contents of the communication through the use of any electronic devices, which include computer programs.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary.**

267.     Chris, Stopczy, and Houbeck are not authorized users of Greg's FYB email and/or exceeded their authorization.

**ANSWER: Denied.**

4870-9978-3058_6

268.    Without authorization, Chris, Stopczy, and Houbeck used a computer program to contemporaneously intercept Greg's electronic communications and used those communications to benefit themselves.

**ANSWER: Denied.**

269.    Chris, Stopczy, and Houbeck took all such actions knowingly and intentionally and in violation of the FWA.

**ANSWER: Denied.**

270.    Punitive and exemplary damages are appropriate because Chris's, Stopczy's, and Houbeck's actions were willful and intentional.

**ANSWER: Denied.**

271.    This Court should award Greg his attorneys' fees under 18 U.S.C. § 2520(b)(3).

**ANSWER: Denied.**

## COUNT XVI: VIOLATION OF THE STORED COMMUNICATIONS ACT AGAINST CHRIS, STOPCZY, AND HOUBECK

272.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

273.    The Stored Communications Act ("SCA") prohibits the intentional access of a facility through which an electronic communication service is provided without authorization, or intentionally exceeding authorization to access that facility, and the obtaining, altering, or prevention of authorized access to an electronic communication while it is in electronic storage in such system.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary.**

274.   In addition to its criminal penalties, the SCA provides a civil cause of action for any person aggrieved by any violation of the SCA.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary.**

275.   Chris, Stopczy, and Houbeck intentionally and without authorization gained access to confidential and sensitive information stored on a facility through which an electronic communications service is provided by accessing Greg's FYB email that was stored on Microsoft's cloud-based Office 365 servers.

**ANSWER: Admitted that emails for FYB are hosted on a cloud-based server that was paid for and controlled by an entity owned by Chris Yatooma. Denied as to the remaining allegations directed to Stopczy and Houbeck. As to the allegations directed at Chris Yatooma, neither admitted nor denied because defendants Stopczy and Houbeck lack knowledge or information to form a belief as to the truth of the allegations.**

276.   Pursuant to the SCA, Microsoft's cloud-based Office 365 servers are a facility through which an electronic communication service is provided.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary.**

277.   Without authorization, Chris, Stopczy, and Houbeck obtained confidential, proprietary, and sensitive business records and electronic communications of Greg while they were stored on Microsoft's cloud-based Office 365 serves.

**ANSWER: Denied.**

4870-9978-3058_6

278.    Chris's, Stopczy's, and Houbeck's unauthorized access or access in excess of authorization caused actual harm to Greg, including but not limited to, investigation costs, attorneys' fees, and the improper disclosure of confidential and sensitive information.

**ANSWER: Denied.**

279.    Chris, Stopczy, and Houbeck took all such actions knowingly and intentionally and in violation of the SCA.

**ANSWER: Denied.**

280.    Punitive and exemplary damages are appropriate because Chris's, Stopczy's, and Houbeck's actions were willful and intentional.

**ANSWER: Denied.**

281.    This Court should award Greg his attorneys' fees under 18 U.S.C. § 2707(c).

**ANSWER: Denied.**

## COUNT XVII: INVASION OF PRIVACY (INTRUSION UPON SECLUSION) AGAINST CHRIS, STOPCZY, AND HOUBECK

282.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

283.    Greg's FYB emails, particularly those sent to his attorney, are of a secret and private nature.

**ANSWER: Denied.**

284.    Greg's privileged emails related to proprietary, secret, and private subject matters.

**ANSWER: Denied.**

4870-9978-3058_6

285.    Greg indisputably had a right to keep the subject matter of his privileged communications private.

**ANSWER: Denied.**

286.    Chris, Stopczy, and Houbeck obtained Greg's emails and the information contained therein by surreptitiously accessing and downloading emails to which Chris, Stopczy, and Houbeck were not parties and had no legitimate reason to ever view or access.

**ANSWER: Denied.**

287.    Chris, Stopczy, and Houbeck obtained Greg's emails and private, confidential information through criminal activity (see, e.g., MCL § 750.540) and violations of the SCA, CFAA, and FWA, all of which have criminal components.

**ANSWER: Denied.**

288.    The manner in which Chris, Stopczy, and Houbeck obtained Greg's emails constitute criminal acts and is objectionable to a reasonable man.

**ANSWER: Denied.**

289.    Any invasion of the attorney-client privilege is per se objectionable to all persons, unreasonable or otherwise.

**ANSWER: Neither admitted nor denied as the allegations call for a legal conclusion to which no response is necessary, but denied that there was an "invasion" of the attorney-client privilege.**

290.    Greg has been damaged as a direct and proximate result of these Chris's, Stopczy's, and Houbeck's intrusions.

**ANSWER: Denied.**

64

291.    The full extent of Greg's damages is not yet known because Chris, Stopczy, and Houbeck remain in possession and control of copies of Plaintiffs' emails and privileged information and are using said information to interfere with Greg's interests and potentially other aspects of Greg's private life.

**ANSWER: Denied.**

### COUNT XVIII: CONVERSION PURSUANT TO COMMON LAW AND MCL 600.2919(A) AGAINST CHRIS, STOPCZY, AND HOUBECK

292.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

293.    At all relevant times, Greg owned and had a right to exclusive possession and control of his FYB email.

**ANSWER: Denied.**

294.    Chris, Stopczy, and Houbeck intentionally and wrongfully exercised distinct acts of dominion over Greg's FYB email.

**ANSWER: Denied.**

295.    The distinct acts of dominion by Chris, Stopczy, and Houbeck over Greg's FYB email were inconsistent with Greg's rights to exclusive ownership, possession, and control over Greg's FYB email.

**ANSWER: Denied.**

296.    The acts described above constitute unlawful conversion of Greg's FYB email.

**ANSWER: Denied.**

297.    As a result, Greg has been damaged in an amount in excess of $25,000.00, exclusive of interest, costs, and attorneys' fees.

4870-9978-3058_6

**ANSWER: Denied.**

298.    Pursuant to MCL 600.2919a, Greg may recover three (3) times the amount of actual damages sustained, plus costs and reasonable attorneys' fees.

**ANSWER: Denied.**

**COUNT XIX: CIVIL CONSPIRACY AGAINST CHRIS, STOPCZY, AND HOUBECK**

299.    Plaintiff incorporates the preceding paragraphs as if fully restated herein.

**ANSWER: Defendants Stopczy and Houbeck incorporate their answers to the preceding paragraphs as if fully restated herein.**

300.    Chris, Stopczy, and Houbeck maliciously and wrongfully conspired with one another for the illegal purpose of unlawfully accessing Greg's FYB email in violating of the Computer Fraud and Abuse Act and Stored Communications Act, converting Greg's FYB email, and improperly using Greg's FYB email.

**ANSWER: Denied.**

301.    Chris, Stopczy, and Houbeck maliciously and wrongfully conspired with one another to personally benefit from such underlying misconduct.

**ANSWER: Denied.**

302.    The conspiracy resulted in the unlawful and tortious activity of violating the Computer Fraud and Abuse Act, violating the Stored Communications Act, and common law and statutory conversion.

**ANSWER: Denied.**

303.    As a proximate result of this conspiracy, Chris, Stopczy, and Houbeck are jointly and severally liable to Greg for all injuries and damages sustained.

**ANSWER: Denied.**

4870-9978-3058_6

WHEREFORE, defendants Stopczy and Houbeck respectfully request that the Court enter a no cause of action as to plaintiff's complaint and award all other relief it deems appropriate.

Respectfully submitted,

BODMAN PLC

By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Defendants*

Dated: November 30, 2023

## AFFIRMATIVE DEFENSES

Stopczy and Houbeck submit the following affirmative defenses to Greg's complaint to which they demand a reply under the Michigan Court Rules:

1.     Greg's claims are estopped, released, and/or waived by his own conduct, including but not limited to his own bad faith, unclean hands, and/or fraud.

2.     Greg's claims are barred by the conduct of non-parties, including but not limited to the bad faith, unclean hands, and/or fraud of non-parties.

3.     Greg has failed to mitigate his damages.

4.     Greg has not suffered any damages directly or proximately caused by any actions taken by Houbeck or Stopczy.

5.     Greg has not shown an actual loss "associated with assessing or remedying damage to a computer or computer system arising from Defendants' acquisition of the subject e-mails" or

67

"an impairment to their business or computer capabilities" as required to make a claim under the CFAA.

6.   Greg has not shown defendants Houbeck or Stopczy did not have authorization to access Greg's emails as required to make a claim under the SCA.

7.   Greg's only clients were Chris Yatooma and entities owned by him and, therefore, there was no violation of the attorney-client privilege; the privilege was owned and held by Chris Yatooma and/or those related entities.

8.   As a licensed Michigan attorney, Greg Yatooma and the obligation under Michigan Rule of Professional Conduct 1.6 to maintain and secure his clients' confidences and maintaining any client confidence/information on an e-mail server—in the cloud or otherwise—that is owned and controlled by a third party is a violation of that duty. *See also* MRPC 1.1 (providing that a lawyer "shall provide competent and diligent representation to a client.")

9.   To the extent that Greg Yatooma permitted his own or so-called attorney-client communications or client confidences to be stored on workplace servers owned or controlled by third parties, he has no expectation to privacy in those e-mails.

10.   Greg Yatooma, individually, lacks standing to assert the rights of Fleming, Yatooma and Borowicz.

11.   Greg used a company-provided computer that was connected to cloud-based server e-mail and document management systems, all of which were paid for and controlled by an entity owned by Chris Yatooma during the scope of his employment with Chris Yatooma, as did other employees of companies owned by Chris Yatooma. By using company resources, Greg agreed that these emails are company property in accordance with applicable law, pursuant to the employee handbook that Greg drafted.

WHEREFORE, defendants Stopczy and Houbeck respectfully request that the Court enter a no cause of action as to plaintiff's complaint and award all other relief it deems appropriate.

Respectfully submitted,

BODMAN PLC

By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Melissa Benton Moore (P73018)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
abehrendt@bodmanlaw.com
mmoore@bodmanlaw.com
*Attorneys for Defendants*

Dated: November 30, 2023

## PROOF OF SERVICE

I hereby certify that on November 30, 2023, I electronically filed the foregoing papers with the Clerk of the Court using the E-filing system which will send notification of such filing to all attorneys of record.

/s/ J. Adam Behrendt (P58607)

69

4870-9978-3058_6