UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY YATOOMA,

Plaintiff,

v.

CHRISTOPHER YATOOMA, et al.,

Defendants.
_______________________________/

Case No. 2:23-cv-13050

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 79) AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 80)**

In early 2023, Defendant Rich Stopczy downloaded Plaintiff Gregory Yatooma's work e-mails. Greg now sues Stopczy, his brother Christopher Yatooma (Stopczy's boss), and Michelle Houbeck (Chris's executive assistant). Greg brings several tort claims arising out of this allegedly improper download. Both sides have moved for summary judgment. This Court will grant summary judgment in favor of Defendants on two of Greg's claims, but the remainder presents questions of fact that require resolution by a jury.

## I. BACKGROUND

### A. The Yatooma Brothers' Business Relationship

Around 2016, brothers Greg, Chris, and Jeffrey Yatooma[1] went into business together. ECF Nos. 10-2 at PageID.1891–92; 79-2 at PageID.5348. They operated several businesses, including Defendant MSY Capital Partners, LLC ("MSY"), nonparty Axon Properties ("Axon"), and various other entities (collectively the "Joint Entities"). ECF No. 79-2 at PageID.5348–49; *see also* ECF No. 10-2 at PageID.1892. The brothers did not formally document the businesses' ownership interests, but it was understood that each brother owned one-third of each business. ECF Nos. 10-2 at PageID.1892; 10-3 at PageID.1941 (Chris testifying that the brothers owned "33.3 percent each"); 11-5 at PageID.2196 (Greg testifying to the same).

At the end of 2018, Jeff separated from the brothers' various businesses. *See generally* ECF No. 10-4. In late 2019, the brothers executed a formal agreement under which Greg and Chris purchased Jeff's interest in the businesses. *Id.*

After Jeff left, Axon was the "parent company" and "holding company" for the Yatoomas' businesses. ECF No. 80-3 at PageID.5587. Axon was originally owned by Greg. *See* ECF No. 79-2 at PageID.5350. Defendants Stopczy and

[1] Because the Parties share a surname, this Court refers to them as Greg, Chris, and Jeff, as the Parties do in their papers.

Houbeck are Axon employees. ECF Nos. 79-5 at PageID.5400 (Stopczy); 1-1 at PageID.826 (Houbeck). Stopczy is Axon's IT Director, ECF No. 79-5 at PageID.5401, and Houbeck is Chris's "director of administration," ECF No. 81-2 at PageID.6285.

By 2022, Greg and Chris's relationship had significantly deteriorated. ECF No. 80-3 at PageID.5605. On December 14, 2022, they executed a buyout agreement,[2] under which Greg assigned many of his interests to Chris in exchange for a cash payment. *See* ECF Nos. 1-2 at PageID.1599; 39-3. That included Axon, which Greg assigned to Chris, effective that day. ECF No. 80-15 at PageID.6199.

**B. Fleming, Yatooma, and Borowicz**

Greg is an attorney, and he provided general counsel to the Joint Entities via his law firm Fleming, Yatooma, and Borowicz, PLC ("FYB"). *See* ECF No. 79-2 at PageID.5347. Greg asserts that he and the other named partners, Gavin Fleming and Christina Borowicz, are equal owners of FYB. *See* ECF No. 44-4 at PageID.4331–32. Chris contests this, claiming that Fleming was the only true partner in FYB. *See* ECF No. 80 at PageID.5481 n.2 (citing the FYB 2022 Annual Report at ECF No. 80-7 at PageID.6160); *see also* ECF No. 79-4 at PageID.5373. However,

[2] A Michigan jury recently determined this agreement is not an enforceable contract. *See* ECF No. 79 at PageID.5320, n.1 (referring to *Bloomfield Hills Swim & Tennis, LLC v. Yatooma*, No. 2024-204877-CB (Mich. Cir. Ct. 2024), which is now on appeal, No. 376792 (Mich. Ct. App. 2025)). That fact is irrelevant to the motions before this Court.

Chris has also testified that Greg was a "partner in" FYB. ECF No. 79-2 at PageID.5347. In any event, Chris admits that he has no ownership interest in FYB, ECF No. 79-4 at PageID.5373, and that Fleming and Borowicz are not his employees, *id.* at PageID.5375.

Chris asserts that Greg provided legal services, as "general counsel" to Chris's businesses, and that Greg received compensation from Chris for those services. ECF No. 13-2 at PageID.2791. He goes further and asserts that FYB was a "captive" law firm that worked exclusively for Chris's companies, such that Greg was akin to "an in-house attorney." *See* ECF No. 80-4 at PageID.5752. Greg, however, testified that he and FYB serviced clients beyond the Joint Entities. ECF No. 80-3 at PageID.5588, 5590.

FYB did have a unique setup where the Joint Entities would hire employees to "work under the FYB banner." ECF No. 80-3 at PageID.5589. Those employees were paid by Axon, *id*., and received the Axon employee handbook when they were hired, *see* ECF Nos. 80-6 at PageID.6158 (showing the Axon handbook signed by lawyer Mark James); 81-1 at PageID.6259 (Mark James was an FYB lawyer). In short, it appears that attorneys other than Fleming and Borowicz "weren't FYB employees." ECF No. 79-4 at PageID.5375. Rather, as Chris testified, they were Axon "employees [that] could use [FYB] e-mail addresses and operate under [the FYB] umbrella." *Id.*

Importantly, FYB set up its IT infrastructure to share IT services—including IT Director Stopczy—with the Joint Entities. ECF No. 79-5 at PageID.5403. In this role, Stopczy had administrative access to FYB's IT systems, including its Microsoft services for e-mail and cloud computing. *See* ECF No. 40-4 at PageID.3770. From May 2020 through December 2022, FYB's e-mails were hosted on a Microsoft tenant[3] owned by OCG Companies, LLC ("OCG"), another company owned by Chris. ECF Nos. 79-5 at PageID.5402–03; 79-7 at PageID.5445–46. However, Greg asserts that he owns the fyblaw.com domain name, *see* ECF No. 35-2 at PageID.2985, 2991, which he alleges confers ownership of the FYB e-mails, *see* ECF No. 83 at PageID.6722.

As part of the brothers' acrimonious split, Stopczy went to Greg's house in December 2022 and removed Greg and his assistant from the servers shared with Chris. ECF No. 79-5 at PageID.5406. At that point, Greg began paying for his own Microsoft tenant and believed his accounts—including the FYB e-mail account—were separate from Chris's accounts. ECF No. 35-2 at PageID.2984–85; *see also* ECF No. 79-8 at PageID.5449.

**C. Stopczy Downloads Greg's E-mails**

In January 2023, Stopczy accessed and downloaded the whole of Greg's FYB

[3] "A 'tenant' houses user emails, data, and other information for the tenant account owner." ECF No. 40-4 at PageID.3771.

e-mail account. ECF No. 79-5 at PageID.5409. Stopczy downloaded approximately 160,000 e-mails and saved them to Houbeck's computer. *Id.* at PageID.5409–10. He testified that Houbeck told him to download Greg's e-mails. *Id.* at PageID.5409. Houbeck testified to the same. ECF No. 81-2 at PageID.6292.

Chris explained that Greg, Greg's assistant, and two other former employees were "accessing the system without permission." ECF No. 79-4 at PageID.5367. So he instructed Stopczy to "investigate [that] security breach." *Id.* at PageID.5366–67. Chris testified that he did not instruct Stopczy specifically to download Greg's e-mails. *Id.*; *see also* ECF No. 79-5 at PageID.5411 (Stopczy testifying that he was not told the e-mail download was specifically at Chris's direction).

In any event, Stopczy testified that he had the *access* to download Greg's e-mails, but "Chris has the *authority*" to do so. ECF No. 79-5 at PageID.5410 (emphasis added). However, he has also submitted an affidavit stating that "[a]nytime [he] accessed FYB's emails, [he] believed [he] was authorized to do so" using his administrative credentials. ECF No. 40-4 at PageID.3773; *see also id*. at PageID.3774.

Chris admits that he reviewed some of Greg's e-mails around this time, which included e-mail conversations between Greg and his attorneys. ECF No. 79-4 at

PageID.5368–69. Chris explained that private investigators[4] reviewed the whole of Greg's inbox "at [his] direction and engagement." *Id.* at PageID.5370.

On February 14, 2023, Stopczy "updated" his initial collection, accessing Greg's e-mail a second time to download an additional swath of about 1,000 e-mails. ECF No. 79-5 at PageID.5410–11.

On February 17, 2023, Stopczy admitted to Greg that he had accessed and downloaded Greg's e-mails. ECF No. 79-5 at PageID.5413–15. That day, Stopczy deleted the download files and sent Greg videos showing the deletion. *Id.* at PageID.5415. Via text message, Stopczy confirmed to Greg that post-deletion, no copies existed. ECF No. 1-2 at PageID.1451–52. Greg told Stopczy that he did not want anyone accessing his e-mails. ECF No. 79-5 at PageID.5416. However, the following day, Stopczy re-downloaded Greg's entire e-mail inbox and gave Houbeck a copy. *Id.* at PageID.5415–16.

**D. Procedural History**

Greg initially filed suit in Oakland County Circuit Court against Chris and MSY in May 2023. *See* ECF No. 1-1 at PageID.7–17. Greg later filed an amended complaint, adding Defendants Stopczy and Houbeck, as well as claims that Defendants unlawfully accessed Greg's company e-mail in violation of Michigan

[4] One of private investigation firms Chris hired, Trident Investigation, is owned by Houbeck. ECF No. 79-4 at PageID.5369.

and federal law. *See* ECF No. 10-2. That Complaint contained a total of nineteen claims: twelve under Michigan law for various alleged breaches of the brothers' agreements, and seven under Michigan and federal law relating to the allegedly unauthorized e-mail access. *Id.* Defendants removed the case to this Court in December 2023. *See id*.

In November 2024, Judge McMillion declined to exercise supplemental jurisdiction over 12 of Greg's state-law claims and remanded those claims back to state court. ECF No. 51 at PageID.4989, 4999. The claims remaining before this Court are: Declaratory Relief as to Access and Administrative Rights to Greg's FYB E-mail (Count XIII); violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. ("CFAA") (Count XIV); violation of the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq*. (Count XV); violation of the Stored Communications Act, 18 U.S.C. 2701 *et seq*. ("SCA") (Count XVI); Invasion of Privacy (Count XVII); Conversion (Count XVIII); and Civil Conspiracy (Count XIX). *See* ECF No. 10-2 at PageID.1926–35. All of these claims are brought against Chris, Stopczy, and Houbeck; no claims remain against Defendant MSY. *See id.*

This case was reassigned to the undersigned on February 5, 2026. *See* ECF No. 88. The Parties have both moved for summary judgment. ECF Nos. 79; 80. Defendants seek summary judgment in their favor on all claims, *see* ECF No. 80, and Greg seeks summary judgment in his favor on Counts XIV, XVI, and XVII, *see*

ECF No. 79. The motions are fully briefed, ECF Nos. 82; 83; 84; 85, and this Court has determined that a hearing is not necessary. E.D. Mich. LR 7.1(f)(2).

## II. LEGAL STANDARD

To prevail on summary judgment, a movant must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 252, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52. Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

## III. DISCUSSION

### A. CFAA (Count XIV)

The CFAA "protects our Nation's computers from hacking." *Abu v. Dickson*, 107 F.4th 508, 514 (6th Cir. 2024). The CFAA's "computer trespass provision covers anyone who 'intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information.'" *Id.* (quoting 18 U.S.C. § 1030(a)(2)(C)).

This language "prohibits two types of digital trespassing: access *without authorization* and access that *exceeds authorization*." *Abu*, 107 F.4th at 514 (emphasis in original). Access without authorization "target[s] so-called outside hackers—those who access a computer without any permission at all." *Van Buren v. United States*, 593 U.S. 374, 389 (2021) (internal quotation marks, citation, and brackets omitted). In contrast, "[a]ccess that exceeds authorization targets 'inside hackers—those who access a computer with permission, but then exceed the parameters of authorized access by entering an area' of a computer that remains off-limits." *Abu*, 107 F.4th at 514 (quoting *Van Buren*, 593 U.S. at 389–90). For either type of trespass to be actionable, it must be intentional. 18 U.S.C. § 1030(a)(2).

#### *1. Access Without Authorization*

Greg argues that when Stopczy accessed his e-mails, he did so without authorization. *See* ECF No. 83 at PageID.6711. Specifically, Greg argues that any

authorization Stopczy had was revoked on February 17, 2023, when he told Stopczy not to access his e-mails. *See* ECF No. 79 at PageID.5336–37. Defendants argue that Stopczy had authorization as IT director and that Greg's conversation did not change or revoke Stopczy's IT credentials. ECF Nos. 80 at PageID.5488–89; 82 at PageID.6614–15.

Stopczy, as Axon's IT Administrator, indisputably had authorization to open e-mails on the OCG Microsoft tenant, including FYB e-mails hosted there.[5] *See* ECF No. 40-4 at PageID.3770–73; *see also Abu*, 107 F.4th at 514–15 (holding that the IT administrator had "undisputed authorization" to access accounts with his credentials). Because "[l]ogging in via his own credentials gave him access to users' emails," the CFAA's "prohibition on intentionally obtaining access 'without authorization' thus does not apply to [Stopczy]'s conduct," *see id.* at 515. And as Defendants persuasively argue, Stopczy's IT credentials were not revoked by Greg's statement on February 17, 2023. *Cf. United States v. Nosal*, 844 F.3d 1024, 1028, 1038 (9th Cir. 2016) (holding that the defendant lacked authorization to access his former employer's data once his "computer access was categorically revoked").

[5] Greg argues that Stopczy used this authorization for an improper purpose. *See* ECF No. 79 at PageID.5334. However, the Supreme Court has made clear that "users do not exceed authorized access merely by having 'improper motives for obtaining information that is otherwise available to them.'" *Abu*, 107 F.4th at 515 (quoting *Van Buren*, 593 U.S. at 378).

Therefore, Stopczy did not access Greg's e-mails "without authorization," as the CFAA uses that term. *See Abu*, 107 F.4th at 514–15.

*2. Access that Exceeds Authorization*

The more difficult question is whether any Defendant "exceed[ed] authorized access." 18 U.S.C. § 1030(a)(2)(C). Greg argues that Stopczy admitted he did not have the authority to access his e-mails, and that Chris and Houbeck never had authority to access his e-mails. *See* ECF No. 79 at PageID.5335, 5337–39. Defendants argue that they did not exceed their authority because Greg had no expectation of privacy in the e-mails. *See* ECF No. 80 at PageID.5489–95.

As the Sixth Circuit explained in *Abu*, "[h]aving authorization means having sanction or permission." 107 F.4th at 515 (internal quotation marks and citation omitted). "Exceeding authorization means entering an area of the protected system that is beyond the parameters of authorization." *Id.* (citing *Van Buren*, 593 U.S. at 389–90). For the reasons provided below, this Court finds that there is a question of fact as to whether Stopczy, Chris, and Houbeck exceeded their authority, so summary judgment will be denied as to this Count.

a. Stopczy

Stopczy admitted he did not have permission to access Greg's e-mails when, during his deposition, he readily distinguished between having "access," i.e., the literal ability to open Greg's e-mails, and "authority" to do so:

Q: All right. Did you believe you had the authority to download Greg Yatooma's FYB emails on that date?

A: I had the access.

Q: And the authority to do that?

A: Chris has the authority.

ECF No. 79-5 at PageID.5410.

Defendants do not contest this admission. Rather, they argue that Stopczy had authorization to download Greg's e-mails because they existed on the same Microsoft tenant as the rest of the Joint Entities' data. *See* ECF No. 80 at PageID.5490. This fact, however, lends support to the argument that Stopczy had access—not that he had authorization. Indeed, in *Abu*, the Sixth Circuit recognized that "two distinct companies [may] have access to a computer system," but users may not have universal permission to access that system. 107 F.4th at 516. Other courts have also recognized this distinction. *See, e.g.*, *Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158, 1238 (D. Nev. 2020) ("[O]wnership does not necessarily equate to control."); *Philips Med. Sys. P.R. Inc. v. CIS Partners Corp.*, 203 F. Supp. 3d 221, 236–37 (D.P.R. 2016) (rejecting argument that "ownership of the computer" confers "authority to give access to *both* the computer itself *and* any data or files stored therein"). This Court rejects the position that ownership of the Microsoft tenant alone provides authority to access every piece of data hosted on

that Microsoft tenant, particularly across different entities with different ownership structures. *See Abu*, 107 F.4th at 516.

Defendants also argue that Greg had no expectation of privacy in his e-mails. *See* ECF No. 80 at PageID.5492–95. This argument is misdirected because the CFAA does not incorporate an expectation-of-privacy element. *See generally* 18 U.S.C. § 1030. It asks solely whether the intrusive actor exceeded his authorization. *See generally Abu*, 107 F.4th 515–20. Defendants rely on caselaw addressing privilege in e-mails, but the cases on which they rely did not involve CFAA claims, rendering them distinguishable. *See, e.g.*, *In re Lightning Techs., Inc.*, 627 B.R. 349, 351 (Bankr. E.D. Mich. 2021) (discussing lack of attorney-client privilege over e-mails since respondents did not have assurance that the e-mails "would remain private or confidential"); *In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 257–58 (Bankr. S.D.N.Y. 2005) (discussing attorney-client privilege and work-product privacy in the workplace in relation to a document subpoena); *Stavale v. Stavale*, 957 N.W.2d 387, 389–92 (Mich. Ct. App. 2020) (similar).

Defendants also argue in reply that this Court must ask whether Stopczy had authorization to access the computer system broadly, rather than whether he had authorization to access Greg's FYB e-mails specifically. ECF No. 84 at PageID.6782–84. Again, *Abu* rejects this position: "The key point is whether the insider is prohibited from accessing *that part of the system*." 107 F.5th at 519 (citing

*Van Buren*, at 389–90) (emphasis added). To hold otherwise would permit anyone with a log-in and password for a computer to access every single piece of data on that computer, which is antithetical to the CFAA's prohibition on authorization that exceeds access. *See id*.

At bottom, Stopczy's admission about having access but not authority over Greg's FYB e-mails and the fact that ownership of the Microsoft tenant did not confer authority on him means there is a question of fact as to whether Stopczy's access exceeded authorization.

b. Chris and Houbeck

Before addressing the merits of Greg's CFAA claims against Chris and Houbeck, this Court must determine whether Chris or Houbeck may be held liable under the CFAA, since it was Stopczy who actually downloaded the e-mails.[6] To answer this question, this Court must ask another: whether "access" under the CFAA is limited to only personal access.

Importantly, "[t]he plain language of the CFAA requires only access—no modifying term suggesting the need for personal access is included." *Advanced*

[6] *Abu* explains that the CFAA permits application of ordinary vicarious liability principles. 107 F.4th at 514. However, "in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents." *Meyer v. Holley*, 537 U.S. 280, 286 (2003). Although Axon might be vicariously liable for Stopczy's actions, Axon is not party to this lawsuit.

*Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 327 (M.D. Pa. 2014) (internal quotation marks and citation omitted). Therefore, this Court finds persuasive the growing chorus of district courts that "have held that the act of inducing another to access a protected computer that he or she is otherwise not authorized to use constitutes 'access' within the meaning of the CFAA." *Id.* (collecting cases). This Court concludes that the CFAA does not limit claims against only the single individual that violated it, and in turn, Chris and Houbeck[7] may be held responsible for directing Stopczy to exceed his access if that direction exceeded their authority. *See id.*

Having determined that it is possible for Greg to bring a claim against Chris and Houbeck, this Court turns to whether these Defendants exceeded their authorization in directing Stopczy to access Greg's FYB e-mails.

Defendants contend that they were they were Greg's employer and argue that an employer retains access to former employees' e-mails when those employees

---

[7] There is an important caveat: if Houbeck did not direct Stopczy to download the e-mails, the mere fact that she received the allegedly improperly obtained e-mails is insufficient to impose liability on her. A CFAA claim requires "access," not mere receipt. Houbeck therefore cannot be held liable if the proofs only demonstrate her receipt of the e-mails. *See Experian Mktg. Sols., Inc. v. Lehman*, No. 1:15-CV-476, at *8 (E.D. Mich. Sept. 29, 2015) ("finding 'no legal basis in the CFAA or otherwise to justify imputing liability from the individuals who access a computer without authorization to others who may eventually benefit from their actions'") (quoting *Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 610, 615 (E.D. Pa. 2013)).

leave.[8] ECF No. 80 at PageID.5488–91. This is a hotly disputed issue: Chris testified that Greg was employed by Axon, like the other attorneys who were employed by Axon but used FYB e-mail addresses. ECF No. 79-4 at PageID.5373. On the other hand, Greg asserts that he was employed by FYB as its owner. ECF No. 44-4 at PageID.4331–32. It is undisputed that the two companies are separate, and that Chris has no ownership interest in FYB. ECF No. 79-4 at PageID.5373.

If a jury concludes Axon was Greg's employer, Defendants are correct that the employer generally has access to the employees' e-mails, and in turn, their access may be authorized. *See, e.g.*, *Stavale*, 957 N.W.2d at 393. On the other hand, if a jury concluded that FYB was Greg's employer, Stopczy testified that Fleming never authorized anyone other than Stopczy to access FYB's e-mails. *See* ECF No. 79-5 at PageID.5418. To the extent any access was conferred to Stopczy by Fleming, there is no evidence it was conferred to Chris or Houbeck. Therefore, there exists a question of fact as to whether Chris or Houbeck exceeded their authority by directing Stopczy to access Greg's e-mails.

*3. Intentional Access*

Next, this Court must evaluate whether there is a question of fact about Defendants' intent, given that any unauthorized access must be intentional to be

[8] To the extent Defendants rely on the ownership of the Microsoft tenant as establishing Chris and Houbeck's authority, that fails for the reasons stated above.

actionable. 18 U.S.C. § 1030(a)(2). Defendants argue that ownership of the Microsoft tenant led them to believe that they had authority to access Greg's FYB e-mails, so there is no evidence they intentionally exceeded that authorization. ECF No. 80 at PageID.5492. Greg responds that Stopczy admitted he intentionally exceeded his authorization, and that Chris and Houbeck never had authorization, so they necessarily intentionally exceeded it. ECF No. 83 at PageID.6718–19.

Again, there is a dispute of fact here as to each Defendant. Begin with Stopczy, who stated that he believed he had authorization to access FYB's e-mails, ECF No. 40-4 at PageID.3773, and Houbeck directed him to do so, ECF No. 79-5 at PageID.5409. In contrast, Greg presents evidence that Stopczy "hesitated" when asked to download the e-mails, showing he knew he did not have authorization to do so. ECF No. 79-5 at PageID.5414. This presents a question of fact requiring jury resolution.

As to Chris, he testified that he directed Houbeck—and in turn, Stopczy—to investigate the "security breach" by any means necessary. ECF No. 79-4 at PageID.5367–68. A reasonable jury could conclude that this statement demonstrates that Chris understood he possessed the authority to direct an investigation into Greg's emails. Greg replies that Chris's authority, if any, is based on the Microsoft tenant ownership theory. ECF No. 85 at PageID.6830–31. As discussed above, ownership does not confer authority. But a jury will have to resolve whether Chris

knew he did not have authority to access Greg's e-mails yet did so anyway, or merely believed he was acting within his authority. *See, e.g.*, *Anderson*, 477 U.S. at 255 ("Credibility determinations . . . are jury functions, not those of a judge.").

*4. Damages*

The final element of Greg's CFAA claim is damages: he must provide evidence that he suffered at least $5,000 in damages. 18 U.S.C. § 1030(a)(4). Defendants argue that Greg's evidence of damages consists solely of a self-serving affidavit, which they argue is insufficient. ECF No. 80 at PageID.5501–02. Greg responds that he has provided sufficient evidence because the threshold $5,000 includes "investigative costs" to respond to the alleged offense and assess damage, and he spent over $25,000 in litigation expenses. ECF Nos. 83 at PageID.6725–26; 83-10.

The CFAA's definition of loss extends to "any reasonable cost" caused by a violation. 18 U.S.C. § 1030(e)(11). That is a broad definition and includes "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense." *Id.* It also encompasses "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* "If a plaintiff is able to establish a loss of at least $5,000 in value, whether that be composed solely of costs identified in the first clause, or solely costs identified in the second clause, or a combination of

both, then he may recover under the statute." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073 (6th Cir. 2014). But litigation costs are not recoverable under the CFAA. *See, e.g.*, *Abu v. Dickson*, No. 20-10747, 2023 WL 3668515, at *4 (E.D. Mich. May 25, 2023) (collecting cases).

Thus, it is irrelevant that Greg has spent more than $25,000 in legal bills in this matter. *See id.* However, Greg alleges that he has incurred more than $5,000 in damages "in responding to, and investigating, this offense and conducting a damage assessment thereof." ECF No. 83-10 at PageID.6778. Although Defendants challenge this statement as self-serving, credibility determinations are inappropriate at the summary judgment stage. *See, e.g.*, *Anderson*, 477 U.S. at 255 ("Credibility determinations . . . are jury functions, not those of a judge."). Having provided some evidence that he suffered damages in excess of the statutory threshold, the Court finds that Greg's CFAA claims may proceed to trial. *See id.*

**B. Stored Communications Act (Count XVI)**

In Count XVI, Greg alleges that when Stopczy downloaded his e-mails, he also violated the SCA. ECF No. 10-2 at PageID.1930–32. Defendants argue the SCA claim rises and falls with the CFAA claim, *see* ECF No. 80 at PageID.5496, and the SCA only prohibits access of unopened e-mails because only unopened e-mails are in "electronic storage" as that term is used in the statute, *see* ECF No. 82 at

PageID.6606–09. Greg responds that the idea that "electronic storage" encompasses only unopened e-mails is a minority view. *See* ECF No. 85 at PageID.6833–34.

Like the CFAA, the SCA protects against intentional, unauthorized access of electronic communications. 18 U.S.C. § 2701(a). The SCA prohibits an individual from "intentionally access[ing] without authorization a facility through which an electronic communication service is provided or . . . intentionally exceed[ing] authorization to access that facility" to obtain an "electronic communication while it is in electronic storage." 18 U.S.C. § 2701(a); *see also* 18 U.S.C. § 2707(a) (allowing a civil cause of action under § 2701).

Electronic storage, as used in the SCA, is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Here, Greg has not produced any evidence that his e-mails were in temporary, intermediate storage, such as being in transit or temporarily held before he opened them. *See, e.g.*, *United States v. Councilman*, 418 F.3d 67, 81 (1st Cir. 2005) (explaining that the first category, § 2510(17)(A), applies to "temporary storage, such as when a message sits in an e-mail user's mailbox after transmission but before the user has retrieved the message from the mail server"). Therefore, § 2510(17)(A) does not apply.

The more interesting question is whether § 2510(17)(B) applies to e-mails that have been opened but remain stored in Greg's e-mail inbox. The circuits are split on this question. The Ninth Circuit has held—and Defendants agree, *see* ECF No. 82 at PageID.6607—that "[t]here is no dispute that [e-mail] messages remaining on [a] server after delivery are stored 'by an electronic communication service' within the meaning of 18 U.S.C. § 2510(17)(B)." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004). Defendants dispute, however, whether those e-mails are stored "for purposes of backup protection," as § 2510(17)(B) requires.

The Ninth Circuit held that opened e-mails "*are* stored 'for purposes of backup protection,'" so they fall within § 2510(17)(B)'s ambit. *Id.* (quoting § 2510(17)(B), emphasis added). The Fourth Circuit agrees. *Hatley v. Watts*, 917 F.3d 770, 786 (4th Cir. 2019) (agreeing with *Theofel*'s statement that "prior access is irrelevant to whether an e-mail is in storage"). And this Court has found the same. *See Bailey v. Bailey*, No. 07-11672, 2008 WL 324126, at *6 (E.D. Mich. 2008) ("This court agrees with the reasoning in *Theofel*. . . . The plain language of the statute seems to include emails received by the intended recipient where they remain stored by an electronic communication service."). But the Sixth Circuit has criticized *Theofel* in dicta, stating that "[o]ne commentator has noted that '*Theofel* is quite implausible and hard to square with the statutory test.'" *United States v. Warshak*, 631 F.3d 266, 291 (6th Cir. 2010) (citation omitted).

Nevertheless, this Court finds the logic of *Bailey*, *Theofel*, and *Hatley* compelling. As the *Hatley* court noted, something is "stored" when it is "reserved for future use," such that it "can be obtained as needed." 917 F.3d at 786 (citations omitted). An e-mail opened but not deleted is certainly "reserved for future use," and the recipient can "obtain[] [it] as needed." *See id.* Put simply, "[t]he fact that [Greg] may have already read the emails and messages copied by Defendant[s] does not take them out of the purview of the Stored Communications Act." *Bailey*, 2008 WL 324156, at *6.

Of course, this Court does not lightly disregard the Sixth Circuit's statement in *Warshak*. But the Sixth Circuit's statement is nonbinding dicta. *See Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) (noting that "only *holdings* are binding"). And although the Sixth Circuit recognized there is a difference of opinion on the issue, it did not purport to resolve the issue in this Circuit. *See Warshak*, 631 F.3d at 291.

Therefore, this Court concludes that all of Greg's e-mails are subject to the SCA. Defendants have provided no other reason they are entitled to summary judgment on Greg's SCA claims. Nor has Greg, given the questions of fact remaining on whether any Defendant exceeded authorization to access his e-mails. This claim will proceed to trial.

### C. Invasion of Privacy (Count XVII)

Greg argues that Defendants accessed his e-mail through "surreptitious means without his permission," which invaded his privacy. ECF No. 79 at PageID.5340–41. Defendants argue that Greg worked for Axon, so his e-mails were not "secret and private," he had no right to keep them private, and Stopczy's use of his credentials means his collection of the e-mails was not objectionable. ECF No. 80 at PageID.5497–98. Therefore, they argue, no reasonable person would find it objectionable that Chris, via Axon, intercepted his employee's e-mails. *Id.* at PageID.5498. Greg responds that his e-mails are "confidential business information" entitled to attorney-client privilege, rather than normal employee-employer privilege. ECF No. 83 at PageID.6721–22.

To establish a prima facia case of intrusion upon seclusion, the plaintiff must show three elements: "(1) the existence of a secret and private subject matter; (2) a right possessed by the plaintiff to keep that subject matter private; and (3) the obtaining of information about that subject matter through some method objectionable to a reasonable man." *Lewis v. LeGrow*, 670 N.W.2d 675, 687 (Mich. Ct. App. 2003) (citation omitted).

Here, Greg's e-mails are arguably "secret and private," particularly since he is an attorney and has the responsibility to maintain attorney-client privilege. *See Stavale*, 957 N.W.2d at 389–90 (explaining the attorney-client privilege); *see also*

Mich. Pro. Conduct R. 1.6 (2026) (describing attorneys' requirements to keep information with and about clients in confidence). Whether Greg had the right to keep those e-mails private is not suitable for summary judgment, given the question of fact regarding Greg's employer noted above. And Stopczy's allegedly unauthorized access to the e-mails is, again, arguably objectionable to the reasonable man. Therefore, neither party is entitled to summary judgment here.[9]

**D. Conversion (Count XVIII)**

Next, Greg claims that Defendants committed statutory and common law conversion by downloading his e-mails. ECF No. 10-2 at PageID.1393–94. Defendants argue that they are entitled to summary judgment because Greg did not own the e-mails. ECF No. 80 at PageID.5498–99. Greg responds that he owned the fyblaw.com domain, so the e-mails were his property. ECF No. 83 at PageID.6722–23. Given that there is a dispute of fact regarding ownership, this Court will not grant summary judgment on this count.

"Conversion arises from 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'"

[9] In reply, Defendants note that Greg asserts that FYB owned the e-mails, rather than Greg individually, meaning Greg does not have standing to pursue this claim. *See* ECF No. 84 at PageID.6787. However, Defendants cite no authority in support of this argument, and this Court finds it unpersuasive. Like the fact that ownership of the Microsoft tenant does not necessarily confer ownership of the entirety of the tenant's data to the Defendants, the fact that FYB may own the e-mails does not destroy Greg's interest in keeping those e-mails secret and private.

*Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 788 (E.D. Mich. 2014) (quoting *Foremost Ins. Co. v. Allstate Ins. Co*., 486 N.W.2d 600, 606 (Mich. 1992)). Importantly, only the person or entity that owns the "personal property" can assert a claim of conversion. *See id.*

Here, Greg asserts that he registered the fyblaw.com domain, which confers ownership. *See* ECF No. 35-2 at PageID.2985. Defendants point out that registration alone does not prove ownership. *See* ECF No. 82-3 at PageID.6681 (stating in the Domain Name Registration Agreement that by signing, Greg "acknowledge[s] and agree[s] that the registration of a domain name does not create any proprietary right for you, the registrar, or any other person in the name used as a domain name"). Based on this language, this Court finds that the domain ownership *alone* cannot create a dispute of fact regarding the ownership of the FYB emails. However, Greg asserts that his ownership of FYB, ECF No. 44-4 at PageID.4331, conferred ownership of FYB's property, including its e-mails, ECF No. 83 at PageID.3722. Chris argues to the contrary: it was actually OGC that owned and controlled the FYB e-mails. *See* ECF No. 82 at PageID.6598. At the risk of redundancy, this Court holds that the question of fact as to ownership precludes summary judgment.

**E. Conspiracy (XIX)**

As to Greg's conspiracy claim, Defendants argue they are entitled to summary judgment because no torts were committed, or in the alternative, they cannot be

liable as actors within the same corporate entity under the intracorporate conspiracy doctrine. ECF No. 80 at PageID.5499–5501. Greg responds that Defendants were not working in their capacity as Axon employees for FYB's benefit; rather, they were working for Chris's benefit in his personal dispute with Greg. ECF No. 83 at PageID.6723–24.

A claim of "civil conspiracy is not a claim of its own; it is necessary to prove a separate, actionable tort." *Breath v. City of Detroit*, 524 F. Supp. 3d 704, 709 (E.D. Mich. 2021) (internal quotation marks, citation, and brackets omitted). Because this Court finds that several of Greg's claims should continue to trial, his claim of civil conspiracy is not subject to summary judgment on this ground alone. *See id.*

Nor is the conspiracy claim subject to summary judgment under the intracorporate conspiracy doctrine because there remain questions of fact about the nature of Defendants' actions with respect to Greg's employment. If, as Chris asserts, he, Stopczy, and Houbeck were working together within the scope of their employment at Axon to investigate a security breach, *see* ECF No. 80 at PageID.5499, then they cannot be liable for conspiracy because "[u]nder the so-called 'intracorporate conspiracy doctrine,' individuals acting in their capacities as employees of the same entity . . . cannot conspire with each other." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 887 (6th Cir. 2024). But given the brothers' lengthy history of contentious disputes, a reasonable jury could conclude that Chris

was acting beyond the scope of his employment, and instead, acted for his personal benefit in his dispute with Greg. Therefore, Defendants are not entitled to summary judgment on Count XIX.

### F. Wiretap Act (Count XV)

Greg admits that an actionable claim under the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq*., requires contemporaneous interception, and no such interception occurred here. ECF No. 83 at PageID.6726, n.8. Therefore, Defendants are entitled to summary judgment on Count XV.

### G. Declaratory Relief (Count XIII)

Count XIII of Greg's complaint seeks declaratory relief. Declaratory relief is a remedy, not "an independent cause of action." *Ebu v. United States Citizenship & Immigration Servs*., 134 F.4th 895, 902 (6th Cir. 2025). Therefore, Defendants are technically entitled to summary judgment on this Claim, but the Court notes that the remedy of declaratory relief remains available if Greg succeeds on his substantive claims. *See, e.g.*, *MS Rentals, LLC v. City of Detroit*, 362 F. Supp. 3d 404, 412 (E.D. Mich. 2019).

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 79, is **DENIED**.

It is further **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 80, is **GRANTED IN PART** as to Counts XIII and XV, and **DENIED IN PART** as to Counts XIV, XVI, XVII, XVIII, and XIX.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: September 30, 2026